```
1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
2                       JACKSONVILLE DIVISION

3    UNITED STATES OF AMERICA,      Case No. 3:21-cr-22(S4)-MMH-MCR

4         Plaintiff,                April 10, 2023

5    v.                             9:11 a.m. - 5:28 p.m.

6    KRISTOPHER JUSTINBOYER ERVIN   Courtroom 10B
     and MATTHEW RAYMOND HOOVER,
7
          Defendants.
8    _____

9
                            JURY TRIAL
10                        (VOLUME 1 of 9)

11
            BEFORE THE HONORABLE MARCIA MORALES HOWARD
12                 UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19   OFFICIAL COURT REPORTER:

20        Katharine M. Healey, RMR, CRR, FPR-C
          PO Box 56814
21        Jacksonville, FL 32241
          Telephone: (904) 301-6843
22        KatharineHealey@bellsouth.net

23

24                         (Proceedings reported by stenography;
                            transcript produced by computer.)
25
```

1                        A P P E A R A N C E S

2

3    COUNSEL FOR THE GOVERNMENT:

4        **LAURA C. TAYLOR, ESQUIRE**
         **DAVID MESROBIAN, ESQUIRE**
5        United States Attorney's Office
         300 North Hogan Street, Suite 700
6        Jacksonville, FL 32202

7

8    COUNSEL FOR DEFENDANT ERVIN:

9        **ALEX KING, ESQUIRE**
         Monroe & King, P.A.
10       1805 Copeland Street
         Jacksonville, FL 32204
11

12

13   COUNSEL FOR DEFENDANT HOOVER:

14       **ZACHARY Z. ZERMAY, ESQUIRE**
         Zermay Law
         1762 Windward Way
15       Sanibel, FL 33957

16   - A N D -

17       **MATTHEW LAROSIERE, ESQUIRE**
         6964 Houlton Circle
18       Lake Worth, FL 33467

19

20

21

22

23

24

25

1                        I N D E X

2                                                    PAGE

3  INITIAL MATTERS......................................... 6

4  DEFENDANT ERVIN'S RENEWED MOTION TO DISMISS............. 24

5  DEFENDANT HOOVER'S RENEWED MOTION TO DISMISS............ 24

6  JURY SELECTION......................................... 28

7  JURY SWORN............................................. 201

8  COURT'S INITIAL JURY INSTRUCTIONS...................... 201

9  GOVERNMENT'S OPENING STATEMENT BY MR. MESROBIAN......... 216

10 DEFENDANT HOOVER'S OPENING STATEMENT BY MR. ZERMAY...... 225

11 DEFENDANT ERVIN'S OPENING STATEMENT BY MR. KING......... 227

12 GOVERNMENT'S WITNESSES:

13 **SPECIAL AGENT JESSE HOOKER**

14   DIRECT EXAMINATION BY MS. TAYLOR...................... 239

15

16

17

18

19

20

21

22

23

24

25

1               E X H I B I T S

2   ADMITTED IN EVIDENCE                                    PAGE

3     GOVERNMENT'S EXHIBIT 18................................ 248

4     GOVERNMENT'S EXHIBIT 19................................ 252

5     GOVERNMENT'S EXHIBITS 20 and 20A...................... 257

6     GOVERNMENT'S EXHIBIT 21................................ 258

7     GOVERNMENT'S EXHIBIT 22................................ 262

8     GOVERNMENT'S EXHIBIT 23................................ 264

9     GOVERNMENT'S EXHIBIT 24................................ 265

10    GOVERNMENT'S EXHIBITS 25, 25A, and 25B................ 273

11    GOVERNMENT'S EXHIBITS 93, 94, 95, and 95A-95E......... 267

12    GOVERNMENT'S EXHIBIT 114.............................. 243

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2  April 10, 2022                           9:11 a.m.

3                      -   -   -

4       (All parties present.  Prospective jurors not present.)

5            COURT SECURITY OFFICER:  All rise.  The United States

6  District Court in and for the Middle District of Florida is now

7  in session.  The Honorable Marcia Morales Howard presiding.

8            Please be seated.

9            THE COURT:  Give me one moment to get my computer

10  going.

11            All right.  This is Case No. 3:21-cr-22(S4)-MMH-MCR,

12  United States of America vs. Kristopher Justinboyer Ervin and

13  Matthew Raymond Hoover.

14            Ms. Taylor and Mr. Mesrobian are here on behalf of

15  the United States.  And Ms. Taylor, if you could introduce the

16  case agent.

17            MS. TAYLOR:  Yes, Your Honor.  With us is Special

18  Agent Jason Slosson of the Bureau of Alcohol, Firearms, Tobacco

19  and Explosives.

20            THE COURT:  All right.  And I have Mr. King here.

21  And Mr. King, let me ask you to introduce the folks beside you.

22            MR. KING:  Yes, Your Honor.  Seated to my left is

23  Theresa Hall, she's a paralegal with my office, and then

24  Mr. Ervin.

25            THE COURT:  All right.  And Mr. Zermay and

1    Mr. Larosiere are here.

2             MR. ZERMAY:  Good morning, Your Honor.  Zachary

3    Zermay here for defendant Matthew Raymond Hoover.

4             THE COURT:  And you are Mr. Hoover?

5             DEFENDANT HOOVER:  (Raises hand.)

6             THE COURT:  All right.  Ms. Taylor, is the United

7    States prepared to proceed?

8             MS. TAYLOR:  Yes, Your Honor.

9             THE COURT:  You, Mr. King?

10            MR. KING:  Yes, Your Honor.

11            THE COURT:  And you, Mr. Zermay?

12            MR. ZERMAY:  Yes, Your Honor.

13            THE COURT:  All right.  So just a few housekeeping

14   matters before we get the jury brought up.

15            Ms. Taylor, for purposes of jury selection, can you

16   identify the law enforcement agencies that were involved in the

17   investigation and for the prosecution, please.

18            MS. TAYLOR:  Yes, Your Honor.  The agencies involved

19   would be ATF, the United States Postal Inspection Service, and

20   IRS Criminal Investigation.

21            THE COURT:  Any JSO?

22            MS. TAYLOR:  No, Your Honor.  There was some

23   assistance from Columbia County Sheriff's Office associated

24   with Mr. Ervin's arrest.  It may be mentioned, but there won't

25   be any testimony from any Columbia County Sheriff's officers,

 1   nor will we be mentioning any of them by name.

 2          THE COURT:  All right.  So for purpose of jury

 3   selection, I intend to tell the jury the following about the

 4   case:

 5          Ladies and gentlemen, in this case, the United States

 6   has charged defendants Kristopher Justinboyer Ervin and Matthew

 7   Raymond Hoover with committing a number of federal offenses.

 8   Specifically, the United States charges Mr. Ervin and

 9   Mr. Hoover with conspiring to transfer items which the United

10   States alleges constitute unregistered machinegun conversion

11   devices, in violation of federal law.  Additionally, the United

12   States charges Mr. Ervin and Mr. Hoover with individual

13   substantive counts of transferring what are alleged to be

14   unregistered machinegun devices.

15          Mr. Ervin is also charged with several counts of

16   possessing alleged unregistered machinegun conversion devices

17   and with structuring cash withdrawals from his bank account in

18   order to evade currency transaction reporting requirements.

19          Both Mr. Ervin and Mr. Hoover have entered not guilty

20   pleas to each and every charge brought against them.

21          Any questions or concerns regarding that statement of

22   the case, Ms. Taylor?

23          MS. TAYLOR:  No, Your Honor.

24          MR. KING:  Nothing on behalf of Mr. Ervin.

25          THE COURT:  Okay.  Mr. Zermay?

1          MR. ZERMAY:  No, Your Honor.

2          THE COURT:  Okay.  So that's what we will read.

3          I've got a witness list -- well, where are my witness

4    lists?  Oh, here.

5          I've got a witness list from the United States and I

6    have a witness list from Mr. Ervin that identifies only one

7    person.  Are these all of the witnesses we anticipate hearing

8    from?  Because I do need to identify all witnesses, even

9    potential witnesses, for the jury and jury selection.

10         MS. TAYLOR:  For the United States, those are all of

11   our anticipated witnesses, Your Honor.

12         THE COURT:  Okay.  Mr. King, just the one?

13         MR. KING:  Yes, we had listed -- we had planned on

14   listing witnesses --

15         COURT REPORTER:  I'm sorry, I can't quite hear you.

16         MR. KING:  Sorry.

17         We had planned on listing several of the government's

18   listed witness.  Once we saw that, we deleted those out,

19   so . . .

20         THE COURT:  Okay.  And Mr. Zermay, I don't have a

21   witness list.  Is that because all of your witnesses are

22   already identified elsewhere?

23         MR. ZERMAY:  That's correct, Your Honor.

24         THE COURT:  Okay.  To the extent that you-all are

25   planning to call any of the government's witnesses, unless you

1   have made arrangements with Ms. Taylor, you need to make sure

2   that you have separately subpoenaed them.  So just -- I'll just

3   say that out loud.

4          Okay.  So the voir dire.  Much of the voir dire that

5   you-all provided me is already covered in my standard voir

6   dire, so the only things that I'm going to address with you-all

7   are questions about -- well, areas that -- of questions that

8   you-all have proposed that I think are on the fence that maybe

9   you could explain to me why I should ask.

10          There's a whole category of questions -- and I'll

11   just start with that.  Mr. Hoover's requested voir dire, with

12   the exception of about four questions, the proposed questions

13   are simply not appropriate questions.  They won't aid in the

14   process of selecting a fair and impartial jury to decide the

15   case; indeed, many of them are irrelevant and potentially

16   inflammatory.  They risk tainting the entire venire and I'm not

17   inclined to ask them.  I can't imagine what good it would do to

18   ask them why someone catches COVID 19.  I can't imagine why it

19   would help to ask people whether they believe manufacturers of

20   opioids are responsible for overdose deaths.

21          I have no intention of asking people whether they

22   read the instructions before assembling toys they give their

23   children over the holidays.

24          In my view, those questions are ridiculous.  Asking

25   whether Will Smith was justified in hitting Chris Rock.

1          There are only four questions on that list that I

2    intend to talk to you-all about.  They're 7, 9, 17, and 18,

3    possibly 10, because the rest are simply inappropriate,

4    irrelevant questions.

5          So what I'm going to do is talk about a few questions

6    that are -- that I want to hear from you on.  Otherwise, if I

7    don't talk to you about a question, you can assume that in my

8    view, it's either covered by my standard voir dire or I have

9    determined it to be an inappropriate question.  Which means

10   that when we finish, if there's a question of yours that I

11   haven't asked the jury that you think was not covered, it will

12   be incumbent upon you at sidebar to ask me about that question

13   and ask me to address it at that time.

14         Okay.  So you -- ATF . . .

15         Let me go through and find what I wanted to talk to

16   you about.

17         So starting with the government's voir dire, on

18   question 6, which is on page 8, what I intend to do,

19   Ms. Taylor, is just ask the jury to raise their paddle if they

20   own firearms and also to raise their paddle if they belong to

21   the various groups.  I think I may break that up and ask them

22   specifically about the NRA and then separate -- and then

23   separately about those others.

24         Turning to question 10, I had a question about --

25   there's a broad question, "Does any member possess firearms

1  that are regulated by the National Firearms Act, such as

2  machinegun silencers, short-barreled rifles, or short-barreled

3  shotguns?"

4          My question there was did you want those broken out?

5  Do you want -- do you-all want to know separately whether they

6  possess those, or just as a group?

7          MS. TAYLOR:  I think that they can be as a group,

8  Your Honor.  I think generally what we were seeking was just

9  information on whether the person has experience with

10  registering a firearm under the NFA.  And those are all

11  firearms that would be required to be registered.

12          THE COURT:  All right.  Mr. King or Mr. Zermay, do

13  you see that any differently?

14          MR. KING:  No, Your Honor.  I agree with Ms. Taylor.

15          MR. ZERMAY:  No, Your Honor.

16          THE COURT:  Okay.  All right.  So that was it for the

17  government's.

18          For Mr. Ervin's, I think it was largely covered or I

19  am intending to ask it.

20          I did have a question, Mr. King, about question 17:

21  "Do you have any feelings about people of different races,

22  gender, nationality, or religion that would affect your ability

23  to be a fair and impartial juror?"

24          I sort of wondered how that fit in this particular

25  case.

1          MR. KING:  Your Honor, as a general practice, I like

2     that question.  I think if anybody would raise their hand on

3     that, generally it would be problematic from a juror's

4     standpoint.

5          There's nothing particular as to Mr. Ervin that I

6     think would come out in trial that would use that issue.

7          THE COURT:  Okay.  So what you're saying is that

8     you -- in your view, if there's somebody that feels they have a

9     strong bias, then they may -- even if it's not as particularly

10    germane to this case, you think that might potentially be a

11    not-good juror.

12         MR. KING:  That would be correct.

13         THE COURT:  All right.  That's fair enough.  I can

14    ask that.

15         So in your question 31 you want them to identify what

16    type of firearm they own.  So normally I would just have them

17    raise their paddle, although I guess I can understand why in

18    this case you would want them to identify them.

19         Ms. Taylor, any thought on that?

20         MS. TAYLOR:  We don't have any concerns about that

21    question, Your Honor.

22         THE COURT:  Okay.  I think, Mr. King, I -- you're

23    asking, "Do you own or possess, or do any members of your

24    immediate family own or possess, firearms?"  And I think that

25    that goes a little broad because "members of my immediate

1    family" include my siblings that may live states -- I'm fine

2    asking "you or any member of your household."

3          MR. KING:  And Your Honor, looking at it again, with

4    that concern, I think "household" is what I was getting at.

5    But I think that's a better way to ask that.

6          THE COURT:  Okay.  All right.  Any objection to that?

7          MS. TAYLOR:  No, Your Honor.

8          MR. ZERMAY:  No, Your Honor.

9          THE COURT:  Okay.  So that's it for -- and you can

10   assume that the others, as I said, I'm either intending to ask

11   them or they're covered by my voir dire.  And if I don't ask

12   them, then it will be incumbent upon you to tell me why what I

13   didn't ask is important.  And you'll be given an opportunity at

14   sidebar to do that.

15         MS. TAYLOR:  Your Honor, could I just ask for

16   clarification?  On our voir dire question number 6 on page 8,

17   there was a -- this was the page that has the question about

18   membership in different organizations.  And then the next

19   question was, "Do you believe that Congress has the authority

20   to regulate the possession of dangerous and unusual weapons,

21   including machine guns?"  Was the Court intending to ask that

22   question?

23         THE COURT:  I rephrased it a little bit, but I am.  I

24   was intending to ask it as, "Does anyone here believe that

25   Congress does not have the authority to regulate the possession

1    of dangerous and unusual weapons, including machine guns?"

2              MS. TAYLOR:  Okay.  Thank you, Your Honor.

3              THE COURT:  And then, as I said, to Mr. Hoover's voir

4    dire, much of it I think was not appropriate.

5              One question that is proposed is whether anyone

6    believes that AR-15s should be banned.

7              Ms. Taylor, any objection to that question?

8              MS. TAYLOR:  Your Honor, I guess it's -- I mean,

9    that's not what this case is about.  This is about -- this is

10   not about kind of standard-issue common weapons like the AR-15

11   or a pistol.  It's about machinegun conversion devices.  So I'm

12   just not sure that it's pertinent here, whether a person

13   believes that the gun should be banned with regard to whether

14   they would follow the law in this case, even if they have a

15   personal belief or a political viewpoint.

16             THE COURT:  Am I correct in understanding that the

17   conversion device acts on an AR-15?

18             MS. TAYLOR:  It does, Your Honor.

19             THE COURT:  Then I think it's probably a fair

20   question.  And certainly we could follow up with can they

21   follow the law.  But if somebody truly believes that an AR-15

22   should be banned, then potentially they may have a strong

23   opinion about a device that acts on an AR-15.  So I'm

24   intending -- inclined to ask the question.

25             But I'm not inclined to ask why or why not,

1   Mr. Zermay.  What I will follow up on is reminding them that

2   the AR-15 is -- or can be -- can be -- lawfully possessed and

3   asking if they can follow -- put aside any personal opinion

4   they have and follow the law as I instruct them on it.

5            Will that suffice, Ms. Taylor?

6            MS. TAYLOR:  Yes, Your Honor.

7            THE COURT:  Mr. Zermay?

8            MR. ZERMAY:  Yes, Your Honor.  Just as to the why or

9   why not, I think that might be -- if I could push back on that

10  a little bit.

11           I do think it would be important to sort of get as to

12  why they would want them to be banned one way or the other,

13  because these rifles were used in a lot of school shootings

14  recently, and we sort of want to parse out their feelings with

15  respect to that.  So that is defendant Hoover's -- the

16  why-or-why-not aspect of the question.

17           THE COURT:  All right.  I'll consider that if -- I'll

18  consider asking that in private depending on the answers that

19  we get.

20           MR. ZERMAY:  Thank you, Your Honor.

21           THE COURT:  I do think that question 9, which asks if

22  someone believes that guns are just inherently bad, is an

23  appropriate question in this particular case.

24           Question 17 about, "Do you believe law enforcement

25  can lie," I cover a -- I cover that -- I ask it differently, as

1    you might imagine, but that would be covered in my standard

2    voir dire, as will be whether they have friends or family in

3    the military.  Well, I don't ask about whether they have

4    friends.  I can't imagine that there's a person out there that

5    doesn't know somebody, but certainly I'll cover whether they

6    have any family in the military.

7            The only other one I guess I want to hear from the

8    government on is question number 10, Ms. Taylor.

9            MS. TAYLOR:  Your Honor, I mean, I'm not even sure

10   what's meant by the term "assault weapon."  It seems very

11   nebulous to me.

12           I also think, particularly with the fact that the

13   Court is asking question number 7 and number 9, that those

14   questions should cover the waterfront on whether a person has a

15   personal belief that firearms are bad or certain kinds of

16   firearms should be banned.  And so I just don't know that it's

17   necessary to go down this road since I'm not even sure what

18   that question means exactly.

19           THE COURT:  I wasn't inclined to ask it, Mr. Zermay.

20   And particularly, as Ms. Taylor points out, in light of

21   questions 7 and 9, I don't -- I don't think it's necessary.  If

22   you have -- if there's something particularly you're trying to

23   elicit from that question you can tell me and I can see if we

24   can rephrase it, but I think as phrased it's not necessary.

25           MR. ZERMAY:  Yes, Your Honor.  Perhaps rephrasing it

1   might be the appropriate mechanism to sort of get what we're

2   trying to parse with this.

3          As to assault weapons, we hear a lot in the media

4   that there's a --

5          COURT REPORTER:  I'm sorry, can I get you to speak

6   into a microphone?  I'm sorry, Your Honor.

7          MR. ZERMAY:  There are these assault weapons, they

8   are weapons of war that shouldn't be on our streets and this

9   is -- we only need hunting rifles.  And the AR-15 has been cast

10  as sort of one of these weapons of war.  And similarly, if this

11  case, which does involve what the government alleges converts

12  an AR-15 into a machinegun, then necessarily that would bleed

13  over into whether or not they have a belief that guns should be

14  banned or merely just hunting weapons and hunting rifles.

15         THE COURT:  I'm still not quite following that.  I

16  mean, I understand what you're saying, but I'm not sure how I

17  can ask a question about that.

18         Yes, Ms. Taylor?

19         MS. TAYLOR:  Your Honor, the way Mr. Zermay has

20  explained this fundamentally, it seems to be duplicative of the

21  question that the Court has already agreed to ask about whether

22  AR-15s should be banned.

23         THE COURT:  Mr. Zermay, unless you can propose a way

24  to rephrase it, what you've just explained to me, I'm not

25  finding a way in my brain to rephrase it.  So if you can

1    rephrase it as an appropriate question, I'll consider it, but

2    as it's currently phrased and as you explained, I'm not

3    inclined to go down that path.

4              MR. ZERMAY:  And Your Honor, when you mean by

5    "rephrase the question," are you going to give us a few moments

6    or a recircle back later on in the day, or do we need to

7    propose it at this exact moment?

8              THE COURT:  Well, you can propose it at sidebar later

9    if you -- that will give you some time.

10             MR. ZERMAY:  Of course.  We appreciate that then,

11   Your Honor.

12             THE COURT:  Okay.

13             All right.  So of Mr. Hoover's voir dire, 1 through 6

14   are not appropriate questions.  I don't intend to ask them.

15   I'll ask number 7, number 8.  Although, again, the why or

16   why-nots I may or may not follow up.  I'll ask number 9.

17             MS. TAYLOR:  Your Honor, I think --

18             THE COURT:  Yes.

19             MS. TAYLOR:  I'm sorry.  Mr. -- were you talking

20   about Mr. Hoover's 8, "Do you believe the Second Amendment is

21   outdated and should be repealed?"

22             THE COURT:  I'm not asking the "is outdated," I'm

23   just going to ask if they believe it should be repealed.  I do

24   think that's a relevant question in this case, but I'm not

25   going to ask them to discuss their feelings about it.  I just

 1    think that's something that we need to know.

 2           Do you have an objection to that question,

 3    Ms. Taylor?

 4           MS. TAYLOR:  It just -- Your Honor, it just wasn't

 5    one of the ones that the Court had noted earlier.

 6           THE COURT:  You're right.  I apologize, I left it

 7    off.

 8           So 7, 8, and 9.  I'm not going to ask 10 as phrased.

 9    If -- you-all -- I've said that you can give me a revised

10    version of it.  And then I think that 17 and 18 are covered.

11           The others, 11 through 16, I do not intend to ask.  I

12    don't find them to be relevant or proper and I don't think that

13    they will in any way aid to seating a fair and impartial jury

14    in this case.

15           All right.  So that's it for the voir dire.

16           I'm going to remind you that I will give the jury

17    their instructions before closing argument, so keep that in

18    mind.

19           Ms. Taylor, how long do you anticipate for your

20    opening?

21           MR. MESROBIAN:  Your Honor --

22           THE COURT:  Oh, Mr. --

23           MR. MESROBIAN:  -- it will be me, and it will be no

24    more than 15 minutes, Your Honor.

25           THE COURT:  I'm sorry?

1           MR. MESROBIAN:  No more than 15 minutes.

2           THE COURT:  Mr. King?

3           MR. KING:  Between 15 and 20 minutes, Your Honor.

4           THE COURT:  And who will be opening for Mr. Hoover?

5           MR. ZERMAY:  I will, Your Honor.  No more than -- no

6   more than 15 to 20 minutes too.

7           THE COURT:  Okay.  And Mr. King and Mr. Zermay, you

8   both plan on doing an opening immediately following the

9   government, not at the close of the government's case; is that

10  right?

11          MR. KING:  That's correct, Your Honor.

12          MR. ZERMAY:  Yes, Your Honor.

13          THE COURT:  All right.

14          And Ms. Taylor, tell me again how long you anticipate

15  for trial.

16          MS. TAYLOR:  Your Honor, our best guess is that we

17  are going to be wrapping up probably next Wednesday.

18          I would note for the Court, I have chemo next

19  Tuesday, so I think I had mentioned that when we scheduled this

20  trial, although I didn't know what day it was but that I may

21  have that during the trial time.  And so if it is okay with the

22  Court, we would ask to take Tuesday next week off so that I can

23  do that and then come back on Wednesday and finish our

24  evidence.

25          THE COURT:  Okay.

1        MS. TAYLOR:  If it turns out we're way behind

2   schedule, I can look into rescheduling that, but that's -- that

3   was how we anticipated things to move.

4        THE COURT:  All right.  Mr. King, how long do you

5   anticipate for Mr. Ervin's case?

6        MR. KING:  Your Honor, I wouldn't imagine it would be

7   more than a day.  Most of the witnesses will be handled in the

8   government's case.

9        THE COURT:  I need you to speak into a microphone.

10        MR. KING:  I apologize.  I can't imagine it would be

11   more than a day.  I think most of this is going to be covered

12   during the government's case.

13        In terms of Mr. Ervin's position taking off next

14   Tuesday, we would have no objection to that.

15        THE COURT:  Okay.

16        And Mr. Zermay?

17        MR. ZERMAY:  Yes, I concur with Mr. King.  I think

18   most of it's going to be covered in the government's case, so

19   we have no objection to taking Tuesday off.

20        THE COURT:  And will you need a day as well or do you

21   think that the two of you combined would be one day?

22        MR. ZERMAY:  We need a day as well, Your Honor.

23        THE COURT:  So should I just go ahead and -- well,

24   no, we'll tell them -- we'll see how things are going on

25   Friday, and on Friday we'll tell them about taking Tuesday off.

1        So in terms of length, though, I don't know that I

2   need to tell them it will take three weeks then.  Seems like I

3   can tell them it will take two weeks and may possibly bleed

4   into the third, but that it's unlikely.  But I will give that

5   in an abundance of caution.  Does that make sense?

6        MS. TAYLOR:  Yes, Your Honor.

7        MR. KING:  Yes, Your Honor.

8        MR. ZERMAY:  Yes, Your Honor.

9        THE COURT:  Okay.  Okay.  We'll get the jury up here

10  in just a minute.

11        Before we do that, Mr. Hoover and Mr. Ervin, I just

12  want to say to you personally -- remind you what the magistrate

13  judge has told you at each of your arraignments, and that is

14  that each of you has the right to testify in this case and you

15  have the right not to testify.

16        That choice is entirely yours.  You should consult

17  with your attorneys and you should seek out their advice, but

18  ultimately you each, individually, have to decide whether you

19  want to testify.

20        So if you take the stand during the trial, I'm going

21  to assume that it was your own personal decision to testify in

22  this case.

23        Is that fair, Mr. Ervin?

24        DEFENDANT ERVIN:  Yes, ma'am.

25        THE COURT:  And Mr. Hoover, do understand that as

1  well?

2         DEFENDANT HOOVER:  Yes, ma'am.

3         THE COURT:  And in the same way, if your attorney at

4  the end of the trial stands up and announces rest and you have

5  not testified, Mr. Ervin, then I'm going to understand that you

6  personally made the decision not to testimony; is that fair?

7         DEFENDANT ERVIN:  Yes, Your Honor.

8         THE COURT:  And Mr. Hoover, if Mr. Larosiere or

9  Mr. Zermay announce rest and you have not testified, I'm going

10  to understand that you personally made the decision not to

11  testify.

12         Do you agree with that, sir?

13         DEFENDANT HOOVER:  Yes, Your Honor.

14         THE COURT:  Okay.  All right.  Then the two last

15  things and then we'll get the jury up here.

16         One, I think we have the Local Rules regarding the

17  Court's decorum requirements on the table.  Please make sure

18  you're familiar with them.

19         And I'll also remind you once we get started into the

20  evidence not to make speaking objections in front of the jury.

21  State the basis of your objection.  And if you need to get into

22  the facts or into the theory, you should ask to approach and

23  not infect the jury or the witness with things in open court.

24         Ms. Taylor, any questions or housekeeping matters

25  from the perspective of the United States?

1     MS. TAYLOR:  Not at this moment -- oh, the only

2  thing, I guess, I don't think we have the list of the jurors

3  yet.

4     COURTROOM DEPUTY:  I just got it, Your Honor.  And

5  I'll hand those out as the jury is coming up.

6     MS. TAYLOR:  Thank you.

7     THE COURT:  All right.  Mr. King, anything further

8  for Mr. Ervin?

9     MR. KING:  Your Honor, just as a housekeeping matter.

10  It occurs there was another superseding indictment.  It would

11  be incumbent upon me for appellate purposes to renew our motion

12  to dismiss as well as our adoption of Mr. Hoover's --

13     COURT REPORTER:  I'm sorry --

14     THE COURT:  You've got to slow down, Mr. King.  This

15  is going to be a really long trial if you keep doing that.

16     COURT REPORTER:  "Incumbent upon me . . ."

17     MR. KING:  To just renew those with the understanding

18  that the government's position and the Court's ruling, there's

19  nothing to change those.

20     THE COURT:  Okay.  And I assume that you do so as

21  well, Mr. Zermay, or --

22     MR. LAROSIERE:  Your Honor, Mr. Larosiere for

23  defendant Hoover.

24     Again, given the nature of the fourth superseding

25  indictment, we would like to orally renew our motions to

1    dismiss.  Again, as Mr. King stated, it's for appellate reasons

2    and otherwise.  And I would just like to state for the record

3    it is our position that Bruen requires an application and

4    finding of historically analogous laws.  And I will leave that

5    there.

6              Thank you, Your Honor.

7              THE COURT:  All right.

8              Ms. Taylor, you simply renew your responses?

9              MS. TAYLOR:  Yes, Your Honor.

10             THE COURT:  All right.  So to the extent that the

11   defendants have renewed their motions to dismiss raising all of

12   the same arguments that the Court previously addressed in a

13   written order and the government renews its responses to those,

14   the Court adopts its prior rulings and denies any supplemental

15   motion to dismiss at this time.

16             All right.  Anything else, Mr. King, before we bring

17   the jury up?

18             MR. KING:  No, Your Honor.

19             THE COURT:  Mr. Zermay, anything else?

20             MR. ZERMAY:  No, Your Honor.

21             THE COURT:  And Mr. Zermay, just so that I recognize

22   the right person, will you be doing the opening when we get

23   there?

24             MR. ZERMAY:  Yes, Your Honor.

25             THE COURT:  Okay.  All right.  Let me . . .

1          All right.  So I'm going to leave while the jury gets

2     brought up.

3          Ms. Wiles will give you the juror list and we will

4     get started with jury selection.

5          Oh, reminder, the defendants, you-all get ten

6     peremptories, the government gets six peremptories.  You can --

7     when we get to the -- what we'll do is in terms of process,

8     I'll ask my questions and those of your questions that I have

9     discussed with you or found to be appropriate.

10         When I finish that, I'll bring you up to sidebar and

11    there will be a few things to address.  One, I'll ask you if

12    there are any additional questions you want me to ask, and that

13    would be follow-up from any particular potential juror that I

14    missed or a question of yours, such as the one you wish to

15    rephrase.  I'll also ask you if there are any potential cause

16    challenges to a juror when we -- and you'll identify those.

17         If at any time a juror asks to answer a question

18    privately, we'll mark that juror's name down and the subject

19    matter.  We'll talk to them later privately.

20         If I have a sense that we have a juror that is a

21    talker, that is, someone that is just bent on influencing the

22    rest of the jury panel, you'll hear me stop inquiring of that

23    juror and we will speak to that juror privately.  I mean, I'll

24    get the basic answers from them, but I won't let them spout

25    off.

1          And then if there's anybody else that you-all think

2     we need to talk to privately, you can identify them at sidebar.

3     In particular, we'll be addressing the cause challenges that

4     way.

5          When we speak to the potential jurors privately at

6     that time, I'll bring them in, I'll begin the discussion, but

7     then each of you will have the opportunity to inquire directly

8     of that juror to determine if there, indeed, is a basis to

9     strike them for cause or if you want to try and rehabilitate

10    that particular juror.

11         Once we finish that, I'll go back, I'll ask whatever

12    additional questions we've agreed to, then we'll let the jury

13    go.  I'll hear cause challenges and then I'll hear your

14    peremptories.  We'll seat -- I think a two-week -- we'll likely

15    seat just two, possibly a third.  We'll see how selection goes

16    in terms of alternates.

17         Any questions about the selection process?

18         MS. TAYLOR:  Your Honor, I was going to suggest that

19    if possible, we try and seat a third alternate, but otherwise

20    no questions.

21         THE COURT:  Okay.

22         MR. KING:  Your Honor, I just wanted to know if we're

23    going to have time to confer after we've gone through all the

24    questions about how long we would have for that.

25         THE COURT:  Okay.  What was your question,

1    Mr. Zermay?

2          MR. ZERMAY:  Yes, just scheduling-wise, during the

3    course of the day, does the Court anticipate opening statements

4    being done today or tomorrow?

5          THE COURT:  Today.

6          MR. ZERMAY:  Today.  Thank you, Your Honor.

7          THE COURT:  So in terms of your question, well, what

8    I usually do is we get through all of the questions and then I

9    hear cause challenges.  When we finish the cause challenges, I

10   usually take a short recess and let you-all do your strategery

11   with regard to your peremptories; usually about ten minutes or

12   so.  It kind of depends on how the day is going.  But I will

13   give you some time to confer.

14         All right.  Any other questions?

15         Seeing none, we will bring up the jury.

16         COURT SECURITY OFFICER:  All rise.

17     (Recess, 9:50 a.m. to 10:06 a.m.)

18     (All parties present.  Prospective jurors not present.)

19         COURT SECURITY OFFICER:  All rise.  This Honorable

20   Court is back in session.

21         Please be seated.

22         THE COURT:  Good morning, ladies and gentlemen.

23         This is Case No. 3:21-cr-22(S4)-MMH-MCR.  It is the

24   United States of America vs. Kristopher Justinboyer Ervin and

25   Matthew Raymond Hoover.

1           Is counsel for the government prepared to proceed?

2           MS. TAYLOR:  Yes, Your Honor.

3           THE COURT:  And you, Mr. King?

4           MR. KING:  Yes, Your Honor.

5           THE COURT:  Mr. Zermay?

6           MR. ZERMAY:  Yes, Your Honor.

7           THE COURT:  All right.  Ladies and gentlemen, as I

8   told you, I'm Judge Howard and I will be presiding over the

9   case.  And this morning we will start by selecting a jury.

10          This is a criminal case in which the government has

11  charged Mr. Ervin and Mr. Hoover with committing federal

12  crimes.  In a criminal case such as this the defendants are

13  presumed to be innocent of the crime that's charged.  And the

14  government has the burden of proving a defendant's guilt and

15  has to prove that guilt beyond a reasonable doubt.

16          You are about to participate in one of the most

17  significant responsibilities that you have as a citizen of this

18  country.  Our system of trial by jury is guaranteed in our

19  Constitution and is one of our unique institutions.

20          Sometimes we have criticism of our justice system,

21  and perhaps you, on occasion, have had reason to criticize it.

22  But you should know that with whatever faults it may have, the

23  American justice system is universally respected throughout the

24  world and is considered to be a fair and effective system of

25  justice.

1          While some look on jury service as a burden, most
2     people who are actually selected to serve on a jury find the
3     experience to be rewarding and educational and are actually
4     happy that they served.
5          The trial is expected to take about two weeks.  It
6     might bleed a little bit over into a third, but it won't go
7     beyond that.  The schedule that we will follow is that we will
8     pick a jury today and then we'll start with the opening
9     statements and we may have some time for some evidence this
10    afternoon, and then we'll continue tomorrow and each day going
11    forward.
12         Each day I'll ask you-all to be here at about 9 --
13    excuse me, at about 8:45, with the expectation that everybody
14    gets here by 9 a.m. so that we can begin.  We can't actually
15    start until all of the jurors have arrived.
16         We will hear evidence in the morning and we'll take a
17    mid-morning break.  We'll take a lunch break.  I usually give
18    you about an hour or an hour and ten minutes so that you have
19    time to eat lunch and also take care of whatever personal
20    affairs you may need to address, and then we'll come back in
21    the afternoon.  And in the afternoon we'll also take a break.
22         So I tell you that so that you know that you would
23    never be sitting for more than about an hour and 45 minutes
24    straight.  So there will be breaks in between so that you can
25    move around.

1           At the end of the day we will finish each day between

2    5 and 5:30.  If we're at a reasonable breaking spot around 5,

3    I'll stop then.  If we're in the middle of a witness we'll

4    continue.  But 5:30 is a hard break for the jurors.  So you can

5    make whatever personal plans, child care arrangements, travel

6    arrangements.  You will know that you will not be asked to stay

7    here past 5:30.  That also means you're not going to be

8    sequestered.  You don't get to go to a hotel.  You do have to

9    go home to your families at the end of each day.

10           So that is the schedule that we will be keeping.  I'm

11   not going to ask if serving on the jury may be inconvenient,

12   because certainly you-all have other things that you were

13   planning to use these next few weeks for.

14           I'm told by the jury administrator that everybody who

15   is upstairs has the required qualifications to serve as a

16   juror, and no one should seek to avoid fulfilling their

17   responsibility except under the most pressing circumstances.

18           And so while the jury administrator has already

19   screened you-all for hardships, I want to ask one more time

20   whether anybody in the courtroom believes that they have an

21   extraordinary hardship, that is, a hardship that you believe a

22   fellow citizen -- perhaps the individual seated next to you --

23   should serve in your place as a juror.

24           And I'll start with those seated in the gallery.

25   Anybody believe they have an extraordinary hardship?

1      (Paddles raised.)

2           THE COURT:  Juror No. 8?

3           PROSPECTIVE JUROR:  My mother is legally blind and

4    has no way around without me.

5           THE COURT:  All right, sir.

6           Anyone else in the jury box?

7      (Paddles raised.)

8           THE COURT:  I need you to raise your paddle so I can

9    see the number, please.

10          PROSPECTIVE JUROR:  Sorry.

11          THE COURT:  Juror No. 11?

12          PROSPECTIVE JUROR:  Yes.  I don't know if this counts

13   or not.  I'm a licensed mental health counselor.  I serve

14   primarily veterans.  I'm in a private practice.  There's no one

15   to take my place, so the length of time would make it

16   difficult.  But I just wanted to put that out there.

17          THE COURT:  Okay.  Thank you.

18      (Paddle raised.)

19          THE COURT:  All right.  And back in the back of the

20   courtroom, No. 45.  If you'll wait for the microphone to make

21   its way to you.

22          PROSPECTIVE JUROR:  Yes.  I believe I have a

23   financial hardship.  Currently I'm a single-income household,

24   going through the expensive cost of a divorce.  And I work on a

25   commission-only sales job.  And being away for a couple weeks,

1   meaning just today alone I missed four appointments.  And

2   explaining basically everything I'm going through right now,

3   there is not a lot of money.  And I have to pay for both

4   lawyers on both sides.  And every week, every day that I miss

5   is one less paycheck.  So I have no salary or anything like

6   that.  It's commission only.  So every appointment I miss I

7   don't get paid for.  So it's currently going to present a very,

8   very significant financial hardship for me.

9           THE COURT:  All right, sir.  Thank you.

10          Anyone else?

11      (Paddle raised.)

12          THE COURT:  Juror No. 32.

13          PROSPECTIVE JUROR:  Hello.  Not sure also if this

14  counts, but I am currently pregnant and I have an appointment

15  within the trial period.

16          THE COURT:  Can you tell me the date and the time of

17  the appointment?

18          PROSPECTIVE JUROR:  It's a Monday, April -- I don't

19  have my phone.  April 24th?  I believe it's two weeks from

20  today.  10:45.

21          THE COURT:  Okay.  Anyone else?

22      (No response.)

23          THE COURT:  All right.  I've made a note of those

24  matters and we will take them up later.

25          All right.  So at this time we are going to begin the

1  jury selection process.  I'm going to be asking you-all a

2  number of questions.  The jury administrator placed all of you

3  under oath; is that right?

4      (Affirmative head nods.)

5          THE COURT:  All right.  So the questions that I ask

6  are designed to determine your qualifications to serve as a

7  juror in this particular case.  And under your oath as a

8  prospective juror, you have agreed to truthfully answer these

9  questions concerning your qualifications.

10         Please understand that the questions are not intended

11 to pry into your personal affairs, but are only for the purpose

12 of obtaining an impartial jury.

13         If at any time I ask a question that you want to

14 answer privately, that's fine, just raise your paddle in

15 response to that question and tell me you'd like to speak

16 privately.  I will take a moment to write down the subject

17 matter of it and then we will speak to you outside the presence

18 of the other potential jurors about that matter.

19         If you are not selected for jury service please do

20 not take it personally.  It's simply part of the process to

21 seat a fair and impartial jury for this particular case.

22         At this point we're going to learn a little about

23 each one of you.  The jury administrator has given you a list

24 of questions.  And I'm going to ask you, beginning with Juror

25 No. 1, to stand up, and in as strong a voice as you can, I'll

1  ask you to give us the answers to those questions.

2      You can go right ahead.

3      PROSPECTIVE JUROR:  Juror No. 1.  St. Augustine,

4  Florida, for about ten years.  Lived in Florida for about 11 or

5  12 years.  I've got some college education.  I'm a veterinary

6  receptionist.  Single.  No kids.  No military service.  And no

7  previous jury service.

8      THE COURT:  Tell me the name of the veterinary

9  clinic, please.

10     PROSPECTIVE JUROR:  Birch Island Veterinary Center.

11     THE COURT:  Thank you.

12     Next.

13     PROSPECTIVE JUROR:  Jury No. 2.  Jacksonville,

14  Florida, for 23 years.  I've lived in Florida for 23 years.

15  Still attending college.  I work as a cook in a kitchen.  I'm

16  single.  No children.  No military service.  And no previous

17  jury service.

18     THE COURT:  Can you tell us the name of the

19  restaurant where you work.

20     PROSPECTIVE JUROR:  It's The Fresh Kitchen in like

21  the Gate gas station.

22     THE COURT:  Okay.

23     PROSPECTIVE JUROR:  Juror No. 3.  I live in Atlantic

24  Beach for about 11 years.  I've lived in Florida for 49 years.

25  I have an AA.  I'm a stay-home mom.  I'm married.  My husband

1   is a civil contractor.  I have a 22-year-old who's still a

2   student, a 23-year-old who is a junior project manager at a

3   construction company, and a 25-year-old daughter who doesn't

4   work.  I have no military experience and never have been on a

5   jury.

6            THE COURT:  Hold on just one minute.  Thank you.

7            Could you take that back?  Your -- the child that is

8   employed, can you tell me the name of the employer?

9            PROSPECTIVE JUROR:  My husband's company, Jax

10  Utilities Management.

11           THE COURT:  Jax?

12           PROSPECTIVE JUROR:  Jax, J-a-x, Utilities Management.

13           THE COURT:  And your husband owns that company?

14           PROSPECTIVE JUROR:  Yes.

15           THE COURT:  And what does it do?

16           PROSPECTIVE JUROR:  Underground utilities, like roads

17  and storm drains and all that kind of stuff.

18           THE COURT:  Okay.  Thank you.  Just a moment.

19           Madam Deputy.  Technical difficulties.

20           You can pass that microphone.  I'm just going to ask

21  you to hold on.

22      (The judge and the courtroom deputy confer.)

23           THE COURT:  All right.  Go ahead, Juror No.

24           PROSPECTIVE JUROR:  Juror No. 4.  I live in Starke,

25  Florida.  I've lived there for 13 years.  I've lived in the

1  state of Florida for 32 years.  I have some college education.

2  I am a front-desk receptionist at a middle school, Bradford

3  Middle School.  I am married.  My husband is self-employed.  He

4  is a logger.  I have three children:  12, 9, and 4 months.  No

5  military service and no prior jury service.

6             THE COURT:  Thank you.

7             No. 5.

8             PROSPECTIVE JUROR:  I'm Juror No. 5.  I live in

9  Fleming Island.  I've lived in Florida for 53 years.  High

10  school diploma.  Occupation, I work for All American Surveyors

11  as a coordinator, land surveying.  I'm married.  My husband is

12  retired Jacksonville Sheriff's Office.  We have no children.

13  No military experience and no jury service.

14             THE COURT:  What did your husband do for JSO?

15             PROSPECTIVE JUROR:  He was a police officer.

16             THE COURT:  And how long have you lived in Fleming

17  Island?

18             PROSPECTIVE JUROR:  Four years.

19             THE COURT:  And was your -- was he a police officer

20  on the streets, a detective?

21             PROSPECTIVE JUROR:  Yes, sir -- excuse me, yes,

22  ma'am, on the street.

23             THE COURT:  Okay.  I anticipate that we will hear

24  evidence from law enforcement officers.  Would you believe a

25  witness who's in law enforcement over other witnesses simply

1  because they're in law enforcement?

2        PROSPECTIVE JUROR:  No, ma'am.

3        THE COURT:  Would you evaluate their credibility in

4  the same way you would any other witness?

5        PROSPECTIVE JUROR:  Yes, ma'am.

6        THE COURT:  All right.

7        Juror No. 6.

8        PROSPECTIVE JUROR:  Juror No. -- excuse me.  Juror

9  No. 6.  I've lived in Jacksonville, Florida, for 31 years.

10  I've lived in Florida for 31 years.  I have a master's degree

11  in physician assistant studies.  I work at Southeast Orthopedic

12  Specialists as an orthopedic surgery physician assistant.  My

13  wife is a high school precalculus and Algebra 2 teacher at

14  Stanton College Prep.  I have one four-month-old son.  I have

15  had no prior military service nor any prior jury service

16  experience.

17        THE COURT:  Thank you.

18        No. 7.

19        PROSPECTIVE JUROR:  Juror No. 7.  I currently live in

20  East Palatka.  Lived there five years.  I've lived in Florida

21  for 25 years.  I have a bachelor's degree in social work and

22  also currently getting my bachelor's in cyber security.  I am a

23  customer service analyst for Genesse and Wyoming Railroad.  I

24  am single.  I have no children, no military service, and no

25  jury -- previous jury.

1          THE COURT:  Tell me the name of your employer again.

2          PROSPECTIVE JUROR:  I'm sorry?

3          THE COURT:  Tell me the name of your employer again.

4          PROSPECTIVE JUROR:  Genesse and Wyoming Railroad.

5          THE COURT:  Can you spell the first name?

6          PROSPECTIVE JUROR:  Genesse, G-e-n-e-s-s-e.

7          THE COURT:  Do you do that remotely?

8          PROSPECTIVE JUROR:  Used to, but no, we had to go

9    back in the office.

10          THE COURT:  Okay.

11          PROSPECTIVE JUROR:  Juror No. 8.  I have lived in

12   Jacksonville, Florida, for six years; Florida for six years.  I

13   have some college.  I went to a tech school.  I am currently

14   working retail at Office Max.  Single, no kids, no military

15   service.  I have had previous jury service if it counts that we

16   were called and then dismissed before we were actually called

17   for questioning.

18          THE COURT:  Next.

19          PROSPECTIVE JUROR:  Good morning.  Juror No. 9.  I

20   have lived in Jacksonville for 13 years as well as the state of

21   Florida for 13 years.  I have an associate's degree.  I work as

22   an administrative specialist for the State of Florida, the

23   Guardian Ad Litem program.  I am single.  I have one child, an

24   adult.  He's 24, part-time student, part-time stagehand, local

25   stagehand.  No prior military or jury experience.

1           THE COURT:  And where is the 24-year-old a stagehand?

2           PROSPECTIVE JUROR:  It's here in Jacksonville, I

3     think it's like a local IATSE.  They work in the local venues

4     here.

5           THE COURT:  Thank you for your work as a Guardian Ad

6     Litem.  That's a wonderful organization.

7           PROSPECTIVE JUROR:  Yes.

8           PROSPECTIVE JUROR:  Juror No. 10.  I've lived in

9     Jacksonville for 34 years.  Lived in Florida for 31 years.  I

10    have an AA degree.  I work in quality assurance for Walmart

11    Distribution.  I am married.  I have three children:  16, 7,

12    and 5.  No previous military experience nor any jury

13    experience.

14          THE COURT:  You said you've lived in Jacksonville for

15    34 years and Florida --

16          PROSPECTIVE JUROR:  Lived in Florida for 34 years --

17    or lived in Jacksonville for 34 years but lived in Florida for

18    34 years.

19          THE COURT:  Okay.  And I have another -- is your

20    spouse employed outside the home?

21          PROSPECTIVE JUROR:  Yes, ma'am.  She's a -- she works

22    for an MRI imaging.  She's an insurance verifier.

23          THE COURT:  Okay.  Can you tell us the name of the

24    company?

25          PROSPECTIVE JUROR:  Beaches MRI.

1            THE COURT:  Thank you.

2            Go ahead.

3            PROSPECTIVE JUROR:  Juror No. 11.  I currently live

4     in St. Augustine, Florida.  I've lived there for 20 years.

5     I've lived in Florida for 40 years.  I have a master's degree

6     in mental health counseling.  I'm currently a licensed mental

7     health counselor.  I'm self-employed in a private practice.

8     I'm married.  My husband, he works for Macquarie Global

9     Financial Services as a compliance and risk person.

10            I do have two children, a five-year-old and a

11    seven-year-old.  I have never served in the military, although

12    I work with them.  And I have never done jury duty.

13            THE COURT:  Thank you.

14            PROSPECTIVE JUROR:  Hi.  I'm Juror No. 12.  I've

15    lived in Florida -- in Jacksonville, Florida, for 32 years and

16    in the state of Florida for 32 years.  I have an undergraduate

17    degree in criminal justice.  I am retired.  My latest job, I

18    was an IT director.  I am widowed.  I have no children.  Have

19    no military experience and I have never served on a jury.

20            THE COURT:  And for whom were you an IT director?

21            PROSPECTIVE JUROR:  The last would have been the Lil'

22    Champ food chain -- no, last was Stein Mart, Stein Mart.

23            THE COURT:  I miss Stein Mart.

24            PROSPECTIVE JUROR:  I do too, and Lil' Champ.

25            THE COURT:  Your spouse, was he employed before --

 1          PROSPECTIVE JUROR:  Yes, he worked for the
 2   Prudential.
 3          THE COURT:  Doing what?
 4          PROSPECTIVE JUROR:  IT.
 5          THE COURT:  And to the extent you remember anything
 6   from your criminal justice studies, would you put that aside
 7   and decide this case solely based on my instructions on the
 8   law?
 9          PROSPECTIVE JUROR:  Of course, yes.
10          THE COURT:  Okay.  Thank you.
11          Go ahead.
12          PROSPECTIVE JUROR:  Juror No. 13.  I've lived in
13   Jacksonville and Florida for 20 years.  High school graduate.
14   I'm currently a client service officer for Wells Fargo.  I am
15   married.  My spouse is retired from the Florida State Prisons.
16   I have one child who is 15.  I have -- I was in the military
17   for 10 years, in the Air Force.  And no previous jury service.
18          THE COURT:  All right.  Well, first, thank you for
19   your service.  Can you tell us what you did in the Air Force?
20          PROSPECTIVE JUROR:  Missile facility specialist.  We
21   maintained and supported the ICBM missile sites, the
22   environmental systems, the emergency power and standby power.
23          THE COURT:  Sounds terrifying.
24          Your husband is retired from the Florida Department
25   of Corrections?

1          PROSPECTIVE JUROR:  Yes, ma'am.

2          THE COURT:  And is he otherwise employed?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  And what do you do for Wells Fargo?

5          PROSPECTIVE JUROR:  Compliance service officer,

6    customer service.

7          THE COURT:  And given that your husband was in a law

8    enforcement capacity, I'll ask you that same question.  I

9    anticipate testimony from law enforcement officers.  Would you

10   be inclined to believe a law enforcement officer over another

11   witness simply by virtue of their employment?

12         PROSPECTIVE JUROR:  No, ma'am.

13         THE COURT:  Would you evaluate the credibility of

14   such a witness in the same way as you would any other witness?

15         PROSPECTIVE JUROR:  Yes, ma'am.

16         THE COURT:  You can pass the microphone, thank you.

17         PROSPECTIVE JUROR:  I'm Juror 14.  I've lived in

18   Jacksonville for 41 years.  I've lived in Florida for 41 years.

19   I'm a high school graduate.  I am a seafood specialist at

20   Publix.  I am divorced.  I have a 21-year-old daughter.  She is

21   a reset merchandise at Advantage Sales.  I have no previous

22   military experience but I have been on a jury before.  It was

23   about 20 years ago, and I was an alternate juror and I did not

24   stay for deliberations.

25         THE COURT:  Okay.  Thank you.

1        PROSPECTIVE JUROR:  You're welcome.

2        THE COURT:  Next.

3        PROSPECTIVE JUROR:  I'm Juror No. 15.  I've lived in

4  St. Augustine, Florida, for 34 years.  I have some college.  I

5  work for St. Johns County utilities.  Not married, no children,

6  no military service or jury service.

7        THE COURT:  And tell me what you do for St. Johns

8  County facilities.

9        PROSPECTIVE JUROR:  I run their water treatment

10  facilities.

11        THE COURT:  And I see that we share a last name, but

12  we're not related, right?

13        PROSPECTIVE JUROR:  No, ma'am.

14        THE COURT:  Okay.  Let me hear from Juror No. 16.

15        PROSPECTIVE JUROR:  Juror No. 16.  I've lived in

16  Starke, Florida, for 13 years.  I lived in Florida for 62.

17  High school diploma.  Bradford County bus driver.

18        THE COURT:  I'm sorry, Bradford County bus driver?

19        PROSPECTIVE JUROR:  Uh-hmm.  I'm single.  I have

20  three children.  No military service, no previous jury service.

21        THE COURT:  Can you tell me what your children do?

22        PROSPECTIVE JUROR:  My oldest daughter is a

23  restaurant manager, my son is a construction worker, and my

24  youngest daughter is deceased.

25        THE COURT:  Okay.  I'm sorry for your loss.

 1          The restaurant manager, can you give me the name of
 2   the restaurant?
 3          PROSPECTIVE JUROR:  Mia's Italian Restaurant.  It's
 4   in Orlando.
 5          THE COURT:  And does the construction worker work for
 6   a particular company?
 7          PROSPECTIVE JUROR:  No, just (shrugs shoulders).
 8          THE COURT:  Okay.  Thank you.
 9          PROSPECTIVE JUROR:  Juror No. 17.  Lived in
10   Jacksonville for four years.  I've been in Florida for nine
11   years.  High school.  Construction project manager, Celebration
12   Church.  I'm married.  Spouse's occupation is -- works for a
13   realtor for Cross View Realty.  Children, age 40, pastor at
14   Bayside Community Church in Bradenton; another daughter, 30- --
15   I don't know why I'm so nervous, I'm sorry -- a daughter, 36,
16   and she is CEO of Awakening School of Theology.  No previous
17   military and no other jury service.
18          THE COURT:  Thank you, sir.
19          PROSPECTIVE JUROR:  Juror No. 18.  Lived in Callahan,
20   Florida, for 13 years now.  I've lived in Florida for 55 years.
21   Level of education, have four years of education, college
22   education.  Self-employed.  Marital status, I'm married.  Have
23   three children:  31, 26, and 16.  No military service and has
24   never had any jury service.
25          THE COURT:  And what is your self employment?

1          PROSPECTIVE JUROR:  Layfield Heating and Air
2    Conditioning.
3          THE COURT:  I'm sorry?
4          PROSPECTIVE JUROR:  Layfield Heating and Air
5    Conditioning.
6          THE COURT:  Is your spouse employed outside the home?
7          PROSPECTIVE JUROR:  Yes, ma'am.  She does AP for my
8    company.  Does our receivables.
9          THE COURT:  Okay.  And the 31- and 26-year-olds, are
10   they employed?
11         PROSPECTIVE JUROR:  Yes, ma'am, they're both employed
12   with my company as service techs.  16-year-old is in high
13   school, so . . .
14         THE COURT:  Okay.  Thank you.
15         19.
16         PROSPECTIVE JUROR:  Juror 19.  I live in Atlantic
17   Beach in Jacksonville.  I've been in Florida for four and a
18   half years.  I have a high school and a technical school
19   education.  I am five days retired from a packaging and
20   graphics company, West Crock.  My wife is also retired.  She
21   retired from the New Jersey Board of Education.
22         I have two children, 40 and 38.  40-year-old son is
23   lieutenant commander with the Coast Guard and my daughter works
24   for an HVAC company in New Jersey as an accountant.  I don't
25   have any military service experience.  And I did serve as a

1    juror back in Ocean County, New jersey, on a civil case.

2            THE COURT:  Did the jury reach a verdict in that

3    case?

4            PROSPECTIVE JUROR:  Yes.

5            THE COURT:  Were you the foreperson?

6            PROSPECTIVE JUROR:  I was not.

7            THE COURT:  You said you've lived in Florida for four

8    and a half years.  Has that whole time been in Atlantic Beach?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  Thank you.

11           PROSPECTIVE JUROR:  I am No. 20.  I live in Fort

12   White.  Lived there for 23 years.  I've lived in Florida for

13   33 years.  High school graduate with some college education.  I

14   work for Drive Line as a retail merchandiser.  I am currently

15   single.  I have no children.  I have not been in the military.

16   And I have been summoned for jury duty but dismissed at the

17   door.

18           THE COURT:  And what does Drive Line sell?

19           PROSPECTIVE JUROR:  We don't sell anything.  I reset

20   displays inside other stores, mostly Dollar General and some

21   Winn-Dixies and Walmarts and stuff like that.

22           THE COURT:  Okay.  And, forgive me, but can you tell

23   me what county Fort White is in?

24           PROSPECTIVE JUROR:  Columbia.

25           THE COURT:  Thank you.

1          Next.

2          PROSPECTIVE JUROR:  Juror No. 21.  I lived in

3  St. Augustine for 22 years.  I've lived in Florida for

4  57 years.  I have a bachelor's degree with some master's

5  classes.  I am a geologist for the United States Navy.

6          I'm married.  My wife is currently retired from the

7  Florida National Guard.  We have two children.  33-year-old is

8  a computer programmer, self-employed; the 28-year-old daughter

9  is a massage therapist and yoga instructor, also self-employed.

10         I have no military experience.  I have served on two

11 juries, one as an alternate, and the other also in a criminal

12 case.  The jury -- I was the alternate and I was dismissed, and

13 the other one, the judge told us to go home.

14         THE COURT:  Anything about those jury experiences

15 that would influence your verdict in this case?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  So with the Navy, do you serve in the

18 Navy or are you a civilian contractor working with the Navy?

19         PROSPECTIVE JUROR:  No, I'm a GS employee.  I do

20 contamination assessment and remediation.

21         THE COURT:  Okay.  And what did your wife do with the

22 National Guard?

23         PROSPECTIVE JUROR:  Program analyst.

24         THE COURT:  Thank you.

25         PROSPECTIVE JUROR:  Juror 22.  I live in Ponte Vedra

1   Beach for nine and a half years.  I've lived in Florida for

2   nine and a half years.  I have a master's of engineering in

3   ocean engineering.  I also have a PE license, civil engineering

4   in Florida.  I'm single.  I work for the U.S. Army Corps of

5   Engineers for 30-plus years, couple years as a private

6   consultant as a civil engineer, Coastal Ocean.  No children.

7   My U.S. Army Corps was as a civilian.  And I have been on --

8   called for jury duty in Suffolk County, Long Island, both

9   federal and county, but was not selected for the jury.

10          THE COURT:  Thank you, sir.

11          PROSPECTIVE JUROR:  Hi.  I'm Juror 23.  I've lived in

12   Ponte Vedra Beach for 34 years but lived in Florida for 57.

13   I've had some college.  My husband and I are both retired.  He

14   was a software systems analyst for Blue Cross Blue Shield.  We

15   have two children; one is 45 and one is 43.  The 45-year-old is

16   a fireman/paramedic and the other one is self-employed.  I have

17   not had any military experience.  I was selected for the jury,

18   but I was also a robbery victim, so then I was -- you know, I

19   didn't have to do that.  So I was -- right.

20          THE COURT:  All right.  Can you tell me the -- who

21   the 43-year-old -- the name of that company?

22          PROSPECTIVE JUROR:  Yes, it's -- excuse me.  It's

23   Naylor Mobile Care.

24          THE COURT:  And what service does that provide?

25          PROSPECTIVE JUROR:  It's for large equipment repair

1   company.

2          THE COURT:  And what did you retire from?

3          PROSPECTIVE JUROR:  Hallmark Stores.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR:  Thank you.

6          PROSPECTIVE JUROR:  Juror No. 24.  I live in

7   St. Augustine for about seven years; Florida about 18.  I have

8   a BS in psychology.  I am military -- I mean ministry support

9   at Memorial Presbyterian Church in St. Augustine.  I am

10  married.  My spouse is a VP of finance at Wells Fargo.  I have

11  two children.  One's 24.  She's a civil engineer in Fleming

12  Island.  And my son works for Costco bakery department.  No

13  military experience and I was an alternate juror once.

14         THE COURT:  Those Costco chocolate chip cookies are

15  the best.

16         All right.

17         PROSPECTIVE JUROR:  Juror 25.  Lake City, Florida,

18  50 years.  Been in Florida 53 years.  High school education

19  with numerous certificates in my occupation that I do.

20  Married.  She -- restaurant owner.  Ken's Barbecue in Lake

21  City.  Try it if you ever come through.

22         THE COURT:  What's the name of it?

23         PROSPECTIVE JUROR:  Ken's Barbecue.

24         THE COURT:  All right.  You heard it, guys.

25         PROSPECTIVE JUROR:  I have two children of my own.

1   They're -- they're 28 and 22.  One is home health; the other is

2   a painter by trade.  No -- no military experience at all.

3   Never served on a jury.  And I work for a construction company

4   in Lake City, Florida, C.A. Boone Construction.  I am the shop

5   foreman on all the equipment.

6               THE COURT:  Thank you, sir.

7               PROSPECTIVE JUROR:  Yes.

8               PROSPECTIVE JUROR:  Juror No. 26.  I've lived in Lake

9   City for 50 years.  I've lived in Florida for 50 years.  I have

10  a technical degree in the golf course management, turf

11  equipment management.  I work with the Columbia County Board of

12  County Commissioners.  I'm a crew leader there.  I am married.

13  My spouse is a nurse practitioner for the University of

14  Florida.  I have two kids, 20 and 19, both in college, one at

15  Florida State, one in Lake City, Florida Gateway Community

16  College.  I don't have any military experience and haven't

17  served on a jury.

18              THE COURT:  And can you tell me what you do as a crew

19  leader?

20              PROSPECTIVE JUROR:  I maintain ball fields.  I manage

21  the people that work underneath me.  There's like six or seven

22  of them.

23              THE COURT:  Okay.

24              PROSPECTIVE JUROR:  That's about it.

25              THE COURT:  Thank you, sir.

1     PROSPECTIVE JUROR:  Uh-hmm.

2     THE COURT:  Go ahead.

3     PROSPECTIVE JUROR:  Juror 27.  I live in Bradford

4  County, Florida, Starke.  I've been there for 22 years.  I've

5  lived in Florida 27 years.  I've got two years of college.  I'm

6  a business owner and a pastor.  I'm married.  She's got the

7  hardest job, she's a homemaker.  I got nine children.  My

8  oldest is 27.  She's a homemaker.  My next one is 25 -- they

9  get close -- he works for me.  My next son works for me.  He's

10  two years younger than him.  He's probably 22.  The one under

11  him is a surfing instructor in Daytona.  He's 21.  Let's see.

12  The 18-year-old, he works for Miller Electric.  He's probably

13  17.  He's in high school.  I got two little girls in junior

14  high that are home-schooled, and a little boy at Bradford

15  Middle School.

16     THE COURT:  Wow.

17     PROSPECTIVE JUROR:  We had triplets and so we adopted

18  the last three all at once, so . . .

19     Let's see.  I have served in the military, the United

20  States Navy.  I was a rescue swimmer in the military for six

21  years.  And I've never been on a jury.

22     THE COURT:  All right.  Thank you for your service.

23     You said you're a business owner.  Can you tell me

24  what the business is.

25     PROSPECTIVE JUROR:  General contracting.

1          THE COURT:  And what's the name of it?

2          PROSPECTIVE JUROR:  Bakers Innovations, Incorporated.

3   My son just got state licensed for HVAC too, so we're going to

4   branch out, so . . .

5          THE COURT:  And where are you a pastor?

6          PROSPECTIVE JUROR:  Victory Chapel Christian

7   Fellowship Church right there in Starke.

8          THE COURT:  Thank you, sir.

9          PROSPECTIVE JUROR:  Yes, ma'am.

10          PROSPECTIVE JUROR:  Juror No. 28.  I live in

11   Jacksonville Beach, Florida.  I've lived in Florida for six

12   years.  I have some college education.  I work for North

13   Florida Sales as an on-premise sales rep.  I'm single.  And I

14   have no prior military service or jury service.

15          THE COURT:  What does North Florida Sales sell?

16          PROSPECTIVE JUROR:  Beer.  It's beer and alcohol

17   distributor.

18          THE COURT:  And you said you've lived in Florida for

19   six years.  Have you been in Jax Beach that whole time?

20          PROSPECTIVE JUROR:  Yes, ma'am.

21          THE COURT:  Okay.

22          Next.

23          PROSPECTIVE JUROR:  Juror 29.  I've lived in Florida

24   roughly 14 years.  Level of education is some community

25   college.  I work for Duval County Schools as a maintenance.

1    I'm single with no children.  No military experience.  Summoned

2    to jury but never chosen.

3             THE COURT:  Can you tell me what city you currently

4    live in?

5             PROSPECTIVE JUROR:  Jacksonville, Florida.

6             THE COURT:  And how long have you been in

7    Jacksonville?

8             PROSPECTIVE JUROR:  Roughly 14 years.

9             THE COURT:  Thank you, sir.

10            PROSPECTIVE JUROR:  Juror No. 30.  I live in

11   Jacksonville.  I live in Jacksonville for I think more than ten

12   years.  I have some college education.  I am call center --

13   just a call center.  I am married.  My husband is an AC -- like

14   he fix AC if it's broken.  That's it.  No children.  No

15   military service.  No jury service.

16            THE COURT:  Can you tell me the name of the company

17   for the call center where you're employed?

18            PROSPECTIVE JUROR:  Naval hospital call center.

19            THE COURT:  For the naval hospital?

20            PROSPECTIVE JUROR:  Yes, ma'am, central appointment

21   line.

22            THE COURT:  And the name of your husband's AC repair

23   employer?

24            PROSPECTIVE JUROR:  FRC.

25            THE COURT:  F, as in frank, RC?

1          PROSPECTIVE JUROR:  Far East -- FRC.  That's all I
2    know.
3          THE COURT:  That's fine.  Okay.  Thank you.
4          PROSPECTIVE JUROR:  Thank you.
5          PROSPECTIVE JUROR:  Juror Number 31.  I live in
6    Jacksonville and I have for eight years and I've lived in
7    Florida for 16.  I have a bachelor's in psychology.  Currently
8    I work at the Jacksonville Humane Society as an adoption
9    counselor.  I am single.  No children.  No previous military
10   service or jury service.
11         THE COURT:  Thank you.
12         Go ahead.
13         PROSPECTIVE JUROR:  Hi.  I'm Juror No. 32.  I live in
14   Atlantic Beach, Florida, for 11 years.  I've lived in Florida
15   for 35.  I have a doctorate in nursing practice.  I'm a nurse
16   practitioner, family nurse practitioner for Mayo Clinic.  I am
17   married.  My spouse is a caddy for Caddy Masters.  I have no
18   children.  I have no military experience or jury experience or
19   service.
20         THE COURT:  What is Caddy Masters?
21         PROSPECTIVE JUROR:  He's a professional caddy.
22         THE COURT:  Okay.  Was he at The Masters this
23   weekend?
24         PROSPECTIVE JUROR:  No.
25         THE COURT:  Well, he avoided all the rain.

1          PROSPECTIVE JUROR:  Juror 33.  I have lived in

2    Middleburg for 16 years.  I have lived in Florida for 16 years.

3    I have a bachelor's in health administration.  I am a

4    respiratory therapist at the North Florida VA clinic.  I am

5    married.  My husband works for LSI.  He is an instructor.  I

6    have a 22- -- 23-year-old who is a second-grade teacher at

7    River City Academy.  I have a 26-year-old who works for

8    Deloitte as an audit consultant.

9          I was in the Navy for nine years as a jet mechanic

10   and an inspection team.  And I have never had any jury service.

11         THE COURT:  And, I'm sorry, I missed the name of your

12   husband's company?

13         PROSPECTIVE JUROR:  LSI.

14         THE COURT:  LSI.  Thank you.  And thank you for your

15   service.

16         PROSPECTIVE JUROR:  Juror 34.  I live in

17   Jacksonville.  I've been there almost three years now.  So I've

18   been in Florida almost three years; however, I grew up in

19   Southwest Florida.  I'm a high school graduate.  Right now I'm

20   a customer service associate at Lowe's.  I am divorced.  I have

21   five children:  32, 27, 24, 20, and 18.  The 27-year-old is in

22   the Navy.  The 18-year-old is in high school.  The other three

23   do not speak to me, so I'm not sure what they're doing.  I have

24   no previous military service or jury service.

25         THE COURT:  And your former spouse, was that

1    individual employed?

2              PROSPECTIVE JUROR:  Yes.  He was a farm manager.

3              THE COURT:  And was that a family farm?

4              PROSPECTIVE JUROR:  No.  It was up in Nebraska.  He

5    worked for a gentleman that owned the farm.

6              THE COURT:  Okay.  Thank you.

7              PROSPECTIVE JUROR:  Juror No. 35.  I live in

8    Jacksonville.  I've lived there for seven months.  I've lived

9    in Florida for 26 years.  I have a bachelor's degree in

10   interdisciplinary studies with a focus in aerial surveillance

11   and a minor in biology.  I work in software as a senior

12   applications analyst for Crowley Maritime Services.  I am

13   single.  I have no children.  I have never served in the

14   military.  And I have been summoned, but never served, for jury

15   duty.

16             THE COURT:  And, I'm sorry, can you repeat for me

17   what you do for Crowley Maritime?

18             PROSPECTIVE JUROR:  I'm a -- I work in software.  I'm

19   a senior applications analyst.

20             THE COURT:  Thank you.

21             PROSPECTIVE JUROR:  Good morning.  Juror No. 36.  I

22   have lived in Jacksonville, Florida, for almost 30 years.  I've

23   lived in Florida for almost 30 years.  My state of education is

24   high school graduate; currently in school trying to get into

25   the nursing program.  I work for Citibank as an elite customer

1  service representative.  I am single.  I do have one child, she

2  is ten.  I have never served in the military nor have I ever

3  had previous jury duty.

4          THE COURT:  Thank you.

5          PROSPECTIVE JUROR:  You're welcome.

6          THE COURT:  Next.

7          PROSPECTIVE JUROR:  Juror 37.  I live in

8  St. Augustine and I've been there for 13 years.  I've got a

9  bachelor's degree.  I'm a manager and executive recruiter for

10 Florida Blue.  I'm married.  My wife is self-employed.  She has

11 her own company called She's Fierce, which is events,

12 motivational speaking.  I've got two children:  8 and 11.  No

13 military service and I've been summoned for jury service but

14 never served.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR:  No. 38.  I've lived in

17 Jacksonville, Florida, for about seven years.  Lived in Florida

18 seven years.  Level of education would be high school.

19 Occupation, I work for Dostie Homes as a warranty tech, former

20 automotive business owner for about 22 years.  I'm divorced.  I

21 have a 12-year-old daughter.  No military experience, no jury

22 experience.

23         THE COURT:  And, I'm sorry, you work for Dostie

24 Homes?

25         PROSPECTIVE JUROR:  Dostie Homes.

1          THE COURT:  And tell me what you do for Dostie.

2          PROSPECTIVE JUROR:  Warranty tech.

3          THE COURT:  Was your former spouse employed?

4          PROSPECTIVE JUROR:  Yes, ma'am.

5          THE COURT:  Can you tell me in what capacity?

6          PROSPECTIVE JUROR:  Cosmetology.

7          THE COURT:  Thank you.

8          PROSPECTIVE JUROR:  Juror No. 39.  Starke, Florida,

9   I've lived there for 21 years.  State of Florida, I've lived

10  there for 21 years.  High school diploma.  My occupation is I

11  work for GRU, City of Gainesville.  I'm a gas module meter

12  installer.  I'm single.  And I have no children, no previous

13  military service, and I have been summoned for jury but never

14  been picked.

15         THE COURT:  Thank you.

16         PROSPECTIVE JUROR:  Yes, ma'am.

17         PROSPECTIVE JUROR:  Juror 40.  Jacksonville seven

18  years, Florida cumulative 30.  JD.  Commercial real estate

19  agent and attorney.  Unmarried.  No children.  No military

20  service, no juror service.

21         PROSPECTIVE JUROR:  Juror No. 41 --

22         THE COURT:  I'm sorry.  I'm sorry, sir.  I have a

23  couple follow-up for No. 40.

24         So you work in commercial real estate currently?

25         PROSPECTIVE JUROR:  Yes.

 1          THE COURT:  And who is your employer?

 2          PROSPECTIVE JUROR:  Franklin Street.  I'm a

 3   recovering attorney.

 4      (Laughter.)

 5          THE COURT:  Okay.  And for Franklin Street, what do

 6   you do?

 7          PROSPECTIVE JUROR:  Industrial leasing and sales.

 8          THE COURT:  All right.  And would you -- if you are

 9   selected as a juror in this case, would you set aside whatever

10   you recall from law school and decide this case solely based on

11   my instructions to you on the law?

12          PROSPECTIVE JUROR:  Your instructions on the law?

13          THE COURT:  Yes, sir.  In other words, at the end of

14   the trial I will give the jury what -- I will tell the jury the

15   law that they have to apply in deciding this case.  Would you

16   be able to follow those instructions?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  Okay.  One moment.

19      Okay.  Go ahead.

20          PROSPECTIVE JUROR:  Juror No. 41.  I've been in

21   Orange Park, Florida, for 28 years; state of Florida 36 years.

22   Two years college education.  I work for LCI, formerly LC

23   Industries.  I am the manager.  I oversee and run two military

24   base supply stores that are located in Japan.  I work their

25   hours, so, I mean, I work 7 p.m. to 5 a.m. normally.

1          I am married, four kids:  a 19-year-old son, a

2    24-year-old daughter, a 26-year-old daughter, and a 29-year-old

3    son.  The 29-year-old, lost contact with.  He's out West, I

4    believe working for like a resort company.  My 26-year-old just

5    graduated and she's going to be going -- looking for a career

6    in accounting.  The 24-year-old is a registered nurse.  And

7    then my son, 19, works for Best Buy.

8          Let me see.  I do -- I did four years in the Navy,

9    Petty Officer Second Class.  It was in an F-18 squadron.  I

10   took care of the aircraft logbooks and the ground support

11   equipment.  I have not had any previous jury experience before

12   this.

13         THE COURT:  The 24-year-old who's a nurse, do you

14   know her employer?

15         PROSPECTIVE JUROR:  Yes, I'm sorry.  Baptist Health

16   out of Fleming Island.  And, I'm sorry, my wife is a medical

17   assistant.

18         THE COURT:  Where?

19         PROSPECTIVE JUROR:  It's a family practice, based --

20   basically works for UF Health.

21         THE COURT:  Thank you, sir.  And thank you for your

22   service.

23         PROSPECTIVE JUROR:  You're welcome.

24         PROSPECTIVE JUROR:  I'm Juror No. 42.  I've lived in

25   Jacksonville, Florida, for 20 years.  I've lived in Florida for

1   21 years.  I have an associate's degree.  My occupation, I'm a

2   substitute teacher.  I'm married.  My husband is retired

3   military.  He's working for the government.  I have four

4   childrens:  30- -- oh, God.  37, 36, 40, and 39.  The

5   41-year-old, he's in construction from Legacy Company.  The

6   39-year-old, he works at Amazon.  My daughter works at IHOP.

7   And my youngest son, he's a -- a welder.  No military prior and

8   no jury service.

9         THE COURT:  And where are you a substitute teacher?

10        PROSPECTIVE JUROR:  At Duval Scholars Academy.

11        THE COURT:  And your husband works for the

12   government.  Can you explain what you mean by that?

13        PROSPECTIVE JUROR:  He works on the base, on Mayport.

14        THE COURT:  Doing what?

15        PROSPECTIVE JUROR:  Oh, I don't -- I don't know.

16        THE COURT:  Okay.  That's fair.  And Juror No. 42,

17   you and I also share a last name.  Apparently it's common

18   today.  But we aren't related, right?

19        PROSPECTIVE JUROR:  No, ma'am.

20        THE COURT:  Okay.

21        Let's hear from No. 43.

22        PROSPECTIVE JUROR:  Juror No. 43.  I live in

23   Middleburg.  I've lived there for eight years.  I've lived in

24   Florida for about 13 years.  Level of education is a bachelor's

25   degree.  I have worked as a health and wellness educator.

1   Currently work as a personal trainer.

2         I'm married.  My husband works for the veteran's

3   hospital in teleradiology.  I don't have military experience,

4   but my husband is a service-disabled veteran.  I just served on

5   a jury two weeks ago and we reached a verdict.

6         THE COURT:  Were you the foreperson of that jury?

7         PROSPECTIVE JUROR:  No, I was not.

8         THE COURT:  Was it a civil or a criminal case?

9         PROSPECTIVE JUROR:  Criminal case.

10        THE COURT:  Give me one moment.

11        Thank you, ma'am.  And we certainly appreciate your

12   husband's service.

13        No. 44.

14        PROSPECTIVE JUROR:  I'm Juror No. 44.  I've lived in

15   St. Augustine for 12 years.  I've lived in Florida for seven

16   years.  I have a degree in early childhood education.  I'm a

17   kindergarten teacher.  I'm married.  My husband is a high

18   school teacher.  I have a stepson who's 15.  I do have previous

19   military -- United States Coast Guard, a mechanic, search and

20   rescue, and law enforcement.  And I've never previously served

21   on a jury.

22        THE COURT:  All right.  First of all, I missed --

23   tell me where you live currently.

24        PROSPECTIVE JUROR:  St. Augustine.

25        THE COURT:  And you've lived there for how long?

1           PROSPECTIVE JUROR:  12 years.

2           THE COURT:  And you're a kindergarten teacher where?

3           PROSPECTIVE JUROR:  Hartley Elementary.

4           THE COURT:  Can you --

5           PROSPECTIVE JUROR:  Hartley -- W.D. Hartley

6     Elementary.

7           THE COURT:  And your spouse is employed where?  What

8     school?

9           PROSPECTIVE JUROR:  Nease High School.

10          THE COURT:  Tell me what law enforcement

11    responsibilities you had in the Coast Guard.

12          PROSPECTIVE JUROR:  We would serve one day of search

13    and rescue, our second day was law enforcement, just searching

14    for boats, searching for drugs, weapons and such.

15          THE COURT:  All right.  First of all, thank you for

16    your service in the Coast Guard.  I do anticipate that we will

17    have witnesses that will be in the law enforcement community.

18    Would you be inclined to believe those witnesses over other

19    witnesses simply because they're in law enforcement?

20          PROSPECTIVE JUROR:  No, ma'am.

21          THE COURT:  Could you evaluate their credibility in

22    the same way you would any other witness?

23          PROSPECTIVE JUROR:  Yes, ma'am.

24          THE COURT:  Thank you.

25          No. 46 -- or 45, I apologize.

1          PROSPECTIVE JUROR:  Juror No. 45.  I currently reside

2     in Ponte Vedra Beach, Florida, for the last seven years.  I've

3     lived in Florida for 31 years.  I have a bachelor's degree from

4     University of Florida.  I currently work for Total Home Roofing

5     in sales.  I'm currently married but in the process of a

6     divorce.  My wife does not work, hasn't worked for about eight

7     years but recently started taking a couple of substitute

8     teaching jobs.  I have two children, one six and one eight

9     years old.  I have zero military experience and I have never

10    served on a jury before.

11         THE COURT:  Thank you, sir.

12         Go ahead.

13         PROSPECTIVE JUROR:  Juror 46.  Last seven years,

14    Duval County; Florida 58.  I have an associate's degree.  My

15    current occupation is a teaching assistant.  Previous

16    occupations were legal secretary.  I am married.  My husband is

17    an attorney for Morgan & Morgan.  I have four children:  30,

18    who works for Dunn Construction in Kansas City; 26-year-old who

19    works for Door Dash; 22-year- -- 23-year-old in medical school;

20    and a 22-year-old about to graduate college.  No military

21    service and no prior jury service.

22         THE COURT:  What sort of law does your spouse do at

23    Morgan & Morgan?

24         PROSPECTIVE JUROR:  Currently I would probably say

25    mass tort.

1          THE COURT:  And were you -- when you were a legal

2   secretary, was that at Morgan & Morgan or elsewhere?

3          PROSPECTIVE JUROR:  Elsewhere.

4          THE COURT:  Can you tell me where?

5          PROSPECTIVE JUROR:  In Jacksonville it was Bullock,

6   Childs & Pendley.

7          THE COURT:  Did they do any criminal work there,

8   criminal law?

9          PROSPECTIVE JUROR:  I don't -- I don't think so.  Not

10  that I was personally aware of.

11         THE COURT:  And where are you a teaching assistant?

12         PROSPECTIVE JUROR:  San Jose Episcopal Day School.

13         THE COURT:  Oh, my alma mater.

14         PROSPECTIVE JUROR:  Oh, really?

15         THE COURT:  How long has it been since you worked as

16  a legal secretary?

17         PROSPECTIVE JUROR:  30 years.  Once I had kids I

18  stayed at home.

19         THE COURT:  All right.  So to the extent you remember

20  anything about that, would you set it aside and decide the case

21  based solely on my instructions on the law?

22         PROSPECTIVE JUROR:  Yes.

23         THE COURT:  And to the extent that you have any

24  discussions about legal issues with your husband, could you set

25  any information he has given you aside and decide the case

1  solely on my instructions?

2          PROSPECTIVE JUROR:  Yes.  He's already told me I am

3  not to talk to him about it.

4          THE COURT:  And he's right.  I will tell all of you

5  not to talk to people about it, so . . .

6          Okay.  Let's hear from the next potential juror.

7          PROSPECTIVE JUROR:  Good morning.  Juror No. 47.

8  I've lived in Jacksonville for 62 years; state of Florida

9  62 years.  My level of education, I have a little -- I have

10 some college.  My husband -- let's see.  State your occupation.

11 Okay.  Sorry.  My occupation, I work with the State of Florida

12 as a deputy district clerk for Worker's Comp.

13         My marital status is a widow.  My husband, he worked

14 for Anchor Glass Container as a furnace operator.  I have three

15 children.  46-year-old is deceased.  I have a 42-year-old who

16 works for the ILA and a 37-year-old that is ITT with Tinker Air

17 Force Base.  I have no previous military service and I have not

18 been a previous juror.

19         THE COURT:  Thank you.

20         PROSPECTIVE JUROR:  I am Juror No. 48.  I have lived

21 in Jacksonville for almost five years; Florida for 23.  I am

22 currently working on my master's.  I'm doing my MBA in

23 accounting.  I'm an internal controls auditor at CSX.  Single

24 with no children.  No military service and no jury service.

25         THE COURT:  Okay.  Let's see.

1           Ladies and gentlemen, I'm going to start by telling

2    you what the case is about.  In this case the United States has

3    charged the defendants, Kristopher Justinboyer Ervin and

4    Matthew Raymond Hoover, with committing a number of federal

5    offenses.  Specifically, the United States charges Mr. Ervin

6    and Mr. Hoover with conspiring to transfer items which the

7    United States alleges constitute unregistered machine gun

8    conversion devices, in violation of federal law.

9           Additionally, the United States charges Mr. Ervin and

10   Mr. Hoover with individual substantive counts of transferring

11   what are alleged to be unregistered machine gun conversion

12   devices.

13          Mr. Ervin is also charged with several counts of

14   possessing alleged unregistered machine gun conversion devices

15   and with structuring cash withdrawals from his bank account in

16   order to avoid -- pardon me -- in order to evade currency

17   transaction reporting requirements.

18          Both Mr. Ervin and Mr. Hoover have entered not guilty

19   pleas to each and every charge against them.

20          Now, I'll start by reminding you of the very

21   important fact that the indictment, which I have just

22   summarized for you, is not evidence against the defendants.

23   The indictment is merely a charging document which identifies

24   the charges against the defendant.  It is not evidence of guilt

25   and you must not be influenced by the fact that an indictment

1    has been returned.

2            Now, I'm going to ask you-all some questions, and I

3    want to make sure that everybody is hearing me.  So I want to

4    see you nodding your heads or shaking your heads in response to

5    my questions.  And if you need to raise your paddle to answer a

6    question, please make sure that you raise it so that I see the

7    number.  We probably should have put numbers on both sides of

8    the paddles, but we weren't that smart.

9            So first of all, having just heard me explain the

10   nature of the case, is there anyone here who believes you know

11   anything about this case?

12       (No response.)

13           THE COURT:  Having simply heard the charges that I

14   have summarized, does anyone here believe that they have an

15   opinion about the case simply based on the nature of the

16   charges?

17       (No response.)

18           THE COURT:  All right.  At this time I'm going to ask

19   the lawyers and the individuals -- the lawyers to introduce

20   themselves and the individuals seated with them.

21           And if you-all have IT assistants that aren't seated

22   with you now but will be joining you during the trial, I will

23   ask you to introduce those people by name so that we know who

24   will be involved.

25           Ms. Taylor.

1          MS. TAYLOR:  Yes, Your Honor.

2          Good morning.  My name is Laura Cofer Taylor and I'm

3     an Assistant United States Attorney here in Jacksonville.

4     Seated with me at counsel table are my co-counsel, David

5     Mesrobian, who is also an Assistant United States Attorney, and

6     then our case agent, Jason Slosson, who is an agent with the

7     Bureau of Alcohol, Tobacco, Firearms and Explosives.

8          When we start the trial, Melita Ganoe, who runs the

9     computers to show all the exhibits for you, will be sitting at

10    the back table right behind us.

11          THE COURT:  Mr. King.

12          MR. KING:  And good morning, still.  My name is Alex

13    King.  Seated to my left is Theresa Hall, who is a paralegal

14    with my office, and then seated at the end is Mr. Justin Ervin.

15          MR. ZERMAY:  Good morning, everyone.  My name is

16    Zachary Zermay.  I'm an attorney.  And seated at the table with

17    me is my co-counsel, Matthew Larosiere; Sam Katzenberger, a

18    paralegal with our office; and the defendant, Matthew Hoover.

19          THE COURT:  All right.  Do any of you believe that

20    you are related by blood or marriage to any of these folks that

21    have just been introduced?

22      (No response.)

23          THE COURT:  Do you know any of them?

24      (No response.)

25          THE COURT:  Have any of you had any interaction with

```
 1   them -- Mr. King, what's -- can you give me the name of your
 2   law firm, please.
 3           MR. KING:  It's Monroe & King.
 4           THE COURT:  And Mr. Zermay and Mr. Larosiere, if you
 5   could identify your law firm names, please.
 6           MR. LAROSIERE:  Yes, Zermay and Larosiere.
 7           THE COURT:  Do any of you believe you've had any
 8   interaction with either of those law firms?
 9       (No response.)
10           THE COURT:  I'm going to read you a list of the names
11   of witnesses that we may hear from during the trial, and I'll
12   ask you to listen carefully because at the end I'm going to ask
13   you if you think you know any of these individuals.
14           Jesse Hooker with the Bureau of Alcohol, Tobacco,
15   Firearms and Explosives; Jason Slosson, also with the ATF; John
16   Powley with ATF; Chad Lifsey with ATF; Andrew Mutz with ATF;
17   Lyndsey Butler; Michael Medlin; Cody Toy; Ernest Lintner,
18   L-i-n-t-n-e-r; Keith Hannon; Christopher Martin; Richard
19   Batchelder; Thomas Plumley; Christopher Pekerol; Aaron
20   Thoroughgood; Carolanne Wolfe; John Monger.  I'm not sure if
21   it's pronounced Monger or Monjer.  It's spelled M-o-n-g-e-r.
22           Kristin Ervin; Kris Ervin; Erica Hoover; Ronald
23   Davis; Steven Duty; Joel Moya; Randy Willis; James Acs.  That's
24   spelled A-c-s.
25           Phillip Wilson; Richard Roberts; Tristan Alderson;
```

1    Aric, spelled A-r-i-c, Osso.  That's O-s-s-o.

2              Darek Stennes; David Bane; John Palmer Clarkson, III;

3    Joncarlos Ruiz; Patrick Breslend; Amy Sarkese; Andrea Useche.

4    That's spelled U-s-e-c-h-e.  Matthew LeVay and Daniel O'Kelly.

5              Do any of you believe that you know any of those

6    individuals?

7         (No response.)

8              THE COURT:  Counsel, did I miss any potential

9    witness?

10             MS. TAYLOR:  No, Your Honor.

11             MR. KING:  No, Your Honor.

12             MR. LAROSIERE:  No, Your Honor.

13             THE COURT:  All right.  Do any of you know or

14   recognize any of the individuals seated in the courtroom?  And

15   that includes one another.

16        (No response.)

17             THE COURT:  All right.  Raise your paddle if you have

18   ever been a party to a lawsuit, that is, if you've ever sued

19   someone or been sued by someone.

20        (Paddles raised.)

21             THE COURT:  So I think I saw Juror No. 1.  Do you

22   have your paddle up?

23             PROSPECTIVE JUROR:  No, sorry.

24             THE COURT:  Okay.  So just the back row, starting

25   with No. 18.  We'll get the microphone up to you right away.

1              All right.  Juror 18, what can you tell us about
2    that?
3              PROSPECTIVE JUROR:  Does it relate to the business
4    that I own?
5              THE COURT:  All right.  So you were involved in a
6    lawsuit relating to your business?
7              PROSPECTIVE JUROR:  Excuse me?
8              THE COURT:  You were involved in a civil lawsuit
9    relating to your business?
10             PROSPECTIVE JUROR:  I had somebody pass away on top
11   of a building, which in turn turned around and sued our
12   business.
13             THE COURT:  Okay.  And did you have attorneys in that
14   case?
15             PROSPECTIVE JUROR:  No.  I did not really hear
16   anything back from it.  Insurance kind of I think squashed
17   everything, yes, ma'am.
18             THE COURT:  Okay.  So did you have to come in and
19   testify?
20             PROSPECTIVE JUROR:  No, ma'am.
21             THE COURT:  Is there anything about that interaction
22   with the justice system that would influence your verdict in
23   this case?
24             PROSPECTIVE JUROR:  No, ma'am.
25             THE COURT:  All right.

1              I think I saw Juror No. 20.

2              PROSPECTIVE JUROR:  Currently being sued for debt.  I

3    am in the middle of a bankruptcy to expunge said debt.

4              THE COURT:  Okay.  And that's -- that's a bankruptcy.

5    Is that going on here in this building?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Where is the bankruptcy?

8              PROSPECTIVE JUROR:  I'm not sure.  I literally got it

9    started a week ago.  I filed and paid the lawyer and we're

10   gathering all the information.

11             THE COURT:  All right.  And so you've got a lawyer

12   that you're working with on that?

13             PROSPECTIVE JUROR:  Yes.

14             THE COURT:  Is there anything about that experience

15   that you believe would influence your verdict in this case?

16             PROSPECTIVE JUROR:  No.

17             THE COURT:  All right, sir.

18             Anybody else ever been sued or sued somebody?  And

19   I'll get to the back in just a minute.  All right.  Nobody else

20   in the gallery, so we'll go to the back of the courtroom.  And

21   if you could raise your paddles.

22        (Paddles raised.)

23             THE COURT:  All right.  We'll start with 27 and then

24   go to 35.

25             27, can you tell us about your --

1          PROSPECTIVE JUROR:  My business has been sued three

2    times.  All three times it was a civil suit.  We went to

3    mediation.  We won.  Well, you know, what we thought was

4    winning.  We resolved the issue and everybody was happy.

5          THE COURT:  All right.  So you resolved it at

6    mediation --

7          PROSPECTIVE JUROR:  Yes, ma'am.

8          THE COURT:  -- in a way that was satisfactory to you?

9          PROSPECTIVE JUROR:  Yes, ma'am.

10          THE COURT:  Was there anything about any of those

11    experiences that would influence your verdict in this case?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  Okay.  Thank you, sir.  That's what we

14    love about mediation.

15          Number --

16          PROSPECTIVE JUROR:  35.

17          THE COURT:  -- 35.

18          PROSPECTIVE JUROR:  I was in a car wreck about three

19    years ago.  I was injured.

20          THE COURT:  And you hired a lawyer to help you with

21    that?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  And did they actually have to file a

24    lawsuit?

25          PROSPECTIVE JUROR:  Yes.

1          THE COURT:  Did you have to give a deposition?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Did it go to trial?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  So it resolved -- it settled after your

6    deposition?

7          PROSPECTIVE JUROR:  It just settled a few weeks ago.

8    Still technically doing paperwork.

9          THE COURT:  Okay.  And are you satisfied with the way

10   that came out?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  Is there anything about that experience

13   that would influence your verdict in this case?

14         PROSPECTIVE JUROR:  No, I don't believe so.

15         THE COURT:  Was your lawyer with Morgan & Morgan?

16         PROSPECTIVE JUROR:  No.

17         THE COURT:  Forgive me if I asked this.  Was there

18   anything about that experience that would influence your

19   verdict in this case?

20         PROSPECTIVE JUROR:  No.

21         THE COURT:  Okay.  Take your seat.  Give me one

22   moment.

23         Okay.  No. 42.

24         PROSPECTIVE JUROR:  I was in a car accident.

25         THE COURT:  All right.  And did you sue somebody for

1   that or did they sue you?

2          PROSPECTIVE JUROR:  No, I sued somebody for that.

3          THE COURT:  Okay.  And did you have to give a

4   deposition?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Did it just settle after you filed the

7   lawsuit?

8          PROSPECTIVE JUROR:  Yes, the lawyers and them settled

9   it.

10          THE COURT:  The lawyers settled it?

11          PROSPECTIVE JUROR:  Yes.

12          THE COURT:  Was Morgan & Morgan one of the lawyers?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  Were you satisfied with that interaction

15   with our justice system?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  Is there anything about that experience

18   that would influence your verdict in this case?

19          PROSPECTIVE JUROR:  No.

20          THE COURT:  All right.  Thank you.

21          I think I saw another paddle.  No. 45.

22          COURTROOM DEPUTY:  There's another one, 33.

23          THE COURT:  Okay.

24          PROSPECTIVE JUROR:  I was in a car accident.  I was

25   sued, went to court, and --

1           THE COURT:  I can't hear you.

2           PROSPECTIVE JUROR:  I said I was in a car accident

3   like 30 years ago.  I was sued, insurance company.  We went to

4   court, trial.  And I have no other -- was satisfied with it.

5           THE COURT:  Okay.  Did you have to testify at the

6   trial?

7           PROSPECTIVE JUROR:  Yes.

8           THE COURT:  And did the jury determine you to be at

9   fault or not at fault?

10          PROSPECTIVE JUROR:  At fault.

11          THE COURT:  Was there anything about that experience

12   that would influence your verdict in this case?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  And I believe I saw . . .

15          PROSPECTIVE JUROR:  The only experience I have is

16   currently I think I mentioned I have sued my current wife for

17   divorce, so I don't know if that counts.  And we're in the

18   legal process now.

19          THE COURT:  All right.  Thank you, No. 45.

20          No. 44.

21          PROSPECTIVE JUROR:  I'm not sure if this is going to

22   be relating or not, but this was several years back.  I don't

23   remember the details, but I did sue for wrongful termination

24   for discrimination.  I didn't go to court.  And like I said, it

25   was a long time ago so I don't remember exactly what happened

1   at the end, but I was not very happy at the end.

2          THE COURT:  And was your dissatisfaction with the

3   justice system?

4          PROSPECTIVE JUROR:  No, ma'am.

5          THE COURT:  Is there anything about that experience

6   that would influence your ability to serve as a fair and

7   impartial juror in this case?

8          PROSPECTIVE JUROR:  No, ma'am.

9          THE COURT:  All right.  Thank you.

10          Have any of you either studied law or had paralegal

11   training that you haven't already told me about?  Anybody on

12   the jury box?  No.

13      (No response.)

14          THE COURT:  Anybody in the back?

15      (Paddle raised.)

16          THE COURT:  No. 45.  Can you tell us about that?

17          PROSPECTIVE JUROR:  I haven't so much studied law,

18   but you mentioned something earlier, people mentioned earlier,

19   previously in undergrad I took criminology classes.  I was

20   going that route, but then I changed direction.

21          THE COURT:  Are you able to set aside what you

22   remember --

23          PROSPECTIVE JUROR:  Absolutely.

24          THE COURT:  -- from your criminology studies --

25          PROSPECTIVE JUROR:  Yeah.

1        THE COURT:  -- and base your verdict based solely on

2   my instructions?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  I see No. 48.

5        Ada, behind you.

6        PROSPECTIVE JUROR:  I took a business law class a

7   long time ago.  It was required for my undergraduate degrees in

8   finance and management.  I do not remember much from that

9   class, so it wouldn't impact my judgment.

10        THE COURT:  And to the extent you do remember it --

11        PROSPECTIVE JUROR:  Absolutely.

12        THE COURT:  -- you'll set it aside and decide the

13   case based solely on my instructions?

14        PROSPECTIVE JUROR:  Yes.

15        THE COURT:  You will be instructed that during the

16   trial you have to keep an open mind and you must not form or

17   express any opinion about the testimony or the evidence until

18   you've heard all of the evidence, my instructions on the law,

19   and the closing arguments of the attorneys.  Can all of you

20   wait until you've heard all of those things before you form or

21   express any opinion?

22        (Affirmative head nods.)

23        THE COURT:  Is there anyone here who just doesn't

24   think they can do that?

25        (No response.)

1          THE COURT:  You're also going to be instructed that

2    you can't discuss the case with one another, your family, your

3    friends, or anybody else, and you can't post about it or

4    discuss it on social media.  Can all of you stay off of social

5    media during the pendency of the case and not discuss anything

6    about the case during that time?

7          (Affirmative head nods.)

8          THE COURT:  Is there anyone here who can't do that?

9          (No response.)

10          THE COURT:  Do all of you believe in a trial by jury

11    under our judicial system?  Is there anybody here who does not

12    believe in our trial by jury?  And if you don't, please raise

13    your paddle.

14          (No response.)

15          THE COURT:  Is there anyone here who does not believe

16    in the right to a jury trial?  Raise your paddle.

17          (No response.)

18          THE COURT:  Does everyone understand that a defendant

19    is presumed innocent of any crime charged, and the defendant is

20    not required to prove his or her innocence?  Does everyone

21    understand that?

22          (Affirmative head nods.)

23          THE COURT:  Please raise your paddle if you are not

24    able to follow that rule.

25          (No response.)

1    THE COURT:  Does everyone understand that a defendant

2  cannot be found guilty unless the government proves the

3  defendant guilty beyond a reasonable doubt?  Does everyone

4  understand that?

5    (Affirmative head nods.)

6    THE COURT:  Is there anyone here that would have

7  difficulty following that rule; that is, difficulty holding the

8  government to their burden of proof beyond a reasonable doubt?

9    (No response.)

10    THE COURT:  Do all of you understand that a defendant

11  has the right to remain silent, and if a defendant chooses not

12  to testify, you must not consider that in any way in reaching

13  your decision?  Does everyone understand that?

14    (Affirmative head nods.)

15    THE COURT:  Is there anyone here who believes that if

16  a defendant was truly innocent, that the defendant would take

17  the stand?

18    (No response.)

19    THE COURT:  Is there anyone here who would hold it

20  against the defendant if a defendant chooses not to testify?

21    (Negative head nods.)

22    THE COURT:  Have any of you or a close member of our

23  family ever served as a prosecuting attorney?

24    (Paddle raised.)

25    THE COURT:  No. 40.  Can you tell us about that?

 1          PROSPECTIVE JUROR:  My father's a retired career
 2   prosecutor.
 3          THE COURT:  And where was he a prosecutor?
 4          PROSPECTIVE JUROR:  I think the 17th Circuit, Fort
 5   Lauderdale.
 6          THE COURT:  All right.  How long has he been retired?
 7          PROSPECTIVE JUROR:  Three years.
 8          THE COURT:  I'm sorry, three years?
 9          PROSPECTIVE JUROR:  About.  Actually, correction, he
10   did a little bit of part-time work maybe a year ago.  He just
11   loved it so much.  But he's retired now.
12          THE COURT:  All right.  Over the years, did you talk
13   to him about his cases?
14          PROSPECTIVE JUROR:  Not specific cases, but I've, you
15   know, been influenced by it.
16          THE COURT:  Do you believe that that would influence
17   your verdict in this case?
18          PROSPECTIVE JUROR:  It could.
19          THE COURT:  All right.  We'll talk about that later.
20          All right.  And we had another -- Juror No. 21.
21          PROSPECTIVE JUROR:  My sister was a DA in Marietta
22   County in Atlanta.
23          THE COURT:  For how long?
24          PROSPECTIVE JUROR:  Maybe five years.
25          THE COURT:  And how long ago was that?

1        PROSPECTIVE JUROR:  Maybe five years ago.

2        THE COURT:  And were you living in -- with or around

3   her at the time?

4        PROSPECTIVE JUROR:  No.

5        THE COURT:  Did you ever talk to her about her work?

6        PROSPECTIVE JUROR:  Maybe just in passing.  It was

7   almost primarily DUI cases.

8        THE COURT:  The what?

9        PROSPECTIVE JUROR:  DUI cases.

10        THE COURT:  She primarily handled DUI cases?

11        PROSPECTIVE JUROR:  Yes.

12        THE COURT:  Is there anything about her discussions

13   or your discussions with her that you believe would influence

14   your verdict in this case?

15        PROSPECTIVE JUROR:  No.

16        THE COURT:  To the extent you recall anything from

17   her -- those discussions, would you set it aside and decide the

18   case based solely on the law as I instruct you?

19        PROSPECTIVE JUROR:  Yes.

20        THE COURT:  Anybody else?

21     (No response.)

22        THE COURT:  Have any of you been in court as a

23   witness or as a participant in a case that you haven't already

24   told me about?

25     (Paddles raised.)

1          THE COURT:  All right.  So we'll start with No. 7.

2          PROSPECTIVE JUROR:  My previous job I was a child

3     protective investigator for the State of Florida in Putnam

4     County.

5          THE COURT:  And so you came into court and testified

6     probably a number of times; is that right?

7          PROSPECTIVE JUROR:  Yes, ma'am.

8          THE COURT:  Anything about those experiences that

9     would influence your verdict in this case?

10         PROSPECTIVE JUROR:  No, ma'am.

11         THE COURT:  All right.  Thank you.

12         There were two more down here.  Let's see.  Well,

13    actually, let's go to 14 because she's closer.  Trying not to

14    make you walk so much.

15         14?

16         PROSPECTIVE JUROR:  I don't know if this counts or

17    not, but I was in a car accident many years ago.  And the

18    person who hit me was uninsured and so he was sued.  And I had

19    to come in and talk to lawyers and my insurance agent because

20    my insurance agency was the one suing him.  And I don't know

21    what happened to it, anything.  We just came in, we sat down in

22    the courthouse, I believe it was the old courthouse, that's how

23    long ago it was, and that was it.

24         THE COURT:  Okay.  Is there anything about that

25    experience that would influence your verdict in this case?

1           PROSPECTIVE JUROR:  No, ma'am.

2           THE COURT:  All right.  Were you satisfied with how

3   you were treated?

4           PROSPECTIVE JUROR:  Yes.

5           THE COURT:  Okay.  Let's talk to No. 22, please.

6           PROSPECTIVE JUROR:  I was a witness in a medical

7   malpractice suit, old girlfriend, years ago.

8           THE COURT:  All right.  And did you give a

9   deposition?

10          PROSPECTIVE JUROR:  Yes, I did.

11          THE COURT:  Did you testify at trial?

12          PROSPECTIVE JUROR:  Yes, I did.

13          THE COURT:  Did you have any opinion about how the

14  trial was handled?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Is there anything about that experience

17  that would influence your verdict in this case?

18          PROSPECTIVE JUROR:  Not at all.  Not at all.

19          THE COURT:  All right, sir.  Thank you.

20          And I think we were down here, No. 9.

21          PROSPECTIVE JUROR:  I had to -- well, with my

22  previous employer -- well, part-time currently.  My previous

23  employer I had to do a deposition on -- at that time it was a

24  civil suit based upon -- from a school shooting.

25          THE COURT:  And tell me who your previous employer

1    was.

2         PROSPECTIVE JUROR:  Contemporary Services

3    Corporation.

4         THE COURT:  What did that company do?

5         PROSPECTIVE JUROR:  It was event security.

6         THE COURT:  I'm sorry?

7         PROSPECTIVE JUROR:  Event security.

8         THE COURT:  Did you testify at a trial --

9         PROSPECTIVE JUROR:  No.

10        THE COURT:  -- or just --

11        PROSPECTIVE JUROR:  I had to do a deposition.  And at

12   the time everything was pretty much Zoom-type calls, but it was

13   during that period of time.

14        THE COURT:  Okay.  Is there anything about that

15   experience that would influence your verdict in this case?

16        PROSPECTIVE JUROR:  I don't believe so.

17        THE COURT:  Do you have any hesitation in that

18   regard?

19        PROSPECTIVE JUROR:  No.  I mean, I don't know all the

20   details of this case, if it would be something that would be

21   correlating to that situation.

22        THE COURT:  Okay.

23        And No. 11.

24        PROSPECTIVE JUROR:  I was a dependency case manager,

25   so I did depositions and had to come and testify.

```
 1            THE COURT:  So you've been in court a number of
 2    times.
 3            PROSPECTIVE JUROR:  I have, in a past life.
 4            THE COURT:  Anything about those experiences that
 5    would affect your ability to sit as a juror in this case?
 6            PROSPECTIVE JUROR:  I don't think so.
 7            THE COURT:  Are you hesitant about that?
 8            PROSPECTIVE JUROR:  I'm hesitant about everything,
 9    so . . .
10            THE COURT:  Okay.  Well, let me put it this way:  Is
11    there anything about those prior interactions that you believe
12    would relate to the subject matter of this case?
13            PROSPECTIVE JUROR:  Doesn't childhood relate to
14    everything?  I don't know.  I don't think so, but that's how my
15    brain functions.
16            THE COURT:  Okay.  All right.
17            Anybody else in --
18        (Paddle raised.)
19            PROSPECTIVE JUROR:  Hi.
20            THE COURT:  No. 23.
21            PROSPECTIVE JUROR:  I'm sorry, Judge.  I thought
22    about this, it's been over 30 years ago.  I was here.  I was
23    the victim of a robbery.  And I really didn't have to go to
24    court or anything.  The gentleman pled out, so it -- I didn't
25    have to do anything with that.
```

 1          THE COURT:  Were you satisfied with the way law

 2   enforcement dealt with that?

 3          PROSPECTIVE JUROR:  Definitely.

 4          THE COURT:  Do you remember what the law enforcement

 5   agency was?

 6          PROSPECTIVE JUROR:  I don't.  It was the -- the

 7   robbery took place in Duval County.  It was actually in Neptune

 8   Beach.

 9          THE COURT:  Okay.  Is there anything about that that

10   would influence your verdict in this case?

11          PROSPECTIVE JUROR:  No, I don't believe so, no,

12   ma'am.

13          THE COURT:  Okay.  Thank you.

14          PROSPECTIVE JUROR:  Thank you.

15          THE COURT:  Anybody else in the jury box?

16      (No response.)

17          THE COURT:  All right.  We'll turn to the back of the

18   courtroom.  The question is whether you've ever been a witness

19   or involved in a court proceeding in any way.

20      (Paddles raised.)

21          THE COURT:  And we'll start with 27.

22          PROSPECTIVE JUROR:  As a pastor in Starke, people

23   would come to the church.  I've had three men and one woman

24   come to the church.  They came for four or five months, and

25   then they would come and want some counsel and they're running

1   from the law or they've got some monkey on their back

2   concerning the law.  And so I would encourage them to turn

3   themselves in and face the consequences, do what they needed to

4   do.  So I would give a character reference, what I knew of

5   them.  I've done it four or five times.

6              THE COURT:  Okay.  Is there anything about your

7   experiences with those individuals and their treatment by the

8   justice system that would influence your verdict in this case?

9              PROSPECTIVE JUROR:  None at all.  My mother is a

10  juvenile officer back home too, so I don't know if you need to

11  know that.  She's in court on Tuesdays and Thursdays every

12  week, so I don't bother her then.

13             THE COURT:  Would any of those matters cause you to

14  favor one side or the other in this case?

15             PROSPECTIVE JUROR:  No, ma'am, no, ma'am.

16             THE COURT:  Can you give both the prosecution and the

17  defense equal opportunity?

18             PROSPECTIVE JUROR:  Yes, ma'am.

19             THE COURT:  And you'll hold the government to their

20  burden?

21             PROSPECTIVE JUROR:  Yes, ma'am.

22             THE COURT:  Okay.  Let's see.  I saw some other

23  paddles, but -- okay.  So 40.

24             PROSPECTIVE JUROR:  Um, so --

25             THE COURT:  Wait, no, no, I'm sorry.  You're 36.

1            PROSPECTIVE JUROR:  36.

2            THE COURT:  Okay.

3            PROSPECTIVE JUROR:  I've only been to court for like

4    traffic and child support.

5            THE COURT:  Okay.  And I'm -- I think almost

6    everybody has had to go to court for either traffic or child

7    support, so we're not concerned with those matters.  Thank you.

8            Number -- I need the paddle.

9            PROSPECTIVE JUROR:  Juror 40.

10           THE COURT:  All right.  40.

11           PROSPECTIVE JUROR:  I've had to litigate a few cases,

12   but I was primarily a transactional attorney.

13           THE COURT:  Okay.  So other than -- well, is there

14   anything about the cases that you handled as an attorney that

15   you believe would influence your verdict in this case?

16           PROSPECTIVE JUROR:  No.

17           THE COURT:  And have you been involved in the justice

18   system in any other way other than as a litigator?

19           PROSPECTIVE JUROR:  I was a clerk before graduating.

20           THE COURT:  Of a --

21           PROSPECTIVE JUROR:  Of a law firm, so . . .

22           THE COURT:  A summer law clerk?

23           PROSPECTIVE JUROR:  Well, that, too, but even in

24   undergrad, just an assistant.

25           THE COURT:  Okay.  Anything about those experiences

1    that would influence your verdict in this case?

2            PROSPECTIVE JUROR:  No.

3            THE COURT:  And once again, to the extent that you --

4    when you were working as an attorney or as a clerk, to the

5    extent that you had any involvement with criminal law, would

6    you put aside any instructions that you received or any

7    understandings that you obtained and base this case solely on

8    the law as you're instructed in this court?

9            PROSPECTIVE JUROR:  Yes.

10           THE COURT:  All right.  Thank you.

11           Anybody else in the gallery?

12       (No response.)

13           THE COURT:  Nope?  Okay.

14           Have you or a member of your close family ever been

15   employed by law enforcement that you haven't already told me

16   about?

17       (Paddle raised.)

18           THE COURT:  No. 44.

19           PROSPECTIVE JUROR:  My father is deceased, but he was

20   with the St. Johns County -- he was a deputy.  And my husband

21   is retired New York City.

22           THE COURT:  All right.  And I think I already asked

23   you -- well, I did already ask you if you would evaluate the

24   testimony of --

25           PROSPECTIVE JUROR:  Yes.

1        THE COURT:  -- law enforcement in the same way.

2    Okay.  So I won't repeat that question because you've answered

3    it.

4        Number -- let's see -- 36 is the closest to you, Ada,

5    or -- all right.  We'll --

6        PROSPECTIVE JUROR:  I don't have --

7        THE COURT:  I'm sorry, you're 41, right?

8        PROSPECTIVE JUROR:  41, yes, ma'am.  I've got family

9    up North.  I've got a brother-in-law who is a police officer,

10   and my sister is a New Jersey state patrol officer, but nobody

11   here in Florida and no -- no like direct relatives for me here

12   in Florida.

13       THE COURT:  All right.  As I've told some of the

14   other potential jurors, I anticipate that there will be law

15   enforcement witnesses testifying.  Would you believe them over

16   other witnesses simply because they're employed by law

17   enforcement?

18       PROSPECTIVE JUROR:  No, ma'am.

19       THE COURT:  Would you evaluate their testimony in the

20   same way as you would any other witness?

21       PROSPECTIVE JUROR:  Yes, ma'am.

22       THE COURT:  All right.  Let's talk to No. 36.

23       PROSPECTIVE JUROR:  My first cousin is a police

24   officer in Jacksonville, Florida.

25       THE COURT:  Do you know what law enforcement agency?

1          PROSPECTIVE JUROR:  No, I just know JSO.

2          THE COURT:  JSO?

3          PROSPECTIVE JUROR:  Yes, ma'am.

4          THE COURT:  Okay.  Would you evaluate the testimony

5     of a law enforcement witness in the same way as any other

6     witness?

7          PROSPECTIVE JUROR:  Yes, ma'am.

8          THE COURT:  Do you believe law enforcement officers

9     are more trustworthy than other witnesses?

10         PROSPECTIVE JUROR:  No, ma'am.

11         THE COURT:  28, I guess -- well, 35 is right beside

12    you.

13         PROSPECTIVE JUROR:  My great aunt is a police -- or

14    is a retired police officer in Phoenix, Arizona, I believe.

15         THE COURT:  Okay.  I'll ask you those same two

16    questions.  Would you believe a law enforcement officer over

17    another witness simply because they're in law enforcement?

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Can you assure us that you would evaluate

20    their testimony in the same way as you would any other witness?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Okay.  Thank you.

23         And I think that was 28?

24         PROSPECTIVE JUROR:  My grandfather is a retired

25    Baltimore City police officer.

 1          THE COURT:  Would you be inclined to believe law

 2   enforcement witnesses over other witnesses because of their

 3   employment?

 4          PROSPECTIVE JUROR:  No, ma'am.

 5          THE COURT:  Would you evaluate their testimony in the

 6   same way as you would any other witness?

 7          PROSPECTIVE JUROR:  Yes, ma'am.

 8          THE COURT:  All right.  Thank you.

 9          26.

10          PROSPECTIVE JUROR:  I don't have family members in

11   law enforcement, but I do have really, really close friends

12   that are in law enforcement.  One of them's the assistant chief

13   in Lake City.  And the other one is an internal investigator.

14   And then I know a few more that work with Lake City Sheriff's

15   Office.  But like I say, I have a few that I know that are in

16   law enforcement.

17          THE COURT:  All right.  So you're pretty close with a

18   number of individuals involved in law enforcement.  Would that

19   cause you to tend to believe a law enforcement officer over

20   other witnesses?

21          PROSPECTIVE JUROR:  It would, it would, because

22   they're real good friends of mine.

23          THE COURT:  Okay.

24          We've got, right here on the front row, No. 6.

25          PROSPECTIVE JUROR:  I have a close friend who's a

1    police officer with St. Augustine Beach.

2              THE COURT:  Given your friendship, have you developed

3    an opinion that would cause you to believe law enforcement

4    officers over other witnesses simply because of their

5    employment?

6              PROSPECTIVE JUROR:  No.

7              THE COURT:  Would you evaluate the testimony of a law

8    enforcement witness in the same way as you would any other

9    witness?

10             PROSPECTIVE JUROR:  Yes, ma'am.

11             THE COURT:  All right.

12             I think No. 2 has her paddle up.  If you could pass

13   that down.

14             PROSPECTIVE JUROR:  My mother works for JSO dispatch

15   and my cousin works as a lieutenant commander for JSO.

16             THE COURT:  All right.  I don't know that we'll hear

17   from JSO witnesses, but we'll certainly hear from other law

18   enforcement agencies.  Would you tend to believe those law

19   enforcement witnesses simply because they're in law

20   enforcement?

21             PROSPECTIVE JUROR:  No, ma'am.

22             THE COURT:  Would you evaluate and test the

23   credibility of their testimony just like any other witness?

24             PROSPECTIVE JUROR:  Yes, ma'am.

25             THE COURT:  Okay.

1            No. 22 in the third row, please.

2            PROSPECTIVE JUROR:  My sister was a probational

3    officer, my brother-in-law -- my brother-in-law was a police

4    officer, and I have two cousins who were police officers.

5            THE COURT:  Okay.  Does your relationship with them

6    cause you to have an opinion that law enforcement officers are

7    more trustworthy than others?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  Would you evaluate the testimony of a law

10   enforcement officer in the same way as you would any other

11   witness?

12           PROSPECTIVE JUROR:  Yes, I would.

13           THE COURT:  Okay.

14           Please raise your paddle if you or a close member of

15   your family has had any dealings with the United States

16   Attorney's Office here in middle Florida or elsewhere.

17       (Paddle raised.)

18           THE COURT:  No. 36.  Yes, ma'am.

19           PROSPECTIVE JUROR:  My brother.

20           THE COURT:  Is that something you want to tell us

21   about here or would you prefer to speak privately about it?

22           PROSPECTIVE JUROR:  Life lessons.  Hopefully he's

23   learned and we won't go through that again.

24           THE COURT:  All right.  I'm just going to make a note

25   and we'll talk about it.

1    To your knowledge, have any of you or a close member

2  of your family ever been the subject of an investigation by the

3  United States Attorney's Office, a federal grand jury, or

4  federal law enforcement agency?

5    PROSPECTIVE JUROR:  Can you repeat that?

6    THE COURT:  Sure.  To your knowledge, have any of you

7  or a member of your family ever been the subject of an

8  investigation by a United States Attorney's Office, a federal

9  grand jury, or a federal law enforcement agency?

10   (Paddle raised.)

11   THE COURT:  Just a moment.

12   Go ahead, Juror No. 5.

13   PROSPECTIVE JUROR:  I don't know if this has any

14  bearing, but if your parent was arrested at some point in their

15  life on drugs and served time, does that . . .

16   THE COURT:  So you have --

17   PROSPECTIVE JUROR:  Many years ago, 40 years ago.

18   THE COURT:  You said a parent?

19   PROSPECTIVE JUROR:  (Nods head.)

20   THE COURT:  And were they charged with criminal

21  charges or just investigated?

22   PROSPECTIVE JUROR:  I do not know.  Served time in

23  prison, I know.

24   THE COURT:  Okay.  And was that before you were old

25  enough to know what was going on?

1          PROSPECTIVE JUROR:  No, I knew it was going on.  I
2   was not -- well, they were going through a divorce, my parents,
3   when that happened.
4          THE COURT:  Was it a mother or father that served
5   some time?
6          PROSPECTIVE JUROR:  Father.
7          THE COURT:  Did you have an opinion as to whether he
8   was treated fairly or unfairly by the justice system?
9          PROSPECTIVE JUROR:  I do not.
10          THE COURT:  Is there anything about his experience
11   with our justice system that would influence your verdict in
12   this case?
13          PROSPECTIVE JUROR:  No, ma'am.
14          THE COURT:  Anybody else?
15      (Paddle raised.)
16          THE COURT:  No. 36, I see your paddle up, but since
17   I'm going to talk to you about that, I'm going to . . .
18          Anyone else?
19      (No response.)
20          THE COURT:  Okay.  Have any of you ever been sued by
21   the United States or sued the United States?
22      (No response.)
23          THE COURT:  Have any of you had any other type of
24   case or claim with the United States government?
25      (No response.)

1    THE COURT:  One of the principal responsibilities of

2  jurors is to consider the testimony of the various witnesses

3  and to determine the credibility, that is, the believability,

4  of the testimony of each witness.

5    As I've expressed to a number of you individually, we

6  will hear testimony from law enforcement officers.  And with

7  respect to those questions, I want you to raise your paddle if

8  because of any past experience or for any other reason you

9  would tend to believe or disbelieve a law enforcement witness

10  over another witness simply because the individual is in law

11  enforcement.

12    (Paddles raised.)

13    THE COURT:  All right.  Juror No. 26.  And you've

14  told me about that.  Thank you, sir.

15    Anybody else?

16    (Paddle raised.)

17    THE COURT:  Juror No. 40.  And I'm just going to make

18  a note to talk to Juror No. 40 about that.

19    Anyone else?

20    (No response.)

21    THE COURT:  Have you, a close relative, or a friend

22  been involved in criminal defense work, that is, defending

23  individuals charged with crimes by the government?

24    (No response.)

25    THE COURT:  No.

1          Do any of you have a medical or physical condition or

2     impairment that would make it difficult for you to serve as a

3     juror in this case?

4          (No response.)

5          THE COURT:  And I will say out loud again, jury

6     selection is the longest you ever sit.  During the trial I

7     won't let you sit for more than about an hour and 45 minutes,

8     and I'm very careful about that.  And those of you who are

9     sitting now, if you need to stand up and stretch, please go

10    ahead and do that.

11         And can everyone hear me and understand me?

12         (Affirmative head nods.)

13         THE COURT:  And can you see me?

14         (Affirmative head nods.)

15         THE COURT:  Have any of you been the victim of a

16    crime that you have not told us about?

17         (No response.)

18         THE COURT:  Does everyone here understand English?

19         (Affirmative head nods.)

20         THE COURT:  Have any of you, a relative, or a close

21    friend been charged with a criminal offense, other than a

22    traffic citation, that you have not already told me about?

23         (Paddles raised.)

24         THE COURT:  And No. 36, is that the same matter that

25    we're going to talk about?

1           PROSPECTIVE JUROR:  Same person.

2           THE COURT:  Okay.

3           PROSPECTIVE JUROR:  And my dad.

4           THE COURT:  Okay.  I've just added that to our list.

5           And I believe I saw 47.

6           PROSPECTIVE JUROR:  I have a cousin that is now -- we

7    have a court case, a murder case, that is in the district court

8    right now.

9           THE COURT:  Is that the state court over here?

10          PROSPECTIVE JUROR:  Yes.

11          THE COURT:  And the cousin, is that individual

12   charged with the --

13          PROSPECTIVE JUROR:  That's correct.

14          THE COURT:  Have you been involved in his defense?

15          PROSPECTIVE JUROR:  Not right now, but I anticipate

16   that I will be because it was my nephew that was murdered, yes.

17          THE COURT:  Okay.  I'm just going to make a note and

18   we'll talk about that.

19          Anybody else?

20       (Paddle raised.)

21          THE COURT:  No. 20.  Go ahead.

22          PROSPECTIVE JUROR:  This is -- when you asked if we

23   were the victim of a crime, and I remembered about 15 years ago

24   my house was burglarized and they stole some electronics, my

25   computer, my stereo system and some other stuff out of my

1  house.

2          THE COURT:  And where was that?

3          PROSPECTIVE JUROR:  Fort White, more than ten years

4  ago.

5          THE COURT:  Did you repeat it to law enforcement --

6          PROSPECTIVE JUROR:  Yes.

7          THE COURT:  -- report it to law enforcement?  And was

8  the individual apprehended?

9          PROSPECTIVE JUROR:  I don't believe so.  They came by

10  and they just took some evidence and a report and I never heard

11  about it again.

12          THE COURT:  All right.  Is there anything about that

13  interaction with the criminal justice system that would

14  influence your verdict in this case?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Is there anyone here who has any

17  conscientious objection, religious belief, or other mental

18  reservation such that you could not in good faith and good

19  conscience sit as a juror in this criminal case and return a

20  verdict of guilty if you believed that the evidence of the

21  United States proved the defendant's guilt beyond a reasonable

22  doubt?  Anyone?

23      (Paddle raised.)

24          PROSPECTIVE JUROR:  Yeah, but I can talk to you in

25  private.

1          THE COURT:  Okay.

2          And putting that another way:  Is there anyone here

3   who feels for any moral or religious reason that they cannot

4   sit in judgment of another human being?

5      (Paddle raised.)

6          THE COURT:  Juror No. 2.  We'll talk about that

7   privately.

8          Do all of you understand that in reaching your

9   verdict in this case, you must not be influenced in any way by

10  either sympathy or prejudice for or against either the

11  defendant or the United States?  Everybody understand that?

12     (Affirmative head nods.)

13         THE COURT:  Have you, a relative, or a close friend

14  ever had an experience, whether pleasant or unpleasant, with a

15  law enforcement officer that would influence your verdict in

16  this case or your ability to serve as a juror?

17     (No response.)

18         THE COURT:  As I said, I expect the case to take no

19  more than two and a half weeks.  Is there any reason any of you

20  would not be able to give your full attention to the case

21  during that time that you haven't already told me about?

22     (Paddle raised.)

23         THE COURT:  Juror No. 9.

24         PROSPECTIVE JUROR:  I'm not sure this really counts

25  because I think everybody has the same situation.  Just work,

1  you know.  You have -- we have a work load that to step away

2  for two and a half weeks is going to be strenuous.

3          THE COURT:  Sure.

4          PROSPECTIVE JUROR:  And not necessarily having

5  somebody that can pick up that work load, being away for that

6  extended amount of time .  .  .

7          THE COURT:  And I suspect that that's true of

8  everyone that's called for jury service, but I guess the

9  question is would you be able to set that concern aside and

10  give the case your full attention while you're seated as a

11  juror?

12          PROSPECTIVE JUROR:  Honestly, no, that -- I mean, the

13  fact that I know that once I return, that all that --

14  everything that I'm missing I'm going to have to rush to catch

15  up on is definitely going to be a thought, so -- just being

16  honest.  But I think that probably speaks for everybody on --

17          THE COURT:  Yeah, I mean, our criminal justice system

18  simply doesn't work unless individuals are willing to set aside

19  their personal concerns and be willing to sit as fair and

20  impartial jurors.  And that's what our Constitution requires,

21  and that's what all of us as citizens of the United States --

22  it's our civil -- it's certainly our civic duty to do so,

23  because without that, we just don't have a criminal justice

24  system.  But I've made note of your comments.

25          No. 18?

1    PROSPECTIVE JUROR:  Yes, just being self-employed,

2  and as she just said, being away from that two weeks, two and a

3  half weeks, just losing that time.

4    THE COURT:  Anyone else?

5    (Paddle raised.)

6    THE COURT:  No. 37.

7    PROSPECTIVE JUROR:  So my father is terminally ill.

8  He's in England.  He's been given anywhere between three and

9  ten months to live.  So I'm fine for two weeks, or just over

10  two weeks, but obviously if things deteriorated quickly, I

11  wouldn't have my full attention on things.

12    THE COURT:  All right, sir.  Thank you.  And I'm very

13  sorry about your father.

14    All right.  We're getting close, folks, and we'll

15  take our break, but I do have some other questions I need to

16  ask.

17    Do any of you, family, or friend -- do any of -- do

18  any of you or a member of your family or friend work with the

19  Bureau of Alcohol, Tobacco, Firearms, the IRS, the U.S. Postal

20  Inspection Service, or the Columbia County Sheriff's Office?

21    (Paddle raised.)

22    THE COURT:  No. 26, I think you've already shared

23  that with us.

24    Anybody else?

25    (No response.)

1          THE COURT:  All right.  So at this point we're going

2    to do this in shifts.  I'm going to start with the folks that

3    are in and in front of the jury box.  Please raise your paddle

4    if you personally own a firearm.

5        (Paddles raised.)

6          THE COURT:  Sir, I need you to turn your paddle

7    around.  All right.  If you'll -- we'll start with No. 5.  Can

8    you tell me what firearm you personally own?

9          PROSPECTIVE JUROR:  I do not know if it's registered

10   in my name.  My husband bought me a .357, I believe, a couple

11   years ago.

12         THE COURT:  So a handgun?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  All right.

15         PROSPECTIVE JUROR:  But I have not used it, actually.

16         THE COURT:  Okay.  And all I'm asking is for you to

17   identify the firearm.  I don't want any other information.

18         All right.  No. 8, do you own a firearm, and if so,

19   what is it?

20         PROSPECTIVE JUROR:  I have several.

21         THE COURT:  Okay.

22         PROSPECTIVE JUROR:  Two handguns and three rifles

23   currently.

24         THE COURT:  All right.  Thank you.

25         You'll have to keep your paddles up so I know.

1      (Paddles raised.)

2           THE COURT:  Okay.  No. 15.

3           PROSPECTIVE JUROR:  I own a lot.

4           THE COURT:  All right.  Can you just give us

5   categories?

6           PROSPECTIVE JUROR:  At least 15 handguns and 10 long

7   rifles or more.

8           THE COURT:  Okay.  Pass it down.

9           No. 10.

10          PROSPECTIVE JUROR:  I own a handgun, about four long

11  rifles, and three shotguns.

12          THE COURT:  Okay.

13          No. 9.

14          PROSPECTIVE JUROR:  I own one handgun.

15          THE COURT:  No. 17.

16          PROSPECTIVE JUROR:  One rifle, one shotgun, and two

17  handguns.

18          THE COURT:  Number 18.

19          PROSPECTIVE JUROR:  I own multiple handguns, multiple

20  rifles.  I also own an AR-15, AR-10s, and a few shotguns also.

21          THE COURT:  All right.

22          No. 21.

23          PROSPECTIVE JUROR:  Three handguns, two rifles, three

24  shotguns.

25          THE COURT:  I'm sorry, I missed you.

1          PROSPECTIVE JUROR:  Three handguns, two rifles, three
2     shotguns.
3          THE COURT:  Okay.  We will now ask that same question
4     of the folks in the back of the courtroom.
5          PROSPECTIVE JUROR:  I own a lot too.  Handguns,
6     long-rifled shotguns, all various types of guns.  I'm a big
7     supporter of them.
8          THE COURT:  Okay.
9          26.
10         PROSPECTIVE JUROR:  Handgun, shotgun.
11         THE COURT:  All right.
12         Who's next?
13         PROSPECTIVE JUROR:  Multiple handguns, multiple long
14    rifles, multiple shotguns.
15         COURTROOM DEPUTY:  You didn't say the juror number
16    for that one.
17         THE COURT:  I'm sorry, that was Juror No. 27 that
18    just answered.
19         PROSPECTIVE JUROR:  Yeah.
20         THE COURT:  Next.
21         PROSPECTIVE JUROR:  I have an AR-15.
22         THE COURT:  I'm sorry, is that Juror No. 34?
23         PROSPECTIVE JUROR:  Yes, ma'am.
24         THE COURT:  Next.  Juror No. 35.
25         PROSPECTIVE JUROR:  I have three handguns and one

1  rifle.

2          THE COURT:  All right.

3          38.

4          PROSPECTIVE JUROR:  Shotguns, handguns.

5          THE COURT:  All right.

6          39.

7          PROSPECTIVE JUROR:  A 9 millimeter FN.

8          THE COURT:  I'm sorry, sir?

9          PROSPECTIVE JUROR:  A 9 millimeter FN handgun.

10          THE COURT:  All right.

11          40.

12          PROSPECTIVE JUROR:  Handgun.

13          THE COURT:  I'm sorry?

14          PROSPECTIVE JUROR:  Handgun.

15          THE COURT:  Handgun.

16          All right.  41?

17          PROSPECTIVE JUROR:  I've got .22 LR revolvers, .22 LR

18  pistols, I got three 9 millimeters, I've got a .380 20-gauge

19  shotgun, an M&P 15-22 rifle, and a Ruger 10/22 rifle.

20          THE COURT:  That was 41.

21          So there's a -- I can't see if 46 is up or not.  46?

22          Oh, okay, 43.

23          PROSPECTIVE JUROR:  A handgun.

24          THE COURT:  45.

25          PROSPECTIVE JUROR:  Two handguns.

1           THE COURT:  46.

2           PROSPECTIVE JUROR:  Two shotguns and one handgun.

3           THE COURT:  47.

4           PROSPECTIVE JUROR:  Handgun.

5           THE COURT:  All right.

6           Please raise your paddle if you are a member of the

7    National Rifle Association.

8        (Paddles raised.)

9           THE COURT:  So I have No. 8, No. 18, 38, and 47.

10          Raise your paddle if you are a member of any other

11   gun owner's association, such as Gun Owners Association of

12   America, Florida Carry, or similar entities.

13       (No response.)

14          THE COURT:  I see none.

15          Does anyone here believe that Congress does not have

16   the authority to regulate the possession of dangerous and

17   unusual weapons, including machine guns?

18       (Paddle raised.)

19          THE COURT:  No. 38?

20          PROSPECTIVE JUROR:  Can you repeat the question?

21          THE COURT:  Sure.  Does anyone believe that Congress

22   does not have the authority to regulate the possession of

23   machine guns or other unusual weapons?

24       (Paddle raised.)

25          THE COURT:  No. 27?

1          PROSPECTIVE JUROR:  Yes, ma'am.  Just for my

2   clarification, I'm not understanding the question.  Are you

3   saying that the government needs to govern weapons or states

4   need to govern weapons?

5          THE COURT:  So let me state my question differently.

6          PROSPECTIVE JUROR:  It's kind of confusing.

7          THE COURT:  All right.  Give me a moment.

8          Congress -- the United States Congress has enacted

9   laws that regulate the possession of machine guns.  Is there

10  anyone here who believes that Congress does not have the

11  authority to pass such laws?

12     (No response.)

13         THE COURT:  Is there anyone here who believes

14  Congress should not have that authority?

15         PROSPECTIVE JUROR:  (Indicating.)

16         THE COURT:  Is there anyone here who believes that

17  Congress should not have that authority?

18     (No response.)

19         THE COURT:  Have any of you, now or in the past, been

20  a federal firearms licensee or a payer of a Special Occupation

21  Tax?  And if you don't know what a Special Occupation Tax is

22  that's fine, that means you haven't paid it.

23         PROSPECTIVE JUROR:  What was the first part?

24         THE COURT:  Have any of you, either now or in the

25  past, been a federal firearms licensee, or the payer of a

1    Special Occupation Tax?

2        (No response.)

3            THE COURT:  Raise your paddle if you possess firearms

4    that are regulated by the National Firearms Act, including a

5    machine gun, a silencer, a short-barreled rifle or a

6    short-barreled shotgun.

7        (No response.)

8            THE COURT:  Have any of you formed any particular

9    opinions about either defense attorneys or prosecuting

10   attorneys that would influence your verdict in this case?

11       (No response.)

12           THE COURT:  Does everyone understand that a defendant

13   is entitled to be represented by an attorney in a criminal

14   case?

15       (Affirmative head nods.)

16           THE COURT:  Would any of you hold that against a

17   defendant?

18       (No response.)

19           THE COURT:  Do any of you have feelings or opinions

20   about people of different races, genders, nationalities, or

21   religions that you believe would affect your ability to be a

22   fair and impartial juror in this case?  Anyone?

23       (No response.)

24           THE COURT:  Please raise your paddle if within the

25   past five years you have belonged to or participated in any

1  crime prevention group, such as a Neighborhood Watch

2  organization, Orange Hat groups, or other crime prevention or

3  victims's rights groups.

4       (Paddle raised.)

5            THE COURT:  All right.  Juror No. 9.  That's all

6  right, I'm just going to make a note of that.

7            All right.  I can't remember if I asked this.  Have

8  any of you ever served on a grand jury?

9       (Negative head shakes.)

10           THE COURT:  No.  Okay.

11           Have any of you or a close member of your family ever

12  been employed by the court -- by the court system that you

13  haven't told us about?

14      (Paddle raised.)

15           COURTROOM DEPUTY:  Judge.

16           THE COURT:  Do any of you or a member of your family

17  have an employment application pending to work for a

18  prosecutor's office?

19      (Paddle raised.)

20           THE COURT:  All right.  Juror 45, did you recall

21  something?

22           PROSPECTIVE JUROR:  I'm not sure about "close"

23  member, but I've had two uncles that were -- my sister's a

24  lawyer, two uncles that are lawyers, and one was a judge in

25  Kentucky and the other one was also a judge in Kentucky.

1          THE COURT:  All right.  And to the extent you've ever

2    had any conversations with them about their work or their

3    opinions on the law, would you set those aside and decide this

4    case solely based upon my instructions?

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  Okay.

7      (Paddle raised.)

8          COURTROOM DEPUTY:  No. 6.

9          THE COURT:  Yes, No. 6?

10         PROSPECTIVE JUROR:  My sister's a paralegal for Farah

11   & Farah.

12         THE COURT:  Okay.  To the extent you've ever talked

13   to her about her work, can you set that aside and decide this

14   case solely based on my instructions to you on the law?

15         PROSPECTIVE JUROR:  Yes, ma'am.

16         THE COURT:  As you have heard, the evidence in this

17   case -- well, I'm sorry.  As you've heard, this case relates to

18   firearms.  Do any of you have such strong feelings about

19   firearms or possession of firearms that you would be unable to

20   decide the case based upon my instructions on the law?

21     (No response.)

22         THE COURT:  Do any of you have special training or

23   experience with firearms?  And by that I don't mean just going

24   to the range and shooting, but do any of you believe yourselves

25   to have specialized experience or training with firearms?

1      (Paddles raised.)

2            THE COURT:  Juror No. 9.  Since we're already going

3      to talk, I'm just going to write that down.

4            And I believe you're Juror No. 35?

5            PROSPECTIVE JUROR:  I'd like to speak to you in

6      private about it.

7            THE COURT:  Okay.  She wants to speak privately about

8      it.

9            No. 27, can you tell us what specialized training

10     you've had.

11           PROSPECTIVE JUROR:  When I was in the Navy, a rescue

12     swimmer, we worked with the SEAL team and shot every -- M60s,

13     M240s, rocket launchers, every -- we worked real close with the

14     SEALs.

15           THE COURT:  Okay.  Raise your paddle if you've

16     never fired any type of firearm.

17       (Paddles raised.)

18           THE COURT:  All right.  We'll start with just the

19     jury box and I'll ask you to raise your paddles high for just a

20     moment so that the lawyers can note your response and then

21     we'll do the same thing in the back shortly.

22           I've got 1, 2, 3, 11, 12, 14, 6, 19, and 22.

23           Did anybody in the -- anybody have their paddle up

24     that I didn't call your number?

25       (No response.)

1          THE COURT:  No.  All right.

2          Turning to the back of the courtroom, please raise

3     your paddle if you have never fired any sort of firearm.

4        (Paddles raised.)

5          THE COURT:  I have 28, 33, 42, and 48.

6          Did anybody raise your paddle that I didn't call your

7     number?

8        (Paddle raised.)

9          THE COURT:  No. 30.  All right.

10         Raise your paddle if you possess a concealed carry

11    permit in the state of Florida.

12       (Paddles raised.)

13         THE COURT:  I've got 9, 10, 17, 18, 15, and 16.

14         And in the back of the courtroom, raise your paddle

15    if you possess a concealed carry permit in the state of

16    Florida.

17       (Paddles raised.)

18         THE COURT:  I have 38, 40, 35, 47, 41, 36.

19         Anybody else whose number I did not call?

20       (No response.)

21         THE COURT:  To reach a verdict, every juror must

22    agree on the verdict; that is, any verdict must be unanimous.

23    In deliberations you must consider the opinions and points of

24    view of your fellow jurors.  In the final analysis, however,

25    you must follow your own conscience and be personally satisfied

1    with the verdict that you reach.

2          Would any of you have difficulty doing that?

3      (Paddle raised.)

4          THE COURT:  Okay.  Juror No. 11 is concerned about

5    that.

6          Is there any reason that you haven't already told us

7    about that you would not be able to sit as a juror in this

8    case?

9      (No response.)

10          THE COURT:  Raise your paddle if you are of the view

11   that AR-15s should be banned.

12     (Paddles raised.)

13          THE COURT:  1, 2 -- I can't tell if your paddle is

14   up, No. 6.

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  1, 2, 8, 11, 12, 14, 16, 19.

17          And 20?

18          PROSPECTIVE JUROR:  (Nods head.)

19     (Paddles raised.)

20          THE COURT:  In the back of the courtroom, No. 37 and

21   43.

22          So for those individuals who raised their paddle in

23   response to that question, AR-15s are currently legal.  Would

24   the fact that you personally believe they should be banned

25   influence your verdict in this case if there is evidence

1  regarding those legal firearms in this case?

2          And I guess let me phrase it -- ask this a different

3  way.  For those of you who raised your hands -- and I'm going

4  to call on you individually -- can you set aside your personal

5  belief about those firearms and decide this case based solely

6  on my instructions on the law?

7          Juror No. 1, can you do that?

8          PROSPECTIVE JUROR:  Yes.

9          THE COURT:  Juror No. 2, can you do that?

10         PROSPECTIVE JUROR:  A bit hesitant.

11         THE COURT:  You're hesitant.  Okay.  Fair.

12         Juror No. 8, can you do that?

13         PROSPECTIVE JUROR:  Yes.

14         THE COURT:  Juror No. 11, can you do that?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  Juror No. 12, can you do that?

17         PROSPECTIVE JUROR:  It would be difficult.

18         THE COURT:  Juror No. 14, can you set aside your

19  opinion and decide the case based solely on my instructions on

20  the law?

21         PROSPECTIVE JUROR:  Yes.

22         THE COURT:  Juror No. 16?

23         PROSPECTIVE JUROR:  I'm not sure.

24         THE COURT:  19?

25         PROSPECTIVE JUROR:  I think so, even though I'm

1    uncomfortable with firearms.

2            THE COURT:  Okay.  But I understood that you -- well,

3    we'll talk about it.

4            No. 20, regardless of your opinion, can you decide

5    this case solely on my instructions?

6            PROSPECTIVE JUROR:  Yes.

7            THE COURT:  No. 37?

8            PROSPECTIVE JUROR:  Yes.

9            THE COURT:  No. 43?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  No. 43, you said yes, that you could

12   follow my instructions; is that correct?

13           PROSPECTIVE JUROR:  Uh-hmm.

14           THE COURT:  Is that yes?

15           PROSPECTIVE JUROR:  Yes.

16           THE COURT:  Raise your paddle if you believe that the

17   Second Amendment, which protects the possession of firearms,

18   should be repealed.

19      (No response.)

20           THE COURT:  Raise your paddle if you believe that

21   guns are inherently bad.

22      (Paddles raised.)

23           THE COURT:  No. 12.

24           COURTROOM DEPUTY:  Judge.  Sorry.

25           THE COURT:  Understanding that -- 14.

1         Understanding that that's your personal feeling, a

2    broad range of firearms are lawfully possessed under the laws

3    of the United States.  Can you put your personal feeling about

4    firearms aside and decide this case on my instructions about

5    what's legal and what is not legal in terms of firearms?

6         (Paddle raised.)

7              THE COURT:  No. 12?

8              PROSPECTIVE JUROR:  It would be difficult, but I

9    would.

10             THE COURT:  And No. 14?

11             PROSPECTIVE JUROR:  Yes, ma'am.

12             THE COURT:  Anyone else?

13        (Paddle raised.)

14             THE COURT:  No. 40.

15             PROSPECTIVE JUROR:  Can you just make a note to talk

16   to me about the Second Amendment?

17             THE COURT:  Okay.  I have made that note.

18        Is there anything else about your own personal

19   experiences or opinions that you think would be important for

20   us to know in seating a fair and impartial jury but you haven't

21   told me just because I'm not smart enough to ask the right

22   question?

23        (No response.)

24             THE COURT:  At the end of the case -- well,

25   throughout the trial I will decide questions of law that arise

1   during the trial, and before you retire to deliberate on your

2   verdict I will give you the instructions on the law that you

3   must follow in reaching your verdict.  Regardless of any

4   opinion you may have as to what the law ought to be, it would

5   be your sworn duty to follow the law as I instruct you.

6           Is there anyone here who believes they could not do

7   so?

8       (No response.)

9           THE COURT:  It would be a violation of your sworn

10  duty to base a verdict on any other view of the law other than

11  that which I give you, and it would also be a violation of your

12  sworn duty to base a verdict on anything other than the

13  evidence presented to you in this case.

14          Can all of you perform that sworn duty if selected as

15  a juror?

16      (Affirmative head nods.)

17          THE COURT:  Let me see counsel at sidebar.  You-all

18  can stretch.  I'll just ask you to keep your voices down.

19  Somehow when I tell people to stretch, they also get loud.

20      (Proceedings at sidebar:)

21          THE COURT:  All right.  So first of all, Mr. Zermay,

22  did you ever -- did you come up with a question you wanted me

23  to ask, or have I covered it?

24          MR. ZERMAY:  You covered it, Your Honor.

25          THE COURT:  All right.  My first question is whether

1   I failed to ask any of the questions that we had agreed to.

2           Mr. King, by the time I got to your question about

3   the firearm ownership, I had already covered it.

4           MR. KING:  You covered it.  We covered it, Your

5   Honor, I'm in agreement.

6           THE COURT:  All right.  So I'm going to -- Mr. King,

7   did I fail to ask any question requested or agreed upon?

8           MR. KING:  No, Your Honor.

9           THE COURT:  Mr. Zermay?

10          MR. ZERMAY:  No, Your Honor.

11          THE COURT:  Ms. Taylor?

12          MS. TAYLOR:  No, Your Honor.

13          THE COURT:  I'm going to identify for you-all the

14  individuals that I think we need to speak to privately as well

15  as the reason and then I'll ask you if there are any others.

16          So we have to talk to Juror No. 2.  She expressed

17  concern about sitting in judgment of others and also expressed

18  concern about AR-57s and said she was hesitant about whether

19  she could follow the law.

20          MS. TAYLOR:  Agreed.

21          THE COURT:  That's all I have on the front row with

22  respect to that, although I -- I don't -- I don't know about --

23  you know, Juror No. 8 says his mother is legally blind and

24  needs him, but he works full time.

25          MS. TAYLOR:  Yes.

1      THE COURT:  I guess we can inquire of him privately

2  on that, but I'm a little skeptical.  Do you-all have any

3  thoughts?

4      MR. KING:  I share the Court's skepticism.

5      MR. ZERMAY:  Same, Your Honor.

6      MS. TAYLOR:  I'm also skeptical, but would definitely

7  be willing to just let him go.

8      MR. LAROSIERE:  He's also expressed some intentional

9  internal conflicts.

10     MS. TAYLOR:  Right, I noticed that too.  He stated

11 he's a member of the NRA, but then he also said he wanted an

12 AR-15 ban.

13     MR. LAROSIERE:  And that he owns multiple --

14     (Proceedings in open court:)

15     THE COURT:  All right.  I made a mistake.  I need

16 everybody to sit down and be quiet because, unfortunately, we

17 have to talk for a few minutes over here before.

18     But I'll tell you this, I'm going to talk to them for

19 probably about ten minutes, and then I'm going to give you-all

20 a break.  So if you'll just bear with us.  But I have to be

21 able to hear them whispering over that noise.

22     PROSPECTIVE JUROR:  There is like a static noise

23 coming from here.

24     THE COURT:  It's white noise.  We do it intentionally

25 because we don't want you hearing us.

1          PROSPECTIVE JUROR:  Yes, ma'am.  Got it.

2          PROSPECTIVE JUROR:  Oh, ah.

3          THE COURT:  So we're going to turn the white noise

4    back on.

5       (Proceedings at sidebar:)

6          THE COURT:  Only in my courtroom.

7          Okay.  I guess we'll talk to him privately.  I have

8    Juror No. 9 said something -- said the words "school shooting,"

9    so I flagged her for that.  She also is concerned about her

10   work, which annoys me.  She raised her hand in response to

11   either being convicted of a crime or being a victim -- and I

12   have "special" written.  I think that was that she had another

13   reason to talk about.  Is there anything else for that juror,

14   Ms. Taylor?

15         MS. TAYLOR:  She -- yeah.  I mean, she said she

16   wouldn't be able to put aside her concerns about her work.

17         THE COURT:  Yeah.

18         MS. TAYLOR:  I have concerns about her as well.  I

19   think we should talk to her.

20         THE COURT:  All right.  I have No. 11, who's not sure

21   she can set aside her feeling regarding firearms, says she

22   can't deliberate, has a moral objection to being a juror and

23   clearly just does not want to be here, but we'll talk to her

24   privately.

25         Juror No. 12 thinks guns are inherently bad and would

1    have a difficult time following -- or following my

2    instructions, so we'll talk to her.

3              Juror No. 18 belatedly expressed concerns regarding

4    his work, so we'll talk to him.

5              Juror No. 19 thinks AR-57s are bad and said "I think

6    so" when I asked if she could set that aside, so I think we

7    need to talk to her.

8              Anyone else in the gallery that you-all think we need

9    to speak to privately or follow up with?

10             MR. KING:  Your Honor, the only -- I'm sorry.

11             MR. LAROSIERE:  14, Your Honor.

12             THE COURT:  14 on what issue?

13             MR. ZERMAY:  She said guns are inherently bad and

14   AR-15s are bad and ticked both of those boxes.

15             COURTROOM DEPUTY:  She can't hear you.

16             MR. ZERMAY:  She indicated ARs should be banned along

17   with guns are inherently bad.  That's two flags that we raised,

18   Your Honor.

19             THE COURT:  She did respond that she would set it

20   aside and follow the law.

21             MR. LAROSIERE:  Yeah, so the only ones that said that

22   they would not -- no, that said they would not follow would be

23   16 and 17, right?

24             MR. ZERMAY:  I still think it would merit speaking to

25   her about it, Your Honor, just, again, to inquire of her to --

1          MS. TAYLOR:  I think she clearly stated that she
2     would follow the law but . . .
3          THE COURT:  I'll think about that one.
4          MR. LAROSIERE:  Thank you, Your Honor.
5          THE COURT:  Anybody else in the jury box?
6          MR. KING:  Your Honor, the only one I have was
7     No. 23.  She kind of unconfronted brought up being the victim
8     of the robbery on several occasions.  I'm not sure.  I don't
9     think she said anything that would be for cause, but I think we
10    should flag that in private, making sure it's not an issue.
11         THE COURT:  I disagree, Mr. King.  She brought it up
12    unconfronted when she said that was why she was kicked off a
13    jury.  But when she brought it up the second time it was in
14    specific response to the fact that I asked about being the
15    victim of a robbery; she said she hadn't thought about it.  But
16    she answered my questions about it.  I don't see what else we
17    would ask her.
18         MR. KING:  She --
19         THE COURT:  And also said it was more than 30 years
20    ago.  So what more would we want to ask her?
21         MR. KING:  Your Honor, she -- because of the
22    hesitancy she expressed, she did bring it up a third time, kind
23    of unprompted, I had it in my notes, I would want to ensure in
24    private that that was not cause for any issues.
25         THE COURT:  Do you recall her bringing it up a third

1  time?

2          MS. TAYLOR:  I don't recall and I also didn't have

3  the sense that she was especially bothered by it at this point.

4          THE COURT:  I'll think about that one.  I think

5  that's harassing, honestly.

6          Anybody else in the jury box?

7          And you guys, I'm letting you get away with this now,

8  but you're going to have to pick who's speaking for particular

9  items because we don't do tag teams.

10          MR. LAROSIERE:  So how can we do that going forward?

11  Just in the beginning of that session just let you know --

12          THE COURT:  Yeah -- well, no, we'll talk about that

13  later.

14          MR. LAROSIERE:  Okay.

15          THE COURT:  Anybody else in the jury box that we need

16  to speak to privately?

17          MR. LAROSIERE:  Just 16 and 17 because they did

18  specifically say that they would not --

19          MR. ZERMAY:  19.

20          MR. LAROSIERE:  Is that 19?

21          MR. ZERMAY:  Yeah.

22          MR. LAROSIERE:  The ones who said they would not be

23  able to follow the law to the AR-15 question, just to kind of

24  hammer that down.

25          THE COURT:  16 isn't one.

1          MR. LAROSIERE:  Oh, okay.

2          THE COURT:  It was 16 and 19.

3          MR. LAROSIERE:  Yeah.  Thank you, Your Honor.

4          THE COURT:  Okay.  Turning to the back of the

5     courtroom, I have --

6          MS. TAYLOR:  26 I think is going to be a cause

7     strike.

8          THE COURT:  Yeah.  Can we just agree that 26 has to

9     be stricken for cause?

10          MR. LAROSIERE:  Would that be because of the law

11     enforcement connection?

12          THE COURT:  Yes, sir.

13          MR. LAROSIERE:  Agreed.

14          THE COURT:  All right.  So we'll just strike him for

15     cause and won't talk to him.

16          Juror No. 35 wanted to speak privately about firearms

17     training.

18          MS. TAYLOR:  Yes.

19          THE COURT:  36, her brother was prosecuted, her

20     father was prosecuted.  She wanted to speak privately about

21     those matters.

22          MS. TAYLOR:  We have concerns.  We believe that her

23     brother is Sule Pedro, one of Mr. Mesrobian's cases, and I

24     believe was also in front of you, Your Honor.

25          MR. MESROBIAN:  Pretty sure.

1          THE COURT:  Do you-all want to agree to strike her

2   for cause?

3          MR. KING:  If she can confirm that's her brother, I

4   would be in agreement.  I'm not sure how the government knows.

5          THE COURT:  Okay.  We'll talk to her.  Give me the

6   name.

7          MS. TAYLOR:  The last name was Pedro.  And the first

8   name of the person who we believe is the brother is Sule.

9          THE COURT:  Okay.

10          And 40, he'll believe --

11          MS. TAYLOR:  He seemed --

12          THE COURT:  He just doesn't want to be on the jury.

13          MS. TAYLOR:  He's really squirrelly.  I think he

14   should be stricken for cause.

15          MR. KING:  I don't disagree, Your Honor.

16          MR. LAROSIERE:  It's odd to see an attorney wind up

17   in the jury box.  For good reason.

18          THE COURT:  Well, I mean, usually they are stricken

19   for peremptory, but he's giving answers that in my view are his

20   attempt to be removed as a juror.  But he's given those answers

21   under oath, so if you-all agree, we'll go ahead and strike him

22   for cause and won't waste our time talking to him.

23          MR. KING:  That's fine, Your Honor.

24          MR. ZERMAY:  Yes, Your Honor.

25          THE COURT:  All right.  So that's by agreement of

1    all -- do you have a red pen?  Mine's dying.  Thank you.

2          Okay.  And I have 47, who's nephew was murdered and

3    the cousin is being prosecuted currently.

4          MR. KING:  My understanding is she had one family

5    member murder another family member.  I was a little confused.

6          MS. TAYLOR:  That's how I understand it.

7          THE COURT:  We'll talk to her.

8          And then No. 37, who's father is ill, I don't see

9    that as a problem.  We're going to seat alternates, so I think

10   we -- the only thing I would do is maybe call him in just to

11   tell him not to worry about that.

12         MS. TAYLOR:  I agree.

13         MR. LAROSIERE:  Agreed.

14         MR. KING:  Agreed.

15         THE COURT:  And two people already said that they

16   were alternates, so they know that's a thing.  So we will mix

17   the alternates in.

18         COURTROOM DEPUTY:  Oh.

19         MS. TAYLOR:  Your Honor --

20         THE COURT:  One sec.

21         MS. TAYLOR:  Sorry.

22      (Pause in proceedings.)

23         THE COURT:  Yes, ma'am?

24         MS. TAYLOR:  25 I thought briefly had his paddle up

25   for the question of whether Congress should not have the

1  authority to regulate firearms, and then he kind of put it

2  down.

3          MR. MESROBIAN:  Same with 27.

4          MS. TAYLOR:  And 27 too.

5          MR. LAROSIERE:  And 26.

6          MS. TAYLOR:  He's already stricken.

7          MR. LAROSIERE:  Yeah, they kind of talked together,

8  and it seemed that they were just confused.

9          THE COURT:  I thought that they misunderstood the

10  question, and when I clarified it --

11          MS. TAYLOR:  Okay.

12          MR. LAROSIERE:  Yeah.

13          THE COURT:  So I don't really see the need to talk to

14  them further.  Is that okay?

15          MR. LAROSIERE:  I agree, Your Honor.

16          MR. ZERMAY:  I agree.

17          THE COURT:  Ms. Taylor.

18          MS. TAYLOR:  I feel like 20 had his paddle up after

19  the clarification, but, I mean, I think it would be a very

20  quick verification with him.  I just want to make sure that we

21  understood his question and it wasn't overlooked.  So I prefer

22  to speak with him.

23          MR. LAROSIERE:  If it's helpful, I was watching him,

24  and I think he was kind of resting on it because I was waiting

25  for the move too.

1          THE COURT:  All right.  Well, since I'm talking to

2    14, despite -- and 23, despite the fact that I didn't really

3    think I need to, I'll go ahead and talk to 25.

4          All right.  So let's review.  I have that I'm going

5    to speak to No. 2, No. 8, No. 9, unless you-all -- well, I

6    wonder -- I don't know, I guess we -- no, we're going to talk

7    to them.

8          No. 11, I do wonder if you-all want to just agree

9    that she could be stricken for cause.  I don't think that she

10   can sit as a fair and impartial juror in this case personally,

11   but . . .

12         MS. TAYLOR:  I'm fine with striking her.

13         MR. KING:  Yes, Your Honor, I planned on moving to

14   strike her.

15         MR. ZERMAY:  Yes, Your Honor.

16         THE COURT:  Okay.  That way we don't have to talk to

17   her.

18         MR. LAROSIERE:  I kind of liked her.  I think she was

19   trying to get out of it.  But I've been outvoted.

20         THE COURT:  No, no, I'm not going to make a record

21   like that.  Does Mr. Hoover agree to strike her for cause?

22         MR. LAROSIERE:  Yes, ma'am.

23         THE COURT:  I have a cold record, so we have to be

24   careful with jokes.

25         We're going to talk to 14 because you-all wanted to

1   hear from her.  We're going to talk to 16.  18, who's the

2   self-employed guy.  19 and 23.  That's all I have for the jury

3   box.

4           MR. KING:  I had 12, Your Honor.

5           THE COURT:  Yeah, sorry.

6           MR. ZERMAY:  I'm sorry.

7           THE COURT:  I don't mean to be rude, but when you-all

8   talk to each other, you don't hear me.  So you didn't just hear

9   what I did.

10          MR. LAROSIERE:  She was just going over everyone, but

11  yes, it lines up with our notes, Your Honor.

12          THE COURT:  I don't know how you could know that it

13  lines up with your notes when you weren't looking at them, but

14  okay.

15          In the back of the courtroom I've got that we're

16  going to talk to 25, 35, 36, 37, just to reassure about the

17  schedule, and 47.

18          Is that -- is that consistent with your

19  understanding, Ms. Taylor?

20          MS. TAYLOR:  Yes.  And I don't -- and, I apologize, I

21  don't know if we talked about 45.  He brought up his divorce a

22  lot.

23          THE COURT:  Oh, the financial hardship guy.  Yeah, I

24  guess we do need to talk to him.

25          All right.  Any others, Mr. King?

1          MR. KING:  No, Your Honor.

2          THE COURT:  Mr. Zermay?

3          MR. ZERMAY:  No, Your Honor.

4          THE COURT:  All right.

5      (Proceedings in open court:)

6          THE COURT:  All right.  I need one moment and then

7   I'll tell you-all where we are.  I just have to -- let's

8   see . . .

9          All right.  So here's what we're going to do.  If I

10  call your number, I'm going to ask you -- oh, did we check if

11  the courtroom across the hall is open?  Can you open it?

12          If I call your number, it means I need to speak to

13  you for a few minutes privately, so I'm going to ask you to go

14  sit in the courtroom across the hall until we bring you in.

15  And then the rest of you-all, I'll give you some instructions.

16          But for those going across the hall, as well as for

17  those that will be taking a break until we reconvene, it's very

18  important that you not talk about the case in any way.  I

19  recognize that the only thing you have in common is that you

20  were summoned here for jury duty to sit on this case, but it is

21  the only thing you cannot talk about.  So I encourage you to

22  get to know one another, make friends, but please don't

23  speculate about anything in any way relating to the case, the

24  people that you've seen, the names that you've heard.  Don't

25  talk about the subject matter of it either.  So you know the

1    case is about firearms.  You shouldn't be talking about

2    firearms either, okay.  So please remember to follow all of

3    those instructions.

4            If I call your number, you'll go out this door, walk

5    straight into the courtroom across the hall and wait to be

6    brought back in.  We're going to bring you back in in order of

7    your juror numbers, so keep an eye on your number so that

8    you're ready to pop back over.  And it will be very brief when

9    you come over.

10           No. 2 and No. 8, No. 9, No. 12, No. 14, No. 16, No.

11   18, 19, and 23.

12           Ms. Wiles, anyone else from the jury box?

13           COURTROOM DEPUTY:  No, Your Honor.

14           THE COURT:  From the back of the courtroom, 25, 35,

15   36, 37, 45, and 47.

16           Did I get everyone, Ms. Wiles?

17           COURTROOM DEPUTY:  You got everyone, Your Honor.

18           THE COURT:  Ms. Taylor, you agree?

19           MS. TAYLOR:  Yes, Your Honor.

20           THE COURT:  Mr. King?

21           MR. KING:  Yes, Your Honor.

22           THE COURT:  Mr. Zermay?

23           MR. ZERMAY:  Yes, Your Honor.

24           THE COURT:  All right.  So ladies and gentlemen, I'm

25   going to give you-all a break.  It's 12:46.  I'm going to ask

1   you to be back at 1:30 to continue with the jury selection.

2          Once you get brought back, we will be here for about

3   20 minutes.  Once you come back in the courtroom it will only

4   be about 20 minutes.  So you'll be in re- -- let's see.  I'll

5   tell you what, we can make it 1 -- let's make it an hour, at

6   1:46.  1:45.  Don't need to be that precise.

7          While you're on the break, please remember you can't

8   discuss the case or anything else.  You'll have to follow those

9   instructions that I've already given, okay?

10          All right.  We'll see you back in one hour.

11      (Prospective jurors exit, 12:47 p.m.)

12          THE COURT:  Ada, we'll start with No. 2 and then

13   Number 8.  Take your seats.

14      (Prospective Juror No. 2 enters the courtroom.)

15          THE COURT:  All right.  If you'll come up to that

16   microphone right there, ma'am.  And this is Juror No. 2.

17          And Juror No. 2, you expressed concern about sitting

18   in judgment.  And just so you understand, what you would be

19   deciding is the facts.  Jurors decide what the facts are and

20   then you apply the law as I instruct you on it.

21          If you were seated as a juror, would you be able to

22   decide -- hear the evidence and decide the case based on my

23   instructions?

24          PROSPECTIVE JUROR:  Yes, ma'am.

25          THE COURT:  And if the government proved the

1  defendant guilty beyond a reasonable doubt, would you be able

2  to render a verdict of guilty?

3         PROSPECTIVE JUROR:  I believe so, yes, ma'am.

4         THE COURT:  When you say you believe so, you sound

5  hesitant, and that's what -- so the obligation of a juror is to

6  find a defendant not guilty if the government fails to present

7  evidence beyond a reasonable doubt --

8         PROSPECTIVE JUROR:  Uh-hmm.

9         THE COURT:  -- but also to find a defendant guilty

10 if, and only if, the government proves guilt beyond a

11 reasonable doubt.

12        Would you be able to do either of those things?

13        PROSPECTIVE JUROR:  Yes, ma'am.  I understand better.

14 Thank you.

15        THE COURT:  Okay.  And so do you think that you could

16 sit as a juror in this case?

17        PROSPECTIVE JUROR:  Yes, ma'am.

18        THE COURT:  Now, you also said that you personally

19 believed that AR-57s should be banned; is that right?

20        PROSPECTIVE JUROR:  I actually meant to raise my

21 paddle to ask if you could repeat the question, yes.

22        THE COURT:  Okay.

23        MS. TAYLOR:  And Your Honor -- it's the AR-15, Your

24 Honor.

25        THE COURT:  Oh, why did I say "57"?  Thank you.  I

1   guess I have Heinz-57 brain.  AR-15s.

2          Do you have a personal opinion about whether the

3   weapon, an AR-15, should be banned?

4          PROSPECTIVE JUROR:  I didn't even know what type of

5   weapon it was, so no.

6          THE COURT:  Okay.  All right.  So is there any reason

7   that you don't believe that you can be a fair and impartial

8   juror in this case?

9          PROSPECTIVE JUROR:  No, ma'am.

10          THE COURT:  Ms. Taylor, any questions by the United

11   States to this potential juror?

12          MS. TAYLOR:  No, Your Honor.

13          THE COURT:  Mr. King?

14          MR. KING:  No, Your Honor.

15          THE COURT:  Mr. Zermay?

16          MR. ZERMAY:  No, Your Honor.

17          THE COURT:  All right.  Ma'am, you're free to go.  Be

18   back across the hall at 1:45.

19          PROSPECTIVE JUROR:  Okay.  Thank you.

20          THE COURT:  Thank you.  And then we'll have No. 8,

21   then No. 9.

22       (Juror No. 2 leaves the courtroom.  Juror No. 8 enters the

23   courtroom.)

24          THE COURT:  Juror No. 8, you expressed some concern

25   about serving on the jury because you care for your mother, but

1   you're employed outside the home, right?

2          PROSPECTIVE JUROR:  Yes, ma'am, but I have a specific

3   day off set by my schedule and my managers that I can take her

4   to appointments on.

5          THE COURT:  So does she have appointments during the

6   jury trial?

7          PROSPECTIVE JUROR:  We did push a couple back.  I'm

8   not sure if they're going to fall in this time frame or if they

9   got pushed back further.  She didn't give me all the details.

10  We pushed them back from when I first got the jury notice to

11  after the 21st.  I'm not sure exactly how far they went.

12         THE COURT:  So you pushed them back to -- let's see.

13         All right.  So is there -- is there any other reason

14  you can't -- because I think that we can accommodate that

15  schedule if you don't have any appointments before the 21st,

16  sir.

17         So is there any other reason you couldn't serve as a

18  juror in this case?

19         PROSPECTIVE JUROR:  No, ma'am.

20         THE COURT:  All right.  Ms. Taylor, any questions for

21  this individual?

22         MS. TAYLOR:  No, Your Honor.

23         THE COURT:  Mr. King?

24         MR. KING:  No, Your Honor.

25         THE COURT:  Mr. Zermay?

1    MR. ZERMAY:  Yes, one question, Your Honor.

2  Clarification question as to whether he raised his paddle about

3  whether or not he wanted to ban the AR-15 or not.

4    PROSPECTIVE JUROR:  I did raise my paddle, sir.

5    MR. ZERMAY:  Thank you.

6    THE COURT:  Just a moment.  And I believe that I

7  asked you this, but I'll confirm it.  Would you be able to set

8  that personal opinion aside and decide this case based on the

9  evidence and the instructions as I give them to you?

10    PROSPECTIVE JUROR:  It would be difficult, but I

11  could.

12    THE COURT:  Interesting.  When I asked that earlier

13  you simply said you could, and now you're hesitating?

14    PROSPECTIVE JUROR:  Yes, ma'am.  The more my head

15  thinks about it, the more it comes up to AR-15s just being

16  overkill for home defense and personal opinions.

17    THE COURT:  Juror No. 8, your change of heart seems

18  to be more a desire perhaps not to serve jury service, which I

19  think is unfortunate, but we'll address that at another time.

20  Be back at 1:45.

21    PROSPECTIVE JUROR:  Yes, ma'am.

22    (Juror No. 8 leaves the courtroom.)

23    THE COURT:  9 then 16.

24    MR. KING:  12 should be up next.

25    THE COURT:  Pardon me.  I keep wanting to flip-flop

 1   them.

 2            9 then 12.

 3            COURTROOM DEPUTY:  And then 14.

 4        (Juror No. 9 enters the courtroom.)

 5            THE COURT:  Juror No. 9 --

 6            PROSPECTIVE JUROR:  Yes, ma'am.

 7            THE COURT:  -- you're concerned about your work

 8   schedule?

 9            PROSPECTIVE JUROR:  Yes.  I mean, and I know that I'm

10   not special compared to everybody else, but it definitely is a

11   concern of mine, just because I know -- I don't really

12   necessarily have somebody else that will be able to cover that.

13            THE COURT:  You understand if everybody felt that

14   way, nobody would get a jury trial?

15            PROSPECTIVE JUROR:  Exactly.  That's why I said I --

16   I mean, it is a concern of mine, yes, but I know it's no

17   different than anybody else that's -- that's here today.

18            THE COURT:  So would you be able to -- if you were

19   seated as a juror, would you be able to listen to the evidence

20   carefully and listen to my instructions and decide your verdict

21   based on my instructions and the evidence?

22            PROSPECTIVE JUROR:  Yes, ma'am.

23            THE COURT:  Now, you mentioned something about a

24   school shooting.  Can you tell us what that was about?

25            PROSPECTIVE JUROR:  So with that I had to do a

1    deposition on that.  It was a high school shooting here locally

2    at a football game.  And because my company provided the

3    security services there and I was the manager on duty and there

4    at the time, I had to do a deposition with that for a civil

5    suit in regards to that incident.

6              THE COURT:  Was that a fairly recent shooting?

7              PROSPECTIVE JUROR:  It's been -- I did the deposition

8    probably about a year and a half, two years ago, but it was --

9    am I allowed to say the actual shooting?  It was the high

10   school football game, the Raines versus Robert E. -- well, at

11   the time it was Robert E. Lee High School football game.

12             THE COURT:  And then you also raised your paddle in

13   response to a question about either prior criminal prosecution

14   or victim.

15             PROSPECTIVE JUROR:  I think it was the one as far

16   as -- well, I think there was the one in regards to special

17   training.  At one point in time I had my G license for armed

18   security.  I no longer do that.

19             THE COURT:  Okay.  So if you are selected as a juror

20   in this case, would you be able to render a fair and impartial

21   verdict?

22             PROSPECTIVE JUROR:  I believe so.  I think the only

23   thing I was saying was like I don't -- maybe if it was

24   something that was more in direct correlation to something that

25   I had especially with that shooting with the schools,

1    potentially that would be something that would -- I'd be uneasy

2    about.  But yes, I believe I could still render a --

3            THE COURT:  Do you -- you recall --

4            PROSPECTIVE JUROR:  -- decision.

5            THE COURT:  You recall that the charges in this case

6    involve -- let me go back.  The defendants are charged with

7    conspiring to transfer items which the United States alleges

8    constitute unregistered machine gun conversion devices,

9    transferring unregistered machine gun conversion devices,

10   possessing alleged unregistered machine gun devices, and

11   structuring cash withdrawals to evade currency transaction

12   reporting.  Those are the charges in this case.

13           Is there any reason why you think that that would

14   relate to the school shooting?

15           PROSPECTIVE JUROR:  I don't believe so.

16           THE COURT:  Okay.  And so with the understanding that

17   those are the charges, can you assure us that if selected as a

18   juror, you would render a fair and impartial verdict?

19           PROSPECTIVE JUROR:  Yes.

20           THE COURT:  All right.

21           Ms. Taylor, any questions?

22           MS. TAYLOR:  No, Your Honor.

23           PROSPECTIVE JUROR:  Ms. -- oh, I'm sorry.

24           THE COURT:  Mr. King?

25           MR. KING:  No, Your Honor.

1            THE COURT:  Mr. Zermay?

2            MR. ZERMAY:  Just one question.  If there is a -- do

3    you remember what weapon was used, and what was it if you do

4    remember the weapons used in the school shooting?

5            PROSPECTIVE JUROR:  No, I don't recall which one that

6    one was.  I only had to do the deposition with one, but I was

7    involved with two separate school shootings.

8            THE COURT:  Do you recall the firearms that were

9    involved in either of them?

10           PROSPECTIVE JUROR:  No, I don't recall what type of

11   firearms they were.

12           MR. ZERMAY:  One follow-up, Your Honor?

13           A handgun or long gun?

14           PROSPECTIVE JUROR:  It would only be an assumption.

15   I don't know by any facts.  I would assume a handgun, but I

16   have absolutely no idea on that.

17           MR. ZERMAY:  Thank you.

18           THE COURT:  All right.  You're free to go.  Be back

19   at 1:45.

20           PROSPECTIVE JUROR:  All right.  And I'm just looking

21   to see if I left a bag over there.

22           THE COURT:  Sure.

23           While she looks, can we bring in No. 12.  And it will

24   be 14 after that.

25           (Juror No. 9 leaves the courtroom.  Juror No. 12

1    enters the courtroom.)

2         THE COURT:  Juror No. 12, you I think said that you

3    believe guns are inherently bad.  And certainly everyone has

4    the right to their own opinions.  Under the laws of the United

5    States they can be lawfully possessed.

6         Is your opinion about guns so strong that you would

7    have difficulty rendering a verdict in this case?

8         PROSPECTIVE JUROR:  My feelings on guns is extremely

9    strong against guns.  I prefer to live in a place that there

10   were no guns.  It's very strong.

11        THE COURT:  Okay.  So --

12        PROSPECTIVE JUROR:  I know right from wrong and I can

13   judge right from wrong.  Guns have no place in our society.

14        THE COURT:  And do you believe that would influence

15   your verdict in this case, given -- given what the charges are?

16        PROSPECTIVE JUROR:  I can weigh right from wrong.  I

17   hear your question.

18        THE COURT:  I think what you're telling me is that

19   your opinion about firearms is so strong that if the evidence

20   was that these individuals are involved in firearms, period,

21   you would think that's bad; is that right?

22        PROSPECTIVE JUROR:  Illegal firearms?  I think that

23   people -- people, I understand, have the right to carry guns,

24   legal guns.  I understand that, and I understand the Second

25   Amendment.  I disagree with it.

1          THE COURT:  Are you able to decide this case based on

2    my instructions even if you disagree with my instructions?

3          PROSPECTIVE JUROR:  Yes, ma'am.

4          THE COURT:  There is also going to be testimony about

5    AR-15s.  And I understand you think that AR-15s should be

6    banned.

7          PROSPECTIVE JUROR:  Yes, ma'am.  But right now

8    they're legal.

9          THE COURT:  All right.  There are going to be a

10   number of witnesses that likely own AR-15s.  Are you going to

11   judge them more harshly because of that?

12         PROSPECTIVE JUROR:  Am I going to judge them more

13   harshly?  I'll have an opinion on them.  I don't think it's my

14   right to judge them.

15         There's a juror that said he had AR-15s.  I mean, I'm

16   not going to hang around with him.

17         THE COURT:  All right.  Ms. Taylor, do you have any

18   questions for this potential juror?

19         MS. TAYLOR:  I guess I would like to inquire whether

20   there's a personal experience that you had in your life that's

21   led to your opinion or it's just -- it's just an opinion that

22   you have about firearms more generally.

23         PROSPECTIVE JUROR:  I'm old.  I've seen a lot.

24   There's no good in it.  There's -- no, no, ma'am, there's

25   nothing that happened personally in me that had anything to do

1    with it.

2            MS. TAYLOR:  And, I mean -- and so you've stated you

3    don't agree with the Second Amendment, but you understand that

4    that is the law, correct?

5            PROSPECTIVE JUROR:  Correct.

6            MS. TAYLOR:  And --

7            PROSPECTIVE JUROR:  I might have misspoken.  The

8    Second Amendment has its place.

9            MS. TAYLOR:  And the Court's going to give you

10   instructions at the end of the case that says, you know, what

11   the law is and what things -- it will give you instructions on

12   how to decide if something was legal or illegal.

13           PROSPECTIVE JUROR:  Correct.

14           MS. TAYLOR:  And would you be able to put aside your

15   opinions about firearms and look at those instructions and

16   evaluate the evidence in light of those instructions and come

17   to the right decision -- or the correct decision about whether

18   the United States has proven its case?

19           PROSPECTIVE JUROR:  Yes, ma'am, I believe I can tell

20   right from wrong with what the law says is the right and the

21   wrong.  Always the criminology major.  I get it.  I get right

22   and wrong.  I get it --

23           MS. TAYLOR:  And I guess the --

24           PROSPECTIVE JUROR:  -- legal and not legal.

25           THE COURT:  Okay.  You-all -- only one person at a

1  time, please.

2        MS. TAYLOR:  Sorry.

3        And I guess the question isn't necessarily right or

4  wrong, it's given what the Court's going to tell you -- and

5  there's going to be, you know, a sheet of paper that says,

6  "These are the rules.  And if you find that the United States

7  proved these things, then you should return a guilty verdict.

8  If you don't find that the United States proved these things

9  beyond a reasonable doubt, then you should say not guilty."

10        And that's true regardless of anything else.  Do you

11  feel that you can do that?

12        PROSPECTIVE JUROR:  Yes, ma'am.

13        THE COURT:  Mr. King?

14        MR. KING:  Ma'am, I wanted to ask you a little bit.

15  Do you have opinions on people who sell guns or distribute guns

16  for a living?

17        PROSPECTIVE JUROR:  Do I have an opinion on them?

18        MR. KING:  Yes, ma'am.

19        PROSPECTIVE JUROR:  No.  Everybody has a job.

20        MR. KING:  In terms of people who are advocating for

21  more guns being legal, including AR-15s, would you have an

22  opinion against them?

23        PROSPECTIVE JUROR:  Well, I think their views are

24  different than my views.  And I wouldn't hang around with them.

25  I wouldn't judge them.  They have their opinion.  They have the

1  right to their opinion.  I have the right to my opinion.  And I
2  would not want to associate with them.  I wouldn't judge them.
3          MR. KING:  And maybe "judgment" is not the right
4  word.  Would you have a negative view of those people or a
5  negative view of their priorities?  And I see you're laughing.
6          PROSPECTIVE JUROR:  Yeah, probably.  Again, I
7  wouldn't want them to be my best friend, no.
8          MR. KING:  Your Honor, I have no further . . .
9          THE COURT:  Mr. Zermay?
10         MR. ZERMAY:  Yes.  Good afternoon, Madam.
11         PROSPECTIVE JUROR:  Yes.
12         MR. ZERMAY:  So in line with the questions that
13  Mr. King just asked you, if, hypothetically, a gun man- --
14  would you hold a gun manufacturer liable to the same extent as
15  a person that pulled the trigger if it was used in a crime?
16         PROSPECTIVE JUROR:  I would have to know what the law
17  was.  I don't know.
18         MR. ZERMAY:  Let me rephrase that another way.
19         PROSPECTIVE JUROR:  Okay.  Thank you.
20         MR. ZERMAY:  Would you find the gun manufacturer to
21  be just as morally culpable as the person that pulled the
22  trigger?
23         PROSPECTIVE JUROR:  No.
24         MR. ZERMAY:  Do you find them morally culpable in any
25  way whatsoever?

1    PROSPECTIVE JUROR:  If they didn't make the gun, then
2  there wouldn't be a way to shoot it.  But no, I'm not saying
3  you should not --
4    COURT REPORTER:  I'm sorry, ma'am, I can't hear you.
5    PROSPECTIVE JUROR:  I'm sorry.  That's the person's
6  business.  They're welcome to do their business.  I wouldn't
7  want to associate with that person, either if they manufacture
8  them or if they do the shooting.  Or the possessing.  I don't
9  have -- my friends don't have guns either.
10    MR. ZERMAY:  I understand.  And you keep saying that
11  you would not want to associate with them.  What do you mean by
12  that?
13    PROSPECTIVE JUROR:  They wouldn't be my friends.  I
14  wouldn't go out and have a beer with them.
15    MR. ZERMAY:  Okay.  Thank you very much.
16    THE COURT:  You're free to go.  Be back at 1:45.
17    PROSPECTIVE JUROR:  Yes, ma'am.
18    THE COURT:  16 -- wait, no, 14 then 16.
19    (Juror No. 12 leaves the courtroom.  Juror No. 14
20  enters the courtroom.)
21    THE COURT:  If you'll go up to that microphone.
22    You indicated that you thought guns were inherently
23  bad and I believe also that AR-15s should be banned.
24    PROSPECTIVE JUROR:  Yes, ma'am.
25    THE COURT:  But gun ownership, under appropriate

1   circumstances, is legal, and AR-15s can be legally possessed.

2   Do you understand that?

3          PROSPECTIVE JUROR:  Yes, ma'am.

4          THE COURT:  All right.  So in rendering a verdict in

5   this case, can you put your personal opinion about those --

6   about firearms aside and decide the case solely based on my

7   instructions?

8          PROSPECTIVE JUROR:  Yes, ma'am.

9          THE COURT:  All right.  I don't have anything else

10  for Juror 14.

11         Ms. Taylor, anything?

12         MS. TAYLOR:  No, Your Honor.

13         THE COURT:  Mr. King?

14         MR. KING:  No, Your Honor.

15         THE COURT:  Mr. Zermay?

16         MR. ZERMAY:  No, Your Honor.

17         THE COURT:  All right.  Be back at 1:45, please,

18  ma'am.

19         PROSPECTIVE JUROR:  Thank you.

20         THE COURT:  16 then 18.

21      (Juror No. 14 exits the courtroom.  Juror No. 16 enters

22  the courtroom.)

23         THE COURT:  If you could go up to that microphone

24  right there, No. 16.

25         PROSPECTIVE JUROR:  Yes, ma'am.

1        THE COURT:  I think you indicated that you thought

2   AR-15s should be banned.  And they can be -- in appropriate

3   circumstances, AR-15s can be lawfully possessed.  And you're

4   going to hear about possession of AR-15s in this case.

5        Can you put your personal opinion aside and assure me

6   that it won't influence your verdict?

7        PROSPECTIVE JUROR:  That, I'm not sure on.

8        THE COURT:  Okay.  Can you tell me a little bit about

9   that?

10       PROSPECTIVE JUROR:  Well, I mean, I just believe that

11   those type guns are made for other things, you know, things

12   that . . .

13       THE COURT:  Okay.  I don't think we need to ask any

14   other questions.

15       Ms. Taylor, anything else?

16       MS. TAYLOR:  No, Your Honor.

17       THE COURT:  Mr. King?

18       MR. KING:  No, Your Honor.

19       THE COURT:  Mr. Zermay?

20       MR. ZERMAY:  No, Your Honor.

21       THE COURT:  All right.  Thanks, ma'am.  Be back at

22   1:45, please.

23       PROSPECTIVE JUROR:  Yes, ma'am.

24       THE COURT:  18, then 19.

25       (Juror No. 16 leaves the courtroom.  Juror No. 18

 1   enters the courtroom.)

 2         THE COURT:  No. 18, if you'll go up to that podium,

 3   please, sir.

 4         I just wanted to clarify with you whether -- so the

 5   trial I think will take two weeks.

 6         PROSPECTIVE JUROR:  Yes.

 7         THE COURT:  I'm saying it will bump into next week

 8   just to be safe because I'm a nerd.  Would you -- if you're

 9   selected as a juror, would you be able to serve your jury

10   service?

11         PROSPECTIVE JUROR:  I would say yes.  It just takes

12   away from my business.  As I said earlier, that's the only real

13   reason.  I'm self-employed.  A lot of my business comes in

14   through my personal telephone because it's family owned.

15   That's -- that's really it.

16         THE COURT:  All right.

17         PROSPECTIVE JUROR:  It's just tough having to be away

18   from my phone all day and losing that work not for a day, but

19   for multiple days beyond.

20         THE COURT:  Sure.

21         PROSPECTIVE JUROR:  Yes, ma'am.

22         THE COURT:  And I will tell you this, once you're

23   selected as a juror, you will be able to bring your phone into

24   the building.  It will be kept in a locker downstairs.

25         PROSPECTIVE JUROR:  In a locker, yes, ma'am, yes,

1    ma'am.

2         THE COURT:  But you are qualified to serve as a

3    juror.  And I don't know whether you'll be selected or not, but

4    if you are selected, could you give this case your full

5    attention for the benefit of the United States and the

6    defendant?

7         PROSPECTIVE JUROR:  Yes, ma'am.  I would have to,

8    yes, ma'am, yes, ma'am.

9         THE COURT:  Okay.  And are you willing to serve in

10   that regard, sir?

11        PROSPECTIVE JUROR:  Ma'am?

12        THE COURT:  Are you willing to serve as a juror?

13        PROSPECTIVE JUROR:  Yes, ma'am.  If I'm called so,

14   I'd have to, yes, ma'am.

15        THE COURT:  All right.

16        PROSPECTIVE JUROR:  I just put that out there just

17   because, like I said, it's two weeks.  But if I got to do what

18   I got to do, I'll do it yes, ma'am.

19        THE COURT:  I just had jurors that had to sit through

20   a four-week patent trial and Judge Corrigan had a six-week

21   health care fraud, so at least you didn't get called for one of

22   those.

23        PROSPECTIVE JUROR:  Right.

24        THE COURT:  I don't have any other questions for this

25   gentleman.

1           Ms. Taylor, anything?

2           MS. TAYLOR:  No, Your Honor.

3           THE COURT:  Mr. King?

4           MR. KING:  No, Your Honor.

5           THE COURT:  Mr. Zermay?

6           MR. ZERMAY:  No, Your Honor.

7           THE COURT:  All right.  Be back at 1:45, please, sir.

8           PROSPECTIVE JUROR:  You got it.

9           THE COURT:  19 and then 23.

10      (Juror No. 18 leaves the courtroom.  Juror No. 19

11  enters the courtroom.)

12          THE COURT:  If you'll go up to that podium, sir.

13          Sir, you indicated that you thought AR-15s should be

14  banned, and I asked whether you could set that -- well, first

15  of all, let me say that under appropriate circumstances, under

16  the law AR-15s can be lawfully possessed.  So could you put

17  your personal opinion about those weapons aside and decide this

18  case based on my instructions on the law?

19          PROSPECTIVE JUROR:  I think I -- what I said is "I

20  think so," and then I added that I'm a little uncomfortable

21  with firearms.  I never been around them.  I'm scared of them.

22  I don't like them.  So I don't know if that's going to affect

23  my decision later.

24          I want to be neutral.  I want to hear both sides and

25  be -- make my judgment without -- based on that, but I want to

1  let you know that firearms is something that I'm not

2  comfortable around.

3        THE COURT:  All right.  Did I hear you say that you

4  didn't think you could be neutral because of your feeling of

5  firearms?

6        PROSPECTIVE JUROR:  No, I said I think I can.  I can

7  be neutral, you know, hear both sides and make a decision based

8  on those, I'm just not familiar with them or comfortable with

9  firearms.

10        THE COURT:  Well, the entire case is going to be

11  about --

12        PROSPECTIVE JUROR:  Exactly, and I just want to make

13  sure that I brought that up.

14        THE COURT:  All right.

15        Ms. Taylor, do you want to ask this gentlemen any

16  questions?

17        MS. TAYLOR:  Yes, Your Honor.

18        Is your discomfort with firearms so extreme that if

19  you were to find out that a witness possesses firearms, even

20  if, you know, they don't have them here in the courtroom, but

21  if a witness possesses firearms, that that would make you view

22  that witness's testimony in a different light than you

23  otherwise would?

24        PROSPECTIVE JUROR:  Oh, God, that's a tough thing to

25  respond.  I mean, I was concerned when I heard how many people

1    in this court here has firearms.  And I understand our Second

2    Amendment about being able to bear arms and protect ourselves.

3    I also understand that firearms don't hurt or kill people,

4    people kill people.

5           But the accessibility of so many firearms that one

6    person can have, it's just temptations sometimes is there.  And

7    you never know what happens when there's a quarrel or

8    discussion, or a child, you know, picks up one of those arms

9    that's available.  So that bothers me a little bit.  And being

10   that this case is . . .

11          MS. TAYLOR:  Right.  And so my question is if you

12   were to find out that a witness owns firearms, would that

13   influence how you view that witness's testimony, or would you

14   still be able to listen to the testimony, evaluate whether that

15   witness is being truthful, and evaluate their testimony just as

16   you would a witness who doesn't own firearms?

17          PROSPECTIVE JUROR:  I would still be able to listen

18   to that witness and be neutral about it.

19          MS. TAYLOR:  If you were to hear that a defendant

20   lawfully owned firearms, would that prejudice you against a

21   defendant?

22          PROSPECTIVE JUROR:  I don't know if I would say it

23   would prejudice me, but it would probably weigh behind in my

24   head, have a concern:  Why so many firearms?

25          MS. TAYLOR:  Do you think that you would still be

1  able to fairly and neutrally evaluate the evidence without

2  taking into consideration that you know that that person owns

3  lawful firearms in making a decision?

4          PROSPECTIVE JUROR:  I'm going to believe so.

5          MS. TAYLOR:  I don't have any other questions, Your

6  Honor.

7          THE COURT:  Mr. King.

8          MR. KING:  Good afternoon, sir.  If there were a

9  witness or a defendant or another person involved in the case

10  that not only possessed firearms but advocated for their

11  widespread distribution so more people have them, would you

12  treat them as any other witness or would they have kind of a

13  strike against them?

14          PROSPECTIVE JUROR:  I would probably -- again, I

15  don't believe that everybody should have firearms and that

16  stuff, so I would probably have the tendency not to go with

17  that decision that everybody should have firearms and

18  distribute them and all that.

19          MR. KING:  Thank you.

20          THE COURT:  Mr. Zermay?

21          MR. LAROSIERE:  Your --

22          THE COURT:  No, Mr. Zermay.

23          MR. LAROSIERE:  Oh, okay.

24          MR. ZERMAY:  Yes.

25          Good afternoon, sir.  When you said that you were --

1  firearms make you nervous, could you explain a little bit more

2  what that means to you?

3        PROSPECTIVE JUROR:  It makes me nervous.  I don't

4  like to handle them.  They may go off and hurt somebody.  If I

5  see one, I don't know what would happen with that, it's just

6  something -- it's a tool that hurts or kills people, so I'm not

7  comfortable with that.

8        MR. ZERMAY:  Okay.

9        THE COURT:  Sir, if the evidence in the case involved

10  firearms being in the courtroom and being handled, would that

11  make you uncomfortable?

12        PROSPECTIVE JUROR:  Probably.

13        MR. ZERMAY:  I have no further questions.

14        THE COURT:  You're free to go, sir.  We'll see you

15  back at 1:45.

16        PROSPECTIVE JUROR:  Thank you.

17        THE COURT:  23 then 25.

18     (Juror No. 19 leaves the room.  Juror No. 23 enters the

19  courtroom.)

20        PROSPECTIVE JUROR:  Hi.

21        THE COURT:  So, ma'am --

22        PROSPECTIVE JUROR:  Of course.

23        THE COURT:  -- you've indicated that you had a

24  previous brush with criminal activity; specifically, a robbery

25  in Neptune Beach.

1          PROSPECTIVE JUROR:  Yes, yes.

2          THE COURT:  And how long ago was that?

3          PROSPECTIVE JUROR:  Gosh, it's been over 30 years.

4    Probably about 33 years ago.

5          THE COURT:  Is there anything about that

6    experience -- let me ask you this, was there a firearm

7    involved?

8          PROSPECTIVE JUROR:  There was.  It was put to my

9    back, though, so I never actually touched it or anything like

10   that.

11         THE COURT:  Is there anything about that experience

12   that you think would influence your verdict in this case?

13         PROSPECTIVE JUROR:  It should not.  No, I don't

14   believe so.  Not at all.

15         THE COURT:  Do you have any hesitation in that?

16         PROSPECTIVE JUROR:  Nope.  Not really, nope.  I'm

17   good.

18         THE COURT:  Okay.  All right.

19         Ms. Taylor, any questions for this potential juror?

20         MS. TAYLOR:  No, Your Honor.

21         THE COURT:  Mr. King?

22         MR. KING:  No, Your Honor.

23         THE COURT:  Mr. Zermay?

24         MR. ZERMAY:  One question.  Roughly how long ago was

25   that?

1           THE COURT:  She said 33 years ago.

2           PROSPECTIVE JUROR:  About 33 years ago.

3           MR. ZERMAY:  33 years ago?  Okay.  No further

4    questions.

5           THE COURT:  You're free to go.  Be back at 1:45.

6           PROSPECTIVE JUROR:  See you then.  Thank you.

7           THE COURT:  25, then 35.

8        (Juror No. 23 exits the courtroom.  Juror No. 25 enters

9    the courtroom.)

10          THE COURT:  Juror No. 25, I think that we wanted to

11   speak to you about regulation of firearms, is that --

12   Ms. Wiles, I can't read my note.

13          MS. TAYLOR:  Your Honor, I think the question was --

14   or the clarification was whether --

15          THE COURT:  Oh --

16          MS. TAYLOR:  -- he had intended to raise his paddle

17   for the question about whether Congress should have the

18   authority to regulate firearms.

19          THE COURT:  Thank you.

20          Sir, I asked a question about if anybody believed

21   that Congress should not have the authority to regulate

22   firearms, and it looked like your paddle went up but then not.

23          And I explained it later, and what I said was that

24   currently under the law, Congress does have the authority to

25   regulate certain firearms.  Do you believe that that's

1    improper?

2         PROSPECTIVE JUROR:  I believe strongly in my Second

3    Amendment rights, I can tell you that.

4         THE COURT:  Okay.

5         PROSPECTIVE JUROR:  Other than that, yes, I do

6    believe they should be able to.

7         THE COURT:  And if I give instructions that a

8    particular type of device is unlawful, will you be able to

9    follow that?

10         PROSPECTIVE JUROR:  Yes, ma'am.

11         THE COURT:  Ms. Taylor, any other questions for this

12    gentleman?

13         MS. TAYLOR:  So whatever the instructions are that

14    the judge -- that Judge Howard gives you if you were to be a

15    juror in this case about what's legal and what's illegal,

16    regardless of your personal views, you can follow those

17    instructions?

18         PROSPECTIVE JUROR:  Absolutely.

19         THE COURT:  Mr. King?

20         MR. KING:  Nothing, Your Honor.  Thank you.

21         THE COURT:  Mr. Zermay?

22         MR. ZERMAY:  Nothing for this juror, Your Honor.

23         THE COURT:  All right.  You're free to go.  Be back

24    at 1:45.

25         We need 35, then 36.

1          (Juror No. 25 leaves the courtroom.  Juror No. 35

2    enters the courtroom.)

3          THE COURT:  If you'll go to that podium over there.

4    Over there.

5          All right.  You indicated that you wanted to speak

6    privately about your firearms training and the reasons for it.

7          PROSPECTIVE JUROR:  Yes.  I can't go into too much

8    detail, unfortunately, it's classified, but I have had pistol

9    and rifle qualifications and re-qual.

10         THE COURT:  And was that with Crowley Maritime?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Was that in some sort of government

13   service?

14         PROSPECTIVE JUROR:  Of sorts.

15         THE COURT:  And when was this?

16         PROSPECTIVE JUROR:  From 2019 until 2022.

17         THE COURT:  And tell me what training you received.

18         PROSPECTIVE JUROR:  Pistol and rifle quals -- initial

19   quals and re-quals every two years.

20         THE COURT:  Were you in law enforcement at that time?

21         PROSPECTIVE JUROR:  No, ma'am.

22         THE COURT:  Ms. Taylor, any questions for Juror

23   No. 35?

24         MS. TAYLOR:  No, Your Honor.

25         THE COURT:  Mr. King?

1          MR. KING:  No, Your Honor.

2          THE COURT:  Mr. Zermay?

3          MR. ZERMAY:  No, Your Honor.

4          THE COURT:  All right.  We'll ask you to be back at

5     1:45.

6          PROSPECTIVE JUROR:  Thank you.

7          THE COOURT:  No. 36, then No. 37.

8       (Juror No. 35 leaves the courtroom.  Juror No. 36 enters

9     the courtroom.)

10          THE COURT:  Juror No. 36, you said your brother had

11    had some life lessons and perhaps was being prosecuted.  Did I

12    understand that correctly?

13          PROSPECTIVE JUROR:  Just that he is currently -- or

14    has been and currently is incarcerated right now.

15          THE COURT:  Does he have charges against him right

16    now?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  And are they pending in this courthouse?

19          PROSPECTIVE JUROR:  I don't believe so.  I don't

20    believe so.

21          THE COURT:  Can you tell me your brother's name?

22          PROSPECTIVE JUROR:  Yeah, Gerald Jenkins.

23          THE COURT:  I'm sorry?

24          PROSPECTIVE JUROR:  Gerald Jenkins.  Gerald with a G

25    and Jenkins with a J.

1          THE COURT:  And what is he incarcerated for?

2          PROSPECTIVE JUROR:  Stealing.

3          THE COURT:  Okay.  And do you know, was he prosecuted

4    over in the Duval County courthouse?

5          PROSPECTIVE JUROR:  Yeah.  He was in the jail and

6    then they sent him to Lake Butler.

7          THE COURT:  Okay.  And did you have any interaction

8    with his legal processes?

9          PROSPECTIVE JUROR:  No, ma'am.

10          THE COURT:  Do you have an opinion about whether he

11    was treated fairly or unfairly?

12          PROSPECTIVE JUROR:  No, ma'am.

13          THE COURT:  You said your father had also been

14    charged with a crime?

15          PROSPECTIVE JUROR:  Yes, ma'am, but I was like six.

16    He got deported back to Jamaica.

17          THE COURT:  Do you have any opinion about whether he

18    was treated fairly or unfairly?

19          PROSPECTIVE JUROR:  I don't know anything about it.

20    I was young.

21          THE COURT:  Is there anything about either of their

22    life experiences that -- as you know that would affect your

23    verdict in this case?

24          PROSPECTIVE JUROR:  No, ma'am.

25          THE COURT:  Is there any reason -- anything that you

1    know about your past that would cause you to have difficulty

2    being a fair and impartial juror in this case?

3              PROSPECTIVE JUROR:  No, ma'am.

4              THE COURT:  All right.

5              Ms. Taylor, any questions for this individual?

6              MS. TAYLOR:  No, Your Honor.

7              THE COURT:  Mr. King?

8              MR. KING:  No, Your Honor.  Thank you.

9              THE COURT:  Mr. Zermay?

10             MR. ZERMAY:  No, Your Honor.

11             THE COURT:  All right.  Thank you.  Be back at 1:45,

12   please.

13             PROSPECTIVE JUROR:  Thank you.

14             THE COURT:  37, then 45.

15        (Juror No. 36 leaves the room.  Juror No. 37 enters the

16   courtroom.)

17             THE COURT:  So Juror 37, I just called you in because

18   I wanted to clarify.  We think the trial will take about two

19   weeks.  It may spill over into the next week, although we think

20   it's unlikely.  But if you were selected as a juror and if

21   anything happened, life happens, and so we would be able to

22   excuse you at that time.

23             PROSPECTIVE JUROR:  Okay.

24             THE COURT:  So with that understanding, are you able

25   to serve as a juror in this case if selected?

```
 1              PROSPECTIVE JUROR:  Yes.
 2              THE COURT:  Okay.  Thank you, sir.
 3              And I need 45, then 47.
 4              COURTROOM DEPUTY:  You didn't tell him when to be
 5      back.
 6              THE COURT:  Oh.  Sir, be back at 1:45.
 7              Thank you, Ms. Wiles.
 8          (Juror No. 37 exits the courtroom.  Juror No. 45 enters
 9      the courtroom.)
10              THE COURT:  Juror 45, if you'll go over to that
11      microphone right over there.
12              Juror 45, I wanted to speak with you about your
13      concern about your financial circumstances.
14              PROSPECTIVE JUROR:  It's financial and personal as
15      well.
16              THE COURT:  You want to talk to me about the
17      personal?
18              PROSPECTIVE JUROR:  Sure.  Well, I guess the
19      financial is the one I talked about first.  I can go either
20      one.
21              Financial is essentially right now I'm the sole
22      income provider in my family.  And I'm going through a really
23      long divorce process in which my wife has -- I've had to pay
24      for lawyers for domestic violence, pay for her lawyers, for my
25      lawyers.  And essentially I'm down to basically one month left,
```

1    you know, upcoming.

2         And everything I get paid is commission based.  So if

3    I don't work for two or three weeks -- like today I missed four

4    appointments -- I have, like I said, a month.  I have two young

5    kids in the house and I have massive legal bills still mounting

6    because I'm trying to work towards full custody or some version

7    of that.

8         Even being, in a personal level, away and out of

9    touch is, I guess, very unfortunate because the person I'm

10   going through the divorce with has massive depression and

11   alcohol problems.  And even the other day I get a call, she

12   forgot to pick up the kids from school, stuff like that.

13        So I have just a lot of personal and financial

14   issues.  And even taking a week or two away from getting

15   appointments and actually earning income puts me in a situation

16   where maybe next month is covered, but the following month is

17   not.  So being the only sole provider, I need to make sure I

18   keep my mortgage up to date for my kids, because the idea of

19   this whole divorce is going to be happening where I'm going to

20   be providing -- keeping the whole house, and I have to come up

21   with almost $300,000 to pay to get her out of the house, and I

22   have to get a loan for that.  And I will have to be required to

23   pay all the alimony, child support and all that stuff, and

24   she's going to take -- basically it's going to be a lot

25   financially.  And on a personal level, I don't like being out

1  of touch because there's definitely alcohol issues going on in

2  my house.

3           THE COURT:  All right, sir.

4           Ms. Taylor, do you have any questions for this

5  gentleman?

6           MS. TAYLOR:  No, Your Honor.

7           THE COURT:  Mr. King?

8           MR. KING:  No, Your Honor.

9           THE COURT:  Mr. Zermay?

10          MR. ZERMAY:  No, Your Honor.

11          THE COURT:  I'll ask you to be back at 1:45, sir.

12  Thank you.

13          PROSPECTIVE JUROR:  Okay.  Is there anything -- I was

14  going to say, as far as the next process, be back at 1:45 --

15  okay.  Yeah, that's fine.  I just didn't know if there was

16  anything else I can provide, specifics or information.

17          THE COURT:  I don't think so.  We're fine.  Thank

18  you.

19          And No. 47, please.

20     (Juror No. 45 exits the courtroom.  Juror No. 47 enters

21  the courtroom.)

22          THE COURT:  If you'll go right over to that

23  microphone.  Thank you.

24          First of all, I'm very sorry for your family's loss.

25          PROSPECTIVE JUROR:  Thank you.

1          THE COURT:  And it sounds like it's even more

2   difficult, because I guess your nephew was -- was murdered, but

3   your cousin is --

4          PROSPECTIVE JUROR:  That's correct.

5          THE COURT:  -- accused of being involved in that?

6          PROSPECTIVE JUROR:  That's correct.

7          THE COURT:  And firearms were involved in that; is

8   that right?

9          PROSPECTIVE JUROR:  That's correct.

10          THE COURT:  All right.  That's a lot to deal with on

11   a personal level.

12          PROSPECTIVE JUROR:  Yes.

13          THE COURT:  This trial is going to be a lot of

14   discussion about firearms.

15          PROSPECTIVE JUROR:  That's correct.

16          THE COURT:  Do you know what sort of firearm was

17   involved in the --

18          PROSPECTIVE JUROR:  No.  They have not released that

19   to us yet, so . . .

20          THE COURT:  Okay.  Do you think that -- how long ago

21   did this happen?

22          PROSPECTIVE JUROR:  It happened July of last year.

23          THE COURT:  July of last year?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  Do you think that any thoughts about that

1   would influence your verdict in this case?

2           PROSPECTIVE JUROR:  No.

3           THE COURT:  Understanding that the testimony and the

4   evidence will involve seeing and perhaps individuals handling

5   firearms, would you be able to sit as a fair and impartial

6   juror in that case?

7           PROSPECTIVE JUROR:  Yes.

8           THE COURT:  Has that incident caused you to have any

9   opinions against the possession of firearms?

10          PROSPECTIVE JUROR:  No.

11          THE COURT:  Ms. Taylor, any questions for 47?

12          MS. TAYLOR:  No, Your Honor.

13          THE COURT:  Mr. King?

14          PROSPECTIVE JUROR:  No, Your Honor.

15          THE COURT:  Mr. Zermay?

16          MR. ZERMAY:  No, Your Honor.

17          THE COURT:  All right, ma'am.  Be back at 1:45,

18  please.

19          PROSPECTIVE JUROR:  Thank you.

20      (Juror No. 47 exits the courtroom.)

21          THE COURT:  Did we speak with all the private

22  inquiries, Ms. Taylor?

23          MS. TAYLOR:  I believe so, Your Honor.

24          THE COURT:  Mr. King?

25          MR. KING:  Yes, Your Honor.

1          THE COURT:  Mr. Zermay?

2          MR. ZERMAY:  Yes, Your Honor.

3          THE COURT:  All right.  From the United States I'll

4    hear cause challenges and then I'll give you-all a break --

5    well, then I'll hear the defendants' cause challenges and then

6    I'll give you a break.

7          MS. TAYLOR:  Yes, Your Honor.

8          I think Juror No. 8 should be stricken for cause.

9    There was nothing about what he said when he came back in here

10   that changed my opinion on that.  He does not want to be here.

11   And we need jurors who are going to be able to be engaged with

12   the evidence for the full length of the trial.  I think both

13   sides deserve that.  So I think he should be stricken for

14   cause.

15         THE COURT:  Mr. King, you disagree?

16         MR. KING:  Yes, Your Honor.  I understand he has

17   expressed some hesitancy to be here and certainly was making

18   some excuses; however, we do not believe it rises to a level of

19   a cause challenge.  You know, there's other jurors who have

20   expressed, you know, not wanting to be here or wanting to be

21   doing other things, but this -- he said he could -- he could do

22   as instructed and follow the rules, and there was no hesitancy

23   with that.  And I don't believe it rises to the level of a

24   cause challenge.

25         THE COURT:  You recall that he was the juror that

1   then changed his mind and suddenly decided that he didn't think

2   he could be fair after I said that his conflict didn't merit

3   exclusion.  And yet you still think he's a fair and impartial

4   juror?

5           MR. KING:  Your Honor, I was addressing -- the

6   government was moving for a cause challenge as to his desire to

7   be here.  I don't think that rises to the level of a cause

8   challenge.

9           THE COURT:  I understand that his desire not to be

10  here does not rise to a cause challenge; I would agree with

11  that.  However, he then went on and when -- and I'm going to go

12  back, but he then went on to express an opinion that in my view

13  was calculated to get off the jury.  And he practically nodded

14  at me when I called him out on that, but if you want to keep

15  him on the jury, Mr. King, I'm going to read back what he said

16  and we'll -- let's see.

17          He was the one who said he thought AR-15s should be

18  banned and in open court said despite that opinion he could

19  follow the law.  But then when I followed up on it privately,

20  he said he wasn't sure about that.  And that's -- that was

21  my -- and as I said, it was my belief that he was doing that

22  because he doesn't want to serve on the jury, and that is a

23  concern because he's now given that answer under oath.  So --

24          MR. KING:  Your Honor, could I briefly confirm with

25  Mr. Ervin --

1              THE COURT:  Sure.

2              MR. KING:  -- make sure I have his opinion on this?

3         (Mr. King confers with defendant Ervin.)

4              THE COURT:  Mr. King, here's the question and answer.

5    He acknowledged that he had raised his paddle as believing that

6    AR-15s should be banned, and I said, "And I believe I asked you

7    this, but I'll confirm it.  Would you be able to set that

8    personal opinion aside and decide this case based on the

9    evidence and the instructions as I give them to you?"

10             And he said, "It would be difficult, but I could."

11             And then I said, "Interesting.  When I asked that

12   earlier, you simply said you could, and now you're hesitating."

13             And he said, "Yes, ma'am.  The more my head thinks

14   about it, the more it comes up to AR-15s just being overkill

15   for home defense and personal opinions."

16             That's the answer.

17             MR. KING:  Yes, Your Honor.  After speaking with

18   Mr. Ervin, we would withdraw our objection to the government's

19   cause challenge.

20             THE COURT:  All right.  No. 8 is stricken for cause.

21             Next cause challenge, Ms. Taylor.

22             MS. TAYLOR:  Your Honor, before we move on, I guess I

23   wanted to see if Mr. Hoover's counsel had any opinion on Juror

24   No. 8.  I mean, obviously we support the cause challenge --

25             THE COURT:  Forgive me.  Mr. Hoover, do you agree

1   that Juror 8 should be stricken for cause?  Mr. Zermay?  I

2   didn't mean to ask Mr. Hoover.

3            MR. ZERMAY:  We agree, Your Honor.

4            THE COURT:  Thank you.  My apologies.

5            Next cause challenge, Ms. Taylor.

6            MS. TAYLOR:  Yes, Your Honor.  If you could give me

7   just a moment.

8            I continue -- give me -- can I confer with

9   Mr. Mesrobian?

10       (Ms. Taylor and Mr. Mesrobian confer.)

11            MS. TAYLOR:  I guess for clarification, Your Honor,

12   with regard to Juror No. 36, the person who we speculated might

13   be her brother is not the person, and it doesn't appear that

14   he's been prosecuted here in federal court or that any of --

15   either this court or Mr. Mesrobian had any involvement with

16   that prosecution, so I think that resolved that concern.

17            With regard to No. 45, I would move to strike him for

18   cause.  He -- I can't imagine that he is going to be able to

19   focus on this trial were he to be a juror with everything that

20   he has going on.  He expressed that he has concern for his

21   children.  He sounds like he's under an immense amount of

22   financial pressure at this moment, which is being exacerbated

23   by the possibility of being in this trial.  He also expressed,

24   I think, concerns about not being available in the event that

25   there's some -- something that happens with his estranged wife,

1   who has substance abuse issues.  And I think with all of that

2   going on, I don't expect, Your Honor, that he would be able to

3   give this trial his undivided attention.

4          THE COURT:  Mr. King?

5          MR. KING:  No objection, Your Honor.

6          THE COURT:  Mr. Zermay?

7          MR. ZERMAY:  No objection.

8          THE COURT:  45 is stricken for cause.

9          Any other cause challenges by the United States?

10         MS. TAYLOR:  No, Your Honor.

11         THE COURT:  All right.  Mr. Zermay -- or, sorry,

12   Mr. King?

13         MR. KING:  Yes, Your Honor.

14         On behalf of Mr. Ervin, we'd first move to remove

15   No. 12 for cause.  After she was brought before the Court to

16   address the two statements that she made agreeing with the

17   statements that guns were inherently bad and she would support

18   a ban on the AR-15, she expressed hesitancy throughout the

19   conversations with the Court and did not seem as if she would

20   be able to be fair and impartial based on her feelings on

21   firearms.

22         You know, the government attempted to rehabilitate

23   her, and during those conversations she maintained she would

24   come back and say that she could do it after awhile, but there

25   was -- it would be a little difficult on the cold record, but

1  she paused for a great deal amount of time and made several

2  verbal and physical tics that -- and then when I followed up

3  with her, she seemed to indicate that she would hold -- anybody

4  that possessed firearms or was in favor of distributing them,

5  she would hold that against this person.  And when asked if

6  they would have a fair shake, she hesitated as well.

7          THE COURT:  Mr. Zermay, are you in agreement with

8  that?

9          MR. ZERMAY:  Yes, Your Honor.  We have great concern

10 with the fact that she kept saying she knows right from wrong

11 and would not affiliate the people with firearms in some manner

12 of the same expression or a different variation of the phrase.

13 But yes, we express the same types of concerns as to that

14 juror.

15         THE COURT:  Okay.  Mr. Zermay, I'm going to have to

16 ask you to pull the microphone over.  I heard you this time,

17 but in the future, it would be -- I need you to speak into a

18 microphone.

19         MR. ZERMAY:  Of course.

20         THE COURT:  All right.

21         Ms. Taylor?

22         MS. TAYLOR:  Your Honor, I felt that Juror No. 12 was

23 rehabilitated through the additional questioning.  She was

24 clear when asked could she follow -- you know, "The Court's

25 going to instruct you on the law.  Can you follow those

1   instructions and law and apply it to the facts?"  And she
2   confidently answered she could do that.
3         She clearly has a personal view on firearms, which is
4   that she doesn't like them, but she indicated that she -- I
5   understood her to be indicating that she wouldn't personally
6   associate with people who were gun owners because those are
7   just not people she wants to associate with, but not that she
8   would hold it against somebody just the fact that they own a
9   gun and judge them based upon that fact.
10        So I do not believe that there's cause to strike
11  Juror No. 12.
12        THE COURT:  Yeah, I disagree.  I mean, the mere fact
13  that she says she wouldn't want to be friends with them if they
14  owned guns, that -- that is clearly her holding gun ownership
15  against an individual.
16        But she did say she could follow the law.  But I
17  would say that watching her expressions, her answers were
18  anything but clear.
19        And I would not describe her answers as having been
20  confident.  I heard her as being equivocal.
21        And regardless, even if she said that she would
22  follow the Court's instructions, which she did say, she made it
23  very clear that there was no good in it, that is, gun
24  ownership, and that she would view individuals who own guns
25  negatively.

1          Given the number of witnesses in this case who will

2     be gun owners and that the entire subject matter of the case is

3     gun ownership, I do not think that this -- that Juror No. 12

4     could render a fair and impartial verdict.

5          She has very fixed opinions about gun ownership and

6     whether there is, as she put it, any good in it.  And I do not

7     think she could render a fair and impartial verdict.  And so

8     for that reason I strike her for cause.

9          Next, Mr. King?

10         MR. KING:  Your Honor, No. 16.  It was almost

11    identical issues.  And I know we spent a lot more time with

12    Juror No. 12, but Juror No. 16 was not rehabilitated and

13    expressed doubts about her ability to be able to follow the

14    Court's instructions and be fair and impartial both in the

15    panel as a whole and then when questioned individually.

16         THE COURT:  And he (sic) said that AR-15s are made

17    for other things, meaning bad things, and I -- there was no

18    effort to rehabilitate him (sic) on that, so I would be

19    inclined to strike him (sic) for cause.

20         Mr. Zermay, is that your request as well?

21         MR. ZERMAY:  Yes, Your Honor, it is our request.

22         THE COURT:  Ms. Taylor.

23         MS. TAYLOR:  No objection, Your Honor.

24         THE COURT:  All right.  16 is stricken for cause.

25         Next from Mr. King?

1          MR. KING:  Your Honor, the last cause challenge we

2     have is No. 19.

3          THE COURT:  Just one moment.  I'm trying to find

4     something.

5          Go ahead.

6          MR. KING:  Your Honor, I know you mentioned -- with

7     regard to Juror No. 16, you referred to as a "he."

8          THE COURT:  Oh.

9          MR. KING:  Juror No. 16 is the female bus driver.

10    Juror No. 19 is the gentleman who -- I believe he was retired

11    with graphics and his wife worked for the New Jersey Board of

12    Education.  He is the one who expressed a great deal of

13    trepidation during the individual questioning about whether or

14    not he could be fair because of his opinions on both banning

15    AR-15s and gun ownership in general.

16         He expressed that he would have difficulty with the

17    witnesses.

18         One of the things I noted is that he did provide some

19    answers that said that he could follow the Court's rules, but

20    he was very hesitant when he did so.  It took him a great deal

21    of time to answer those questions.  And he seemed to express

22    general turmoil as to whether or not he would be able to do

23    that.

24         And overall, with his demeanor, given the subject

25    matter of the trial and his difficulty in answering those

1   questions, his hesitancy, we have a doubt that he would be able

2   to set those long-held beliefs aside to reach a fair and

3   impartial verdict.

4           THE COURT:  Are you in agreement with that,

5   Mr. Zermay?

6           MR. ZERMAY:  Yes, Your Honor.  The juror has

7   expressed immense trepidation as to whether or not he -- at

8   least his physical demeanor leads me to believe, at least, that

9   he could not render a fair and impartial verdict in this matter

10  because of the subject matter.

11          He admits that guns make him nervous.  And when

12  Mr. King asked a question regarding distribution of firearms

13  and testimony that may be elicited regarding that, he had what

14  looked like a stunned or shocked look on his face, and that

15  speaks volumes.

16          And for those reasons we'd also ask that the Court

17  strike him for cause.

18          THE COURT:  Ms. Taylor?

19          MS. TAYLOR:  Your Honor, I felt that Juror No. 19

20  repeatedly stated that he can hear both sides and be neutral.

21  There was a request that was asked I think by Mr. King, and I

22  think that juror understood that question to be, you know,

23  "Would you agree with the idea that firearms should be widely

24  distributed?"  And he said, "No, I wouldn't agree with that

25  idea."

1    But he stated that he would follow the law as

2 instructed and would not be prejudiced against either side,

3 even though firearms -- admittedly he did state that he does

4 not like them.

5    THE COURT:  I think the main concern I had with Juror

6 No. 19 is that his -- he repeatedly expressed a fear of

7 firearms and expressed that he would be uncomfortable with

8 firearms in the courtroom.

9    And I guess you-all know what your evidence is.  Are

10 we going to see firearms in the courtroom?

11    MS. TAYLOR:  Your Honor, the only firearms that would

12 be physically in the courtroom would be the auto key cards.

13 There's going to be images and videos that have firearms in

14 them, but there's not going to be any pistols, rifles,

15 shotguns, physically in the courtroom.

16    THE COURT:  I'm going to strike Juror No. 19 for

17 cause.  I think that his overall demeanor reflected a

18 significant discomfort with the subject matter of firearm

19 ownership entirely.  And I just -- I think he would be affected

20 by his fear of firearms, and that's a matter not in evidence,

21 and may cause him to presume guilt rather than innocence

22 because of his dislike of and fear of firearms.  And for those

23 reasons I'm striking 19 for cause.

24    Any other cause challenges, Mr. King?

25    MR. KING:  Not on behalf of Mr. Ervin, Your Honor.

 1            THE COURT:  Mr. Zermay, any cause challenges on

 2    behalf of Mr. Hoover?

 3            MR. ZERMAY:  No, Your Honor.

 4            THE COURT:  All right.  So just to make sure that we

 5    are all on the same page before I give you-all about ten

 6    minutes to talk, I have that I've stricken No. 8, No. 11,

 7    No. 12, No. 16, No. 19, No. 25 --

 8            COURTROOM DEPUTY:  I don't think 25 --

 9            THE COURT:  I'm sorry, 26, 26.

10            -- 26, 40, and 45.

11            Madam Deputy, is that right?

12            COURTROOM DEPUTY:  Yes, Your Honor.

13            THE COURT:  Ms. Taylor, you agree?

14            MS. TAYLOR:  Yes, Your Honor.

15            THE COURT:  Mr. King?

16            MR. KING:  Yes, Your Honor.

17            THE COURT:  Mr. Zermay?

18            MR. ZERMAY:  Yes, Your Honor.

19            THE COURT:  All right.  Any other cause challenges?

20            MS. TAYLOR:  No, Your Honor.

21            MR. KING:  No, Your Honor.

22            MR. ZERMAY:  No, Your Honor.

23            THE COURT:  All right.  So I'm going to -- just tell

24    them we'll be just a few more minutes.  I can't do anything

25    while . . .

1           All right.  So I'm going to give you-all about ten

2   minutes-ish to do your strategery.  You will have -- the

3   government has six peremptories, the defense has ten.  Are

4   you-all going to exercise them together or how are you planning

5   to do that?

6           MR. KING:  We're going to attempt to exercise them

7   together, Your Honor.

8           THE COURT:  So the way it will go is you'll get two,

9   government gets one; you get two, one; two, one; two, one.  And

10  at that point it's one, one; one, one.

11          And I would suggest in an abundance of caution,

12  because we have a juror that we might lose, that we seat three

13  alternates.  So we'll pick the jury first, and then because

14  we're seating three alternates, you'll get two peremptories

15  each as to the alternates.

16          We'll be in recess until 2 o'clock.

17          MR. KING:  Your Honor, could I request a little bit

18  more time than the ten minutes?  Because we haven't had a

19  comfort break in about five hours.

20          THE COURT:  I think you can do it in ten minutes.

21          COURT SECURITY OFFICER:  All rise.

22       (Recess, 1:52 p.m. to 2:06 p.m.)

23          COURT SECURITY OFFICER:  All rise.  This Honorable

24  Court is back in session.

25          Please be seated.

1          THE COURT:  All right.  We start with the defense.
2    So two strikes to the defense.
3          MR. KING:  Judge, the defense would exercise its
4    first two peremptory strikes on Juror No. 14 and Juror No. 6.
5          THE COURT:  And just as a reminder, you can
6    back-strike as much as you want.  You can strike anyone at any
7    time until you pass.  So if you pass at some point and don't
8    exercise a strike, then those jurors that you have found
9    acceptable at that point, you cannot go back and strike one of
10   them.
11         Ms. Taylor, first government strike.
12         MS. TAYLOR:  Your Honor, the government would strike
13   No. 15.
14         THE COURT:  All right.
15         Mr. King, two to you.
16         MR. KING:  We would strike No. 7, Your Honor, as our
17   third peremptory and No. 1 and our fourth peremptory.
18         THE COURT:  I'm sorry, No. 7 --
19         MR. KING:  7 and 1, Your Honor.
20         THE COURT:  -- and 1.
21         Ms. Taylor?
22         MS. TAYLOR:  The government would strike No. 20.
23         THE COURT:  All right.  Mr. King, two.
24         MR. KING:  Your Honor, defense would exercise its
25   fifth and sixth peremptory challenges on Nos. 23 and 24.  I

1    think those are the last two in the box.

2           THE COURT:  So 23 is defendant's five; 24 is

3    defendant's sixth.

4           Ms. Taylor.

5           MS. TAYLOR:  If I could have just a moment, Your

6    Honor.

7           THE COURT:  Certainly.

8           MS. TAYLOR:  The government would strike No. 25, Your

9    Honor.

10          THE COURT:  All right.  Mr. King, this is your last

11   set of -- no, it's not your last set of two.  You've got one

12   more.  Wait.

13          MR. KING:  Your Honor, I believe we've struck six at

14   this point.

15          THE COURT:  Yeah, this is your last set of two.

16          MR. KING:  Correct, Your Honor.  If I could have a

17   moment.

18          THE COURT:  Yes.

19          MR. KING:  Your Honor, defense would exercise its

20   seventh and eighth peremptory strikes on No. 9 and No. 5.

21          THE COURT:  All right.  So that's defendant's seventh

22   strike as to No. 9; defendant's eighth strike is to No. 5.

23          Okay, Ms. Taylor.

24          MS. TAYLOR:  The government would move to strike No.

25   27, Your Honor.

```
 1              THE COURT:  No. 27.

 2              One to you, Mr. King.

 3              MR. KING:  No. 28, Your Honor.

 4              THE COURT:  28?

 5              MR. KING:  Yes, ma'am.

 6              THE COURT:  Ms. Taylor.

 7              MS. TAYLOR:  Just a moment, Your Honor.  I count that

 8    we're up to Juror 31, Your Honor?

 9              THE COURT:  I haven't done the count.

10              Yes, that's what I come up with.

11              MS. TAYLOR:  The government will move to strike

12    No. 18.

13              THE COURT:  Your final strike, Mr. King.

14              MR. KING:  If I could just have a moment, Your Honor?

15              THE COURT:  Yes.  Whoa.

16              I don't know that we -- we may should have circled

17    back and spoken privately with No. 32 about her doctor's

18    appointment.  Does anybody have a thought on that?

19              MR. KING:  Your Honor, I'd be comfortable moving her

20    to basically No. 48, and if we need her as an alternate -- and

21    that way if we need to address it, we can, otherwise move her

22    back.

23              THE COURT:  I don't know that we can move someone's

24    position.  Would there be a consensus to strike her for cause

25    in light of her doctor's appointment?  I don't know . . .
```

1          MS. TAYLOR:  It's not until the 24th, Your Honor.  I

2    think that was why I didn't -- why it didn't occur to me that

3    we needed to maybe call her back.

4          THE COURT:  That's true.  It's two weeks out.  All

5    right.  If there's -- and I suppose if we go into the 24th we

6    can just start late that day.  She did say it was at like

7    10:45.

8          MS. TAYLOR:  That's what she said.

9          THE COURT:  Okay.  Then your final strike, Mr. King?

10         MR. KING:  To Number --

11         MS. TAYLOR:  Oh, no, never mind.

12         MR. KING:  No. 31, Your Honor.

13         THE COURT:  Your final strike is 31?

14         MR. KING:  Yes, Your Honor.

15         THE COURT:  Government's final strike?

16         MS. TAYLOR:  We would accept the panel, Your Honor.

17         THE COURT:  All right.  Then our jury -- and you've

18    exercised all of the defense strikes, Mr. King?

19         MR. KING:  That's correct, Your Honor.

20         THE COURT:  And Mr. Zermay, that's with the agreement

21    of Mr. Hoover?

22         MR. ZERMAY:  Yes, Your Honor.

23         THE COURT:  All right.  So our jury is -- please

24    follow along.  And Madame Deputy, tell me when I mess up.  But

25    we have No. 2 and No. 3 and No. 4, No. 10, No. 13, No. 17,

1  No. 21, No. 22, No. 29, No. 30, No. 32, and No. 33.

2          Is that correct, Ms. Wiles?

3          COURTROOM DEPUTY:  Yes, Your Honor.

4          THE COURT:  Ms. Taylor, is that the jury we've

5  selected?

6          MS. TAYLOR:  Yes, Your Honor.

7          THE COURT:  Mr. King?

8          MR. KING:  Yes, Your Honor.

9          THE COURT:  Mr. Zermay?

10         MR. ZERMAY:  Yes, Your Honor.

11         THE COURT:  We're going to seat three alternates.

12 Under Rule 24, if it's either three or four alternates you get

13 two strikes.

14         So Mr. King, first strike as to the alternates?

15         MR. KING:  Your Honor, we would accept all three of

16 those.

17         THE COURT:  I'm sorry?

18         MR. KING:  Oh, I apologize.  We would accept all

19 three of those.

20         THE COURT:  So that would be 34, 35, and 36?

21         MR. KING:  Correct, Your Honor.

22         THE COURT:  All right.

23         Ms. Taylor.

24         MS. TAYLOR:  We would move to strike No. 34.

25         THE COURT:  All right.  So that means our alternates

1    are 35, 36, and 37.

2              Mr. King?

3              MR. KING:  We'd move to strike No. 37.

4              THE COURT:  Our alternates are now 35, 36, and 38.

5              Ms. Taylor?

6              MS. TAYLOR:  We would move to strike 38.

7              THE COURT:  Alternates are now 35, 36, and 39.

8              MR. KING:  Your Honor, we would -- I'm sorry, Your

9    Honor.

10             THE COURT:  Go ahead.

11             MR. KING:  We can -- we'll strike No. 39, putting

12   No. 41 as our third alternate.

13             THE COURT:  All right.  So our alternates are 35, 36,

14   and 41.

15             Is that correct, Ms. Wiles?

16             COURTROOM DEPUTY:  Yes, Your Honor.

17             THE COURT:  Ms. Taylor, you agree?

18             MS. TAYLOR:  Yes, Your Honor.

19             THE COURT:  You, Mr. King?

20             MR. KING:  Yes, Your Honor.

21             THE COURT:  Mr. Zermay?

22             MR. ZERMAY:  Yes, Your Honor.

23             THE COURT:  All right.  So let's get -- let's get

24   them in and just have them sit in the back anywhere.

25             Ma'am, if I can get you to move all the way down to

1  the end of an aisle so that there's enough room for all the

2  jurors, please.

3       (Prospective jurors enter, 2:20 p.m.)

4            THE COURT:  If you'll just come in and sit in the

5  back of the gallery.  Just slide all the way in.  Don't worry

6  about sitting where you sat before, just fill up the back of

7  the courtroom.

8            I think there are a couple of seats up front.

9            Counsel, you can take your seats.

10           All right, ladies and gentlemen.  We're about done.

11  If I call your -- Ms. Wiles, are you ready?

12           COURTROOM DEPUTY:  I'm printing right now.

13       (The judge and the courtroom deputy confer.)

14           THE COURT:  All right.  If I call your number, I'll

15  ask you to come forward.  Juror No. 2, Juror No. 3, Juror

16  No. 4, Juror No. 35, Juror No. 10, No. 13, No. 17, No. 36,

17  No. 21, No. 22, No. 29, No. 41, No. 30, No. 32, and No. 33.

18           All right, Ms. Taylor, have I seated the jury we

19  agreed upon?

20           MS. TAYLOR:  Yes, I think --

21           THE COURT:  Let me have you come to sidebar.

22       (Proceedings at sidebar:)

23           MS. TAYLOR:  I'm sorry, I might have just been

24  confused.  I might have just been confused because I saw 35 in

25  the front row, but I guess -- are you just mixing the

1    alternates in with the --

2              THE COURT:  Yes.

3              MR. KING:  Putting one every fourth --

4              THE COURT:  We mixed them in because they talked

5    about alternates.  I don't like jurors thinking they're an

6    alternate because they don't pay attention.

7              So have I seated the jury we agreed upon, Ms. Taylor?

8              MS. TAYLOR:  Yes.

9              THE COURT:  Mr. King?

10             MR. KING:  Yes, Your Honor.

11             THE COURT:  Mr. Zermay?

12             MR. ZERMAY:  Yes, Your Honor.

13        (Proceedings in open court:)

14             THE COURT:  All right.  I'm going to speak for a

15   moment to the gallery and then I'll come back to those of you

16   who are in the jury box.

17             If you're in the gallery, as you can probably guess,

18   you will not be trying this particular case.  As I told you

19   earlier, please don't take the fact that you weren't selected

20   personally.  It's simply a matter of seating a fair and

21   impartial jury for this particular case.  And so you have --

22   you've -- despite the fact that you weren't picked, simply by

23   being here today and participating in the jury selection

24   process and answering all of our questions, you have allowed us

25   to do what the Constitution requires, and that is to seat a

1    fair and impartial jury for this case.  For that, the citizens

2    of the Middle District of Florida are in your debt, as are the

3    lawyers and the parties and the judges of this court.  So we

4    thank you very much.

5           You'll need to stop by and see the jury administrator

6    on the way out.  You'll please take the paddles back to him.

7    They are not a souvenir.  I need them for my next trial.

8           Do they need to continue to call in or are they done?

9           COURTROOM DEPUTY:  He will let them know that

10   downstairs.  I don't believe they have to call in.

11          But No. 27, you did leave something with the jury

12   administrator that you'll need to pick up from him.

13          THE COURT:  All right.  So you-all are free to go.

14   Have a very nice afternoon and thank you for your participation

15   in jury selection.

16      (Unselected jurors exit the courtroom.)

17          THE COURT:  So, ladies and gentlemen, you are the

18   jury that will try this case.  We're going to take about an

19   hour recess because the lawyers have been in here non-stop

20   since 8:45 this morning, so I need to let them get some lunch.

21   And hopefully you were able too get some lunch earlier, if you

22   didn't --

23      (Negative head shakes.)

24          THE COURT:  Okay.  So I highly recommend Happy

25   Grilled Cheese across the street.  It's magical, trust me.  If

1    you try it, you'll agree.

2         But we're going to come back at 3:30.  And at 3:30

3    Madam Deputy will administer the oath that you have to take as

4    jurors, and then I will give you some preliminary instructions.

5    Then we'll hear the opening statements from the attorneys and

6    we'll start with the evidence.  We'll go until probably around

7    5, not much later than that today because you had to get here

8    pretty early.  That will be our plan.

9         Please remember during this break and all others you

10   must not talk to anybody or one another about the trial.  You

11   can tell your employer or your family that you have been

12   selected as jurors and the -- when you have to be here, the

13   schedule, but you can't talk to them about the case.  Don't

14   even tell them the subject matter of the case.

15        People automatically freely express opinions, and you

16   should not be listening to anybody's opinions about the case.

17   You must decide it based solely on the evidence that's

18   presented in this courtroom, my instructions on the law, and

19   the arguments that you hear from the attorneys.  So please

20   don't talk to anybody about the case.

21        Don't let anybody speak in your presence about the

22   case.  If anybody should do so, stop them and notify the court

23   security officer immediately.

24        Don't conduct any independent research about anything

25   in any way relating to the case, and that includes not Googling

1  the people, the lawyers, the words, the lawyers, me.  If you

2  want to find out about us, great, do it after the trial but not

3  now because none of that should be considered by you in

4  rendering a fair and impartial verdict.

5        Please don't communicate on social media about the

6  trial in any way.  Please don't read, watch, or listen to any

7  media reports.  I am not aware of any, but I don't know about

8  that.  So please try to avoid the media until the conclusion of

9  the case.  If you want to ask a family member to keep track of

10 anything about a trial, then you can ask them to do that, but

11 that's it.  Don't watch the news in any other way.

12       When you go out into the jury room you will find some

13 juror stickers.  Please put them on.  They lessen the

14 likelihood that somebody will accidentally speak in your

15 presence.  When you arrive tomorrow morning I'll ask you to go

16 straight to the jury room and put that on.  And then if you

17 want to go get coffee or something, do that afterwards so that

18 you can be identified as a juror.

19       All right.  With that, it's 2:30.  We'll be in recess

20 until 3:30 and we'll begin the case at that time.

21             COURT SECURITY OFFICER:  All rise for the jury.

22             COURTROOM DEPUTY:  They can leave their notepads on

23 their chairs.

24             THE COURT:  You can leave your notepads on your

25 chairs.

1          (Jury exits the courtroom, 2:31 p.m.)

2               COURT SECURITY OFFICER:  You may be seated.

3               THE COURT:  Okay.  So we'll be in recess.  Don't go

4    to Happy Grilled Cheese for lunch because I just sent the jury

5    to Happy Grilled Cheese.

6               There was a question at sidebar about what I meant as

7    one lawyer at a time.  What I mean by that is, for example,

8    Mr. Zermay is doing the opening statements.  That means I only

9    hear from Mr. Zermay during opening statements.

10              And Ms. Taylor, are you doing the opening for the

11   government?

12              MS. TAYLOR:  Mr. Mesrobian is.

13              THE COURT:  Oh.  You told me that already too.  So

14   Mr. Mesrobian -- so I'm only going to hear from Mr. Mesrobian

15   during opening.

16              If Mr. Mesrobian calls the first witness, then he

17   will handle objections as to that witness.  Whoever's going to

18   cross that witness, that's the only person that I'll hear from

19   with regard to objections.  So in other words, it's one lawyer

20   at a time.  We're not going to tag team and I'm not going to

21   hear from two people on everything.  It becomes quite

22   disruptive and difficult to follow.

23              So any questions before I let you go get some lunch,

24   with the understanding that when we get back I intend to go

25   right into preliminary instructions and then opening

1    statements?

2           Ms. Taylor?

3           MS. TAYLOR:  No, Your Honor.  I guess the only

4    question would be whether you think we will call our first

5    witness today.  It's going to be a very lengthy witness, so I'm

6    not sure whether it's the Court's preference that we call him

7    because it may only be a half an hour or so of time today that

8    he would testify or if we would start tomorrow with our first

9    witness.

10          THE COURT:  Let's play that by ear.  It kind of

11   depends on how long the initial instructions take and the

12   openings.

13          MS. TAYLOR:  Yes.

14          THE COURT:  So you should have him here ready to

15   start.

16          MS. TAYLOR:  Yes, Your Honor.  And then with regard

17   to witnesses, we are invoking the rule of witness sequestration

18   with the exception of our case agent.

19          THE COURT:  And the rule has been invoked, so I'll

20   rely on you-all to make sure there's no witness in the

21   courtroom.  I don't know what your witnesses look like, so I

22   can't police that.  So I'll ask counsel to be vigilant when

23   someone new enters the courtroom and make sure that we don't

24   have a witness listening to testimony.

25          Mr. King, anything from you before we break for

1    lunch?

2              MR. KING:  Yes.  The only question I have is I know

3    the Court's been looking to me primarily during the jury

4    selection.  Are we going to be permitted to determine between

5    the parties order of cross-examination, opening, and closing as

6    to Mr. Hoover and Mr. Ervin, or --

7              THE COURT:  Well, do you-all have a -- I was going

8    to -- I generally would recognize the government and then you

9    and then Mr. Hoover.  Do you-all want me to do it differently

10   for purposes of opening?

11             MR. KING:  I know for opening we discussed Mr. Hoover

12   going first and then me following up, but --

13             THE COURT:  That's fine.  But if I forget that, just

14   remind me, please.

15             MR. KING:  Yes, Your Honor.  I just wanted to make

16   sure that was acceptable to the Court.

17             THE COURT:  That's fine.  Generally during trial,

18   unless you tell me otherwise, I'm going to go in the order

19   that's on the indictment.

20             So if there's a particular witness that you -- if I

21   call on you, if you want to say that Mr. Hoover's counsel is

22   going to go first, that's fine.

23             MR. KING:  Yes, ma'am.  Okay.

24             THE COURT:  Any other questions or housekeeping

25   matters we need to address?

1          Yes, Mr. Larosiere.

2          MR. LAROSIERE:  Yes, Your Honor.

3          Just for clarity, for example, as we're going forward

4    doing one counsel at a time, would you like us to pre-identify

5    that or would you just simply ask for counsel for Hoover and

6    then whoever goes up?

7          THE COURT:  I'll just try to remember to ask counsel

8    for Hoover.  But if I call Mr. Zermay and it's going to be you,

9    then you can just stand up and say that you're handling that

10   witness or whatever, that's fine.

11         MR. LAROSIERE:  Okay.  Thank you.

12         THE COURT:  All right.  Any other questions or

13   matters that we need to address?

14      (No response.)

15         THE COURT:  All right.  Seeing none, we will be in

16   recess.  We'll start back right at 3:30.

17         COURT SECURITY OFFICER:  All rise.

18      (Recess, 2:35 p.m. to 3:32 p.m.)

19      (All parties present.  Jury not present.)

20         COURT SECURITY OFFICER:  All rise.  This Honorable

21   Court is back in session.

22         Please be seated.

23         THE COURT:  All right.  Is everybody ready to go?

24         MS. TAYLOR:  Yes, Your Honor.

25         MR. KING:  Yes, Your Honor.

1          MR. ZERMAY:  Yes, Your Honor.

2          THE COURT:  Okay.  And it's going to be

3   Mr. Mesrobian, then Mr. Zermay?

4          MR. ZERMAY:  Yes, Judge.

5          THE COURT:  And Mr. King?

6          MR. KING:  Yes, Your Honor.

7          THE COURT:  Okay.  Let's have the jury, please.

8          COURT SECURITY OFFICER:  All rise for the jury.

9      (Jury enters, 3:34 p.m.)

10          COURT SECURITY OFFICER:  Please be seated.

11          THE COURT:  Good afternoon, everyone.  Hope you had a

12   good lunch.

13          We are going to begin the trial at this time in

14   Case No. 3:21-cr-22(S4)-MMH-MCR, United States of America vs.

15   Kristopher Justinboyer Ervin and Matthew Raymond Hoover.

16          Madame Deputy, will you please swear the jury.

17          COURTROOM DEPUTY:  Please stand and raise your right

18   hands.  Do each of you solemnly swear that you will well and

19   truly try the case now before the Court and render a true

20   verdict according to the law, evidence, and instructions of

21   this court, so help you God?

22      (Affirmative responses.)

23          COURTROOM DEPUTY:  Thank you.  You may be seated.

24          THE COURT:  Ladies and gentlemen, now that you have

25   been sworn as the jury to try the case and before we get into

1  further discussions, I'll tell you about the people that you'll

2  be working with during the trial.

3        First, as I told you earlier, I'm Judge Howard.  I

4  will be the judge trying the case.  I won't be able to

5  socialize with you during the case, but I will be kept informed

6  of any matters that relate to your welfare, and I will make

7  every effort to see to it that your jury service is as pleasant

8  as possible.

9        My courtroom deputy is Ms. Wiles.  She's in charge of

10  the courtroom and will also be in charge of the exhibits.

11        Next to Ms. Wiles is Ms. Healey.  She is our court

12  reporter.  She takes down everything that is said in the

13  courtroom and makes a permanent record of it.

14        You've already met the court security officers.  They

15  provide security for the courtroom and will also attend to your

16  needs during your jury service.  So if you have any questions

17  relating to your accommodations or your needs, please direct

18  them to the court security officer on a break, and the court

19  security officer will either be able to address the situation

20  or bring it to my attention.

21        Periodically you may see my law clerk, Mr. McCroskey,

22  who is seated over at the law clerk table.  He assists me with

23  the trial, and so he may be in court at times and other times

24  he may not be here.  And then at other times during the trial

25  you may see some of my other law clerks.  As you can imagine,

 1    we have other cases, and sometimes they need to consult with me

 2    regarding other matters.

 3          You've already been introduced to the lawyers and the

 4    parties so I'm not going to repeat that.

 5          Any personal items that you wish to bring with you

 6    can be left in the jury room, and it will be locked and

 7    secured.

 8          As you may have noticed, there's a refrigerator, a

 9    microwave, a coffee maker, and water cooler in there.  And all

10    of those are available for your use.

11          As I told you, I intend to run the trial on a

12    schedule of 9 to 5 or 5:30.  What that means is that each day

13    I'll ask you to plan to be here by 8:45 so that we can hope

14    that all of you will be here by 9 o'clock.  And we'll go in the

15    morning, we'll take a morning break, we'll break for a little

16    over an hour at lunchtime, and then we'll continue in the

17    afternoon with an afternoon break.  And we'll stop between 5

18    and 5:30 each day, with 5:30 being a hard break.

19          If there's anything else that we can do to make your

20    jury service more comfortable, please let the court security

21    officer know and I'll see what we can do to address it.

22          Now, in order to maintain the impartiality that is

23    required of you as a juror, I have instructed all of the

24    lawyers and the parties, as well as the members of their staffs

25    not to speak to you during the trial.  So if you find yourself

1   in proximity with one of the lawyers, maybe at the elevator or

2   at the water cooler, don't be offended when they don't speak to

3   you.  They're simply following my instructions.

4        Likewise, you should not speak to them because that

5   will just be awkward because they're not supposed to speak to

6   you.

7        And don't let anybody talk to you about the case

8   while it's being tried.  If anybody attempts to discuss the

9   case with you or in your presence, you should stop them

10  immediately and you must report that contact to the court

11  security officer, who will bring it to my attention.

12       While you're serving as jurors you'll be asked to

13  wear those juror stickers.  Those identify you as a juror and

14  make it much less likely that someone will inadvertently speak

15  about the case in your presence.

16       I will decide all questions of law and procedure that

17  arise during the trial.  And before you retire to the jury room

18  at the end of the trial to deliberate upon your verdict and to

19  decide the case, I will explain to you the rules of law that

20  you must follow in applying and making your decision.

21       The evidence presented to you during the trial will

22  primarily consist of the testimony of witnesses and tangible

23  items, including papers or documents that we refer to as

24  "exhibits."

25       You should pay close attention to the testimony

1    because it will be necessary for you to rely upon your memories

2    concerning what the testimony was.  Although the court reporter

3    is making a stenographic record of everything that is said,

4    typewritten transcripts will not be prepared in sufficient time

5    for your use during your deliberations, and you should not

6    expect to receive them.

7             On the other hand, any exhibits admitted in evidence

8    during the trial will be available for your detailed study if

9    you wish during your deliberations.  So if an exhibit is

10   received in evidence but is not fully read or shown to you at

11   that time, do not be concerned; you will get it to study later

12   during your deliberations.

13            If you would like to take notes during the trial you

14   may do so.  Ms. Wiles has provided notepads and pens for all of

15   you.  We will collect them at the end of the day and then give

16   them back to you in the morning.  Please write your juror

17   number on the first page of the notepad so that we get the

18   right notepad back to the right person.

19            Of course, you are not required to take notes.  And

20   if you do not want to take notes, you don't have to.  That

21   choice will be left up to each individual juror.

22            If you do decide to take notes, please do not try to

23   write everything down because you can get so involved in

24   note-taking that you become distracted from the ongoing

25   proceedings.

1          Also, your notes should be used only as aids to your

2     memory.  And if your memory should later differ from your

3     notes, you should rely upon your memory and not your notes.

4          Your notes should be personal to you and should not

5     be read by other jurors.

6          If you do not take notes, you should rely upon your

7     own independent recollection or memory of what the testimony

8     was and you should not be unduly influenced by the notes of

9     other jurors.

10         Notes are not entitled to any greater weight than the

11    recollection or impression of each juror concerning what the

12    testimony was.

13         Our law requires jurors to follow certain

14    instructions regarding their personal conduct in order to help

15    assure a just and fair trial.  I will now give you those

16    instructions.

17         Do not talk, either among yourselves or with anyone

18    else, about anything related to the case.  You may tell the

19    people with whom you live and your employer that you are a

20    juror and give them information about when you'll be required

21    to be in court, but you must not discuss with them or anyone

22    else anything related to the case.

23         Do not at any time during the trial request, accept,

24    agree to accept, or discuss with any person any type of payment

25    or benefit in return for supplying any information about the

1   trial.  You must promptly tell me about any incident you know

2   of involving an attempt by any person to improperly influence

3   you or any member of the jury.

4           Do not visit or view the premises or place where the

5   charged crime is alleged to have been committed or any other

6   premises or place involved in the case.  And you must not use

7   internet maps or Google Earth or any other program or device to

8   search for a view of any location discussed in the testimony.

9           Do not read, watch, or listen to any accounts or

10  discussions related to the case which may be reported by

11  newspapers, television, radio, the internet, or any other news

12  media.

13          Do not attempt to research any fact, issue, or law

14  related to this case, whether by discussions with others, by

15  library, by internet search, or any other means.  In this age

16  of instant electronic communication and research, I want to

17  emphasize that in addition to not talking face-to-face with

18  anyone about the case, you must not communicate with anyone

19  about the case by any other means, including telephone, text

20  messages, email, internet, chat rooms, social networking sites,

21  Facebook, Twitter, TikTok, or anything else.

22          You must not provide any information about the case

23  to anyone by any means whatsoever, and that includes not

24  posting information about the case or what you're doing in the

25  case or any device, internet site, social networking websites,

1   Twitter, Facebook, TikTok, or anything else.

2           You also must not use Google or other search engines

3   to seek information about the case or the law that applies to

4   the case or the people involved in the case, including the

5   defendant, the witnesses, the lawyer or the judge.

6           It is important that you understand why these rules

7   exist and why they are so important.

8           Our law does not permit jurors to talk with anyone

9   else about the case or permit anyone to talk to them about the

10  case because only you jurors are authorized to render a verdict

11  and only you have been found to be fair and impartial and only

12  you have promised to be fair.  No one else is so qualified.

13          Our law does not permit jurors to talk among

14  themselves about the case until the Court tells them to begin

15  deliberations because premature discussions can lead to a

16  premature final decision.

17          Our law does not permit you to visit a place

18  discussed in the testimony.  First, you can't be sure that the

19  place is in the same condition as it was on the day in

20  question.  Second, even if it were in the same condition, once

21  you go to a place discussed in the evidence to evaluate the

22  evidence in light of what you see, you become a witness, not a

23  juror.  And as a witness, you may now have a mistaken view of

24  the scene that neither party may have a chance to correct, and

25  that would not be fair.

1        Finally, our law requires that you not read, watch,

2   or listen to any news accounts of the case and that you not

3   attempt to research any fact, issue, or law related to the

4   case.  Your decision must be based solely on the testimony and

5   other evidence presented in this courtroom.

6        Also, the law often uses words and phrases in special

7   ways, so it's important that any definitions you hear come from

8   me and not from any other source.

9        It would not be fair to the parties for you to base

10  your decision on some reporter's view or opinion or upon other

11  information that you acquire outside the courtroom.

12       Importantly, if you should consider evidence or

13  information beyond what is presented in this courtroom, a

14  mistrial may result.  And the cost of a mistrial can be quite

15  substantial.  Indeed, if a mistrial occurs, then the time,

16  resources, and efforts invested by all involved will have been

17  wasted.

18       These rules are designed to help guarantee a fair

19  trial, and our law, accordingly, sets forth serious

20  consequences if the rules are not followed.  I trust that each

21  of you will understand and appreciate the importance of

22  following these rules and, in accord with your oath and

23  promise, that you will do so.

24       During the trial you should keep an open mind and you

25  should avoid reaching any hasty impressions or conclusions.

1  Reserve your judgment until you have heard all of the testimony

2  and evidence, my instructions on the law, and the closing

3  arguments of the attorneys.

4         The evidence from which you will find the facts will

5  consist of the testimony of witnesses, documents, and other

6  things received into the record as evidence and any facts that

7  the lawyers and parties agree to or stipulate to or that I

8  instruct you to find.

9         From time to time during the trial I may be called

10  upon to make rulings of law on objections or motions made in

11  the courtroom.  You should not infer or conclude from any

12  ruling or other comment I may make that I have any opinions of

13  the merits of the case favoring one side or the other.

14         And if I should sustain an objection to a question

15  that goes unanswered by a witness, you should not guess or

16  speculate what the answer might have been, nor should you draw

17  any inference or conclusion from the question itself.

18         During the trial it may be necessary for me to confer

19  with the lawyers from time to time out of your hearing with

20  regard to questions of law or procedure that require

21  consideration by me alone.  On some occasions you may be

22  excused from the courtroom for that same reason.  I will try to

23  limit these interruptions as much as possible, but you should

24  remember the importance of the matter you are here to determine

25  and should be patient if at times it seems the case may be

1    going slowly.

2         The case will proceed in the following way:  First,

3    the attorneys will have an opportunity to make opening

4    statements.  Counsel for the government may make an opening

5    statement at the beginning of the case, and counsel for the

6    defendants may make an opening statement following the

7    government's opening statement, but neither -- but no party is

8    obligated to make an opening statement.

9         Second, the government will present testimony and

10   evidence which it believes supports the charges contained in

11   the indictment.  After the government has presented its

12   evidence, the defendants may present evidence but are not

13   obligated to do so.  The law never imposes on a defendant in a

14   criminal case the burden of calling any witnesses or

15   introducing any evidence.

16        Next, if a defendant produces testimony or evidence,

17   the government will have the opportunity to present rebuttal

18   testimony or evidence.  The law gives the government the

19   opportunity to present rebuttal evidence because it is the

20   government's burden to prove a defendant's guilt beyond a

21   reasonable doubt.

22        At the conclusion of all the evidence I will instruct

23   you on the applicable law that you must follow.  Then the

24   parties will have the opportunity to present final arguments,

25   after which you will retire to deliberate on your verdict.

1          Although I will give you a more complete set of

2    instructions at the end of the case before you begin to

3    deliberate, I will now give you some further preliminary

4    instructions to help you as you listen to the evidence.

5          The indictment, or formal charge, against any

6    defendant is not evidence of guilt.  It is only an accusation

7    and nothing more.  Indeed, every defendant is presumed by the

8    law to be innocent.  The defendant starts out with a clean

9    slate.  The law does not require a defendant to prove innocence

10   or to produce any evidence at all.  And if a defendant elects,

11   or chooses, not to testify, you must not consider that in any

12   way during your deliberations.

13         The government has the burden of proving a defendant

14   guilty beyond a reasonable doubt.  And if it fails to do so,

15   you must find that defendant not guilty.  While the

16   government's burden of proof is a strict, or heavy, burden, it

17   is not necessary that a defendant's guilt be proved beyond all

18   possible doubt.  It is only required that the government's

19   proof -- pardon me.  It is only required that the government's

20   proof exclude any reasonable doubt concerning the defendant's

21   guilt.

22         A "reasonable doubt" is a real doubt based upon

23   reason and common sense after careful and impartial

24   consideration of all the evidence in the case.

25         "Proof beyond a reasonable doubt," therefore, is

1    proof of such a convincing character that you would be willing

2    to rely and act upon it without hesitation in the most

3    important of your own affairs.

4         In your deliberations you must consider only the

5    evidence that I admit in the case.  The term "evidence"

6    includes the testimony of the witnesses and the exhibits

7    admitted in the record, but remember that anything the lawyers

8    say is not evidence in the case, and it is your recollection

9    and interpretation of the evidence that controls.

10        In considering the evidence you may make deductions

11   and reach conclusions which reason and common sense lead you to

12   make.  And you should not be concerned about whether the

13   evidence is direct or circumstantial.

14        "Direct evidence" is the testimony of a witness who

15   asserts actual knowledge of a fact, such as an eyewitness.

16        "Circumstantial evidence" is proof of a chain of

17   facts and circumstances tending to prove or disprove any fact

18   in dispute.  The law makes no distinction between the weight

19   you give to either direct or circumstantial evidence.

20        Now, in saying that you must consider all the

21   evidence, I do not mean that you must accept all the evidence

22   as true or accurate.  You should decide whether you believe

23   what each witness has to say and how important that testimony

24   is.  In making that decision you may believe or disbelieve any

25   witness in whole or in part.

1        Also, the number of witnesses testifying concerning

2    any particular dispute is not controlling.

3        In deciding whether you believe any witness, I

4    suggest that you ask yourself a few questions:

5        Did the witness impress you as one who was telling

6    the truth?

7        Did the witness have any particular reason not to

8    tell the truth?

9        Did the witness have a personal interest in the

10   outcome of the case?

11       Did the witness seem to have a good memory?

12       Did the witness have the opportunity and ability to

13   observe accurately the things he or she testified about?

14       Did the witness appear to understand the questions

15   clearly and answer them directly?

16       Did the witness's testimony differ from other

17   testimony or other evidence?

18       When knowledge of a technical or specialized subject

19   matter might be helpful to a jury, a person having specialized

20   training or experience in that area is permitted to state an

21   opinion concerning those areas.  Merely because such a witness

22   has expressed an opinion, however, does not mean that you must

23   accept that opinion.  The same as with any other witness, it is

24   up to you to decide whether to rely upon it.

25       Those are some preliminary instructions to help you

1    as you begin to hear the evidence.  I will give you a more

2    complete set of instructions at the end of the trial before you

3    begin to deliberate.

4            In a moment we will begin with the opening

5    statements.  I caution you again that any statements the

6    lawyers make now, as well as the arguments they present at the

7    end of the trial, are not to be considered by you either as

8    evidence in the case or as your instruction on the law.

9    Nevertheless, these statements are intended to help you

10   understand the issues and the evidence as it comes in, as well

11   as the positions taken by both sides.  So I will ask you to

12   give them your close attention as I recognize them for purposes

13   of their opening statements.

14           May I see counsel at sidebar.

15      (Proceedings at sidebar:)

16           THE COURT:  Mr. Mesrobian, any objection to the

17   Court's preliminary instructions to the jury?

18           MR. MESROBIAN:  No, Your Honor.

19           THE COURT:  Mr. King, any objections?

20           MR. KING:  No, Your Honor.

21           THE COURT:  Mr. Zermay, any objections?

22           MR. ZERMAY:  No, Your Honor.

23           THE COURT:  Okay.  So I'm going to recognize you,

24   Mr. Mesrobian, then you, Mr. Zermay, and then you, Mr. King?

25           MR. KING:  Thank you, Your Honor.

1           MR. ZERMAY:  Thank you, Your Honor.

2           MR. MESROBIAN:  Thank you, Your Honor.

3       (Proceedings in open court:)

4           THE COURT:  Mr. Mesrobian, you may proceed.

5           MR. MESROBIAN:  Thank you, Your Honor.

6           Ladies and gentlemen of the jury, good afternoon.  As

7   you've already heard a few times, what brings us here today is

8   a case about firearms.  Now, it's not the guns you normally

9   think of when you hear the word, the rifles and pistols that

10  you can find at your average gun store.

11          Rather, what is at the center of this case is a

12  simple device which can convert one of the most commonly

13  available types of semiautomatic rifles, the AR-15, into a

14  machine gun capable of fully automatic fire.  And it's a device

15  that the defendants, Kristopher Justinboyer Ervin, who goes by

16  "Justin," and Matthew Raymond Hoover, conspired to distribute

17  at a massive scale.

18          My name is David Mesrobian.  I'm an Assistant United

19  States Attorney here in Jacksonville.  You've already met

20  Ms. Taylor and Special Agent Slosson, and now we've been joined

21  by Ms. Ganoe at the table behind us, who's going to be

22  assisting us with the evidence in this case.

23          We're going to be presenting this case to you over

24  the next few days.  The evidence is going to come to you in

25  pieces from over two dozen witnesses, because as you're going

1   to hear, this investigation involves a conspiracy which the

2   Bureau of Alcohol, Tobacco, Firearms and Explosives, or ATF,

3   and the United States Postal Inspection Service unraveled

4   through search warrants and financial investigations and

5   witness interviews and expert analysis.

6           The judge is going to instruct you on the law at the

7   end of the case, but I expect that you're going to hear that

8   under federal law, certain categories of unusual or dangerous

9   firearms, including silencers and destructive devices, like

10   grenades or grenade launchers, machine guns, and machine gun

11   conversion devices, are all subject to additional regulation.

12   It's possible to buy or possess a machine gun legally today,

13   but they're subject to special restrictions on production and

14   ownership and they must be registered under a law called the

15   National Firearms Act, or the NFA.

16           And most people are familiar with machine guns,

17   meaning a fully functioning firearm that fires automatically or

18   continuously when you pull the trigger.  But machine gun

19   conversion devices are also considered firearms under this law,

20   the NFA.  These are devices which when installed into a regular

21   semiautomatic firearm can convert it into a machine gun,

22   meaning a rifle or pistol, which normally when you pull the

23   trigger fires only one bullet, can be converted to fire an

24   entire magazine of ammunition with a single pull of the trigger

25   at a rate of hundreds of rounds of ammunition per minute.

1          Both machine guns and machine gun conversion devices

2     must be registered with ATF and their transfers or sales

3     reported.

4          The story of this case starts with Mr. Ervin, a

5     resident of Orange Park, just down the road from here.  As

6     you're going to hear, in 2020, Mr. Ervin started a business

7     selling items bearing the design for a lightning link, which is

8     a type of machine gun conversion device.  Now, the lightning

9     link isn't something that Mr. Ervin invented.  It's a

10    decades-old design for a simple device, two pieces of metal,

11    which a shooter can simply drop into a regular semiautomatic

12    AR-15 rifle -- one of the most popular types of rifles in the

13    United States -- and convert it into a machine gun.

14         Now, it's not a crime to sell a T-shirt or a coffee

15    mug with a picture of a lightning link or a silencer or a

16    grenade on it.  But the flagship item that Mr. Ervin offered

17    for sale was something he called the auto key card.  That's a

18    name that you're going to hear a lot over the next few days.

19         On his website Mr. Ervin referred to these items as

20    pen holders or bottle openers or artwork.

21         The evidence is going to show that that was a mirage,

22    a cover.  Their true nature was very different.

23         You're going to hear from employees at a machine shop

24    in the Jacksonville area that Mr. Ervin came to them with

25    carefully crafted designs for stainless steel cards with

1   precision laser etchings and cutouts.  Ultimately he had them

2   create thousands of these cards, which he then sold as the auto

3   key card.

4           What the machine shop didn't know was that these cuts

5   were the precise dimensions for the lightning like, the machine

6   gun conversion device, which Mr. Ervin then sold as the auto

7   key cards.

8           The cards he sold, of course, weren't all the same

9   price.  Cheaper ones had the parts for just one lightning link.

10  More expensive ones, which he called 2 in 1s or 3 in 1s, had

11  the parts for two or three lightning links on them, with some

12  of the cutouts already made for where the lightning link parts

13  fit together and drop in to an AR-15.

14          You'll hear how Mr. Ervin's activities came to light

15  when his own bank contacted law enforcement in January 2021,

16  after investigating activity in Mr. Ervin's account.

17          Not only was Mr. Ervin making numerous deposits of

18  business proceeds into his personal account, but he was making

19  frequent cash withdrawals in amounts just less than $10,000,

20  which is the threshold for a bank to report cash transactions.

21          ATF and the postal inspectors undertook an

22  investigation of the business and then made two undercover

23  purchases of auto key cards from Mr. Ervin.

24          These auto key cards were not registered with ATF.

25  Indeed, neither were any of the thousands of auto key cards

1   made or sold by Mr. Ervin.

2          But as you'll hear from an ATF expert who examined

3   these cards, in very little time and with a common household

4   tool, he took one of those auto key cards and cut out a

5   lightning link.  And you'll watch a video where the ATF expert

6   drops that lightning link into a regular semiautomatic AR-15

7   and fires it as a machine gun.

8          As you'll learn, Mr. Ervin initially had trouble

9   selling this auto key card.  You're going to hear from

10  Carolanne Wolfe, a friend of Mr. Ervin's who helped him with

11  his business.  She'll tell you about Mr. Ervin's early

12  difficulties in marketing.  You'll watch one of the early ads

13  he created, which is primitive, but he very clearly

14  communicates the fact that the auto key card was a machine gun

15  conversion device.  But you'll also hear that Mr. Ervin was

16  looking to build his business by partnering with someone who

17  could really get the word out about his product.  And that is

18  how he met his codefendant, Mr. Hoover.

19         Mr. Hoover runs a popular YouTube channel called CRS

20  Firearms, where he posts videos to the internet about guns and

21  gun-related issues for his tens of thousands of subscribers.

22         The evidence will show that in the fall of 2020,

23  Mr. Hoover started to talk up the auto key card on this YouTube

24  channel as a discreet way for his viewers to make their own

25  unregistered machine gun.

1          You're going to see a number of these videos, some of

2    which just contain a simple short advertisement, but others

3    where Mr. Hoover describes in some detail how to cut the

4    lightning link out of the auto key card, how to configure the

5    AR-15 and then drop in the lightning link to make the machine

6    gun.  You'll see him compare it to other machine guns and

7    machine gun conversion devices, and you'll hear him advise

8    viewers on how to purchase the auto key card anonymously.

9          Why did he do that?  Because he had entered into a

10   conspiracy with Mr. Ervin to sell these devices.  You'll hear

11   Mr. Hoover in his videos state that he was being sponsored by

12   Mr. Ervin to advertise the auto key card.  But getting paid to

13   sell a product he knew to be an unregistered machine gun

14   conversion device is not a sponsorship, it's a conspiracy, just

15   like with other illegal items.

16         You will hear from Ms. Wolfe and see the supporting

17   records that Mr. Ervin sent Mr. Hoover both cash and goods,

18   including video equipment and a Louis Vuitton purse for his

19   then-girlfriend in exchange for his work advertising the auto

20   key card.  Mr. Hoover became the salesman and Mr. Ervin handled

21   the production and shipping.

22         You'll see the volume of communications between the

23   two of them during the time of this conspiracy.  You'll hear

24   how pleased Mr. Ervin was with the increase in sales and how he

25   viewed Mr. Hoover as a great salesman for the auto key card.

1    You'll see the effect that Mr. Hoover's videos had on the sales

2    of these devices through records and testimony.

3           As Ms. Wolfe will tell you, Mr. Ervin could barely

4    keep up with the demand that Mr. Hoover was creating.

5           You'll also hear testimony from a number of gun

6    owners who bought these auto key cards.  You'll hear from each

7    of them that they learned about the auto key card and what it

8    can do to their AR-15 from Mr. Hoover.  You'll hear how they

9    ordered one, or in some cases multiple, auto key cards from

10   Mr. Ervin, and then what they intended to do with it or what

11   they actually did with it once they got it.

12          And to be clear, some of the witnesses you're going

13   to hear from in this trial, people who bought the auto key

14   cards, people who may have assisted the defendants in this

15   business in some way, have received a form of immunity so that

16   they can testify here today.  It's going to be your job to

17   listen to that testimony and determine if it's credible in

18   light of all the other testimony and the evidence in this case.

19          Now, as I said, the judge is going to instruct you on

20   the law at the end, after you hear all the evidence.  And what

21   she tells you will be what you must apply when you go back to

22   deliberate.  But I'd like to highlight the charges in this case

23   so that you have them in mind as you hear the evidence.

24          Count One charges both defendants with that

25   conspiracy, to transfer unregistered machine gun conversion

1    devices.

2          Counts Two through Eight charge both defendants with

3    individual transfers of auto key cards relating to some of the

4    purchasers that you're going to hear testify.

5          Count Nine is a little bit different.  It charges

6    just Mr. Ervin with structuring, which means engaging in cash

7    transactions in an attempt to avoid reporting requirements.

8    Banks are obligated to file reports with the federal government

9    when a customer engages in a cash deposit or withdrawal in

10   excess of $10,000 as a means of preventing fraud and money

11   laundering.

12         As I noted earlier, you're going to hear record -- or

13   see records and hear from several employees of a local bank

14   regarding Mr. Ervin making numerous cash withdrawals of the

15   proceeds from his auto key card business in amounts just under

16   that $10,000 reporting threshold with the intent to avoid

17   triggering that report to the government.

18         And finally, Counts Ten, Eleven, and Twelve charge

19   just Mr. Ervin with simple possession of these unregistered

20   machine gun conversion devices, specifically, the ones he sold

21   to the undercover agents and the hundreds and hundreds of these

22   devices recovered from his home on the day a search warrant was

23   executed.

24         For these charges, ladies and gentlemen, one of the

25   questions that you're going to have to answer is about the

1  defendants' intent.  Was it their intent to sell hundreds of

2  identical pieces of tiny metal art which could also open

3  bottles and hold your pen?  Or were those labels simply a cover

4  for the fact that every single auto key card had a machine gun

5  conversion device cut into it?

6           We believe that at the end of the case there will be

7  a mountain of evidence to show that it was their intent to sell

8  these devices from the words out of their own mouths, from

9  their actions, the marketing they prepared, and the response

10  that it generated.

11           There's more witnesses and evidence than just these

12  highlights I've laid out for you.  There's going to be a lot of

13  phone records, bank records, videos, bags of these devices, and

14  other things that we're going to show you in this case.

15           We are going to keep things moving as best we can,

16  but this evidence is meant to carry our burden.  And it's

17  always the government's burden to prove these defendants guilty

18  beyond a reasonable doubt.

19           But at the end of the case, once all the evidence is

20  before you, Ms. Taylor will be back up to speak with you.  And

21  we believe that the evidence will have shown that Mr. Ervin and

22  Mr. Hoover are guilty of all these counts.

23           Thank you.

24           THE COURT:  Thank you, Mr. Mesrobian.

25           Mr. Zermay.

1          MR. ZERMAY:  Thank you, Your Honor.  May it please

2     the Court.

3          Good afternoon, ladies and gentlemen of the jury.  My

4     name is Zachary Zermay.  I'm the attorney for Matthew Raymond

5     Hoover.

6          Let me give you a little bit of background about

7     Matthew Hoover.  The facts and testimony elicited will show

8     that Mr. Hoover is actually a blue-collar American.  He's the

9     embodiment of a blue-color American.  He was a diesel mechanic

10    turned political commentator on YouTube.

11         He's a famous YouTuber.  He has a large channel

12    called CRS Firearms.  And CRS Firearms is -- has over 200,000

13    subscribers and over 55 million views.  And that's a large

14    audience, ladies and gentlemen of the jury.  That means that

15    every single -- assuming that the United States has 350 million

16    people in the country and each video is viewed uniquely one

17    time by one American, then one in eight people in the country

18    would have seen his YouTube videos.  Or it could have been

19    viewed 305 million times by an agent of the IRS -- or, sorry,

20    the ATF.

21         But that gets to just why Matthew Hoover is here in

22    this courtroom today.

23         He said a lot of things that the ATF don't like.  He

24    is remarkable for stating things that make them upset.  He's a

25    political commentator that routinely attacks the ATF and says

1   things that they don't particularly like.

2        And with respect to the auto key card that the

3   government keeps contending is a device that can or may be used

4   to convert a weapon into a machine gun, the device they're

5   referencing is actually a singular piece of stainless steel

6   that is dubbed the "auto key card."

7        Now, the auto key card, again, is a credit-card piece

8   of stainless steel that you could sort of scratch with your

9   fingernails and you won't even feel the light indent of what

10  the government contends is the lightning link.  It's just that,

11  ladies and gentlemen of the jury:  it's a stainless steel piece

12  of card with a drawing of a lightning link on it.

13       Mr. Mesrobian said at the beginning of his remarks

14  that they were selling designs.  Well, unfortunately he said

15  the quiet part out loud.  And that's exactly what my client is

16  here before you charged with violating the National Firearms

17  Act for doing:  selling designs and essentially upsetting the

18  Bureau of Alcohol, Tobacco, Firearms.

19       What the government will show later on is that the

20  ATF can and has an ability to send letters to people that if

21  they're violating the National Firearms Act, they could send

22  notices out to people.  They didn't do that in this case.

23  Instead, what they did was they sent agents of the ATF and went

24  ahead and rounded up Mr. Ervin and Mr. Hoover and arrested them

25  and charged them with this.

1          Again, the reason why they did this is because he's a

2    political provocateur and he got the word out regarding his

3    message.  And by bringing these charges in these indictments,

4    the ATF is trying to send a message not to Mr. Hoover, not to

5    Mr. Ervin, but to everybody that if you try -- or even come

6    close to the line as to what the ATF doesn't like, then they

7    will come for you.  And that's effectively what this case is

8    about, ladies and gentlemen.

9          And -- yes.  Thank you.

10          THE COURT:  Thank you.

11          Mr. King.

12          MR. KING:  Thank you, Your Honor.  Counsel.  I'm

13    going to try to speak slowly.  Ms. Healey gets on to me.  I

14    tend to get a little excited and I talk very fast.  So if I do

15    that, if y'all will let me know, and I will try to slow down.

16          As we were introduced earlier this morning, my name

17    is Alex King.  It's my privilege to represent Justin Ervin here

18    before you and to talk a little bit about the auto key card and

19    what we're here for.

20          And I want to start talking -- the government refers

21    to it as a simple device.  And what we're talking about is a

22    piece of metal.  And on that piece of metal is some designs,

23    and one of those designs is what the government alleges is a

24    lightning link.

25          One of the things that you're going to hear from

1    government witnesses, and it's not a big surprise or a secret,

2    these have been around for a very long time.  The information

3    about them is completely legal.  If you Google it -- and please

4    don't because we're not doing that during the trial, but if you

5    were to Google it, you could find myriad of drawings of these

6    anywhere on the internet.  If I could draw one on a piece of

7    paper, you could have them out.  It's common knowledge.  It's

8    nothing secret, it's nothing special.

9         Where the government alleges that these guys crossed

10   the line is by putting that drawing, instead of on a piece of

11   plastic or a piece of paper or on a stencil or any other way

12   that literally anybody could figure out if they wanted to, that

13   they put that on a piece of metal.

14        As we go through, one of the -- I want to talk about

15   kind of two things.  One's the reality of how this trial is

16   going to work versus television, those sorts of things; and

17   then, two, talk a little bit specifically about the

18   government's allegations and some of the things I want you to

19   look out for.

20        So to be clear, there's -- you can probably see

21   there's piles of binders.  And there's going to be tons of

22   witnesses and tons of exhibits and tons of paperwork.  One of

23   the things to keep in mind is this is not going to be something

24   at the end of it you're going to be trying to figure out who

25   did anything.

```
 1              Mr. Hoover --
 2         (Audio distortion.)
 3              THE COURT:  It's my courtroom.  It does that.  Go
 4    ahead.
 5              MR. KING:  All right.  Sorry about that.
 6              Mr. Hoover, proudly -- and you will see more videos,
 7    I'm sure, than any of you want to see -- goes on the internet
 8    and he talks about this device.  But more of what he talks
 9    about -- the thing he talks about most is --
10         (Audio distortion.)
11              MR. KING:  Did I do something to the mic?
12              THE COURT:  I don't think it's anything that you're
13    doing.  We'll get our IT people down here.  I just have
14    gremlins.  And whenever I have a trial, the gremlins come out.
15              MR. KING:  Hopefully I'm not sparking this.  So I'll
16    try to speak up.  If anybody can't hear me, let me know.
17              What Mr. Hoover spent most of his time on his web
18    channel talking about was not this device, it was about how he
19    doesn't like the ATF.  And that's going to be a big thing.
20              You're going to hear from I believe two ATF experts.
21    You'll hear from a bunch of other ATF agents.  You'll hear from
22    postal inspector agents.  And one of the things they're going
23    to tell you is they're going to talk -- ATF kind of has a dual
24    manifest.  They've got two things.  One is they do regulatory
25    work.  So if you own a gun shop, they make sure your paperwork
```

1    is in order, you're doing the right things, you know, the right

2    people have the right ID to do the right things.  As part of

3    that they do regulatory work.

4         The other half of ATF is they do criminal

5    investigations.  So, you know, I can tell you Agent Jesse

6    Hooker, somebody here locally, I know he's done a lot of work.

7    If dangerous murderers and felons have firearms, he helps take

8    those off the street, and that's a good thing that they do.

9         What we're going to talk about is where those kinds

10   of merge, where ATF has the ability to regulate but they don't

11   necessarily have the ability to define what criminal law is.

12   So at the end of this -- and I'm not going to get too much into

13   what the law is now, but I'm going to ask you to keep an open

14   mind.  There's a one-sentence definition of what a machine gun

15   is, what a firearm is.  And what I want you to keep in mind

16   when you're hearing all this is that's the definition we're

17   working off of.  ATF may have their own beliefs and their

18   versions and, you know, to some extent they're a government

19   agency that's trying to do a job, but your job as a juror is to

20   make sure that you are applying the law, and that's the

21   statutory law, not the ATF regulations or what they wish the

22   law would be.  And so as we're going through this, one of the

23   things I'd ask you to keep an open mind to is what does the

24   actual law say, not what does some of the ATF regulators want

25   the law to be.

1          Whether you agree with them or not -- and I'll tell
2    you, it's -- I'm sympathetic to it, it's understandable, but
3    please look as the law as to what the law actually is.
4          As we go through, I want to talk a little bit
5    about -- I'm going to stand a little bit over here.
6          As we talk about some of the government's case, like
7    I said before, this is not a big who-done-it.  You're going to
8    hear that Justin Ervin took a design to a machine shop that he
9    had been wanting to do for years, had it made up, made a
10   website.  He'd had like three or four kind of failed internet
11   businesses.  He's living with his dad.
12          He gets this going.  It's not going great.
13   Mr. Hoover puts it on his website and -- as part of kind of his
14   ATF spiel and some of those other things, and they get into it.
15          One of the things the government told you is that the
16   AR-15 is a very common rifle.  And that's very true.  What they
17   didn't tell you was that the auto key card, if it's cut out to
18   the precise dimensions, it also has to be put in specific
19   rifles, specific AR-15s with specific bolt carriers.  I'm not a
20   gun guy, but it's not every AR-15, it's very specific ones.
21          And in terms of, you know, the instructions Mr. Ervin
22   gave people, there weren't any.  He never told anybody, "Hey,
23   this is what you need to do, this is how you need to do it."
24          What we're talking about is a piece of stainless
25   steel metal.  And you may say, well, if the purpose is not as a

1    machine gun, what is it?  And what you'll hear is that

2    Mr. Ervin, like Mr. Hoover, does not like the ATF.  Whether you

3    agree with them or not, that's not why we're here, but that is

4    to some extent why we are here.  They do not like the ATF.  And

5    much like, lack of a better word, internet trolls everywhere,

6    they want to push the boundaries and they want to give ATF a

7    hard time.

8         And some of the videos you'll hear are Matthew Hoover

9    talking about all the things that ATF shouldn't be able to

10   regulate under the National Firearms Act and the issues that

11   they have with it.

12        And this isn't a small thing.  Like Mr. Zermay said,

13   we're talking 50, 60 million YouTube views, hundreds of videos,

14   tens of thousands of subscribers.  I think it's pushing 200,000

15   subscribers to Mr. Hoover's YouTube channel.  This is not a

16   small deal.  This is very different than the guy talking to the

17   potted plant out in the park over here who's not having a good

18   day.

19        When Mr. Hoover's upset about the government and

20   complains about it, he has a very big audience.  And it's not a

21   mistake that we're here.  And it's not a mistake that the

22   government has charged him with this.

23        As you talk -- as you look at it, the -- you know,

24   one of the things counsel for the government said is this was

25   unraveled through search warrants.  And one of the things you

1  look for if people are trying to commit a crime is are they

2  hiding their actions?  Are they trying to hide who they are?

3  Are they trying to deceive people?

4        What you will learn is that the money orders for all

5  these were told to go to Mr. Ervin; not even a business name,

6  but send money orders personally to me.

7        Agent Hooker, I think it took him sometime over lunch

8  to figure out -- the minute he knew what the auto key card was

9  to figure out Mr. Ervin was the one behind it.  It took

10 literally no time at all because he did nothing to hide who he

11 was or what he was doing.

12       Same with Mr. Hoover.  This is not some secret, dark

13 web, have to hide, you know, the secret IP address and the

14 password to get into the secret websites where they're talking

15 about these things.  This is on YouTube.  It's widely available

16 and widely viewed.

17       One of the things we'll talk about -- a little bit

18 about, you know, this further is, you know, was this a mirage?

19 Was there a coverup?  And you'll hear a ton of evidence.  But

20 it's simple:  He sold it and he promoted it on the internet.

21 As much as we're going to hear about them, and we'll hear a lot

22 of details, it's not complicated as far as that goes.

23       The undercover purchases that you heard about, both

24 of them made out money orders to Mr. Ervin.  They knew who he

25 was when they sent those out.

1            The government talks to you about "conspiracy" and

2    "sponsored" and how this was a money-making enterprise.

3            One of the things you'll hear is Mr. Hoover -- and

4    you'll see receipts from everything he purchased to help him

5    out.  He bought him some microphone equipment to help his show.

6    He bought his girlfriend, now wife, a purse to thank him for

7    all the work, and a couple hundred bucks, I think it might have

8    been 2- or 3,000 when it was all said and done in cash over the

9    course of this.

10           Mr. Hoover's conversations and everything he does is

11   not about making money, it's about his mission against the ATF.

12   And again, whether you subscribe to it or not, that's what it

13   is.

14           When we talk about how the case is going to progress,

15   we're going to talk about the different counts.  So the first

16   count is a conspiracy count.  And that says that these two

17   gentlemen got together to conspire to violate the law.  That's

18   going to be -- so basically all the evidence we're going to

19   hear is going to be focused towards that.

20           The next thing you're going to hear are Counts Two

21   through Eight, which we call substantive act, or substantive

22   act witnesses.  And what that is, is over the course of it --

23   and again, because nobody was trying to hide anything, the

24   government has a complete list of everybody that one of these

25   was mailed out to.  It's available.  They know it.  It's a

1    little over 900.  They've knocked on doors.  This agent and

2    many others knocked on doors and talked to a lot of these

3    people.

4            And the government is able to charge what they call

5    substantive act evidence witnesses to determine who are going

6    to be witnesses here.  So they are able to cherry pick out of

7    those thousand, they have kind of Counts Two through Eight

8    individuals that they're going to bring to you.

9            A couple of things I want you to keep in mind.  One,

10   these are the witnesses kind of hand-selected by the government

11   for these counts.  Not any of the other hundreds of people that

12   ordered that they have their names and addresses for.

13           Number two is every single one of these individuals,

14   you're going to be told, knew that they were buying a machine

15   gun and that's a very serious crime.  And then you're going to

16   hear that none of them were charged with a crime that's

17   punishable by up to ten years in prison.  Every single one of

18   them got immunity.

19           And that's going to become a theme, is you're going

20   to hear how obvious and dangerous this is and how serious it

21   is, and then you're going to hear there's 900 or a thousand of

22   these people floating out there, none of whom have been

23   arrested and charged for purchasing the auto key card in and of

24   itself.

25           We'll talk about, you know, in terms of -- and it

1   will become a theme.  The government talks about structuring a

2   financial transaction.  What the evidence is going to show is

3   that Mr. Ervin got mad at his bank because they wouldn't cash

4   an Auto Key Card -- somebody didn't write it out to Mr. Ervin,

5   they wrote it out to Auto Key Card, the money order for it.  He

6   got mad, tried to take all his money out of the bank.  They

7   told him no.

8           In terms of him hiding, in terms of him trying to

9   deceive or distort what he was doing, they got into an argument

10  when he said, "Give me" -- "I want to empty out my accounts

11  right now."  And they said, "That's not how banks work.  We

12  don't have all of your money.  That's just not how it works."

13          And so he got mad, they got into an argument,

14  eventually he takes out 9,000.  He says, "I'm going to be back

15  every day and take out my money."

16          In fact, he goes to another branch that day, and this

17  is December 28th of -- I'm going to get the year wrong, it's

18  either 2000 or 2021, I think it's 2000, and tries to take --

19  and takes out more of his money.

20          The government's going to tell you that he has

21  structured all these transactions to avoid a Currency

22  Transaction Report.  The first day he goes to take out his

23  cash, do you know what's generated?  A Currency Transaction

24  Report.  Do you know who's name is on it?  Justin Ervin's.

25          The business that he says he has is Auto Key Card.

1    He's not hiding anything.  He's not lying to them.

2         And then he does exactly as he tells them.  Every

3    day, with the exception of the weekends and New Year's Day,

4    because that's a bank holiday, he goes and takes out more money

5    from his bank.

6         As we go through these things, the -- it will be

7    clear to you the political leanings of Mr. Hoover and

8    Mr. Ervin.  What I'd ask you to do is -- whether you agree or

9    disagree, it is not important here, but set that aside and

10   apply the law as it should be applied, as you'd want it if

11   somebody didn't like your political beliefs.

12        And as you'll go through this thing, we're going to

13   talk more and more about the role of ATF and how they define,

14   you know, what's crimes and where they can't in terms of

15   regulations.  And at the end of this we believe that you will

16   come to the same conclusion that we have, that this is ATF

17   doing what should be a regulatory action in a criminal context

18   and they're overreaching and that you'll reach the conclusion

19   we have, that both these gentlemen are not guilty.

20        And I want to thank you for your time.  We'll go

21   through about two weeks of evidence and then I'm going to come

22   back before you just like I'm doing right now, maybe I'll have

23   a fancy PowerPoint, maybe I won't, I haven't decided that yet,

24   and we'll go over exactly what I'm talking about in terms of

25   the evidence, who's hiding, who's telling the truth, and more

1    importantly, what the law is and how you should apply it.

2         So I want to thank you for your time and attention

3    and I look forward to working with you-all during the next two

4    or three weeks.  Thank you so much.

5         THE COURT:  Thank you, Mr. King.

6         Ms. Wiles, can we move the podium?

7         And Ms. Taylor, who will the government's first

8    witness be?

9         MS. TAYLOR:  The government's first witness is

10   Special Agent Jesse Hooker.

11        (Witness enters the courtroom.)

12        THE COURT:  Sir, if you'll come all the way up here.

13        COURTROOM DEPUTY:  If you'll please raise your right

14   hand for me.  Do you solemnly swear that the testimony you're

15   about to give before this Court will be the truth, the whole

16   truth, and nothing but the truth, so help you God?

17        THE WITNESS:  I do.

18        COURTROOM DEPUTY:  You may have a seat.  And if you

19   could please state your name for the record and spell your last

20   name.

21        THE WITNESS:  Jesse Hooker, H-o-o-k-e-r.

22        THE COURT:  Go ahead, Ms. Taylor.

23        MS. TAYLOR:  Yes, Your Honor.  It's going to take me

24   just a minute to pull all the exhibits.

25        THE COURT:  That's fine.

1          Ms. Wiles.

2       (The judge and the courtroom deputy confer.)

3    **SPECIAL AGENT JESSE HOOKER, GOVERNMENT WITNESS, SWORN,**

4                   DIRECT EXAMINATION

5  BY MS. TAYLOR:

6  Q.   Special Agent Hooker, if you could please start with

7  telling the jury your name and spell your last name for the

8  court reporter.

9  A.   Jesse Hooker, H-o-o-k-e-r.

10  Q.   And where do you work?

11  A.   I work for the Bureau of Alcohol, Tobacco, Firearms, and

12  Explosives.

13  Q.   What's your job responsibilities for ATF?

14  A.   I investigate violations of federal law pertaining to

15  arson, explosives, firearms, alcohol, tobacco, and narcotics.

16  Q.   And what's your title?

17  A.   Special Agent.

18  Q.   And what -- how long have you been an agent for ATF?

19  A.   A little over 21 years.

20  Q.   And did you have other law enforcement experience prior to

21  joining ATF?

22  A.   Yes.  I worked for the Immigration and Naturalization

23  Service for four years prior to joining ATF.

24  Q.   Did you receive any specialized training when you joined

25  Immigration and Naturalization Service?

1  A.    Yes.  I attended the Immigration Officers' Basic Training

2  Academy in Artesia, Mexico.

3  Q.    And when you became an ATF agent, did you receive

4  additional specialized training?

5  A.    I did.

6  Q.    And what was that?

7  A.    The Criminal Investigators' Training Program in Brunswick,

8  Georgia, as well as the ATF Agent Advanced Academy in

9  Brunswick, Georgia.

10  Q.    And are you -- let's talk about the investigation of

11  Mr. Ervin and Mr. Hoover.  What has been your role in that

12  investigation?

13  A.    I was the case agent.

14  Q.    And what is the role -- what does it mean to be the case

15  agent for a case?

16  A.    Typically the case agent is the agent that opens the

17  investigation and they have the primary responsibility for

18  conducting the entire investigation from the inception through

19  the judicial process.

20  Q.    And is there a reason -- are you still the case agent on

21  this case?

22  A.    I am not.

23  Q.    And what's the reason for that?

24  A.    I recently accepted another position within ATF that

25  required me to be absent from the area for training for a

1    significant period of time.  And the case was transferred to a

2    different agent.

3    Q.    Could you also just tell us what your educational

4    background is in terms of do you have a college degree?

5    A.    Yes, ma'am.

6    Q.    And what is your college degree in?

7    A.    I have a master of science degree in criminal justice from

8    the University of Central Florida.  I also have a graduate

9    certificate in explosives and engineering technology from the

10   Missouri University of Science and Technology.

11   Q.    Now, can you tell the jury, how did you come to be

12   involved in the investigation of Mr. Ervin and Mr. Hoover?

13   A.    Yes.  On January 8th, 2021, I was contacted by a fraud

14   investigator who worked for Community First Credit Union in

15   Jacksonville, Florida.

16   Q.    And what was -- what was that initial contact regarding?

17   A.    The fraud investigator advised me that they had

18   information they wanted to refer to ATF regarding potential

19   criminal activity involving one of their customers.

20   Q.    And who was that customer?

21   A.    It was Kristopher Justinboyer Ervin.

22   Q.    And did they give you any information about what exactly

23   their concern was?

24   A.    They briefly discussed --

25            MR. KING:  Objection, hearsay.

1          MS. TAYLOR:  Your Honor, it's intended to explain the

2     steps that Special Agent Hooker took in beginning his

3     investigation.

4          THE COURT:  I'll allow it.  Go ahead.

5          THE WITNESS:  Yes, ma'am.

6     A.    They advised me about unusual activity in Mr. Ervin's bank

7     account.  They also -- specifically, unusual deposits into a

8     personal checking account that seemed to be business related.

9     They also advised me about large cash withdrawals that were

10    occurring from the account.

11    Q.    Is it normal for a bank to contact ATF about unusual

12    banking activity?

13    A.    No.

14    Q.    And why -- why were they contacting you in this particular

15    instance?

16    A.    The credit union had apparently located a website

17    associated with Mr. Ervin.  And the website was viewed by the

18    fraud investigator, and they were concerned that the website

19    was selling items that may be used to convert an AR-15 rifle

20    into a machine gun.

21    Q.    And after you received this initial information, did you

22    attempt to verify any of that?

23    A.    Yes, ma'am.

24    Q.    How did you -- how did you do that?

25    A.    I accessed the website that was provided to me.

1    Q.    And what was that website?

2    A.    Autokeycards.com.

3            MS. TAYLOR:  Your Honor, may I approach the witness?

4            THE COURT:  What number?

5            MS. TAYLOR:  I'm going to -- right now I'm going to

6    be talking about Exhibit 114, but I was also going to go ahead

7    and give him 18, 19, 21, 22, 23, and 24.

8            THE COURT:  All right.  Go ahead.

9    BY MS. TAYLOR:

10   Q.    Special Agent Hooker, could you look at Exhibit 114 and

11   describe for the jury what that is.

12   A.    114 is screenshots of what I recognized when I viewed the

13   website Autokeycards.com.

14   Q.    And does this largely appear to be how the website looked

15   when you had viewed it as part of your investigation?

16   A.    Yes, ma'am.

17           MS. TAYLOR:  I would move for admission of

18   Exhibit 114 at this time.

19           MR. KING:  Without objection on behalf of Mr. Ervin.

20           MR. ZERMAY:  Without objection.

21           THE COURT:  114 is admitted and you may publish if

22   you wish.

23           MS. TAYLOR:  Yes, Your Honor.

24       (Government's Exhibit 114 admitted in evidence.)

25   BY MS. TAYLOR:

1    Q.    Looking at the --

2          MS. TAYLOR:  Ms. Ganoe, if you could focus on that

3    top part of the website.

4    BY MS. TAYLOR:

5    Q.    Is this -- this is the -- essentially the front page of

6    the website; is that correct?

7    A.    Yes, ma'am.

8    Q.    Looking at the top, what is depicted at the very top of

9    that website?

10   A.    The words "AutoKeyCard.com" and there are three -- three

11   drawings or diagrams of cards above it.

12         MS. TAYLOR:  Ms. Ganoe, could you focus specifically

13   on that part.

14   BY MS. TAYLOR:

15   Q.    And those three diagrams that you referred to, do those

16   look familiar from other parts of your investigation?

17   A.    Yes.

18   Q.    And what's depicted by those diagrams?

19   A.    Those are lightning link machine gun conversion devices.

20   Q.    So those outlines are?  Could you describe exactly what --

21   what would be part of the lightning link.

22   A.    It's a two-part machine gun conversion device.  These

23   particular cards depict -- each card depicts three complete

24   lightning link machine gun conversion devices consisting of a

25   larger, longer piece as well as a small piece that would fit

1  in -- there's a little slot that it would fit in.  I'm sorry, I

2  don't know how to describe it any better than that, but it is a

3  two-piece machine gun conversion device.

4  Q.    So if I -- I'm going to draw on one of them.  Is that one

5  of the pieces?

6  A.    Correct.

7  Q.    And it's the piece -- on the middle card it's the piece on

8  the top left?

9  A.    Yes, with the red mark.

10  Q.    And now if I -- well, I apparently drew some dots on

11  another piece.  Is that the second piece of the lightning link?

12  A.    Yes, with the two dots.

13  Q.    Okay.  And so -- so those two pieces combined together

14  create what?

15  A.    A lightning link machine gun conversion device.

16  Q.    And that's not made out of paper, correct?

17  A.    The device?

18  Q.    Right.

19  A.    No, it would need to be made out of some type of metal.

20  Q.    Okay.  But that's what's depicted in that diagram?

21  A.    Yes.

22  Q.    And that diagram also is generally what the auto key card

23  looked like?

24  A.    Correct.

25  Q.    Did you identify an address associated with Mr. Ervin?

1  A.   Yes.

2  Q.   And did you -- what was that address?

3  A.   2409 Kirkwall Court, Orange Park, Florida.

4  Q.   And did you attempt to identify who might be living at

5  that address?

6  A.   Yes.

7  Q.   And who was that?

8  A.   My investigation revealed that Mr. Ervin lived there as

9  well as his father.

10  Q.   Did you attempt to identify where -- where Mr. Ervin was

11  actually operating the business from?

12  A.   Yes.

13  Q.   And did you also contact anyone from ATF -- elsewhere in

14  ATF to get an opinion on whether you should open a full

15  investigation?

16  A.   I did.

17  Q.   Who was that?

18  A.   Cody Toy.

19  Q.   And who is Cody Toy?

20  A.   He is a firearms enforcement officer with ATF located in

21  Martinsburg, West Virginia.

22  Q.   And what's the reason why you consulted with Officer Toy?

23  A.   Our firearms experts are experts in identifying and

24  testing items such as machine guns and silencers.

25  Q.   And so you wanted his opinion?

1  A.   I did.

2  Q.   Based upon what Officer Toy told you, did you proceed with

3  opening a full investigation?

4  A.   I did.

5  Q.   And what did you need to do to get a more definitive idea

6  on whether the auto key card could actually be used to make a

7  machine gun?

8  A.   I needed to obtain one of the auto key cards and send it

9  in for testing.

10  Q.   And did you -- did you do that?

11  A.   Yes, I did.

12  Q.   And how did you go about obtaining an auto key card?

13  A.   On January 15th, 2021, I obtained an undercover laptop

14  computer as well as an undercover credit card.  I then drove to

15  an establishment that had free public wifi.  I accessed the

16  internet and went to the Auto Key Card's website.  I then

17  placed an order for one auto key card; specifically, a 3 in 1

18  Pen Holder Edition with Bottle Opener.

19  Q.   And did you receive an order confirmation?

20  A.   Yes.

21  Q.   If you could please look at Exhibit 18.  It should be in

22  front of you.

23  A.   Okay.

24  Q.   And describe what it is.

25  A.   This is an email to my email account from Autokeycards.com

1   containing an order confirmation as well as a shipping

2   confirmation.

3   Q.   Is it addressed to you, Special Agent Hooker?

4   A.   It is not.

5   Q.   Who is it addressed to?

6   A.   John O'Leary.

7   Q.   And is that a name that you were using in your undercover

8   capacity --

9   A.   Yes.

10   Q.   -- at this time?

11        MS. TAYLOR:  At this time I would move for admission

12   of Exhibit 18.

13        MR. KING:  No objection.

14        MR. ZERMAY:  No objection.

15        THE COURT:  18 is admitted.  You may publish.

16   (Government's Exhibit 18 admitted in evidence.)

17        MS. TAYLOR:  And Ms. Ganoe has zoomed in on the top

18   part of that email.  I think you might need to zoom in a little

19   bit more.

20   BY MS. TAYLOR:

21   Q.   So you received an order confirmation number?

22   A.   Yes.

23   Q.   And what was that?

24   A.   2667.

25   Q.   And what was the address that -- or that sent this order

1  confirmation?

2  A.   Customerservice@autokeycards.com.

3  Q.   And what is the date stamped at the top of that order

4  confirmation?

5  A.   January 15th, 2021.

6       MS. TAYLOR:  And if we could go down to the next

7  part, Ms. Ganoe.

8  BY MS. TAYLOR:

9  Q.   Now we're in the part that says Order Summary, correct?

10 A.   Yes.

11 Q.   And what does that reflect?

12 A.   It reflects an order number, the date it was placed, the

13 particular auto key card that I ordered, the cost, the shipping

14 cost, the sales tax, and that it was paid for with a credit

15 card.

16 Q.   And so was the price -- it was one item that you

17 purchased?

18 A.   Correct.

19 Q.   And was the price $139?

20 A.   Yes.

21 Q.   And with the sales tax, the total was $148.73?

22 A.   Correct.

23 Q.   Ms. Ganoe is going to -- there's a little icon next to the

24 item that you purchased, correct?  And we've zoomed in on it.

25 It's a little bit blurry, isn't it?

1   A.   Yes.

2   Q.   But what's depicted here?

3   A.   That is -- appears to be a Pen Holder Edition auto key

4   card.  I think it's going to be a 3 in 1.  I think there would

5   be three lightning links on that.

6   Q.   And how do you know it's a Pen Holder Edition?

7   A.   It has a pen going through it.

8           MS. TAYLOR:  If we could move to the next page,

9   Ms. Ganoe.

10  BY MS. TAYLOR:

11  Q.   The second page of your order indicated that it was

12  shipping to John O'Leary at an address in Jacksonville Beach,

13  correct?

14  A.   Yes.

15  Q.   And that address has been redacted off of this document,

16  correct?

17  A.   Yes.

18  Q.   But is that an address that you were able to obtain mail

19  from in an undercover capacity?

20  A.   Yes.

21  Q.   And at the very -- at the bottom of the part we're zoomed

22  in on it indicates Auto Key Cards and an address in Orange

23  Park, correct?

24  A.   Yes.

25  Q.   What's that address?

1    A.    950 Blanding Boulevard, Suite 23, PMB 335, Orange Park,

2    United States.

3    Q.    You might be better off looking at the hard copy document.

4    A.    336, excuse me.

5    Q.    Okay.  And now did you receive a shipment confirmation at

6    some point after you placed this order?

7    A.    I did.

8          MS. TAYLOR:  Could we go to page 3, Ms. Ganoe.

9    BY MS. TAYLOR:

10   Q.    Is this the shipping confirmation that you received?

11   A.    Yes.

12   Q.    And what date -- did it provide a tracking number to you?

13   A.    It did.

14   Q.    And what date did you receive the shipping confirmation?

15   A.    On January 15th, 2021.

16   Q.    Was that the same date that you had placed the order?

17   A.    Yes.

18   Q.    And did you receive anything in the mail as a result of

19   this purchase?

20   A.    I did.

21   Q.    And could you please look at Exhibit 19.  Should be in

22   front of you.

23   A.    I have it.

24   Q.    Could you describe in general what's in Exhibit 19?

25   A.    It contains pictures of the envelope and a mailing label

1  that I received as well as additional pictures of the contents

2  of the mailing envelope, which consists of a plastic bag

3  containing an auto key card and a business card.

4  Q.    Are those the items that you received as a result of the

5  order that we've been discussing?

6  A.    Yes.

7            MS. TAYLOR:  I'd move for admission of Exhibit 19.

8            THE COURT:  Any objection?

9            MR. KING:  Without objection, Your Honor.

10           MR. ZERMAY:  Without objection, Your Honor.

11           THE COURT:  19 is admitted.  You may publish.

12       (Government's Exhibit 19 admitted in evidence.)

13           MS. TAYLOR:  Ms. Ganoe, if we could zoom in on that

14  top photo on page one.

15  BY MS. TAYLOR:

16  Q.    Special Agent Hooker, that first photo on page 1, what is

17  that photo?

18  A.    That is the packaging envelope that I received.

19  Q.    And is that how it looked when you received it?

20  A.    Correct.

21  Q.    Does it have that same tracking number that was in the

22  email that we were just talking about?

23  A.    I would have to look back to see if it matches, but I

24  believe it does.

25           Yes, it's the same tracking number.

1   BY MS. TAYLOR:

2   Q.   Did you open this package?

3   A.   Yes, I did.

4   Q.   Did you need a search warrant to do that?

5   A.   I did not.

6   Q.   Why did you not need a search warrant?

7   A.   ATF purchased the item.

8   Q.   And so it belonged to ATF at that point?

9   A.   Correct.

10          MS. TAYLOR:   Moving to the next page, Ms. Ganoe.

11  BY MS. TAYLOR:

12  Q.   What is depicted in that top picture of this second page

13  of the exhibit?

14  A.   That's what I removed from the envelope consisting of a

15  plastic bag:  an auto key card and a business card.

16  Q.   And the business card, what does it say on it?

17  A.   It says -- it has an image of an auto -- of an automobile.

18  It says, "Please share on social media and tell your friends

19  about us.  Thank you!  Thank you for your support of our all

20  American freedom business.  Many more awesome products coming

21  soon."

22  Q.   And does it also say "automatic" over the vehicle at the

23  top of the card?

24  A.   Yes.

25  Q.   And looking at the next photo.

1          MS. TAYLOR:  Ms. Ganoe.

2    BY MS. TAYLOR:

3    Q.   What's -- what's the metal item that's depicted on this

4    page?

5    A.   That is the auto key card after I removed it from the

6    plastic envelope, or plastic packaging.

7    Q.   And could you describe -- Ms. Ganoe's zoomed in on that

8    metal item that you said was the auto key card.  Could you

9    describe what model this is?

10   A.   A 3 in 1 Pen Holder Edition with Bottle Opener.

11   Q.   What makes this a 3 in 1?

12   A.   It has three lightning links on the card.

13   Q.   So six total etched pieces, correct?

14   A.   Correct.

15   Q.   To combine together for three lightning links?

16   A.   Yes.

17   Q.   And then where's the bottle opener?

18   A.   Between the words "made in the U.S.A." and "patent

19   pending."

20   Q.   And why is it a Pen Holder Edition?

21   A.   On the website he -- you know, there's pens depicted going

22   through the cutouts on the card, and that's what it was called.

23   Q.   Were the ones that -- so which cutouts are you talking

24   about?

25   A.   The larger cutouts that's somewhat round.

1   Q.   I'm going to draw -- are there three of them?

2   A.   There are three of them, yes.

3   Q.   Okay.  I'm drawing one, two, three?

4   A.   Correct.

5   Q.   Are they almost kind of like D shaped, a little tab on it?

6   A.   Yes.

7   Q.   And those are the cutouts that you're talking about?

8   A.   Yes.

9   Q.   And that's what makes it a Pen Holder Edition?

10  A.   Yes.

11  Q.   And there's three other little slits that are cut into

12  that piece too?

13  A.   Correct.

14  Q.   And were those fully cut out as well on this version?

15  A.   Yes.

16          MS. TAYLOR:  Your Honor, may I approach the witness

17  with Exhibits 20 and 20A?

18          THE COURT:  You may.

19  BY MS. TAYLOR:

20  Q.   Could you please describe what Exhibit 20 is?

21  A.   It is the packaging envelope I received from my order at

22  Autokeycard.com.

23  Q.   Is it the same one that's depicted in the photo that we

24  were just looking at?

25  A.   Yes.

1    Q.    And what's Exhibit 20A?

2    A.    20A is the auto key card 3 in 1 Pen Holder Edition that I

3    ordered.

4    Q.    And is it in the same condition as when you received it?

5    A.    It is not.

6    Q.    Does it look the same as it looks in those photos we were

7    just looking at?

8    A.    No.

9    Q.    What happened to it subsequently that it looks different?

10   A.    One of the lightning links was cut out.

11   Q.    Did you do that?

12   A.    I did not.

13   Q.    Who did that?

14   A.    Cody Toy.

15   Q.    Then did you receive it back with all of the pieces

16   including the cutout bits?

17   A.    I did.

18   Q.    And did you place it back into evidence?

19   A.    I did.

20         MS. TAYLOR:  I would move for admission of Exhibits

21   20 and 20A.

22         MR. KING:  Can I take a look at it?

23         MS. TAYLOR:  Mr. King is asking to go look at the

24   exhibit.

25         THE COURT:  You may.

1          Any objection?

2          MR. KING:  No, Your Honor.

3          THE COURT:  Mr. Zermay?

4          MR. ZERMAY:  No, Your Honor.

5          THE COURT:  20 and 20A are admitted.

6      (Government's Exhibits 20 and 20A admitted in evidence.)

7          MS. TAYLOR:  Your Honor, I'd ask to retrieve it now

8  from Special Agent Hooker so I can put it on the projector.

9          THE COURT:  Certainly.

10  BY MS. TAYLOR:

11  Q.   Okay.  So it's still in this bag here, right?

12  A.   Yes.

13  Q.   But -- but this is Exhibit 20A, correct?

14  A.   Yes.

15          THE COURT:  Can you pull that microphone a little

16  closer to you while you're standing -- there you go.  Thank

17  you.

18  BY MS. TAYLOR:

19  Q.   Okay.  These two pieces that are cut out, are -- those are

20  the two pieces that create a lightning link?

21  A.   Correct.

22  Q.   And then there's -- the remainder of it still has the

23  other four etchings intact?

24  A.   Yes.

25  Q.   Now, you stated that it was Officer Toy that cut these two

1  pieces out of this exhibit?

2  A.  Yes.

3  Q.  And did he give you feedback on -- that was relevant to

4  whether you continued your investigation?

5  A.  Yes.

6  Q.  And did you continue your investigation?

7  A.  I did.

8  Q.  Did you make another undercover purchase from Auto Key

9  Cards?

10  A.  Yes.

11  Q.  And what was the date of that purchase?

12  A.  January 26, 2021.

13  Q.  And you should have in front of you Exhibit 21?

14  A.  I do.

15  Q.  Could you describe what Exhibit 21 is.

16  A.  Email correspondence between myself and

17  customerservice@autokeycard.com.

18  Q.  Was that from your undercover e-mail account?

19  A.  Yes.

20      MS. TAYLOR:  I'd move for admission of Exhibit 21.

21      THE COURT:  Any objection?

22      MR. KING:  No, Your Honor.

23      MR. ZERMAY:  No, Your Honor.

24      THE COURT:  21 is admitted.  You may publish.

25      (Government's Exhibit 21 admitted in evidence.)

1  BY MS. TAYLOR:

2  Q.    All right.  If we could -- so this is an email chain,

3  correct?

4  A.    Yes.

5  Q.    So let's move to the bottom of the email chain.  Why did

6  you begin emailing with the Auto Key Card's website?

7  A.    I wanted to purchase two particular auto key cards, and

8  the website, when I accessed it, indicated that both were out

9  of stock.

10  Q.    And so what did you write in your email?  Well, what was

11  the date of the email and what did you write?

12  A.    It was January 26th, 2021, at 1:57 p.m.

13  Q.    And what did you write?

14  A.    I wrote, "Hello.  I was wanting to buy a auto key card

15  1 in 1 or 2 in 1 Pen Holder Edition.  I wanted to do everything

16  by mail with a money order to pay with.  Your website says they

17  are sold out.  Will you be getting more in soon?  Should I just

18  send in my order form and money order now and then you will

19  ship it to me as soon as you get more?  I am just worried about

20  sending the money order and the thing never coming back in

21  stock.  Thanks."

22  Q.    And that email indicates that the sender was somebody

23  named John Holbrook, correct?

24  A.    Yes.

25  Q.    Previously you had been using the undercover name John

1  O'Leary?

2  A.   Yes.

3  Q.   Who is John Holbrook?

4  A.   Another undercover name.

5  Q.   Another undercover name?

6  A.   Yes.

7  Q.   And you had control over this email account?

8  A.   I do.

9        MS. TAYLOR:  Ms. Ganoe, could you move to the next

10 email.

11 BY MS. TAYLOR:

12 Q.   Did you receive a response to that email?

13 A.   Yes.

14 Q.   And when was that?

15 A.   January 26th, 2021, at 2:09 p.m.

16 Q.   And what did Auto -- and what email address responded to

17 your email?

18 A.   Customerservice@autokeycard.com.

19 Q.   And what did you -- what was the email?

20 A.   "Thank you for contacting us.  We always hold a few items

21 back for mail-in order customers.  There is a mail-in order

22 form on our website.  Please print and fill it out, then mail

23 it to us.

24        "If you already know which products and the amount

25 you want, let us know and we can set those aside for you.  We

1    always take care of our great customers.

2            "Sincerely, Autokeycard.com."

3    BY MS. TAYLOR:

4    Q.   Did you respond again to this email?

5    A.   Yes.

6    Q.   And what did you indicate?

7    A.   I said, "Thank you for getting back to me.  I wanted to

8    get two different cards.  A AKC" -- which I abbreviated for

9    auto key card -- "2 in 1 for $80 and an AKC 2 in 1 Pen Holder

10   Edition" -- "Pen Holder for $110.  After the mail-in order fee

11   and taxes I came to a total of $214.  If you have those two

12   cards in stock and that is the right price, I will put the

13   money order in the mail by morning at the latest if you will

14   hold them back for me.  Thanks."

15   Q.   And did you then have some further correspondence that day

16   with the Auto Key Card email address related to your purchase?

17   A.   Yes.

18   Q.   Did you end up using a mail-in order form to complete this

19   purchase?

20   A.   Yes.

21   Q.   Could you please look at what's been marked as Exhibit 22

22   in front of you.

23   A.   I have it.

24   Q.   And describe what that is.

25   A.   It is a mail-in order form that I printed from the

1    Autokeycards.com website.

2              MS. TAYLOR:  I'll move for admission of Exhibit 22.

3              THE COURT:  Any objection?

4              MR. KING:  Without objection.

5              MR. ZERMAY:  No objection, Judge.

6              THE COURT:  22 is admitted.

7         (Government's Exhibit 22 admitted in evidence.)

8    BY MS. TAYLOR:

9    Q.   Okay.  So this is the mail-in order form that you used for

10   your second undercover purchase, correct?

11   A.   Yes.

12   Q.   And could you describe how you filled out the mail-in

13   order form and what pieces you were ordering.

14   A.   Yes.  I -- for quantity I requested one auto key card

15   Stainless Steel Business Card 2 in 1 for $80 as well as one

16   auto key card Stainless Style Business Card 2 in 1 Pen Holder

17   Edition for $110.

18   Q.   And looking -- and you have some math down kind of in the

19   middle of this form, correct, for a total of $214?

20   A.   Yes.

21             MS. TAYLOR:  And if we can keep scrolling, Ms. Ganoe,

22   to the bottom there.

23   By MS. TAYLOR:

24   Q.   You indicated that it was to be shipped to John Holbrook,

25   correct?

1    A.    Yes.

2    Q.    And was that using that same mailing address that your

3    first undercover order went to?

4    A.    It is.

5    Q.    And did it -- did the order form provide instructions for

6    how to make out your payment?

7    A.    Yes.

8    Q.    And what was that?

9    A.    At the bottom left of the form it says, "Money orders are

10   to be made payable to J. Ervin.  Mail completed accurate order

11   to AutoKeyCard, hyphen, J. Ervin, 950 Blanding Boulevard,

12   Suite 23, PMB, 336, Orange Park, Florida, 32065."

13   Q.    And is that how you made out your -- did you use the money

14   order?

15   A.    I did.

16   Q.    And is that who you made it out to?

17   A.    I did.

18   Q.    And could you please look at Exhibit 23 in front of you.

19   A.    Okay.

20   Q.    What is that?

21   A.    That is a copy of the money order I obtained from the U.S.

22   Postal Service.

23   Q.    So you took a photocopy of it before you put it in the

24   mail?

25   A.    Yes.

1          MS. TAYLOR:  And move for admission of Exhibit 23.

2          THE COURT:  Any objection?

3          MR. KING:  No, Your Honor.

4          MR. ZERMAY:  No, Your Honor.

5          THE COURT:  23 is admitted.  You may publish.

6       (Government's Exhibit 23 admitted in evidence.)

7    BY MS. TAYLOR:

8    Q.   And who did you make this money order out to?

9    A.   J period Ervin.

10   Q.   And is that the same -- addressed to the same address at

11   950 Blanding Boulevard?

12   A.   Yes.

13   Q.   And to ship to John Holbrook?

14   A.   Yes.

15   Q.   Okay.  I want to ask you now to look at Exhibit 24.  Did

16   you receive any information about where that money order was

17   deposited?

18   A.   Yes, I did.

19   Q.   And could you look at Exhibit 24 and tell us what that is.

20   A.   It is a copy of the Postal Money Order after it has been

21   negotiated.

22   Q.   And where did it indicate --

23          MS. TAYLOR:  Well, I'll move for admission of

24   Exhibit 24 now.

25          THE COURT:  Any objection?

1          MR. KING:  Without -- no, Your Honor.

2          MR. ZERMAY:  No, Your Honor.

3          THE COURT:  All right.  24 is admitted.  You may

4    publish.

5       (Government's Exhibit 24 admitted in evidence.)

6    BY MS. TAYLOR:

7    Q.   And where did it -- so this was after the money order was

8    deposited into a bank?

9    A.   Yes.

10   Q.   And where did this document indicate that the money order

11   was deposited?

12   A.   At Community First Credit Union of Florida.

13   Q.   And how did you -- how did you get this particular

14   document?

15   A.   I was jointly working the investigation with a United

16   States Postal Inspector named Keith Hannon.  And I provided him

17   with a serial number of the Postal Money Order that I

18   purchased, and he was able to obtain this and provide me with a

19   copy.

20   Q.   And did you also -- as part of your investigation, you

21   mentioned that CFCU, Community First Credit Union, had

22   initially contacted ATF about Mr. Ervin, correct?

23   A.   Yes.

24   Q.   Did you receive banking records from Community First

25   Credit Union as part of your investigation?

1   A.   Yes, I did.

2        MS. TAYLOR:   Your Honor, may I approach with Exhibits

3   95, 95A, 95B, 95C, 95D, 95E, as well as 93 and 94?

4        THE COURT:   You may.   And . . .

5   BY MS. TAYLOR:

6   Q.   First, looking at Exhibit 93, that's a disk, correct?

7   A.   Yes.

8   Q.   Are you able to recognize that as a disk that you

9   previously reviewed the contents of?

10  A.   Yes.

11  Q.   How are you able to recognize it?

12  A.   I placed my initials on the outside of the compact disk.

13  Q.   And does that contain surveillance video footage that you

14  obtained from Community First Credit Union?

15  A.   It does.

16  Q.   And Exhibit 94, if you could look at that one as well.

17  A.   Okay.

18  Q.   Is that also a disk?

19  A.   Yes.

20  Q.   And how do you recognize it?

21  A.   My initials are also on this disk.

22  Q.   Did you review the contents of the disk before you

23  initialed it?

24  A.   I did.

25  Q.   And did it contain surveillance video footage also

1  obtained from Community First Credit Union?

2  A.   It did.

3  Q.   And I would also ask you to look at Exhibits 95 and then

4  all of the sub exhibits, I think it was A through E.  And are

5  those banking records that you obtained from Community First

6  Credit Union?

7  A.   Yes.

8       MS. TAYLOR:  Move for the admission of 93, 94, 95,

9  and 95A through E.

10      THE COURT:  Any objection?

11      MR. KING:  No, Your Honor.

12      MR. ZERMAY:  No, Your Honor.

13      THE COURT:  All right.  93, 94, and 95A through E are

14  admitted and you may publish as you wish.

15      (Government's Exhibits 93, 94, 95, and 95A-95E admitted in

16  evidence.)

17      MS. TAYLOR:  Ms. Ganoe, would you please bring up

18  Exhibit 95A.

19  BY MS. TAYLOR:

20  Q.   Looking at page 56, this is part of the banking records,

21  correct?

22  A.   Yes.

23  Q.   And who's banking records are these?

24  A.   Kristopher Ervin.

25  Q.   And what's the date on this particular record --

1    A.    January --

2    Q.    -- or this page of the record?

3    A.    January 29th, 2021.

4    Q.    And does it have a time stamp on it?

5    A.    4:43 p.m.

6    Q.    And does it indicate that, "Check received, 214; check

7    received, 110"?

8    A.    Yes.

9    Q.    And then does it also indicate that cash was dispensed --

10   it says, "Cash dispense clearing 1," correct?

11   A.    Yes.

12   Q.    And then, "Cash dispense clearing minus 325"?

13   A.    Yes.

14          MS. TAYLOR:  If we could look at the next page,

15   Ms. Ganoe.

16          THE COURT:  And this is page?

17          MS. TAYLOR:  This is page 57, Your Honor.

18          The first two, please.

19   BY MS. TAYLOR:

20   Q.    We've zoomed in on the top two items, correct?

21   A.    Yes.

22   Q.    And the bottom one -- so I guess it's the middle one on

23   page 57, but what's that one that's on the bottom of the part

24   where we've zoomed in?

25   A.    That is the money order that I sent to Autokeycard.com.

1    Q.    And the same one that we were talking about a moment ago?

2    A.    Yes.

3    Q.    For $214?

4    A.    Yes.

5    Q.    And confirming that it was deposited to Community First

6    Credit Union?

7    A.    Yes.

8    Q.    And the date of the deposit is January 29th, 2021?

9    A.    Yes.

10   Q.    And then another one that has the same date and time stamp

11   on it, correct?

12   A.    Correct.

13   Q.    For $110?

14   A.    Correct.

15   Q.    Did you attempt to obtain video -- did you obtain video

16   surveillance showing who was making transactions at Community

17   First Credit Union at that time?

18   A.    I did.

19          MS. TAYLOR:  Ms. Ganoe, could you please pull up

20   Exhibit 93.

21      (Video played.)

22   BY MS. TAYLOR:

23   Q.    And we're at the beginning of the video, correct?  Did a

24   vehicle just pull into the parking lot?

25   A.    Yes.

1   Q.   Can you describe it?

2   A.   It's a silver Honda SUV.

3   Q.   And did a man just get out of the vehicle?

4   A.   Yes.

5   Q.   And what is he doing?

6   A.   Walking towards the entrance.

7   Q.   The entrance of Community First Credit Union?

8   A.   Yes.

9   Q.   And what is he doing now?

10  A.   He just walked inside the lobby.

11  Q.   And now it's at 4:42 and 52.  What is he doing?

12  A.   Just approached a teller.

13  Q.   And now what is he doing?

14  A.   He appears to be signing two items.

15  Q.   And then what did he do with the two items?

16  A.   Handed them to the teller.

17  Q.   You've watched this entire video before, correct?

18  A.   Yes.

19  Q.   And are you able to recognize who that man is that's

20  handing the items to the teller?

21  A.   Yes.

22  Q.   Who is it?

23  A.   Mr. Ervin.

24        MS. TAYLOR:  And we can skip forward to -- or, yeah,

25  like maybe the last 30 seconds of the video.

1       (Video played.)

2    BY MS. TAYLOR:

3    Q.   We skipped forward to 4 minutes and 45 -- sorry, 4:45 and

4    08.  And what's he doing now?

5    A.   Exiting the lobby.

6    Q.   And at 4:45 and about 12 seconds did he walk close to a

7    surveillance camera?

8    A.   Yes.

9    Q.   And could you clearly see his face?

10   A.   Yes.

11   Q.   And how are you able to recognize Mr. Ervin?

12   A.   Numerous ways.  During my investigation I conducted

13   numerous surveillances of Mr. Ervin in his residence.  I

14   obtained his Florida driver's license photograph.  I

15   transported him to his initial court appearance after his

16   arrest.  And I've attended numerous court hearings with him

17   present.

18   Q.   And so you had several personal face-to-face, or close to

19   it, interactions with Mr. Ervin?

20   A.   I have.

21   Q.   Did you also recognize that silver Honda that was in the

22   surveillance video?

23   A.   Yes, I did.

24   Q.   How do you recognize that vehicle?

25   A.   I've seen that vehicle numerous times at Mr. Ervin's

1    residence.  I've run the tag from that vehicle.  I've seen

2    Mr. Ervin in that vehicle on numerous surveillances.

3    Q.    So in other words, that's Mr. Ervin's vehicle?

4    A.    Yes.

5    Q.    After you made the second undercover purchase, did you

6    receive anything in the mail as a result of that purchase?

7    A.    Yes, I did.

8          MS. TAYLOR:  Your Honor, may I approach with Exhibits

9    25, 25A, and 25B?

10         THE COURT:  You may.

11   BY MS. TAYLOR:

12   Q.    Could you describe what Exhibit 25 is.

13   A.    Exhibit 25 is the packaging, the exterior packaging, a

14   white padded envelope.  It also contains two plastic

15   Ziploc-type bags and two business cards.

16   Q.    And what's 25A?

17   A.    25A is an auto key card.

18   Q.    And what's 25B?

19   A.    It is also an auto key card.

20   Q.    Do those two auto key cards look the same as when you

21   first received them?

22   A.    They do not.

23   Q.    And how are they different?

24   A.    They have been cut.

25   Q.    Both of them?

```
 1   A.    Both of them, yes.

 2   Q.    Who cut them?

 3   A.    Cody Toy.

 4   Q.    And then after Mr. Toy -- he did an examination of these

 5   items?

 6   A.    Yes.

 7   Q.    And did you then receive them back from him?

 8   A.    I did.

 9   Q.    And did you put them back in ATF evidence?

10   A.    Yes.

11         MS. TAYLOR:  I'd move for admission of 25, 25A, and

12   25B at this time.

13         THE COURT:  Any objection to --

14         MR. KING:  Your Honor, if I could just approach.  I

15   don't have digital copies of the physical items.

16         THE COURT:  All right.

17         MR. ZERMAY:  Same request, Your Honor.

18         THE COURT:  Let's just inspect the evidence.

19         Any objection to 25, 25A, or 25B?

20         MR. KING:  No, Your Honor.

21         MR. ZERMAY:  No, Your Honor.

22         THE COURT:  Those are admitted.  You may publish.

23      (Government's Exhibits 25, 25A, and 25B admitted in

24   evidence.)

25         MS. TAYLOR:  Your Honor, may I approach Agent Hooker?
```

1           THE COURT:  Yes.

2    BY MS. TAYLOR:

3    Q.    Okay.  So I've put 25 on the projector.  And you mentioned

4    there are two little plastic baggies in here in addition to the

5    mailing envelope?

6    A.    Yes.

7    Q.    And with a green business card?

8    A.    Yes.

9    Q.    Is that the same kind of green business card that you got

10   with your first order?

11   A.    It is.

12   Q.    And then there's also the -- the bubble mailer, correct?

13   A.    Yes.

14   Q.    And is this the bubble mailer that you received the items

15   in?

16   A.    It is.

17   Q.    And it's addressed to ship to John Holbrook?

18   A.    Yes.

19   Q.    And what's the return address?

20   A.    AKeyCard, 950 Blanding Boulevard, Suite 23, PMB 336,

21   Orange Park, Florida, 32065.

22   Q.    Now, I'm going to put 25A on the projector.  And it's been

23   cut into a number of pieces, correct?

24   A.    Yes.

25   Q.    It looks like there's one that's kind of -- one piece

1    that's a little bit torn up here?

2    A.    Yes.

3    Q.    And has a -- a spot where the link is broken?

4    A.    Yes.

5    Q.    And then another piece that's the main body of a link,

6    correct?

7    A.    Correct.

8    Q.    As well as two of the smaller pieces?

9    A.    Yes.

10   Q.    And then the rest of this is all just leftover material?

11   A.    Right, from the card.

12   Q.    Okay.  And looking at 25 -- this is 25B, correct?

13   A.    Yes.

14   Q.    And this was -- this would be a 2 in 1, correct?

15   A.    Yes.

16   Q.    Because it has etchings for two lightning links?

17   A.    Correct.

18   Q.    But four total etchings?

19   A.    Yes.

20   Q.    And is this a Pen Holder Edition or not?

21   A.    It is not.

22   Q.    Because this piece -- the kind of D-shaped piece is not

23   cut out on this one?

24   A.    Correct.

25   Q.    And then one of the two lightning links has been cut out

1   of this card as well, correct?  Bear with me.

2   A.    Yes.

3           MS. TAYLOR:  Your Honor, I would suggest that this

4   may be a good stopping point for today.

5           THE COURT:  Yeah, I actually was going to suggest

6   that we stop around 5:15 since the jury came in so early, so

7   that's fine.

8           Ladies and gentlemen, we're going to go ahead and

9   stop for the afternoon.  I'll ask you, as I said, to be back

10  here at 9:45.  You'll leave your notepads only the chair.

11          COURTROOM DEPUTY:  Judge, sorry, you said 9:45.

12          THE COURT:  What is -- sorry about that.  No, you

13  don't get an extra hour of sleep.  8:45.  8:45.

14          Thank you, Ms. Wiles.

15          We'll plan hopefully -- if everybody can be here on

16  time, we'll plan to start no later than 9 a.m.

17          You'll leave your notepads on chairs.

18          I'll ask you to follow all of the instructions that I

19  gave you earlier, and that is you must not talk to one another,

20  your family, your friends, or anybody at all about the case.

21  You can tell them information about your -- when you have to be

22  at court and the fact that you've been selected as a juror, but

23  you must not discuss the case in any way with anyone at all.

24          If anybody speaks to you or in your presence about

25  the case, please stop them and notify the court security

1  officer immediately.

2        Please do not conduct any independent research about

3  anything in any way relating to the case.  That includes the

4  words that you're hearing, the types of firearms, any of the

5  terminology, and any of the people.

6        Remember that you must not form or express any

7  opinions until you've heard all the evidence, the arguments of

8  the attorneys, and my instructions on the law, and remember not

9  to read, watch, or listen to any media reports or communicate

10 over the internet or by cell phone, smart phone, tablet,

11 computer, or anything at all.  All of the information you use

12 to decide the case must come only from inside this courtroom.

13       Have a wonderful evening and we will see you bright

14 and early tomorrow morning, 8:45.

15       COURT SECURITY OFFICER:  All rise for the jury.

16     (Jury exits, 5:16 p.m.)

17       COURT SECURITY OFFICER:  Please be seated.

18       THE COURT:  You may step down.

19       THE WITNESS:  Thank you.

20       THE COURT:  So Ms. Taylor, we're going to continue

21 with Agent Hooker tomorrow.  What's next?  Give us the rundown

22 of who we can expect to hear from tomorrow.  And please

23 remember to over disclose, not under disclose.

24       MS. TAYLOR:  Yes, Your Honor.  After Agent Hooker

25 would be Postal Inspector Hannon, and then after him I would

1    anticipate Special Agent Powley from ATF.  And then there's two

2    other postal inspectors, Martin and Batchelder.

3          Medlin, my preference is for him to go after Powley,

4    but he's from out of town so we may have to shift a little bit

5    depending on when exactly he's getting here.  But I would be

6    surprised if we got beyond that.

7          THE COURT:  Okay.

8          MS. TAYLOR:  May I put these on the table?

9          THE COURT:  Get to a microphone.

10         MS. TAYLOR:  Sorry.  So it's going to be more from

11   Special Agent Hooker.  His testimony will take some time.  Then

12   it will be Postal Inspector Hannon, Special Agent Powley.  Next

13   on my list is the digital forensic examiner, Medlin.  However,

14   we may have to shift him back a little bit if we're ahead of

15   schedule because he's coming from out of town.  And then it

16   would be Postal Inspectors Martin and Batchelder.  I do not

17   think that there's a chance that we would get beyond them

18   tomorrow.

19         Your Honor, I would suggest all of the physical

20   exhibits are here in the courtroom, and that for efficiency

21   purposes, that counsel can inspect them now so that they don't

22   have to walk up to the podium because there are a lot of them.

23         THE COURT:  Yeah, I was actually going to ask if

24   there is a way we can resolve that, because I don't know that

25   it's -- I think it's rather disruptive to have to go to the --

1          MR. KING:  I agree, Your Honor.  I was going to

2     suggest because of the number -- there's hundreds -- if the

3     government can just bring them by so I can take a look and make

4     sure that it is what I think it is, that should solve

5     everything.  Because I don't have a digital copy, I don't want

6     to stipulate or not object to something and it be different

7     than what I think it is.

8          THE COURT:  That's fine.

9          Ms. Taylor, normally I do say -- ask that you show

10    the exhibits to the other side before you walk them up just so

11    there's no confusion.  If there are paper documents that have

12    been produced ahead of time you don't have to do that, but with

13    physical items, when you are going to approach, I'll ask you to

14    please show them to opposing counsel as you go up.

15         MS. TAYLOR:  Yes, Your Honor.

16         THE COURT:  Are there any particular exhibits that

17    you have concerns about, Mr. King?

18         MR. KING:  No, Your Honor.  There's just a lot of

19    them.  And the way they're labeled, some of them particularly

20    on the exhibit list, I think I know what they are, but I'm not

21    a hundred percent confident.  I want to make sure, before not

22    objecting to something, I'm making a hundred percent sure what

23    something is first.

24          I don't think of the physical evidence there's -- I

25    can imagine we'll have -- I think we'll probably not object to

1    the vast, vast majority of it, if not all of it, but I do want

2    to make sure before I don't object that I know exactly what it

3    is.

4           THE COURT:  All right.  Give me a moment.

5           Ms. Wiles, may I see you.

6        (The judge and the courtroom deputy confer.)

7           THE COURT:  All right.  Ms. Taylor, is there anything

8    else I need to hear from the government?

9           MS. TAYLOR:  Your Honor, I think one thing that I

10   have been a little concerned about with regard to this trial is

11   we have made a motion in limine, which was granted, at least

12   mostly granted, with regard to excluding defenses that are not

13   legal defenses and that are essentially requests for

14   nullification.

15          I have concerns that there may be -- that counsel may

16   be advancing an argument at this trial that this is a

17   vindictive prosecution, that Mr. Hoover was targeted because he

18   doesn't like the ATF and the ATF doesn't like him.

19          From my perspective, that is completely baseless, but

20   it's also just not a defense under the law.  And the jury is

21   going to be instructed that they -- you know, I mean, if he

22   committed the crime, then none of that matters.

23          And we considered filing a brief on it beforehand and

24   didn't.  I asked Mr. Zermay before openings whether he was

25   going to be arguing at opening that this is a vindictive

1    prosecution, and he assured me that he was not doing that.

2    Maybe I misunderstood him.  But I directly asked him that

3    question, and then that seemed to be what the opening was

4    focused on.

5              So we can file briefing on it, but, I mean,

6    essentially it's a nullification defense, which this Court has

7    already ordered excluded.

8              THE COURT:  Mr. Zermay.

9              MR. ZERMAY:  Yes, Your Honor.  I don't particularly

10   remember the conversation going in that direction and I

11   generally disagree with the characterization of that.

12             And moreover, part of our argument is that this -- it

13   goes to that this auto key card tchotchke isn't a machine gun

14   conversion device.  Of course, in part -- ATF is saying it is

15   in part because they don't like Mr. Hoover.

16             THE COURT:  I'm not sure I understood the beginning

17   of your argument when you say you don't particularly remember

18   the conversation going in that direction and --

19             MR. ZERMAY:  She -- yes.

20             THE COURT:  Whoa, whoa, whoa.  You guys always have

21   to let me finish because I need a record.

22             -- and you generally disagree with the

23   characterization.  Tell me what you mean by that.

24             MR. ZERMAY:  She asked me, to the best of my

25   recollection, if I was going to go in the vindictive prosecutor

1    direction.  And I said something to the remark, "I'm not going

2    in a fire-and-brimstone, going-to-thump-the-table direction."

3    That was my remarks to Ms. Taylor.  It wasn't that I wasn't

4    going to argue that ATF doesn't like my client, it was that I

5    wasn't going to -- I was conveying to her that I wasn't going

6    to personally attack her and say that she or Mr. Mesrobian are

7    bringing a prosecution against my client for vindictive

8    purposes.

9              THE COURT:  All right.

10             Well, Ms. Taylor, to the extent that you're saying

11   that it's not a defense for them to say ATF didn't like them or

12   ATF was vindictive, it is true that if the evidence supports a

13   conviction for the charged offenses, then the defense can't

14   advance a defense saying that they should be acquitted because

15   this is a vindictive prosecution.

16             I think that I would say probably the opening

17   statements were walking a fine line.  To the extent the

18   argument in the openings was, "They're mad at my client and

19   they're after my client and he's not guilty of anything," I

20   don't think that's improper.

21             If the defense -- if, however, what they're saying

22   is, "They don't like my client.  They went after my client, who

23   is guilty anyway," then that's improper.

24             So I think we're just going to have to hear how the

25   arguments play out.  But I guess I want to make it clear, you

1   don't get to argue a nullification.  You don't get to argue

2   that, "Even if they did it, it's not fair," or, "They were just

3   mad at my client," or, "They went after my client."

4         But to the extent what you're saying is, "My client

5   did not commit an offense against the laws of the United

6   States," that may be fair game, but you need to be careful on

7   how you tread on that.

8         Ms. Taylor, do I need to hear further from you on

9   that?

10         MS. TAYLOR:  No, Your Honor.

11         THE COURT:  All right.

12         Mr. King, anything on behalf of Mr. Ervin before I

13   let you go?

14         MR. KING:  No, Your Honor.  Thank you.

15         THE COURT:  Mr. Zermay, anything further from you,

16   sir?

17         MR. ZERMAY:  No, Your Honor.

18         THE COURT:  The jury has to be here by 9:45 -- I mean

19   8:45.  You-all have to be here by 8:45.  And I mean here in

20   your seats at 8:45 and not coming in at 8:58.  So we'll plan to

21   get started at 9 with the jury, but I'll ask you-all to be here

22   at 8:45, ready to begin.  And we can take up anything that

23   needs to be addressed at that time.

24         And Ms. Taylor, if you could have a list of the

25   physical exhibits that you're intending to address tomorrow for

1    the defense in the morning.

2         Then I'll ask, while we've got that 15 minutes in the

3    morning, Mr. Zermay and Mr. King, if you want to go out -- let

4    me rephrase that.  I will ask you to go ahead and take a look

5    at the physical exhibits so that we can avoid any unnecessary

6    delays, all right?

7         MS. TAYLOR:  And Your Honor, I think it's pretty well

8    reflected, because Hooker and Hannon are going to be the next

9    witnesses and all of the physical exhibits they're going to be

10   talking about are listed in the exhibit list with their name

11   next to them.

12        THE COURT:  All right.  Then in the morning when you

13   get here I'll ask you, Mr. King and Mr. Zermay and

14   Mr. Larosiere, try and take a look at those, or as many of them

15   as you can, so that we can avoid the additional time.

16        But regardless, Ms. Taylor, as you walk any of these

17   physical exhibits up, I'll ask you to please show them to

18   opposing counsel on your way up.

19        MS. TAYLOR:  Yes, Your Honor.

20        THE COURT:  All right, then.  It's 5:30.  We'll be in

21   recess, to resume with everybody at 8:45 tomorrow morning.

22        COURT SECURITY OFFICER:  All rise.

23      (Proceedings adjourned at 5:28 p.m., to be continued on

24   Tuesday, April 11, 2023.)

25                              -     -     -

1          CERTIFICATE OF OFFICIAL COURT REPORTER

2

3    UNITED STATES DISTRICT COURT)

4    MIDDLE DISTRICT OF FLORIDA )

5

6          I hereby certify that the foregoing transcript is a true

7    and correct computer-aided transcription of my stenotype notes

8    taken at the time and place indicated herein.

9

10          DATED this 30th day of May, 2023.

11

12                              /s/ Katharine M. Healey
                                Katharine M. Healey, RMR, CRR, FPR-C
13                              Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25