Vol. 4-1

1          IN THE UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
2                JACKSONVILLE DIVISION

3
   UNITED STATES OF AMERICA,      Jacksonville, Florida
4
              Plaintiff,          Case No. 3:21-cr-22(S4)-MMH-MCR
5
   -vs-                           April 13, 2023
6
   KRISTOPHER JUSTINBOYER ERVIN,  9:20 a.m.
7  MATTHEW RAYMOND HOOVER,
                                  Courtroom 12B
8             Defendants.
   _____

9

10                  **TRANSCRIPT OF JURY TRIAL**
                       **(VOLUME 4 of 9)**
11        BEFORE THE HONORABLE MARCIA MORALES HOWARD
                  UNITED STATES DISTRICT JUDGE
12

13

14

15

16

17

18

19

20

21
   OFFICIAL COURT REPORTER:
22
        Shelli Kozachenko, RPR, CRR, CRC
23      221 North Hogan Street, #185
        Jacksonville, FL  32202
24      Telephone:  (904) 301-6842

25
                   (Proceedings reported by stenography;
                    transcript produced by computer.)

Vol. 4-2

1                    A P P E A R A N C E S

2

COUNSEL FOR THE GOVERNMENT:
3
        **Laura Taylor, Esquire**
4       **David Mesrobian, Esquire**
        United States Attorney's Office
5       300 North Hogan Street, Suite 700
        Jacksonville, FL  32202
6

7
COUNSEL FOR DEFENDANT ERVIN:
8
        **Alex King, Esquire**
9       Monroe & King PA
        1805 Copeland Street
10      Jacksonville, FL  32204

11

12  COUNSEL FOR DEFENDANT HOOVER:

13      **Matthew Larosiere, Esquire**
        6964 Houlton Circle
14      Lake Worth, FL  33467

15      **Zachary Zermay, Esquire**
        Zermay Law
16      1762 Windward Way
        Sanibel, FL  33957

17

18

19

20

21

22

23

24

25

1              T A B L E   O F   C O N T E N T S

2  GOVERNMENT WITNESSES:                                    Page No.

3      DAVID BANE
           DIRECT EXAMINATION BY MS. TAYLOR..........         12
4          CROSS-EXAMINATION BY MR. LAROSIERE........         20

5      JOHN PALMER CLARKSON
           DIRECT EXAMINATION BY MS. TAYLOR..........         22
6          CROSS-EXAMINATION BY MR. LAROSIERE........         60
           CROSS-EXAMINATION BY MR. KING.............         68
7          REDIRECT EXAMINATION BY MS. TAYLOR........         73

8      JONCARLOS RUIZ
           DIRECT EXAMINATION BY MS. TAYLOR..........         75
9          CROSS-EXAMINATION BY MR. LAROSIERE........         95
           CROSS-EXAMINATION BY MR. KING.............         97
10
       PATRICK BRESLEND
11         DIRECT EXAMINATION BY MS. TAYLOR..........        104
           CROSS-EXAMINATION BY MR. KING.............        114
12         REDIRECT EXAMINATION BY MS. TAYLOR........        119
           RECROSS-EXAMINATION BY MR. KING...........        120
13
       KRIS ANDERSON ERVIN
14         DIRECT EXAMINATION BY MS. TAYLOR..........        123
           CROSS-EXAMINATION BY MR. LAROSIERE........        150
15         CROSS-EXAMINATION BY MR. KING.............        151
           REDIRECT EXAMINATION BY MS. TAYLOR........        163
16
       KRISTEN ERVIN
17         DIRECT EXAMINATION BY MR. MESROBIAN.......        167
           CROSS-EXAMINATION BY MR. LAROSIERE........        177
18         CROSS-EXAMINATION BY MR. KING.............        178
           REDIRECT EXAMINATION BY MR. MESROBIAN.....        182
19
       CAROLANNE WOLFE
20         DIRECT EXAMINATION BY MR. MESROBIAN.......        184
           CROSS-EXAMINATION BY MR. KING.............        253
21         PROFFER BY MR. KING.......................        257
           CROSS-EXAMINATION (CONTINUED) BY MR. KING.        259
22         REDIRECT EXAMINATION BY MR. MESROBIAN.....        261

23     JONATHAN MONGER
           DIRECT EXAMINATION BY MS. TAYLOR..........        262
24         CROSS-EXAMINATION BY MR. LAROSIERE........        277
           CROSS-EXAMINATION BY MR. KING.............        278
25         REDIRECT EXAMINATION BY MS. TAYLOR........        281

1
2
**GOVERNMENT WITNESSES:**

**LYNDSEY BUTLER**
3
   DIRECT EXAMINATION BY MR. MESROBIAN.......     287
4
5
6
                    E X H I B I T S   R E C E I V E D
7
8
**GOVERNMENT EXHIBITS:**                                        **Page No.**

9    GOVERNMENT'S EXHIBITS 56, 57A, 57B, AND 57C....      30

10   GOVERNMENT'S EXHIBIT 55.........................      82

11   GOVERNMENT'S EXHIBIT 60.........................     131

12   GOVERNMENT'S EXHIBIT 59.........................     190

13   GOVERNMENT'S EXHIBIT 126........................     240

14   GOVERNMENT'S EXHIBITS 120, 120A, 120B, 120C, ..     298

15   AND 120D

16   GOVERNMENT'S EXHIBIT 115........................     303
17
18
19
20
21
22
23
24
25

1                P R O C E E D I N G S

2     April 13, 2023                              9:20 a.m.

3                         -  -  -

4        (Outside the presence of the jury:)

5            COURT SECURITY OFFICER:  All rise.  This Honorable

6     Court is now in session.

7            Please be seated.

8            THE COURT:  We are back on the record this morning in

9     Case No. 3:21-cr-22(S4)-MMH-MCR, United States of America

10    versus Kristopher Justinboyer Ervin and Matthew Raymond Hoover.

11           Ms. Taylor and Mr. Mesrobian are here, along with the

12    case agent, for the United States.  Mr. King and Mr. Ervin are

13    in the courtroom.  Mr. Zermay, Mr. Larosiere, and Mr. Hoover

14    are in the courtroom.

15           We're ready to get started, but I am sad to report

16    that we have lost yet another juror.  It will surprise nobody

17    that juror No. 8, who was coughing and sneezing and sneezing

18    and coughing and sniffling and everything, has told the jury

19    administrator that she is sick and is not able to report for

20    jury service today.

21           We have one alternate juror left.  That's -- we did

22    not ask her, if we took the day off, whether she would be able

23    to continue.  I don't really know that I have any reason to

24    believe that she would.  I think we just have to continue

25    without her and excuse her and hope that we hold the rest of

 1   the jurors.

 2         But I will hear from counsel as to your thoughts.

 3         Ms. Taylor.

 4         MS. TAYLOR:  Your Honor, I agree with continuing.  In

 5   particular, we have a number of witnesses who have travel

 6   scheduled and the like, and I'm not sure but it's possible that

 7   if we lose a day, it could cause issues with availability.

 8         And we do have, on Monday, quite a few out-of-town

 9   witnesses who are expecting to testify that day.

10         THE COURT:  All right.  Mr. King?

11         MR. KING:  Your Honor, that's -- that's fine.

12         THE COURT:  Okay.  Mr. Larosiere?

13         MR. LAROSIERE:  No objection.

14         THE COURT:  All right.  So with the agreement of all

15   counsel, we will dismiss juror No. 8, who, for purpose of the

16   record, was an alternate, so we're not actually removing

17   someone from the jury.

18         But it does leave us with one alternate, and that

19   alternate is juror No. 12, who was, during jury selection,

20   juror No. 41, just for purposes of the record.

21         With that, Ms. Taylor, anything from the Government

22   that I need to address before we bring the jury in?

23         MS. TAYLOR:  Your Honor, there was one thing that I

24   wanted to address this morning, which is I want to assert an

25   objection to any further questioning along the lines of what

1    we've seen to the previous law enforcement witnesses with

2    regard to, "Did you arrest anyone else?"

3           I can't imagine what the relevance is to whether

4    anyone else was arrested or prosecuted as a -- in relation to

5    this case other than to support a vindictive or selective

6    prosecution defense which, as we've already discussed, is not a

7    defense that's permissible.  It's a nullification argument.

8           And additionally, to the extent that we have to then,

9    on redirect, attempt to justify it in response, it also invades

10   the Government's privilege with regard to how it allocates

11   resources and -- and its internal deliberations about what

12   cases to pursue with those resources.

13          So maybe Mr. Larosiere or Mr. Zermay have -- and

14   Mr. King have some basis for relevance that I haven't thought

15   of, but I don't -- I don't see how those questions are

16   relevant, Your Honor.

17          THE COURT:  Mr. King, do you wish to respond?

18          MR. KING:  Yes, Your Honor.  In terms of the -- you

19   know, and I understand Ms. Taylor's point well.  Obviously I --

20   they are not intended to elicit a selective or vindictive

21   prosecution.

22          However, there is, you know, an argument that these

23   devices are clearly and obviously illegal, and I know there's

24   been testimony from Agent Hooker that everybody who purchased

25   this knew they were illegal.

1    And, you know, we're going to have, by my count,

2  numerous witnesses who would have touched or handled these

3  devices or even purchased it, some of whom admittedly cut them

4  out to turn them into a machine gun part.  And, you know, those

5  witnesses were given immunity.

6    The fact that they were given immunity is very

7  relevant to their testimony.  And the fact that, you know, law

8  enforcement, for whatever reason, has not arrested them or

9  charged them -- you know, we talked about Mr. Alderson which --

10  you know, who was -- reeked of marijuana and had a gun on him,

11  and the decision was made not to prosecute him.  He was given

12  immunity.

13    All of that is relevant to those witnesses'

14  testimony.  And, you know, we think it's a fair comment on, you

15  know, the -- you know, essentially the bias of the witnesses

16  and the bias towards the -- you know, the choices the

17  Government has made in terms of who to arrest, not to arrest,

18  and immunity.

19    THE COURT:  All right.  Mr. Larosiere, any -- well,

20  actually, I don't know which one of you wants to address that.

21    MR. LAROSIERE:  Thank you, Your Honor.  The thrust of

22  the defense argument, at least for our part, being that this is

23  not a machine gun, I think it's clearly relevant.

24    The Government is asserting, basically, that the auto

25  key card *ab initio* was a machine gun.  And so logically

1    consistent with that, somebody who intentionally caused to be

2    shipped through the mail -- again, taking the Government's

3    position -- a machine gun has completed an offense.

4            Then the Government separately goes through a list of

5    questions with each of these witnesses which they granted

6    immunity to which we believe is very relevant to whether or not

7    the item has crossed the line into being a machine gun.

8            And so that question is relevant to two factors

9    there:  (1) whether the device at all is consistent with the

10   statutory definition and whether ATF actually believes it is

11   consistent with the statutory definition, and (2) at what point

12   does that -- is that Rubicon crossed.

13           So I think it's very important.  And, again, we are

14   not making a nullification argument.  It is simply -- virtually

15   everything that is being elicited is simply to support the

16   contention that this is not a machine gun.

17           THE COURT:  I do think that evidence of the fact that

18   the Government did not arrest anyone else with regard to these

19   is relevant to whether or not the ATF genuinely believes it's a

20   machine gun.

21           I also think that the testimony of one of the agents

22   about -- I think it was the postal inspector about why it was

23   so important to stop these things from -- these devices from

24   being sent out certainly opens the door to the question of why

25   no arrests have been made or they haven't been retrieved,

1   because if it was so important to stop them from being sent

2   out, it would be equally important to retrieve them.

3          So I think that -- that some of the agents' testimony

4   has opened the door to that, and I don't think it would be

5   appropriate to limit the defense in the way that you've

6   requested.

7          If there's a particular question, Ms. Taylor, that

8   you want to object to, that's fine, but I think the breadth of

9   what you're asking me to prevent them from eliciting would be

10  improper.

11         So I'll -- I'm going to overrule that request but

12  without prejudice to your making objections to specific

13  questions, if appropriate.

14         MS. TAYLOR:  Yes, Your Honor.  I mean, I certainly

15  think it's fair for the defense to inquire of the individual

16  purchasers who are going to testify whether they were

17  prosecuted and inquire, you know, as to whether that has

18  impacted their testimony.

19         But in any event, I will reraise the objection if I

20  feel it's appropriate.

21         THE COURT:  Okay.  All right.  Mr. King, anything on

22  behalf of Mr. Ervin?

23         MR. KING:  No, Your Honor.  We're prepared to

24  proceed.

25         THE COURT:  Counsel for Hoover, anything further

1  before we continue?

2          MR. LAROSIERE:  No, Your Honor.  Thank you so much.

3          THE COURT:  All right.  Let's get the jury in.

4          And who's our -- who's the first witness?

5          MS. TAYLOR:  The next witness is going to be David

6  Bane.

7          THE COURT:  Could you go ahead and get Mr. Bane.

8          COURT SECURITY OFFICER:  All rise for the jury.

9      (Jury in at 9:30 a.m.)

10          COURT SECURITY OFFICER:  Please be seated.

11          THE COURT:  All right.  Ladies and gentlemen, we are

12  continuing with the evidence this morning in Case No.

13  3:21-cr-22(S4)-MMH-MCR.

14          You'll notice that juror No. 8 isn't with us.  You

15  heard her sneezing and coughing and sniffling all day

16  yesterday.  Well, she's not feeling any better today, so she --

17  I released her from her jury service.  She just was -- she was

18  too sick to come in today.  So we will plod forward.

19          Ms. Taylor, we asked the witness to come in, but

20  could you formally announce your next witness, please?

21          MS. TAYLOR:  Yes, Your Honor.  The United States

22  calls David Bane.

23          THE COURT:  And, Mr. Bane, could you stand up just a

24  moment to be sworn.

25          COURTROOM DEPUTY:  If you could please raise your

 1    right hand for me.

 2            Do you solemnly swear that the testimony you're about

 3    to give before this Court will be the truth, the whole truth,

 4    and nothing but the truth, so help you God?

 5            THE WITNESS:  I do.

 6            COURTROOM DEPUTY:  You may have a seat.

 7            And if you could please state your name for the

 8    record and spell your last name.

 9            THE WITNESS:  David Bane, spelled B-a-n-e.

10            THE COURT:  Mr. Bane, can I get you to pull your

11    chair forward and try to speak directly into that microphone?

12            THE WITNESS:  Sure.

13            THE COURT:  Thank you, sir.

14            Go ahead, Ms. Taylor.

15            MS. TAYLOR:  Yes, Your Honor.

16              DAVID BANE, GOVERNMENT'S WITNESS, SWORN

17                       DIRECT EXAMINATION

18    BY MS. TAYLOR:

19    Q.   Mr. Bane, we previously spoke related to the design for a

20    card, correct?

21    A.   Correct.

22    Q.   Could you explain to the jurors a little bit about -- you

23    had a business related to machining metal?

24    A.   Correct.  Yes.  I had a CNC company, which we did

25    large-format lasers and pneumatic-controlled equipment.

1    Q.    And you no longer operate in that business?

2    A.    That's correct.

3    Q.    When did you stop operating that business?

4    A.    Approximately two years ago.

5    Q.    And I want to pull up for you Exhibit 91F.

6          Do you recognize this?

7    A.    It's a PayPal receipt to my business.

8    Q.    Okay.  And that business is -- it says, "Merchant, Bane

9    Industries"?

10   A.    Correct.

11   Q.    And is that what your business was called?

12   A.    Correct.

13   Q.    And there's a phone number under there, 904-551-1046?

14   A.    That was the local number, correct.

15   Q.    Okay.  So this is a PayPal -- a receipt for a payment to

16   you, correct?

17   A.    Correct.

18   Q.    And who was the payment made by?

19   A.    I don't know.

20   Q.    It says -- well, I guess it says shipping --

21   A.    Kristopher Ervin.  Kristopher Ervin.

22   Q.    Okay.  And it has an address under shipping address,

23   correct?

24   A.    Correct.

25   Q.    2409 Kirkwall Court?

1    A.    Correct.

2    Q.    And what was the payment for?

3    A.    That was for design work.

4    Q.    And what was the amount?

5    A.    $200.

6    Q.    Now, Mr. Bane, did -- for that -- for $200, what would you

7    have -- what would you have done for a customer?

8    A.    Well, they would have come into my office, and they would

9    have had some sort of idea, a design that they wanted to

10   reproduce and/or to make.  And I would sit down and go over it

11   with them and design it.

12   Q.    And would you have produced a large quantity of actual

13   products as a result of that $200 worth of work?

14   A.    No.  I just did the artwork.  I just did the computer

15   work.

16   Q.    Okay.  And when we spoke before, you had told me you

17   didn't specifically remember working with Mr. Ervin; is that

18   correct?

19   A.    I do not.

20   Q.    But -- but you do acknowledge that --

21   A.    Absolutely, yes.

22   Q.    Okay.  This payment receipt shows that you did something

23   with him.

24   A.    Sure.

25   Q.    Okay.  Now, Mr. Bane, I also talked to you a little bit

1    about what the process was that your lasers use, correct?

2    A.   Uh-huh.

3    Q.   Could you explain that -- and, sorry, if you could just

4    make sure you say yes or no.

5    A.   Okay.

6    Q.   Could you explain --

7    A.   Yes.

8    Q.   -- what that --

9    A.   Yes.

10   Q.   Could you explain what that process is?

11   A.   Yes.  You want me to explain that process now?

12   Q.   Yes, please.

13   A.   Okay.  I had two different types of lasers, a $CO_2$ and a

14   CerMark -- or a fiber laser.

15            And the parts that you showed me earlier that I

16   believe I worked with Mr. Ervin on were some stainless steel

17   cards.  And I created the machine code and turned it into a

18   piece of metal and gave him the files.

19   Q.   Mr. Bane, I want to show you -- I'm going to put on the --

20   on the projector Government's Exhibit 25B.

21            Is this what you and I looked at earlier today?

22   A.   Correct.

23   Q.   And it's cut up, right?

24   A.   Correct.

25   Q.   But we -- we took it out of the bag, and you -- you took a

1    look at this part, correct?

2    A.   Uh-huh.  Uh-huh.

3    Q.   And --

4    A.   Yes.

5    Q.   Okay.  And did you believe that your laser had actually

6    made this part?

7    A.   That part, I did not make.

8    Q.   And how were you able to tell that?

9    A.   Doing it for 15, 20 years, I know that that wasn't one of

10   my parts.

11   Q.   And --

12        THE COURT:  Excuse me, Ms. Taylor.

13        Sir, I'm having a little difficulty hearing you.  If

14   you could try to --

15        THE WITNESS:  With my experience, I did not -- it was

16   not my part.

17   BY MS. TAYLOR:

18   Q.   Okay.  And the manner in which this card was made, are you

19   able to tell what type of process was used to -- to create the

20   "Made in the USA" and this graphic that's on the card?

21   A.   I can, yes.

22   Q.   And what -- what type of process was that?

23   A.   It would have been two different processes.  It could

24   either been CerMark on a $CO_2$ laser, which is a clay chemical

25   you can put on which will draw the carbon forward on the

1    stainless steel, or some fiber lasers will draw the carbon

2    forward --

3    Q.    And when you reviewed --

4    A.    -- which makes a black mark.

5    Q.    Okay.  When you reviewed this particular exhibit, it --

6    the black marks that are on this card are very superficial; is

7    that fair?

8    A.    I don't know what you mean by superficial.

9    Q.    I guess I mean they're not -- they're not cuts into the

10   metal.

11   A.    Correct.  Yes.

12   Q.    Okay.

13   A.    It's pulling the carbon forward in the stainless steel.

14   Q.    Okay.  And have -- and that is a process that you used in

15   your business; is that correct?

16   A.    Yes.

17   Q.    And would you sometimes use that process to -- for

18   example, somebody had a drawing or something like that that

19   they had made, and they wanted it -- they wanted that imposed

20   on metal.  Was that a project that you would do for them?

21   A.    Yes.  Yes.

22   Q.    Okay.  And did you do a lot of small-scale and custom type

23   of work?

24   A.    Yes.

25           MS. TAYLOR:  And just so the jurors can see a bigger

 1   image of this type of card we were looking at, Ms. Ganoe, if

 2   you could pull up Exhibit 49A.

 3           Yeah.  So if we could play 49A and then when the --

 4   there should be an image of an auto key card there.

 5       (Video played.)

 6           MS. TAYLOR:  Pause it, please.

 7   BY MS. TAYLOR:

 8   Q.   Okay.  This image in the video -- we've paused it at --

 9           MS. TAYLOR:  What's the timestamp?

10   BY MS. TAYLOR:

11   Q.   About 6 to 7 seconds into the video.

12           Is that image with the black line -- is that

13   consistent with the type of laser process that we were

14   discussing?

15   A.   Yes.

16   Q.   And so it's -- it's on the surface of the metal?

17   A.   Correct.  Yes.

18   Q.   Okay.  And how are you able to recognize -- you made some

19   remarks when we were looking at Exhibit 25B that you could

20   tell -- how could you tell that it wasn't your personal work?

21   A.   It wasn't cut with a laser.  If it was, it was a laser

22   that wasn't working properly.

23           MS. TAYLOR:  If we could have 25B back up on the

24   screen -- or, sorry, on the projector.

25   BY MS. TAYLOR:

1    Q.   We're speaking -- and I'm not talking about the cuts that

2    are made to the bottom part of this card, but these parts up

3    here?

4    A.   Yeah.  That was done with a laser, yes.

5    Q.   Okay.  But how are you able to tell that you didn't do

6    that laser work, for example, where it says "Made in the USA"?

7    A.   I'm not a hundred percent sure that it's not mine, but I'm

8    99.9 percent sure it's not mine.  I don't remember ever putting

9    any patented or "Made in the USA" on the artwork that I did.

10   Q.   When we spoke earlier, you also had told me that if this

11   process is done correctly with drawing the carbon to the

12   surface, that you wouldn't even be able to feel it on the card

13   with your fingertip?

14   A.   That is correct, yes.

15   Q.   When you felt this card, could you feel that with your

16   fingers?

17   A.   Correct.  Yes.

18   Q.   Is that one of the reasons why you believe it is not your

19   work?

20   A.   Yes.  Correct.

21   Q.   Okay.

22          MS. TAYLOR:  I have no further questions for

23   Mr. Bane.

24          MR. KING:  Your Honor, no questions for Mr. Bane.

25          THE COURT:  Mr. Larosiere?

1                         CROSS-EXAMINATION

2    BY MR. LAROSIERE:

3    Q.   Hi, Mr. Bane.  Thank you for your time.

4         You said you just did the artwork, right?

5    A.   Uh-huh.

6              THE COURT:  Is that yes?

7              THE WITNESS:  Yes.  I'm sorry.  Yes.

8    BY MR. LAROSIERE:

9    Q.   And was that a DXF file?

10   A.   It probably would have been a DXF file.

11   Q.   And that stands for Drawing Exchange Format, right?

12   A.   Correct.

13   Q.   And in a DXF file, is there any three-dimensional

14   information?

15   A.   No.

16   Q.   Is there any material properties?

17   A.   That I do not know of.

18   Q.   Okay.  When you feed a DXF file to a laser, is it on the

19   DXF or on the laser postprocessor where you determine how the

20   cuts will be?

21   A.   Postprocessor.  DXF is just the format.

22   Q.   Right, which is --

23   A.   DXF is a line drawing.  That's all it is.  There's no

24   dimension to it.  It's a flat-line black-and-white drawing.

25   Q.   Strictly two-dimensional lines?

1   A.    Absolutely, yes.

2   Q.    So a drawing.

3   A.    Yes.

4           MR. LAROSIERE:  Thank you so much, Mr. Bane.

5           THE WITNESS:  Uh-huh.

6           THE COURT:  Ms. Taylor?

7           MS. TAYLOR:  No further questions, Your Honor.

8           THE COURT:  All right, sir.  You may step down.

9           I assume this witness is released?

10          MS. TAYLOR:  Yes, Your Honor.

11          THE COURT:  Counsel, I assume this witness is

12  released?

13          MR. KING:  Yes, Your Honor.  I apologize.

14          THE COURT:  All right.  Okay.  You're free to go,

15  sir.  Thank you very much for your time.

16          THE WITNESS:  Thank you.

17      (Witness excused.)

18          THE COURT:  Next witness?

19          MS. TAYLOR:  The next witness is John Palmer

20  Clarkson.

21      (The witness entered the courtroom.)

22          THE COURT:  Sir, if you'll come all the way up here.

23          COURTROOM DEPUTY:  Right up here to the witness

24  stand, please.

25          THE COURT:  And if you'll remain standing to be

 1   sworn, please.

 2              THE WITNESS:  Yes, ma'am.

 3              COURTROOM DEPUTY:  Please raise your right hand.

 4              Do you solemnly swear that the testimony you're about

 5   to give before this Court will be the truth, the whole truth,

 6   and nothing but the truth, so help you God?

 7              THE WITNESS:  Yes, ma'am.

 8              COURTROOM DEPUTY:  Okay.  You may have a seat.

 9              And if you could please state your name for the

10   record and spell your last name.

11              THE WITNESS:  John Palmer Clarkson, C-l-a-r-k-s-o-n.

12              THE COURT:  Go ahead, Ms. Taylor.

13            JOHN PALMER CLARKSON, GOVERNMENT'S WITNESS, SWORN

14                          DIRECT EXAMINATION

15   BY MS. TAYLOR:

16   Q.   Mr. Clarkson, could you tell the jurors where you work?

17   A.   Orange Park Machine & Fab.

18   Q.   And what's your role at -- I'm going to call it Orange

19   Park Machine; is that fair?

20   A.   Yes, ma'am.

21              I'm the president.

22   Q.   And how long have you been working at Orange Park Machine?

23   A.   Six years.

24   Q.   Is that a family business?

25   A.   Yes, ma'am.

1   Q.    And what type of business does Orange Park Machine engage

2   in?

3   A.    We're a contract manufacturer, so we do CNC machining,

4   laser cutting, press brake, punching, welding, powder coat.

5   We're a manufacturer of industrial parts.

6   Q.    And could you explain what CNC is?

7   A.    Yes.  It's computer numerical control.  It's basically a

8   computerized machine.

9   Q.    And so do you feed -- how does it -- how does it -- what

10  does it do exactly?

11  A.    We basically load in information into a computer, and --

12  we load in inputs, and it machines out outputs.

13  Q.    Do you have a CNC machine that would be able to cut flat

14  metal stock?

15  A.    Yes, ma'am.  We have an Amada 3 kilowatt fiber laser.

16  Q.    And -- and so that laser can make cuts?

17  A.    Yes, ma'am.  Yes, ma'am.  Cuts through material, CNC

18  driven.

19  Q.    Could it also make surface etchings?

20  A.    Yes, ma'am.

21  Q.    And which one is faster, making a cut or making a surface

22  etching?

23  A.    Etching is slower than cutting.  Cutting is faster than

24  etching, generally.

25  Q.    If it's making an etching, or essentially making a line

1  that's not cut all the way through onto the piece of metal, how

2  does the laser do that?

3  A.   It basically really -- our laser, it powers it way down so

4  we're not giving it enough energy to cut through the material.

5  It's basically just pulsing on the material, similar to -- I

6  guess you could say similar to welding, where it's heating up

7  the material enough to deform it but not enough to cut it all

8  the way through.

9  Q.   Does it -- so the line that's made, is it -- is it kind of

10 bumpy or wavy?

11 A.   Yes, ma'am.  Yes, ma'am.  You should -- you could see a

12 little -- you know, the finish indentions in the material.

13 Q.   And is that because of it -- because of the pulsing that

14 it does?

15 A.   Yes, ma'am.  It's kind of melting away a fraction of the

16 material but not all the way through.

17 Q.   And for your laser, if it's doing that type of work, the

18 pulsing, do you have control over how deep those pulses go into

19 the material?

20 A.   A certain amount.  We -- we -- we were kind of

21 experimenting.  Our laser's not specifically designed to

22 etching, so it's kind of something that it can do but it's not

23 specifically set up to do.

24         So there's typically a little trial-and-error work

25 kind of finding the right power adjustments to get the etching

1    we're looking for, the finished etch we're looking for.

2    Q.    Okay.  But it's not -- it's not making an image on the

3    surface of the metal; is that fair?

4    A.    Yes, ma'am.  It's --

5    Q.    Okay.

6    A.    -- etching in the material, not just on the surface.  It's

7    digging in the material.

8    Q.    Yeah.  And that microphone, sometimes you have to get a

9    little close to it --

10   A.    Yes, ma'am.

11   Q.    -- for it to really pick you up.

12         Okay.  Now, what type of thing -- you -- do you do a

13   lot of work for walk-in customers with small projects?

14   A.    We typically deal with larger customers with big

15   production parts.  We do do some walk-in business, but not

16   typically what -- what our core competency is.

17   Q.    So your -- where you make your money is what part of the

18   business?

19   A.    In production manufacturing.  We build production parts

20   for other manufacturers.

21   Q.    And to the extent that you do small projects, what's your

22   motivation for doing those?

23   A.    It kind of varies.  We kind of get -- we get kind of

24   cool -- pulled in for a cool project.  Or, you know, we -- you

25   know, a lot of times people have ideas or businesses that

1  they're trying to -- trying to get started, and, you know,
2  we're in a position to help, so if we can help, we generally
3  do.
4  Q.   Are you familiar with a man who you may know to go by the
5  name Justin Ervin?
6  A.   Yes.
7  Q.   And how did you meet Mr. Ervin?
8  A.   He came into our shop and -- with parts to manufacture.
9  Q.   And what was your initial impression of Mr. Ervin when --
10  when he -- and were you the first person to meet with
11  Mr. Ervin?
12  A.   I -- I'm not sure if I was the first person, but I would
13  have gotten involved pretty -- pretty quickly for kind of a
14  non -- nonstandard production part.
15  Q.   Okay.  And what was your initial impression of Mr. Ervin?
16  A.   He seemed like a gentleman that had an idea and was trying
17  to get it off the ground.
18  Q.   And have you had face-to-face meetings with Mr. Ervin?
19  A.   Yes, I have.
20  Q.   Are you able to recognize him as one of the people here in
21  the courtroom today?
22  A.   Yes, ma'am.
23  Q.   And can you describe what he is wearing, what he looks
24  like?
25  A.   Wearing a suit, short hair.

1   Q.   And where is he sitting?

2   A.   Front row in the corner.

3          MR. KING:  Your Honor, we'll stipulate that that's

4   Mr. Ervin.

5          THE COURT:  All right.  The record will reflect that

6   the witness identified Mr. Ervin.

7          Go ahead, Ms. Taylor.

8   BY MS. TAYLOR:

9   Q.   And Mr. Ervin had an idea for a part that he wanted to

10  make?

11  A.   Yes, ma'am.

12  Q.   And did you have an understanding of what that part was at

13  the time?

14  A.   No, ma'am.

15  Q.   And did you -- did you ask him what it was?

16  A.   We -- yeah, we -- we were kind of curious about what it

17  was, and that curiosity kind of evolved the deeper we got into

18  it.  But we were under the impression that it was a tool,

19  initially.

20  Q.   What gave you the impression that it was a tool?

21  A.   He told us it was a tool.

22  Q.   And did you understand what kind of tool it was, like what

23  it would be used for?

24  A.   No.  We -- we didn't have a clear understanding of that.

25  We -- I assumed it was going to be in some type of construction

1    or electrical -- some type of, you know, tool that -- that, you

2    know, you could -- he had an idea for a tool that he could sell

3    and market and make some money on.

4    Q.    And was he starting from scratch, or did he already have a

5    design for that -- for that tool that he wanted made?

6    A.    He had a design concept.

7    Q.    And did he have a digital file that could be used in a

8    laser machine?

9    A.    Yes.  He had a DXF file.

10   Q.    And did you-all -- did Orange Park Machine have to do work

11   on that file to get it to work with your laser?

12   A.    Yes, ma'am.  We took the file and cleaned it up, so to

13   speak, and formatted it to work on our machine.

14   Q.    What were the issues with that file when -- with regard to

15   your laser when you first received it?

16   A.    Mostly lines not being connected.

17         So with our laser and the DXF file, it's a

18   two-dimensional, you know, CNC format.  And it has -- you know,

19   just like if you're drawing, you know, an O, you have to

20   have -- that line has to be completely connected, and it can't

21   be overlapped.  It just has to be a perfect fit or the laser

22   gets to a point where it's like -- you know, it only does what

23   you tell it to, so it gets to a point where it's not -- not

24   cutting or not picking up the line, or it's going to throw an

25   error code.

1    So we kind of go through the file and make sure that

2    no errors are going to be placed.  And we also clean it up,

3    make sure all the lines are parallel.

4    Q.    And if it -- if that work hadn't been done, would it cause

5    problems when you actually tried to run the machine with that

6    file?

7    A.    Yes, ma'am.  It would have thrown error codes.  It

8    wouldn't -- wouldn't have completed the part to be what it was

9    supposed to be.  It would have left some parts of it

10   unfinished.

11   Q.    Did you charge Mr. Ervin for any design work?

12   A.    I don't think we charged him for the design work.

13   Q.    Did you search your files for any business records that

14   you had related to Mr. Ervin?

15   A.    Yes.

16   Q.    And did you find any?

17   A.    Yes.

18   Q.    And what were those?

19   A.    We have basically our order acknowledgements and packing

20   slips from our ERP system.

21        MS. TAYLOR:  Ms. Ganoe, if you could pull up Exhibit

22   57A, please.

23        Give me just a second.

24   (Pause in proceedings.)

25        MS. TAYLOR:  Your Honor, may I approach with Exhibits

1    56 and then 57A, B, and C?

2            THE COURT:  You may.

3    BY MS. TAYLOR:

4    Q.   Mr. Clarkson, if you could start with Exhibit 57A, B, and

5    C and tell us -- tell the jurors what -- what those documents

6    are.

7    A.    56 is my text message history.  57A is, I believe, our

8    first order acknowledgment, 57B is our second order

9    acknowledgment, and 57C is our third or fourth order

10   acknowledgment.  Maybe not sure of the order, but these are our

11   order acknowledgments for the key cards.

12   Q.   And on 56, you said it was your text message history.

13   A.   Yes, ma'am.

14   Q.   Are those messages with a particular person?

15   A.   Justin.

16   Q.   Justin Ervin?

17   A.   Yes, ma'am.

18           MS. TAYLOR:  At this time I'd move for admission of

19   Exhibits 57A, B, and C and 56.

20           MR. KING:  Without objection, Your Honor.

21           MR. LAROSIERE:  Without objection, Your Honor.

22           THE COURT:  56 and 57A, B, and C are admitted, and

23   you may publish.

24       (Government's Exhibits 56, 57A, 57B, and 57C were received

25   in evidence.)

1            MS. TAYLOR:  Ms. Ganoe, now could we have 57A on the

2    screen, please?

3    BY MS. TAYLOR:

4    Q.   Mr. Clarkson, looking at this, this is -- is this an

5    invoice, or what is this?

6    A.   This is just an order acknowledgment, an acknowledgment

7    that we have your order in our system and are -- are working

8    towards delivery.

9    Q.   And what is the date on this order?

10   A.   September 25th.

11   Q.   Of what year?

12   A.   2020.

13   Q.   And does it have a name for the customer?

14   A.   There's not a name on this order acknowledgment, but the

15   name would be in our system.

16            You know, we could -- you could search by Justin

17   Ervin in our ERP system and find this order acknowledgment.  It

18   would have been on the packing slip with the invoice.

19   Q.   And scrolling down on this particular exhibit, did it

20   indicate that you -- that Mr. Ervin had ordered a number of

21   different items to be manufactured?

22   A.   Yes, ma'am.  It was a pretty large-quantity order.

23   Q.   Okay.  So we're looking still at the first page, right,

24   and it's got four different types of items?

25   A.   Yes, ma'am.

1  Q.   And how many of each of those types of items did Mr. Ervin

2  order?

3  A.   A hundred of each.

4  Q.   And the description on the first item is about a -- looks

5  like maybe a descriptor, but then it says key card 1 in 1 with

6  cutouts, laser only?

7  A.   Yes.

8  Q.   And what did you charge per piece for those key cards?

9  A.   $2.20.

10  Q.   And then the next one is key card 1 in 1 no cutouts, laser

11  only and -- correct?

12  A.   Yes, ma'am.

13  Q.   And what did you charge for each of those?

14  A.   2.20.

15  Q.   And the next -- item 3 is key card 2 in 1 no cutouts,

16  laser only?

17  A.   Yes, ma'am.

18  Q.   And how much did you charge for those?

19  A.   $2.20.

20  Q.   The fourth one is key card 3 in 1 with bottle opener no

21  cutouts, laser only?

22  A.   Yes, ma'am.

23  Q.   And how much did you charge for those?

24  A.   $2.45.

25          MS. TAYLOR:  If we could go to the next page, please.

1   BY MS. TAYLOR:

2   Q.   Item 5 is a hundred of item 5 as well, correct?

3   A.   Yes, ma'am.

4   Q.   And those are key card 2 in 1 with cutouts, laser only?

5   A.   Yes, ma'am.

6   Q.   And those were how much?

7   A.   2.20.

8   Q.   And then the last item, item 6, is a hundred of key card 3

9   in 1 with bottle opener with cutouts, laser only?

10  A.   Yes, ma'am.

11  Q.   And how much did you charge for each of those?

12  A.   $2.45.

13  Q.   And so the -- you charged $2.20 for each of these items

14  regardless of the number of items that were etched onto the

15  card?

16  A.   Yes, ma'am.  It was a markup over our material cost, so

17  that's why some of them are a little more expensive, because

18  they're a little larger.

19  Q.   Okay.  So the bottle-opener version was the only kind that

20  cost -- that you charged more for.

21  A.   Yes, ma'am.

22  Q.   And that was an additional 25 cents?

23  A.   Yes, ma'am.

24  Q.   And that's because those have a -- the piece of metal is

25  bigger?

1   A.   Yes, ma'am, took up a little more material.

2   Q.   Let's look at Exhibit -- sorry.

3        And could you tell from this, or from elsewhere in

4   your system, what form of payment Mr. Ervin used for this?

5   A.   He was set up as a walk-in, so it was cash payment.

6   Q.   And did he decide on the names, the 1 in 1, 2 in 1, 3 in

7   1, or did you decide on that?

8   A.   So the -- I'm not sure what SOP stands for.  That's

9   typically our customer's initials or the first three letters

10  of -- it's kind of tying it to the customer.

11       And then we've got part numbers, you know, the dash

12  002, which would have been the second part we made for them,

13  and dash 001 would have been a component type of that -- that

14  part.

15  Q.   But the key card 1 in 1, was that Mr. Ervin's name for it

16  or --

17  A.   Yes, ma'am.

18  Q.   -- your name?

19  A.   We knew them as key cards kind of initially.

20  Q.   And it says 18GA?

21  A.   18 gauge, 304 stainless.  It's the material we use.

22  Q.   Okay.  So does 18 gauge indicate the thickness?

23  A.   The material thickness, yes, ma'am.

24  Q.   How thick is 18 gauge stainless?

25  A.   .043 inches thick.

1    Q.    .043 inches?

2          Do you know in millimeters how thick that is?

3    A.    Oh, gosh.

4    Q.    If you don't, it's okay.

5    A.    No, ma'am.

6    Q.    Is 18 gauge a pretty common gauge of stainless that you

7    would use?

8    A.    Yes, ma'am.  We use it a lot for appliances and

9    countertops and showrooms and stuff like that, so we stock it.

10   We use a lot of it.

11   Q.    And what does 304 mean?

12   A.    It's the series of stainless steel.

13   Q.    Okay.  Now, looking at -- let's look at Exhibit 56.

14         These are your text messages with Mr. Ervin?

15   A.    Yes, ma'am.

16   Q.    And you previously provided them to Special Agent Hooker?

17   A.    Yes, ma'am.

18   Q.    When -- so we've zoomed in on the first page here, and it

19   looks like maybe you had him in the phone as Justin Erving?

20   A.    Yeah.  That was a typo that I just never corrected or -- I

21   don't think that was -- that was not intentional.  I just

22   misspelled his name.

23   Q.    Okay.  The first message that he sent -- Ms. Ganoe zoomed

24   in on it -- what date was that?

25   A.    November 23rd.

1  Q.   And Mr. Ervin stated -- is Mr. Ervin's messages in the

2  black and white on the left side?

3  A.   Yes, ma'am.

4  Q.   And then on the right side there are messages that are

5  green and white.  Are those yours?

6  A.   Yes, ma'am.

7  Q.   And Mr. Ervin stated, "Hey, Jack.  This is my cell phone.

8  Save it.  Thanks for everything.  Justin Ervin"?

9  A.   Yes, ma'am.

10 Q.   And then you-all had some more back-and-forth, and then

11 you told Mr. Ervin, "I really appreciate the opportunity to

12 earn" -- I think you meant to say "your business"?

13 A.   Yes, ma'am.

14 Q.   "Please let me" -- I think maybe it's supposed to say --

15 A.   "Please let me know if we can do anything to help," is, I

16 think, what I'm trying to say.

17 Q.   Okay.

18       MS. TAYLOR:  And Ms. Ganoe, could we move to Exhibit

19 57B.

20 BY MS. TAYLOR:

21 Q.   After you -- you completed that first order that was

22 reflected on 57A, correct?

23 A.   Yes, ma'am.

24 Q.   And did you expect to ever see Mr. Ervin back in your shop

25 again?

1   A.   We -- we did not.

2   Q.   Why is that?

3   A.   It just -- there's just -- I figured he would have a hard

4   time selling -- selling these.  There's not a whole lot of $2

5   ideas that you can sell that readily that no one's thought of

6   or no one, you know ...

7   Q.   Have you dealt --

8   A.   And --

9   Q.   Sir, have you dealt with other customers who would come in

10  with an idea and make an order, and then they never come back?

11  A.   Yes.  Yes, ma'am.  We get a fair amount of people with --

12  with an idea that they'd like to develop and see and be brought

13  to -- you know, brought to market.

14  Q.   All right.  This -- 57B is another invoice related to

15  Mr. Ervin.  Is that accurate?

16  A.   Yes, ma'am.

17  Q.   And this is from your computer system at Orange Park

18  Machine?

19  A.   Yes, ma'am.

20  Q.   And what's the date on this invoice?

21  A.   November 30th, 2020.

22  Q.   And in this particular order, did Mr. Ervin order

23  additional auto key cards to be manufactured?

24  A.   Yes, ma'am.  He ordered double -- doubled the quantities,

25  at least.

1  Q.   So 200 -- it looks like 200 of the key card 1 in 1 with

2  cutouts?

3  A.   Yes, ma'am.

4  Q.   And then 200 of the key card 1 in 1 no cutouts?

5  A.   Yes, ma'am.

6  Q.   And you charged the same price for those whether they had

7  the cutouts or not; is that accurate?

8  A.   Yes, ma'am.

9  Q.   What was that price?

10 A.   $2.20.

11 Q.   And then he ordered 200 key card 2 in 1 no cutout,

12 correct?

13 A.   Yes, ma'am.

14 Q.   And you charged $2.20 for those?

15 A.   Yes, ma'am.

16 Q.   And then he ordered 300 of the key card 3 in 1 with bottle

17 opener no cutouts?

18 A.   Yes, ma'am.

19 Q.   And you charged 2.45 each for those?

20 A.   Yes, ma'am.

21 Q.   And that was the same price you charged him before?

22 A.   Yes, ma'am.

23          MS. TAYLOR:  Ms. Ganoe, can we move to the second

24 page?

25 BY MS. TAYLOR:

1    Q.   And then he ordered 200 key card 2 in 1 with cutouts?

2    A.   Yes, ma'am.

3    Q.   At a price of $2.20 each?

4    A.   Yes, ma'am.

5    Q.   And then key card 3 in 1 with bottle opener with cutouts,

6    he ordered 300 of those as well?

7    A.   Yes, ma'am.

8    Q.   And they were 2.45 each?

9    A.   Yes, ma'am.

10   Q.   How did he pay for -- what was the total for this order?

11   A.   $3,230.

12   Q.   And how did he -- how did Mr. Ervin pay for the order?

13   A.   Cash.

14   Q.   And did Mr. Ervin place another order after this?

15   A.   Yes, ma'am.

16        MS. TAYLOR:  Exhibit 57C, please.

17   BY MS. TAYLOR:

18   Q.   Is this the third invoice that you found in your system?

19   A.   Yes, ma'am.

20   Q.   And what's the date on this invoice?

21   A.   January 15th, 2021.

22   Q.   And this invoice, under PO number, what does it say?

23   A.   Justin 1/15/21.  That was just the date that he -- he

24   placed the order.

25   Q.   Okay.  And in this case he ordered 200 of the key card 1

1  in 1, correct?

2  A.   Yes, ma'am.

3  Q.   And -- but you charged him more this time, right?

4  A.   Yes, ma'am.

5  Q.   Why was that?

6  A.   Etching took a lot longer than we thought it was, and he

7  was concerned about the finish.  So we -- we just -- it took us

8  more time to get the cards where he -- he was looking for them.

9  Q.   When you say he was concerned about the finish, what --

10  what was the particular issue that he had with the finish?

11  A.   Our laser is a manufacturing laser.  It's really designed

12  to cut, not to etch.  So we -- we have the option to etch, but

13  it's not necessarily something that is designed to make the

14  part look -- look pretty or to have a pretty finish.

15        So it took us a while just to find the right -- we

16  don't do a lot of etching, especially on this scale, so it just

17  took us a little bit to dial in our machine to get the finish

18  correct, which took time.

19  Q.   And --

20  A.   We charged him a premium for that.

21  Q.   -- when the laser is operating, does it make any surface

22  debris on the metal?

23  A.   Yes, ma'am.

24  Q.   What kind of surface debris does it make?

25        And if you could just get a little closer to the

1   microphone.  Sorry.

2   A.   Yes, ma'am.

3        It will -- it will oxidize typically, and that's what

4   our laser's doing, is it's just basically burn -- welding and

5   burning.  And there's oxidation around the -- around the

6   material that leaves, like, a sooty -- a sooty finish around --

7   around the edge.

8   Q.   And Mr. Ervin did not like that?

9   A.   No, ma'am.

10  Q.   Did he have any conversations with you at any point

11  about -- essentially asking you to help him make the surface

12  look nicer?

13  A.   Yes, ma'am.  We -- we did a little bit to clean them up.

14  You know, the material comes oily.  We'll spray the sheet with

15  WD40 to limit how -- how much sticks to it, and we kind of wipe

16  them down before packaging.

17       But Justin wanted us to do -- you know, to basically

18  sand them down and put -- regrain the material.

19  Q.   Did he ever bring anything into your shop that he was

20  wanting you to use to improve the finish?

21  A.   He had a belt sander, and he had kind of developed a

22  process to -- to regrain -- to regrain the cards after we

23  etched them.

24  Q.   Did you agree to do that for him?

25  A.   No, ma'am, we did not.

1    Q.    Okay.  But you -- you increased your price.

2          Did he -- did he have any reaction to the price

3    increase?

4    A.    He seemed -- he seemed to be okay with it.

5    Q.    He didn't protest that the price went up almost 50

6    percent?

7    A.    No, ma'am.

8    Q.    Okay.  This -- so on this order, he ordered 200 1 in 1 no

9    cutouts, correct?

10   A.    Yes, ma'am.

11   Q.    $3 each, yes?

12   A.    Yes, ma'am.

13   Q.    And then he ordered 200 key card 2 in 1 with no cutouts

14   for $3 each?

15   A.    Yes, ma'am.

16   Q.    And he ordered 200 key card 3 in 1 with bottle opener with

17   no cutouts for $3 each?

18   A.    Yes, ma'am.

19   Q.    So you charged the same for the bottle-opener version on

20   this order?

21   A.    Yes, ma'am.

22   Q.    And then he ordered 200 key card 1 in 1 with cutouts?

23   A.    Yes, ma'am.

24   Q.    For $3 each?

25   A.    Yes, ma'am.

1  Q.   And then he ordered 200 key card 2 in 1 with cutouts for
2  $3 each?
3  A.   Yes, ma'am.
4  Q.   And then he ordered 200 key card 3 in 1 with bottle opener
5  with cutouts for $3 each.
6  A.   Yes, ma'am.
7  Q.   And what was the total for this order?
8  A.   $3,600.
9  Q.   And how did he pay for that order?
10 A.   Cash.
11            MS. TAYLOR:  Ms. Ganoe, if we could have Exhibit 56.
12            And go forward.
13            If we could zoom in on this -- we're on the second
14 page of Exhibit 56.
15 BY MS. TAYLOR:
16 Q.   On January 14th Mr. Ervin texted you and asked, "Hey, when
17 would be a good time to stop by tomorrow?" correct?
18 A.   Yes, ma'am.
19 Q.   And then he said, "I'll call you back in just a few" --
20 or, sorry, you said you would call him back in just a few?
21 A.   Yes, ma'am.
22 Q.   And that was the day before the order we were just looking
23 at was placed?
24 A.   Yes, ma'am.
25 Q.   And so he did -- he did come by on January 15th?

1   A.    I believe so.

2   Q.    Okay.  Did he pick up all of the auto key cards that he

3   had ordered in those first three orders?

4   A.    No, no.  He didn't pick up any of them on January 15th.

5   That order he didn't -- he didn't get any of them.

6   Q.    Are you confident that there wasn't another order after

7   January 15th?

8   A.    Yes.

9   Q.    Okay.  Let's go through --

10        MS. TAYLOR:  If we could move to page 3 of Exhibit

11   56.

12   BY MS. TAYLOR:

13   Q.    Did Mr. Ervin frequently press for updates on the status

14   of his orders?

15   A.    Yes, ma'am.

16   Q.    And did he ever come pick up partial orders?

17   A.    Yes, ma'am.

18   Q.    Did he explain why he was doing that?

19   A.    He had -- he had these -- he had sales, and he was low on

20   stock.  So he was pushing us to -- to get our orders through

21   the shop so he could -- he could deliver to his customers.

22   Q.    For your business, was completing Mr. Ervin's orders your

23   highest priority?

24   A.    No, ma'am, something we were -- we were trying to do on

25   the side, way outside of our core competency or normal

1   production work.

2   Q.   And this was not a big moneymaker for you; is that fair?

3   A.   Yes, ma'am.

4   Q.   Did you ever -- did Mr. Ervin seem excited about how his

5   business was going during your conversations with him?

6   A.   Yes.  Yes.  He seemed to be doing very well and -- and

7   happy about it.

8   Q.   Did you ever have any conversations with him about whether

9   you could just cut out the pieces all the way rather than

10  etching them into the surface?

11  A.   Yes, ma'am.

12  Q.   And what was his response to that?

13  A.   He didn't want the cards fully cut out.

14  Q.   Did he say why?

15  A.   He just said that's not what his customers were looking

16  for.

17  Q.   And why would -- why did you want -- why would you have

18  preferred to cut out those pieces all the way?

19  A.   It's quicker from our standpoint.  It's easier to -- it's

20  faster to cut -- cut the parts completely out than to etch.

21          And it's just a little bit unusual, so we were just

22  kind of curious why -- why he wouldn't want to cut them all the

23  way out.

24          MS. TAYLOR:  Ms. Ganoe, if we could please have

25  Exhibit 48, page 22.

 1   BY MS. TAYLOR:

 2   Q.   You spoke a minute ago about the -- that he brought by a

 3   sander.

 4            Do these look familiar to you?

 5   A.   Yes.  Yes, ma'am.

 6   Q.   Are these consistent with the sander that Mr. Ervin

 7   brought to your shop?

 8   A.   Yes, ma'am.  I'm not -- I don't know if that's the

 9   specific sander, but it's that style of sander.

10   Q.   Okay.  And that was when he was asking you to do

11   additional surface conditioning work?

12   A.   Yes, ma'am.

13            MS. TAYLOR:  If we could have Exhibit 56, page 4,

14   please.

15   BY MS. TAYLOR:

16   Q.   On February 22nd Mr. Ervin sent you an image, correct?

17   A.   Yes, ma'am.

18   Q.   And what did he tell you?

19   A.   Just -- it's a picture of his tour bus.  "I'm working on

20   the RV/mobile Internet office command center."

21            MS. TAYLOR:  Could we have the next page, please.

22   BY MS. TAYLOR:

23   Q.   And did he send you additional pictures of the interior of

24   the bus?

25   A.   Yes, ma'am.

1    Q.   And what -- it looks like it has -- there's a picture in

2    the middle of this page.  It's page 5.

3             It has seats inside the bus, correct?

4    A.   Yes, ma'am.

5    Q.   And then there's another picture on the bottom that he

6    texted to you?

7    A.   With the seats removed.

8             MS. TAYLOR:  Could we have the next page, please,

9    Ms. Ganoe.

10   BY MS. TAYLOR:

11   Q.   Some more images of the interior of the bus?

12   A.   Yes, ma'am.

13   Q.   That Mr. Ervin sent to you?

14   A.   Yes, ma'am.

15            MS. TAYLOR:  Could we have the next page, please.

16   BY MS. TAYLOR:

17   Q.   And then did Mr. Ervin text you, "I got it for a deal.

18   10K with only 61,000 miles.  It's a 2004.  I will tell you more

19   about it when I see you this afternoon.  Thanks again for your

20   help on my quest for my personal independence"?

21   A.   Yes, ma'am.

22   Q.   And did you text him back on February 22nd and say, "Looks

23   great"?

24   A.   Yes, ma'am.

25   Q.   Did you see Mr. Ervin after that day?

1    A.    Yes.

2    Q.    And what was the reason that -- that Mr. Ervin was coming

3    to see you on February 22nd?

4    A.    On February -- I believe that's the day that he came in

5    to -- to talk about the surface finish and -- and placing

6    additional orders, just kind of talking about -- talking about

7    the -- the production we were doing.

8    Q.    Was he unhappy with the surface finish?

9    A.    Yes.  Yes.  He was looking for a higher quality -- quality

10   finish.

11   Q.    And what -- did anything happen during that meeting that

12   caused you to become suspicious of what the items were that he

13   was manufacturing?

14   A.    Yes, ma'am.  We -- we -- you know, I think after a couple

15   of meetings, we just kept kind of prodding and not -- you know,

16   the -- we weren't quite sure what we were manufacturing.

17          We kind of had suspicions we might be making

18   something that -- that we weren't sure -- weren't sure of, or

19   he wasn't be truthful about what we were manufacturing.

20          So we just -- kind of a series of kind of red flags.

21   Q.    And who was in that meeting with you from your --

22   Mr. Ervin was in the meeting?

23   A.    Yes, ma'am.  Mr. Ervin, Jon -- Joncarlos Ruiz, and Patrick

24   Breslend.

25   Q.    And Mr. Ruiz and Mr. Breslend, those are both employees of

1   yours?

2   A.    Yes.

3   Q.    And so had you ever gotten a clear answer from Mr. Ervin

4   about what this part was?

5   A.    We thought it was a -- like, a construction tool or some

6   type of tool.  And, no, we did not get a clear answer about

7   what it -- what it was.

8   Q.    And after this meeting, did -- did you learn more about

9   what it was?

10  A.    Yeah, we did.  When the meeting ended, we basically had an

11  internal discussion, "We need to figure out what -- what this

12  part is."

13  Q.    And what did you learn about it?

14  A.    We -- well, we did a Google Image search of it, so we took

15  a picture of it and then did a Google image search --

16          MR. KING:  Your Honor, can we approach sidebar?

17          THE COURT:  Yep.

18      (At sidebar, out of the hearing of the jury:)

19          THE COURT:  Yes, Mr. King.

20          MR. KING:  Your Honor, I would object to hearsay.  It

21  appears the witness is preparing to get into what he uncovered

22  doing his own Internet research and the conclusions that he

23  reached based on hearsay information from Internet research.

24          THE COURT:  Ms. Taylor?

25          MS. TAYLOR:  Your Honor, this goes to the next

1   exhibit that I'm going to show him, which is the three boxes of

2   the cut-up auto key cards and explaining why they undertook

3   that step.

4           THE COURT:  Can you tell me what -- proffer for me

5   what you anticipate his answer to your question to be?

6           MS. TAYLOR:  That they located Mr. Ervin's website

7   and viewed it and came to believe that they had been

8   manufacturing something that was potentially illegal and that

9   they did not -- and a gun part and that they did not want to

10  engage in that business, and that they decided that they should

11  not give him any more of his order.

12          THE COURT:  So if you can ask the question to ask him

13  not to -- I think he can testify that he looked at a website

14  and the conclusions that he drew from that website, Mr. King.

15          MR. KING:  Yes, ma'am.

16          THE COURT:  That's not offered for the truth of the

17  matter asserted.

18          Even to the extent that he says what he saw on it --

19  well, no.  He can say what he viewed on it, so -- I don't think

20  that's hearsay, so I'm going to overrule the objection.

21          Go ahead.

22          MR. KING:  Thank you.

23      (End of discussion at sidebar.)

24          THE COURT:  Go ahead, Ms. Taylor.

25          MS. TAYLOR:  Yes, Your Honor.

1    BY MS. TAYLOR:

2    Q.   Mr. Clarkson, after the meeting -- if you could please

3    continue with describing what it was that -- that happened.

4              Well, so Mr. Ervin left your business; is that

5    correct?

6    A.   Yes, ma'am.

7    Q.   After Mr. Ervin left, what -- what happened?

8    A.   Well, we -- we just kind of left more curious about what

9    we were manufacturing.  So we did a Google Image search with --

10   and used the keywords "key card."

11             And with that we were able to find, I think, a

12   YouTube -- a YouTube video link and then eventually his

13   website.

14   Q.   And were you concerned about what you viewed when you did

15   that Internet research?

16   A.   Yes.

17   Q.   And did you have any concern about whether you should

18   continue business with Mr. Ervin?

19   A.   Yes.  Yeah.  We had -- we had immediate concerns.

20   Q.   And what did you -- what steps did you take after

21   learning -- after doing this research with regard to your

22   business relationship with Mr. Ervin?

23   A.   Once we figured out what -- that it was auto key card, not

24   key card, and kind of the website, we had a bunch of these

25   manufactured, ready for delivery.

1           So we -- we stuck the finished cards in -- we call it

2     a Piranha ironworker, which is a big shear.  We cut them up

3     into -- into pieces, deleted the DXF fuels, and we basically

4     closed out the order, canceled -- canceled the order.

5     Q.    And you were expecting to make about $3 per card for this

6     order of key cards, correct?

7     A.    Yes, ma'am.

8     Q.    By cutting -- you cut them all up?

9     A.    Yes, ma'am.  We basically scrapped them.

10    Q.    What was the -- what would be your estimate for the scrap

11    value of -- of the cards?

12    A.    Scrap -- scrap value, probably not very high.  I'd

13    probably say in the -- 20, $30.  It's probably, I'd say, a

14    thousand dollars, $1200 of raw material that we ended up

15    scrapping.

16    Q.    And so you expected -- if you had taken it to a scrapyard,

17    you would expect to get about 20 or $30 back?

18    A.    Yes, ma'am.

19           MS. TAYLOR:  Your Honor, I want to ask the witness to

20    look at Exhibits -- these three boxes up here.  I need

21    Mr. Mesrobian's assistance.

22           THE COURT:  Go ahead, Mr. Mesrobian.

23       (Pause in proceedings.)

24           THE COURT:  And, Ms. Taylor, when you get back to the

25    podium, for purposes of the record, if you could tell us the

1  numbers of those exhibits.

2          MS. TAYLOR:  Yes, Your Honor.

3          THE COURT:  Thank you.

4  BY MS. TAYLOR:

5  Q.   Mr. Clarkson, the boxes in front of you should have labels

6  on them that say 57A, 57B, and 57C; is that correct?

7  A.   Yes, ma'am.

8  Q.   Oh, sorry, 58A, B, and C.

9  A.   Yes, ma'am.

10 Q.   Okay.  Now, looking at those boxes, do you recognize them?

11 A.   Yes, ma'am.

12 Q.   And how do you recognize them?

13 A.   Well, I mean, I can see inside the boxes.  So we -- we

14 made these cards.  I'm not sure if these are our boxes or not.

15 Q.   But those are the cards that you made?

16 A.   Yes, ma'am.

17 Q.   And they're the cut-up cards that you were describing?

18 A.   Yes, ma'am.

19 Q.   And so for all of that scrap metal that's in those three

20 boxes, you thought you'd get probably 20 or $30 at the

21 scrapyard?

22 A.   Yes, ma'am.  It's not worth much.

23 Q.   Mr. Clarkson, did you talk to Mr. Ervin again after your

24 meeting with the other members of Orange Park Machine?

25 A.   Yes, ma'am.  Once we -- once we figured it out -- figured

1   out what they were, I called Justin and was pretty upset that

2   he had kind of deceived us of what -- what these parts were.

3   Q.   Did you confront him about that?

4   A.   Yes, ma'am.

5   Q.   Did you tell him whether you would continue doing business

6   with him?

7   A.   Yeah.  Yes, ma'am.  We told him we wouldn't.  We have

8   essentially just cut up all the cards.

9        I got a phone call.  We ended up meeting the next

10  day.  I gave him his -- his deposit down for -- for this order,

11  and we just destroyed it all, deleted the files, and just tried

12  to cut ties.

13  Q.   With the money that you gave back to Mr. Ervin, was it in

14  excess of a thousand dollars?

15  A.   It -- yes, ma'am.

16  Q.   Did you have him come to your office for that meeting?

17  A.   No, ma'am.  We met at a -- at a local restaurant up the

18  street.

19       MS. TAYLOR:  Ms. Ganoe, could we have Exhibit 56,

20  page 8.

21  BY MS. TAYLOR:

22  Q.   These are -- okay.

23       These are your text messages with Mr. Ervin, correct?

24  A.   Yes, ma'am.

25  Q.   After you had the phone call with him, did you -- did

1  these text messages follow the phone call?

2  A.   Yes, ma'am.

3  Q.   And the first text message is February 22nd at 2:02 p.m.,

4  correct?

5  A.   Yes, ma'am.

6  Q.   Is that before the meeting?

7  A.   Yes, ma'am.

8  Q.   And Mr. Ervin texted, "Headed your way"?

9  A.   Yes, ma'am.

10 Q.   And then the next message is the same date, it looks like,

11 4:50 p.m.?

12 A.   Yes, ma'am.

13 Q.   And what did Mr. Ervin -- was that after your phone call?

14 A.   Yes, ma'am.

15 Q.   And what did Mr. Ervin text to you?

16 A.   "Check out notagunpart.com and check out autokeycard.com."

17 Basically, I think -- assuming those were the websites leading

18 to -- leading to his cards.

19       MS. TAYLOR:   And if we could have the next page,

20 Ms. Ganoe.

21       Actually.  Sorry.  Go back.

22 BY MS. TAYLOR:

23 Q.   And then he says -- he sends a message that starts,

24 "Jack."

25       Is that -- do you go by the name Jack?

1    A.    Yes, I go by Jack.

2    Q.    What did Mr. Ervin say to you?

3    A.    "Just so you know, the new model has one or many Js

4    representing the artist name, mine.  It's 100 percent First

5    Amendment activity, and I wanted to register my already idea,"

6    or something.

7    Q.    Moving on to the next page.

8    A.    "Genuine artwork."

9    Q.    I think it says genius artwork.

10   A.    "... genius artwork.  The intent is artwork, conversation

11   piece, satire of stupid ideas, my political protest."

12   Q.    And then he said, "If you have any questions, I'm here to

13   help you understand"?

14   A.    Yes.  Yes, ma'am.

15   Q.    And, "I'm sorry it went this way"?

16   A.    Yes, ma'am.

17   Q.    And then did he say, "You were at no risk at all.  It's

18   just an artwork idea and that's it"?

19   A.    Yes, ma'am.

20   Q.    "A picture on a card and a fresh start for me.  I have

21   even had offers to buy the company, Free Speech Industries LLC.

22   Call me if you need anything.  Your friend, Justin Ervin"?

23   A.    Yes, ma'am.

24   Q.    Had he described it before this as being artwork?

25   A.    Yes.  I think that the last meeting -- the last meeting we

1  had, he was calling -- calling it artwork.

2  Q.   But initially he had said it was a tool?

3  A.   It was a tool, was our first impressions of what we were

4  making.

5  Q.   What concerned you -- why were you so concerned when you

6  viewed his website?

7  A.   We got a -- I think we came across a YouTube video first

8  of him -- of somebody talking about the auto key cards and

9  their intended -- or their -- you know, what they could be used

10 for.

11 Q.   And what -- what did that video say they could be used

12 for?

13 A.   My impression --

14        MR. KING:  Your Honor, I'm going to object to -- I'm

15 going to object to hearsay.

16        THE COURT:  I'll ask the witness to testify about his

17 impression from it.

18        Go ahead.

19        THE WITNESS:  Under the impression that it was a gun

20 part.

21 BY MS. TAYLOR:

22 Q.   And does your business manufacture gun parts?

23 A.   No, ma'am.

24 Q.   Anything -- do you manufacture anything related to

25 firearms?

1    A.    No, ma'am.

2    Q.    And what's the reason -- do you have a reason for that,

3    or --

4    A.    Well, we've never -- we've never tried, so we've never --

5    we've never explored the legality of making gun parts.

6          But I guess more generally, it seems to be kind of a

7    race to the bottom.  There's -- you know, guns are relatively

8    cheap compared to the manufacturing that they entail.

9    Q.    And I think when we spoke before, you also expressed that

10   you had concerns that some of your -- your major customers

11   would not want you to be also in that industry?

12   A.    Absolutely.  Absolutely.

13   Q.    So did you view it as a potential threat to your other

14   business if you would continue making these items?

15   A.    Yes, ma'am.

16         MS. TAYLOR:  Could we have the next page, please,

17   Ms. Ganoe.  We're on Exhibit 56, page 10.

18         Sorry.  The next page after this one, page 11.

19   BY MS. TAYLOR:

20   Q.    And did you -- you responded to Mr. Ervin's text message?

21   A.    Yes, ma'am.

22   Q.    And you stated, "Dude, I understand your position.  You

23   have got to understand mine.  I have an obligation to

24   understand my legal exposure and decide if this is something

25   that I can manufacture.  You should have been straightforward

1   with me from the beginning."

2           And then did you ask, "How is it scaled, 1 to 1?"

3   A.   Yes, ma'am.

4   Q.   Why did you ask, "How is it scaled?"

5   A.   You know, if -- my concern was that if it -- if it was

6   artwork, it wouldn't -- it wouldn't have been scaled or

7   wouldn't have been functional.  So I was trying to figure out

8   if it -- if it -- if it could have been used, you know, in a

9   gun effectively.

10  Q.   Okay.  And then Mr. Ervin responded and said, "I

11  understand your position too.  I apologize for any

12  inconvenience.  Have your people look at it, and we will

13  continue to grow the business together"?

14  A.   Yes, ma'am.

15          MS. TAYLOR:  And could we have the next page,

16  Ms. Ganoe.

17  BY MS. TAYLOR:

18  Q.   All right.  And is that -- was that the last time you

19  interacted with Mr. Ervin?

20  A.   Yes, ma'am.

21          MS. TAYLOR:  Your Honor, may I have a moment?

22          THE COURT:  You may.

23      (Pause in proceedings.)

24          MS. TAYLOR:  I have no further questions, Your Honor.

25          THE COURT:  Mr. Larosiere?

1          MR. LAROSIERE:  Yes, Your Honor.

2          THE COURT:  Go ahead.

3          MR. LAROSIERE:  May it please the Court?

4          THE COURT:  Go ahead.

5                    CROSS-EXAMINATION

6    BY MR. LAROSIERE:

7    Q.   Hey, Mr. Clarkson.

8    A.   Hey.

9    Q.   I won't take a bunch of your time.

10        So Mr. Ervin gave you a DXF file, right?

11   A.   Yes.

12   Q.   Drawing Exchange Format, right?

13   A.   Yes, sir.

14   Q.   And that's just a two-dimensional series of lines --

15   A.   Yes, sir.

16   Q.   -- right?

17   A.   Yes, sir.

18   Q.   Okay.  So from just a DXF, you wouldn't be able to know

19   how thick something should be, right?

20   A.   No.

21   Q.   That's incorrect?

22   A.   That is correct.  We wouldn't -- it doesn't have the

23   thickness in there.

24   Q.   Right.

25   A.   Just a -- just a sketch on a sheet of paper.

1  Q.   Exactly.

2       Oh, so a DXF is like you're saying.  It's a digital

3  sketch, basically.

4  A.   Digital sketch.

5  Q.   All right.  Cool.

6       So tell me, what's the model of the laser you used

7  for this?  It's a large fiber laser, correct?

8  A.   Yes, sir.  It's an Amada 3 kilowatt Ensis fiber laser.

9  Q.   3 kilowatts, so that's -- so that's a lot of wattage.

10 A.   A lot of wattage.

11 Q.   Right.  And do you advertise that you can do etchings?

12 A.   No.

13 Q.   But you generally represented, at least to this

14 individual, that you can etch?

15 A.   We can etch, yes.

16 Q.   Right.  And so the reason the etching was hard was because

17 of how different the laser parameters are between etching and

18 cutting, right?

19 A.   You're just -- we're turning down -- we're turning down

20 the -- you know, the power of the laser so it's not cutting

21 through the material.

22 Q.   Turning it down substantially, right?

23 A.   Yes, substantially.

24 Q.   And adjusting, perhaps, the frequency?

25 A.   Yes, sure.

1   Q.   And the laser speed as well?

2   A.   Yes.

3   Q.   So the reason it takes longer, would you agree, is not

4   because it's more difficult or more intensive, but rather

5   you're having the laser be more intentional, right?

6   A.   Yeah.  It's just less wattage, less -- less energy so it's

7   not cutting all the way through the material.

8   Q.   And so when somebody asks you to etch something, the

9   settings that you would put into your laser are night and day

10  compared to the settings for cutting a part out.

11           Would you agree?

12  A.   I wouldn't call it -- I mean ...

13  Q.   Let me ask it another way.

14  A.   Okay.

15  Q.   Would an operator at your shop get confused between the

16  two?  Like, if it was set to etch, it -- would an operator

17  think that it was going to cut?

18  A.   No.  Part -- well, part of what we're doing, we use a

19  variety of different softwares, but we can -- the DXF file, we

20  can highlight the lines in different colors --

21  Q.   Right.

22  A.   -- to assign different tasks.

23  Q.   Okay.

24  A.   We have a red line that cuts, a blue line that etches.

25  Q.   Right.  But whoever's putting those in -- right? --

1   there's a -- there's a big difference between cutting

2   through --

3   A.    Yes.

4   Q.    -- and etching.

5   A.    Yes.

6   Q.    Okay.

7   A.    Yes.

8   Q.    So when you etch, you talked about it being a reductive

9   process, right, removing material?

10  A.    Yes, sir.

11  Q.    Would it -- would it surprise you to -- if you had found

12  after etching that less than a thou of material had been

13  removed?

14  A.    That sounds -- I mean, a thou is probably what a decent

15  etch would be.

16  Q.    And that's one thousandth of an inch, correct?

17  A.    Yes.

18  Q.    So less than the thickness of a human hair, right?

19  A.    Sure.

20  Q.    And the laser, doesn't it kind of discolor the material

21  below the surface as well?

22  A.    I couldn't comment on that.  It does oxidize around --

23  around the cutting surface.

24  Q.    Around the area the laser's passed?

25  A.    Yes, sir.

 1  Q.   Okay.  So it's possible -- would you say that sometimes

 2  when you etch metal, it's difficult to even feel where it is?

 3  A.   We can do a couple different types of etching.  We can do

 4  a deep etch, or we can do just basically an oxidation burn over

 5  the material that you could -- you could potentially smudge off

 6  or wipe off.

 7  Q.   Right.

 8  A.   We use that mostly when we assemble parts.  We can wipe

 9  them down afterwards and remove the -- the part number code is

10  essentially what we typically etch.

11  Q.   All right.  Great.

12       So when you etch something onto a piece of steel,

13  assuming it's 18 gauge or thicker, you're not going to be able

14  to sit there with your thumbs and pop it out, right?

15  A.   No.

16  Q.   No.  It's effectively drawing?

17  A.   We're not -- the integrity of the overall part isn't

18  changing much.

19  Q.   Unchanged.

20  A.   (Nods head up and down.)

21  Q.   Okay.  Awesome.  Thank you so much for that.

22       So --

23            MS. TAYLOR:  Your Honor, can I have sidebar?

24            THE COURT:  Yes.

25       (At sidebar, out of the hearing of the jury:)

1           THE COURT:  Mr. Larosiere?

2           MR. LAROSIERE:  I'm moving on now.

3           THE COURT:  Well, no.  You need to stop saying "cool"

4  and "awesome" and "thank you for that" when you get an answer

5  that you like.  That's not appropriate.

6           I assume that was the objection, Ms. Taylor?

7           MS. TAYLOR:  Yes, Your Honor.

8           MR. LAROSIERE:  I'm so sorry.

9           THE COURT:  So let's cut that out.

10          MR. LAROSIERE:  I'm so sorry.

11          THE COURT:  It's okay.

12          MR. LAROSIERE:  I'll be very cognizant of it.

13          THE COURT:  Okay.

14      (End of discussion at sidebar.)

15  BY MR. LAROSIERE:

16  Q.   Moving on now.

17          So we talked about a belt sander, right?

18  A.   Yes.

19  Q.   Harbor Freight model, green guy?

20  A.   Yes, sir.

21  Q.   A pretty standard piece of kit?

22  A.   Yes, sir.

23  Q.   And you understand that this was being used to -- you said

24  regrain the steel?

25  A.   Yeah.  I believe he had some type of like Scotch-Brite

 1    belt that he was pressing onto the material to -- to regrain

 2    it.

 3    Q.    Okay.  And what, in your opinion, would that do to the

 4    steel?

 5    A.    It will stripe -- stripe the material, essentially making

 6    the finish -- so basically taking it from a raw piece of steel

 7    to something that looks like a stainless refrigerator.

 8    Q.    Right.  So is that reductive?  Is that removing a little

 9    bit of material?

10    A.    Yeah, potentially, yeah.

11    Q.    All right.  Maybe up to a thou --

12    A.    I don't think --

13    Q.    -- thousandth of an inch?

14    A.    I don't think you could remove that much.  I mean, you

15    potentially could.  It just depends on how -- how hard you

16    grind into it.

17    Q.    Right.  So you potentially could remove up to a thousandth

18    of an inch doing it, depending?

19    A.    Yeah.  Yes, sir.

20    Q.    Okay.  And you talked about these things being made of 18

21    gauge steel, and you call that a thickness of, like, 043 of an

22    inch?

23    A.    043.

24    Q.    But you kind of hesitated.

25          Is that because gauged isn't really correlated with

1    an exact thickness?

2    A.   It is correlated with -- with a spec of thicknesses so

3    there's a tolerance.

4    Q.   Right.  It's a range.

5    A.   Yeah.  You know, I -- I just couldn't necessarily give you

6    the thickness off the top of my head.  But 043, I believe, is

7    the correct material thickness for 18 gauge.  There's a 5 or 6

8    thou intolerance in that.

9    Q.   And that's.

10   A.   There's a wide spec of material.

11   Q.   Thank you so much.

12        And that's 5 or 6 thousandths of an inch, so meaning

13   it could be --

14   A.   Yes.

15   Q.   You know, if you cut one spot, it could be 048, or if you

16   cut one spot, it could be 038.

17        Is that what you're saying?

18   A.   Yes.

19   Q.   Okay.

20        MR. LAROSIERE:  I think that's all I have for you.

21   Thank you so much.

22        THE WITNESS:  Well -- yeah.

23        THE COURT:  Mr. King?

24        MR. KING:  May it please the Court?

25        THE COURT:  Go ahead.

1                        CROSS-EXAMINATION

2    BY MR. KING:

3    Q.   Good afternoon -- good morning, Mr. Clarkson.  I

4    apologize.

5             I wanted to just ask you a couple questions kind of

6    generally about your business.

7             It's a -- it's not just you and one or two employees.

8    Is that fair to say?

9    A.   Yes, sir.

10   Q.   How many employees do you have, roughly?

11   A.   I think we have about 25 currently.

12   Q.   And, you know, you kind of indicated that this was about

13   as small of a project as y'all did?

14   A.   This is, yeah, an untypical project.

15   Q.   And -- and I don't need to get into the -- too many of the

16   details of your business, but in the scope of things, y'all are

17   doing, dollarwise, significantly bigger projects.

18   A.   Yes, sir.

19   Q.   Some of those are for government and government contracts?

20   A.   Yes, sir.

21   Q.   And those are -- that's how you make your money.

22   A.   Yes, sir.

23   Q.   I think it would be fair to say that, you know, a couple

24   thousand dollars, and you had a couple thousand, probably, in

25   material with this?

1   A.    Yes.

2   Q.    And so you're making a couple -- by the time you actually

3   pay your employees for going through it, you're not making very

4   much money.

5   A.    Low-margin project.

6   Q.    And, in fact, you raised the price because it was

7   significantly more labor intensive than you thought and were

8   making little -- little to no money; is that fair?

9   A.    Yes, sir.

10  Q.    And as a business owner, you're -- you know, the goal is

11  to make money.

12  A.    Yes, sir.

13  Q.    And nothing wrong with that, by the way.

14        And the -- and I guess my point is twofold.  One is

15  in terms of the things that were going to pay your employees

16  and generate revenue, this was -- you might have had better

17  luck with a metal detector outside finding loose change.  Is

18  that --

19  A.    This is not -- not a winner for the shop, yes, sir.

20  Q.    And if it had a -- you guys have been talking about thous.

21  I guess that's one in a thousand?

22  A.    One thousandth of an inch.

23  Q.    If this had, I guess, a one-in-a-thousand chance of

24  causing you to have to come to court or taking time out of the

25  business, that would go away almost entirely?

1    A.    Yes, sir.

2    Q.    So even if the risk is approaching zero, if it's not zero

3    for something that you're really not making money on it, it's

4    not a business that you really want or need.

5    A.    Yes, sir.

6    Q.    And frankly, even if that chance was zero, this was close

7    to a thing that was not worth the amount of time and effort

8    y'all had into it.

9    A.    Yes, sir.

10   Q.    And this was something that -- I mean, he's -- he's

11   calling you about something that's, if not losing you money,

12   coming close to it and taking up your time?

13   A.    Yes, sir.

14   Q.    Taking up your employees' time?

15   A.    Yes, sir.

16   Q.    And so putting everything else aside -- I mean, I know

17   we're in a courtroom here, but putting all of that aside, this

18   was just not -- not something y'all wanted to do, really,

19   and -- is that fair?

20   A.    Yes, sir.

21   Q.    I want to talk to you a little bit more about -- sorry.

22   I'm doing the thing with the microphone.  It's starting to go

23   again.

24          I want to talk to you a little bit because I want to

25   make sure I understand.

Case 3:21-cr-00022-MMH-MCR  Document 280  Filed 06/06/23  Page 71 of 316 PageID 5045

1    It's possible for you to do what you said is an

2  oxidation kind of mark?

3  A.    Yeah, to shallow edge or ...

4  Q.    And if I ran that with the belt sander that we've been

5  talking about, if I tried to polish that, it would go away

6  completely.

7  A.    Yes.

8  Q.    During your time with Mr. Ervin, did he ever say, "Hey, I

9  want to get it so -- cut so deep that it would be easy to push

10  out or punch out"?

11  A.    (Shakes head from side to side.)

12  Q.    I'm sorry?

13  A.    No.

14  Q.    Did he ever -- did he ever try to get you to cut it deeper

15  or thicker?

16  A.    He wanted it deep enough that the lines would stay on the

17  card.

18  Q.    So his only concern was that once it was polished, the

19  lines wouldn't disappear.

20  A.    Yes, sir.

21  Q.    He didn't want it any deeper than that, and y'all had no

22  conversations about that.

23  A.    No, sir.

24  Q.    And that's what you attempted to do.

25  A.    Yes, sir.

1   Q.    In terms of kind of metal parts, is there -- if

2   something's a metal part, is there a real need for it to be

3   aesthetically pleasing for the most part?

4   A.    Yeah.  I mean, we -- finishing is a big part of what we

5   do.

6   Q.    For -- and that was the part that Mr. Ervin was concerned

7   about, was the physical appearance.

8   A.    Yes, sir.

9   Q.    And the things where he was upset with you or your shop

10  had entirely to do with how it -- how it looked, the

11  aesthetics?

12  A.    Yes, sir.

13  Q.    And that was -- and he was trying to get you to belt sand

14  it to make it as shiny and pretty as possible.

15  A.    Yes, sir.

16  Q.    And the only concern he had with the thickness was to make

17  sure that when he made it shiny and pretty, it didn't destroy

18  what was on there.

19  A.    Yes, sir.  Yes, sir.  We were trying to find the balance

20  between cutting the material or making it look ugly and making

21  it presentable.

22  Q.    And in terms of designing how thick and stuff like that,

23  that's entirely y'all's department.  That's not something he

24  said, "I need it this thick"?  It would -- you know --

25  A.    Yes, sir.  Yes, sir.

1    Q.    And that was a decision y'all made just -- nothing --

2    nothing secretive here, but probably just how to get it to work

3    on your machine to where once it was polished, it would still

4    work.

5    A.    Yes, sir.  Basically it was what our machine could do.  We

6    spent a lot of time kind of dialing in this deep etch, which we

7    don't do a lot of.

8    Q.    And that kind of ties back into what we were saying

9    before --

10   A.    Right.

11   Q.    -- about this being not so great for your business?

12   A.    Yes, sir.

13           MR. KING:  Your Honor, I have nothing further.

14           Thank you, sir.

15           THE COURT:  Ms. Taylor?

16           MS. TAYLOR:  Yes, Your Honor.

17                       REDIRECT EXAMINATION

18   BY MS. TAYLOR:

19   Q.    Mr. Clarkson, is it unusual amongst your customers who are

20   making parts that they care about the aesthetics of how those

21   parts look?

22   A.    No, ma'am.

23   Q.    Do most of them care about how their parts look?

24   A.    Everybody cares, yes, ma'am.

25   Q.    And that's even if it's like a useful article, correct?

1    A.   Yes, ma'am.

2    Q.   The cards that are in the three boxes next to you, those

3    are 58A, B, and C, correct?

4    A.   Yes, ma'am.

5    Q.   Those have not had the surface conditioning done to them

6    that Mr. Ervin -- you understood Mr. Ervin to be doing himself?

7    A.   Yes, ma'am.

8    Q.   So whatever the thickness is of those cards, that was how

9    they -- how thick they would be when they left your shop?

10   A.   Yes, ma'am.

11   Q.   Okay.  And Mr. Ervin was clear that he wanted that line to

12   still be visible after he -- after he did his surface

13   conditioning?

14   A.   Yes, ma'am.

15            MS. TAYLOR:  I have no other questions, Your Honor.

16            THE COURT:  Anything else?

17            MR. KING:  No, Your Honor.  Thank you.

18            MR. LAROSIERE:  No, Your Honor.  Thank you.

19            THE COURT:  You may step down, sir.

20            MR. MESROBIAN:  Your Honor, I'll move 58 back to the

21   table.

22            THE COURT:  Thank you.

23            And this witness is released, correct?

24            MS. TAYLOR:  Yes, Your Honor.

25            MR. KING:  Yes, Your Honor.

```
 1              THE COURT:  Sir, you can head out that --
 2              THE WITNESS:  Yes, ma'am.  Thank you.
 3         (Witness excused.)
 4              MS. TAYLOR:  Our next witness is Joncarlos Ruiz.
 5              THE COURT:  Joncarlos Ruiz.
 6         (The witness entered the courtroom.)
 7              THE COURT:  Sir, I'll ask you to come all the way up
 8    here.
 9              And if you'll remain standing for just a moment to be
10    sworn.
11              COURTROOM DEPUTY:  If you could please raise your
12    right hand for me.
13              Do you solemnly swear that the testimony you're about
14    to give before this Court will be the truth, the whole truth,
15    and nothing but the truth, so help you God?
16              THE WITNESS:  I do.
17              COURTROOM DEPUTY:  You may have a seat.
18              And if you could please state your name for the
19    record and spell your first and last name.
20              THE WITNESS:  Joncarlos Ruiz, J-o-n-c-a-r-l-o-s,
21    R-u-i-z.
22              THE COURT:  Go ahead, Ms. Taylor.
23              JONCARLOS RUIZ, GOVERNMENT'S WITNESS, SWORN
24                        DIRECT EXAMINATION
25    BY MS. TAYLOR:
```

1   Q.   Mr. Ruiz, could you please tell the jurors where you work.

2   A.   I work at Orange Park Machine --

3   Q.   And what --

4   A.   -- & Fab.

5   Q.   -- do you do there?

6   A.   So I -- I'm their fiber laser tech.  Yeah.

7   Q.   And what does that -- what does that entail?

8   A.   So I run their fiber laser.  It's -- you mean a --

9   Q.   Yeah.  What sort of things do you do day to day?

10  A.   So I put in the programs in our fiber laser.  You know, I

11  buy material, sheet metal there and -- yeah.

12  Q.   Do you also work with customers on --

13  A.   Every -- every now and then, you know, if we have people

14  come in.  Like, if Patrick, you know, is busy, then I'll kind

15  of take charge of that too.

16  Q.   When you say Patrick, are you referring to Mr. Breslend?

17  A.   Yes.

18  Q.   Okay.  Do you ever work on -- work directly with customers

19  on refining designs?

20  A.   Yes.

21  Q.   And could you please tell the jurors, is there anyone in

22  this courtroom who you recognize from your work at Orange Park

23  Machine, anyone who was a customer of Orange Park Machine?

24  A.   In this room?

25  Q.   Yes.

 1  A.   Yes.

 2  Q.   And who is that?

 3  A.   Mr. Justin.

 4  Q.   And is that Justin Ervin?

 5  A.   Yes, sir -- or yes, ma'am.

 6  Q.   Could you please describe which individual you're

 7  identifying as Justin Ervin?

 8  A.   As far as?

 9  Q.   Describe what he's wearing and where he's -- where he is.

10  A.   Yeah.  He's to my right wearing a --

11          MR. KING:  I apologize.  We'd stipulate to

12  Mr. Ervin's ID.

13          THE COURT:  The record will reflect that the witness

14  identified Mr. Ervin.

15          Go ahead, Ms. Taylor.

16  BY MS. TAYLOR:

17  Q.   What was your -- so you worked with Mr. Ervin in your

18  capacity at Orange Park Machine?

19  A.   Right.

20  Q.   And what -- what exactly was your interaction with

21  Mr. Ervin?

22  A.   So, you know, he just kind of needed some help with a -- I

23  guess an idea he had, and, you know, I just kind of worked with

24  him into -- you know.

25  Q.   Did you personally work on helping him refine the computer

1   file --

2   A.   Yes.

3   Q.   -- for his project?

4   A.   Yes.

5   Q.   What kind of file was that?

6   A.   So it was a DXF file.  He gave me a DXF file, and, you

7   know, of the -- of -- yeah, to the -- the key card and all

8   that.

9   Q.   Okay.  So it was for something you knew to be called a key

10  card?

11  A.   Well, I didn't -- no, I did not know at the time what it

12  was called, but ...

13  Q.   When you initially started working with Mr. Ervin, what

14  did you understand his products to be?

15  A.   Artwork.

16  Q.   Is that what he told you it was?

17  A.   Uh-huh.

18  Q.   Yes?

19  A.   Yes.

20  Q.   Okay.  And were there issues with the DXF file that you

21  helped Mr. Ervin resolve?

22  A.   Yes.  So when he gave me the files -- I mean, just small

23  little errors.  I mean, like the -- you know, in our -- in the

24  fiber laser, like the shapes have to be complete, and if

25  they're not complete, it won't run in the machine.  So I just

1    kind of refined them and made them work.

2    Q.   And when you were in the process of doing that, did you

3    consult with Mr. Breslend about making the changes you were

4    making?

5    A.   I'm not sure.

6    Q.   Okay.  Did you have any correspondence with Mr. Ervin

7    while he was a customer of Orange Park Machine, meaning text

8    messages?

9    A.   Yes.

10        MS. TAYLOR:  Your Honor, may I approach the witness

11   with Exhibit 55?

12        THE COURT:  Yes.

13   BY MS. TAYLOR:

14   Q.   Would you please -- I've handed you -- it's an envelope

15   that has an Exhibit 55 sticker on it, correct?

16   A.   Yes.

17   Q.   Could you go ahead and open up that envelope and tell the

18   jurors just in general what's inside of that envelope.

19        THE COURT:  Ms. Taylor, let me stop you.

20        Before you get into the exhibit, why don't we go

21   ahead and take our morning break.

22        MS. TAYLOR:  Yes, Your Honor.

23        THE COURT:  So, ladies and gentlemen, it's about

24   10:50.  We'll take 15 minutes.  I'll ask you to be back in the

25   courtroom -- or back in the jury room prepared to come back in

1   at 11:05.

2           Please remember not to discuss the case with one

3   another, your family, or anybody else, and please don't allow

4   anybody to speak to you or in your presence about the case.  If

5   anyone should do so, please notify the court security officer

6   immediately.

7           Please do not read, watch, or listen to any media

8   reports or conduct any independent research, whether by

9   conversation or by computer or the Internet, about anything

10  relating to the case.

11          And do not form or express any opinions as you've not

12  yet heard all the evidence or my instructions on the law.

13          We'll see you back at 11:05.

14          COURT SECURITY OFFICER:  All rise for the jury.

15      (Jury out at 10:50 a.m.)

16          COURT SECURITY OFFICER:  Please be seated.

17          THE COURT:  All right, sir.  You may step down.  Just

18  be ready to come back in the courtroom at 11:05, okay?

19          THE WITNESS:  Yes.

20          THE COURT:  We're in recess.

21          COURT SECURITY OFFICER:  All rise.

22      (Recess from 10:51 a.m. until 11:07 a.m.; all parties

23  present.)

24      (Outside the presence of the jury:)

25          COURT SECURITY OFFICER:  All rise.  This Honorable

 1    Court is now in session.

 2              Please be seated.

 3              THE COURT:  Let's have the jury, please.

 4              Did we get Mr. Hoover some cough drops?

 5              COURTROOM DEPUTY:  Yes, Your Honor, I did.

 6              THE COURT:  Okay.  Thank you.

 7              Cough drops are in high demand in this courtroom.

 8              COURTROOM DEPUTY:  That's the family size.

 9              COURT SECURITY OFFICER:  All rise for the jury.

10        (Jury in at 11:08 a.m.)

11              COURT SECURITY OFFICER:  Please be seated.

12              THE COURT:  All right.  You may continue, Ms. Taylor.

13              MS. TAYLOR:  Yes, Your Honor.

14    BY MS. TAYLOR:

15    Q.   Mr. Ruiz, I think right before the break, you were about

16    to open Exhibit 55 and let the jurors know what's inside.

17    A.   Right.

18    Q.   Did you open it?

19    A.   No.

20    Q.   Go ahead and open it now, please.

21              Do you need scissors?

22    A.   I don't think so.

23    Q.   If you could just describe in general what's in there.

24    A.   Yeah.  So these are the text messages between Justin and

25    I.

1    Q.   Mr. Ervin?

2    A.   Yes.

3         MS. TAYLOR:  Your Honor, move for admission of

4    Exhibit 55.

5         THE COURT:  Any objection?

6         MR. KING:  No, Your Honor.

7         MR. LAROSIERE:  No objection, Your Honor.

8         THE COURT:  55 is admitted, and you may publish as

9    you wish.

10        MS. TAYLOR:  Yes, Your Honor.

11       (Government's Exhibit 55 was received in evidence.)

12        MS. TAYLOR:  I'm going to retrieve the exhibit and

13   put it on the ELMO.

14        THE COURT:  Go ahead.

15   BY MS. TAYLOR:

16   Q.   All right.  Let's look at the first -- this is the first

17   text message, correct?

18   A.   Right.

19   Q.   And, now, looking at this exhibit, are you able to see the

20   date of that text message?

21   A.   Not really, no.

22   Q.   Trying to make it a little bit less glare.

23        Now can you see the date?

24   A.   Yeah.  It's kind of hard to read that.  It's a little

25   blurry.  Just a little.

1   Q.   Does it indicate October?

2   A.   Yeah.  You can say that, yeah.

3   Q.   October -- and then does it look like it's a 2 with

4   another number behind it?

5   A.   Yeah, 2 -- yeah, 2 something.

6   Q.   Okay.  So sometime in late October?

7   A.   Correct.

8   Q.   Okay.  And in this first message there is a picture that's

9   sent.

10          Was this sent by you to Mr. Ervin, this top picture?

11  A.   Was that sent by me?

12  Q.   Yes.

13  A.   Yes.  Yes.

14  Q.   And what's depicted in that -- in that top picture?

15  A.   Just all the cards laid out.

16  Q.   These are the cards that you were manufacturing for

17  Mr. Ervin?

18  A.   Right.  Correct.

19  Q.   And there's stacks of the different models of cards?

20  A.   Yes.

21  Q.   And then this next picture, did you also send that to

22  Mr. Ervin?

23  A.   Yes.

24  Q.   And what's depicted in this picture?

25  A.   So that is the -- the -- basically just the fiber laser

1    cutting out the cards.

2    Q.   Okay.  So they're all being cut out of one large sheet of

3    metal; is that accurate?

4    A.   Correct.  Correct.

5    Q.   And then did you -- are these your messages in the green

6    bubbles?

7    A.   In green, yes.

8    Q.   And Mr. Ervin's messages are in the black bubbles?

9    A.   Right.

10   Q.   Okay.  So you wrote to Mr. Ervin, "Good morning, Justin.

11   We got them all cut out except for a couple.  We are starting

12   the boxing process now"?

13   A.   Right.

14   Q.   And Mr. Ervin -- Mr. Ervin sent you some reply messages

15   back.

16        Can you read that date?  Is it still the October --

17   A.   Yeah, looks like the -- the 21st, right?  Yeah.

18   Q.   Yeah.  And then he stated that basically he hopes the

19   boxes have enough room and made arrangements to come pick some

20   up?

21   A.   Right.

22   Q.   And then here there was an image that was sent by

23   Mr. Ervin to you, correct?

24   A.   Right.

25   Q.   And then he sent a message, and this is also still from

1   late October, correct?  It looks like it says -- does it say

2   October 23rd?

3   A.   Yeah, looks like it.

4   Q.   Okay.  And he sent -- sent you this -- this image, a

5   close-up of two auto key cards, correct?

6   A.   Right.

7   Q.   And he stated, "I got all 400 of the smaller cards done,

8   cleaned up, bagged, and ready for sale.  I just went to start

9   on the 3 in 1s with the bottle opener.  I just noticed

10  something.  The spacing was never corrected."

11          Do you know what spacing he was referring to?

12  A.   Well, I want to say it was the -- it's kind of hard to

13  tell without pointing it out.  I would have to point that out,

14  but I want to say it's --

15  Q.   So I'm going to point to an area of the card, okay?

16  A.   So it's -- yeah.

17  Q.   Here there's a space between two different etchings,

18  correct?

19  A.   Right.

20  Q.   And this is the top space on the lower auto key card

21  that's pictured?

22  A.   Right.

23  Q.   And then on the bottom space of that same card, there's a

24  space between two etchings, correct?

25  A.   Correct.

1   Q.   And is it smaller?

2   A.   Yes.

3   Q.   Is that -- do you know whether that's what he was

4   referring to when he talked about the spacing?

5   A.   I'm not a hundred percent sure.  I want to say that's the

6   spacing we were talking about, but it's kind of hard to tell

7   for -- you know, to be sure.

8   Q.   Looking at the third page of the exhibit, did he also send

9   you this picture with a piece of metal pointing to that same

10  area?

11  A.   Right.

12  Q.   Does that refresh your recollection on what spacing issue

13  he was referring to?

14  A.   Yeah.  Sure.

15  Q.   Okay.  So it was the space -- this very -- it was a pretty

16  narrow space between those two etchings?

17  A.   Uh-huh.

18  Q.   And if you could say yes or no, please.

19  A.   Yes.  Sorry.

20  Q.   Okay.  And then he stated, "These are more clear pictures.

21  The first one was blurry"?

22  A.   Yes.

23  Q.   Oh, sorry.  I need to zoom out.

24          Is that what he said?

25  A.   Yes.

1  Q.   Okay.  Do you -- and then did you then write a message to

2  Mr. Ervin and state, "Sorry about that.  I just updated them on

3  my side.  Will you still be able to use them?"

4  A.   Yes.

5  Q.   And then did Mr. Ervin respond, "I'm not even sure.  The

6  problem is if one of the YouTubers sees it and talks about it

7  on their video, hundreds of thousands of people would see the

8  flaw when their video goes live.  Check with Jack and see what

9  solution he comes up with.  We can talk about it Monday"?

10 A.   Yes.

11 Q.   And who is Jack?

12 A.   My boss, Jack.

13 Q.   And is his last name Clarkson?

14 A.   Yes.

15 Q.   And then there's a message here on this page also dated,

16 looks like, October possibly 25th?

17 A.   Right.

18 Q.   And Mr. Ervin stated, "Headed your way.  I have to stop by

19 the bank and will see you about 3:30."  Is that correct?

20 A.   Yes.

21 Q.   And then you replied, "Sounds good"?

22 A.   Yes.

23 Q.   And then on November 12th -- well, it looks like either

24 November 12th or some number with a 1 in front of it; is that

25 accurate?

1   A.   Yes.

2   Q.   Did Mr. Ervin write to you and state, "Hey, how many guys

3   are at the shop?  I need to come see you and place another

4   order," and then state that he wanted to bring chicken

5   biscuits?

6   A.   Yes.

7   Q.   And then later in November -- I'm turning to the next page

8   of the exhibit -- there are some messages from possibly

9   November 16th?

10  A.   Yes.

11  Q.   And -- and Mr. Ervin stated, "Hey, can I come see you this

12  afternoon and we can add the copyright symbols to the new cards

13  on my order?  It won't take long, maybe 30 minutes.  What time

14  is good?"

15  A.   Yes.

16  Q.   Do you know why Mr. Ervin wanted to add copyright symbols?

17  A.   I don't know.

18  Q.   Was that usual, for your shop to be putting copyright

19  symbols on metal parts?

20  A.   No.

21  Q.   Now, then, in November -- appears to be November 17th; is

22  that correct?

23  A.   Right.

24  Q.   You sent this image to Mr. Ervin?

25  A.   Yes.

1    Q.   And is that a copyright symbol in the middle of the card?

2    A.   Looks -- it looks like it, yeah.

3    Q.   Okay.  And then you stated, "Was a little worried about

4    the copyright symbol being too small.  What do you think?"

5    A.   Correct.

6    Q.   And then did Mr. Ervin respond, "I think that is correct.

7    Maybe the circle larger so the C is more visible"?

8    A.   Yes.

9    Q.   And then did you send him another image with multiple

10   copyright symbols on a card?

11   A.   Yes.

12   Q.   And did you state, "I think it looks a lot better.  Also

13   put the symbol in other spots just in case you ever want to

14   move it"?

15   A.   Yes.

16   Q.   So were you just providing him with options for where to

17   place the copyright symbol?

18   A.   Yes.

19   Q.   And then did you send him subsequently another image with

20   different models of cards with the copyright symbol on them?

21   A.   Yes.

22   Q.   And then did Mr. Ervin state, "Good to go.  I like them.

23   Approved for final production.  Thank you.  Good job"?

24   A.   Yes.

25   Q.   Later in November -- looks like November 20 something,

1    correct?

2    A.    Right.

3    Q.    Did Mr. Ervin text you and state, "Hey, I got those larger

4    baseball card boxes in on Saturday.  I would like to bring them

5    by this afternoon.  How are we doing on the new order

6    production?  I only have 20 cards left, and they are selling

7    good.  I am almost totally out.  Looking for a status update"?

8    A.    Yes.

9    Q.    And did you then respond and provide Mr. Ervin with some

10   information about how many cards you had ready for him?

11   A.    Yes.

12   Q.    And then did he send you other messages as well checking

13   on status of the cards, asking when they would be available,

14   and asking to come by and pick up partial orders?

15   A.    Yes.

16   Q.    And there's a message on -- on this page as well about

17   surface conditioning, correct?

18   A.    Yes.

19   Q.    Oh, sorry.  I'll read the message.

20         Did Mr. Ervin send you a message saying, "I'm fine

21   with it.  I can wipe them to help speed up the process.  The

22   customers are ready to buy.  I want to get them back in stock

23   ASAP.  I still have to surface condition them.  I hope to be

24   back in stock for Black Friday.  Thanks for your hard work.

25   See you about 3:00"?

1   A.   Yes.

2   Q.   At some point did you participate in a meeting with --

3   with Mr. Ervin and Mr. Clarkson and Mr. Breslend?

4   A.   Yes.

5   Q.   Well, actually, sorry, before we get to that, let me ask

6   you about this -- this particular interaction between you and

7   Mr. Ervin.

8          This is a text message on the right side of a page of

9   your messages, and there's a hand drawing right below the

10  message, correct?

11  A.   Correct.

12         THE COURT:  Ms. Taylor, can you tell us what page

13  that is?

14         MS. TAYLOR:  Yes, Your Honor.  I'll have to count.

15         Oh, sorry, it's page 10, Your Honor.

16         THE COURT:  Okay.  Go ahead.

17  BY MS. TAYLOR:

18  Q.   In this message, did Mr. Ervin state, "There are two ideas

19  I have.  I took pictures of both.  The only difference is the

20  line at the top is segmented.  We are on taking out the

21  straight part a little to create a new artistic design to be

22  interesting.  Save the original files as we will still make

23  those from time to time.  These will be a new design, bringing

24  the total number of designs to nine.  We will work on the

25  coaster next for the tenth design"?

1    A.    Correct.

2    Q.    And is this -- this drawing on a piece of paper, is that

3    something Mr. Ervin texted you a picture of?

4    A.    Yes.

5    Q.    Now, when he texted you that picture with this new idea,

6    he wanted -- essentially he wanted these breaks to be made in

7    the straight lines; is that correct?

8    A.    Yes.

9    Q.    Did he then come and make alterations to the DXF file that

10   would tell the -- tell the laser how to draw this onto the

11   metal?

12   A.    You're asking if he did it?

13   Q.    Right.

14   A.    No.

15   Q.    Who did it?

16   A.    I did.

17   Q.    Did you directly take this exact image that Mr. Ervin sent

18   you and use it for the laser process, or did you refine it,

19   make the lines straight, and make it to the correct dimensions

20   at Mr. Ervin's direction?

21   A.    (No response.)

22   Q.    Let me rephrase my --

23   A.    Yeah.  I'm kind of --

24   Q.    Let me rephrase my question.

25   A.    -- kind of confused.

1   Q.   Is this -- this image here that he texted you, is this

2   what the final etching that went onto the cards looked like?

3   A.   Yes.

4   Q.   Is it exactly like this, or did you take this drawing or

5   the idea and --

6            MR. KING:  Your Honor, I'll object to leading.

7            THE COURT:  Rephrase, Ms. Taylor.

8   BY MS. TAYLOR:

9   Q.   Who actually altered the DXF file to reflect these

10  alterations Mr. Ervin was requesting?

11  A.   Who did?

12  Q.   Who did --

13  A.   Me.

14  Q.   -- this?

15  A.   Yeah, I did.

16  Q.   Not Mr. Ervin?

17  A.   Well, he's -- he sent me those pictures -- you know, that

18  picture and asked to change the design to that picture, and

19  that's what I did.

20  Q.   Did you understand him asking you to change the design,

21  the original design that had been in the DXF file, just to have

22  these chunks taken out, or did you understand him asking you to

23  actually use this specific illustration and put that onto a

24  card?

25  A.   So the cards were solid before, and then he asked me to

1    change it to that design.

2    Q.   Could you take this drawing that Mr. Ervin did and put it

3    into the laser as it -- as it is right here?

4    A.   No.

5    Q.   Now, was there a meeting in February of 2021 that you

6    participated in with Mr. Ervin?

7    A.   Yes.

8    Q.   Who was present at that meeting?

9    A.   It was myself, Jack, and Patrick.

10   Q.   And Jack being Mr. Clarkson?

11   A.   Jack Clarkson and Patrick Breslend.

12   Q.   Okay.  At that meeting -- what was the purpose of the

13   meeting, if you know?

14   A.   I guess from what I remember, it was just a meeting about

15   the conditions of these cards.

16   Q.   And did you -- you sat through that meeting?

17   A.   Yeah.

18   Q.   And after the meeting what occurred?

19   A.   After the meeting I went home.  It was the end of the day,

20   so I went home.

21   Q.   And did you -- were you aware of any cards being cut up

22   after that meeting?

23   A.   No, not until the next day when we all came back in, or

24   until I came back in.

25   Q.   The next day you helped with cutting up the cards?

1   A.   I did not help, myself, you know, cutting up the cards,

2   but ...

3   Q.   Okay.  Do you know whether Mr. Ervin had any further

4   business with Orange Park Machine after that meeting?

5   A.   Can you say that again?

6   Q.   After that meeting did you interact with Mr. Ervin

7   anymore?

8   A.   I didn't, no.

9           MS. TAYLOR:  I have no further questions, Your Honor.

10          THE COURT:  Mr. Larosiere?

11          MR. LAROSIERE:  Yes, Your Honor.  Thank you.

12          THE COURT:  Go ahead.

13          MR. LAROSIERE:  Thank you.

14                      CROSS-EXAMINATION

15  BY MR. LAROSIERE:

16  Q.   Mr. Ruiz, have you ever seen my client, Matthew Hoover?

17  A.   You said Matthew Hoover?

18  Q.   Yeah.

19  A.   I don't know who that is.

20  Q.   Okay.

21  A.   Matthew Hoover?  No.

22  Q.   That's a --

23  A.   Okay.  Yeah, I'm --

24  Q.   -- perfectly fine answer.

25  A.   I've never heard that.

 1              THE COURT:  One at a time, please.
 2    BY MR. LAROSIERE:
 3    Q.   That answer's fine.  Thank you.
 4              So -- all right.  Moving on.
 5              You talked about the DXF that was provided to you by
 6    Mr. Ervin not being compatible with your software, right?
 7    A.   Right.
 8    Q.   And that software is designed for your large industrial
 9    laser --
10    A.   Correct.
11    Q.   -- right?
12              You said it was because there was an open loop?
13    A.   So -- and this happens a lot of times.  It's just -- I
14    mean, if you look at it from far away, it looks complete, but
15    you have to zoom in.  And, you know, if you zoom in all the
16    way, those lines don't connect.
17    Q.   All right.  So basically at a corner, it's actually two
18    lines and not a complete circuit.
19    A.   Right.  It could be two lines, or it could be, you know,
20    intersecting, yeah.
21    Q.   Right.  And so your software -- which is designed for
22    cutting steel, right?
23    A.   Yes.
24    Q.   Yeah.  Your software's designed for cutting steel,
25    correct?

1   A.   Yes.

2   Q.   And so it seeks -- it won't accept an incomplete circuit

3   or an open loop or a crossover like that.

4   A.   Right.

5   Q.   Okay.  So are you familiar with other lasers, like

6   smaller-wattage laser engravers, or no?

7   A.   No.

8   Q.   Okay.  But just fair to say, the DXF that was given to you

9   in the beginning could not be used to cut.

10  A.   Right.

11             MR. LAROSIERE:  Thank you so much.

12             Nothing further, Your Honor.

13             THE COURT:  Mr. King?

14             MR. KING:  May it please the Court?

15             THE COURT:  Go ahead.

16                        CROSS-EXAMINATION

17  BY MR. KING:

18  Q.   Good morning, sir.

19  A.   Good morning.

20  Q.   I wanted to talk to you a little bit about something you

21  just discussed.  You were saying open loop and there were,

22  like, two other terms.

23             Can you repeat what those are and then kind of

24  explain -- I don't know what that means.

25  A.   Can you ask that again?

1   Q.   I -- you were discussing open loops and -- I didn't quite

2   catch the rest of it.

3        Can you kind of explain to the jury what that means

4   and why it's important, to have a continuous circuit, I guess?

5   A.   Yes.  So I guess if you imagine a square, if you're

6   looking at a square, it looks complete.  It looks like a

7   square.  But if you zoom into a corner, it won't meet.

8        And then I guess the -- the program won't -- it will

9   alarm itself.  It will say that is not a complete shape and,

10  you know, you have to fix it to -- you know.

11  Q.   And why do you have to fix that?  Why is that important?

12  A.   Without -- without fixing it, you know, you're not going

13  to go any further than that.  You're just kind of at that

14  point.

15  Q.   And it won't function correctly?

16  A.   Right.  Correct.

17  Q.   So the design needs to -- you had to -- you had to kind of

18  make the design so that it would work with the equipment?

19  A.   Not really make it, but just kind of connect the --

20  connect dots, if you will.

21  Q.   Is it okay if I try asking that a different way so that --

22  A.   Yeah.  Yeah.

23  Q.   Let me -- let me try that again.

24       So the design that you got that -- it was from Bane

25  Industries, in and of itself, wouldn't have worked with your

1    equipment.  You made it -- you took the artwork and then made

2    it so that it would function with your equipment.

3            Is that a fair way to put it?

4    A.   Well, I wasn't sure if it was -- I don't know if it came

5    from Bane Industries.  What I got was about, you know -- I

6    mean, it's basically 99 percent done.  It's just me moving a

7    tiny line from here to there just to complete the -- the loop,

8    if you will.

9    Q.   And prior to your testimony today, you've spoken with the

10   prosecutors involved in this case?

11   A.   Yes.

12   Q.   And you've spoken with the ATF agents and the other

13   federal agents?

14   A.   Sure.

15   Q.   And do you recall telling them that when you first spoke

16   with Mr. Ervin, that he didn't want to tell you what

17   specifically he was looking -- you know, what was going on

18   until he had everything patented and copyrighted?

19   A.   I'm not sure.  It's -- yeah, I can't remember.

20   Q.   In terms of ...

21           And, Mr. Ruiz, if I could get -- I'm not good with

22   the technology here, so I have Government's Exhibit 55.

23           Do you remember going over this with the Government?

24   A.   (Nods head up and down.)

25   Q.   I'm sorry.  You're nodding your head.

```
1    A.   Yes.
2    Q.   I know you mean yes, but we have a court reporter.
3    A.   Yeah, I'm sorry.  Yes.
4    Q.   No.  No.  You're fine.
5              And there's a conversation about a coaster?
6    A.   Yes.
7    Q.   And you had conversations with Mr. Ervin about taking his
8    designs and putting them on all sorts of other objects?
9    A.   I don't know.  It -- yeah, it was -- it wasn't all types
10   of objects.  It was just ...
11   Q.   Let me put it this way.  Things that you could have done
12   with your shop and your equipment, though, things like a
13   coaster.
14   A.   Can you say the question again?
15   Q.   Sure.  So obviously, in terms of designs, it would have
16   only been things that your shop would have been able to make
17   with the equipment you have, like a coaster or something like
18   that, right?
19   A.   Right.
20   Q.   And you did discuss other types of objects, designs with
21   him as well?
22   A.   It was just a coaster.  It wasn't ...
23   Q.   Okay.
24   A.   Yeah, yeah, yeah.
25             MR. KING:  Your Honor, I have no further questions.
```

1   Thank you.

2           THE COURT:  Ms. Taylor?

3           MS. TAYLOR:  No redirect, Your Honor.

4           THE COURT:  All right, sir.  You may step down.

5           And is this witness released?

6           MS. TAYLOR:  Yes, Your Honor.

7       (Witness excused.)

8           THE COURT:  Let me see counsel at sidebar for a

9   moment.

10      (At sidebar, out of the hearing of the jury:)

11          THE COURT:  Your next witness is Mr. Batchelder?

12          MS. TAYLOR:  No.  It's Mr. Breslend.

13          THE COURT:  Breslend.

14          MS. TAYLOR:  Yes.

15          THE COURT:  Okay.  And how long will he be?

16          MS. TAYLOR:  Probably somewhere between the length of

17  Mr. Clarkson and Mr. Ruiz.  I don't have text messages with

18  him.

19          THE COURT:  Do you need a cough drop?

20          MR. LAROSIERE:  I think so now.  Sorry.

21          THE COURT:  I'm just trying to make sure that

22  whatever -- the witness we end on is not your witness when we

23  break at 12:15 --

24          MS. TAYLOR:  Oh, yeah.  Gotcha.

25          THE COURT:  -- because you're not going to --

1    MS. TAYLOR:  He'll be done by 12:15.

2    THE COURT:  Okay.  And who will be after that?

3    MS. TAYLOR:  After that would be my longer witnesses.

4    THE COURT:  Okay.

5    MR. KING:  We just want to make sure that it's not

6   your witness when we start back so that you can be

7   downstairs --

8    MS. TAYLOR:  Oh, yeah.  Okay.  Got it.  Sorry.

9    THE COURT:  I'm trying to be thoughtful here.

10    MS. TAYLOR:  No.  I wasn't -- I just wasn't

11   following.

12    Okay.  We could call a witness that's Mr. Mesrobian's

13   witness after that --

14    THE COURT:  Okay.

15    MS. TAYLOR:  -- and she'll take a little time.

16    THE COURT:  Okay.  Because we are going to -- I'm

17   going to interrupt at 12:15 --

18    MS. TAYLOR:  Okay.

19    THE COURT:  -- and I'm going to just tell the jury

20   now that we do have to break promptly at 12:15 so I'm going to

21   interrupt whatever witness we have.

22    MS. TAYLOR:  Okay.  Yes.  Sorry.  That went right

23   over my head.

24    THE COURT:  Okay.

25    (End of discussion at sidebar.)

1        THE COURT:  I was just conferring with them about the

2   schedule because we do have to break at 12:15 to accommodate a

3   particular request.

4        So if there's a witness and you see me interrupt more

5   abruptly than I usually do, that's why.  I'm going to -- I'm

6   going to cut it off at 12:15, and we'll take our break a little

7   bit early today.

8        Next witness, please?

9        MS. TAYLOR:  Your Honor, the United States calls

10  Patrick Breslend.

11       THE COURT:  All right.

12       MS. TAYLOR:  I will go get him myself.

13       THE COURT:  All right.

14     (The witness entered the courtroom.)

15       THE COURT:  Sir, if I can ask you to come all the way

16  up here and remain standing for just a moment while you're

17  sworn.

18       COURTROOM DEPUTY:  Please raise your right hand for

19  me.

20       Do you solemnly swear that the testimony you're about

21  to give before this Court will be the truth, the whole truth,

22  and nothing but the truth, so help you God?

23       THE WITNESS:  I do.

24       COURTROOM DEPUTY:  You may have a seat.

25       And if you could please state your name for the

 1  record and spell your last name.

 2          THE WITNESS:  Patrick Breslend, B-r-e-s-l-e-n-d.

 3          THE COURT:  Go ahead.

 4          PATRICK BRESLEND, GOVERNMENT'S WITNESS, SWORN

 5                      DIRECT EXAMINATION

 6  BY MS. TAYLOR:

 7  Q.   Mr. Breslend, could you please tell the jurors where you

 8  work.

 9  A.   Orange Park Machine.

10  Q.   And what -- and could you get a little bit closer to the

11  microphone?

12  A.   Orange Park Machine.

13  Q.   Thank you.

14          And what's your role at Orange Park Machine?

15  A.   Director of manufacturing.

16  Q.   What kind of things do you do as the director of

17  manufacturing?

18  A.   Basically intake new customers, design parts, train the

19  team, manage the operation, make sure that things run smoothly

20  and ...

21  Q.   Okay.  Are you familiar with a man named Justin Ervin?

22  A.   Yes.

23  Q.   Have you met Mr. Ervin in person?

24  A.   Yes.

25  Q.   Do you see Mr. Ervin in the courtroom today?

1    A.    I think so.

2    Q.    And if you do see him, could you describe who -- the

3    person who you believe to be Mr. Ervin?

4    A.    I think it's the guy on the end over there where --

5              MR. KING:  Your Honor, we can stipulate to

6    Mr. Ervin's ID.

7              THE COURT:  Let me see counsel at sidebar for just

8    one moment.

9         (At sidebar, out of the hearing of the jury:)

10             THE COURT:  Mr. King, I understand what you're trying

11   to do, but you're cutting the witness off, and the local rules

12   specifically prohibit an offer to stipulate in the presence of

13   the jury.

14             MR. KING:  Yes, Your Honor.

15             THE COURT:  So --

16             MR. KING:  I apologize.

17             THE COURT:  All right.  So maybe can we agree to a

18   different way to do it?

19             I think what you need to do is let the witness finish

20   and just not object or -- you need to do it a different way.

21   But offering a stipulation in that way and cutting off the

22   witness, we just can't keep doing, okay?

23             MR. KING:  Yes, Your Honor.

24             THE COURT:  And I know -- and I understand --

25             MR. KING:  I understand what you're saying, Your

 1   Honor.

 2           THE COURT:  There's just a different --

 3           MR. KING:  I understand what you're saying, Your

 4   Honor.

 5           THE COURT:  You've just got to do it a different way.

 6           MR. KING:  I understand.

 7           THE COURT:  Okay.

 8           MR. KING:  Thank you.

 9           THE COURT:  But I am going to let the record reflect

10   that he identified the witness.

11           MS. TAYLOR:  Yes.

12       (End of discussion at sidebar.)

13           THE COURT:  All right.  The record will reflect that

14   Mr. Breslend identified the defendant as Mr. Ervin.

15           Go ahead.

16   BY MS. TAYLOR:

17   Q.   How are you familiar with Mr. Ervin?

18   A.   He's a customer who came in a while back to get us to make

19   some parts for him.

20   Q.   And did you work on that project for Mr. Ervin?

21   A.   Yes.

22   Q.   How so?  What kind of work did you do on the project?

23   A.   I think at the time JC just had some questions about how

24   the laser was cutting the parts, so I gave him some advice on

25   it.  And I sat in on some of the meetings.

1   Q.   You said -- referred to somebody as JC?

2   A.   Joncarlos.

3   Q.   And that's Mr. Ruiz?

4   A.   Yes.

5   Q.   And so that was -- was that, like, mechanically just

6   making sure that the drawing was going to work with the laser,

7   just helping -- helping with that?

8   A.   Yeah.  I do some of the training, so he -- he kind of runs

9   the laser, but there -- like, when he comes to a technical

10  problem, he'll come to me.  So we were just kind of working on

11  the DXF that was given to us.

12          THE COURT:  Sir, can I ask you to try and keep your

13  voice up a little bit?

14          THE WITNESS:  Okay.

15          THE COURT:  Thank you.

16          Go ahead.

17  BY MS. TAYLOR:

18  Q.   And you stated that a DXF was given to you?

19  A.   Yes, a DXF was given.

20  Q.   So Mr. Ervin already had a DXF file?

21  A.   Yes.

22  Q.   And was it for the -- essentially the design for the auto

23  key card?

24  A.   Yeah.  It's -- it's basically a vector file.  It's a

25  drawing.

1    Q.    And did you ever have any questions about -- well, at one

2    point did Mr. Ervin ask for patent or copyright indicators to

3    be placed upon the auto key cards that Orange Park Machine was

4    manufacturing?

5    A.    Yes.

6    Q.    Did you have any thoughts on that?

7    A.    I did.

8    Q.    What were your thoughts?

9    A.    It's kind of -- I mean, if you have a patent, you can put

10   the patent number, and the fact that it just said "Patent

11   Pending" and didn't have a number --

12   Q.    Are you --

13   A.    -- I thought that was kind of strange.

14   Q.    Are you familiar with the process of applying for patents?

15   A.    Yes.  I've applied for a patent.

16   Q.    You have applied for patents?

17   A.    Yes.

18   Q.    And did you ever ask whether there was a patent pending

19   number to be placed with the patent pending language?

20   A.    Yes.

21   Q.    And what was the response?

22   A.    They just didn't want to put anything on there.  I -- at

23   the time I just thought that he didn't want us to know what the

24   patent was for, because a lot of people are fearful of that.

25   Q.    And before when we spoke, you explained that -- well, your

1   understanding, once you've applied for a patent, does that

2   protect -- does that protect the design?

3   A.   Yes.

4   Q.   And --

5   A.   You're free to talk.

6   Q.   -- so did it make sense to you that Mr. Ervin was refusing

7   to provide the number for his application?

8   A.   I think for most people that's the first time filing for a

9   patent, they -- they don't know all those rules.  But after

10  going through the process, I know that you are protected, and

11  you're free to talk about your idea without fear of somebody

12  taking the idea.

13  Q.   Once you've applied, even if it hasn't been granted?

14  A.   Yes.

15  Q.   Did you also have questions about why Mr. Ervin wanted

16  these items etched -- or some of the lines on them etched

17  rather than fully cut out?

18  A.   Yeah.  I asked why -- why couldn't we just tab the parts

19  in, because typically we'll -- if it's something small on the

20  laser, we tab it into the material so that you can pop it out

21  later and not have it fall through.

22       So we asked -- we said we could cut most of it out

23  and have it tabbed, and he said he didn't want that.

24  Q.   So in other words, if you were manufacturing small --

25  small parts, such as the individual pieces that were being

1  etched on the auto key card, you would leave a little piece of

2  metal there just as part of the manufacturing process?

3  A.   Yeah.

4  Q.   And then at some point later in the process, you would cut

5  that tab to take the part out of the sheet?

6  A.   Yes.

7  Q.   And that's just for manufacturing convenience?

8  A.   Yeah, for handling the parts.

9  Q.   Did Mr. Ervin agree to that?

10 A.   No.  We never did that.  He didn't want them tabbed.

11 Q.   Do you know -- did he ever give you a reason why, or did

12 you not have that conversation directly with him?

13 A.   Yeah.  It was a vague -- like, it was just, "This is,

14 like, artistic," and we didn't -- he didn't really give a good

15 reason why he didn't want it tabbed in, but definitely didn't

16 want it tabbed in.

17 Q.   Did you participate in a meeting on February 22nd, 2021,

18 with Mr. Ervin?

19 A.   Yes.

20 Q.   Who else was at that meeting?

21 A.   Jack Clarkson and Joncarlos Ruiz.

22 Q.   And what was the reason -- what was your understanding of

23 the reason for the meeting?

24 A.   So there were some issues, I think, with the way that the

25 laser was etching, deep etching the material.  He didn't like

1  the way it looked.  It looked kind of bubbly, and he was asking
2  us if we can fix that.
3  Q.    And during the meeting -- or following that meeting, did
4  you personally have any suspicions about or questions about the
5  product that you were making for Mr. Ervin?
6  A.    Yes.
7  Q.    And what specifically -- what was your concern after that
8  meeting?
9  A.    He just wasn't answering the questions, like, why he
10 didn't want us to just cut it out.  The etching of it -- to me,
11 like, if you're going to etch it to cut it later, then why
12 don't we just cut it now and make that process easier?  Cutting
13 stainless by hand is not easy, so --
14 Q.    Did you have --
15 A.    -- somebody --
16 Q.    I apologize.
17 A.    That's fine.
18 Q.    Did you have an understanding that Mr. Ervin intended for
19 them to be cut out later?
20 A.    It seemed like that that's what that would be for, yeah.
21 Q.    Was that just your inference, or did he ever tell you
22 that?
23 A.    I think originally, like, early on, we thought it was for
24 some type of, like, tool or equipment for construction.  So I
25 thought that it would have to be cut out to be used for that,

1  so to me it seemed like it needed to be cut out.

2  Q.   Did you think that it was a tool for construction because

3  that's what he said it was?

4  A.   Yes.

5  Q.   Later on did he -- or at some other point did he describe

6  it in another way?

7  A.   I mean --

8  Q.   Did he ever describe it to you as being art?

9  A.   Yes.

10 Q.   Okay.  Was that before or after he said it was a tool?

11 A.   I think after, yeah.

12 Q.   Okay.  After that meeting did you take any steps to try

13 and identify what it actually was?

14 A.   Yes.

15 Q.   What did you do?

16 A.   I went to my office, and I took a photo of one of the

17 cards that we -- we still -- we hadn't fulfilled the order

18 completely so we still had some at our shop.

19       So I took a photo, and then I put it in Google

20 Images, and then I typed in key card, and I started searching

21 the Internet for it.

22 Q.   Key card, was that what you -- your shop knew them to be?

23 A.   That's what we were told the part number was.

24 Q.   It wasn't told to you to be auto key card?

25 A.   No.

1   Q.   Just key card?

2   A.   Key card.

3   Q.   And did you see anything or learn anything as a result of

4   your searching that caused you concern?

5   A.   I saw that it was on a site, and I saw a video that was

6   kind of gun related.  So I told Jack that, "Hey, I think this

7   is gun related."  And we don't do anything with guns, so that

8   was kind of ...

9   Q.   Had you ever -- in the times that you asked Mr. Ervin what

10  this thing was, did he ever indicate to you that it was gun

11  related?

12  A.   No.

13  Q.   Did you feel that he was evasive about describing what it

14  was?

15  A.   Yes.

16  Q.   After you did that Internet research, what steps did you

17  take after that related to your -- to Orange Park Machine's

18  business with Mr. Ervin?

19  A.   We decided that we really just needed to destroy that.  We

20  didn't feel comfortable having that at our shop and kind of

21  wanted to be done with it.

22        So we didn't want to tell the other employees, so we

23  went and collected all of the items and put them in the

24  ironworker and sheared them up, made sure we sheared all of

25  them to smaller pieces.

1    Q.    And were you -- were you attempting to cut the etchings

2    that were in the card as well?

3    A.    Yeah.  Just completely destroy the cards.  Didn't want to

4    have any part in that, and wanted --

5    Q.    Did -- sorry.

6              Did you personally participate in destroying the

7    cards?

8    A.    I made sure, yeah.  Yes.

9    Q.    Okay.

10             MS. TAYLOR:  May I have a moment, Your Honor?

11             THE COURT:  Yes.

12        (Pause in proceedings.)

13             MS. TAYLOR:  I have no further questions, Your Honor.

14             THE COURT:  Mr. King?

15                        CROSS-EXAMINATION

16   BY MR. KING:

17   Q.    Good afternoon, sir -- I'm sorry.  Good morning still.  I

18   apologize.

19             I wanted to go over a little bit about what you

20   talked about.  You said you're familiar with the patent

21   process?

22   A.    Yes.

23   Q.    Would you describe that to a novice as an easy or a

24   complicated process?

25   A.    I'd say it's definitely complicated.

1   Q.    And -- and you said you've dealt with other people who
2   have tried to do that for the first time?
3   A.    Yes.
4   Q.    And -- as part of your work?
5   A.    No.
6   Q.    Okay.  But you've dealt with multiple people who, for the
7   first time, were going through the patent process.
8   A.    Yes.
9   Q.    And in your experience, do they also find it convoluted
10  and difficult?
11  A.    Yes, I guess.
12  Q.    And for those people -- you mentioned before that you know
13  that once you've applied for everything and have, you know, a
14  number back, that you're completely protected, and you had that
15  knowledge.
16  A.    Yes.
17  Q.    Is it uncommon when you're, in your experience, dealing
18  with people who don't have that knowledge for them to not
19  understand how that works?
20  A.    Yes.
21  Q.    I'm sorry.  Can you speak up a little?
22  A.    Yes.
23  Q.    I can't --
24  A.    Yes.
25  Q.    And as a result, many of them are secretive about what

1    they're actually doing for fear that they're not going to be

2    able to protect their property?

3    A.    Exactly, yeah.

4    Q.    And the conversations you had with Mr. Ervin, he was

5    evasive about what was going on.

6    A.    Uh-huh.

7    Q.    I'm sorry.  Is that a yes?

8    A.    Yes.

9    Q.    And part of that had to do with his trying to get

10   copyright or patents?

11   A.    He said he already had them.  Like, he had a copyright,

12   so ...

13   Q.    And did you know if he had a copyright applied for or if

14   he'd actually successfully obtained it?

15   A.    That's all he said.  He wouldn't get into detail.

16   Q.    I want to talk to you a little bit more about some of the

17   conversations and your technical expertise on machining parts.

18           One of the things that you said is that if the

19   intention is to take the pieces that were on there out, that

20   you would cut much deeper.

21   A.    You would cut, yes.

22   Q.    And you would do it so that they could be tabbed out or

23   much more easily removed.

24   A.    Yes.

25   Q.    And that it would be very difficult to cut them out

1    manually without a laser CNC machine like you had.

2            MS. TAYLOR:  Objection.  I don't think that was the

3    testimony, Your Honor.

4            MR. KING:  I'm sorry, let me -- if I could --

5            THE COURT:  Rephrase, please.

6            MR. KING:  -- rephrase, Your Honor.

7    BY MR. KING:

8    Q.   Would that be an easy thing to cut out by hand, or is it

9    much easier to do it by machine?

10   A.   It's not about easy.  It's -- it just takes more time.

11   Q.   And in terms of the ability to -- let me back up a little

12   bit.

13           You had a conversation where you suggested that if

14   the intention was to take parts out of the key card, that it

15   would make sense to really dig into or drill much deeper or

16   laser etch or whatever the right word is.

17   A.   No.  Laser etching is just to mark the material.  We would

18   laser through the whole piece.  It would be a full cut.  Like,

19   it would cut the part out.

20   Q.   Let me ask -- I asked a poor question.  Let me take

21   another stab of this.

22           The -- if the intention was to have something that

23   could -- where you were to take those pieces out of the key

24   card, it would make sense to drill or laser -- if I'm using the

25   right [verbatim] word, please correct me -- but drill or laser

1   much deeper than what was being done.

2   A.    Yeah, fully through.

3   Q.    Okay.

4   A.    Yeah.

5   Q.    And if your intention was to keep it whole but to allow it

6   to be easily removed, you would do it a lot differently so it

7   could be tapped out.

8   A.    Yeah.  You would just skip -- you would be cutting, and

9   then you would stop and skip a little bit, and keep cutting,

10  and you would leave that material behind.

11  Q.    And that -- if the intent was to get it out, that's what

12  you would want to do.

13  A.    Yes.

14  Q.    And that's been your experience with people who are

15  actually trying to make tools to actually be removed from that.

16  A.    No.  That -- I mean, that's a process that we use to make

17  all the parts stay stuck to the full sheet, and then we would

18  shake them out, and then we'd have individual parts.

19  Q.    And the -- and you asked Mr. Ervin about doing it that

20  way.

21  A.    Yes.

22  Q.    And he told you he absolutely did not want to do it that

23  way.

24  A.    Didn't want it that way, no.

25  Q.    And he wanted it to be basically as shallow as possible so

1    the marks stayed on there but not any deeper.

2    A.   Yes.

3    Q.   And he told you that he was trying to leave it as a whole

4    piece of steel rather than parts.

5    A.   Yes.

6    Q.   And that was his artistic idea.  What he was trying to

7    accomplish was to keep it as a whole piece, not to break it

8    into parts.

9    A.   Yes.

10              MR. KING:  Nothing further.

11              THE COURT:  Mr. Larosiere?

12              MR. LAROSIERE:  Nothing, Your Honor.

13              THE COURT:  Ms. Taylor, anything further from this

14   witness?

15              MS. TAYLOR:  Briefly, Your Honor.

16              THE COURT:  Go ahead.

17                      REDIRECT EXAMINATION

18   BY MS. TAYLOR:

19   Q.   You have an understanding as well of what patents are for,

20   right?

21   A.   Yes.

22   Q.   What are patents for?  What types of things can be

23   patented?

24   A.   You have to have, like, a unique idea, something that's

25   new, novel.

1    Q.   Does it have to be function- --

2    A.   Utility.

3    Q.   Sorry.  Does --

4    A.   Utility.

5    Q.   Utility?

6             THE COURT:  Okay.  One at a time.

7    BY MS. TAYLOR:

8    Q.   Does it to be a functional object?

9    A.   Yes.

10   Q.   Can artwork be patented?

11   A.   Under a different process, yeah.

12   Q.   It can be patented, or it can be protected under

13   copyright?

14   A.   Copyright.

15   Q.   Okay.  So copyright is for art, yes?

16   A.   Yes.

17   Q.   Patenting is for utilitarian objects that perform some

18   function?

19   A.   Yes.

20   Q.   And you described that --

21            MS. TAYLOR:  Actually, I have no further questions,

22   Your Honor.

23            MR. KING:  If I could briefly.

24            THE COURT:  Go ahead.

25                      RECROSS-EXAMINATION

1  BY MR. KING:

2  Q.   Mr. Breslend, my understanding is Mr. Ervin wanted both

3  copyrights and patents on -- marks on the key cards.

4  A.   Yes.

5  Q.   Does -- if somebody understands -- actually understands

6  how all of that works, does that make any sense to you?

7  A.   I don't know.  I mean, what do you mean?

8  Q.   If somebody had an understanding of how -- patent law and

9  copyright law and the correct application of which, would that

10 make sense to have both on the same item?

11 A.   You can file for both --

12 Q.   Okay.

13 A.   -- on the same item.

14 Q.   So did that demonstrate to you a lack of understanding of

15 what's patentable, what's copyrightable?

16          MS. TAYLOR:  Objection, Your Honor.  He just

17 testified that you file for both.

18          THE COURT:  I confess your -- you answered so

19 quietly, I didn't understand whether --

20          THE WITNESS:  You can file for both.  So you can have

21 a patent for the utility of something and for the design of

22 something, the way it looks.

23 BY MR. KING:

24 Q.   Based on your time and experience with Mr. Ervin and your

25 conversations about that, did he seem to have a good grasp of

1    the difference between patent and copyright?

2    A.   We didn't have a very detailed conversation with that, but

3    when I asked him -- I said, "We could cut this out."  He said

4    he didn't want to cut it out.

5            He didn't want to give us too much information.  He

6    was being very secretive about it.

7            MR. KING:  Nothing further, Your Honor.

8            THE COURT:  All right, sir.  You may step down.

9            Is this witness released?

10           MS. TAYLOR:  Yes, Your Honor.

11           MR. KING:  Yes, Your Honor.

12           MR. LAROSIERE:  Yes, Your Honor.

13           THE COURT:  All right.  You're free to go.

14       (Witness excused.)

15           THE COURT:  Who's your next witness?

16           MS. TAYLOR:  Can I have just a moment, Your Honor?

17           THE COURT:  Certainly.

18           MS. TAYLOR:  The United States calls Kris Ervin.

19       (The witness entered the courtroom.)

20           COURTROOM DEPUTY:  Good morning.

21           THE WITNESS:  Good morning.

22           COURTROOM DEPUTY:  Come right up here to the witness

23   stand for me, please.

24           THE WITNESS:  Okay.

25           COURTROOM DEPUTY:  And if you could please raise your

 1  right hand for me.

 2          Do you solemnly swear that the testimony you're about

 3  to give before this Court will be the truth, the whole truth,

 4  and nothing but the truth, so help you God?

 5          THE WITNESS:  So help me God.

 6          COURTROOM DEPUTY:  You may have a seat.

 7          THE WITNESS:  Okay.

 8          THE COURT:  And if you could please state your name

 9  for the record and spell your last name.

10          THE WITNESS:  Kris Anderson Ervin, and it's

11  E-r-v-i-n.

12          THE COURT:  Go ahead, Ms. Taylor.

13       KRIS ANDERSON ERVIN, GOVERNMENT'S WITNESS, SWORN

14                      DIRECT EXAMINATION

15  BY MS. TAYLOR:

16  Q.   Mr. Ervin, could you please tell the jurors where you

17  live.

18  A.   I live at 2409 Kirkwall Court, Orange Park, Florida.

19  That's my residence.  I do live with my girlfriend, Julie Cade.

20  Q.   And she has a different residence?

21  A.   Yeah.  She's 3437 Fallon Court in Middleberg.

22  Q.   And are you related to a defendant in this case?

23  A.   Yes, I am.

24  Q.   And who is that?

25  A.   Justin Ervin.  He's my son.

1   Q.   Okay.  Is this hard for you to be here today?

2   A.   It -- it certainly is.

3   Q.   Okay.  And could you identify your son Justin Ervin?

4   A.   Sure.  He's right over there, Justin Ervin.

5   Q.   And which seat is he seated at?

6   A.   The far right seat in the front row.

7   Q.   In the front table or the back table?

8   A.   Front table.

9         MS. TAYLOR:  I would ask that the record reflect that

10  Mr. Ervin's identified Justin Ervin.

11        MR. KING:  Without objection, Your Honor.

12        THE COURT:  All right.  The record will so reflect.

13  BY MS. TAYLOR:

14  Q.   Mr. Ervin, I just wanted to go over a couple, like, just

15  basic things about phone numbers and email accounts that may

16  have belonged to your son.

17  A.   Okay.

18  Q.   What phone number did you know Justin Ervin to have back

19  in -- back around late 2020 to early 2021?

20  A.   I apologize.  I don't know it off the top of my head

21  because it was in my cell phone.

22  Q.   Okay.  If I told you the phone number, would it possibly

23  sound familiar?

24  A.   Yes.  Let's try that.

25  Q.   Okay.  Are you familiar with the phone number

1   904-405-9878?

2   A.   I think -- believe that's it.

3   Q.   Okay.  And are you familiar with email accounts that your

4   son Justin Ervin has had?

5   A.   Yes, some of them.

6   Q.   And do those include justin.ervin80@gmail.com?

7   A.   That's one.

8   Q.   Justinervin80@aol.com?

9   A.   That's one.

10  Q.   Do you know if he made any email accounts that were

11  related specifically to his Auto Key Cards business?

12  A.   I do not.

13  Q.   You don't know whether he did or not?

14  A.   If he deleted them, no.

15  Q.   Okay.  And I want to ask you a little bit about Auto Key

16  Cards.

17           Whose business was Auto Key Cards?

18  A.   My son Justin's.

19  Q.   And did you -- did you have involvement with the Auto Key

20  Cards business?

21  A.   Not other than letting him use my credit card.

22  Q.   Okay.  Prior to -- prior to having his Auto Key Cards

23  business, had your son Justin Ervin had any other businesses

24  that he tried to launch?

25  A.   He did.

1   Q.   And could you describe the most recent one before Auto Key

2   Cards, what that was?

3   A.   It was a -- he was purchasing slime from China and trying

4   to market it on the Internet.

5   Q.   And was that business successful?

6   A.   No, it was not.

7   Q.   At the time he -- around when do you recall Justin

8   starting the Auto Key Cards -- or Justin Ervin starting the

9   Auto Key Cards business?

10   A.   I would say August or September of 2021 maybe.

11   Q.   Was it possibly 2020?

12   A.   2020.  I'm sorry, yes.

13   Q.   And prior to your son Justin Ervin starting that

14   business -- and I'm referring to him as your son Justin Ervin

15   because you have another son, correct?

16   A.   That is correct.

17   Q.   Okay.  Prior to your son Justin Ervin starting the Auto

18   Key Cards business, were you financially supporting him?

19   A.   I was.

20   Q.   And you mentioned that as part of that business, you

21   allowed your son Justin Ervin to use your credit cards,

22   correct?

23   A.   Correct.

24   Q.   So was that just to help get the business off the ground?

25   A.   No.  He -- he had been using it for quite a while, since

1  he didn't have any income, and it bled over into the Auto Key

2  Cards.

3  Q.   Okay.  Are you familiar or know of an individual named

4  Matt who was associated with your son Justin Ervin?

5  A.   I am.

6  Q.   And how -- who was Matt?  Did you know his last name?

7  A.   Matt Hoover?

8  Q.   Yes.

9  A.   Yes.

10 Q.   Okay.  Are you able to identify whether Matt Hoover is in

11 the courtroom?

12 A.   I can.  That's Matt Hoover.  He's sitting in the second

13 row to the far right with a blue suit.

14       MS. TAYLOR:  I would ask the record to reflect that

15 Mr. Ervin has identified Matt Hoover.

16       MR. LAROSIERE:  Without objection.

17       THE COURT:  The record will so reflect.

18 BY MS. TAYLOR:

19 Q.   Do you know how your son Justin Ervin came to be in

20 contact with Matt Hoover?

21 A.   I believe he reached out or they had some contact through

22 YouTube or a video.

23 Q.   Okay.  And was Matt Hoover involved in the Auto Key Cards

24 business in some way?

25 A.   Not directly involved.  They -- not -- not like selling or

1    anything.

2    Q.    What -- did he make videos related to Auto Key Cards?

3    A.    They did have a sharing of information and made videos,

4    and I believe Auto Key Cards sponsored a couple of his

5    episodes.

6    Q.    And what did you understand that to mean, that Auto Key

7    Cards was sponsoring Matt Hoover's videos?

8    A.    That they had some kind of a working relationship.

9    Q.    Was there a financial exchange involved in the

10   sponsorship, to your knowledge?

11   A.    I didn't see anything directly, but Justin did tell me

12   that he did send some money to Matt.

13   Q.    Do you know how much money?

14   A.    I don't know the amount.

15   Q.    Did -- did your son Justin Ervin also tell you that he had

16   purchased a Louis Vuitton purse for Erica?

17   A.    Yes, he did.

18   Q.    And who is Erica?

19   A.    I think that was Matt's girlfriend or wife.

20   Q.    And when Mr. Ervin -- when Justin Ervin started the Auto

21   Key Cards business, did you have a joint bank account with him?

22   A.    I did.

23   Q.    And was that at Community First Credit Union?

24   A.    That's correct.

25   Q.    And you had yourself removed from that account on November

1    24th, 2020.

2            Does that sound correct?

3    A.   That is correct.

4    Q.   Around that time had Justin -- your son Justin Ervin told

5    you that Shopify had shut down his business?

6    A.   He did tell me that Shopify had stopped doing business.

7    Q.   Did he give you a reason why he thought Shopify had shut

8    down his business?

9    A.   He did not.  We assumed that it was because he was selling

10   items on -- through Shopify, and we thought maybe it was a --

11   they thought it might be some fraud or something like that.

12   But that's the only thing we discussed.

13   Q.   Did -- did your son Justin Ervin experience fairly sudden

14   success with the Auto Key Cards business?

15   A.   Yes.  I would say that.

16   Q.   He made a lot of sales in a short period of time, and

17   it -- and it was a very -- was it, like, a jump in sales that

18   happened all of a sudden, to your knowledge?

19   A.   To my knowledge, yes.  I would think that was it.

20   Q.   Did -- once Mr. Ervin, Justin Ervin, started having

21   success with his Auto Key Cards business, did he begin

22   financially supporting you?

23   A.   No.

24   Q.   Okay.  Mr. Ervin --

25            MS. TAYLOR:  I'd like to approach Mr. Ervin with

1  Exhibit 60, Your Honor.

2            THE COURT:  Go ahead.

3            MS. TAYLOR:  I apologize.  It took me a moment to

4  find it, but I have it now.

5            THE COURT:  Okay.

6  BY MS. TAYLOR:

7  Q.   Mr. Ervin, could you describe -- just in general, describe

8  what Exhibit 60 is.

9  A.   Exhibit 60 has Justin's name at the top, his phone number.

10 It says, "Groups in common (3).  Create messages.  Add

11 favorites.  Mute conversations."

12 Q.   Is it text messages?

13 A.   Oh, is it -- other pages?

14 Q.   I'm just asking you, you know, generally what is it.  Are

15 those text messages that are in that exhibit?

16 A.   Oh.  Oh, yes.  Yes.

17 Q.   And are they your text messages with your son Justin

18 Ervin?

19 A.   It appears so, yes.

20 Q.   Okay.  And previously did you -- did you agree to allow

21 ATF to take just those text messages off your phone?

22 A.   I did.

23 Q.   Okay.

24            MS. TAYLOR:  Your Honor, I'd move for admission of

25 Exhibit 60.

1          MR. KING:  Without objection, Your Honor.

2          MR. LAROSIERE:  No objection, Your Honor.

3          THE COURT:  60's admitted.

4      (Government's Exhibit 60 was received in evidence.)

5          MS. TAYLOR:  Ms. Ganoe, if we could have the first

6   page on the screen.

7   BY MS. TAYLOR:

8   Q.   I think you were describing this a minute ago, Mr. Ervin.

9          This is the front page, and it says "Justin,"

10  correct?

11  A.   Correct.

12  Q.   And then it has that 904-405-9878 phone number.  That's

13  the one I asked you about earlier?

14  A.   That is correct.

15  Q.   Okay.  So that's -- that is the phone number for Justin

16  Ervin?

17  A.   Yes.

18         MS. TAYLOR:  If we could look at page 2.

19  BY MS. TAYLOR:

20  Q.   On this page of the text messages -- well, throughout

21  these messages, are your messages on the right-hand side with

22  the blue marks?

23  A.   Yes.

24  Q.   And are Justin Ervin's text messages on the left-hand side

25  with the red marks?

1   A.   Yes.

2   Q.   On September 15th of 2020, did -- did your son Justin

3   Ervin send you a link to a YouTube video titled "What is an

4   Auto Key Card"?

5   A.   He did.

6   Q.   And then did you tell him, "That is so awesome"?

7   A.   I did.

8   Q.   And then did he respond that he worked hard on that?

9   A.   He did.

10          MS. TAYLOR:  If we could go to page 4.

11  BY MS. TAYLOR:

12  Q.   On October 10th of 2020, you had texted your son Justin

13  Ervin that you made a $500 payment to Discover?

14  A.   I did.

15  Q.   And was that because you were asking him to cover that

16  payment, or what was the reason you were texting him that

17  information?

18  A.   No.  At that time I was just advising that I'd made a

19  payment.

20  Q.   Okay.  And then did --

21          MS. TAYLOR:  If we could go to the next page.

22  BY MS. TAYLOR:

23  Q.   Did your son Justin Ervin respond, "Thank you.  I'm just

24  worried about my business"?

25  A.   He did.

1  Q.   Okay.

2       MS. TAYLOR:   And then if we could go to page 6,

3  please.

4  BY MS. TAYLOR:

5  Q.   On October 13th of 2020, did your son Justin Ervin send

6  you a message with a link to an Instagram account?

7  A.   He did.

8  Q.   And was that -- was that account -- in the message it says

9  it's @autokeycarddotcom, and dot is spelled out?

10  A.   Oh, yes.

11  Q.   And then on page 7 did you text your son Justin Ervin and

12  let him know that you saw unmarked cars around the corner from

13  the house?

14  A.   Yes.  It appears I did.

15  Q.   And on page 8, on October 24th of 2020, did your son

16  Justin Ervin text you that image that's at the bottom of the

17  page?

18  A.   Yes, he did.

19  Q.   Do you know who's in that image?

20  A.   I do not.

21  Q.   Okay.  Is it a man with a face mask on, holding a rifle?

22  A.   Yes.

23  Q.   And does it say, "I just wanted to be left alone"?

24  A.   It does.

25  Q.   And then on the next page, after sending that image, did

1  your son Justin Ervin state, "This is what the statist are

2  messing with"?

3  A.   He did text that, yes.

4  Q.   On page 10 of these text messages, on November 4th of

5  2020, did your son Justin Ervin text you a link to a YouTube

6  video titled "Is This an ATF Trap and How Does It Work?"

7  A.   He did.

8  Q.   Have you watched that video?

9  A.   I don't recall if I watched that one.

10 Q.   And then right before he texted the link, did he say to

11 you, "Here's the video.  I'm going to watch it now.  Call me

12 after you see it.  I have 85 people on the website now"?

13 A.   He did.

14 Q.   And later that evening --

15       MS. TAYLOR:  If we can move to the next page.  We're

16 on page 11.

17 BY MS. TAYLOR:

18 Q.   So still on November 4th of 2020, did your son Justin

19 Ervin text you and say that he had received 12 orders for $1125

20 total in two hours?

21 A.   Yes.

22 Q.   And did he text you with -- it looks like a screenshot

23 with some sort of --

24       MS. TAYLOR:  Can we zoom in on that?

25 BY MS. TAYLOR:

1   Q.   Some sort of metrics, sales metrics?

2   A.   Correct.

3           MS. TAYLOR:  And then if we could move to page 12.

4   BY MS. TAYLOR:

5   Q.   Did your son Justin Ervin, on November 7th, 2020, text you

6   an image that said, "Autokeycard.com.  My man has one.  Does

7   yours?"

8   A.   Yes, he did.

9   Q.   And it's imposed over a woman's body?

10  A.   It does.

11  Q.   Then did he state, "Check out my latest meme ad"?

12  A.   He did.

13  Q.   And then on the next page did he then also say that it was

14  on Instagram?

15  A.   Yes, he did.

16          MS. TAYLOR:  And if we could go to page 14.

17  BY MS. TAYLOR:

18  Q.   On November 11th of 2020, did he text you and state that

19  he was up to $700 in sales today?

20  A.   He did.

21  Q.   And that was -- from your perspective, that was -- that

22  was good news, right?

23  A.   From my perspective, yes.

24  Q.   Were you excited for his business to be successful?

25  A.   Yes, I was.

1    Q.    And then did you respond and ask if -- ask your son if

2    that was an all-time high for the day?

3    A.    I did.

4    Q.    And then did he later --

5          MS. TAYLOR:  If we go to the next page.

6    BY MS. TAYLOR:

7    Q.    Did he state that 2,000 was his record for -- for one day?

8    A.    Yes.

9    Q.    And then did he state, "It's working"?

10   A.    Yes.

11   Q.    Moving down now, is -- there's a text message on November

12   11th of 2020, correct?

13   A.    Correct.

14   Q.    And is it linked to a video called "The Parts the ATF

15   Wishes Never Existed" that was on YouTube?

16   A.    Yes.

17   Q.    And it continues on to page 16, correct?

18   A.    Correct.

19   Q.    And then on November 13th of 2020, did you text a

20   screenshot of a message related to your credit card?

21   A.    Which page?  I'm sorry.

22   Q.    It's still the same page that we're on.

23   A.    Same page.  Oh, okay.  I'm sorry.

24   Q.    No. 16.

25   A.    Yeah.

1   Q.   And, Mr. Ervin, you're looking at the paper document,

2   correct?

3   A.   I'm looking at -- yes, I am.

4   Q.   Okay.  It's on the screen too, but if the paper is easier

5   for you --

6   A.   Yes.  I use it as a reference back and forth.

7   Q.   Okay.

8   A.   Okay.  And your question was did I text that to him?

9   Q.   Yes, that screenshot.

10  A.   Yes, I did.

11  Q.   Okay.

12            MS. TAYLOR:  If we could move to page 18.

13  BY MS. TAYLOR:

14  Q.   On November 14th, 2020, your son Justin Ervin texted you,

15  "I just passed $25,000 in sales this month.  275 orders.  We

16  are only two weeks in.  That would be a 50K month if the rate

17  of sales continues"?

18  A.   Yes, he did.

19            MS. TAYLOR:  And, Your Honor, I've still got a number

20  of pages to get through, and so at whatever point the Court

21  wants to stop.

22            THE COURT:  We'll go ahead and stop.

23            MS. TAYLOR:  Yes.

24            THE COURT:  So, ladies and gentlemen, as we have,

25  we'll take an hour and ten minutes, so I'll ask you to be back

1    at 1:25.

2           Please continue to follow all of the instructions

3    that I've been giving you throughout the trial.  I don't think

4    I need to repeat them to you; is that right?

5       (Affirmative response.)

6           THE COURT:  Okay.  So please follow all of my

7    instructions, have a nice lunch, and we'll see you back at

8    1:25.

9           COURT SECURITY OFFICER:  All rise for the jury.

10      (Jury out at 12:15 p.m.)

11          COURT SECURITY OFFICER:  Please be seated.

12          THE COURT:  Sir, you may step down, and I'll just ask

13   you to be outside ready to come back in at 1:25, okay?

14          THE WITNESS:  Perfect.

15      (The witness left the courtroom.)

16          THE COURT:  All right.  When we get back, before we

17   start, I need to know from Mr. King what you decided about

18   whether you still want me to instruct the jury to disregard the

19   testimony about prosecution for wall hanger or not.

20          MR. KING:  Your Honor, I can go ahead and tell the

21   Court I've not made a decision on that yet.  So I -- I'm not

22   asking the Court to do anything at this time.

23          THE COURT:  Okay.  So this is the way we're going to

24   leave it.  If you don't bring it up again, then nothing is

25   going to be said, so it's going to be up to you to bring it up.

1          MR. KING:  Yes, Your Honor.  I completely understand.

2    I appreciate that.

3          THE COURT:  Okay.  Then we're in recess.

4          COURT SECURITY OFFICER:  All rise.

5      (Recess from 12:16 p.m. until 1:37 p.m.; all parties

6    present.)

7      (Outside the presence of the jury:)

8          COURT SECURITY OFFICER:  All rise.  This Honorable

9    Court is now in session.

10          Please be seated.

11          THE COURT:  Let's have the jury.

12          COURT SECURITY OFFICER:  All rise for the jury.

13      (Jury in at 1:39 p.m.)

14          COURT SECURITY OFFICER:  Please be seated.

15          THE COURT:  Go ahead, Ms. Taylor.

16          MS. TAYLOR:  Yes, Your Honor.

17          Ms. Ganoe, if we could have Exhibit 60, page 19.

18          THE COURT:  I'm sorry, Ms. Taylor.  I didn't hear

19    you.

20          MS. TAYLOR:  Exhibit 60, page 19.

21          THE COURT:  Go ahead.

22    BY MS. TAYLOR:

23    Q.   Mr. Ervin, on November -- well, on November 26th of 2020,

24    did you text your son Justin Ervin, "I have Buster"?

25    A.   Correct.

1   Q.   Who is Buster?

2   A.   My dog.

3   Q.   And on November 27th of 2020, did your son Justin Ervin

4   text you that he thought he might have locked up the Discover

5   card and stated, "I was setting up a stamps.com account and it

6   won't go through"?

7   A.   Yes.

8   Q.   Do you know why he was setting up a stamps.com account in

9   late November of 2020?

10  A.   Not particularly, no.

11  Q.   Do you recall whether at some point in November of 2020

12  Shopify had shut down Mr. Ervin's business?

13  A.   Those dates -- yeah, I was aware of it, but I'm not sure

14  about those exact dates.

15  Q.   Okay.  And then on the next page, page 20, did your -- did

16  your son's text continue, "The new site is up and I have four

17  orders for 350 already.  I just need to ship them.  LOL"?

18  A.   Yes.

19  Q.   And then did he state, "Try autokeycard.com, and with an S

20  try autokeycards.com"?

21  A.   Yes, he did.

22  Q.   On page 21 is there an image that's on this page?

23  A.   There is.

24  Q.   And is that something that your son Justin Ervin texted to

25  you?

1    A.    It is.

2    Q.    Do you know who's in that image?

3    A.    I -- I don't know for sure, but I assume that would be

4    Justin.

5    Q.    And it says on the side, "I just want to be left alone"?

6    A.    Yes, it does.

7    Q.    And then below that did Justin Ervin state, "Carolanne

8    made this for me with her phone.  I like it"?

9    A.    Yes.

10   Q.    And then moving on to the next page, he stated, "You might

11   get a laugh out of it too"?

12   A.    Yes, he did.

13   Q.    And then did he state in his next message to you, "It's

14   from a picture of me with my winter ski mask on"?

15   A.    Yes.

16   Q.    And then after he -- you had those messages about the

17   image --

18         MS. TAYLOR:  Ms. Ganoe, can we have page 23.

19   BY MS. TAYLOR:

20   Q.    -- did he send you this image?

21         Is that an auto key card in this image?

22   A.    Yes, it is.

23   Q.    And did he --

24         MS. TAYLOR:  If we could move to 24.

25   BY MS. TAYLOR:

1   Q.   Did he state, "Check out what a customer sent me on his

2   Instagram story"?

3   A.   Yes, he did.

4   Q.   And then did you indicate that you couldn't see the image?

5   A.   I did.

6   Q.   And then did your son Justin Ervin send it to you a second

7   time?

8   A.   He did.

9   Q.   And then --

10         MS. TAYLOR:  If we could move to page 25, please.

11   BY MS. TAYLOR:

12   Q.   -- did you respond to his messages about the image of the

13   auto key card by saying, "Lightning bolt"?

14   A.   I did.

15   Q.   And then did your son Justin Ervin state, "I thought it

16   was neat.  It's working"?

17   A.   He did.

18   Q.   And then on January 2nd of 2021, did your son Justin Ervin

19   say, "You better come get this dog.  He is ready and looking

20   for you"?

21   A.   He did.

22         MS. TAYLOR:  And if we could move to page 27.

23   BY MS. TAYLOR:

24   Q.   Are those -- there are two pictures of a dog on this page?

25   A.   That is Buster, yes.

1   Q.   Okay.  On the top one are there auto key cards stacked on

2   the table in the image with Buster?

3   A.   It looks like it.

4           MS. TAYLOR:  And then if we could move to page 29.

5   BY MS. TAYLOR:

6   Q.   On January 3rd of 2021, did -- or, sorry, did you send to

7   your son Justin Ervin a link to autotrader.com?

8   A.   I did.

9   Q.   And did you --

10          MS. TAYLOR:  Let's move on to the next page, page 30.

11  BY MS. TAYLOR:

12  Q.   Did you text him, "Check this out.  It may be too pricey.

13  What do you think about the concept?"

14  A.   I did.

15  Q.   At this time was your son Justin Ervin looking to buy some

16  sort of bus or large vehicle?

17  A.   He was.

18  Q.   And do you know the reason for that?

19  A.   He was going to move to his land in Lake City.

20  Q.   And was that land that he had owned before the Auto Key

21  Cards business?

22  A.   No.

23  Q.   Do you know approximately when he -- when your son Justin

24  Ervin purchased that land?

25  A.   I don't know exactly when it was, no.

1    Q.    Do you know if he used proceeds from the Auto Key Cards

2    business to buy the land?

3    A.    I would assume so.

4    Q.    Did he have any other source of proceeds that could be

5    used to buy real estate?

6    A.    No.

7    Q.    And do you know whether your son Justin Ervin ended up

8    buying some sort of large vehicle?

9    A.    He did.

10   Q.    And you said he was -- he was planning to live in the

11   vehicle?  Is that what your testimony was?

12   A.    Yes.  He -- he was planning to convert it into an

13   RV/camper type of vehicle.

14   Q.    And did you have a number of messages, text messages, with

15   Justin Ervin about what vehicle to purchase and about his plans

16   for the land?

17   A.    Yes.

18   Q.    Okay.

19         MS. TAYLOR:  Let's move on to page 35, please.

20   BY MS. TAYLOR:

21   Q.    On this page of the messages -- these are from January 9th

22   of 2021, correct?

23   A.    Okay.  All right.

24         Oh, I'm sorry.  Ask that question again?

25   Q.    I'm just asking if the date on this page is January 9th of

1   2021.

2   A.   Yes.

3   Q.   And did your son Justin Ervin text you, "Just got home.

4   You left all the lights on"?

5   A.   Yes.

6   Q.   And did you respond, "I did on purpose.  Make sure people

7   think somebody's home"?

8   A.   Yes.

9        MS. TAYLOR:  And then if we could look at page 37,

10   please.

11        THE WITNESS:  Let me catch up with you.

12        THE COURT:  Excuse me.  Swallowed wrong.

13        My apologies.  Go ahead.

14   BY MS. TAYLOR:

15   Q.   Mr. Ervin, are these messages from -- are you on the --

16   are you able to find that page?

17   A.   I'm working on that.

18   Q.   Okay.  Let me know when you're ready.

19   A.   Okay.

20   Q.   What --

21   A.   What is the date of that?  That's the --

22   Q.   January 16th.

23   A.   -- 16th?

24        Okay.  Let me catch up with you here.

25        January 16th.  Okay.  I'm with you.

```
 1   Q.    Okay.  So January 16th, 2021, did your son Justin Ervin
 2   text you that he was going to Walmart to pick up supplies?
 3   A.    He did.
 4   Q.    And then looking on the next page, page 38, did he send
 5   you an image of a receipt?
 6   A.    He did.
 7   Q.    And did he state, "Just got back and stocked up for us.
 8   $515"?
 9   A.    Correct.
10   Q.    And then on page 39, did you respond to those messages?
11   A.    I did.
12   Q.    And did you state, "Okay.  Good.  I was surprised you had
13   someone in the house with the ATF dangers.  I don't trust it.
14   You don't want me even talking to anyone, and you bring someone
15   in.  Don't understand it.  Anyway, I am at a wedding.  Please
16   take care of Buster.  I may not get him tonight, but I will let
17   you know"?
18   A.    I did.
19         MS. TAYLOR:  If we could look at page 40, please.
20   BY MS. TAYLOR:
21   Q.    On February 4th of 2029 -- sorry, 2021, did your son
22   Justin Ervin state that "Okay.  I'm building these now"?
23   A.    He did.
24   Q.    And what -- and then did he send an image?
25   A.    He did.
```

1   Q.   What's in the image?

2   A.   It looks like it's rifles.

3             MS. TAYLOR:  And then if we could look at page 44,

4   please.

5   BY MS. TAYLOR:

6   Q.   These are message from February 6th, 7th, and 8th.

7   A.   Okay.  February 6th, 7th, and 8th.  Okay.

8   Q.   Looking at that bottom message from February 8th of 2021,

9   did your son Justin Ervin text you, "I found the title for the

10  CRV"?

11  A.   He did.

12  Q.   And what vehicle did that refer to?

13  A.   My wife's vehicle.

14  Q.   And what color was that vehicle?

15  A.   Silver.

16  Q.   And what -- did you end up making a transaction with

17  Justin Ervin related to the silver CRV?

18  A.   I did.

19  Q.   And what was that transaction?

20  A.   He purchased his mother's car.

21  Q.   He bought the car?

22  A.   He bought the car.

23  Q.   From you?

24  A.   From me.

25  Q.   And so did you transfer the title into his name?

1    A.   I did.

2    Q.   And then looking at page 49, these are messages from

3    February 9th of 2021.  There's a few pictures of a white bus.

4    A.   Those are.

5    Q.   Okay.  Is that a bus that you're familiar with?

6    A.   Yes, it is.

7    Q.   And what -- what is that bus?

8    A.   Are you --

9    Q.   I'm just asking you how -- who does it belong to?

10   A.   Oh, it belongs to Justin.

11   Q.   And looking at page 50, is that the same bus that's

12   pictured on this page?

13   A.   That is.

14   Q.   And is this a bus that you -- that Mr. Justin Ervin

15   purchased?

16   A.   It is.

17   Q.   And looking at page 52 -- do you know whether he purchased

18   the bus with cash, or did he finance it, or do you know?

19   A.   I think he said cash.

20   Q.   Looking at page 52, there's a picture of some wooded

21   property on this one, right?

22   A.   Yes.

23   Q.   And that's from February 27th of 2021?

24   A.   Correct.

25   Q.   And do you recognize that property?

1   A.   I do.

2   Q.   And what is that property?

3   A.   That's the property he purchased in -- for Lake City -- in

4   Lake City.

5   Q.   And do you know whether he financed that property?

6   A.   I understand he paid cash.

7   Q.   All right.  Do you know who, if anyone, was helping your

8   son Justin Ervin with the Auto Key Cards business?

9   A.   I think -- as far as --

10  Q.   Well, was there anyone who helped him with customer

11  service?

12  A.   Oh, yes.  It was Carolanne.

13  Q.   And who's Carolanne?

14  A.   Carolanne was my daughter's significant other.

15  Q.   Was she a longtime significant other of your daughter?

16  A.   Yes, she was.

17  Q.   And do you know -- do you know -- well, sorry.  Let me

18  start over.

19  A.   Okay.

20  Q.   You were aware that Matt Hoover was making videos that

21  promoted the auto key card?

22  A.   I was aware of one that I saw, yes.

23  Q.   Did your son Justin Ervin ever express to you any concerns

24  about the way in which Matt Hoover was promoting the auto key

25  card?

1    A.   Not that I'm aware of, no.

2    Q.   Did he seem happy with how Matt Hoover was promoting the

3    auto key card?

4    A.   Seemed to be.

5              MS. TAYLOR:  I have no further questions, Your Honor.

6              THE COURT:  Who am I going to hear from first?

7              MR. LAROSIERE:  (Indicating.)

8              THE COURT:  All right.  Mr. Larosiere.

9              MR. LAROSIERE:  May it please the Court?

10                         CROSS-EXAMINATION

11   BY MR. LAROSIERE:

12   Q.   Mr. Ervin, earlier you identified my client, Matthew

13   Raymond Hoover, right?

14   A.   Correct.

15   Q.   Have you ever seen Mr. Hoover at your house?

16   A.   No.

17   Q.   Anywhere in Florida?

18   A.   No.

19   Q.   Have you ever seen him in person at all?

20   A.   Not until yesterday.

21   Q.   Right.

22        Outside of this courthouse.

23   A.   No.

24   Q.   Okay.  Do you know when Matthew Hoover first met your son

25   Justin?

 1    A.    I -- no, I do not.

 2    Q.    Okay.

 3               MR. LAROSIERE:   Thank you so much.   That's all I

 4    have.

 5               THE COURT:   Mr. King?

 6               MR. KING:   May it please the Court?

 7               THE COURT:   Go ahead.

 8                           CROSS-EXAMINATION

 9    BY MR. KING:

10    Q.    Good afternoon, Mr. Ervin.

11    A.    Good afternoon, Mr. King.

12    Q.    I'm going to start off, do you love your son?

13    A.    Very much so.

14    Q.    And I know you have two sons.  I want to make sure I'm

15    clear.  I'm talking about Justin.

16    A.    I love him too.

17    Q.    All right.  And is this difficult for you to be here?

18    A.    Absolutely.

19    Q.    Are you here voluntarily, or were you required to be here?

20    A.    I'm required to be here.

21    Q.    Now, I want to talk about some things that -- let me start

22    off with this.

23               Me and you have talked before.

24    A.    Yes.

25    Q.    At any point in time have I told you what questions I was

1   planning on asking you or what we were going to discuss when

2   you were up here on the witness stand?

3   A.   Not at all.

4   Q.   Now, you've also met with attorneys for the Government?

5   A.   I have.

6   Q.   Have you met with them once or more than once?

7   A.   I've met during the investigation probably three times and

8   then a pretrial session.

9   Q.   And when I talk about the attorneys for the Government,

10  I'm talking about the attorneys seated here before you at

11  counsel table.

12  A.   Yes.

13  Q.   And you have -- and that was voluntary?

14  A.   It was.

15  Q.   And you were -- other -- and you discussed what questions

16  they were going to ask you during that time.

17  A.   We did.

18  Q.   And went over what your expected testimony would be here

19  today.

20  A.   Correct.

21  Q.   The -- you also met with several ATF agents over the

22  course of all of this?

23  A.   I have.

24  Q.   And voluntarily or not voluntarily?

25  A.   Both.

1    Q.    And you've answered all their questions?

2    A.    I have.

3    Q.    And you've been forthcoming and honest with them.

4    A.    Absolutely.

5    Q.    And was that difficult because of your -- because you were

6    talking about your son?

7    A.    At times it was, yes.

8    Q.    Were you honest and truthful with them throughout this

9    entire process?

10   A.    The entire time.

11   Q.    I want to talk to you a little bit about your son

12   specifically.

13         He had several failed businesses and ideas where he

14   was trying to sell things on the Internet --

15   A.    He did.

16   Q.    -- prior to this?

17   A.    He did.

18   Q.    And this was something he'd been working on over the

19   years, various business ideas.

20   A.    Yes.

21   Q.    And was it fair to say that he was always trying to come

22   up with new business ideas to promote various things?

23   A.    Yes, he was.

24   Q.    During the -- I want to talk to you a little bit about

25   what you know about him.

1          Was he a big fan of the Bureau of Alcohol, Tobacco,

2  Firearms and Explosives?

3  A.    No.

4  Q.    Did he make comments against them?

5  A.    Not aggressive comments.  Same comments everybody makes

6  from time to time.

7  Q.    And he expressed to you and I guess --

8          MS. TAYLOR:  Objection.  Hearsay.

9          THE COURT:  Sustained.

10 BY MR. KING:

11 Q.    The other thing I want to talk to you about in terms of

12 your son is kind of from his mental state and kind of who he is

13 as a person.

14          Did he -- have you heard the term "prepper" or

15 "doomsday prepper," things like that?

16 A.    Yes.

17 Q.    And certainly not putting words in your mouth, did your

18 son stockpile things like food and things like that?

19 A.    Yes, he did.  He --

20 Q.    And, you know, kind of a survivalist type of mentality?

21 A.    Very much so.

22 Q.    And did he, during the -- I mean, you've known him his

23 whole life, obviously.

24          During the course, did he tend to identify and

25 associate with people who thought like him?

1           MS. TAYLOR:  Objection.  Vague.

2           THE COURT:  Can you rephrase, please?

3    BY MR. KING:

4    Q.   During -- during your time, did you know him to associate

5    and spend time with people who shared those kind of survivalist

6    prepper ideas?

7    A.   Yes.

8    Q.   And during your time with him, without getting to specific

9    things he said, that's kind of an ideology that he would

10   espouse and things that he would say.

11          MS. TAYLOR:  Objection.  Hearsay.

12          THE COURT:  Sustained.

13   BY MR. KING:

14   Q.   Would you consider that part of his identity?

15   A.   Yes, very much so.

16   Q.   I want to talk to you a little bit about some of the

17   messages that we went through for the Government.

18          MR. KING:  Ms. Ganoe, if I could get Government

19   Exhibit 60, page 7.

20   BY MR. KING:

21   Q.   Now, prior to coming here, you discussed all of this with

22   the Government, correct?

23   A.   Correct.

24   Q.   And we have not discussed any of this.

25   A.   Correct.

1    Q.    The -- were there a lot of speed traps near your house?

2    A.    Yes.

3    Q.    Can you take a look at what's up on the screen.

4    A.    (Complies.)

5    Q.    Do you see that?

6    A.    The, "Hey, son, I wanna ..."?

7    Q.    Yes, sir.

8    A.    Okay.

9    Q.    Can you read that out loud?

10   A.    "Hey, son.  I just wanna let you know I saw a couple

11   unmarked cars right there around the corner from our house so

12   be careful going home.  Love you."

13   Q.    Did you write that because you thought he was going to go

14   get arrested, or you were worried he was going to be speeding?

15   A.    Worried he was going to be speeding.

16   Q.    And you shared that with the Government before coming here

17   today?

18   A.    They -- I did not.  They did not ask that question.

19   Q.    Okay.  That's fair.

20           MR. KING:  If we could turn to Exhibit 60, page 39.

21   BY MR. KING:

22   Q.    Do you see this message, Mr. Ervin?

23   A.    I do.

24   Q.    Could you read it out to the jury?

25   A.    "Okay.  Good.  I was surprised you had someone in the

1   house with the ATF dangers.  I don't trust it.  You don't want

2   me even talking to anyone, and you bring someone in.  Don't

3   understand it.  Anyway, I'm at a wedding.  Please take care of

4   Buster.  I may not get him tonight, but I will let you know.  I

5   can't answer now."

6   Q.   Did you write this message because you had a fear that ATF

7   was going to arrest him for something?

8   A.   No, sir.

9   Q.   What led to this message?

10  A.   There was a -- previously, Justin -- or I brought a friend

11  into the house --

12  Q.   And not to cut you off, when you say the house, this is

13  the house that he primarily lived in and you were kind of in

14  and out of?

15  A.   Yes, 2409 Kirkwall Court.

16  Q.   All right.  I'm sorry.  Please continue.

17  A.   Okay.  I brought a friend in, and Justin kind of was

18  chastising me in a way of bringing somebody in the house.  They

19  could see our food stores, our prepping, our water that we had

20  in the garage.  And he said -- and the firearms and ammo.

21          And he said, you know, "We need that -- we'll need

22  that for survival in the future, and if the economy went down,

23  we'd have to defend ourselves with that, and it's not good for

24  anybody to see that."

25          I thought he was a little pointed in the way he said

1   it.

2          So a few days later, I swung by the house and -- like

3   I said, I was on and off staying with my girlfriend.  I swung

4   by the house, and he had a friend there.  So that night, that

5   evening, I kind of bantered back to him what he had said to me.

6   Q.   And he'd gotten very upset with you?

7   A.   He did.

8   Q.   The -- and we talked about food and water storage.

9          This is not, like, for hurricane season or there was

10  a storm coming, was it?

11  A.   No.  He had facilitated, like, two 55-gallon drums of

12  water, water filters, supplies, fuel, generator, that kind of

13  stuff, not just hurricane stuff.

14  Q.   And I'm certainly not trying to belittle and make fun of

15  your son.

16          Was there -- was there something that was about to

17  happen that you were aware of or a natural disaster pending

18  that made that level of preparation in your mind necessary?

19  A.   Not in my mind, no.

20  Q.   And he was upset with you for somebody else even seeing

21  those preparations.

22  A.   Right.  Correct.

23  Q.   And so how does that lead to this message?

24  A.   I was just giving him some of his own medicine.

25  Q.   Okay.  Why did you mention the ATF specifically?

1   A.   Well, I mentioned the ATF because he has firearms in the

2   house, but in truthfulness, it was just an acronym that I

3   picked because he had firearms.

4   Q.   Did it have any -- did it have anything to do with his

5   feelings towards the ATF, why you picked that?

6   A.   No.

7   Q.   Now, I know we talked a little bit about, you know, you

8   voluntarily and sometimes not voluntarily speaking.

9        You're also -- you were also given a grant of

10  immunity to testify.  That's part of your compulsion to be here

11  today; is that correct?

12  A.   Yes.

13  Q.   And as part of that, you were told that if you provided

14  incomplete or untruthful testimony, statements, or information

15  pursuant to the grant of immunity or you falsely implicated or

16  incriminated any person or failed to voluntarily and

17  unreservedly disclose a full, complete, truthful, and honest

18  knowledge and information cooperation, that the agreement that

19  they wouldn't prosecute you would be null and void.

20       Is that your understanding?

21  A.   That is my understanding, yes.

22  Q.   And in terms of the number of auto key cards that were

23  recovered in your home, there was a substantial number.

24  A.   I don't know the exact number, but yes.

25  Q.   And if we -- there was -- not counting the auto key cards

 1  but the -- you know, the alleged devices that the Government
 2  has alleged are in there, about 1,550.
 3          Is that -- understanding you may not know the exact
 4  number, is that consistent with what your knowledge is?
 5  A.   Yes.  Yes.
 6  Q.   And you understand that the Government could potentially,
 7  if they charged you with each of those individually --
 8          MS. TAYLOR:  Objection, Your Honor.  I think it's --
 9  sorry, assuming knowledge that he hasn't stated he has.
10          THE COURT:  All right.  Let's rephrase the question,
11  Mr. King.
12          MR. KING:  Yes, Your Honor.
13  BY MR. KING:
14  Q.   Mr. Ervin, during the course of this case, you've learned
15  that each one of those is punishable by up to ten years in
16  prison.
17  A.   Yes.
18  Q.   And so if you were charged individually for all of those,
19  that would be 15,500 years in prison.
20          MS. TAYLOR:  Objection, Your Honor.
21          THE COURT:  Sidebar, please.
22      (At sidebar, out of the hearing of the jury:)
23          THE COURT:  Let me hear from you, Ms. Taylor.
24          MS. TAYLOR:  Your Honor, first off, I think it
25  completely mischaracterizes the amount of time in prison that

1   he could have been facing, because whenever we charge a

2   possession of a firearm by a convicted felon, we charge all the

3   firearms that were possessed on a date in a single count.  So

4   to suggest that it would be charged as, you know, 1500 counts

5   of possession of a firearm is really misleading.

6                THE COURT:  Mr. King --

7                MR. KING:  If I could address that.  I understand

8   that may be the current practice of the Jacksonville Division

9   of the Middle District of Florida on how they choose to charge

10  things.

11               They could -- that is not what the law is.  They

12  could charge each individually.  I mean, it's -- it's a lot; I

13  understand that.  But if they charged him individually, which

14  there's nothing that would legally prevent them from doing

15  that, that's the exposure.

16               And, you know, my client has over a hundred-year

17  exposure --

18               THE COURT:  Okay.  But, Mr. King, it's inappropriate

19  to bring in the specific penalty that the defendant may be

20  facing because the jury's not to consider that.

21               You are free to ask him if he understands he could --

22  there could be a significant sentence, but I'm going to direct

23  the jury to disregard the specific number because that's not --

24  that's not appropriate to bring before the jury.

25               MR. KING:  Your Honor, I -- it's for -- and I

1    understand the Court's point.  I guess that's what this

2    specific witness is facing.  So it -- the way that I understand

3    it, they're similar charges to Mr. Ervin, but that's what this

4    witness is facing.

5              I don't think it's misleading or incorrect.

6              THE COURT:  I'm not going to change my ruling on

7    that.  What you're doing --

8              MR. KING:  I understand.

9              THE COURT:  What you're trying to bring in, whether

10   it's your reason or not, is the sentence that Mr. Ervin could

11   be facing, and that's -- that's not appropriate for the jury's

12   consideration.

13             You are free to say that he could be facing a very

14   significant sentence, and that's fine.  But the specifics of

15   the potential sentence is not appropriate evidence for the jury

16   to consider.

17             MR. KING:  Yes, Your Honor.

18             THE COURT:  Okay.

19             MR. KING:  Understood.

20        (End of discussion at sidebar.)

21             THE COURT:  Ladies and gentlemen, I'm going to direct

22   you to disregard testimony regarding any specific penalty that

23   may be applicable to any charges in this case.

24             In any criminal trial, the question of sentence is

25   for the Court alone to consider and not the jury.

1            Go ahead.

2            MR. KING:  Thank you, Your Honor.

3  BY MR. KING:

4  Q.   Mr. Ervin, you understand that if the Government

5  determines your testimony in any way was untruthful, you're

6  subjected to a very lengthy prison sentence.

7  A.   I am.

8  Q.   And has that weighed on your mind throughout the time

9  you've been speaking with them in the testimony you've

10 provided?

11 A.   No.

12 Q.   And why not?

13 A.   Because I'm telling the truth.

14           MR. KING:  Nothing further, Your Honor.  Tender the

15 witness.

16           THE COURT:  Thank you, Mr. King.

17           Ms. Taylor, anything further for this witness?

18           MS. TAYLOR:  A little bit, Your Honor.

19                     REDIRECT EXAMINATION

20 BY MS. TAYLOR:

21 Q.   Mr. Ervin, we've been -- I've been clear with you

22 throughout our discussions that the Government views you as a

23 witness in this case so long as you're truthful, correct?

24 A.   That is correct.

25 Q.   Mr. Ervin, there was a question about the speed trap --

1    or, sorry, the unmarked cars text message.

2              And you explained that you believed that it could be

3    a speed trap, and that's why you were texting your son?

4    A.   Yes.  That's what I believed.

5    Q.   Have you -- have you ever seen a speed trap with unmarked

6    cars?

7    A.   There's plenty in Orange Park, yes.

8    Q.   They use unmarked cars for that.

9    A.   Yes.

10   Q.   Not patrol vehicles?

11   A.   Well, you know, I've seen cars on the side of the road

12   where they pulled -- had pulled over people.  There's a black

13   Camaro in Orange Park that is -- parks and pulls people over.

14   Q.   So the police in Orange Park are pulling over people with

15   unmarked cars.

16   A.   Well, I don't know specifically with that, but I did

17   see -- I have seen unmarked cars doing traffic stops.

18   Q.   And you talked about the "ATF dangers" text message that's

19   still up on the screen.

20   A.   Uh-huh.

21   Q.   And that's a yes?

22   A.   That's yes.

23   Q.   Sorry.  I'm just making sure because you said uh-huh.

24   A.   Oh, yeah.

25   Q.   The court reporter --

1    A.    I'm sorry.

2    Q.    -- doesn't know whether that's --

3    A.    I'm sorry.  Yes, I do see it, and it's on the screen.

4    Q.    Okay.  And your explanation -- I mean, you didn't say

5    police dangers, right?

6    A.    Uh-huh.

7    Q.    Yes?

8    A.    No, I did not say police dangers.

9    Q.    You didn't say DEA, right?

10   A.    I didn't say DEA.

11   Q.    You didn't say the FBI.

12   A.    No, I did not say the FBI.

13   Q.    You didn't say the IRS.

14   A.    No, I didn't say the IRS.

15   Q.    But your testimony is that you just picked ATF out of the

16   air?

17   A.    Well, mainly, as I've said, it was because he had firearms

18   in the house.

19   Q.    Okay.  So you --

20   A.    That was the main reason.

21   Q.    So you were thinking about Mr. Ervin's firearms in the

22   house, and that's why you said ATF?

23   A.    Yes.

24          MS. TAYLOR:  I have no further questions, Your Honor.

25          MR. KING:  Nothing further.  He can be excused.

1              MR. LAROSIERE:  Nothing further.

2              THE COURT:  You may step down, sir.  Thank you, and

3    you're excused.

4              THE WITNESS:  Thank you.

5         (Witness excused.)

6              COURTROOM DEPUTY:  I'll take that, sir.

7              THE WITNESS:  Oh, okay.

8              COURTROOM DEPUTY:  Thank you.

9              THE COURT:  Mr. Mesrobian?

10             MR. MESROBIAN:  Your Honor, the United States calls

11   Kristen Ervin.

12        (The witness entered the courtroom.)

13             COURTROOM DEPUTY:  If you can please remain standing

14   and raise your right hand for me.

15             Do you solemnly swear that the testimony you're about

16   to give before this Court will be the truth, the whole truth,

17   and nothing but the truth, so help you God?

18             THE WITNESS:  I do.

19             COURTROOM DEPUTY:  You may have a seat.

20             If you could please state your name for the record

21   and spell your first and last name.

22             THE WITNESS:  Kristen Ervin, K-r-i-s-t-e-n, last name

23   is E-r-v-i-n.

24             THE COURT:  Go ahead.

25             MR. MESROBIAN:  Thank you, Your Honor.

1                KRISTEN ERVIN, GOVERNMENT'S WITNESS, SWORN

2                            DIRECT EXAMINATION

3    BY MR. MESROBIAN:

4    Q.    Ms. Ervin, where do you live?

5    A.    2409 Kirkwall Court, Orange Park, Florida.

6    Q.    And how long have you lived in the Orange Park area?

7    A.    A good time.  Pretty much my whole life.

8    Q.    And what do you do for a living?

9    A.    I own my own company.

10   Q.    And what type of work is that?

11   A.    Basically corporate consultation for leaders, teaching

12   them to be more effective and efficient in what they do.

13   Q.    Ms. Ervin, do you know an individual named Kristopher

14   Justinboyer Ervin?

15   A.    Yes.

16   Q.    Is he your brother?

17   A.    Yes.

18   Q.    And do you know him as Justin?

19   A.    Yes.

20   Q.    I'll ask you -- I'm guessing you could identify him in the

21   courtroom, but would you just identify him by where he's

22   sitting and an article of clothing he's wearing?

23   A.    A suit with a yellow-goldish tie right there (indicating).

24              MR. MESROBIAN:  Your Honor, will the record reflect

25   that the witness identified Mr. Ervin?

 1              MR. KING:  Without objection, Your Honor.

 2              THE COURT:  The record will so reflect.

 3   BY MR. MESROBIAN:

 4   Q.   So, Ms. Ervin, do you want to be here to testify in this

 5   case today?

 6   A.   No.

 7   Q.   Were you required to be here to testify today --

 8   A.   Yes.

 9   Q.   -- pursuant to a -- pursuant to a subpoena?

10   A.   Yes.

11   Q.   And the Government provided you with a letter advising you

12   that your testimony wouldn't be used against you in a future

13   proceeding.

14   A.   Yes.

15   Q.   You understood that you took an oath to tell the truth

16   just now.

17   A.   Yes.

18   Q.   And is it your intent to do that?

19   A.   Absolutely.

20   Q.   Your brother -- and I'm going to refer to Mr. Ervin, and I

21   mean your brother.  If I mean another male member of your

22   family, I'll specify.

23   A.   Thank you.  Yes.

24   Q.   Mr. Ervin was arrested in March of 2021; is that right?

25   A.   Yes.

1  Q.   How often, leading up to his arrest, were you seeing him,
2  interacting with him?
3  A.   I would probably say pretty regularly.  A couple of times
4  a week.
5  Q.   During the months leading up to his arrest, did you
6  understand your brother to be interested -- I should say
7  Mr. Ervin to be interested in firearms?
8  A.   Yes.
9  Q.   Was that a longstanding interest?
10 A.   Yes.
11 Q.   Did you ever go shooting with him?
12 A.   I believe once on a family trip.
13 Q.   And to your knowledge, did he own an AR-15?
14 A.   Yes.
15 Q.   More than one?
16 A.   I'm not sure.  Could have been a few, but I don't know the
17 exact amount.
18 Q.   For his -- during his adult life, how was Mr. Ervin
19 employed?
20 A.   I know at one point he had his own telecommunications
21 company.  After that, I mean, he didn't really have a job.  My
22 dad took care of him most of the time.
23 Q.   Your dad was financially supporting him?
24 A.   Yes.
25 Q.   Were you aware at any point of other businesses that

1    Mr. Ervin had started?

2    A.   Yes.  He was looking into a company.  I believe it was

3    called Crazy Uncle Justin's, and it was around toys and things

4    like that.

5    Q.   Did he ever work as an artist?

6    A.   Not that I'm aware of.

7    Q.   Ms. Ervin, are you familiar with something called the auto

8    key card?

9    A.   Yes.

10   Q.   And whose business was the Auto Key Card?

11   A.   Justin's.

12   Q.   What did Mr. Ervin tell you about how or why he started

13   this business?

14   A.   It wasn't really so much around a how, but the information

15   I got was it was a metal card that was a conversation piece

16   around the Second Amendment.

17   Q.   Did he tell you ever how long ago he had had this idea for

18   this card?

19   A.   He did mention that it was a drawing that he had many

20   years ago and stored in what was called, like, an idea cabinet.

21   So there was multiple different ideas and thoughts and things

22   for the future, so ...

23   Q.   How old is your brother now?

24   A.   I don't know.  40 -- I'm 45, so 47, 48.

25   Q.   Well, approximately.

1      When he -- when he said that he had had this drawing
2  or he had made this drawing many years before --
3  A.   Yes.
4  Q.   -- did you understand that to be when he was a child or
5  when -- a younger adult?
6  A.   Probably -- I would probably say -- if I had to guess I'd
7  put ages around early kid to teenage years, probably around
8  there.
9  Q.   Did he ever show you this drawing of the card?
10 A.   No.
11 Q.   So was it your understanding that your brother was having
12 these metal cards made by some company?
13 A.   Yes.
14 Q.   And after he picked up those cards, was there a process
15 that he would go through before selling them?
16 A.   Yes.
17 Q.   And did you ever assist him with that process?
18 A.   Yes.
19 Q.   So could you tell the jury just what that was like.
20 A.   Yeah.  So the cards would come in, and they would have
21 almost like a machine oil on them.  And they would need to be
22 sanded down and kind of polished, all the rough spots and all
23 of that.
24      And then from there they were washed with hand soap
25 and then dried on, like, a beach towel and then put in a

1    plastic bag.

2    Q.   And you were doing this to sort of remove extra metal,

3    oil, that type of thing?

4    A.   Yes.

5    Q.   And did he ever pay you for that work?

6    A.   Yes.

7    Q.   And approximately how much?

8    A.   It honestly varied.  Sometimes it -- it could have been 20

9    bucks here, 40 bucks here, a hundred bucks here, but nothing

10   substantial.

11   Q.   Did anyone else assist with this sanding/cleaning?

12   A.   Yes.

13   Q.   Who was that?

14   A.   Johnny Monger, or Jonathan Monger, however ...

15   Q.   And is that a friend of yours or your brother's?

16   A.   Of Justin's.

17   Q.   Did you ever see any other items that he was selling as

18   part of this Auto Key Card business?

19   A.   I don't necessarily know about the selling part, but I did

20   see the image on, like, a beanie, and there was talk of it

21   being on a ball cap and a T-shirt and things of that nature.

22   Q.   But to your knowledge -- withdrawn.

23            You never saw large quantities of these items,

24   anyway.

25   A.   Correct.  I never saw large quantities.

1    Q.    What was your impression during the late 2020/early 2021

2    time frame as to how the Auto Key Card business was doing

3    financially?

4    A.    I don't know exact numbers, but I assumed it was doing

5    pretty well for people to start helping, I guess, process or

6    sand and polish the cards, so ...

7    Q.    Did your brother -- or did Mr. Ervin ever boast to you or

8    tell you about how much money he was making day to day, week to

9    week?

10   A.    Not necessarily money, but he would be like, "Oh, I sold

11   four today," or "five today," something along those lines, but

12   I never really knew an exact dollar amount.

13   Q.    At one point did Mr. Ervin tell you that his business or

14   his website had been shut down?

15   A.    Yes.

16   Q.    And did he tell you it was because the provider couldn't

17   handle the sales volume?

18   A.    I believe so, that there was something along -- with

19   either the volume or payment or something along those lines.

20   Q.    Did he ever tell you about -- that it was shut down

21   because he was selling restricted items or something illegal?

22   A.    No.

23   Q.    Before his arrest -- and I'm in the weeks or a couple

24   months before his arrest in March of 2021 -- did Mr. Ervin show

25   you recent purchases he had made?

1  A.   I don't know the exact timeline, but I knew about the bus,

2  and I knew that he wanted to purchase land.

3  Q.   So what do you know about this bus?

4  A.   I knew that he had found a bus and -- was looking for a

5  bus and found one, I believe, in Hastings.  And I actually

6  drove him down there to pick it up.

7  Q.   And do you understand that he -- he purchased this bus; is

8  that right?

9  A.   To my knowledge, yes.

10  Q.   Do you know how he paid for it?

11  A.   I do not.

12  Q.   And are you aware if he purchased that land that you

13  mentioned?

14  A.   I heard he did, but I didn't see, like, a deed or anything

15  along those lines, so ...

16  Q.   And are you aware during that time frame of him making any

17  other significant purchases of weapons or other related items?

18  A.   I know that he consistently would buy things.  I mean, it

19  would be anything from, like, a flashlight that would go on a

20  pistol, or it could have been a vest, a helmet, like those type

21  of things.

22  Q.   Ms. Ervin, did Mr. Ervin ever tell you he was partnering

23  with someone to promote sales of the auto key card?

24  A.   Yes.

25  Q.   And who was that?

1    A.    A gentleman by the name of Matt.

2    Q.    To be clear, did you ever talk to this person?

3    A.    To be honest, just in the hallway, like, during a break.

4    That's the first time I ever met him.

5    Q.    Prior -- prior to these proceedings, did you ever talk

6    to --

7    A.    No.

8    Q.    -- this person?

9          But your -- Mr. Ervin was -- advised you that he

10   had -- he was partnering with this person to promote sales of

11   auto key cards.

12   A.    Yes.

13   Q.    Are you aware if Mr. Ervin used social media?

14   A.    Yes.

15         MR. MESROBIAN:  And, Your Honor, may we publish

16   what's already in evidence as Government's Exhibit 54?

17         THE COURT:  Go ahead.

18         MR. MESROBIAN:  And, Ms. Ganoe, could we go to page

19   22, please.

20         And if we could zoom in on the top quarter or so.

21   BY MR. MESROBIAN:

22   Q.    So there's a heading at the top of page 22 of Government

23   Exhibit 54, and it says, "Profile picture," and below that, is

24   that an image of Mr. Ervin?

25   A.    Yes.

1  Q.   So further down or -- further down in this -- where we are

2  right now, there's a heading that says, "Comments."

3          MR. MESROBIAN:  And if we could go to page 23.

4          And focus on the bottom half, please.

5  BY MR. MESROBIAN:

6  Q.   There's a heading up there that says -- well, there are a

7  few line items that say, "Media owner, Kristen Ervin," and then

8  there's texts of particular comments that were made by the --

9  this account.

10          And it says, "I love this."

11          Below that there's a text that says, "Nice.  Bad to

12  the bone."

13          And those are -- Kristen Ervin, do you have your own

14  Instagram account?

15  A.   Yes.

16  Q.   And do you recall connecting or becoming friends with

17  Mr. Ervin on Instagram?

18  A.   I mean, I don't know an exact date, but I would imagine I

19  would have.

20  Q.   To your knowledge, did anyone else use Mr. Ervin's

21  Instagram account?

22  A.   Not to my knowledge.

23          MR. MESROBIAN:  I have no further questions for

24  Ms. Ervin.

25          THE COURT:  Go ahead, Mr. Larosiere.

```
 1                      CROSS-EXAMINATION
 2   BY MR. LAROSIERE:
 3   Q.   Good afternoon, Ms. Ervin.  Just a couple questions.
 4          So you -- can you recognize Mr. Matthew Hoover?
 5   A.   I'm assuming it's the gentleman behind my brother.
 6   Q.   Okay.
 7   A.   Am I right?
 8   Q.   You are.
 9   A.   Okay.
10          THE COURT:  Well, actually, you ask questions.
11          You just answer questions.
12          THE WITNESS:  Oh, sorry.
13          THE COURT:  Go ahead.
14          MR. LAROSIERE:  Right.  That's fine.
15   BY MR. LAROSIERE:
16   Q.   So you said you'd never met Mr. Matthew Hoover, right?
17   A.   Correct.
18   Q.   You spent quite a bit of time with Justin Ervin, right?
19   A.   Yes.
20   Q.   Did you ever have any -- rephrase this carefully.
21          Are you personally aware of Justin Ervin and Matthew
22   Hoover ever meeting in person before this week?
23   A.   Not that I know of.
24          MR. LAROSIERE:  Nothing further.  Thank you so much.
25          THE COURT:  Mr. King.
```

                            CROSS-EXAMINATION
2   BY MR. KING:
3   Q.   Good afternoon, ma'am.
4   A.   Hi.
5   Q.   Excuse me.  I think it's going around.
6            Good afternoon.
7   A.   Hi.
8   Q.   I wanted to ask you a couple of questions about your
9   brother.
10           Without getting into the details of what he said, do
11  you remember a time where he became very angry at his bank?
12  A.   Yes.
13  Q.   And what was the source of his frustration?
14  A.   From what I recall, it was that he went to try and get
15  money and that they didn't have enough there.
16  Q.   And how did that impact him?  How did he feel about that?
17  A.   I believe it was towards the purchase of the bus.  And so
18  I believe I said, "Well, you know, just wait until they get the
19  money and go get what you need," but ...
20  Q.   Was he upset?
21  A.   Yeah.
22  Q.   I -- and I'll apologize in advance.  I want to get into a
23  subject that may be a little sensitive to you.
24           Who is Carolanne Wolfe?
25  A.   She is my ex.

1   Q.   How long were the two of you together?

2   A.   12 years.

3   Q.   Did you live together?

4   A.   Yes.

5   Q.   Did you share a house together?

6   A.   Yes.

7            MR. MESROBIAN:  Objection, Your Honor.  Relevance.

8            THE COURT:  Mr. King, may I see you -- counsel at

9   sidebar?

10           MR. KING:  Yes, Your Honor.

11       (At sidebar, out of the hearing of the jury:)

12           THE COURT:  What's the relevance, Mr. King?

13           MR. KING:  Your Honor, Ms. Wolfe is a Government

14  witness that I expect to be testifying later today, who went

15  through a very messy breakup with Ms. Ervin, and it goes

16  towards her bias towards her testimony.

17           MR. MESROBIAN:  I don't exactly understand how a

18  messy breakup between Ms. Kristen Ervin and Ms. Wolfe would

19  somehow color her testimony involving a federal trial of

20  Ms. Ervin's brother.  I --

21           THE COURT:  We'll let the jury evaluate that.

22           I mean, if somebody is antagonistic to their ex, one

23  can certainly consider whether that would influence their

24  testimony about the ex's family member.

25           So I can't say it's irrelevant, so I'm going allow

 1   it, but you'll be able to address it on redirect.

 2              MR. MESROBIAN:  Okay, Your Honor.

 3              THE COURT:  Okay.

 4        (End of discussion at sidebar.)

 5              THE COURT:  Go ahead, Mr. King.

 6              MR. KING:  Thank you, Your Honor.

 7   BY MR. KING:

 8   Q.   I can't remember where I stopped, so I'm going to take a

 9   step back.

10              You said you were in a relationship with her for a

11   little over 11 years.

12   A.   Yes.

13   Q.   And this was not a friendship.  This was a romantic

14   relationship.

15   A.   Correct.

16   Q.   And you lived together?

17   A.   Yes.

18   Q.   You owned a home together.

19   A.   Yes.

20   Q.   You had pets together?

21   A.   Yes.

22   Q.   What was the -- how many pets?

23   A.   Three.

24   Q.   During the course of the last two years, are y'all still

25   together?

1  A.   No.

2  Q.   How would you describe your -- let me ask it this way.

3       Sometimes people break up, and they remain good

4  friends.  Sometimes they don't.

5       How would you describe your current relationship with

6  Ms. Wolfe?

7  A.   No contact whatsoever.

8  Q.   Do y'all just not speak, or do you not get along, or --

9  A.   The relationship ended on really bad terms, and so I just

10 thought it was better for me not to be around that toxic

11 environment, so ...

12 Q.   And would it -- I understood it ended on bad terms.

13      Would you -- would it be fair to say the two of you

14 are still on very bad terms?

15 A.   Well, I guess no terms is bad terms, so yeah.

16 Q.   And did you have a fight with her about who was going to

17 keep which pets?

18      MR. MESROBIAN:  Objection, Your Honor.  Hearsay.

19      THE COURT:  Sustained.

20      THE WITNESS:  (Unintelligible.)

21      THE COURT:  You don't answer.

22      THE WITNESS:  I'm sorry.

23      MR. KING:  I'm sorry, Your Honor.

24      THE COURT:  No.  The witness was confused about

25 whether she should answer the question, but I sustained the

1  objection, so there's no answer necessary.

2  BY MR. KING:

3  Q.   And, Ms. -- Ms. Ervin, you had -- it wasn't a quick

4  breakup.  It was a long, drawn-out fight over items and who was

5  going to own the house and all sorts of things.

6  A.   I wouldn't necessarily say it was a fight.  I left with a

7  lot less out of my choices, but some things were pretty hard to

8  deal with, yes.

9  Q.   And without getting into the details of what the two of

10  you have said, is this something -- would you -- based on your

11  conversations with her and how things went, do you think her

12  feelings would be similar to your feelings?

13           MR. MESROBIAN:  Objection, Your Honor.

14           THE COURT:  Sustained.  That's entirely speculative.

15  BY MR. KING:

16  Q.   To your knowledge, has she maintained friendly

17  relationships with any members of your family?

18  A.   Not to my knowledge.

19           MR. KING:  Your Honor, I have nothing further.

20           THE COURT:  Mr. Mesrobian?

21                      REDIRECT EXAMINATION

22  BY MR. MESROBIAN:

23  Q.   Ms. Ervin, is there anything about your -- the end of your

24  relationship with Ms. Wolfe that affects your testimony here

25  today?

1  A.   Absolutely not.

2  Q.   You're here to tell the truth.

3  A.   Yes, sir.

4  Q.   And have you done so today?

5  A.   Yes, sir.

6            MR. MESROBIAN:  I have no questions, Your Honor.

7            THE COURT:  Anything else, Counsel?

8            MR. KING:  No, Your Honor.

9            MR. LAROSIERE:  No, Your Honor.

10           THE COURT:  All right.  You may step down.

11           And this witness is released?

12           MR. MESROBIAN:  Yes, Your Honor.

13           MR. KING:  Yes, Your Honor.

14           THE COURT:  Okay.

15       (Witness excused.)

16           THE COURT:  All right.  Who's the next witness?

17           MR. MESROBIAN:  Your Honor, the United States calls

18  Carolanne Wolfe.

19       (The witness entered the courtroom.)

20           THE COURT:  I'm going to ask you to come all the way

21  up here.  Right up here.

22           And remain standing for just a moment.

23           THE WITNESS:  Okay.

24           COURTROOM DEPUTY:  If you would please raise your

25  right hand for me.

1        Do you solemnly swear that the testimony you're about
2  to give before this Court will be the truth, the whole truth,
3  and nothing but the truth, so help you God?
4        THE WITNESS:  I do.
5        COURTROOM DEPUTY:  You may have a seat.
6        And if you could please state your name for the
7  record and spell your first and last name.
8        THE WITNESS:  Yes.  It's Carolanne Wolfe,
9  C-a-r-o-l-a-n-n-e, W-o-l-f-e.
10        THE COURT:  Go ahead, Mr. Mesrobian.
11        CAROLANNE WOLFE, GOVERNMENT'S WITNESS, SWORN
12                     DIRECT EXAMINATION
13  BY MR. MESROBIAN:
14  Q.  Good afternoon, Ms. Wolfe.
15        Could you tell the jury where you live, generally?
16  A.  I live in the Oakleaf area.
17  Q.  And is that in Jacksonville, Florida?
18  A.  Yes.  Yes.
19  Q.  And how long have you lived in the Jacksonville area?
20  A.  All my life.
21  Q.  And what do you do for a living?
22  A.  I do instructional design for educational courses.
23  Q.  And could you describe a bit of your educational and
24  professional background.
25  A.  I have a bachelor's degree in psychology and just various

1    work experience, and I'm mostly self-taught with what I do

2    currently.

3    Q.    Have you ever worked as a musician?

4    A.    Yes, I have.

5    Q.    And what type of music or music-related work do you do?

6    A.    I work with various artists and helped them produce

7    whatever genre they want, and then I make my own personal music

8    too.

9    Q.    And do you have a performer name?

10   A.    Yes.  I release my music under Taylor Voss.

11   Q.    Is that V-o-s, Vos?

12   A.    V-o-s-s.

13   Q.    V-o-s-s.

14   A.    Uh-huh.

15   Q.    Thank you.

16         And do you have a background in graphic design?

17   A.    I'm self-taught with that.

18   Q.    But you -- have you pursued graphic design and graphic

19   design work in the past?

20   A.    Not professionally, just for my personal projects.  I

21   design the covers for my songs.

22   Q.    So, Ms. Wolfe, do you know an individual named Kristopher

23   Justinboyer Ervin?

24   A.    Yes.

25   Q.    And you know him as Justin?

1   A.   Yes.

2   Q.   When -- or how did you first meet Mr. Ervin?

3   A.   I met him through his sister Kristen.

4   Q.   And approximately when was that?

5   A.   I'd say probably around 2011, 2011 sometime.

6   Q.   Were you in a relationship with Mr. Ervin's sister?

7   A.   Yes.

8   Q.   And to be clear, are you currently in a relationship

9   with --

10  A.   No.

11  Q.   -- Ms. Ervin?

12           When did that relationship end?

13  A.   December of 2021.

14  Q.   And did it end on good terms or not so good terms?

15  A.   It was amicable for the most part.

16  Q.   Is there anything about the breakup with Mr. Ervin's

17  sister that is affecting your testimony today?

18  A.   No.

19  Q.   And to be clear, do you want to be here today testifying?

20  A.   No.

21  Q.   Were you required to be here today pursuant to a subpoena?

22  A.   Yes.

23  Q.   Prior to your testimony, we -- you have met with the

24  Government voluntarily.

25  A.   Yes.

1  Q.    And did we provide you with a letter setting forth terms

2  that your testimony today, if truthful, would not be used

3  against you in a future proceeding?

4  A.    Yes.

5  Q.    You understand a few minutes ago you took an oath to tell

6  the truth.

7  A.    Yes.

8  Q.    And is it your intent to tell the truth today?

9  A.    Yes.

10  Q.    So with respect to Mr. Ervin, you met -- you met him

11  through his sister.

12  A.    Yes.

13  Q.    What was the nature of your relationship with Mr. Ervin

14  initially?

15  A.    It was friendly.

16  Q.    Over time did you become friends yourself with Mr. Ervin?

17  A.    Yes, over time.

18  Q.    So do you recognize him in the courtroom today?

19  A.    Yes, I do.

20  Q.    And would you identify him by where he's sitting and an

21  article of clothing?

22  A.    Yes.  He's sitting at the table right there with the

23  yellow tie.

24        MR. MESROBIAN:  Your Honor, would the record reflect

25  that the witness identified Mr. Ervin?

 1              MR. KING:  Without objection, Your Honor.

 2              THE COURT:  The record will so reflect.

 3    BY MR. MESROBIAN:

 4    Q.   So, first, did you understand Mr. Ervin to be interested

 5    in firearms?

 6    A.   Yes.

 7    Q.   Are you interested in firearms yourself?

 8    A.   No.

 9    Q.   Did you ever go shooting with him?

10    A.   One time, a long time ago.

11    Q.   To your knowledge, did he own an AR-15?

12    A.   I know he had machine guns.  I don't know what -- what

13    types.

14    Q.   And when you say --

15    A.   Or rifles, I'm sorry.

16    Q.   Are you familiar with an AR-15 or how it works even?

17    A.   Not in great detail, no.

18    Q.   So during the course of this investigation, you spoke to

19    agents with the Bureau of Alcohol, Tobacco, Firearms and

20    Explosives; is that right?

21    A.   Yes.

22    Q.   And you voluntarily provided your phone so that your text

23    messages with Mr. Ervin could be extracted.

24    A.   Yes.

25              MR. MESROBIAN:  Your Honor, may I approach with

1    Government Exhibit 59?

2              THE COURT:  You may.

3    BY MR. MESROBIAN:

4    Q.   So, Ms. Wolfe, I placed Government Exhibit 59 marked for

5    identification before you.

6              Could you just take a look through a few of those

7    pages to see if you recognize it.

8    A.   Yes.

9    Q.   And what do you see in this document?

10   A.   (No response.)

11   Q.   Are these text messages between you and Mr. Ervin?

12   A.   Yes.

13   Q.   To be clear, are these -- the text messages you provided

14   with Mr. Ervin went back a number of years; is that right?

15   A.   Yes.

16   Q.   Is this all of the text messages that you exchanged with

17   Mr. Ervin over those years?

18   A.   This is a good bulk of them.  I know he's changed numbers,

19   so there might be messages on his end, and I changed phones

20   too, so whatever was on that phone.

21   Q.   And to be clear -- I understand, but with respect to the

22   ones that you provided --

23   A.   Oh, yes.  Yes.

24   Q.   -- to the Government, this is some -- many but not all of

25   those messages.

1   A.   Right.  Yes.

2   Q.   And are the screenshots -- these are in a screenshot

3   format kind of?

4   A.   Yes.  It appears to be.

5   Q.   Are these screenshots a fair and accurate documentation of

6   your text message conversations with Mr. Ervin?

7   A.   Yes.

8            MR. MESROBIAN:  Your Honor, move into -- the

9   Government moves Government Exhibit 59 into evidence.

10            MR. KING:  Without objection, Your Honor.

11            MR. LAROSIERE:  No objection.

12            THE COURT:  59 is admitted.  You may publish if you

13   wish.

14            MR. MESROBIAN:  Thank you, Your Honor.

15       (Government's Exhibit 59 was received in evidence.)

16            MR. MESROBIAN:  Ms. Ganoe, can we publish page 1,

17   please.

18   BY MR. MESROBIAN:

19   Q.   And you can either follow along on the page or on the

20   screen in front of you.

21   A.   Okay.

22   Q.   So the first page here --

23            MR. MESROBIAN:  And can we zoom in on the top part?

24   BY MR. MESROBIAN:

25   Q.   So the date on this is March 21st, 2020.

1           Was that around the beginning of the COVID-19

2    pandemic?

3    A.   Yes.

4    Q.   And when we're looking at these messages, there are ones

5    in white on the left side of the screen with a J next to them.

6           Are those Mr. Ervin's messages?

7    A.   Yes.

8    Q.   And then there are ones in green on the right side of the

9    screen.

10          Are those your messages?

11   A.   Correct.

12   Q.   So, Mr. Ervin, on Saturday, March 21st, 2020, sends you a

13   message about a run on the bank that he perceives, and towards

14   the bottom of that message, which appears to cut off -- because

15   of the format here, not -- the full message is not always

16   captured; is that right?

17   A.   Yes.

18   Q.   And where it says, "View all," that would indicate that

19   there was additional text in that message?

20   A.   Uh-huh.

21   Q.   But from what we see here, at the end of this message on

22   March 21st at 1:24 a.m., Mr. Ervin states, "I would go to your

23   closest branch when it opens at 8:00 or 9:00 a.m. and try to

24   take out half of what you want.  Say you're buying a car for a

25   great deal from a friend cash, settle for what," and then it

1    continues on; is that right?

2    A.    Correct.

3    Q.    And further down this page there's a reference to a

4    collection, and Mr. Ervin says, "That's not all of it.  I have

5    some more.  It's just my get-out-of-Dodge collection.  When you

6    get here, I will show you the cool stuff."

7             And you say, "Looking forward to seeing the rest of

8    it."

9             Did I state that accurately?

10   A.    Yes.

11   Q.    Do you recall what Mr. Ervin meant about a

12   get-out-of-Dodge collection?

13   A.    At the time I -- we were discussing purchasing gold and

14   silver, so ...

15   Q.    And was he advocating purchasing gold and silver?

16   A.    Yes.

17   Q.    And why was that?

18   A.    He felt it was a good investment at the time.

19            MR. MESROBIAN:  You can take this down.

20   BY MR. MESROBIAN:

21   Q.    Ms. Ervin [verbatim], did there come a time when you

22   helped Mr. Ervin with one of his businesses?

23   A.    Yes.

24   Q.    More than one business did you assist him with?

25   A.    Yes.

1   Q.   What was the first business that you assisted him with?

2   A.   I don't remember the name of the business, but he sold

3   slime for kids and kids' toys.

4   Q.   And was he manufacturing slime?

5   A.   No.  It was -- it was -- no, he was not.

6   Q.   What type of business was this?

7   A.   I guess I would call it a drop-shipping business where he

8   would acquire the products and then resell them on Amazon.

9   Q.   And what was your role with respect to that business?

10  A.   Just offering an outside opinion on the aesthetic of the

11  products and how they were packaged.  He was trying to create a

12  label for them, so he just kind of wanted my input on how it

13  looked.

14  Q.   Was that business successful, to your knowledge?

15  A.   No.

16  Q.   Subsequently, did you become aware of one of Mr. Ervin's

17  businesses called the Auto Key Card?

18  A.   Yes.

19  Q.   How did you first hear about it?

20  A.   First heard about it, I want to say, the summer of 2020.

21  August sometime, I think, is when he had mentioned it to me.

22  Q.   And Mr. Ervin first mentioned it to you?

23  A.   Uh-huh.

24  Q.   And what did he tell you about it?

25              THE COURT:  I'm sorry.  Is that yes?

1          THE WITNESS:  Yes.  I'm sorry.  Yes.

2          MR. MESROBIAN:  Thank you, Your Honor.

3   BY MR. MESROBIAN:

4   Q.   What did you tell you about it?

5   A.   He described it as a conversational piece.  Artwork is how

6   he described it.

7   Q.   Did he tell you what the origin of this thing was?

8   A.   Yes.  He told me about a story when he was younger; I

9   think 10 or 12 years old.  And he spoke to I believe it was a

10  war veteran who talked about that particular drawing that he

11  had on it.  And the person had told him that, "One day we won't

12  be able to talk about this anymore."  So he just kept that with

13  him for a long time.

14          And that's what he told me.

15  Q.   What items did Mr. Ervin tell you he was planning to sell

16  with this picture on it?

17  A.   Initially he just told me the metal cards.

18  Q.   Did he ever sell paper drawings of this drawing?

19  A.   No paper drawings.  He eventually put that image on

20  T-shirts and hats.  I think water bottles too.

21  Q.   Did putting this design onto a metal card strike you as

22  strange?

23  A.   At first it did.  It wasn't what I -- it wasn't my cup of

24  tea as far as artwork is concerned, but I wasn't one to judge.

25  That's the presentation he wanted.

1   Q.   So moving forward, you mentioned this was probably in the

2   summer or August of 2020?

3   A.   Uh-huh.

4   Q.   Did you continue to talk about the Auto Key Card business

5   with Mr. Ervin?

6   A.   Yes.

7   Q.   Did he ever tell you about different types of these cards,

8   metal cards, that he planned to sell?

9   A.   Not initially.

10  Q.   Did he -- at a point did he tell you about different types

11  of these cards?

12  A.   Yes.  He had other ideas.

13  Q.   Well, with respect to these metal cards, are you familiar

14  with the terms 1 in 1, 2 in 1 --

15  A.   Yes.

16  Q.   -- and 3 in 1?

17  A.   Yes.

18  Q.   Whose idea was it to have 1 in 1, 2 in 1, and 3 in 1

19  versions of these cards?

20  A.   It was his idea.

21  Q.   His being Justin's?

22  A.   Justin's, yes.

23  Q.   Mr. Ervin's?  Sorry.

24  A.   Yes.

25  Q.   Did he explain to you why -- the reasons behind these

1  different versions?

2  A.   He just thought it was cool to kind of make a pattern with

3  that image, so he would kind of just play with the pattern of

4  it and see how many he could fit on the card.

5  Q.   Did he explain to you why he would charge more for a 2 in

6  1 than a 1 in 1 and more for a 3 in 1 than a 2 in 1?

7  A.   I believe at some point he added a bottle opener on the

8  end of one of them, so that was part of the reason for charging

9  more.

10  Q.   Well, regardless of a bottle opener, did you become aware

11  that a 2 in 1 cost more than a 1 in 1?

12  A.   Yes.

13  Q.   And a 3 in 1 cost more than a 2 in 1.

14  A.   Yes.

15  Q.   The numbers 3 and 2 referred to the number of these

16  designs that were on the card?

17  A.   Yes.

18  Q.   Did you ever discuss with him anything related to the auto

19  key card being copyrighted or patented?

20  A.   Yes.

21  Q.   And what did he say about that?

22  A.   On the card it had the copyright symbol and the "Patent

23  Pending" written on it.  So I asked him about it, and he said

24  it was to deter potential people from stealing his idea.

25  Q.   But did he tell you that he had actually applied for a

1    copyright or a patent?

2    A.    No.

3    Q.    So did you -- did there come a time when you became

4    involved in assisting Mr. Ervin with this business?

5    A.    Yes.

6    Q.    And what was your role at the beginning for the business?

7    A.    Initially it was to look at his website and kind of look

8    for -- do proofreading, look for errors, look for ways to make

9    it more seamless.

10   Q.    And Mr. Ervin had set up a website; is that right?

11   A.    Yes.  He had set up two websites.

12   Q.    And was that autokeycard.com?

13   A.    Yes.

14   Q.    What was the other website you referenced?

15   A.    Well, he had used Shopify at one point, and then -- I

16   guess the commerce store had changed, is more what I meant.  He

17   had used Shopify at one point, and then he switched to, I

18   believe, Squarespace at some point.

19   Q.    Do you know if Mr. Ervin set up business email accounts

20   associated with the autokeycard.com domain?

21   A.    Yes.

22   Q.    Did there come a time when he set up a particular email

23   address for you?

24   A.    Yes.

25   Q.    And was that the admin@autokeycard.com account?

1   A.    Yes.

2   Q.    There were a number of other accounts with the

3   autokeycard.com domain; is that right?

4   A.    Yes.

5   Q.    Did Mr. Ervin use all of those accounts?

6   A.    Yes.

7   Q.    Did he check them regularly, to your knowledge?

8   A.    Yes.

9   Q.    And you corresponded with him from your admin account --

10  you sent messages from your admin account to him on the other

11  accounts; is that right?

12  A.    Yes.

13          MR. MESROBIAN:  And, Ms. Ganoe -- or, Your Honor, may

14  we publish Government Exhibit 67C, already in evidence?

15          THE COURT:  You may.

16  BY MR. MESROBIAN:

17  Q.    So, Ms. Wolfe, we're jumping forward a good bit in time,

18  but do you recognize this email?

19  A.    Which email?

20  Q.    So at the bottom there, there's an email from

21  admin@autokeycard.com --

22  A.    Yes.

23  Q.    -- on February 10th, 2021, at 4:56 p.m.

24          And the email reads:  "Hi, Justin.  When you get a

25  moment, can you mail this customer a replacement order?

1    Thanks, Carolanne."

2              Did I read that correctly?

3    A.   Yes.

4    Q.   And would that have been an email you sent from the admin

5    account to Mr. Ervin?

6    A.   Yes.

7    Q.   And the email account autokeycard@autokeycard.com replied,

8    "Done.  Here is the info.  Thank you."

9              Did I read that correctly?

10   A.   Yes.

11   Q.   And is that a response from Mr. Ervin?

12   A.   Yes.

13   Q.   And is that generally how you might correspond with him

14   from time to time?

15   A.   Yes.

16   Q.   Did there come a time when Mr. Ervin gave you access to a

17   customer service account?

18   A.   Yes.

19   Q.   And was that sometime later in the business when sales

20   were increasing?

21   A.   Yes.

22   Q.   Did you understand that Mr. Ervin was monitoring that

23   account -- that account as well?

24   A.   Yes.

25   Q.   We'll talk about this more later, but at times would you

1   see that he had replied to emails in that account before you

2   even saw them?

3   A.   Sometimes.

4   Q.   If Mr. Ervin asked you to respond to emails in that

5   account, would you have done that?

6   A.   Yes.

7   Q.   In general, Ms. Ervin [verbatim], when you sent emails

8   relating to the Auto Key Card business, would you speak to

9   Mr. Ervin first or send a message to him first?

10  A.   Yes.

11  Q.   And why would you do that?

12  A.   There were some emails that I didn't know how to respond,

13  and I wanted to ask him how to respond.

14  Q.   Did Mr. Ervin also like to exercise control in his

15  business?

16  A.   Yes.  He was -- had his hands in everything, pretty much.

17  Q.   Did anyone else have access to the autokeycard.com email

18  accounts, to your knowledge?

19  A.   No.

20  Q.   And who was paying for the autokeycard.com domain?

21  A.   He was.

22  Q.   Mr. Ervin?

23  A.   Mr. Ervin, yes.

24  Q.   And who controlled the access to these accounts?

25  A.   He did.

1   Q.   And did he have access to all of these email accounts, to

2   your knowledge?

3   A.   Yes.

4   Q.   So did anyone else help with the sort of physical aspects

5   of the Auto Key Card business?

6   A.   The physical aspects?

7   Q.   That's unclear.  I'm sorry.

8        The handling of the cards and getting them ready for

9   production -- or for shipping.

10  A.   Yes.

11  Q.   And what type of -- who were those people?

12  A.   Kristen Ervin, and I think his name's Johnny Monger.

13  Q.   And what type of tasks did Ms. Ervin and Mr. Onger do --

14  Mr. Monger do?

15  A.   They helped with -- when they came from wherever they were

16  manufactured, they were not the finished product.  They were --

17  like, they had grease on them, and they were dirty.

18        So there were sanding belts, and they would polish

19  them and wipe them off and clean them.  They helped with that.

20  Q.   And that was prior to them being sent out to the

21  purchaser.

22  A.   Yes.

23        THE COURT:  Ma'am, can I ask you to try and keep your

24  voice up a little bit?

25        THE WITNESS:  Oh, I'm sorry.

1          THE COURT:  Thank you.

2          Okay.  Go ahead.

3   BY MR. MESROBIAN:

4   Q.   Ms. Wolfe, did you have an understanding of how, early in

5   the business, Mr. Ervin was advertising the auto key card?

6   A.   I think it was not too soon after he had set up the basic

7   things, like the domains and all that.  I think it was probably

8   September sometime maybe.  It was -- he had told me about it in

9   August, and so about -- not too soon after, he had started

10  advertising or trying to advertise for it.

11  Q.   And was he advertising on social media?

12  A.   Yes.

13  Q.   Did he tell you about attempts to advertise on Facebook?

14  A.   Yes.

15  Q.   And how did that go?

16  A.   Not very well.

17  Q.   Do you recall him telling you that he had issues with

18  getting kicked off of Facebook?

19  A.   Yes.

20  Q.   Did Mr. Ervin use social media, other social media, to

21  advertise the product?

22  A.   Yes.  I believe he used Instagram as well.

23          MR. MESROBIAN:  Your Honor, may we publish Government

24  Exhibit 53, already in evidence?

25          THE COURT:  Yes.

1           MR. MESROBIAN:  Go to page 2, please.

2    BY MR. MESROBIAN:

3    Q.   So at the top -- this is a record from Instagram.  And at

4    the top it says, "Service, Instagram" and, "Account,

5    autokeycarddotcom."  Is that right?

6    A.   Yes.  Yes.

7    Q.   Is this -- do you recall this being the business Instagram

8    account that Mr. Ervin set up?

9    A.   Yes.

10          MR. MESROBIAN:  Ms. Ganoe, can you go to page 53,

11   please.

12   BY MR. MESROBIAN:

13   Q.   So, Ms. Wolfe, there's a photo up here from the Instagram

14   account.

15          Does that look familiar to you?

16   A.   No.

17   Q.   Were you familiar with how Mr. Ervin -- withdrawn.

18          Did Mr. Ervin handle the shipment of these auto key

19   cards?

20   A.   Yes.

21   Q.   And how would he ship these out to customers?

22   A.   USPS.

23   Q.   Did he use a particular type of packaging?

24   A.   Yes.  He used specific -- like a bubble envelope, kind of.

25   Q.   And is it the bubble envelope or bubble mailing --

1   A.    Yes.

2   Q.    -- here (indicating)?

3   A.    It looked like them, yes.

4   Q.    It looked like the ones in this photograph?

5   A.    Uh-huh.

6              THE COURT:  Is that yes?

7              THE WITNESS:  Yes.

8   BY MR. MESROBIAN:

9   Q.    And to your recollection, did Mr. Ervin post pictures like

10  this on Instagram regarding the auto key card as a means of

11  promoting it?

12  A.    Yes.

13  Q.    Do you know if Mr. Ervin himself made any advertising

14  videos?

15  A.    I know he was trying to experiment with making his own

16  videos.

17  Q.    Did you ever view a couple of these videos or one of these

18  videos?

19  A.    I came across one of them, yes.

20  Q.    And did that video involve a fish?

21  A.    Yes.

22             MR. MESROBIAN:  Your Honor, may we publish already in

23  evidence Government Exhibit 49A?

24             THE COURT:  You may.

25       (Video played.)

1         MR. MESROBIAN:  And now, Your Honor, may we publish

2    Government Exhibit 49B, already in evidence?

3         THE COURT:  Yes.

4      (Video played.)

5    BY MR. MESROBIAN:

6    Q.   So, Ms. Wolfe, I just played two videos for you,

7    Government Exhibit 49A and 49B.

8         Do you recall seeing one or both of those videos

9    before?

10   A.   The first video, yes.

11   Q.   And is that the video that -- with the fish?

12   A.   Yes.

13   Q.   And the fish in that video -- I won't replay it, but

14   there's a fish in this video, and then there's a -- the auto

15   key card pops onto the screen; is that right?

16   A.   Yes.

17   Q.   And the auto key card in that video, is that similar to

18   the ones that you saw Mr. Ervin handling and selling?

19   A.   Yes.

20   Q.   And after the auto key card pops on the screen, the fish

21   begins firing -- it appears to be firing bullets out of its

22   mouth, correct?

23   A.   Correct.

24   Q.   Do you recall precisely when you saw this video?

25   A.   No, I cannot.

1    Q.    But you understood that it was an ad that was meant to

2    promote sales of the auto key card.

3    A.    Yes.

4    Q.    Was Mr. Ervin experienced at creating content on social

5    media?

6    A.    I don't know if he was experienced or not, but I know that

7    he did it.

8    Q.    Do you recall discussing with Mr. Ervin his intent to

9    expand his promotions of the auto key card?

10   A.    Yes.

11              MR. MESROBIAN:  And, Your Honor, may we publish what

12   is in evidence as Government Exhibit 59, page 4?

13              THE COURT:  Go ahead.

14   BY MR. MESROBIAN:

15   Q.    So here we have text messages, again, between you and

16   Mr. Ervin; is that right?

17   A.    Yes.

18   Q.    And Mr. Ervin says, "Just passed 10,000 views on my first

19   auto key card video.  Wow."  Is that right?

20   A.    Yes.

21   Q.    Do you know what video he was referring to there,

22   specifically which video?

23   A.    (No response.)

24   Q.    If you don't know --

25   A.    At the time I might have known, but I -- I can't recall.

1   Q.   And you respond with some emojis and say, "That's

2   awesome."

3   A.   Yes.

4   Q.   Mr. Ervin responds, "I was also talking to a gun YouTuber

5   today.  I told him I would send him my new products for review.

6   I sent him this pic.  He said, 'H-e-l-l, yes.  I totally

7   support what you're doing.  Send it.'  He has 60K subs.  Then

8   on to bigger YouTubers with large targeted gun followers."  Is

9   that right?

10  A.   Yes.

11  Q.   And then he says, "Little by little.  Good night."  Is

12  that right?

13  A.   Yes.

14  Q.   And you respond, "Love it.  I'm so proud of you."

15  A.   Yes.

16  Q.   Let us pause here before we continue.

17       Ms. Ervin -- or, excuse me, Ms. Wolfe, you had

18  affection for Mr. Ervin; is that right?

19  A.   Yes.

20  Q.   And was that independent of your relationship with -- of

21  your relationship with his sister?

22  A.   Yes.

23  Q.   I mean, does that make it hard for you to testify here

24  today?

25  A.   Yes.

1          MR. MESROBIAN:  Ms. Ganoe, can we continue, please.

2   BY MR. MESROBIAN:

3   Q.   So Mr. Ervin then responds to your text about your being

4   proud of him, "We are going to see.  A great step forward for

5   sure."  Is that right?

6   A.   This is on the next page?

7   Q.   Correct, the next page.

8   A.   Oh, okay.

9          Okay.  Yes.

10  Q.   And you reply, "Definitely.  That inspires me to keep

11  pushing, 1 percent at a time.  Have a good night."

12  A.   Yes.

13  Q.   And then Mr. Ervin replies, "He said," quote, "'I am going

14  to make a metric f-u-c-k ton of money,'" unquote, "LOL."

15  A.   Yes.

16  Q.   With respect to that particular comment, did you

17  understand that to be referring to the gun YouTuber that he was

18  speaking to?

19  A.   Yes.

20  Q.   With respect to that particular gun YouTuber, did you come

21  to learn who he was referring to?

22  A.   Yes.

23  Q.   And who was that?

24  A.   It was CRS Firearms.

25  Q.   And is that Matthew Hoover?

1    A.    Yes.

2    Q.    Did you come to understand that Mr. Ervin and Mr. Hoover

3    were partnering to promote the auto key card?

4    A.    Yes.

5              MR. KING:  I would object to leading, Your Honor.

6              THE COURT:  I'll sustain the objection.  Rephrase.

7              The jury will disregard the answer.

8    BY MR. MESROBIAN:

9    Q.    What did Mr. Ervin tell you about his relationship with

10   Mr. Hoover?

11   A.    He said that he was going to advertise with him his

12   product.

13   Q.    And did you understand that to mean that Mr. Hoover was

14   going to make content?

15   A.    Yes.  Mr. Hoover was going to advertise Justin's product

16   on his YouTube channel.

17   Q.    Did Mr. Ervin tell you if he was going to compensate

18   Mr. Hoover for that?

19   A.    Yes.

20   Q.    And how was that compensation to be made?

21   A.    I wasn't very clear on the way he was going to compensate

22   him.  I do know that he was going to compensate him.  There was

23   a limited run of advertisements he was going to do, and

24   whatever fee they had negotiated, that's what Mr. Ervin was

25   going to pay.

1   Q.   Did you understand how much that fee was going to be?

2   A.   I remember it was probably a couple thousand per

3   advertisement, around there.

4   Q.   And did you understand or did Mr. Ervin tell you that he

5   sent money to Mr. Hoover?

6   A.   Yes.  I don't know how he did it, but I know he did.

7   Q.   Did Mr. Ervin ever talk to you about items of value that

8   he sent or bought for Mr. Hoover?

9   A.   Yes.  He mentioned coming to the Town Center to purchase

10  an expensive purse for Matt's wife.

11  Q.   And by Matt, you mean Mr. Hoover?

12  A.   Yeah, sorry.  Mr. Hoover's wife.

13  Q.   And did you understand that to be in lieu of paying for an

14  advertisement?

15  A.   Yes.

16  Q.   Did he talk to you about sending other items to

17  Mr. Hoover?

18  A.   Yes.  I don't know if it was for payment, but I know that

19  he sent Mr. Hoover better equipment to make his videos.

20  Q.   Are you aware if Mr. Hoover began making videos pursuant

21  to this arrangement?

22  A.   Yes.

23  Q.   What was -- you mentioned CRS Firearms.

24       Was that the YouTube channel, to your understanding?

25  A.   Yes.

1  Q.   Do you recall approximately when Mr. Hoover started

2  advertising the auto key card?

3  A.   I believe it was, I want to say, sometime in November.

4  Q.   What happened after Mr. Hoover started advertising the

5  auto key card, in terms of sales?

6  A.   Sales went up dramatically.

7  Q.   Did Mr. Ervin have enough stock on hand to handle the

8  sales?

9  A.   I can't recall if he did.

10  Q.   Do you recall if people were buying the metal auto key

11  cards, or were they buying other items?

12  A.   I believe at the time all he had was the metal cards.

13  Q.   To your knowledge, at any point during the sale of the

14  auto key card or during the Auto Key Card business, were people

15  buying anything other than the metal cards themselves in great

16  quantity?

17  A.   In great quantity, no.

18  Q.   To be clear, Mr. Ervin did offer other items for sale with

19  this design on it?

20  A.   Yes.

21  Q.   Did Mr. Ervin ever remove any of those items for sale?

22  A.   At some point he removed the items that weren't selling a

23  lot, but I think he kept the T-shirts and hats, if I'm not

24  mistaken.

25  Q.   Did Mr. Ervin ever discuss with you the results of the

1    advertisements by Mr. Hoover?

2    A.    As far as sales?

3    Q.    Did he express to you that he was pleased or displeased

4    about --

5    A.    Oh, no.  He was very pleased.

6    Q.    And with respect to the sales that were coming in, how

7    were most of them being made, through the website, by mail, or

8    other?

9    A.    I would say the majority were through the website.

10   Q.    Did you receive mail order items as well?

11   A.    Yes.

12   Q.    And when I say you, I'm referring to the Auto Key Card

13   business.

14   A.    Oh, yes.

15   Q.    How were the shipments of auto key cards packaged?

16         You mentioned the bubble mailers before, but who

17   handled the packaging for the auto key cards for sale?

18   A.    Mr. Ervin primarily did.

19   Q.    And who would take them to the post office for sale?

20   A.    Mr. Ervin.

21   Q.    Did you ever take any to the post office for sale, to your

22   recollection?

23   A.    There was one time I was with him, and he didn't want to

24   go into the post office because he was concealed carrying and

25   didn't want to take off -- he didn't want to mess with his

1    belt.

2           So he said, "Do you mind going in there for me?  And

3    just -- all you've got to do is put it on the counter and then

4    walk out."

5    Q.    Do you recall what means of payment Mr. Ervin used for

6    processing the Internet orders?

7    A.    I think he used Stripe at first.

8    Q.    And he also had an account with Shopify as well; is that

9    right?

10   A.    Yes.

11   Q.    Did there come a time when the Auto Key Card website was

12   shut down or his Shopify account was shut down?

13   A.    Yes.

14   Q.    What happened that led into that, to your knowledge?

15   A.    I'm not sure exactly what happened.  I remember it was

16   around Thanksgiving.  I hadn't heard from him in a few days,

17   and he told me that the site shut everything down, and he

18   couldn't get access to it.  And he was dealing with them,

19   trying to figure out what happened.

20   Q.    And by the site, you mean Shopify?

21   A.    Yes.

22   Q.    And this was around Thanksgiving of 2020?

23   A.    Yes.

24   Q.    What did Mr. Ervin do in response to that?

25   A.    He decided to use a different e-commerce website, so ...

1   Q.   And did he set up a new website and new --

2   A.   Yes.

3   Q.   -- payment --

4   A.   Yes.

5           MR. MESROBIAN:  So may we publish Government Exhibit

6   59, page 6.

7           The very top section of these messages here.

8   BY MR. MESROBIAN:

9   Q.   Beginning on Friday, November 27th, 2020 -- to your

10  recollection, is that around the time we're talking about,

11  Thanksgiving of 2020?

12  A.   Okay.  Yes.

13  Q.   And you wrote, "I can't get on your site.  Was wanting to

14  see your progress.  Everything okay?"  Is that right?

15  A.   Yes.

16  Q.   And Mr. Ervin responded, "Almost home.  Halfway now."  Is

17  that right?

18  A.   Yes.

19  Q.   When you were -- when you said, "I can't get on your

20  site," and that you were wanting to see his progress, what were

21  you referring to?

22  A.   The new site that he was trying to set up.

23  Q.   The next day, November 28th, 2020, you said -- you began

24  by saying, "Check your email when you can.  Sent you my latest

25  preset pack music."

1         Is that something related to the Auto Key Card?

2    A.   No.

3    Q.   What's that about?

4    A.   That was for my personal business.  That was for music

5    that I was making.

6    Q.   And a couple messages below that, Mr. Ervin says, "Check

7    that Reddit you showed me.  There is a new commit you should

8    see."  Is that right?

9    A.   Yes.

10   Q.   Did it appear he meant comment?

11   A.   Yes.

12   Q.   And you replied, "LOL okay.  I'll look.

13        "Nice.  That's exactly what I would have said too.  I

14   almost wrote a comment.  Glad you cleared it up for everyone."

15        Do you have a recollection of what this exchange was

16   about?

17   A.   Yes.  When his site shut down, there were -- I was looking

18   up his website to see if it would come up, and I came across

19   forums.  And some people were commenting that it seemed shady

20   that his site disappeared all of a sudden so they didn't know

21   what had happened.

22        MR. MESROBIAN:  If we could advance to page 8 of

23   Government Exhibit 59.

24   BY MR. MESROBIAN:

25   Q.   So beginning under the heading Monday, November 30th,

1   2020, you wrote, "Glad you responded to this."  Is that right?

2   A.   Yes.

3   Q.   Is the context clear of what we're -- of what you were

4   referring to there in this text thread?

5   A.   Not the first part of it, no.

6   Q.   You then say -- state, "Also auto key card search without

7   the 'S' leads to your new site, so that looks fixed across the

8   board."  Is that right?

9   A.   Yes.

10  Q.   "Should be smooth sailing until you get your new site set

11  up with that 3D cart company."

12          Is that something else you wrote?

13  A.   Yes.

14  Q.   Do you know what you were referring to there?

15  A.   Yes.  This had to do with the new website that he was

16  setting up.

17  Q.   And you were -- what were you doing in terms of checking

18  on that new website?

19  A.   I was helping to see if the website was working.

20  Q.   To be clear, who was setting up this new site?

21  A.   Mr. Ervin.

22  Q.   Mr. Ervin replies at 10:47 a.m., "Awesome.  I have 75

23  orders since Friday for $7500."  Is that right?

24  A.   Yes.

25  Q.   And you replied, "Check out the Reddit screenshot"?

1   A.   Yes.

2   Q.   And he replied, "It's working," and several periods after

3   that.

4   A.   Yes.

5   Q.   Do you know what that was referring to?

6   A.   I can't recall.

7   Q.   Below that you wrote, "Of course it is," smiley face.  Is

8   that right?

9   A.   Yes.

10  Q.   And then you stated, "Yes.  Can't wait to knock those

11  out."

12          And then if we go to the next page, please, you'll

13  see where that picks up again.  "Yes.  Can't wait to knock

14  those out."

15          And below that there's a link that you sent; is that

16  right?

17  A.   Correct.

18  Q.   And it's a link to a forum on ar15.com; is that right?

19  A.   Yes.

20  Q.   And you state, "I can reply to this guy if you want or you

21  can."  Is that right?

22  A.   Yes.

23  Q.   Do you recall what that was about?

24  A.   No, not at the moment.

25  Q.   Do you know why you were monitoring -- or why you were

1   sending him something from ar15.com?

2   A.   I had searched for auto key card, and whatever popped up,

3   I would let him know.

4   Q.   And Mr. Ervin replied, "Went to Louis Vuitton already.

5   Bought that $2,000 purse.  LOL.  Weird."  Is that right?

6   A.   Yes.

7   Q.   And you replied, "LOL."

8   A.   Yes.

9   Q.   And what did that refer to?

10  A.   That referred to the purse he purchased for Mrs. Hoover.

11  Q.   Did you ever watch any of the videos Mr. Hoover made about

12  the auto key card?

13  A.   Yes.

14  Q.   Did anything about those videos cause you concern?

15  A.   At the time, no.

16  Q.   Did there come a time when you became concerned about the

17  auto key card and its legality?

18  A.   Yes.

19  Q.   And what happened to prompt that?

20  A.   I had created music for Mr. Hoover, for his videos, and I

21  would go to the comments section to see if anybody said

22  anything about that.  And I would come across comments that

23  were polarized.  Some said, "This is awesome.  I love what

24  you're doing."

25          Some would say, "He's going to go to jail," so ...

1   Q.   And to be clear, you stated that you had created music for

2   Mr. Hoover?

3   A.   Yes.

4   Q.   And at whose request was that?

5   A.   Mr. Ervin.

6   Q.   And this music, how was it used in these videos?

7   A.   It was used as outro music for the end of the video.

8   Q.   So after reading those polarized comments, did you follow

9   up on the concerns that you had?

10  A.   Yes.

11          MR. MESROBIAN:   So now could we publish Government

12  Exhibit 59 at page 10.

13  BY MR. MESROBIAN:

14  Q.   And this is Thursday, December 3rd, 2020; is that right?

15  A.   Yes.

16  Q.   And you write a series of text messages here, and I'm

17  going to read them all and then I'll ask you if I captured that

18  accurately.

19          At 12:28 p.m. you wrote, "Sorry.  I was in the

20  shower.  Call me back if you can."

21          "Can't talk on the phone, but I wanted to ask what it

22  would take to prove intent."

23          "Discussing your product with my BJJ teacher.  He's

24  convinced you'll go to jail, LOL."

25          "I keep shaking my head at him, LOL."

1            "He's seeing your product all over FB right now."

2            And did I read those accurately?

3     A.    Yes.

4     Q.    Could you -- without going into conversations you had with

5     people other than Mr. Ervin, could you explain the context for

6     your statements here?

7     A.    Yes.  I was discussing the product with my jujitsu teacher

8     and --

9     Q.    And I'll -- did he indicate to you -- did you describe

10    this product to your BJJ teacher?

11    A.    I had shown him, yes.

12    Q.    And did your conversation with him cause you concern about

13    the auto key card?

14    A.    It did.

15    Q.    And in the second text message here, you state, "I wanted

16    to ask what it would take to prove intent."  Is that right?

17    A.    Yes.

18    Q.    Had you discussed proving intent with Mr. Ervin before?

19    A.    No.

20    Q.    Did you discuss proving intent with him at a point?

21    A.    Yes.

22    Q.    And what did he tell you about that?

23            MR. KING:  Objection, hearsay.

24            THE COURT:  Overruled.

25            You can answer the question.

1            THE WITNESS:  Okay.  What --

2   BY MR. MESROBIAN:

3   Q.    What did he tell you about proving intent?

4   A.    He told me that nobody can prove your intent because

5   it's -- it's in your head.  Nobody can get inside your head and

6   know what your intention is unless you tell them.

7   Q.    On the next page Mr. Ervin replied at 9:54 p.m., "Many are

8   too brainwashed to leave the Titanic in time to survive.  I am

9   glad it's spreading on FB."

10           Do you understand that to mean Facebook?

11  A.    Correct.

12  Q.    He continues, "My intent is to sell my First Amendment

13  art.  How can anyone know your intent?  Oh, you tell them

14  yourself.  Unless the law enforcers break the law, I am fine.

15  What would he do if they outlawed BJJ?  Just quit," and there

16  appears to have been additional text in that message.

17  A.    Yes.

18  Q.    He then follows up, "The best part about my product is you

19  know who is a slave, who is a fence setter, who likes freedom,

20  and who hates true freedom.  It reveals all.  Best art ever."

21           Did I read that correctly?

22  A.    Yes.

23  Q.    Then you reply, "He was asking what would happen if the

24  ATF found a gun with your product and traced it back to you."

25  Is that right?

1    A.    Yes.

2    Q.    And you state, "I totally agree with everything you said,

3    FYI.  He's never met someone like you, on your level."  Is that

4    right?

5    A.    Correct.

6              MR. MESROBIAN:  If we could go to the next page.

7    BY MR. MESROBIAN:

8    Q.    Mr. Ervin replies to that -- your last text, "Not my

9    responsibility.  I have individual responsibility for myself,

10   not others.  That person should have a problem.  I sell a piece

11   of metal.  If someone turns it into something illegal, it's

12   their a-s-s.  What if his BJJ students used his training to

13   kill?  Would they come get him?  Same thing."

14              Did I read that right?

15   A.    Correct.

16   Q.    And you replied, "That's a great point."

17   A.    Yes.

18   Q.    Mr. Ervin then states, "You can see the cognitive

19   dissonance in his mind, believing two conflicting ideas at the

20   same time.  It applies to me if someone else does bad and

21   thinking his BJJ training would not.  Both are untrue.  Neither

22   of us is different.  We are both in the clear.  Neither of us

23   is responsible for others' actions."

24              Did I read that right?

25   A.    Correct.

1    Q.    And you reply, "I agree 100 percent"?

2    A.    Yes.

3    Q.    And then he continued, Mr. Ervin continued, "They don't

4    arrest car makers when someone gets run over.  It's the

5    driver's fault."  Is that right?

6    A.    Yes.

7    Q.    And you replied, "Exactly."

8    A.    Yes.

9    Q.    And then Mr. Ervin says, "Not the chunk of metal formed

10   into a legal product, a car.  Same thing."

11   A.    Yes.

12          MR. MESROBIAN:  And if we could go to the next page.

13   BY MR. MESROBIAN:

14   Q.    You replied to his comment about the car, "I told him he

15   should warn you, LOLOL"?

16   A.    Yes.

17   Q.    And then there's an emoji and you ask, "How is business

18   going?"  Is that right?

19   A.    Correct.

20   Q.    Mr. Ervin responds, "Rule followers will never understand.

21   They believe in the tyrants' false authority, even to their

22   detriment or destruction."  Is that right?

23   A.    Yes.

24   Q.    And then he states, "15K this week."  Is that right?

25   A.    Yes.

1   Q.   Did you understand that to be a reference to sales that

2   week?

3   A.   Yes.

4   Q.   And you reply, "That's amazing," right?

5   A.   Correct.

6   Q.   And Mr. Ervin states, "It's not even over.  Three days

7   left.  Weekends are slower for sales.  We will see."  Is that

8   right?

9   A.   Correct.

10  Q.   And you replied, "That's true.  Were those cancels

11  flukes?"

12  A.   Correct.

13  Q.   Mr. Ervin then states, "I think they are people on FB that

14  bought then scrolled down and read a statist authority comment

15  and got scared.  No more cancels since we were at dinner."  Is

16  that right?

17  A.   Correct.

18  Q.   And on the next page towards the bottom, he follows up and

19  states, "Oh, and my intent is to be independent and live my

20  life.  LOL, I couldn't resist."  Is that right?

21  A.   Yes.

22  Q.   Do you recall having a particular reaction to this

23  exchange with Mr. Ervin?

24  A.   At the time I looked beyond any gut feelings.  I trusted

25  him implicitly.

1   Q.   Were you completely comforted by his statements to you?

2   A.   Not completely, no.

3   Q.   But nonetheless, you continued to assist him with the Auto

4   Key Card business; is that right?

5   A.   Yes.

6            MR. MESROBIAN:   If we could go to the next page.

7   BY MR. MESROBIAN:

8   Q.   There are a couple more messages that evening after --

9   after he wrote, "LOL, I couldn't resist," you replied, "Okay.

10  That's good.  Kristen ran the cards again, and they're looking

11  really nice.  Let me know if you get more cards tomorrow.  We

12  want to make sure you have plenty of inventory."  Is that

13  right?

14  A.   Correct.

15  Q.   And Kristen in that reference, is that a reference to

16  your -- Ms. Ervin?

17  A.   Yes.

18  Q.   And you replied, "And I will never get tired of that

19  picture," smiley face.

20            Do you know what that refers to?

21  A.   Yes.  There was a picture I had made -- he had sent me a

22  picture of himself, and I edited it, like, to look like he was

23  in the Matrix or something like that.  It was a weird effect I

24  did, and --

25  Q.   And that was something you did for him --

1   A.   Yes.  It was just --

2   Q.   -- what, just --

3   A.   -- for fun.

4   Q.   -- to be nice or --

5   A.   Yeah, for fun.

6   Q.   And then he replies, "I know.  I love that picture you

7   made for me.  Classic.  I will let you know about tomorrow.

8   Matt is going to start commercials on his next video.

9   Inventory is key."

10          Who did -- is that right?

11  A.   Yes.

12  Q.   And who did you understand Matt to refer to?

13  A.   Mr. Hoover.

14  Q.   So let's move on to the next page.  And these texts

15  occurred -- at the top it says Monday, December 7th, 2020; is

16  that right?

17  A.   Yes.

18  Q.   And you send a link, and the pop-up there says, "Drop In

19  Auto Sear Bottle."  Is that right?

20  A.   Yes.

21  Q.   And then you state, "Your product is so much better."  Is

22  that right?

23  A.   Yes.

24  Q.   And then, "Ignore the red object in the picture.  Scroll

25  down to see what I'm talking about."  Is that right?

1   A.   Correct.

2   Q.   And then a little further down, you send another link, and

3   the file name is file -- or, excuse me, the link says

4   https://filecnc.com/home/12999-lightning-link-DXF-file.html.

5   Is that right?

6   A.   Correct.

7   Q.   And below that there's an image captioned "Lightning Link

8   DXF File."  Is that right?

9   A.   Yes.

10  Q.   Was that image there familiar to you?

11  A.   Yes.

12  Q.   What did it look like to you?

13  A.   It looked like Justin's image.

14  Q.   Were you familiar with what a Lightning Link is?

15  A.   At the time, no.

16        MR. MESROBIAN:  If we could go back out, please.

17  BY MR. MESROBIAN:

18  Q.   And you state, "That's not yours, right?"

19  A.   Correct.

20  Q.   And then, "Sorry to bombard you with stuff.  I just enjoy

21  researching, LOL."  Is that right?

22  A.   Correct.

23  Q.   I'll pause there.

24        Ms. Wolfe, why were you sending him these messages?

25  A.   He emphasized that it was artwork, and as an artist

1  myself, I understand registering copyright of your work.  So I

2  had that in mind to see if it had been copied in any way.

3  Q.   Did you -- did you know what a drop-in auto sear was?

4  A.   No.

5  Q.   And you did not know what a Lightning Link was at that

6  time?

7  A.   No, not at that time.

8        MR. MESROBIAN:  If we could go to next page.  That's

9  page 17.

10 BY MR. MESROBIAN:

11 Q.   Those are those same messages at the top of the screen,

12 and on the bottom half, Mr. Ervin replies, "Sorry.  I went to

13 the gas station.  I'm back.  That's not mine.  My keyhole is

14 different."  Is that right?

15 A.   Correct.

16 Q.   Did you understand -- what did you understand this comment

17 to mean?

18 A.   That it was similar, but it was different regarding the

19 keyhole.  I don't know what part he was referring to on that

20 image, but ...

21 Q.   And did you understand what the different aspects of the

22 auto key card were or why holes were in particular places?

23 A.   No.

24 Q.   And you reply to his message, "Okay.  I thought so."  Is

25 that right?

1   A.   Yes.

2   Q.   And he says, "I started driving and my phone started

3   blowing up.  LOL.  It's no problem."

4   A.   Correct.

5   Q.   And on the next page towards the bottom, he added, "Plus

6   that one is no bottle opener and is a gun part.  It's like 95

7   percent.  A no-no."  Is that right?

8   A.   Correct.

9   Q.   And you replied, "Yeah, the difference between theirs and

10  yours is night and day.  My friend is probably lumping you in

11  with the no-no pile, LOL."  Is that right?

12  A.   Correct.

13  Q.   And he replied, "Happens my whole life, LOL."

14  A.   Correct.

15  Q.   Do you recall having a reaction to him mentioning a gun

16  part?

17  A.   I thought the phrasing was odd, that he -- it being a gun

18  part and that it was any way associated with that.

19  Q.   Did you have a previous understanding that -- withdrawn.

20        Did you have an understanding, during this early

21  December period when you were discussing intent and then gun

22  parts or receiving messages about those from Mr. Ervin, why

23  these issues were coming up?

24  A.   At the time, no.

25  Q.   So, Ms. Wolfe, did there come a time when Mr. Ervin

1    started paying you for your work?

2    A.    Yes.

3    Q.    Did that happen after the increase in auto key card sales?

4    A.    Yes.

5    Q.    How much time were you spending on assisting Mr. Ervin

6    with the business?

7    A.    I'd say close to 20 hours a week probably, like a

8    part-time job.

9    Q.    For Mr. Ervin, did you understand it to be a full-time

10   job?

11   A.    Can you clarify that?

12   Q.    You referred to a part-time job, from your perspective.

13             Was Mr. Ervin spending a lot of time on the Auto Key

14   Card business?

15   A.    Oh, yes.

16   Q.    Did he spend a lot of time responding to customers?

17   A.    In the beginning, yes.

18   Q.    Was it important to him to handle customer relationships?

19   A.    Yes.

20   Q.    As part of that, did he ask you to handle emails from

21   customers from time to time?

22   A.    Yes.

23   Q.    And were you both reading and responding to customer

24   emails?

25   A.    Yes.

1   Q.   So --

2           MR. MESROBIAN:  If we could go to page 19 now.

3           Actually, page 20 is better.  We'll have the full

4   image, I think.

5   BY MR. MESROBIAN:

6   Q.   So -- and this is from -- from the previous page, this was

7   on January 30th, 2021 -- January 13th, 2021.  Excuse me.

8   A.   Yes.  Correct.

9   Q.   And it appears you send a screenshot of an email here; is

10  that right?

11  A.   Correct.

12  Q.   And this message reads, "I made two orders that I mailed

13  in with cash, and I only received one of them.  I know I can't

14  prove that I mailed in two since it was cash, but I did, and I

15  hope you can look to see if two packages were mailed out to

16  me."  Is that right?

17  A.   Correct.

18  Q.   And this appears to be a screenshot from your phone; is

19  that right?

20  A.   Correct.

21  Q.   Did Mr. Ervin allow you to access the emails on your

22  phone?

23  A.   Yes.

24  Q.   And how did you do that?

25  A.   There was an app that I was able to install.  There's the

1    desktop version and the mobile app version.

2    Q.   And what was that app called?

3    A.   Private Email.

4    Q.   And below that you state, "I asked for his address.  Does

5    this order sound familiar?"  Is that right?

6    A.   Correct.

7    Q.   And is that you seeking input from Mr. Ervin?

8    A.   Yes.

9    Q.   And if we go down to the next page, page 21, at the top

10   there's another screenshot of an email, and -- which is the

11   customerservice@autokeycard.com account; is that right?

12   A.   Correct.

13   Q.   And you state below the screenshot, "He said he had sent

14   out both orders at the same time in two different envelopes.

15   He definitely got the first order that you shipped him.  The

16   second order was never received, which was two of the 2 in 1

17   pen and one of the 3 in 1 pen."  Is that right?

18   A.   Correct.

19   Q.   In the message below that, Mr. Ervin responds, "Okay.  I

20   got it.  I will call you when I get back.  At UPS Store now."

21   A.   Correct.

22   Q.   Was this during the -- the weeks leading into Mr. Ervin's

23   arrest in March 2021, is this how you were assisting him with

24   the business?

25   A.   Correct.

1    Q.   And I believe you testified about this earlier, but I'll

2    be clear.

3              Generally when you were handling emails for the Auto

4    Key Card business, would you seek input from Mr. Ervin?

5    A.   Yes.

6              MR. MESROBIAN:  So let's move on to page 22.

7    BY MR. MESROBIAN:

8    Q.   There's another screenshot at the bottom here --

9              THE COURT:  Mr. Mesrobian, can we go ahead and take

10   our afternoon break?

11             MR. MESROBIAN:  Yes, Your Honor.  This is a good

12   time.

13             THE COURT:  Okay.

14             MR. MESROBIAN:  Thank you.

15             THE COURT:  Ladies and gentlemen, it's a little after

16   3:30, so if you can be back in a little after 3:45, and we'll

17   plan to continue with the testimony at that time.

18             Please remember to continue following all of the

19   instructions that I've been giving you for the entirety of the

20   trial, and we'll see you back in about 15 minutes.

21             COURT SECURITY OFFICER:  All rise for the jury.

22        (Jury out at 3:32 p.m.)

23             COURT SECURITY OFFICER:  Please be seated.

24             THE COURT:  You may step down, ma'am, and just be

25   ready to come back in in 15 minutes.

 1          Mr. King, I want to go back and make sure you

 2     understand my ruling with regard to the cross-examination with

 3     respect to the specific sentence that a potential witness might

 4     be facing.

 5          The Eleventh Circuit has held that, "Information

 6     about the severity of a sentence that a defendant faces is

 7     extrinsic and prejudicial, such that the district court is

 8     authorized to restrict cross-examination of a witness on that

 9     subject."

10          And the problem that I have with it, particularly the

11     way that you asked the question, is that it presumed -- we --

12     none of these witnesses were actually charged with anything.

13     So you're presuming what they would be charged with, how many

14     counts, that they would, in fact, be charged with separate

15     counts for each charge, and that they would face consecutive

16     sentences for that.

17          All of that is entirely speculative, confusing, and

18     frankly it's inconsistent with what I know to be the norm,

19     which is that in the absence of a mandatory consecutive

20     sentence, the far more common occurrence is that sentences are

21     run concurrent and not consecutive.

22          So you are certainly free to inquire of the

23     cooperating witnesses, or the witnesses who have been given

24     immunity, that but for that immunity, they could face

25     significant sentences.  That is fair.

1          What -- what I'm not going to allow you to do is to

2    go into the specific sentence that they and also Mr. Ervin and

3    Mr. Hoover potentially face, because that information would be

4    confusing, and it's irrelevant to the jury's determination.

5          And the Supreme Court has clearly said that the

6    sentence faced by a particular individual is not information

7    that's appropriate for the jury.

8          So I just wanted to make clear, you -- I'm not saying

9    you can't discuss the fact that they face penalties and

10   significant penalties.  It's just the inquiry about the

11   specific sentence and, even more so, specific consecutive

12   sentences.

13         But the specific sentence, I don't think, is

14   necessary in order for you to explore the bias that they may be

15   experiencing because of the grant of immunity.

16         Does that explain it?

17         MR. KING:  If I can ask a clarifying question?

18   Because I want to make sure I'm very careful here.

19         THE COURT:  If you go to a microphone.

20         MR. KING:  Very fair, Your Honor.

21         The -- if I say significant or lengthy prison

22   sentence, would that be acceptable?  And discussing it as a

23   felony conviction, would that be acceptable?  Those are the --

24   I understand the Court's ruling.  I want to make sure that I'm

25   not --

1           THE COURT:  Okay.

2           MR. KING:  -- getting into ground that I'm not

3    supposed to.

4           THE COURT:  I think those -- I think those things are

5    fair questions, are fair descriptions that -- to explore the

6    potential bias.

7           But anything beyond that, I think, would go too far.

8           MR. KING:  Thank you for clarifying that.  I just

9    want to make sure I'm not stepping on ground I'm not supposed

10   to be.

11          THE COURT:  Okay.  Does the Government wish to be

12   heard as to that?

13          MS. TAYLOR:  No, Your Honor.

14          THE COURT:  All right, then.  We'll be in recess.

15          COURT SECURITY OFFICER:  All rise.

16      (Recess from 3:36 p.m. until 3:49 p.m.; all parties

17   present.)

18      (Outside the presence of the jury:)

19          COURT SECURITY OFFICER:  All rise.  This Honorable

20   Court is now in session.

21          Please be seated.

22          THE COURT:  Let's have the jury, please.

23          Do you have enough water up there?

24          THE WITNESS:  I'm sorry?

25          THE COURT:  Do you have enough water up there?

1           THE WITNESS:  Yes, ma'am.

2           THE COURT:  Okay.

3           THE WITNESS:  Thank you.

4           COURT SECURITY OFFICER:  All rise for the jury.

5      (Jury in at 3:50 p.m.)

6           COURT SECURITY OFFICER:  Please be seated.

7           THE COURT:  Go ahead, Mr. Mesrobian.

8           MR. MESROBIAN:  Thank you, Your Honor.

9    BY MR. MESROBIAN:

10   Q.   Ms. Wolfe, when we left off, we were looking at Government

11   Exhibit 59, page 22, bottom half.

12           And this appears to be another screenshot of an email

13   you sent?

14   A.   Correct.

15   Q.   I may have read this already, but I'll do it again just to

16   be sure.

17           The email reads, "Hi, I was interested in the 2 in 1

18   via mail-in order.  I wanted to reach out and confirm that it

19   is stocked.  I didn't want to be in a situation if inventory is

20   low where it goes out of stock by the time my order arrives.

21   Please advise.  Thank you."

22           Is that right?

23   A.   Correct.

24   Q.   And beneath that you sent a message to Mr. Ervin that

25   says, "We have 2 in 1 available, right?"

1    A.    Correct.

2    Q.    On the next page -- well, why did you ask Mr. Ervin that

3    question?

4    A.    Because he knew what inventory we had.

5    Q.    He was in control of aspects --

6    A.    Right.

7    Q.    Of those aspects of the business.

8    A.    Yes.

9    Q.    Is it fair to say, Ms. Wolfe, that Mr. Ervin had control

10   of the business as a whole?

11   A.    Yes.

12   Q.    Mr. Ervin then responds, "Yes, let him know that we always

13   hold back some inventory for our great mail-in customers."  Is

14   that right?

15   A.    Correct.

16   Q.    And you reply, "Okay.  Will do."

17   A.    Yes.

18   Q.    Is this consistent with how you might reply to customer

19   emails, that you would ask Mr. Ervin something, and he would

20   tell you how to respond?

21   A.    Correct.

22   Q.    Mr. Ervin then writes, "I will call the other guy about

23   the lost mail-in order."  Is that right?

24   A.    Yes.

25   Q.    And that appears to be referring to another email or

1    message that's not here.

2    A.   Correct.

3    Q.   And then Mr. Ervin states, "I will use Google Voice from

4    here," correct?

5    A.   Correct.

6    Q.   What does that refer to?

7    A.   He had a phone number set up with Google Voice where

8    customers could call and leave a message, and it would put the

9    voice to text.

10   Q.   And he would use the Google Voice number from time to time

11   to call the customer back?

12   A.   Correct.

13   Q.   And then Mr. Ervin writes, at 8:05 p.m., "Do not respond

14   to CL last email.  Weird questions."  Is that right?

15   A.   Correct.

16   Q.   And, again, the -- what email he's referring to here is

17   not referenced earlier in this chain, is it?

18   A.   Correct.

19   Q.   And is that consistent with your understanding that he was

20   also reading the customer service email?

21   A.   Yes.

22        MR. MESROBIAN:  Your Honor, may I approach with what

23   is marked for identification as Government Exhibit 126?

24        THE COURT:  126?

25        MR. MESROBIAN:  126.

1           THE COURT:  Yes.

2   BY MR. MESROBIAN:

3   Q.    So, Ms. Wolfe, do you recognize that?

4   A.    Yes.

5   Q.    And what is that document?

6   A.    This is an email exchange with a customer.

7   Q.    And do you recognize having seen that email at the time it

8   was sent?

9   A.    Yes.

10  Q.    And is this an email from an individual with the name CL?

11  A.    Yes.

12  Q.    And what date was it sent?

13  A.    January 14th is what it says on ...

14  Q.    And is that the same date as the text messages we were --

15  we're talking about?

16  A.    Yes.

17  Q.    And is it a fair and accurate representation of the email

18  as you recall seeing it on or about that date?

19  A.    Yes.

20          MR. MESROBIAN:  Your Honor, move to admit Government

21  Exhibit 126.

22          MR. KING:  Without objection, Your Honor.

23          MR. LAROSIERE:  Without objection, Your Honor.

24          THE COURT:  126 is admitted.

25      (Government's Exhibit 126 was received in evidence.)

1        MR. MESROBIAN:  And could we publish that, please?

2        THE COURT:  You may.

3        MR. MESROBIAN:  If you could start at the bottom.

4   BY MR. MESROBIAN:

5   Q.   There's an email here sent January 14th, 2021, at 6:04

6   p.m., and it begins, "Hi, I was interested in the 2 in 1 via

7   mail-in order."

8        Does that appear to be the email that we looked at a

9   moment ago that you had screenshot?

10  A.   Yes.

11  Q.   And above that, there is a reply from

12  customerservice@autokeycard.com; is that right?

13  A.   Correct.

14  Q.   And you write, "Hi there.  How many 2 in 1 would you like

15  to order?  We always take care of our great customers so we

16  will set aside the inventory for your mail-in order."  Is that

17  right?

18  A.   Correct.

19  Q.   And is that -- was that likely written by you?

20  A.   Yes.

21  Q.   And is that echoing the language that Mr. Ervin gave you

22  about great mail-in customers?

23  A.   Yes.

24  Q.   And, now, at the top, is this a reply from CL?

25  A.   Yes.

1  Q.   And he -- this individual writes, "Hi.  Thank you for the

2  quick response.  However, after further research, it appears

3  that this business card may not be compatible with my wallet.

4  From my understanding, this only fits inside a smaller hobby

5  wallet and not a full-size professional business wallet,

6  correct?  The back side of the business wallet is too long, and

7  I need the wallet with the shorter back side," question mark.

8          "Please let me know if my understanding is correct.

9  Thank you."

10         Did I read that correctly?

11 A.   Yes.

12 Q.   To go back to -- well, with respect to this email,

13 Mr. Ervin advised you in the text message not to respond to it;

14 is that right?

15 A.   Correct.

16 Q.   Did you understand that he had read this email and was

17 telling you not to respond?

18 A.   Yes.

19 Q.   When you looked at this email, did you understand what

20 this person was talking about?

21 A.   No.

22 Q.   Did it make sense to you?

23 A.   No, not at the time.

24 Q.   Did you understand -- well, withdrawn.

25         From time to time did you see emails in the customer

1  service account or other Auto Key Card -- or other emails that

2  did not appear to make sense?

3  A.   Yes.

4  Q.   And could you talk a little bit about -- about those

5  emails and what -- and what you did with them.

6  A.   Yes.  I remember this email, and I remember some emails

7  that asked for -- they were more direct.  They asked for

8  specific instructions on what to do with it and how to cut it

9  out.

10  Q.   Did Mr. Ervin look at those emails as well --

11  A.   Yes.

12  Q.   -- or would you ask him to look at them?

13  A.   I asked him about them.

14  Q.   And what would he tell you with respect to those emails?

15  A.   Ignore them.

16  Q.   In general, if you received or if you saw an email like

17  this one from CL, would you have Mr. Ervin address it?

18  A.   Yes.

19        MR. MESROBIAN:  If we could move forward -- or,

20  excuse me, move to Government Exhibit 59, page 25.

21  BY MR. MESROBIAN:

22  Q.   At the top there's an image here that Mr. Ervin sends to

23  you.

24        What do you see in that image?

25  A.   It looks like a vest.

1   Q.   What type of vest?

2   A.   Tactical vest.

3   Q.   And do you recall, during the January 2021 time frame,

4   Mr. Ervin purchasing this item or other items like it?

5   A.   I remember he purchased some things.  I recognize this

6   vest.

7   Q.   And did you have an understanding why he was purchasing

8   these things?

9   A.   At the time, no.  I just -- I know he liked things like

10  that.

11  Q.   So moving down to the bottom half of the page, there are

12  messages from Friday, January 15th, 2021; is that right?

13  A.   Yes.

14  Q.   Mr. Ervin writes to you, "I took care of the customer that

15  fat-fingered their email, FYI."

16  A.   Correct.

17  Q.   And you reply, "Okay.  Thank you.  I emailed him."

18  A.   Yes.

19  Q.   Again, is this consistent sort of with how at this point

20  you were assisting Mr. Ervin?

21  A.   Yes.

22  Q.   And then the next page at the top, you wrote, "I just

23  emailed him to say thanks for the info, and we would update

24  it."  Is that right?

25  A.   Correct.

1    Q.    And Mr. Ervin replied, "Okay, cool.  Perfect.  I did it

2    cause I had not shown you how yet.  Thank you.  Don't forget,

3    it's payday today for you."

4    A.    Correct.

5    Q.    This -- again, this is January 15th, 2021.

6          Were there -- at this point were there still aspects

7    of this business you didn't know anything about?

8    A.    Yes.

9    Q.    And did you ever really have a full understanding of how

10   the full business worked?

11   A.    At the time, no.

12   Q.    And do you -- how much did Mr. Ervin end up paying you?

13   A.    I tried to calculate it.  Probably maybe a thousand or so,

14   1500.

15   Q.    And that's throughout the --

16   A.    That was throughout the whole period.

17   Q.    So you referenced before having prepared outro music for

18   Mr. Hoover's videos.

19   A.    Correct.

20   Q.    Did there come a time when you performed other services

21   for Mr. Hoover or his channel?

22   A.    Yes.

23   Q.    And who asked you to do that?

24   A.    Mr. Ervin.

25   Q.    And why did he ask you to do this, to your understanding?

1  A.   He asked me because he thought I had the talent to be able

2  to create those graphics or music for Mr. Hoover.

3  Q.   And was it both -- was it to assist Mr. Hoover?

4  A.   It was both to assist Mr. Ervin and Mr. Hoover.

5  Q.   And also was it to give you an opportunity to expand your

6  work --

7  A.   Yes --

8  Q.   -- as well?

9  A.   -- exposure.

10       MR. MESROBIAN:   So if we could go forward to page 29

11  of Government Exhibit 59, please.

12  BY MR. MESROBIAN:

13  Q.   And this is strictly for the date stamp of these text

14  messages being Thursday, January 28th, 2021; is that right?

15  A.   Correct.

16  Q.   And on the next page, Mr. Ervin sends a link to you that

17  says -- that leads to a site called Free Speech Services --

18  A.   Oh, okay.

19  Q.   -- dash -- I'm sorry?

20  A.   I'm sorry.  I ended up on the wrong page.  There's no page

21  numbers on this, so ...

22  Q.   Okay.

23  A.   I'll just look at the screen.  I'll look at the screen.

24  Go ahead.

25  Q.   There's a link that he sends to you that's

1   freespeechservices-crs-firearms; is that right?

2   A.   Yes.

3   Q.   And the picture below that is --

4   A.   Mr. Hoover.

5   Q.   And do you know what this Free Speech Services website

6   was?

7   A.   I remember it -- it was a website that Mr. Ervin was

8   building to help other YouTubers be independent and have their

9   own website.  I remember he used Builderall.  I recognize that.

10  Q.   So there's an image at the bottom of page 30, and I'm just

11  going to walk through the next few pages and I'll ask you a

12  question at the end.

13              MR. MESROBIAN:  So could we publish page 31, please.

14              Then page 32.

15              Then page 33.

16              Then page 34.

17              Then page 35.

18  BY MR. MESROBIAN:

19  Q.   So on those pages there were a series of images; is that

20  right?

21  A.   Correct.

22  Q.   And there were particular individuals depicted in those

23  images; is that right?

24  A.   Mr. Hoover, and Mrs. Hoover was in one of them.

25  Q.   At the bottom here you respond and state, "I'm sure I can

1    use one of those" --

2    A.    Correct.

3    Q.    -- or, excuse me, "these."  Is that right?

4    A.    Correct.

5    Q.    What were you referring to there?

6    A.    One of the images that were sent to me.

7    Q.    Well, how were you going to use it?

8    A.    There was an application that you could take somebody's

9    face and put it on, like, a celebrity body, like Rambo; Rambo,

10   for example.  So I was using his face to transpose it for media

11   purposes.

12   Q.    And was that a part of what you had been asked to do for

13   Mr. Ervin and Mr. Hoover?

14   A.    Yes.

15         MR. MESROBIAN:  Now if we could move forward to page

16   39 of Government Exhibit 59.

17   BY MR. MESROBIAN:

18   Q.    And, Ms. Wolfe, in the top half of this page, on Sunday,

19   January 31st, 2021, Mr. Ervin sends you a picture, and within

20   the picture there's a -- there's a drawing; is that right?

21   A.    Correct.

22   Q.    And what is the caption in this drawing?

23   A.    "CRS Firearms."

24   Q.    And what did you understand this to be?

25   A.    This was a sketch of an idea he had for the YouTube art,

1    the background picture that he wanted me to create.

2    Q.   And who did you understand to have drawn this picture?

3    A.   Mr. Ervin.

4    Q.   And was this -- you know, did this look like a type of

5    drawing that he would do?

6    A.   Loosely, yes, if he was in a hurry.

7    Q.   And on the next page in the bottom half here, there is an

8    image that you sent -- is that right? --

9    A.   Correct.

10   Q.   -- at 1:20 p.m.?

11   A.   Yes.

12   Q.   And what is that image?

13   A.   That is the image referenced in the sketch drawing that

14   was done for Mr. Hoover.

15   Q.   And is this the image -- did you create this image?

16   A.   Yes.

17   Q.   And is this what you were referring to in terms of

18   transposing a face from a photo onto another image?

19   A.   Yes.

20   Q.   And underneath that, Mr. Ervin replies, "Perfect, LOL.  I

21   can't stop laughing and smiling."

22   A.   Correct.

23   Q.   On the next page you replied, "Okay.  I created a folder

24   in the CRS Firearms folder called art and music.  It has both

25   backgrounds and the music clip."

1  A.    Correct.

2  Q.    And when you reference the CRS Firearms folder, what are

3  you referring to?

4  A.    There was a folder that had all of the projects and the

5  files associated with whichever YouTuber he was working with.

6  There was another YouTuber, so ...

7  Q.    And was this a file on a computer?

8  A.    Yes, in a computer that he gave me to use.

9  Q.    Mr. Ervin gave that -- gave a computer to you?

10  A.    To use, yes.

11  Q.    In connection with the Auto Key Card --

12  A.    Correct.

13  Q.    -- business?

14        And then, I think, finally, on page 42 of Government

15  Exhibit 59, you screenshot, in the middle of the page, another

16  email, it appears.

17        This is February 14th, 2021?

18  A.    Correct.

19  Q.    It's not clear what email account this is from, but this

20  individual writes, "Hello.  My name is Brent Johansen.  I

21  accidenty [sic] ordered a 2 in 1 card when I meant to order the

22  3 in 1 card.  Can I cancel my 2 in 1 card and just have the 3

23  in 1 card?  Thank you."  Is that right?

24  A.    Correct.

25  Q.    Beneath that you wrote, "If you haven't mailed this order

1    yet, did you want to add a 3 in 1?"

2           And then you state, "Never mind.  I see you fixed

3    it."

4    A.   Correct.

5    Q.   And, again, did that reflect to you that Mr. Ervin was

6    monitoring these emails?

7    A.   Yes.

8    Q.   So I want to finally discuss the period after Mr. Ervin

9    was arrested.

10   A.   Okay.

11   Q.   And do you remember that happening on or about March 2nd

12   of 2021?

13   A.   Yes.

14   Q.   Did there come a time after that date when you spoke to

15   Mr. Hoover?

16   A.   Yes.

17   Q.   How did that happen?

18   A.   I was messaged through my Bandcamp website.  They knew my

19   artist name; Mr. Hoover knew my artist name, found me on

20   Bandcamp, and you can message the artist directly.

21          And it was a few days after his arrest, and I

22   received a message saying they haven't heard from him, and

23   they're worried about him.  "Here's phone numbers to contact

24   me," and that's what I did.

25   Q.   And when you say "they," who are you referring to?

1   A.    Mrs. Hoover had reached out to me and gave me her number

2   and Mr. Hoover's number.

3   Q.    And did you call either of them?

4   A.    Yes.

5   Q.    Who did you call?

6   A.    I can't remember which one I called first.

7   Q.    Well, let's say did you speak to Mr. Hoover at a point?

8   A.    Yes.

9   Q.    And what was the topic of that discussion?

10  A.    What happened to Mr. Ervin.

11  Q.    Did he appear -- and meaning Mr. Ervin's arrest; is that

12  right?

13  A.    Correct.

14  Q.    Did he appear concerned about Mr. Ervin having been

15  arrested?

16  A.    Yes.

17  Q.    Did you subsequently watch a video that Mr. Hoover made

18  about Mr. Ervin's arrest?

19  A.    Yes.

20  Q.    And what was your reaction to that video?

21  A.    He had spoken about Mr. Ervin, but he gave inaccurate

22  information.  He gave the wrong name, the wrong birthday, and

23  said that his whole family was arrested.

24          So I called him, and I corrected the information.

25  Q.    Had Mr. Ervin's whole family been arrested?

1   A.   No.

2   Q.   Had anyone other than Mr. Ervin been arrested?

3   A.   No.

4   Q.   And has -- since that date, has anyone in Mr. Ervin's

5   family been arrested, to your knowledge?

6   A.   No.

7   Q.   Did he say why, when you called him, he had provided

8   inaccurate information?

9   A.   He said that he had used a private investigator, and that

10  was information he had gathered.  But I corrected it, and then

11  he reposted a correction -- or posted a correction video.

12            MR. MESROBIAN:  Your Honor, may I have one moment?

13            THE COURT:  Yes.

14            MR. MESROBIAN:  No further questions, Your Honor.

15            MR. LAROSIERE:  No questions for this witness, Your

16  Honor.

17            THE COURT:  All right.  Mr. King?

18            MR. KING:  May it please the Court?

19            THE COURT:  Go ahead.

20                         CROSS-EXAMINATION

21  BY MR. KING:

22  Q.   Ms. Wolfe, you were discussing kind of the understanding

23  of the business that was going on, that is, Auto Key Cards.

24            Is that -- do you remember that conversation?

25  A.   When?

1   Q.   Today, when you were talking today.

2   A.   Oh, yes.

3   Q.   Would you describe Mr. Ervin as a sophisticated

4   businessperson?

5   A.   Define sophisticated.

6   Q.   Did he seem to have an understanding of the types of

7   things, you know, accounting, management, those sorts of things

8   that a typical business would?

9   A.   I felt he had a good sense of how things should be run.

10  Q.   I want to talk to you a little bit.  We've mentioned --

11  you know, we've been talking about auto key cards, but we've

12  also discussed other merchandise.

13          To your knowledge, were the T shirts and water

14  bottles and -- remind me, what else was --

15  A.   There were hats.

16  Q.   Okay.  And were those manufactured here in Jacksonville

17  and stored at Mr. Ervin's home?

18  A.   To my knowledge, no.

19  Q.   Do you know how those were sent to customers?

20  A.   I'm not -- I think it was through a third party,

21  through -- I think it was set up through the Squarespace

22  website.  I might have helped with that.

23  Q.   And --

24          MR. MESROBIAN:  Your Honor, may I approach briefly?

25          THE COURT:  You may.

1          (At sidebar, out of the hearing of the jury:)

2          MR. MESROBIAN:  Your Honor, before the cat gets out

3    of the bag literally, I did see Mr. King walk up with an item

4    in a plastic bag to the podium.  And he's about to explore, I

5    think, some of the other items that were perhaps for sale.

6          I would object if he would intend to introduce any

7    evidence like physical items through this witness on

8    cross-examination.  I think -- I may not have any objection to

9    those coming into evidence on a direct of another witness.

10          But I think under these circumstances, I would

11   object, and that would be a little bit difficult after he

12   pulled something out to show the jury.  So I just -- before we

13   got there, I wanted to make that objection.

14          THE COURT:  And what is the objection to -- the

15   evidentiary objection to the item?

16          MR. MESROBIAN:  It would be inappropriate to

17   introduce this evidence, physical evidence, through a witness

18   on cross-examination.

19          THE COURT:  Mr. King?

20          MR. KING:  Your Honor, I don't disagree.  I don't

21   necessarily want to subject Ms. -- if it's coming in anyway, I

22   don't necessarily want to bring Ms. Wolfe back next week to

23   say, "Hey, do you recognize this T-shirt?" and wave around a

24   T-shirt.

25          If -- and candidly, I don't know how familiar she is

1    with this, so I was going to explore it.  But I have not

2    discussed it with her, so I don't know if I can lay a predicate

3    with her.  That's why I was about to get in to see if I even

4    can.

5              MR. MESROBIAN:  And --

6              MR. KING:  It may be -- I'm sorry.

7              MR. MESROBIAN:  My concern is that to the extent that

8    there would be an attempt to lay a foundation by showing this

9    physical item -- but, again, just with this specific item,

10   where it's not a document or something like that where -- it's

11   going to be pretty obvious to the jury what it is, even if

12   she's not able to identify it.

13             THE COURT:  Why don't I suggest that we give the jury

14   about a five-minute break, and we can see if he can lay the

15   foundation outside the presence of the jury.

16             I would hate to have to call the witness back

17   unnecessarily.

18             Would that be acceptable?

19             MR. MESROBIAN:  Yes, Your Honor.

20             MR. KING:  Yes, Your Honor.  Thank you.

21        (End of discussion at sidebar.)

22             THE COURT:  Ladies and gentlemen, I'm going to give

23   you-all about a five-minute break so that we can take care of

24   something.

25             I promise that this won't turn into two and a half

 1   hours like yesterday.  You will be coming back in.  We just

 2   need -- we just need a few minutes to address a matter outside

 3   your presence that -- where we're not whispering at each other

 4   over here.

 5           So just continue to follow all of my instructions,

 6   and we'll bring you back in in about five minutes.

 7           COURT SECURITY OFFICER:  All rise for the jury.

 8       (Jury out at 4:15 p.m.)

 9           COURT SECURITY OFFICER:  Please be seated.

10           THE COURT:  All right.  We are now outside the

11   presence of the jury.

12           And, Mr. King, I'm going to let you make your

13   proffer.

14           MR. KING:  Yes, Your Honor.  I know the Government's

15   requested to physically see the item.  Can I show that to them

16   before I begin the --

17           THE COURT:  Yes.

18       (Pause in proceedings.)

19           THE COURT:  Go ahead, Mr. King.

20                          PROFFER

21   BY MR. KING:

22   Q.   Ms. Wolfe, are you -- let me ask it this way.

23           The -- it was your understanding that the

24   merchandise, other than the auto key cards, was sent directly

25   from the manufacturer?

 1  A.    Which manufacturer?

 2  Q.    Whoever was manufacturing the items, whether it was a

 3  T-shirt or a hat.

 4  A.    I believe so.

 5  Q.    And are you -- did you ever see and are you familiar with

 6  the physical items?

 7  A.    I saw the digital images of them.  I don't remember seeing

 8  them in person.

 9  Q.    So you've never actually seen one in person?

10  A.    I don't think so.

11        MR. KING:  Your Honor, I think with that, I don't

12  believe I can lay a predicate, so I am prepared to move on.

13        THE COURT:  Okay.

14        MR. KING:  And, Your Honor, if I could return this so

15  there's no --

16        THE COURT:  Yeah.  Let's do that.

17        And I told the jury they'd have five minutes, so

18  let's give them a couple of minutes in case anybody decided to

19  use the opportunity for a comfort break.

20     (Pause in proceedings.)

21        COURT SECURITY OFFICER:  They're ready, Your Honor,

22  when you are.

23        THE COURT:  Okay.  Then bring them back in.  Thank

24  you.

25        Mr. King, do you want to go back to the ...

1           COURT SECURITY OFFICER:  All rise for the jury.

2      (Jury in at 4:20 p.m.)

3           COURT SECURITY OFFICER:  Please be seated.

4           MR. KING:  May it please the Court?

5           THE COURT:  Go ahead.

6           MR. KING:  Thank you, Your Honor.

7                CROSS-EXAMINATION (CONTINUED)

8  BY MR. KING:

9  Q.   Ms. Wolfe, we were talking a little bit about the website

10  and the merchandising.

11           Were you responsible for shipping anything out or

12  getting orders together, or was that all Mr. Ervin?

13  A.   There was only one part of that I assisted with that was

14  to do with ShipStation, and I had to verify the addresses so

15  that the post office could send them.  And it would not process

16  if there was a problem with the way the address was entered.

17           So sometimes I would have to go in and figure out

18  what they meant to put or what the post office wanted it to be,

19  or I'd have to contact the customer and say, "Hey, this address

20  isn't working.  Do you have something else?"

21  Q.   I appreciate that.

22           And my understanding is other than that, your focus

23  was on dealing with some customer issues in terms of emails and

24  then primarily kind of marketing, graphics, that sort of thing.

25  A.   The only emails that I really handled had to do with,

1    "Where is my package?"

2            "What's my tracking number?  I didn't get it."

3            "My package says it's arrived, but it's not here."

4            "I ordered this three weeks ago.  Where is it?"

5    Those are the bulk of the emails that I handled.

6            And as far as marketing, the materials that I made

7    for Mr. Hoover and another YouTuber -- I can't remember his

8    name -- under Freedom Inc., I made some art for both of them

9    and then music for Mr. Hoover.  That's the extent of what I

10   did.

11   Q.   And Freedom Inc. was another business that Mr. Ervin had?

12   A.   No.  Freedom Inc. is another YouTuber that he assisted.

13   Q.   I'm sorry.  I misunderstood.

14           So that was another YouTuber that Mr. Ervin worked

15   with.

16   A.   Briefly, in the beginning.

17   Q.   I want to talk a little bit more about the -- Mr. Hoover.

18           Did you ever meet him in person?

19   A.   No.

20   Q.   Did you ever know if he came down to Florida to visit

21   Mr. Ervin?

22   A.   No.

23   Q.   Do you know if they ever met in person?

24   A.   No.

25   Q.   And let me ask this.

1         Do you not know, or do you know that they did not?

2    A.   I don't know if they did.

3    Q.   Okay.  And in terms of -- and did you ever know Mr. Ervin

4    to go up to where he lived in Wisconsin to visit?

5    A.   To my knowledge, no.

6    Q.   The messages that we went through, are those consistent

7    with the verbal conversations that you had with Mr. Ervin?

8    A.   Yes.

9    Q.   And did he ever tell you to lie or mislead or do anything

10   like that on the text messages?

11   A.   No.

12   Q.   Give you any reason to believe that he wasn't being

13   straightforward and honest with you on those text messages?

14   A.   No.

15        MR. KING:  Your Honor, I have nothing further.  Thank

16   you.

17        MR. MESROBIAN:  I have one question, Your Honor.

18                    REDIRECT EXAMINATION

19   BY MR. MESROBIAN:

20   Q.   Ms. Wolfe, now do you believe that Mr. Ervin was not

21   straightforward with you about what the auto key card was?

22   A.   Yes.

23        MR. MESROBIAN:  No further questions, Your Honor.

24        MR. KING:  Nothing further, Your Honor.

25        THE COURT:  All right.  Ma'am, you may step down.

1          THE WITNESS:  Thank you.

2          THE COURT:  Is this witness released?

3          MR. MESROBIAN:  Yes, Your Honor.

4          MR. KING:  Yes, Your Honor.

5          THE COURT:  All right.  You're free to go, ma'am.

6          THE WITNESS:  Thank you.

7      (Witness excused.)

8          THE COURT:  Next witness?

9          MS. TAYLOR:  The United States calls Jonathan Monger.

10     (The witness entered the courtroom.)

11         COURTROOM DEPUTY:  If you could please raise your

12 right hand for me.

13         Do you solemnly swear that the testimony you're about

14 to give before this Court will be the truth, the whole truth,

15 and nothing but the truth, so help you God?

16         THE WITNESS:  I do.

17         COURTROOM DEPUTY:  You may have a seat.

18         And if you could please state your name for the

19 record and spell your first and last names.

20         THE WITNESS:  Jonathan Neal Monger, J-o-n-a-t-h-a-n,

21 M-o-n-g-e-r.

22         THE COURT:  Go ahead.

23         MS. TAYLOR:  Yes, Your Honor.

24         JONATHAN MONGER, GOVERNMENT'S WITNESS, SWORN

25                    DIRECT EXAMINATION

1   BY MS. TAYLOR:

2   Q.   Mr. Monger, just city and state, where do you live?

3   A.   Orange Park, Florida.

4   Q.   And are you -- is there someone in this courtroom right

5   now who you know personally?

6   A.   Yes.

7   Q.   And who is that?

8   A.   Justin Ervin --

9   Q.   And can you --

10  A.   -- and his family as well.

11  Q.   You see some of his family members --

12  A.   Yes.

13  Q.   -- as well?

14       And -- and let's -- I will try and I'll ask you to

15  try for us to make sure that we don't talk at the same time so

16  the court reporter -- it's hard for her to -- it's actually, I

17  think, almost impossible for her to type what both of us are

18  saying at the same time, okay?

19  A.   Okay.

20  Q.   All right.  Could you first -- with regard to Justin

21  Ervin, can you describe what he's wearing, what he looks like,

22  where he's sitting?

23  A.   He's wearing the black jacket with the yellow tie.

24  Q.   And where is he sitting?

25  A.   Sitting next to the lady in the white dress, white and

 1    black dress.

 2            MS. TAYLOR:  I would ask the record to reflect that

 3    Mr. Monger has identified Justin Ervin.

 4            MR. KING:  Without objection, Your Honor.

 5            THE COURT:  The record will so reflect.

 6    BY MS. TAYLOR:

 7    Q.   And you recognize a few of Mr. Ervin's family members?

 8    A.   Yes, I do.

 9    Q.   And they're sitting -- sitting back in the gallery; is

10    that correct?

11    A.   Yes.

12    Q.   Okay.  Now, do you live somewhere close to 2409 Kirkwall

13    Court?

14    A.   Yes.  I live at 1144 Londonderry Drive, which is

15    catty-corner to the house.

16    Q.   To the Kirkwall --

17    A.   Kirkwall drive.

18    Q.   Okay.  And is that a house -- how long have you lived at

19    that residence?

20    A.   Ever since fourth grade.  Probably in '93, '94.

21    Q.   And how long have you known Mr. Ervin?

22    A.   Whenever we moved to the neighborhood.

23    Q.   So around when you were in fourth grade?

24    A.   Yes.

25    Q.   And how old are you now?

1   A.   40 years old.

2   Q.   So it's been quite a while?

3   A.   25-plus years.

4   Q.   And, Mr. Monger, you're required to be here to testify

5   today, correct?

6   A.   Yes.

7   Q.   Are you excited to be here to testify today?

8   A.   Not at all.

9   Q.   Is it difficult for you to be here testifying today?

10  A.   Yes.

11  Q.   Prior to Mr. Ervin being arrested in this case, would you

12  have considered him a friend?

13  A.   Yes.

14  Q.   A close friend?

15  A.   I wouldn't consider him a close friend, but I would

16  consider him a friend.

17  Q.   Would you see him frequently?

18  A.   Before October of 2020, no, not really.

19  Q.   Were you living somewhere else before October of 2020?

20  A.   Yes, I was.

21  Q.   And then in October of 2020, did you move back to the

22  house that you're currently living in?

23  A.   I moved in with my in-laws, and they lived in another

24  neighborhood in Orange Park.

25  Q.   And that was before October of 2020?

1   A.   Yes.

2   Q.   And then in October of 2020, where did you move?

3   A.   I was still living at my in-laws' house in Fox Meadows.

4   Q.   And do your parents still live near the Kirkwall Court

5   house where the Ervins lived?

6   A.   Yes, they do.

7   Q.   And would you be over there regularly?

8   A.   I would go on the weekends whenever I would have my kids

9   so the kids could visit.

10  Q.   Now, are you familiar with what -- with an auto key card?

11  A.   I was, yes.

12  Q.   And how are you familiar with auto key cards?

13  A.   Whenever I started going over there in October/November

14  time frame, that's when Mr. Ervin told me about them.

15  Q.   And whose business was Auto Key Cards?

16  A.   It was Justin's business.

17  Q.   Justin Ervin?

18  A.   Yes.

19  Q.   And what did he tell you about the auto key cards?

20  A.   It was a design he's been working on for many years.  It

21  was a gray-market item that wasn't illegal, but it -- it

22  resembled something, the Lightning Link.

23  Q.   And did you say it was a gray-market item?

24  A.   Yes.

25  Q.   What did you understand that to mean?

1  A.    It teetered on the line, that it wasn't illegal but it was

2  legal, I guess.

3  Q.    And so that was based upon his description that you -- you

4  understood it was sort of on the line of legal or illegal?

5  A.    Yes.

6  Q.    And that's based on how he described it to you?

7  A.    Yes.

8  Q.    And what did he -- what did he tell you was the thing that

9  could possibly make it teeter on the wrong side of the line?

10 A.    He explained to -- it was something that he designed that

11 was -- looked like a Lightning Link or an auto sear receiver.

12 Q.    And did you know what a Lightning Link was?

13 A.    Not at the time, no.

14 Q.    Did you know what an auto sear was?

15 A.    I knew about fully auto weapons and auto sears, but I

16 didn't know what a Lightning Link was.

17 Q.    And did he have -- leave you with the impression that he

18 had designed that particular shape that was engraved on the

19 auto key card?

20 A.    Yes.

21 Q.    And that he had invented that design?

22 A.    It's something he came up with.

23 Q.    And did he tell you -- did he tell you what the design

24 could do if it were removed from the card -- if the pieces were

25 removed from the card?

1   A.   If they were cut out correctly and formed in a certain

2   way, it could make a certain model AR-15 fully auto.

3   Q.   And when you say fully auto, you mean shoot fully

4   automatic with one pull of the trigger?

5   A.   Yes.

6   Q.   Is that another way to say a machine gun?

7   A.   Yes.

8   Q.   Did he -- did Mr. Ervin -- was he interested in firearms

9   in general?

10  A.   He was very interested in firearms, yes.

11  Q.   Was -- looking back into the time frame of October 2020,

12  had he been interested in firearms for a long time at that

13  point?

14  A.   To my knowledge, yes.

15  Q.   And did he have an interest in machine guns?

16  A.   I don't know about that.

17  Q.   Did he ever talk to you about any other kind of machine

18  gun conversion device that he knew of?

19  A.   He did talk about the portable wall hanger.

20  Q.   What did he tell you about portable wall hangers?

21  A.   It was something that a man in West Virginia was selling

22  online.

23  Q.   Did he ever indicate to you what a portable wall hanger

24  really was?

25  A.   He did.  He said that all you had to do was break two tabs

1  off, and it would make it fully auto if you dropped it into an
2  AR-15.
3  Q.    Did he ever talk to you about whether he had possessed a
4  portable wall hanger?
5  A.    I believe he did say that he ordered one.
6  Q.    And did he say what he had -- whether he done anything
7  with it after ordering it?
8  A.    I know he said he destroyed it after he ordered it.
9  Q.    Did he tell you why he destroyed it?
10  A.    No, he didn't.
11  Q.    Were you aware of how Mr. Ervin -- how Justin Ervin was
12  marketing auto key cards?
13  A.    He did show me the website, yes.
14  Q.    The Auto Key Cards website?
15  A.    Yes.
16  Q.    And do you know how -- how he was advertising auto key
17  cards?
18  A.    I know that he was trying to find YouTubers, different
19  kinds, to help promote it, I guess.  And I know he had links on
20  Facebook that he was trying to send out.
21  Q.    When you talk about YouTubers, was there a particular kind
22  of subject-matter category for those YouTubers that he was
23  trying to get in contact with?
24  A.    Yes, firearms.
25  Q.    And eventually did Mr. Ervin find a YouTuber to work with?

1    A.    I believe he found CRS Firearms that he was working with.

2    Q.    And why do you believe that?

3    A.    I mean, I know he told me he was in contact with him, and

4    he sent him some, and he showed me some of the YouTube videos.

5    Q.    And did you know the name of the person who -- at the time

6    did you know the name of the person who ran -- or made the CRS

7    Firearms videos?

8    A.    I did not.

9    Q.    Did you know Mr. Ervin to be communicating with anybody in

10   particular about making videos?

11   A.    I know he was talking to the person at the time, and then

12   I did -- and -- and he was communicating with him, yes.

13   Q.    And do you know what that person's name was?

14   A.    It was Matt.

15   Q.    Do you know -- did you know that it was Matt at the time?

16   A.    I didn't know it was until maybe a couple times going over

17   there.

18   Q.    Okay.  So you knew Matt's name before Mr. Ervin was

19   arrested?

20   A.    Yes.

21   Q.    And so did you ever observe Mr. Ervin taking phone calls

22   from Matt?

23   A.    I know when he would take phone calls when I was over

24   there, he would walk away, and I didn't really hear their

25   conversations at all.

1   Q.   Did you believe that he was talking to Matt?

2   A.   Yes.

3   Q.   What made you believe that?

4   A.   He told me that that was him.

5   Q.   At some point did -- did CRS Firearms begin making

6   advertising videos for Mr. Ervin's --

7   A.   I know that --

8   Q.   -- auto key cards?

9   A.   I know that he started putting some of the key cards in

10  the video, some of the products that he would send him in the

11  videos.

12  Q.   Did Mr. Ervin ever show you those videos?

13  A.   Yes.

14  Q.   Do you recall the names of any of the videos?

15  A.   I do not.

16  Q.   And from your observation, once Matt or CRS Firearms

17  started making these videos, what was the effect on Mr. Ervin's

18  business?

19  A.   I know that he was getting a lot of sales, and I also know

20  that the YouTube channel was getting a lot more subscribers and

21  video views.

22  Q.   So it was mutually beneficial for both of them?

23  A.   In my opinion, yes.

24  Q.   Did Mr. Ervin ever tell you how much money he was making?

25  A.   I know at one point he told me he was making in the six

1   figures.

2   Q.    And did that -- did you take that to be six figures, like,

3   on a yearly basis or on -- over what period of time?

4   A.    Just the period of time that he was starting, from October

5   till January/Februaryish.

6   Q.    So maybe a three-month period of time?

7   A.    A three- or four-month period, yes.

8   Q.    To your knowledge, did Mr. Ervin at that time have any

9   other source of income?

10  A.    Not to my knowledge.

11  Q.    Do you know if Mr. Ervin ever paid Matt or CRS Firearms

12  for those advertising videos?

13  A.    I know that he said that he sent him money and some other

14  items as well.

15  Q.    What other items do you know Mr. Ervin to have sent to

16  Matt?

17  A.    I know that he sent him a purse and then some camera

18  equipment.

19  Q.    What do you know about the purse?

20  A.    I know it was a designer handbag.

21  Q.    Do you know how Mr. Ervin purchased it?

22  A.    I do not.

23  Q.    But he -- did he tell you that he had purchased the purse?

24  A.    Yes.

25  Q.    Did he tell you whether it was expensive or not?

1   A.   Yeah.  It was a designer handbag, so yeah, I figured it

2   was expensive.

3   Q.   And did Mr. Ervin ever send you links to any CRS Firearms

4   videos about the auto key card?

5   A.   I don't remember.  I believe he just showed me when I was

6   over there.

7   Q.   Did Mr. Ervin express to you any concern about the things

8   that Matt Hoover was saying in the advertising videos about

9   what the auto key card was?

10  A.   Not to my knowledge.

11  Q.   Did he ever express any displeasure about how Matt Hoover

12  was marketing the auto key card?

13  A.   No.

14  Q.   Did you know whether Mr. Ervin had any issues with his

15  websites being shut down?

16  A.   I know one of the first ones he had, I guess they shut it

17  down.

18  Q.   Who shut it down?

19  A.   I -- I don't remember the name.  I know it was one of the

20  pay -- one of the -- the companies that does -- I don't

21  remember the name of the website, but I know the first one that

22  he was doing all his transactions on was shut down.

23  Q.   So it was the web provider -- or the website provider that

24  shut it down?

25  A.   Yes, I believe so.

1    Q.    And did Mr. Ervin give you any reason for why he -- what

2    he understood to be the reason why the website was shut down by

3    the provider?

4    A.    I believe that he was making too much money too fast, I

5    guess.

6    Q.    That's what Mr. Ervin told you?

7    A.    Yes.

8    Q.    Did that make sense to you?

9    A.    I don't know.  I've never really dealt with that much

10   money, so ...

11   Q.    In general, if a company is making a lot of money, is that

12   a good thing or a bad thing, in your experience?

13            MR. KING:  Objection.  Calls for speculation.

14            THE COURT:  Sustained.

15   BY MS. TAYLOR:

16   Q.    Did you personally assist Mr. Ervin with his Auto Key Card

17   business?

18   A.    I did help him three or four times, yes.

19   Q.    And in what -- in what way did you help Mr. Ervin with the

20   business?

21   A.    I would help him polish the raw metal cards to give them a

22   better appearance.

23   Q.    And how -- and so these were cards -- were these cards

24   that already had the engravings on them?

25   A.    Yes.

1    Q.    And what was used to polish the cards?

2    A.    He had some belt sanders in the shed out back that we

3    would use with different types of grit paper on them.

4    Q.    Okay.  So maybe it was a heavy grit and then a series of

5    different grits?  Is that accurate?

6    A.    Yes.

7    Q.    And did Mr. -- you said that was three or four times?

8    A.    Yes, three or four times.

9    Q.    And did Mr. Ervin pay you for your assistance with the

10   polishing?

11   A.    Yes, he did.

12   Q.    Approximately how much did he pay you?

13   A.    I think it was about 150 each time.

14   Q.    And do you recall telling Special Agent Slosson

15   previously --

16             MR. KING:  Objection, Your Honor.  This calls for

17   hearsay.

18             MS. TAYLOR:  I'm just --

19   BY MS. TAYLOR:

20   Q.    Well, if I were to give you a report of a previous

21   discussion you had with Special Agent Slosson, would it

22   possibly refresh your memory as to how much you were paid?

23             THE COURT:  Hold on.  What's the question?

24             MR. KING:  Can we approach, Your Honor?

25             THE COURT:  Yes.

1        (At sidebar, out of the hearing of the jury:)

2            THE COURT:  Ms. Taylor, you're offering to refresh

3    his recollection, but he didn't say he couldn't remember.  He

4    gave an answer.

5            I think you might be trying to impeach him, but he

6    hasn't -- I mean, you can't -- you have to establish that he

7    needs his recollection refreshed before you can do that.

8            MS. TAYLOR:  Okay.

9            MR. KING:  Yes, Your Honor.  That's the first issue.

10           And then, you know, I would think there would need to

11   be an establishment that reading another person's report --

12   sorry, that reading another individual's report -- I ...

13           THE COURT:  Actually, that is -- it is a permissible

14   way to refresh an individual's recollection.  It doesn't need

15   to be their own statement.

16           MR. KING:  Yes, Your Honor.

17           THE COURT:  But -- but I -- there's not a basis to

18   refresh the recollection right now.  He gave an affirmative

19   answer, so ...

20           MS. TAYLOR:  Yes, Your Honor.

21           THE COURT:  Okay.

22       (End of discussion at sidebar.)

23   BY MS. TAYLOR:

24   Q.   So, Mr. Monger, you stated it was three or four times that

25   you helped with polishing the cards?

1    A.    Yes.

2    Q.    And Mr. Ervin did pay you for that?

3    A.    Yes.  Each time I helped him, yes.

4    Q.    Initially, when you met with law enforcement, were you 100

5    percent truthful about that?

6    A.    No, I was not.

7    Q.    And what was the reason why you weren't 100 percent

8    truthful initially?

9    A.    I was honestly really scared.

10   Q.    Later -- and is this the truth, though, that you're

11   telling the jury today?

12   A.    Yes.

13            MS. TAYLOR:  I have no other questions, Your Honor.

14            THE COURT:  Mr. Larosiere?

15            MR. LAROSIERE:  Yes, Your Honor.

16            May it please the Court?

17            THE COURT:  Go ahead.

18                          CROSS-EXAMINATION

19   BY MR. LAROSIERE:

20   Q.    You said it was about -- October of what year were you --

21   you started seeing Justin Ervin more often?

22   A.    I started going over there October of 2020, I believe.

23   Q.    Thank you -- or strike that.

24            How often, again, from then until the period

25   Mr. Ervin was arrested did you go over there?

1    A.   It was usually on the weekends whenever I would go to

2    bring my kids to my parents' house.

3    Q.   So about every week?

4    A.   Yeah.  Some weekends I wouldn't, but most of the time it

5    was every weekend or so.

6    Q.   Right.  So it would be fair to say that you were there

7    quite often.

8    A.   A couple hours on the weekends, yeah.

9    Q.   Did you ever see Matt Hoover there?

10   A.   No, I did not.

11   Q.   Did you ever gain any information that Matt Hoover was in

12   Florida at all?

13   A.   No.

14   Q.   Okay.

15          MR. LAROSIERE:  That's all I have for you.  Thank

16   you.

17          THE COURT:  Go ahead, Mr. King.

18          MR. KING:  May it please the Court?

19          THE COURT:  Go ahead.

20                      CROSS-EXAMINATION

21   BY MR. KING:

22   Q.   Good afternoon, sir.

23          I wanted to ask you a little bit about Justin Ervin

24   himself.  You've known him for a long time.

25   A.   Yes.

1  Q.   And would it be fair to say that you've described him as a

2  prepper in the past?

3  A.   Yes.

4  Q.   And he would have large quantities of food and water and

5  other items consistent with that?

6  A.   Yes.

7  Q.   I want to talk to you a little bit about your testimony

8  here today as well.

9        The Government went over that you're here under

10  subpoena, but you also have a letter of immunity.

11  A.   Yes.

12  Q.   And if -- and what that does is -- your understanding --

13  and if it's different, please correct me -- is that if you tell

14  what the Government believes to be the truth throughout these

15  proceedings, that they will not prosecute you for what you say

16  here.

17  A.   If I tell the truth, yes, they will not prosecute me.

18  Q.   And the Government's the one who determines whether or not

19  what you've said is the truth or not.

20  A.   I guess so, yes.

21  Q.   And otherwise you, you know -- potentially, with relation

22  to the auto key cards, you're looking at a -- you know,

23  potentially a substantial prison sentence, a felony conviction.

24  A.   I don't know about that.

25  Q.   And you said before that when you spoke with law

 1  enforcement earlier, that you didn't tell them the truth.

 2  A.   Yes.  About getting paid, yes.

 3  Q.   And at that time were you under the threat of arrest?

 4  A.   No.  I would just have a subpoena.  They just gave me a

 5  subpoena.

 6  Q.   And you talked to them.

 7  A.   Yes.

 8  Q.   And it was -- and you answered their questions.

 9  A.   Some of them.

10  Q.   And subsequently you've been under the threat of

11  prosecution.

12  A.   I don't think they've ever threatened me to be prosecuted.

13  Q.   Let me -- let me rephrase that.

14        And so subsequently -- and you're aware lying to a

15  federal agent is, in and of itself, a serious felony.

16  A.   Yes, I do.

17  Q.   And they told you that.

18  A.   Yes, they did.

19  Q.   And as of -- as it sits here, if the Government determines

20  that your testimony is truthful, you have -- you've been told

21  you're not going to be prosecuted for that.

22  A.   Yes.

23  Q.   And it's your testimony here that with all of that going

24  on, your testimony here today is completely truthful and what

25  you said before was what was mistaken?

1   A.   Yes.  I was really -- I was honestly scared because I have

2   a family.  I have a really good job.

3   Q.   You were scared of going to jail.

4   A.   Yes.

5   Q.   And it's important to you not to go to jail.

6   A.   I need to be there for my family.

7           THE COURT:  I'm sorry, sir.  You're going to have to

8   speak up.

9           THE WITNESS:  Yes.  I have to be there for my family.

10  BY MR. KING:

11  Q.   And prior to coming to court today, the Government and

12  agents for the Government and these prosecutors talked to you

13  about what they expected your testimony to be.

14  A.   They talked to me about my testimony.

15          MR. KING:  Your Honor, I have no further questions.

16          Thank you, sir.

17          MS. TAYLOR:  Brief redirect, Your Honor?

18          THE COURT:  Go ahead.

19                      REDIRECT EXAMINATION

20  BY MS. TAYLOR:

21  Q.   Mr. Monger, to be clear, the only thing that you didn't --

22  you weren't initially truthful with ATF about was getting paid,

23  correct?

24  A.   Yes.

25  Q.   The other things that we've talked about here today, you

1   told to ATF up front?

2   A.   Yes.

3   Q.   Have I ever threatened to arrest you?

4   A.   No.

5   Q.   Have I been telling you, throughout the times -- the few

6   times that we've met, that --

7            MR. KING:  Objection.  Hearsay.

8            THE COURT:  I'm going to sustain the objection.

9   BY MS. TAYLOR:

10  Q.   Is it your understanding that the Government views you as

11  a witness in this case?

12  A.   Yes.

13  Q.   And what is your understanding of what my expectation is

14  with regard to the nature of your testimony here today?

15           MR. KING:  Your Honor, that still calls for hearsay.

16           THE COURT:  I'm going to allow it based upon your

17  cross-examination.

18           Go ahead.

19           THE WITNESS:  To tell the truth.

20           MS. TAYLOR:  I have no other questions.

21           THE COURT:  Anything else, Mr. King or Mr. Larosiere?

22           MR. KING:  No, Your Honor.

23           MR. LAROSIERE:  No, Your Honor.

24           THE COURT:  All right.  You may step down, sir.

25           And this witness, I assume, is released?

```
1              MS. TAYLOR:  Yes, Your Honor.

2              MR. KING:  Yes, Your Honor.

3              MR. LAROSIERE:  Yes, Your Honor.

4              THE COURT:  Okay.

5         (Witness excused.)

6              THE COURT:  Who's next?

7              MR. MESROBIAN:  Your Honor, may we approach briefly?

8              THE COURT:  You may.

9         (At sidebar, out of the hearing of the jury:)

10             MR. MESROBIAN:  So the next witness will be Lyndsey

11   Butler, the ATF intelligence research person.

12             I just wanted to make sure we were all squared away

13   on Government's Exhibits 17 and the GoFundMe materials, which I

14   believe is 73, in terms that we've redacted them pursuant to

15   the discussion yesterday.

16             And I just want to make sure, because she will be the

17   witness with whom we'd discuss this.

18             THE COURT:  Okay.  Has -- Mr. King, have you reviewed

19   the redacted GoFundMe?

20             MR. KING:  Yes, Your Honor.  I believe it's

21   consistent with the Court's order.

22             THE COURT:  Okay.  And there's nothing additional

23   that you would want redacted?

24             MR. KING:  Other than my previous objection, there's

25   nothing else that I would seek to add, and what the Government
```

 1  has done is consistent with what the Court's order was after my

 2  objection.

 3          THE COURT:  Okay.  Mr. Larosiere?

 4          MR. LAROSIERE:  And so the related issue is the

 5  videos.  I didn't expect her to be introducing them today.  Do

 6  you know if she will be?

 7          MR. MESROBIAN:  I don't know how fast we'll go, Your

 8  Honor, but we may get to the first one.  I'm not sure.

 9          MR. LAROSIERE:  So I will reflect, for the record,

10  that we do generally, with the rule of completeness, want to

11  get more context for the videos than just the auto key card

12  advertisement.

13          However, if you wanted to cooperate and perhaps give

14  buffer spots, we would be happy to only play the parts not

15  referring to the GoFundMe so as not to create this issue.

16          THE COURT:  Well, I mean, the Government is

17  introducing the entirety of the videos --

18          MR. LAROSIERE:  Yes, ma'am.

19          THE COURT:  -- so what's played is not what matters.

20          MR. LAROSIERE:  Right.

21          THE COURT:  That was the confusion I had yesterday.

22          I don't know that I -- I haven't actually heard an

23  objection specifically to Exhibits 13 and 14 yet.  What I heard

24  objections to, 73 and the 17 series, which I ruled on, I was

25  told that there were related matters by Mr. Mesrobian.

1        I read through them last night.  I would have to hear

2   what the objection to 13 and 14 is in order to rule on it -- I

3   haven't gotten one yet -- and what the specific language in it

4   is.  So that's where I am on 13 and 14.

5        MR. LAROSIERE:  I believe the concern was that

6   playing 13 and 14 in their entirety would open the door to then

7   getting that same evidence in.

8        THE COURT:  Okay.  But that -- the -- well, I've

9   already ruled 73 and the 17 series to be admissible.

10       So to the -- Mr. Mesrobian advised me that there's

11  some relationship between 13 and 14 and that -- because the

12  GoFundMe is listed.

13       But as I said, just said, I have not heard from the

14  defense an objection to 13 and 14, nor have I heard what the

15  basis for it would be, and I would have to have it identified.

16       So that's where I am on the current record in the

17  case.

18       MR. KING:  And, Your Honor, just to preview, while

19  we're all here, based on the Court's rulings as to the 17

20  series and the other number that is currently eluding me, I

21  don't plan on making any further objections to those two videos

22  being introduced into evidence.

23       THE COURT:  Okay.

24       MR. MESROBIAN:  The other matter, Your Honor, very

25  briefly, twice today, both during this current last series of

1  questioning and I believe before lunch, there were a couple
2  jurors who had their cell phones with them and --
3          THE COURT:  In the courtroom?
4          MR. MESROBIAN:  In the courtroom.  And they were
5  handed back to the marshal and the CSO --
6          THE COURT:  I'll --
7          MR. MESROBIAN:  -- similar to the previous time.  Not
8  an issue where they were looking at them, but --
9          THE COURT:  I'll remind them.
10         MR. MESROBIAN:  -- at this point I just wanted to --
11         THE COURT:  Yeah.
12         MR. MESROBIAN:  Thank you.
13         MR. KING:  Thank you, Your Honor.
14         MR. LAROSIERE:  Thank you.
15     (End of discussion at sidebar.)
16         THE COURT:  Next witness?
17         MR. MESROBIAN:  Your Honor, the United States calls
18  Lyndsey Butler.
19         COURTROOM DEPUTY:  Please raise your right hand.
20         Do you solemnly swear that the testimony you're about
21  to give before this Court will be the truth, the whole truth,
22  and nothing but the truth, so help you God?
23         THE WITNESS:  I do.
24         COURTROOM DEPUTY:  You may have a seat.
25         And if you could please state your name for the

```
 1   record and spell your first and last names.
 2              THE WITNESS:  Lyndsey Butler.  It's L-y-n-d-s-e-y.
 3   Last name is Butler, B-u-t-l-e-r.
 4              THE COURT:  Go ahead.
 5              LYNDSEY BUTLER, GOVERNMENT'S WITNESS, SWORN
 6                       DIRECT EXAMINATION
 7   BY MR. MESROBIAN:
 8   Q.   Ms. Butler, where are you employed?
 9   A.   I work for the Bureau of Alcohol, Tobacco, Firearms and
10   Explosives, or ATF.
11   Q.   What is your position?
12   A.   I'm an intelligence research specialist.
13   Q.   So what are your duties and responsibilities in that role?
14   A.   As an intelligence research specialist, I provide case
15   support to the special agents to further their investigations.
16              Typically that's through social media research, phone
17   record analysis, open source research, general database
18   lookups, things of that nature.
19   Q.   To be clear, are you a law enforcement officer who goes
20   out and arrests people and --
21   A.   No, I'm not.
22   Q.   -- so forth?
23              How long have you been with ATF?
24   A.   I've been with ATF since June of 2020, so almost three
25   years.
```

1   Q.   And do you have prior law enforcement experience?

2   A.   I do.

3   Q.   What was that?

4   A.   Prior to ATF, I was an analyst up in Washington, D.C., for

5   the D.C. Metropolitan Police Department, and prior to that I

6   was an analyst in Hampton, Virginia.

7   Q.   What is your educational background?

8   A.   I have a master's in criminal justice from the University

9   of Cincinnati, and I have a bachelor of science in criminal

10  justice from Virginia Commonwealth University.

11  Q.   And have you received any training from ATF?

12  A.   I have.

13  Q.   And could you talk about that a little bit.

14  A.   Sure.  I attended a four-week -- it's called Intelligence

15  Research Specialist Basic Training.  It's just basically an

16  end-all be-all class about all of the tools and techniques that

17  we use as analysts.

18        And I've also attended multiple intelligence-related

19  trainings since I've been with ATF as well.

20  Q.   Ms. Butler, have you assisted with the investigation of

21  Kristopher Justinboyer Ervin and Matthew Hoover?

22  A.   Yes, I did.

23  Q.   What has your role been in that investigation?

24  A.   I've done general social media research, open source

25  research, some phone toll analysis, general database queries,

 1   and just general data analysis.  Kind of going through the

 2   different returns that we've received in this case.

 3              THE COURT:  Ma'am, can I get you to pull up to the

 4   microphone and try to speak into ]it, please?

 5              THE WITNESS:  Sorry.

 6              THE COURT:  Thank you.

 7              Go ahead.

 8   BY MR. MESROBIAN:

 9   Q.   So, first, Ms. Butler, did you become familiar with the

10   auto key card as part of this investigation?

11   A.   Yes.

12   Q.   And were you requested to look into, first, the online

13   presence of the auto key card?

14   A.   Yes.

15   Q.   Did you locate the website from which auto key cards were

16   being sold?

17   A.   I did.

18   Q.   And how did you go about doing that?

19   A.   I was initially contacted by Agent Hooker.  He provided me

20   with some screenshots of the website in January of 2021, and

21   then I would have visited the website myself around that time.

22              MR. MESROBIAN:  And, Your Honor, may we publish

23   what's already in evidence as Government Exhibit 114?

24              THE COURT:  You may.

25              MR. MESROBIAN:  And, Ms. Ganoe, if we could just show

1    a few of these pages to the witness.

2           Thank you.

3    BY MR. MESROBIAN:

4    Q.   So, Ms. Butler, do you recognize what this is?

5    A.   Yes.

6    Q.   What is it?

7    A.   This looks like a PDF that I captured of a mirrored

8    version of the Auto Key Cards website.

9           MR. MESROBIAN:  So if we could go back to page 1,

10   please.

11          And could we zoom in on the items in the middle

12   there.

13   BY MR. MESROBIAN:

14   Q.   So, Ms. Butler, do you see the top three items here?

15   A.   Yes.

16   Q.   And are these different types of the auto key card?

17   A.   Yes, they are.

18   Q.   And left to right, are they a 1 in 1, 2 in 1, and 3 in 1

19   with bottle opener?

20   A.   Yes.

21   Q.   And in the second row, are those also the metal auto key

22   cards?

23   A.   Yes.

24   Q.   And those say, "New G2 1 in 1 pen holder," "New G2 2 in 1

25   pen holder," and, "New G2 3 in 1 pen holder."  Is that right?

1    A.    Yes.

2    Q.    And when -- I believe you testified that you recall

3    creating this screenshot of the website.

4    A.    Yes.

5    Q.    And when you did that, did you attempt to capture all the

6    different pages on the site as you found it?

7    A.    I did, yes.

8             MR. MESROBIAN:  So, Ms. Ganoe, could we move to page

9    11 of this exhibit.

10   BY MR. MESROBIAN:

11   Q.    What's reflected on page 11 here?

12   A.    This is the "Mail-In Order" section of the website.

13   Q.    And in the center there, is there a hyperlink to download

14   the mail-in order form itself?

15   A.    There is.

16            MR. MESROBIAN:  And, Ms. Ganoe, could we go to page

17   13.

18   BY MR. MESROBIAN:

19   Q.    And here what page is this on the website?

20   A.    This is the "Contact Us" page of the website.

21   Q.    And is there a phone number?  It's difficult to read, but

22   in white there's a phone number here on the website?

23   A.    Yes.

24   Q.    And did -- through your investigation, did you come to

25   know that this was a customer service number for

 1   autokeycards.com?

 2   A.   Yes.

 3          MR. MESROBIAN:  And now I'd like to move to page 14.

 4   BY MR. MESROBIAN:

 5   Q.   What are we looking at here?

 6   A.   This is the "Terms of Service" section of the website.

 7          MR. MESROBIAN:  And, Ms. Ganoe, could we go down

 8   first to Section 5 of the terms of service.

 9          Zoom in on the first paragraph, please.

10   BY MR. MESROBIAN:

11   Q.   And, Ms. Butler, would you mind reading -- this is --

12   Section 5 is -- has the heading "Products or Services."  Is

13   that right?

14   A.   Yes.

15   Q.   And could you just read the first paragraph here?

16   A.   Sure.  "Certain products or services may only be available

17   exclusively online through the website or mail order only.

18   These products or services may have limited quantities and are

19   subject to our returns policy.

20          "Products are made to order and not returnable or

21   refundable.  Products are a political sculpture for

22   conversation, a novelty, or as artwork only.  Products are not

23   designed or intended to increase any rate, just to increase the

24   rate at which people have conversations.

25          "A form of creative, artistic peaceful protest, along

1    with other common-use features such as bottle opener or a

2    desktop pen holder.  They are not sold or intended to be

3    altered in any way.

4             "Our products are a form of satire and 100 percent

5    First Amendment activity.  Nothing like it has existed before

6    because we drew the art, designed the piece, and made it to

7    keep the conversation going."

8             MR. MESROBIAN:  Now, Ms. Ganoe, could we go down to

9    Section 12 on this page.

10   BY MR. MESROBIAN:

11   Q.   And, Ms. Butler, this Section 12 is titled "Prohibited

12   Uses"?

13   A.   Yes.

14   Q.   And I'll read here.  Does this section begin, "In addition

15   to other prohibitions as set forth in the terms of service, you

16   are prohibited from using the site, its products, your order,

17   or its content (a) for any unlawful purpose; (b) to solicit

18   others to perform or participate in any unlawful acts; (c) to

19   violate any international, federal, provincial, or state

20   regulations, rules, laws, or local ordinances; (d) to infringe

21   upon or violate our intellectual property rights or the

22   intellectual property rights of others; (e) to harass, abuse,

23   insult, harm, defame, slander, disparage, intimidate, or

24   discriminate based on gender, sexual orientation, religion,

25   ethnicity, race, age, national origin, or disability"?

1          And it continues on with some other items, but did I
2    read that accurately?
3    A.   Yes.
4    Q.   And I'd like to now move to Section 14.
5          And this section is entitled "Indemnification."  Is
6    that right?
7    A.   Yes.
8    Q.   And would you read this paragraph, please?
9    A.   "You agree to indemnify, defend, and hold harmless
10   autokeycard.com/autokeycards.com and our parent, owners,
11   subsidiaries, affiliates, partners, officers, directors,
12   contractors, licensors, service providers, subcontractors,
13   suppliers, manufacturers, interns, and employees harmless from
14   any claim or demand, including reasonable attorneys' fees made
15   by any third party due to or arising out of your breach of
16   these terms of service or the documents they incorporate by
17   reference or your violation of any law or the rights of a third
18   party."
19          MR. MESROBIAN:  You can take this down.  Thank you.
20   BY MR. MESROBIAN:
21   Q.   So, Ms. Butler, did you also review public social media
22   activity related to Auto Key Cards?
23   A.   I did.
24   Q.   And how did you go about doing that?
25   A.   So when I was initially contacted by Agent Hooker, I

1  started just doing basic keyword searches on social media and

2  open source websites related to Mr. Ervin, his business, and

3  the products that he was selling.

4  Q.   And did you locate certain accounts that you believed to

5  be relevant to the investigation?

6  A.   I did.

7  Q.   And how did you follow up on that?

8  A.   I would -- I took screenshots of the accounts and just

9  reviewed what they were posting and the different comments that

10  had been made.

11  Q.   Did ATF engage in any legal process to obtain additional

12  information about those accounts?

13  A.   Yes.  After I identified the accounts, ATF served grand

14  jury subpoenas.  From there we reviewed the information that

15  was received, and that ultimately led to some search warrants.

16              THE COURT:  Ms. Butler, can I get you to slow down a

17  little?

18              THE WITNESS:  I'm sorry.  Yes.

19              THE COURT:  Go ahead.

20              MR. MESROBIAN:  Thank you, Your Honor.

21  BY MR. MESROBIAN:

22  Q.   Ms. Butler, did you identify an Instagram account

23  called -- with the screen name autokeycarddotcom?

24  A.   Yes.

25  Q.   And for those who don't know, could you just summarize

1  what Instagram is?

2  A.   Yeah.  Instagram is a photo-sharing social media app.  You

3  are able to post photos and videos.  You can comment on other

4  people's videos.  You can follow their accounts, just interact

5  based on photos and videos.

6  Q.   And can account users also send direct messages on that

7  platform?

8  A.   Yes, they can.

9  Q.   Did ATF serve a search warrant on Facebook for records

10  associated with that account?

11  A.   Yes.

12       MR. MESROBIAN:  And may we publish what's already in

13  evidence as Government Exhibit 53?

14       THE COURT:  You may.

15       MR. MESROBIAN:  And go to page 2, please.

16  BY MR. MESROBIAN:

17  Q.   Focusing on the top portion there, is this the Instagram

18  return in response to the search warrant on the

19  autokeycarddotcom account?

20  A.   Yes.

21  Q.   Separately, did you identify Mr. Ervin's personal

22  Instagram account?

23  A.   Yes, I did.

24       MR. MESROBIAN:  And if we could publish Government

25  Exhibit 54, page 2.

1    BY MR. MESROBIAN:

2    Q.    This is the return for Mr. Ervin's personal account?

3    A.    Yes, it is.

4    Q.    And it's -- the account name is therealjustin_ervin?

5    A.    Yes.

6    Q.    Then, with respect to YouTube, did you identify two

7    different accounts named Justin Ervin?

8    A.    Yes, I did.

9    Q.    And could you provide a concise summary of what YouTube

10   is?

11   A.    Sure.  YouTube is a video-sharing website.  It allows

12   individuals to create accounts or channels.  They can post

13   videos.  You can comment on videos.  You can like other

14   people's comments on videos, that kind of thing.

15   Q.    And how did you identify these accounts named Justin

16   Ervin?

17   A.    When I was initially doing those keyword searches, I came

18   across two videos that had comments underneath them by an

19   account named Justin Ervin.

20   Q.    So were you able to identify the particular identifiers on

21   these two different YouTube accounts through your open source

22   research?

23   A.    Yes.

24   Q.    And did ATF subsequently serve a grand jury subpoena on

25   Google related to these accounts?

1    A.   Yes.

2         MR. MESROBIAN:  Your Honor, may I approach with

3    Government Exhibits 120, 120A, 120B, 120C, and 120D?

4         THE COURT:  Yes.

5    BY MR. MESROBIAN:

6    Q.   So, Ms. Butler, let me know when you've looked through

7    those.

8    A.   Yes.

9    Q.   And do you recognize those documents?

10   A.   I do.

11   Q.   And what are they?

12   A.   The first one is the certificate of authenticity provided

13   by Google.

14        The others are subscriber and account information

15   associated with the two YouTube accounts.

16        MR. MESROBIAN:  Your Honor, move to admit Government

17   Exhibit 120A through D.

18        MR. KING:  Without objection, Your Honor.

19        MR. LAROSIERE:  Without objection, Your Honor.

20        THE COURT:  120A through D are admitted, and you my

21   publish.

22        MR. MESROBIAN:  Your Honor --

23        THE COURT:  Sorry.  120 and 120A through D.

24      (Government's Exhibits 120, 120A, 120B, 120C, and 120D

25   were received in evidence.)

1    BY MR. MESROBIAN:

2    Q.   So, Ms. Butler, what are we looking at in 120A?

3    A.   This is the subscriber information for the YouTube account

4    beginning in account ID UCLC.

5    Q.   And is there any particular identifying information on

6    this -- on 120A as to the ownership of this account?

7    A.   No, there is not.

8    Q.   Did this account reflect that it had been deleted at some

9    point?

10   A.   Yes.

11   Q.   And when was that?

12   A.   The time listed on here is February 26th, 2021, at 12:30

13   a.m.

14        That's in UTC time, so at that point we would have

15   been five hours behind that, so it's really on February 25th.

16   Q.   And for those who may not know, what is UTC time?

17   A.   UTC is Coordinated Universal Time.  It's just the standard

18   from which the world regulates its clocks.

19        So right now we're four hours behind UTC, but in the

20   winter we're five hours behind.

21   Q.   And often, when you're analyzing records that you've

22   received from -- via subpoena, are the times listed in UTC?

23   A.   Yes.

24   Q.   And is part of your role making sure all the times are

25   synced up and -- so you can chronologically arrange records?

1   A.   Yes.

2            MR. MESROBIAN:  So I'd like to move to 120C.

3   BY MR. MESROBIAN:

4   Q.   And at the top here, is this Google subscriber information

5   related to that same YouTube account --

6   A.   Yes.

7   Q.   -- we just looked at?

8   A.   Yes, it is.

9   Q.   And was there identifying information on this result?

10  A.   Yes.  The account email -- I'm sorry, the name, as well as

11  the account email.

12  Q.   And the name is Justin Ervin?

13  A.   Yes.

14  Q.   And the email listed here is 7laneproducts@gmail.com?

15  A.   Yes.

16  Q.   And through your investigation did you attribute that

17  email to Mr. Ervin?

18  A.   Yes.

19  Q.   And, again, at the bottom -- or near the bottom here, it

20  says, "Deletion date:  2021-2-25, 9:11:56 UTC"?

21  A.   Yes.

22  Q.   That's not exactly the same time as what we looked at

23  previously?

24  A.   Correct.

25  Q.   But it's -- is it approximately on the same date?

1    A.   Yes, it's on the same day.

2    Q.   Separately, I'd like to look at 120B.

3         And this is the second Justin Ervin YouTube profile

4    you identified, correct?

5    A.   Yes.

6    Q.   And is there identifying information on this record?

7    A.   There is.  There's a signup email,

8    justin.ervin80@gmail.com.  The display name is Justin Ervin as

9    well.

10        MR. MESROBIAN:  And separately, could we publish 120D

11   as in Delta.

12   BY MR. MESROBIAN:

13   Q.   And this is the Google subscriber information

14   corresponding to the same?

15   A.   Yes.

16   Q.   And, again, the name is Justin Ervin, and the email is

17   justin.ervin80@gmail.com?

18   A.   Yes.

19   Q.   And you also attributed this email account to Mr. Ervin

20   through your investigation?

21   A.   Yes.

22        MR. MESROBIAN:  Your Honor, may I approach the

23   witness with what is marked for identification as Government

24   Exhibit 115?

25        THE COURT:  Yes.

1   BY MR. MESROBIAN:

2   Q.   Please take a look, and let me know when you're done.

3   A.   Okay.  Ready.

4   Q.   Do you recognize that document?

5   A.   I do.

6   Q.   And what is it?

7   A.   This is a compilation of social media screenshots that I

8   took in January of 2021.

9   Q.   And do these relate to those two Justin Ervin YouTube

10   accounts that we were just discussing?

11   A.   Yes.

12   Q.   And are these a fair and accurate representation of the

13   videos and the comments as you saw them in January of 2021?

14   A.   Yes.

15          MR. MESROBIAN:  Your Honor, move to admit Government

16   Exhibit 115.

17          MR. KING:  Your Honor, if we could just have a

18   moment.

19          THE COURT:  I'm sorry, Mr. King.  I didn't hear you.

20          MR. KING:  If I could just have a brief moment.

21          THE COURT:  Certainly.

22      (Pause in proceedings.)

23          MR. KING:  Your Honor, no objection.

24          MR. LAROSIERE:  Without objection, Your Honor.

25          THE COURT:  All right.  Exhibit 115 is admitted, and

1    you may publish.

2         (Government's Exhibit 115 was received in evidence.)

3              MR. MESROBIAN:  Could we start with page 1, please,

4    Ms. Ganoe.

5    BY MR. MESROBIAN:

6    Q.   So on page 1 of Government Exhibit 115, what do we see

7    here?

8    A.   This is a screenshot of the CRS Firearms video, "The Parts

9    the ATF Wishes Never Existed."

10   Q.   And when was this video posted?  And focus underneath the

11   title there of the video.

12   A.   November 11th, 2020.

13   Q.   And through your investigation, did you come to learn that

14   this was the second video that CRS Firearms made about the auto

15   key card?

16   A.   Yes.

17   Q.   And how many views had this video received in January of

18   2021 when you were looking at it?

19   A.   494,327 views.

20   Q.   And, Ms. Butler, at the time you made this screenshot in

21   January 2021, did you know what CRS Firearms was?

22   A.   No.

23   Q.   Was CRS Firearms or Matthew Hoover a part of the

24   investigation?

25   A.   No.

 1              MR. MESROBIAN:  Ms. Ganoe, could we go to page 2,
 2    please.
 3              And could we focus on the top.
 4    BY MR. MESROBIAN:
 5    Q.    What are we looking at at the top of page 2?
 6    A.    This is a screen grab of a comment made by one of the
 7    Justin Ervin YouTube accounts, as well as some comments that
 8    were made in response to the original comment.
 9    Q.    And what does Mr. Ervin say?
10    A.    "Clear your cookies and web data.  Autokeycard.com is back
11    up, and we have a secondary site up at autokeycards.com with an
12    S until we get both sites pointing to our new online freedom
13    store platform next week.  15 percent off sale Black Friday to
14    Cyber Monday.  Code 15%OFF.  Thank you for your support during
15    this time.  I am thankful for all of you."
16    Q.    Below this comment by the Justin Ervin account, are there
17    other comments responding to it?
18    A.    There are.
19    Q.    What does the first comment read?
20    A.    "Swift link require an m4 specific lower receiver like the
21    auto sear?"
22              MR. MESROBIAN:  Ms. Ganoe, could you back out,
23    please?
24    BY MR. MESROBIAN:
25    Q.    Beneath that, did Mr. Ervin post another reply?

1    A.    He did.

2    Q.    And was this in response to a question about auto key

3    cards being in stock or not in stock?

4    A.    Yes.

5    Q.    And what did the Justin Ervin account state?

6    A.    "@Justin Other:  They are in stock on autokeycards.com.

7    The original single and double cards are sold out till later

8    this week.  At the bottom of the main page is an email

9    subscription box to get updates to your inbox."

10   Q.    And is there another reply by someone else in this chain

11   beneath that?

12   A.    Yes.

13   Q.    And what does that -- who is the account that wrote that?

14   A.    Looks like ChiTownGuerilla.

15   Q.    And what does the comment read?

16   A.    "@Johnny:  It's 'artwork,' but if you cut it out, it's

17   part" -- sorry, "but if you cut it out, it's a part to make

18   something really cool.  Watch the video."

19          MR. MESROBIAN:  And, Ms. Ganoe, if we could go to

20   page 3.

21   BY MR. MESROBIAN:

22   Q.    Is this a screenshot of that Justin Ervin YouTube account?

23   A.    Yes.

24   Q.    The one that made the comments we were just looking at?

25   A.    Yes.

1        MR. MESROBIAN:  Can we now go to page 4.

2   BY MR. MESROBIAN:

3   Q.    What are we looking at on page 4?

4   A.    This is a screenshot of a YouTube video titled "Facebook

5   GOA FEC Complaint ATF Honey Badger" that was posted -- it was

6   streamed live on October 6th, 2020.

7        And below is a comment made by one of Justin Ervin's

8   YouTube accounts.

9   Q.    And this is the other Justin Ervin YouTube account that we

10  looked at the Google results for?

11  A.    Yes.

12       MR. MESROBIAN:  And, Ms. Ganoe, if we could focus on

13  the comment itself.

14  BY MR. MESROBIAN:

15  Q.    So what did that comment say?

16  A.    "Get your autokeycard.com while you can.  AR related.  It

17  only gets worse from here.  Get ready.  Get it and save it in

18  your wallet.  Search for it on YouTube."

19       MR. MESROBIAN:  Your Honor, may we publish what's

20  already in evidence as was Government Exhibit 90A?

21       THE COURT:  Yes.

22  BY MR. MESROBIAN:

23  Q.    So, Ms. Butler, this is -- what document are we looking at

24  here?

25  A.    This is the YouTube activity summary for one of the Justin

1    Ervin YouTube accounts.

2    Q.    And was this obtained separately through other legal

3    process?

4    A.    Yes.

5    Q.    Is -- you reviewed these records as part of your

6    investigation --

7    A.    Yes.

8    Q.    -- correct?

9    A.    Yes.

10   Q.    What is contained in this document in terms of YouTube

11   activity?

12   A.    It contains videos that were watched by this account,

13   search terms that were searched by this account.

14   Q.    And the -- the records are voluminous; is that right?

15   A.    Yes.

16              MR. MESROBIAN:  To that end, Ms. Ganoe, can we go to

17   page 597?

18   BY MR. MESROBIAN:

19   Q.    On page 597 of Exhibit 90A, we've zoomed in on a portion

20   on the lower part -- lower middle of this page.

21              What do we see here?

22   A.    It says that this account watched the "Facebook GOA FEC

23   Complaint ATF Honey Badger w/PRP Walter Crump/Hank Storage

24   [verbatim] Podcast."

25   Q.    That was the same video we just saw a screenshot of?

```
 1   A.   Yes.
 2   Q.   And that's the one where the comment states that the auto
 3   key card is AR related?
 4   A.   Yes.
 5            MR. MESROBIAN:  Your Honor, may I approach briefly?
 6            THE COURT:  You may.
 7        (At sidebar, out of the hearing of the jury:)
 8            THE COURT:  Yes, sir.
 9            MR. MESROBIAN:  Your Honor, I'm just about to go into
10   the demonstrative timeline.  I can continue, but this might be
11   a good stopping point, if it --
12            THE COURT:  That's fine.  I mean, we're -- it's
13   basically 5:20, so we'll go ahead and stop, and we'll continue
14   in the morning.
15            MR. KING:  Thank you, Your Honor.
16        (End of discussion at sidebar.)
17            THE COURT:  Ladies and gentlemen, I'm told that we're
18   at a good stopping point, and since we're not going to finish
19   this witness today, it makes sense to go ahead and let you go
20   home.
21            So it's about 5:20.  I'll ask you to be back at 8:45
22   tomorrow morning.
23            Please remember not to discuss the case with one
24   another, your family, your friends, or anyone else.  Please do
25   not let anyone talk to you about the case or in your presence,
```

1  and if anybody should do so, notify the court security officer

2  immediately.

3       Please do not read, watch, or listen to any media

4  reports.  Don't conduct any independent research, and don't go

5  on the Internet.  Don't look up anything at all related to the

6  case.

7       It is imperative that the only things you consider in

8  deciding the case are what is presented to you in this

9  courtroom.

10       And don't form or express any opinions until you've

11  heard all the evidence, the arguments of the attorneys, and my

12  instructions.

13       I do need to remind you-all that the cell phones are

14  supposed to be kept in the lockers down on the first floor, so

15  if you'll leave them down there.  And you can get them at

16  lunch, and if you need me to take 20 minutes instead of 15 for

17  our morning and afternoon breaks, I can do that.  But the cell

18  phones do need to stay downstairs on the first floor in the

19  lockers.

20       All right.  With that, we will see you at 8:45

21  tomorrow morning.

22       COURT SECURITY OFFICER:  All rise for the jury.

23     (Jury out at 5:20 p.m.)

24       COURT SECURITY OFFICER:  Please be seated.

25     (Pause in proceedings.)

1            COURTROOM DEPUTY:  You need them back, Your Honor?

2            THE COURT:  I do.  I need to tell them we're going to

3    stop early tomorrow.

4            If I don't write a note and put a sticky right

5    here ...

6            COURT SECURITY OFFICER:  All rise for the jury.

7        (Jury in at 5:21 p.m.)

8            THE COURT:  It will just be one minute, and you're

9    going to be happy about it.

10           All right.  You can be seated.

11           My apologies.  I needed to tell you one other thing,

12   and that is that we're going to stop early tomorrow.  We'll

13   stop between probably 2:30 or 3:00 at the latest.

14           But I wanted to make sure you knew that today in case

15   you wanted to make any plans, and I just forgot because I

16   didn't leave myself a note.  But I figured you wouldn't be

17   disappointed getting dragged back in to be told that you get

18   Friday afternoon off a little bit.

19           So know that tomorrow, the latest we will go is

20   3 o'clock.  We might stop a little bit before that.  It will

21   depend on where we are.

22           So with that, you're free to go, and we'll see you at

23   8:45 tomorrow morning.

24           COURT SECURITY OFFICER:  All rise for the jury.

25       (Jury out at 5:22 p.m.)

```
 1              COURT SECURITY OFFICER:  Please be seated.
 2              THE COURT:  All right.  Mr. Mesrobian, we'll have
 3     Ms. Butler tomorrow.  Is that going to be the full day
 4     tomorrow?
 5              MR. MESROBIAN:  I think so, Your Honor.  If
 6     possible -- I mean, we have Special Agent Slosson if we need to
 7     fill some time, but I anticipate, given the videos that are
 8     going to be played, that it's going to take most of the day, if
 9     not the whole day.
10              THE COURT:  Okay.  And then if you-all can confer and
11     resolve maybe shortening the amount of it that the jury needs
12     to see in open court.  But I'm going to leave that to you-all
13     to discuss because that doesn't deal with the -- the
14     admissibility, because if there's an objection to
15     admissibility, I'll hear that.
16              But in terms of what portion you're publishing, that
17     really, I think, is something that you-all should try to agree
18     on.
19              MR. MESROBIAN:  Yes, Your Honor.  And I'm -- I have a
20     list of sort of where I planned to play things.  I'm happy to
21     share that with counsel.  We can perhaps hash that out.
22              But I suppose if we're -- if we are not able to
23     arrive at everything being mutually agreeable, everything will
24     be in evidence, so -- or presumably.  So counsel, I guess, can
25     publish it on cross-examination if there are other portions if
```

1    needed.

2              But we'll make our best effort to fix that.

3              THE COURT:  All right.  Okay.  So we have Ms. Butler

4    and possibly Agent Slosson.

5              Is there anything else that we need to address this

6    evening before I let you-all go?

7              MR. MESROBIAN:  I guess for our purposes, Your Honor,

8    I just wanted to confirm that there is no objection to the

9    videos in terms of the substance that we've already discussed,

10   because if there is, then we do need -- we'll need to be

11   redacting things and -- if those objections were sustained.

12             So I just wanted to clarify that.

13             THE COURT:  Their objections to -- is it -- are we

14   talking just specifically about 13 and 14, Mr. --

15             MR. MESROBIAN:  I guess I would say with any of 1

16   through 16, and I believe it's 125 are the -- are the CRS

17   Firearms videos.

18             Just if there is anything in there that we need to

19   address, we just -- because they're about to -- they're about

20   to be played, or we intend to at least, so I just wanted to

21   make sure.

22             THE COURT:  All right.  Are there objections to

23   Exhibits 13 and 14?

24             MR. KING:  Your Honor, I have no objection to 1

25   through 16 plus the attachment transcripts.  We would have no

1  objection, no issue if the Government wanted to

2  (unintelligible).

3          COURT REPORTER:  I can't hear you.  Can you please --

4          THE COURT:  And I need you at a microphone because

5  even I can't hear you.

6          MR. KING:  I will learn sometime by the end of this

7  trial to stand by the microphone.

8          Your Honor, there will be no objections to 1 through

9  16, including the attachments that were the transcript.  If the

10  Government moved -- if the Government moved to move them in

11  now, it would be without objection by -- on behalf of

12  Mr. Ervin.

13          And 125, Your Honor.  I apologize.

14          THE COURT:  So 1 through 16 and 125?

15          MR. KING:  Yes, Your Honor.  And it's 1, 1A, 2 and

16  2A, but we would include that as well.

17          THE COURT:  Okay.  Mr. Larosiere?

18          MR. LAROSIERE:  No objection, Your Honor.  We join

19  King.

20          THE COURT:  Okay.  So, Mr. Mesrobian, do you want to

21  go ahead and move those in now, or do you want to move them in

22  in front of the jury?

23          MR. MESROBIAN:  I think I'll move them in in front of

24  the jury because I'd like the witness to explain how she

25  preserved them, but it will be brief.  I will not belabor it.

```
1           THE COURT:  Okay.  I think the jury might be confused
2  because -- if we don't do that, simply because that's what
3  they've been hearing throughout the trial, so -- but that will
4  be the anticipation.
5           Is there -- all right.  Is there -- so nothing else
6  from the Government, then?
7           MR. MESROBIAN:  No, Your Honor.
8           THE COURT:  Mr. --
9           MR. KING:  And nothing else from me, Your Honor.
10          THE COURT:  All right.  Mr. Larosiere?
11          MR. LAROSIERE:  Nothing else from Hoover, Your Honor.
12          THE COURT:  All right.  Then I will wish you-all a
13  good evening, and we'll see you back here at 8:45 tomorrow
14  morning.
15          MR. KING:  And, Your Honor, I said that.
16          The only thing is are we still --
17          THE COURT:  Wait.  Wait.  Wait.
18          MR. KING:  Just for our scheduling purposes, are we
19  still planning on taking Tuesday off?
20          THE COURT:  Yes.  Ms. -- do you still have chemo?
21          MS. TAYLOR:  I do.
22          THE COURT:  Unfortunately?
23          MS. TAYLOR:  Yeah.
24          THE COURT:  I'm -- I'm not interfering with that so
25  that --
```

1          MR. KING:  No, Your Honor.  I just wanted to make

2    sure we were still doing -- planning on that just for our

3    planning purposes.

4          THE COURT:  Yes.  The plan is that we'll be off

5    Tuesday.

6          Madam Deputy, would you please remind me to tell jury

7    that on Friday?

8          COURTROOM DEPUTY:  Yes, Your Honor.

9          THE COURT:  Okay.  Anything else?

10          MR. KING:  No, Your Honor.

11          THE COURT:  Okay.  We're in recess.

12          COURT SECURITY OFFICER:  All rise.

13      (The proceedings were adjourned at 5:27 p.m., to be

14    continued on April 14, 2023.)

15                              -  -  -

16

17

18

19

20

21

22

23

24

25

1           CERTIFICATE OF OFFICIAL COURT REPORTER

2

3

4   UNITED STATES DISTRICT COURT )

5   MIDDLE DISTRICT OF FLORIDA    )

6

7           I hereby certify that the foregoing transcript is a

8   true and correct computer-aided transcription of my stenotype

9   notes taken at the time and place indicated therein.

10

11          DATED this 7th day of June, 2023.

12

13                              s/Shelli Kozachenko_____
                                Shelli Kozachenko, RPR, CRR, CRC
14                              Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25