1      UNITED STATES DISTRICT COURT
       MIDDLE DISTRICT OF FLORIDA
2      JACKSONVILLE DIVISION

3    UNITED STATES OF AMERICA,        Case No. 3:21-cr-22(S4)-MMH-MCR

4         Plaintiff,                  April 17, 2023

5    v.                               9:04 a.m. - 5:36 p.m.

6    KRISTOPHER JUSTINBOYER ERVIN     Courtroom 10B
     and MATTHEW RAYMOND HOOVER,
7
          Defendants.
8    _____

9
                          **JURY TRIAL**
10                      **(VOLUME 6 of 9)**

11
              BEFORE THE HONORABLE MARCIA MORALES HOWARD
12                 UNITED STATES DISTRICT JUDGE

13

14

15

16

17

18

19   OFFICIAL COURT REPORTER:

20     Katharine M. Healey, RMR, CRR, FPR-C
       PO Box 56814
21     Jacksonville, FL 32241
       Telephone: (904) 301-6843
22     KatharineHealey@bellsouth.net

23

24                         (Proceedings reported by stenography;
                           transcript produced by computer.)
25

# A P P E A R A N C E S

COUNSEL FOR THE GOVERNMENT:

**LAURA C. TAYLOR, ESQUIRE**
**DAVID MESROBIAN, ESQUIRE**
United States Attorney's Office
300 North Hogan Street, Suite 700
Jacksonville, FL 32202

COUNSEL FOR DEFENDANT ERVIN:

**ALEX KING, ESQUIRE**
Monroe & King, P.A.
1805 Copeland Street
Jacksonville, FL 32204

COUNSEL FOR DEFENDANT HOOVER:

**ZACHARY Z. ZERMAY, ESQUIRE**
Zermay Law
1762 Windward Way
Sanibel, FL 33957

- A N D -

**MATTHEW LAROSIERE, ESQUIRE**
6964 Houlton Circle
Lake Worth, FL 33467

I N D E X

PAGE

GOVERNMENT'S WITNESSES:

**LYNDSEY BUTLER**

  CROSS-EXAMINATION BY MR. ZERMAY........................ 9

  CROSS-EXAMINATION BY MR. KING.......................... 14

  REDIRECT EXAMINATION BY MR. MESROBIAN................. 32

  RECROSS-EXAMINATION BY MR. ZERMAY..................... 37

**ARIC OSSO**

  DIRECT EXAMINATION BY MS. TAYLOR...................... 38

  CROSS-EXAMINATION BY MR. KING......................... 48

  CROSS-EXAMINATION BY MR. LAROSIERE.................... 50

**TRISTEN ALDERSON**

  DIRECT EXAMINATION BY MS. TAYLOR...................... 53

  CROSS-EXAMINATION BY MR. LAROSIERE.................... 64

  CROSS-EXAMINATION BY MR. KING......................... 73

  REDIRECT EXAMINATION BY MS. TAYLOR.................... 79

  CROSS-EXAMINATION BY MR. KING......................... 83

**PHILLIP WILSON**

  DIRECT EXAMINATION BY MS. TAYLOR...................... 88

  CROSS-EXAMINATION BY MR. LAROSIERE.................... 94

  CROSS-EXAMINATION BY MR. KING......................... 95

  REDIRECT EXAMINATION BY MS. TAYLOR.................... 99

  RECROSS-EXAMINATION BY MR. KING....................... 102

1                            I N D E X

2                                                              PAGE

3    GOVERNMENT'S WITNESSES:

4    **RICHARD ROBERTS**

5       DIRECT EXAMINATION BY MR. MESROBIAN................... 104

6       CROSS-EXAMINATION BY MR. LAROSIERE.................... 116

7       CROSS-EXAMINATION BY MR. KING......................... 118

8       REDIRECT EXAMINATION BY MR. MESROBIAN................. 124

9    **RANDY WILLIS**

10      DIRECT EXAMINATION BY MR. MESROBIAN................... 126

11      CROSS-EXAMINATION BY MR. LAROSIERE.................... 132

12      CROSS-EXAMINATION BY MR. KING......................... 139

13      REDIRECT EXAMINATION BY MR. MESROBIAN................. 142

14   **STEVEN DUTY**

15      DIRECT EXAMINATION BY MS. TAYLOR...................... 145

16      CROSS-EXAMINATION BY MR. LAROSIERE.................... 164

17      CROSS-EXAMINATION BY MR. KING......................... 166

18      REDIRECT EXAMINATION BY MS. TAYLOR.................... 170

19   **JOEL MOYA**

20      DIRECT EXAMINATION BY MR. MESROBIAN................... 174

21      CROSS-EXAMINATION BY MR. LAROSIERE.................... 183

22      CROSS-EXAMINATION BY MR. KING......................... 186

23      REDIRECT EXAMINATION BY MR. MESROBIAN................. 190

24      RECROSS-EXAMINATION BY MR. KING....................... 193

25

I N D E X

                                                                    PAGE

GOVERNMENT'S WITNESSES:

**DAREK STENNES**

  DIRECT EXAMINATION BY MR. MESROBIAN.................... 194

  CROSS-EXAMINATION BY MR. LAROSIERE..................... 208

  CROSS-EXAMINATION BY MR. KING.......................... 209

  REDIRECT EXAMINATION BY MR. MESROBIAN.................. 213

**ERNEST LINTNER**

  DIRECT EXAMINATION BY MR. MESROBIAN.................... 227

  CROSS-EXAMINATION BY MR. LAROSIERE..................... 253

E X H I B I T S

ADMITTED IN EVIDENCE                                        PAGE

  GOVERNMENT'S EXHIBIT 61................................ 247

  GOVERNMENT'S EXHIBIT 108.............................. 208

  GOVERNMENT'S EXHIBITS 116A-116D....................... 241


  DEFENDANT ERVIN'S EXHIBIT 8........................... 30

1                    P R O C E E D I N G S

2    April 17, 2023                                   9:04 a.m.

3                          -   -   -

4        (All parties present.  Jury not present.)

5            COURT SECURITY OFFICER:  All rise.  This Honorable

6    Court is now in session.

7            Please be seated, everyone.

8            THE COURT:  Good morning, everyone.

9            This is Case No. 3:21-cr-22(S4)-MMH-MCR, United

10   States of America vs. Kristopher Justinboyer Ervin and Matthew

11   Raymond Hoover.

12           Ms. Taylor and Mr. Mesrobian are here with Agent

13   Slosson.

14           Mr. King is here with Mr. Ervin.

15           Mr. Zermay and Mr. Larosiere are here with

16   Mr. Hoover.

17           Do we have any matters that we need to address before

18   we bring the jury in?

19           MR. MESROBIAN:  Not from the United States, Your

20   Honor.  Though I know Mr. King, shortly before court, filed a

21   notice of a requested limiting instruction with respect to the

22   issue we discussed last week about the portable wall hanger

23   case.  I'm happy to address that now or we can -- or later.

24           THE COURT:  Well, if it was filed shortly before

25   court it doesn't magically get filed in my head.  So does

1   somebody have a copy of it for me to see?  I'm not the

2   computer.

3          MR. KING:  And Your Honor, I do have a copy.  My

4   printer was running out of ink, so it's actually difficult to

5   read.

6          I might suggest that when we have a break, where

7   we're not holding up the jury, everybody gets a chance to look

8   at it, because I want to make sure everybody has an opportunity

9   to review it.

10          THE COURT:  Ms. Wiles, can you print a copy of that

11   for me?

12          COURTROOM DEPUTY:  It's 27 pages.

13          THE COURT:  Oh, it's 27 pages?  Print it to chambers

14   and ask Ms. Miller to . . .

15          Well, we don't need to take it up -- it's not going

16   to come up now, right?

17          MR. KING:  No, Your Honor.  And just -- I know it's

18   lengthy.  It's actually about a paragraph long.  There's

19   attachments which are required under the rule so that everybody

20   can review and know what we're talking about.

21          THE COURT:  Okay.  All right.  Just send it to

22   chambers and I'll look at it over lunch.

23          And one matter I did want to circle back to is that

24   at the end of the day Mr. Hoover's counsel joined in the

25   objection to Exhibits 69 and 70, which were the screenshots of

1   policies on the Shopify website.  The objection to those was

2   hearsay.

3           I went back and just wanted to confirm one thing on

4   it, and I did confirm this.  69 and 70 are screenshots of

5   what's displayed when one clicks on the link -- or the links

6   that are in the email, which is now in evidence as Exhibit 67U.

7           I'll note that Exhibit 67U was admitted as a business

8   record under 803(6) with a 902(11) certification, and that that

9   was admitted without objection.

10          So the links -- the screenshots are screenshots of

11  what is displayed when one clicks on the links that are in that

12  email that is now in evidence.

13          So the screenshots are not admitted for the purpose

14  of establishing the truth of the content of the web page.  It

15  simply shows the complete content of the email communication

16  that's already in evidence.  And so on that basis it's not

17  hearsay.  But I just wanted to clarify that since it was

18  brought up, again, at the end of the day.

19          The other issues that were brought up at the end of

20  the day don't involve Ms. Butler, so I don't think we need to

21  delay the jury with that.

22          Do we have Ms. Butler?

23          MR. MESROBIAN:  Yes, Your Honor.

24          THE COURT:  Can we get her on the stand?

25          MR. MESROBIAN:  Yes, Your Honor.

```
 1              THE COURT:  And let's get the jury.
 2         (Witness enters the courtroom.)
 3              COURT SECURITY OFFICER:  All rise for the jurors.
 4         (Jury enters, 9:09 a.m.)
 5              COURT SECURITY OFFICER:  You may be seated, please.
 6              THE COURT:  Good morning, ladies and gentlemen.
 7              JURY:  Good morning.
 8              THE COURT:  Welcome back.  We are continuing this
 9    morning with the evidence in Case No. 3:21-cr-22(S4)-MMH-MCR.
10              Ms. Butler, do you understand that you're still under
11    oath?
12              THE WITNESS:  Yes, Your Honor.
13              THE COURT:  All right.  Then Mr. --
14              MR. MESROBIAN:  Your Honor, I had announced no
15    further questions of the witness.
16              THE COURT:  All right, sir.
17              So who's going to -- Mr. Zermay?
18              MR. ZERMAY:  Yes, Your Honor.
19              THE COURT:  Go ahead.
20              MR. ZERMAY:  May it please the Court.
21         LYNDSEY BUTLER, GOVERNMENT WITNESS, PREVIOUSLY SWORN,
22                        CROSS-EXAMINATION
23    BY MR. ZERMAY:
24    Q.   Good morning, Ms. Butler.
25    A.   Good morning.
```

1  Q.   So last week the government played some clips of

2  Mr. Hoover's videos, right?

3  A.   Yes.

4  Q.   We did publish or watch all of those videos, correct?

5  A.   All of the videos that were posted to his account?

6  Q.   Yes.  We watched some of the clips that are currently in

7  evidence, right?

8  A.   Yes.

9  Q.   Okay.  We didn't watch all of Government's Exhibit 5,

10 right?

11 A.   Which video is that?

12          MR. ZERMAY:  Ms. Ganoe, could you please pull up

13 Government's Exhibit 5.

14      (Video played.)

15      (Video stopped.)

16 BY MR. ZERMAY:

17 Q.   Ms. Butler, you're familiar with Mr. Ervin's demographic

18 information, like his name and his date of birth, right?

19 A.   Yes.

20 Q.   Okay.

21          MR. ZERMAY:  Ms. Ganoe, could you please publish a

22 still of Exhibit 12.  Could we get one with the whiteboard

23 visible, please.  Thank you so much.

24          THE COURT:  Could we get a timestamp?  Is that at 02?

25 Two seconds --

1            MR. ZERMAY:  Yes, Your Honor.

2            THE COURT:  -- of Exhibit 12?  Go ahead.

3            MR. ZERMAY:  Could we please zoom in to the

4    whiteboard?

5            MS. GANOE:  No.

6            MR. ZERMAY:  Oh, we cannot?

7    BY MR. ZERMAY:

8    Q.   Okay.  So Ms. Butler, I'll represent to you that the

9    whiteboard that is behind Mr. Hoover --

10           MR. MESROBIAN:  Objection, Your Honor.  May we

11   approach?

12           THE COURT:  Yes.

13       (Proceedings at sidebar:)

14           THE COURT:  Yes, sir.

15           MR. MESROBIAN:  Your Honor, before we get too far

16   down this road of Mr. Zermay reading what he represents to be

17   on the board, I just wanted to know where we were heading with

18   this.

19           THE COURT:  Yeah, because you can't testify.  So

20   what's the question that you're going to ask her?

21           MR. ZERMAY:  Yes, whether or not that's Mr. Ervin's

22   correct name and whether or not that's his correct date of

23   birth.

24           THE COURT:  I think what you -- I mean --

25           MR. KING:  If you play the video, it's there as well.

1   Sorry.  If you play the video, I know he verbally says it out

2   loud.  That may be the easiest way to get there.

3            THE COURT:  Maybe you need to do that, because that's

4   not legible.  If you want to ask her if she knows whether that

5   Mr. Ervin's name and date of birth are up there -- why don't

6   you do that.  You can't represent to her --

7            MR. ZERMAY:  Okay.

8            THE COURT:  -- okay?

9            MR. ZERMAY:  Thank you very much, Your Honor.

10           THE COURT:  Go ahead.

11           MR. MESROBIAN:  Thank you, Your Honor.

12       (Proceedings in open court:)

13  BY MR. ZERMAY:

14  Q.   Ms. Butler, is Mr. Ervin's name on that whiteboard?

15  A.   The whiteboard has "Justin S. Ervin."

16  Q.   Is that Mr. Ervin's name?

17  A.   He goes by "Justin," but his middle initial is not S.

18  Q.   Okay.  For the record, what is his true legal name?

19  A.   Kristopher Justinboyer Ervin.

20  Q.   Okay.  Thank you.  And is his date of birth on that board?

21  A.   Yes -- or a date of birth is on the board.

22  Q.   Okay.  Is that his correct date of birth?

23  A.   I don't believe so, no.

24  Q.   Okay.  Thank you.

25           MR. ZERMAY:  And if we could turn to Exhibit 100,

1  please.

2  BY MR. ZERMAY:

3  Q.   So last week we heard some testimony that there was over

4  500 points of contact between Mr. Ervin and Mr. Hoover, right?

5  A.   Yes.

6         MR. ZERMAY:  Could we please turn to page 8 of

7  Exhibit 100.

8  BY MR. ZERMAY:

9  Q.   Are all the points of contact there -- does every text

10  message between Mr. Ervin and Mr. Hoover, does that count as a

11  point of contact?

12  A.   Yes.

13  Q.   Is that page only text messages?

14  A.   Can you repeat that?

15  Q.   Does that page reflect that there was only text messages

16  between Mr. Hoover and Mr. Ervin between January 22 and

17  January 23 of the year 2021?

18  A.   Yes, that page only has text messages.

19  Q.   Okay.  And those points of contact also include missed

20  calls between Mr. Hoover and Mr. Ervin, right?

21  A.   No missed calls are reflected on that page, but yes.

22  Q.   Okay.  So they are generally reflected in the over

23  500 points of contact, right?

24  A.   Yes.

25  Q.   Okay.

1          MR. ZERMAY:  Thank you very much.  I have no further

2    questions for you.  Thank you so much.

3          THE COURT:  Mr. King.

4          MR. KING:  Thank you.

5          May I show something to Mr. Mesrobian?

6       (Counsel confer.)

7          MR. KING:  May it please the Court.

8          THE COURT:  Go ahead.

9                      CROSS-EXAMINATION

10   MR. KING:

11   Q.    Good morning, Ms. Butler.

12   A.    Good morning.

13   Q.    Prior to coming here to testify, have we spoken before?

14   A.    No.

15   Q.    And have we discussed what your testimony is going to be?

16   A.    No.

17   Q.    However, you have discussed your testimony with attorneys

18   for the government?

19   A.    Yes.

20   Q.    And gone over not only what your testimony would be, but

21   what some of your exhibits would look like?

22   A.    Yes.

23   Q.    I want to talk to you about when you first got involved in

24   this case.  You were involved in early January of 2021; is that

25   accurate?

1    A.    Yes.

2    Q.    And that would have been -- you were involved within two

3    weeks of this case beginning?

4    A.    I'm not sure when exactly it started on the agent side,

5    but I started it in early January 2021.

6    Q.    And if that's when the case began, you started at that

7    time?

8    A.    Yes.

9    Q.    One of the first things you did was review mailings that

10   occurred from Mr. Ervin?

11   A.    From the Stamps.com or -- what are you referring to?  I'm

12   sorry.

13   Q.    From Stamps.com.

14   A.    Yes.

15   Q.    And you were able to determine where those stamps -- I'm

16   sorry, where those mailings were going to?

17   A.    Yes.

18   Q.    And you provided that information to the other ATF agents?

19   A.    Yes.

20   Q.    And there was a mailing that went to -- at least one went

21   to every single state in the country?

22   A.    I don't exactly recall the number to each state.

23   Q.    If you had a chance to look at your chart, would that

24   refresh your recollection?

25   A.    Yes.

1          MR. KING:  Your Honor, may I approach?

2          THE COURT:  Yes.

3     A.   Thank you.

4          THE COURT:  Do you want to make a record of the

5     exhibit number?

6          MR. KING:  Your Honor, that's not an exhibit number.

7          THE COURT:  Okay.

8     BY MR. KING:

9     Q.   Ms. Butler, when you get a chance to look at that, if

10    you'd just look up so I know you've had a chance to review it

11    thoroughly.

12    A.   I've reviewed it.

13    Q.   And Ms. Butler, is that all 50 states, or close to it, if

14    you didn't get a chance to count?

15    A.   Yes, it looks that way.

16    Q.   And there's ATF agents in all 50 states of the United

17    States?

18    A.   Yes.

19    Q.   The reason you knew what state they were going to is

20    because you had a full name and address for all the mailings?

21    A.   Correct.

22    Q.   And you were able to produce that very early on in the

23    investigation?

24    A.   Yes.

25    Q.   Were you asked at any point in time to forward that to any

1  of the other ATF offices in any other state?

2  A.   We began the process, but I don't think that the referrals

3  ever went out.

4  Q.   So is that a no?

5  A.   That's a no.

6  Q.   I want to turn a little bit to the Stripe data.  Are you

7  familiar with that data?

8  A.   Yes.

9  Q.   Is it -- let me ask it this way:  Is it common or rare for

10 ATF to get credit card information through subpoenas and things

11 like that?

12 A.   I can't speak to how common or rare it is.  I've received

13 financial information from other investigations, but for this

14 one specifically we did get the credit card information.

15 Q.   And when you say "we got the credit card information," the

16 Stripe data would have had not just that Mr. Ervin's business

17 got the credit card information, but it would have had the

18 credit card number of the person who purchased it, and you

19 would have been able to get, for credit card information,

20 names, addresses, dates of birth, all of that that you can get

21 through credit card information?

22 A.   Are you speaking about if we did further legal process --

23 Q.   Correct.

24 A.   -- to obtain that information?

25 Q.   Correct.

1    A.    Yes.

2    Q.    And that's a -- and let me ask it this way:  That's an

3    investigative tool that's frequently used by law enforcement?

4    A.    What -- what is an investigative tool?

5    Q.    Getting people's names and addresses, date of birth

6    through credit card information.

7    A.    I have never done that.  I don't -- I'm not sure.

8    Q.    Okay.  And that's fine.  The question I have for you,

9    you've had a chance to look at all of the purchases of auto key

10   cards as well, correct?

11   A.    Yes.

12   Q.    And the bulk of them, would it be fair to say, came

13   through Stripe or the online purchase where you would have the

14   credit card information?

15   A.    Yes.

16   Q.    What efforts were undertaken by you or were you directed

17   to provide all that information to other ATF agents to

18   investigate any of those individuals?

19   A.    Not to investigate those individuals.  We compiled a list

20   based on the Stripe data.  And we have not done any further

21   referrals other than a few for this case.

22   Q.    So you've not referred that, or nobody's asked you to

23   refer that out so that somebody can go try to collect these

24   things or investigate or arrest any of those individuals?

25   A.    Again, we began the process, but it has -- it was placed

Case 3:21-cr-00022-MMH-MCR   Document 282   Filed 06/07/23   Page 19 of 295 PageID 5428

VOL 6 - PG 19

1    on hold and it has not fully been completed.

2    Q.    And it -- would it be fair to say that you've had a large

3    chunk of this information for more than two years?

4    A.    Yes.

5    Q.    Does that indicate to you that there's any urgency to get

6    that accomplished?

7    A.    I don't think I could speak to that.  I'm not sure what

8    the reasoning was for the, you know, putting that on hold.

9    Q.    I want to talk to you a little bit about a different

10   topic, if that's okay.

11            MR. KING:  And actually, Your Honor, may I

12   re-approach and get the piece of paper back?

13            THE COURT:  Yes.

14   BY MR. KING:

15   Q.    Thank you.

16   A.    You're welcome.

17   Q.    And I apologize, I said I was going to move on, but I just

18   wanted to make clear.  I handed you a single sheet of paper?

19   A.    Yes.

20   Q.    But the data set that you compiled that data from came

21   from a significant amount of data and addresses and all that;

22   is that fair to say?

23   A.    Yes.

24   Q.    I wanted to clarify that.

25            Turning to -- we discussed Exhibits 69 and 70, the

1    Shopify Terms of Use and Prohibited Items?

2    A.    Yes.

3    Q.    Do you remember that?  I know it was last week, but --

4    A.    Yes.

5    Q.    Working at ATF, are you familiar with the items on that

6    list?

7    A.    I reviewed the items.  I know them to be generally

8    firearms related.

9    Q.    One of the items was a magazine over ten rounds?

10   A.    I believe so, yes.

11   Q.    And we can agree that that's not federally regulated in

12   any sort of way?

13   A.    I can't speak to that.

14   Q.    A trigger crank, is that federally regulated in any sort

15   of way?

16   A.    I'm not sure.

17   Q.    What about a barrel shroud?

18   A.    I'm not sure.

19   Q.    Pistol grips?

20   A.    I'm not sure.

21   Q.    Firearms prior to 1968, before they were required to have

22   serial numbers on it, those are excluded.  Do you know if those

23   are federally regulated?

24   A.    Just generally, as part of my job, I don't get into the

25   federal regulation side of things typically.  So I'm not sure

1  about the ins and outs, I'm sorry.

2  Q.   And if that's the answer, that's okay.  So do you have any

3  reason based on your training and experience to know whether

4  those items are illegal or just something Shopify doesn't want

5  to deal with?

6  A.   I'm not sure.

7  Q.   I want to talk also a little bit about the videos that we

8  saw.  It's fair to say that the CRS Firearms channel has a lot

9  more videos than even the clips that we saw, I think the 16

10  that were admitted in evidence; is that, from your review,

11  accurate?

12  A.   Yes.

13  Q.   And they have, in aggregate, tens of millions of views?

14  A.   I would say that's probably accurate.

15  Q.   And hundreds of thousands of subscribers to the CRS

16  Firearms channel?

17  A.   Yes.

18  Q.   And in terms of YouTube channels, it's pretty big in terms

19  of the numbers; is that fair to say?

20  A.   I'm not sure how to compare it to other YouTube channels,

21  but yes, those numbers that you stated are -- they're a large

22  viewership, yes.

23  Q.   I want to talk a little bit about --

24       MR. KING:  Ms. Ganoe, could we publish Government

25  Exhibit 129 at page 9 -- 121 at page 9.

1    BY MR. KING:

2    Q.    And Ms. Butler, Government Exhibit 121 is the summary time

3    chart that you came up with.  Do you remember creating this?

4    A.    Yes.

5    Q.    The labels on there, did you come up with those labels or

6    did you do that in conjunction with the prosecutors in the

7    case?

8    A.    The -- "the labels" meaning like the individual events in

9    the timeline?

10   Q.    I'll be more specific so that there's no confusion as to

11   what I'm talking about.

12          Can you read what it says for March 30th of 2021?

13   A.    "Jail phone call" --

14          MR. MESROBIAN:  Objection, Your Honor.  May we

15   approach?

16          THE COURT:  Yes.

17      (Proceedings at sidebar:)

18          THE COURT:  Go ahead.

19          MR. MESROBIAN:  Your Honor, I would object to the

20   extent that Mr. King is trying to get into the preparations

21   made with the witness with the U.S. Attorney's Office.  I think

22   that does intrude on the work-product privilege and the

23   prosecutor's privilege in this case in terms of preparing its

24   case.

25          THE COURT:  Mr. King?

1          MR. KING:  Your Honor, I moved on from that.  I've
2    moved on from that question.  I'm just asking her to read it
3    and I'm done.
4          THE COURT:  And you're not asking her who came up
5    with the wording of it?
6          MR. KING:  I'm going to ask her if she came up with
7    the wording from it, but not anything further.
8          THE COURT:  No, Mr. King, because you've set it up.
9    So who came up with the wording I don't think is relevant.
10         MR. KING:  Can I ask her if she ultimately will agree
11   with it after I go through the -- I plan on going through the
12   exhibits, because she mentions -- asking if she ultimately
13   agrees with the description.
14         THE COURT:  But what's the point of that?  What are
15   you getting at with that?
16         MR. KING:  I don't believe the description is
17   accurate based on the exhibits that point to the evidence.  I'm
18   raising that I think it is an inaccurate portrayal -- that the
19   charge is an inaccurate portrayal of what occurred based on the
20   exhibits before the Court.
21         THE COURT:  Okay.  You're -- I can't hear you.
22         MR. KING:  I'm sorry, Your Honor.
23         THE COURT:  So you're going to ask her to read the
24   March 30th entry and then --
25         MR. KING:  Go through the exhibit that it cites to

1   and ask if she agrees with essentially my assessment that

2   that's not what it says or whether that's accurate.

3           THE COURT:  Okay.  You can do that.  Okay.  Go ahead.

4           MR. KING:  Thank you, Your Honor.

5       (Proceedings in open court:)

6           THE COURT:  Go ahead, Mr. King.

7   BY MR. KING:

8   Q.    Ma'am, if could you please read the March 30th entry.

9   A.    Sure.

10          "Jail phone call from Ervin to Hoover and Ibe.

11  Parties discussed plans to continue selling auto key cards and

12  create additional videos upon Ervin's release."

13  Q.    And do you understand that to mean that they were going to

14  continue selling the auto key cards immediately from that

15  description?

16  A.    No.

17  Q.    What do you interpret that to mean?

18  A.    I -- I -- just that they were discussing plans to continue

19  selling them.  I don't think an exact time frame was

20  determined.

21          MR. KING:  Ms. Ganoe, can we pull up 17.1A at page 5

22  towards the bottom.

23  BY MR. KING:

24  Q.    Ms. Butler, do you recognize this?

25  A.    Yes.

1    Q.    And what is this?

2    A.    This is a page of the transcript of video number 17 -- I'm

3    sorry, a jail phone call.

4    Q.    And that is one of the jail phone calls that is cited to

5    in that March 30th entry?

6    A.    Yes.

7          MR. KING:  Ms. Ganoe, can we go down to the very

8    bottom line.

9    BY MR. KING:

10   Q.    Ms. Butler, if you could read that.

11   A.    "So I wonder if the when [verbatim] case gets thrown out,

12   if you can go back into" --

13   Q.    And that's Matt Hoover?

14   A.    Yes.

15         MR. KING:  And Ms. Ganoe, if we could go to the top

16   of page 6 where that line continues.

17   A.    -- "manufacturing them."

18         MR. KING:  And Ms. Ganoe, if we can get the next

19   sentence by Mr. Ervin.

20   A.    "I don't know.  I was wondering about that.  And that's

21   one of the things with, um -- you know, cause then we can ramp

22   that sucker up.  I'll sell it and then we'll pile all that into

23   the, uh, the new project."

24   Q.    And you've reviewed 17.1, 17.2, and 17.3 prior to your

25   testimony here today and you heard them Friday?

1    A.    Yes.

2    Q.    Is there anywhere other than that where they discuss

3    manufacturing auto key cards?

4    A.    I don't believe so.

5    Q.    And can we agree that they're talking about after a legal

6    determination is made that they would continue manufacturing

7    auto key cards, not in the absence of that?

8            MR. MESROBIAN:  Objection, Your Honor.  Speculation.

9            THE COURT:  Sustained.

10           MR. KING:  Ms. Ganoe, can we turn to Exhibit 12A at

11   page 6.

12   BY MR. KING:

13   Q.    And Ms. Butler, 12A is one of the transcripts of the video

14   that we reviewed on Friday, if you'll recall.

15   A.    Which video?

16   Q.    I'm afraid I -- I know it's 12.  I don't have the -- if

17   you can bear with me, I can let you know the title.

18           THE COURT:  The title is "Auto Key Card Got Raided"

19   published on March 5th, 2021.

20           THE WITNESS:  Thank you.

21           THE COURT:  Go ahead.

22   BY MR. KING:

23   Q.    Ms. Butler, are you familiar with that video?

24   A.    Yes.

25           MR. KING:  Ms. Ganoe, can we get lines 21 through the

1    bottom.

2    BY MR. KING:

3    Q.   Ms. Butler, could you read those lines?

4    A.   "Now, I didn't send out the last winners and I can't right

5    now because the fact that I know that this happened means that

6    I know they consider them a machine gun.  So if I were to send

7    those out, I would be intentionally sending you a machine gun.

8    So I apologize to the people that haven't gotten them yet.

9    You're not going to.  Um, I'll try to come up" --

10            MR KING:  And Ms. Ganoe, if we can get the next page,

11   that would be page 7.

12   Q.   And could you read the rest of that, Ms. Butler.

13   A.   -- "with some other prizes for you guys to get.  I'm just

14   finding out about all this stuff now, so just give me a little

15   bit to work out the bugs and see what the hell's going on and

16   then we'll go from there.  However, that definitely means you

17   probably shouldn't buy any from the website and you won't be

18   able to get any from me."

19   Q.   Ms. Butler, you've had an opportunity to review the things

20   that we've published and seen in court today?

21   A.   Yes.

22   Q.   And Friday?

23   A.   Yes.

24   Q.   But you've also reviewed a ton of messages?

25   A.   Yes.

1    Q.    Emails?

2    A.    Yes.

3    Q.    Instagram postings?

4    A.    Yes.

5    Q.    Facebook postings?

6    A.    Yes.

7    Q.    All the electronic mails for numerous accounts for

8    Mr. Ervin?

9    A.    Yes.

10   Q.    In any of those did you come across where Mr. Ervin gave

11   any individual instructions how to cut out anything from an

12   auto key card to -- or give any instruction?

13   A.    No direct instruction on how to cut them out.

14   Q.    Did he give in any of the things that you reviewed -- text

15   messages, emails, Instagram messages, private messages, any of

16   that -- any additional information other than what was on his

17   website and a few emails telling people where they could find

18   it otherwise on the internet?

19   A.    I believe there was a comment that instructed

20   individuals -- either a comment or an email -- individuals to

21   search for the item on YouTube for additional information.

22   Q.    And when we're talking about these messages, we're not

23   talking a small amount.  If we printed everything up and

24   stacked it up, it would be substantial; is that fair?

25   A.    Yes.

1    Q.    And, I mean, how many hours, roughly, have you spent going

2    through all this?

3    A.    It would be hard to estimate.  It was -- it's been -- it's

4    thousands of pages of information.

5    Q.    So we're not talking an hour or two.  We're talking tens,

6    if not hundreds, of hours of information --

7    A.    Yes.

8    Q.    -- that you've gone through?

9            MR. KING:  Your Honor, if I could have a brief

10   moment.

11           (Pause in proceedings.)

12   BY MR. KING:

13   Q.    Ms. Butler, I apologize, sometimes I can't read my own

14   handwriting.  So I wanted to talk to you a little bit about --

15   you know, we talked about all of those messages.  And were

16   those messages all just from Mr. Ervin, Mr. Hoover, or were

17   there messages to and from a lot of people?

18   A.    To and from a lot of people.

19   Q.    And without getting into any specifics of what somebody

20   said, would it be fair to say there was a lot of anti-ATF

21   rhetoric in those?

22   A.    Yes.

23           MR. KING:  Ms. Ganoe, could you publish Government

24   Exhibit 53 at page 45.

25   BY MR. KING:

1    Q.   And Ms. Butler, do you recognize this as one of the

2    Instagram records from Mr. Ervin?

3    A.   Yes.

4    Q.   And there's a black box above the image there?

5    A.   Yes.

6              MR. KING:  Your Honor, may I approach the witness?

7              THE COURT:  Yes.  Go ahead, Mr. King.

8    BY MR. KING:

9    Q.   And Ms. Butler, do you recognize -- without reading it

10   out, do you recognize Government -- I'm sorry, Defense

11   Exhibit 8?

12   A.   Yes.

13   Q.   And I saw you looking --

14             MR. KING:  And Your Honor, at this time I'd move

15   Defense Exhibit 8 into evidence under the business record --

16             MR. MESROBIAN:  No objection, Your Honor.

17             THE COURT:  Defendant's 8 is admitted.

18        (Defendant Ervin's Exhibit 8 admitted in evidence.)

19   BY MR. KING:

20   Q.   And Ms. Butler, I noticed you kind of taking a look over

21   at the -- what's currently published right now as Government

22   Exhibit 53?

23   A.   Yes.

24   Q.   Do you recognize -- let me ask it this way:  Do Government

25   Exhibit 8 and Government Exhibit 53 contain the same

1    information?

2    A.    No.

3    Q.    What's the difference?

4    A.    Government Exhibit 8 has additional messages that appear

5    to have been redacted in 53.

6    Q.    And can we otherwise agree that those are the same pages?

7    A.    They appear --

8    Q.    I'm sorry, I don't --

9    A.    They appear to be, yes.

10            MR. KING:  Can I get the ELMO?

11   BY MR. KING:

12   Q.    And Ms. Butler, I'm showing you Defense Exhibit 8.

13            THE COURT:  Mr. King, I think we need to clarify that

14   it's Mr. Ervin's Exhibit 8.

15            MR. KING:  Yes, Your Honor.

16   BY MR. KING:

17   Q.    Mr. Ervin's Exhibit 8, I apologize.  Do you see the

18   message there?

19   A.    Yes.

20   Q.    And is that message to or from Mr. Ervin?

21   A.    To Mr. Ervin.

22   Q.    And that individual is not somebody who's otherwise

23   involved with the case; would you agree with that?

24   A.    I don't believe so, no.

25   Q.    And what's the message?

1   A.   "F the ATF."

2   Q.   And Ms. Butler, is that a message or sentiment that was

3   common in all the emails and messages that you received?

4   A.   I definitely saw things that were similar to that, yes.

5           MR. KING:  Your Honor, if I could have a moment.

6           THE COURT:  Sure.

7        (Pause in proceedings.)

8           MR. KING:  Your Honor, I have no further questions.

9           Thank you, Ms. Butler.

10          THE COURT:  Mr. Mesrobian.

11          MR. MESROBIAN:  Yes, Your Honor.

12                       REDIRECT EXAMINATION

13  BY MR. MESROBIAN:

14  Q.   Good morning, Ms. Butler.

15  A.   Good morning.

16  Q.   So on cross-examination Mr. Zermay asked you a question

17  about Government Exhibit 5, and he published that video in its

18  entirety; is that right?

19  A.   Yes.

20  Q.   During your direct examination, just a portion of that

21  video was published; is that right?

22  A.   Yes.

23  Q.   And was that the portion during which an advertisement for

24  the auto key card was played?

25  A.   Yes.

1  Q.    And Mr. Hoover advised the listener about means of

2  ordering it without putting your name on a list?

3  A.    Yes.

4  Q.    The rest of that video, was there anything relevant to the

5  auto key card in that exhibit?

6  A.    No.

7  Q.    To your knowledge, there was a discussion of a case or an

8  arrest in the rest of that video.  To your knowledge, did that

9  have anything to do with the auto key card?

10  A.    No.

11  Q.    And to your knowledge, did that have anything to do with

12  any of the agents involved in this particular case?

13  A.    No.

14  Q.    And just now Mr. King was asking you questions about a

15  comment that was made in Defense -- Ervin's Exhibit 8; is that

16  right?

17  A.    Yes.

18  Q.    What was the date of these two comments, which appear to

19  be the same?  I'm pointing at them on the ELMO, but it's the

20  comment "F the ATF."

21  A.    March 11th of 2021.

22  Q.    And was that before or after Mr. Ervin was arrested in

23  this case?

24  A.    After.

25  Q.    And Ms. Butler, Mr. King also asked you about whether or

1    not Mr. Ervin ever provided direct instructions on how to cut

2    out the auto key card.

3    A.    Yes.

4             MR. MESROBIAN:   And Ms. Ganoe, could we call up

5    Government Exhibit 67E, please.

6             I'm still on the ELMO.

7    BY MR. MESROBIAN:

8    Q.    So Ms. Butler, are you familiar with this email?

9    A.    Yes.

10   Q.    And was this obtained from the search warrant on the -- on

11   Namecheap on the accounts related to autokeycard.com?

12   A.    Yes.

13   Q.    So I'm going to read the -- there's an email sent by

14   customerservice@autokeycard.com on August 24th of 2020?

15   A.    Yes.

16   Q.    And I'll read the middle paragraph of that email.  And let

17   me know if I read it accurately.

18            "I can point you in the right direction so you can

19   find the information on your own at your own risk.  Do a Google

20   image search for different combinations of the terms, quote,

21   lightning; quote, swift; quote, coat hanger test; quote, link,

22   and any terms you discover along the way.  YouTube search the

23   same terms and between both you should find the information you

24   seek.  The image search will help you greatly find general

25   available schematic information.  It is not difficult to find."

1          Did I read that correctly?

2    A.   Yes.

3    Q.   And did you observe this same language repeated in other

4    emails subsequent to this one?

5    A.   Yes.

6          MR. MESROBIAN:  And Ms. Ganoe, could we publish

7    Government Exhibit G.  67G, sorry.

8          Oh, I'm sorry, 67F.  My mistake.

9    BY MR. MESROBIAN:

10   Q.   And so we've published Government Exhibit 67F.  This is an

11   email from the same account in September -- on September 15th

12   of 2020?

13   A.   Yes.

14   Q.   And does this appear to be the same or very similar

15   language to what we just looked at?

16   A.   It does.

17   Q.   Very early in your direct testimony, Ms. Butler, you

18   talked about how you searched YouTube for -- and Google for

19   information related to the auto key card?

20   A.   Yes.

21   Q.   And one of the items you found was a CRS Firearms video;

22   is that right?

23   A.   Yes.

24   Q.   And I believe you testified, but just to be clear, at the

25   time you found that video early in the case, did you know who

1  Matthew Hoover was?

2  A.   No.

3  Q.   And did you know what CRS Firearms was?

4  A.   No.

5        MR. MESROBIAN:  And Ms. Ganoe, could we publish

6  Government Exhibit 1 beginning at approximately 12 minutes.

7     (Video played.)

8     (Video stopped.)

9  BY MR. MESROBIAN:

10  Q.   And I've stopped publishing at minute market 14:30.  This

11  video, Ms. Butler, was published by CRS Firearms on

12  November 4th, 2020?

13  A.   Yes.

14  Q.   And what happened on November 2nd, 2020?

15  A.   On November 2nd there was a FedEx package that was shipped

16  from Mr. Ervin to Mr. Hoover.

17        MR. MESROBIAN:  And Ms. Ganoe, could we publish

18  Government Exhibit 49Q.

19  BY MR. MESROBIAN:

20  Q.   And this was a photograph that was retrieved from

21  Mr. Ervin's SD card in his phone, correct?

22  A.   Yes.

23  Q.   And this is a picture of Mr. Ervin?

24  A.   Yes.

25  Q.   And he's holding up a package?

1   A.   Yes.

2   Q.   And it's addressed to Matthew Hoover?

3   A.   Yes.

4        MR. MESROBIAN:  Your Honor, I have no further

5   questions.

6        THE COURT:  Mr. Zermay?

7        MR. ZERMAY:  May it please the Court.

8        THE COURT:  Go ahead.

9                    RECROSS-EXAMINATION

10  BY MR. ZERMAY:

11  Q.   Ms. Butler, there's a lot of records that you reviewed,

12  right?

13  A.   Yes.

14  Q.   Do any of those records show that Mr. Hoover personally

15  met Mr. Ervin at any point before these proceedings?

16  A.   I don't think so, no.

17  Q.   Any flight records from Florida -- or from Wisconsin to

18  Florida?

19  A.   I didn't review any flight records for this case.

20  Q.   Okay.  Were there any flight records from Mr. Ervin going

21  to Wisconsin --

22  A.   I didn't review any --

23  Q.   -- to go and visit Mr. Hoover in Coloma?

24  A.   I didn't review any flight records.

25  Q.   So there's no records demonstrating that these two men met

1    each other in person prior to this proceeding?

2    A.    Nothing that I reviewed, no.

3              MR. ZERMAY:  Okay.  Thank you so much.

4              THE COURT:  Mr. King?

5              MR. KING:  Nothing, Your Honor.  Thank you.

6              THE COURT:  You may step down.

7         (Witness exits the courtroom.)

8              THE COURT:  Who's the next witness?

9              MS. TAYLOR:  The United States calls Aric Osso.

10        (Witness enters the courtroom.)

11             COURTROOM DEPUTY:  If you could please raise your

12   right hand.  Do you solemnly swear that the testimony you're

13   about to give before this Court will be the truth, the whole

14   truth, and nothing but the truth, so help you God?

15             THE WITNESS:  Yes, I do.

16             COURTROOM DEPUTY:  You may have a seat.  And if you

17   could spell your first and last name.

18             THE WITNESS:  First name is Aric, A-r-i-c, last name

19   is Osso, O-s-s-o.

20             THE COURT:  Go ahead.

21             MS. TAYLOR:  Yes, Your Honor.

22             **ARIC OSSO, GOVERNMENT WITNESS, SWORN,**

23                      DIRECT EXAMINATION

24   BY MS. TAYLOR:

25   Q.   Mr. Osso, could you tell the jury in general where you

1  live.  It doesn't need to be your specific address, just city

2  and state.

3  A.   White Lake, Michigan.

4  Q.   And what do you do for a living?

5  A.   I am a forge press operator.  I turn steel into parts for

6  like tanks and stuff.

7  Q.   And back in late 2020/early 2021 time frame, what were you

8  doing for a living then?

9  A.   I was wallpapering.

10  Q.   And what company did you work for?

11  A.   Alderson Wall Covering.

12  Q.   And who owns Alderson Wall Conferring?

13  A.   Um, Alderson.  Sorry.

14  Q.   So was Mr. Alderson your boss?

15  A.   Yes.

16  Q.   And would you -- have you ever been to Mr. Alderson's

17  residence?

18  A.   Yes.

19  Q.   Would you be at Mr. Alderson's residence frequently?

20  A.   Yes.

21  Q.   Did you know other members of Mr. Alderson's family?

22  A.   Oh, yeah, everybody.

23  Q.   Did Mr. Alderson have any -- a male child who you

24  associated with?

25  A.   Yes.

1    Q.    And what was his name?

2    A.    Tristen.

3    Q.    And is Tristen's last name also Alderson?

4    A.    Yes.  Sorry, yes.

5    Q.    And let's just make sure that we don't speak over each

6    other because it's very difficult for the court reporter to

7    accurately take down what we're both saying at the same time,

8    okay?

9    A.    (Nods head.)

10   Q.    Are you a firearms enthusiast?

11   A.    No.

12   Q.    Do you own any firearms?

13   A.    I do not.

14   Q.    And are you familiar with an item called the auto key

15   card?

16   A.    I am, yes.

17   Q.    How are you familiar with the auto key card?

18   A.    Through Tristen Alderson.  He told me about it.

19   Q.    What did Mr. Alderson tell you about the auto key card?

20            MR. KING:  Objection, hearsay.

21            THE COURT:  Sustained.

22   BY MS. TAYLOR:

23   Q.    Did Mr. -- did you and Mr. Alderson --

24            MS. TAYLOR:  Your Honor, if I may, this is --

25            THE COURT:  Come to sidebar, Ms. Taylor.

1          MS. TAYLOR:  Yes, Your Honor.

2       (Proceedings at sidebar:)

3          MS. TAYLOR:  Your Honor, Mr. Alderson and Mr. Osso

4    essentially worked together on purchasing the auto key card

5    following the instructions from Mr. Hoover's video to use the

6    mail-in order form and a money order.  And so Mr. Alderson

7    asked Mr. Osso to purchase the auto key card.  Mr. Osso filled

8    out the mail-in -- well, filled out part of the mail-in order

9    form, got the money order and sent it in, and then gave it to

10   Mr. Alderson.

11         So I think these questions about kind of the

12   formulation of this plan are necessary to showing the steps

13   that Mr. Osso took in terms of going and getting the money

14   order and et cetera.

15         THE COURT:  Go ahead, Mr. King.

16         MR. KING:  Your Honor, I think the question of "Did

17   Mr. Alderson ask you to purchase an auto key card" is not

18   hearsay.  I think any conversations they had about what it is

19   or what he thought it was or any of those things are hearsay.

20         So if the question is, "Did he ask you to purchase

21   one," "Did you use a mail-order form," "Did you, in fact, order

22   it," I would not have an objection to any of those.

23         If it's, "What did he think," "What was he telling

24   you," "How did you understand it to be," I think all of that is

25   hearsay.

1        So my objection was because of them getting into the

2   conversation.  But if it's, "Did he ask you to help him

3   purchase something," there would be no objection to that.  But

4   anything kind of outside of that we would object on hearsay

5   grounds.

6        THE COURT:  And Ms. Taylor, your question was

7   something to the effect of -- and I'm not going to quote it

8   exactly, but it was something about, "What did he tell you

9   about the auto key card?"  That's hearsay.

10       The other stuff that you talked about, about what did

11  he ask you to do, those things are not.  It was the phrasing of

12  that particular question.

13       MS. TAYLOR:  Yes, Your Honor.

14       THE COURT:  Okay.

15    (Proceedings in open court:)

16  BY MS. TAYLOR:

17  Q.   Mr. Osso, did you ever watch any videos about the auto key

18  card back in --

19  A.   No, I did not.

20  Q.   Okay.  Did Mr. Alderson ever ask for your assistance with

21  purchasing an auto key card?

22  A.   He did.

23  Q.   And what did Mr. Alderson propose to you with regard to

24  purchasing the auto key card?

25  A.   Well, he told me that you had to be 21 to get it.  At the

1    time I don't believe he was.  So I told him since I don't have

2    any firearms, that I would purchase it for him since they were

3    not illegal yet.  That's what I was led to believe.

4    Q.    Was there a particular method for the purchase that you

5    and Mr. Alderson planned to use?

6    A.    He gave me $200 and I went and got a money order.  And I

7    filled out the money order and put it in the mail.

8    Q.    Was there a form that was used with the purchase?

9    A.    I believe so.  I think he got it off the internet.

10   Q.    And when you say "he," you're referring to --

11   A.    Tristen, yes, Mr. Alderson.

12   Q.    And let's be careful about not talking at the same time.

13         Okay.  So you're referring to Tristen Alderson?  Yes?

14   A.    Yes.

15   Q.    And did he -- did Tristen Alderson provide you with the

16   mail-in order form?

17   A.    Yes.

18   Q.    And could you make sure that you're speaking loud enough

19   so that --

20   A.    Sorry, yes.

21   Q.    Are you nervous today, Mr. Osso?

22   A.    Absolutely.

23   Q.    Let's just make sure we're speaking into the microphone,

24   okay?

25   A.    Okay.

1   Q.   Okay.

2        Mr. Alderson provided you with the mail-in order

3   form?

4   A.   Yes.

5   Q.   And had he filled out any part of it?

6   A.   I believe so.  All I had to do was sign it and put my

7   address on it and put it in the mail.

8   Q.   And so do you recall whether there was a part in the

9   mail-in order form that specified which products were being

10  ordered?

11  A.   I do not.

12  Q.   Okay.  But you went -- did you go and get a money order?

13  A.   I did.

14  Q.   Was that something that you were familiar with the process

15  for how to do that?

16  A.   For a money order?  Yes.

17  Q.   And did you put the money order in the mail?

18  A.   I did.

19  Q.   With the mail-in order form?

20  A.   Yes.

21       MS. TAYLOR:  And Ms. Ganoe, if we could please have

22  Exhibit 95A, page 75.  And Ms. Ganoe, zooming in on the top two

23  items that are on this page.

24  BY MS. TAYLOR:

25  Q.   Can you see that on your screen?

1   A.   Yes, yes.

2        MS. TAYLOR:  I'm sorry, I think I need a page up from

3  this.

4  BY MS. TAYLOR:

5   Q.   I apologize.  We're on page 73 now.  And there's one item

6  on this page, correct?

7   A.   Yes.

8   Q.   Do you recognize what's on that page?

9   A.   Yes, I do.

10   Q.   What is it?

11   A.   That is the money order.

12   Q.   Is that -- is that your name on the -- on the second line?

13   A.   It is.

14   Q.   It says -- it says your full name, Aric Osso?

15   A.   Aric Osso, yes.

16   Q.   And on the right side of it it's stamped "Community First

17  Credit Union"?

18   A.   Yes, it is.

19   Q.   And does it have a date that's stamped on it?

20   A.   Sorry, I don't have my glasses.

21        2/1/21.

22   Q.   And do you recognize this as being the money order that

23  you mailed with the mail-in order form?

24   A.   Yes, ma'am.

25   Q.   Did you ever receive a package from Auto Key Card?

1    A.    I did.

2    Q.    Did it -- did it go to you personally or to Mr. Alderson's

3    address?

4    A.    It came to my address and I gave it to him when it

5    arrived.

6            MS. TAYLOR:  Ms. Ganoe, could we have Exhibit 89G,

7    please.  Could we zoom in on the middle section there.

8    BY MS. TAYLOR:

9    Q.    This is a document that's already in evidence, Mr. Osso.

10   Do you see where it says "Shipping To"?

11   A.    Yes.

12   Q.    Are you able to read that?

13   A.    It says "Shipping To:  A. Osso," which would be myself.

14   Q.    And then it has a -- the address is taken off, correct?

15   A.    Correct.

16   Q.    But then it says "White Lake, Michigan," correct?

17   A.    Correct.

18   Q.    And that's where you resided?

19   A.    Yes, ma'am.

20   Q.    And then at the bottom it indicates a quantity of two Auto

21   Key Card 3 in 1 With Bottle Opener?

22   A.    Correct.

23   Q.    After you got the auto key card, what did you do with it?

24   A.    I handed them over to Mr. Alderson.

25   Q.    Did you open the package?

1    A.   Oh, yes.  I opened them to make sure they were what they

2    were and then I gave them to Mr. Alderson.

3    Q.   And "Mr. Alderson" is Tristen Alderson?

4    A.   Tristen, yes, sorry.

5    Q.   And Mr. Osso, you said you don't have any firearms,

6    correct?

7    A.   I do not.

8    Q.   Do you have -- are you aware of what an NFA firearm is?

9    A.   No.

10   Q.   Are you aware of what the National Firearms Registration

11   and Transfer Record is?

12   A.   Unh-unh.

13   Q.   That was a no?

14   A.   No.

15   Q.   So you don't -- to your knowledge, do you have any

16   firearms registered in the National Firearms Registration and

17   Transfer Record?

18   A.   I do not.

19            MS. TAYLOR:  May I have a moment, Your Honor?

20            THE COURT:  You may.

21            MS. TAYLOR:  I have no further questions, Your Honor.

22            THE COURT:  Is it . . .

23            MR. KING:  Sorry, Your Honor.  I apologize.  Monday

24   kinks, I suppose.

25            May it please the Court.

```
 1                THE COURT:  Go ahead.

 2                          CROSS-EXAMINATION

 3   BY MR. KING:

 4   Q.    Good morning, Mr. Osso.

 5          Mr. Osso, I want to talk to you a little bit about

 6   some things that you didn't get into in too much depth with the

 7   government.

 8          Prior to coming here today you did discuss your

 9   testimony with the government?

10   A.    I believe so, yes.

11   Q.    And me and you have never met and have not talked about --

12   A.    No, first time.

13   Q.    All right.  And you have no idea what I'm going to ask

14   you; is that fair?

15   A.    Very fair.

16   Q.    Okay.  I'll take it easy.

17          The -- at the time you knew Mr. Alderson you were

18   working for his father?

19   A.    Yes.

20   Q.    And you knew -- and I'm going to say "Tristen Alderson" to

21   make sure that I'm differentiating from his father.  But you

22   knew Tristen Alderson on a -- not just because you worked for

23   his dad, but even on a personal level?

24   A.    Yeah, personal level as well.

25   Q.    And we talked a little bit about -- you've discussed with
```

1   the government -- do you recognize any individuals other than

2   the two attorneys for the government, Mr. Mesrobian and

3   Ms. Taylor, in the courtroom?

4   A.   No.

5   Q.   Do you know an Agent Slosson with ATF?

6   A.   Possible.  I'm not good with the names.  Would that be

7   him?  No.

8   Q.   Well, let me ask you this:  Do you recognize that

9   gentleman?

10  A.   I do.

11  Q.   And has he identified himself to you as an ATF agent?

12  A.   He has, yes.

13  Q.   And have you seen Tristen Alderson use marijuana?

14  A.   I don't see what that has to do with this, but yes, I

15  have.

16  Q.   And once or more than once?

17  A.   More than once.

18  Q.   And is that something that you discussed with Agent

19  Slosson with the ATF?

20  A.   I probably ran by it.  He said that he smelled of it and I

21  let him know that it is a hundred percent legal in Michigan.

22  Q.   And you understand that it is illegal federally?

23  A.   Yes.  I am very aware of that, yes.

24  Q.   And are you aware that it's illegal to be a user of

25  marijuana and possess a firearm?

1    A.    That, I did know.

2    Q.    And did you know Mr. Alderson --

3            THE COURT:  I apologize, I didn't understand whether

4    you said "did" or "didn't."

5            THE WITNESS:  I did.  That, I did know.  It is

6    illegal to use a firearm while under the influence of

7    marijuana.

8    BY MR. KING:

9    Q.    And did you know Mr. Alderson to regularly own, possess,

10   and carry firearms?

11   A.    Openly, yes.

12           MR. KING:  Your Honor, I have nothing further for

13   this witness.

14           Thank you, sir.

15           THE WITNESS:  Thank you.

16           THE COURT:  Mr. Larosiere.

17           MR. LAROSIERE:  May it please the Court.

18           THE COURT:  Go ahead.

19                        CROSS-EXAMINATION

20   BY MR. LAROSIERE:

21   Q.    So Mr. Osso, similarly to what Mr. King said, you've never

22   met me, right?

23   A.    No.

24   Q.    So you met with Agent Slosson of the ATF one time, two

25   times?

1    A.    One time.  They came to my house.

2    Q.    They came one time.  And you had a separate discussion --

3    they came to your house on the 2nd, correct, of April?

4    A.    I couldn't give you exact dates.

5    Q.    Okay.  But the time they came to your house, that's when

6    they talked about basically, "Hey, did you purchase this

7    thing?"

8    A.    Yes.

9    Q.    And did they ask you questions about cutting anything out

10   or --

11   A.    They asked me if I still had them and I told them I did

12   not.

13   Q.    Okay.  At what point did they ask you about Tristen

14   Alderson's marijuana use?  It was a couple days later, right?

15   A.    Yeah.

16   Q.    Okay.  So it was two times you spoke with Agent Slosson?

17   A.    Yeah.

18   Q.    Okay.  And they asked fairly specific questions about

19   Tristen Alderson, right?

20   A.    I -- I -- it's been so long, but I'm sure, yes.

21   Q.    I understand.  Do you recall at some point during either

22   of these discussions agents for the ATF talking about the

23   severity of the penalties?

24            MS. TAYLOR:  Objection, hearsay.

25            THE COURT:  Sustained.

1   BY MR. LAROSIERE:

2   Q.   Let me rephrase that.  Do you remember at some point you

3   stating something to the effect of "ten years per chip"?

4   A.   I don't recall that, no.

5   Q.   Okay.

6            MR. LAROSIERE:  Thank you so much for your time.

7            THE WITNESS:  Thank you.

8            MS. TAYLOR:  No redirect, Your Honor.

9            THE COURT:  All right, sir.  You may step down.

10           I assume this witness is released?

11           MS. TAYLOR:  From the government's perspective, yes.

12           MR. KING:  Yes, Your Honor.

13           MR. LAROSIERE:  Yes, Your Honor.

14           THE WITNESS:  Am I dismissed?

15           THE COURT:  You're free to go.

16           THE WITNESS:  Thank you very much.

17      (Witness exits the courtroom.)

18           THE COURT:  Next witness.

19           MS. TAYLOR:  The United States calls Tristen

20   Alderson.

21      (Pause in proceedings.)

22           THE COURT:  If you-all want to stretch, go ahead.

23           MS. TAYLOR:  I apologize for the brief delay, Your

24   Honor.  Mr. Alderson was on the 7th floor and he's coming up in

25   the elevator.

1          THE COURT:  Our elevators are quite slow, as you've

2    probably noticed.  We're actually in the midst of replacing

3    them, and so some of them are out of service while we're doing

4    that.

5       (Witness enters the courtroom.)

6          THE COURT:  Sir, if you'll come all the way up here

7    to the witness stand and remain standing to be sworn.

8          COURTROOM DEPUTY:  Please raise your right hand.  Do

9    you solemnly swear that the testimony you're about to give

10   before this Court will be the truth, the whole truth, and

11   nothing but the truth, so help you God?

12         THE WITNESS:  Yes, I do.

13         COURTROOM DEPUTY:  You may have a seat.  And if you

14   could please state your name for the record and spell your

15   first and last names.

16         THE WITNESS:  My name is Tristen Alderson.

17         You said spell my last name?

18         COURTROOM DEPUTY:  First and last, please.

19         THE WITNESS:  T-r-i-s-t-e-n, A-l-d-e-r-s-o-n.

20         THE COURT:  Go ahead, Ms. Taylor.

21         **TRISTEN ALDERSON, GOVERNMENT WITNESS, SWORN,**

22                     DIRECT EXAMINATION

23   BY MS. TAYLOR:

24   Q.   Mr. Alderson, could you please tell the jurors in general

25   where you live, just city, state.

1    A.    I live in White Lake, Michigan.

2    Q.    And how long have you lived in White Lake, Michigan?

3    A.    My whole life.

4    Q.    And what do you do for a living?

5    A.    I work for my dad and then I became a realtor.

6    Q.    What's your dad's business?

7    A.    Installing commercial wall covering.

8    Q.    And at the time -- let's go back to late 2020/early 2021.

9    What were you doing at that time?

10   A.    I was in college.

11   Q.    And Mr. Alderson, do you own any firearms?

12   A.    I do.

13   Q.    Approximately how many?

14   A.    Several.

15   Q.    Do you own any AR-15-type firearms?

16   A.    Two.

17   Q.    Would you consider yourself to be an enthusiast when it

18   comes to firearms?

19   A.    I do enjoy the sport.

20   Q.    Are you familiar with an item called an auto key card?

21   A.    Yes.

22   Q.    How did you first come to learn of the auto key card?

23   A.    Through a YouTube video online.

24   Q.    And do you recall anything about that YouTube video?

25   A.    It was talking about the auto key cards and more or less

1  advertising.  They sponsored it.  And I watched the video when

2  I was doing homework.

3  Q.   And do you recall the name of the video?

4  A.   "Parts the ATF Wish Never Existed," or somewhere about

5  that.

6  Q.   Something along those lines?

7  A.   Yes, ma'am.

8  Q.   Do you recall the name of the channel that had published

9  that video?

10  A.   I believe it was CRS Firearms.

11  Q.   And if I were to show you a portion of that video, would

12  you be able to say whether that was the video that you watched?

13  A.   I believe so, yes.

14       MS. TAYLOR:  Ms. Ganoe, could you please pull up

15  Exhibit 2.

16       Exhibit 2 is playing.

17   (Video played.)

18       MS. TAYLOR:  Could you pause the video, please.

19   (Video stopped.)

20  BY MS. TAYLOR:

21  Q.   We paused the video at 52 seconds in, correct?

22  A.   Yep.

23  Q.   Yes?

24  A.   Yes.

25  Q.   Okay.  Is this the video that you watched?

1    A.    Yes, it is.

2    Q.    And are you -- have you watched other videos that featured

3    this man who is in this video that we just played the clip

4    from?

5    A.    Yeah, I believe so.

6    Q.    And approximately how many?

7    A.    I'm not entirely sure of exactly how many.

8    Q.    Do you think it would be more or less than ten?

9    A.    Right around there.

10   Q.    And if -- do you recognize the man who is in this video in

11   the courtroom today?

12   A.    Yes.

13   Q.    Can you describe what he's wearing, where he's sitting?

14   A.    On the right side wearing burgundy/red sport coat.

15         MS. TAYLOR:  Your Honor, I would ask that the record

16   reflect that Mr. Osso has identified Matthew Hoover -- sorry,

17   Mr. Alderson has identified Matthew Hoover.

18         MR. LAROSIERE:  Without objection, Your Honor.

19         THE COURT:  All right.  The record will so reflect.

20   BY MS. TAYLOR:

21   Q.    And Mr. Alderson, do you recall whether you watched this

22   video that's Exhibit 2 -- do you recall whether you watched the

23   whole video?

24   A.    Yes, I believe I have.

25   Q.    At the time that you originally saw it?

1  A.   Yes.

2  Q.   And after you watched this video, did you purchase any

3  items that were discussed in the video?

4  A.   I did.

5  Q.   And what was that?  What items did you purchase?

6  A.   The auto key card bottle opener.

7  Q.   And how did you go about making that purchase?

8  A.   I asked a friend of mine -- well, I printed off the order

9  form, filled it out, and asked a friend to get a money order

10  and order it.

11  Q.   And why -- what was the reason that you decided to use a

12  mail-in order form?

13  A.   It was more discreet, and that's pretty much why.  It was

14  recommended in the video.

15  Q.   So that was something that Mr. Hoover recommended in the

16  video you watched?

17  A.   Yes.

18  Q.   Mr. Alderson, how old are you?

19  A.   I am 23 now.

20  Q.   And so back in early 2021 you were about 21 years old?

21  A.   Yes.

22  Q.   Or 21 years old?

23  A.   Yes, ma'am.

24  Q.   Do you -- how many times in your previous life had you

25  used a money order and a mail-in order form to obtain a

1    product?

2    A.   Never.

3    Q.   So this was the first time?

4    A.   Yes.

5    Q.   And why did you not just send it in yourself?

6    A.   I guess it was recommended in the video, and it was more

7    discreet that way.

8    Q.   "More discreet," what did you understand that to mean?

9    A.   It was harder to be traced, I guess, or tracked.

10   Q.   Did you -- were you interested in not being traced or

11   tracked?

12   A.   Yes.  Um . . .

13   Q.   Okay.  Now, who did you ask to help you with the purchase?

14   A.   Aric Osso.

15   Q.   And how do you know Mr. Osso?

16   A.   He worked with my dad as well at work.

17   Q.   Is he someone who worked for your dad?

18   A.   Yes, yes, sorry.

19   Q.   And what did Mr. Osso do to help you with placing the

20   order?

21   A.   He got the money order, because I knew he's done it before

22   and I never have, and had it shipped to his house.

23   Q.   And at some point did you receive the auto key card?

24   A.   Yes, I did.

25   Q.   Did you receive it from Mr. Osso?

1    A.    Yes.

2    Q.    What was your intention for the auto key card?  When you

3    decided to purchase it, what did you intend to do with it?

4    A.    I thought it was, I guess, more or less a talking point,

5    something cool.  I didn't really have any specific intentions

6    of going out, like, next weekend and cutting it out or altering

7    it at that time.

8    Q.    Did you have intentions to cut it out or alter it at some

9    point in time?

10   A.    I figured I would have the opportunity at some point if I

11   so chose.

12   Q.    Did you have an expectation that if you cut the pieces out

13   of the auto key card that you ordered that it would do anything

14   to an AR-15?

15   A.    It would have the potential to.

16   Q.    And do what, specifically?

17   A.    Could potentially make it a automatic weapon.

18   Q.    When you say "potentially," why are you saying

19   "potentially"?

20   A.    Because I never used it or altered the ones that I got, so

21   I don't know for a fact.

22   Q.    So you never actually cut it out or tested it?

23   A.    No, ma'am.

24   Q.    But you intended to do that at some point in the future?

25   A.    I would have the opportunity, yes.

1   Q.   And had you done that, what was your expectation for what

2   it would do?

3   A.   It would work, I guess.  Without doing it, I guess I don't

4   know exactly.

5   Q.   Mr. Alderson, you spent over $200 on auto key cards,

6   correct?

7   A.   Yes, ma'am.

8   Q.   Mr. Alderson, what did you end up doing with your auto key

9   cards?

10  A.   So about a week or two after I got them I saw a video

11  online saying that the owner was arrested and that the ATF was

12  going to come to people's houses.  So I took them and I threw

13  them away in a neighborhood's trash can.

14  Q.   Do you recall whose video you watched that alerted you to

15  the arrest of the owner Auto Key Cards?

16  A.   I do not.  I don't believe it had like a specific person

17  in the videos.  It was more or less like a black screen with

18  words from what I remember.

19  Q.   And when ATF -- did ATF agents ultimately show up at your

20  house in Michigan?

21  A.   Yes, they did.

22  Q.   Did you -- initially did you believe that they were there

23  for a different reason?

24  A.   Yes, I did.

25  Q.   What did you believe the ATF agents were there for?

1    A.    Because I had filed all the paperwork to obtain a

2    suppressor license earlier that year.

3    Q.    Is a suppressor another word for a silencer?

4    A.    Yes.

5    Q.    And were you attempting to register that silencer?

6    A.    Yes.

7    Q.    Is there a trust that has been formed that has items

8    registered in it that you were allowed to possess?

9    A.    That was the only item in the trust.

10          MS. TAYLOR:  Your Honor, may we have Exhibit 83,

11   please.

12          THE COURT:  Go ahead.

13   BY MS. TAYLOR:

14   Q.    Mr. Alderson, this is a document that's already in

15   evidence related to a search of the National Firearms

16   Registration and Transfer Record, correct?

17   A.    Correct.

18   Q.    Are you familiar with the National Firearms Registration

19   and Transfer Record?

20   A.    Yes.

21   Q.    What do you understand that to be?

22   A.    That's anything to do with suppressors and I guess other

23   devices similar, like SBRs, or short-barreled rifles, or

24   machine guns.

25   Q.    Is it your understanding that suppressors, short-barreled

1  rifles, and machine guns are all required to be registered?

2  A.   Yes.

3  Q.   And in the little short paragraph at the top of the

4  highlighted portion it talks -- it references "Obsidian

5  BCBB8570 Trust"?

6  A.   Yes.

7  Q.   Are you familiar with that trust?

8  A.   Yes.

9  Q.   And how are you familiar with that trust?

10  A.   That's the one that I set up when I was purchasing the

11  suppressor.

12  Q.   So any firearms that are registered to that trust, those

13  are your firearms?

14  A.   Correct.

15  Q.   And then the only -- you said the only item listed in the

16  part -- the chart below is the suppressor that you thought the

17  ATF was there to talk to you about?

18  A.   Correct.

19  Q.   And that's the -- it says "Type of Firearm" in the first

20  column, it looks like "SI"?  Or just "S"?  "SI"?

21  A.   Yes.

22  Q.   And then it says "Rugged Design, Inc."?

23  A.   Correct.

24  Q.   And that's the silencer that you own --

25  A.   Correct.

1    Q.    -- or the suppressor?

2          Mr. Alderson, you've talked to the ATF and to me

3    about your use of marijuana, correct?

4    A.    Correct.

5    Q.    And is it accurate to say that at the time the ATF came to

6    your house that you used marijuana at least sometimes?

7    A.    Yes, at times.

8    Q.    And were you also regularly carrying a firearm during that

9    time?

10   A.    Not while I was under the influence ever.

11   Q.    Okay.  So in general, would you carry a firearm?

12   A.    Yes.

13   Q.    But if you were under the influence you would not carry a

14   firearm?

15   A.    Correct.

16   Q.    You also have been given a letter from me, correct?

17   A.    Correct.

18   Q.    And that outlines some terms and conditions of your

19   testimony here today, correct?

20   A.    Correct.

21   Q.    And are you also -- you have an understanding that -- do

22   you have an understanding that the U.S. Attorney's Office where

23   you live, in Michigan, had been looking at a potential charge

24   related to you being an unlawful user of marijuana in

25   possession of firearms?

1   A.   Correct.

2   Q.   And do you have an understanding that if you give truthful

3   testimony here today that that will be conveyed to the U.S.

4   Attorney's Office in Michigan?

5   A.   Correct, yes.

6   Q.   And is it your understanding that they will take that into

7   consideration in making their decision about what to do with

8   your case up there?

9   A.   Yes.

10              MS. TAYLOR:   I have no other questions, Your Honor.

11              THE COURT:   Mr. Larosiere.

12              MR. LAROSIERE:   Yes, Your Honor.

13                          CROSS-EXAMINATION

14  BY MR. LAROSIERE:

15  Q.   Mr. Alderson, how long before you met with agents from the

16  ATF did you, you know, start the process of getting that

17  suppressor?

18  A.   Gosh, I'm not entirely sure.  It was a year-long process.

19  Q.   Right.  Would about six months sound right?

20  A.   Yeah.

21  Q.   And was that -- to buy a suppressor from a dealer -- did

22  you buy it from a dealer?

23  A.   Yes, correct.

24  Q.   You went to get a Form 4, right?

25  A.   I believe so.

1  Q.   And that's basically where you ask the government's

2  permission to transfer the suppressor from the dealer to you as

3  an individual, right?

4  A.   Correct.

5  Q.   And so was your Form 4 approved?

6  A.   Yes, it was.

7  Q.   Okay.  Do you recall when the ATF agents came to your

8  house that day -- first of all, are any of those agents here in

9  the courtroom right now?

10  A.   I believe so.

11  Q.   Could you -- is he this one here in the middle of the

12  prosecution table?

13  A.   Yes, I believe so.

14  Q.   Okay.  I understand that when you first spoke to them you

15  said you had no idea what the auto key card was, right?

16  A.   Correct.

17  Q.   All right.  And you had no idea what they were talking

18  about, is what you basically told them?

19  A.   Correct.

20  Q.   And is it fair to say they said some things to you that

21  made you very uncomfortable?

22  A.   Absolutely.

23  Q.   Do you recall at some point saying that your nerves were

24  shot and that you were going to throw up?

25  A.   I don't recall exactly that.

1    Q.    Were your nerves shot?

2    A.    I was pretty nervous, yes.

3    Q.    Did you feel nauseous?

4    A.    I'm sure I did.  I can't remember exactly.

5    Q.    Do you remember the phrase, "You can be on Team U.S.A. or

6    against Team U.S.A."?

7              MS. TAYLOR:  Objection, hearsay.

8              THE COURT:  Sustained.

9              MS. TAYLOR:  Your Honor, may we have sidebar?

10             THE COURT:  Yes.  Actually, it's 10:35.  Why don't we

11   just take our morning break.  We'll take 15 minutes.  I'll ask

12   you to be back in at ten minutes to 11.

13             Please remember not to read, watch, or listen to any

14   media reports.

15             Don't talk to anybody about the case or allow anybody

16   to speak about it in your presence.  And if anybody should do

17   so, please notify the court security officer immediately.

18             Don't conduct any independent research in any way

19   relating to the case.

20             And please do not form or express any opinions.

21             We'll see you back at 10:50.

22             COURT SECURITY OFFICER:  All rise for the jury.

23        (Jury exits, 10:35 a.m.)

24             COURT SECURITY OFFICER:  Please be seated.

25             THE COURT:  I'll let you stay there for a moment.

1              Go ahead, Ms. Taylor.

2              MS. TAYLOR:  Your Honor, I think maybe this shouldn't

3    be discussed in front of the witness.

4              THE COURT:  I didn't know if we would need to

5    proffer.

6              Sir, can I get you to stand outside.

7              THE WITNESS:  Yes.

8              THE COURT:  Just go outside the door.  But don't go

9    far.

10             THE WITNESS:  Okay.

11        (Witness exits the courtroom.)

12             THE COURT:  Go ahead.

13             MS. TAYLOR:  Your Honor, my concern is that we've now

14   had two witnesses in a row at which during cross the -- and I

15   apologize that I don't remember whether it was Mr. King or

16   Mr. -- I'm not even sure who crossed Mr. Osso, but during

17   which -- it was Mr. Larosiere -- but during which -- during

18   cross there has been an attempt to elicit what the ATF agents

19   said to the witness when the ATF went and visited them at their

20   house.  And both times I've objected to hearsay.  Both times

21   it's been sustained.  But both times prior to the objection,

22   essentially, the -- you know, on cross the attorney was able to

23   state exactly what they are saying the ATF told this witness.

24             And it seems at some point that this is just a

25   deliberate disregard of the Court's rulings that these

1    statements are hearsay.  And I'm not sure whether the intention

2    is that going forward with the remainder of the purchaser

3    witnesses that this is going to continue in this manner with

4    the cross-examination.

5            THE COURT:  Mr. Larosiere, can you avoid doing that

6    in the future unless you have a good-faith basis to believe

7    that it's admissible?

8            MR. LAROSIERE:  Yes, Your Honor.  And this time I

9    had -- I had thought it was calculated not to elicit anything

10   for the truth of the matter asserted, but, rather, effect on

11   the listener.  If I'm mistaken, then I can avoid that line

12   entirely.

13           THE COURT:  Can you explain that further,

14   Mr. Larosiere?

15           MR. LAROSIERE:  I'm not -- there's -- I don't see

16   much evidentiary value in whether or not it's true.  Like there

17   is no truth of being on Team U.S.A. or against Team U.S.A.  The

18   effect is to suggest that the -- it attacks the credibility of

19   the witness, basically, that he's been strong-armed.

20           THE COURT:  Because he's being told that "You can

21   either be on Team U.S.A. or not on Team U.S.A.," which is, in

22   my view -- it's only strong-arming if it's true, right?

23           MR. LAROSIERE:  I understand.

24           THE COURT:  Mr. King.

25           MR. KING:  And Your Honor, I apologize, because I --

1    frankly, that's an area that I would have intended to get into.

2           It's not whether or not it's true, it's the effect on

3    the listener.  So whether or not Mr. Alderson believes it's

4    true, "You need to get on Team U.S.A.," or not -- and I'm

5    talking very quickly and away from a microphone.

6           Mr. Alderson -- so the question isn't whether or not

7    it's true or not, it's how that impacted Mr. Alderson's answers

8    to questions and his relationship with the government and his

9    testimony here today, is if he views that as a threat or not,

10   not whether or not you're either on Team U.S.A. or not on Team

11   U.S.A.  Him hearing that and the effect that that has on him is

12   very probative of his bias and his reasons for testifying.  And

13   whether it's true or not or what the government does with that

14   really doesn't matter.

15          So it's -- frankly, it's my opinion that that's not

16   hearsay.  That is 100 percent textbook definition of not for

17   the truth of the matter asserted but for the effect it has on

18   that listener, which is:  You're either with us or against us.

19   And you have -- I mean, I've counted three or four felonies

20   he's probably committed that the government is aware of.  That

21   threat, coupled with the felonies that he's aware of not being

22   prosecuted for, absolutely goes to his bias and I think would

23   be kind of a textbook non-hearsay statement.

24          THE COURT:  Ms. Taylor, I think Mr. King makes a

25   persuasive argument.  And it is important that the Court not

1   unduly restrict cross-examination.  To the extent that that

2   influences his testimony, I think they should be allowed to

3   explore it.

4         I think he makes a good argument that it's not for

5   the truth, that it's for the impact that it has on

6   Mr. Alderson.  And I'm inclined to overrule the objection on

7   that basis, but I'll hear from you further if you wish.

8         MS. TAYLOR:  Your Honor, I think it is fair to cross

9   on whether the person feared prosecution and whether that could

10  have caused the witness to be biased.  However, I don't think

11  it's necessary to directly quote -- purport to directly quote

12  these ATF agents where there's no foundation to suggest that

13  this person remembers the exact words that the ATF has said to

14  them.  And in my view, the quoting is only intended to

15  prejudice the jury.  I don't think it's necessary.

16        THE COURT:  Well, certainly they -- I would expect

17  that they're not going to ask a quote if there's not a

18  good-faith basis to quote.  They're not going to make it up if

19  the witness says he doesn't remember it.  But if that's what

20  the agent said and the witness remembers it, I think that the

21  jury is entitled to hear it.

22        MS. TAYLOR:  I think, Your Honor, to lay the

23  foundation for that, then first the question should be asked,

24  "Do you remember exactly what the ATF told you?"

25        THE COURT:  I don't think the rules of evidence

1    require that, Ms. Taylor.  If you don't like what your agent

2    said, you know, that -- you can't sugarcoat it.

3         So I'm going to -- I think it is a permissible

4    inquiry into the bias.  It's not -- they've made a persuasive

5    argument that it is not being offered for the truth of the

6    matter asserted.  And if the witness doesn't remember it, then

7    the witness doesn't remember it.

8         I've told the jury previously that what the lawyers

9    say isn't evidence.  I'll remind them of that in my closing

10   instructions.  But I'm going to allow the area of inquiry, both

11   with this witness and others, if that is -- but I will direct

12   defense counsel, if you don't have a -- I don't know if you

13   guys have audio of these that you've listened to or if it's a

14   FBI 302.  I don't know what you're looking at.  But if the

15   statement isn't made, then I'm going to direct you not to

16   suggest that it was.  But if you-all have in the discovery that

17   that was a statement made, then I think it's fair to ask the

18   witness whether the witness recalls that statement, and if so,

19   the effect it had.

20        So with that, is there anything further that we need

21   to address?

22        MS. TAYLOR:  No, Your Honor.

23        MR. KING:  No, Your Honor.

24        MR. LAROSIERE:  No, Your Honor.  Thank you.

25        COURT SECURITY OFFICER:  All rise.

```
 1        (Recess, 10:43 a.m. to 10:54 a.m.)

 2        (All parties present.  Jury not present.)

 3            COURT SECURITY OFFICER:  All rise.  This Honorable

 4   Court is back in session.

 5            Please be seated.

 6            THE COURT:  Let's have the jury.

 7            COURT SECURITY OFFICER:  All rise for the jury.

 8            I'm sorry, one escaped.

 9            All rise for the jury.

10        (Jury enters, 10:56 a.m.)

11            COURT SECURITY OFFICER:  Please be seated.

12            THE COURT:  Go ahead.

13   BY MR. LAROSIERE:

14   Q.   So Mr. Alderson, how long have you been into firearms?

15   A.   I grew up hunting and going to the shooting range, so

16   pretty much my whole life.

17   Q.   Your whole life.  So you're pretty familiar with them,

18   pretty comfortable with them?

19   A.   I'm comfortable with them, yeah.

20   Q.   And you even got an NFA firearm, right, that suppressor?

21   A.   Correct.

22   Q.   And you set up a trust to have that suppressor go into,

23   right?

24   A.   Yes.  I mean, I didn't really set it up.  It was all done

25   legally for me and everything --
```

1    Q.   Of course.

2    A.   -- from the shop.

3    Q.   But you opted to have it go into a trust for a reason, I'm

4    guessing?

5    A.   I believe they have to.

6    Q.   Right.  And that's -- that would be so that, you know,

7    other people could be added onto the trust?  Family members,

8    stuff like that?

9    A.   I believe so, yes.

10   Q.   Right.  So you got NFA firearms, you know about all the

11   forms and everything.

12        Can you tell me, have you ever heard of indexing?

13   A.   I can't recall.

14   Q.   In the NFA context, you've never heard of indexing?

15   A.   I'm not familiar.

16        MR. LAROSIERE:  Okay.  All right.  Thank you so much.

17   That's all I have for you.

18        THE WITNESS:  All right.

19        THE COURT:  Mr. King.

20        MR. KING:  May it please the Court.

21        THE COURT:  Go ahead.

22                    CROSS-EXAMINATION

23   BY MR. KING:

24   Q.   Mr. Alderson, prior to coming here, have we ever spoken or

25   met?

1  A.   No.

2  Q.   Do you have any idea what questions I'm going to ask you?

3  A.   No idea.

4  Q.   And you have spoken with attorneys for the government?

5  A.   Correct.

6  Q.   And they've told you what questions to expect of them?

7  A.   Correct.

8  Q.   And the answers that they would anticipate you providing

9  to them?

10          MS. TAYLOR:  Objection.

11          THE COURT:  Sustained.

12  BY MR. KING:

13  Q.   Mr. Alderson, you're here pursuant to a letter of

14  immunity?

15  A.   Correct.

16  Q.   So if you tell something the government believes to be

17  truthful, you would not be subject to prosecution for anything

18  you say here today.  Is that your understanding of how that

19  works?

20  A.   That is truthful.

21  Q.   And that -- and the people who determine whether or not

22  it's truthful, that's the attorneys for the government,

23  correct?

24  A.   I -- I would assume so.

25  Q.   Before coming to testify, you've also spoken with agents

1    with ATF?

2    A.    Correct.

3    Q.    And one of those is here today.  Another one is Agent

4    Hooker.  Do you remember talking to him?

5    A.    Yes.

6    Q.    And he told you, "You can be on Team U.S.A. or you can be

7    against Team U.S.A."  Do you remember that?

8    A.    Yes.

9    Q.    What did you take that to mean?

10   A.    I'm sorry, what?

11   Q.    What was your -- when you hear "You can be on Team U.S.A.

12   or you can be against Team U.S.A." told to you by Agent Hooker,

13   what was the context of that conversation?

14   A.    Being helpful towards -- with them.

15   Q.    And that was your understanding of what that meant?

16   A.    Yes.

17   Q.    And you understand that if -- let me ask you this:

18   There's allegations that you've used marijuana while a

19   possessor of a firearm?

20   A.    Correct.

21   Q.    And you understand that that's a serious felony,

22   punishable by prison?

23   A.    Yes.

24   Q.    And you understand that if that's true -- you also filled

25   out a Form 4 to get your silencer, or suppressor.  Do you

1    remember that?

2    A.    Correct.

3    Q.    And one of the questions on there is if you are a legal --

4    a user of unlawful drugs.  Do you know that question to be on

5    that form?

6    A.    I believe addicted, yes.

7    Q.    And if you said no on that and that's not accurate, that's

8    a separate felony?

9    A.    Correct.

10   Q.    And you also said that when you first met with the agents

11   that you did not tell them the truth?

12   A.    Correct.

13   Q.    And one of the conversations you had with them is that if

14   you lie to them about, you know, anything material, that is a

15   separate felony, even apart from everything else?

16   A.    Yes.

17   Q.    You've also said that you suspected they were going to

18   come potentially looking for the auto key card, and you

19   intentionally hid or destroyed it by throwing it away?

20   A.    Before I really knew they were coming, yes.

21   Q.    And that would be destruction of evidence?

22         MS. TAYLOR:  Objection.  Foundation.

23         THE COURT:  Rephrase your question, Mr. King.

24   BY MR. KING:

25   Q.    Knowing that there may be an investigation, you disposed

1  of potential evidence; is that fair to say?

2  A.   I guess yes.  I didn't really know there was for certain

3  an investigation at that time.

4  Q.   But you didn't throw it away -- you threw it away because

5  you knew that somebody had been arrested, not for other

6  reasons; is that fair?

7  A.   Correct, and --

8  Q.   And that there may be an investigation?

9  A.   And if it was for that, I wanted nothing to do with the

10  key card.

11  Q.   But you got rid of it?

12  A.   Correct.

13  Q.   And that's a separate felony?  If you know.

14        MS. TAYLOR:  Objection.

15        THE COURT:  Sustained.

16  BY MR. KING:

17  Q.   So you have a lot of -- is it fair to say there's a lot

18  hanging over your head?

19  A.   Yes.

20  Q.   And you have decided to cooperate with the government?

21  A.   Yes.

22  Q.   And you're here today hoping that if you do that, there

23  will be no arrests or charge for being an unlawful user of a

24  drug while in possession of firearms, for falsifying

25  information on a Form 4, which is a felony, or for lying when

1    you met with agents.  Is that your hope?

2    A.   Yes.

3    Q.   And you mentioned that you have watched the video of

4    Mr. Hoover before?

5    A.   Correct.

6    Q.   And you recall him saying that if you cut up the auto key

7    card, that potentially you could be committing an illegal act?

8    A.   Correct.

9    Q.   And you had not done that?

10   A.   Correct.

11   Q.   And you understood that if you had done that, you may be

12   doing something that was illegal?

13   A.   Correct.

14   Q.   But it was your sincerely-held belief, as somebody who's

15   knowledgeable -- it was your sincerely-held belief that by

16   purchasing --

17            MS. TAYLOR:  Objection, foundation.

18            THE COURT:  Go ahead with your question, Mr. King.

19   BY MR. KING:

20   Q.   It was your sincerely-held belief that by purchasing it

21   you had not violated the NFA; is that correct?

22   A.   Yes.

23   Q.   And that you would not have actually committed an illegal

24   act until you had cut out and formed machine gun conversion

25   devices yourself, correct?

```
 1   A.    Yes.

 2            MR. KING:  Your Honor, I have no further questions.

 3   Thank you, sir.

 4            THE COURT:  Ms. Taylor, any other questions for this

 5   witness?

 6            MS. TAYLOR:  Yes, Your Honor.

 7            THE COURT:  Go ahead.

 8                          REDIRECT EXAMINATION

 9   BY MS. TAYLOR:

10   Q.    Mr. Alderson, you testified a moment ago that the ATF

11   agents, when they came to your house, said things that made

12   you -- or that you -- you previously said that the agents said

13   things that made you uncomfortable?

14   A.    I guess the situation was uncomfortable.  I've never dealt

15   with a federal agent before in my life.

16   Q.    Were there two agents who came to your house?

17   A.    Yes, ma'am.

18   Q.    And one of them was Agent Slosson.  I think you identified

19   him as the agent sitting next to Mr. Mesrobian?

20   A.    Correct.

21   Q.    Did Agent Slosson yell at you when he was at your house?

22   A.    No.

23   Q.    Did the other agent yell at you?

24   A.    No.

25   Q.    Did -- did they strong-arm you?
```

1   A.   No.  I was just nervous about the whole interaction.

2   Q.   Were you nervous because you were worried about being

3   prosecuted?

4   A.   I -- I've never dealt with a federal agent in my life, and

5   the situation was just a lot.

6   Q.   So having -- just having a federal agent show up on your

7   doorstep made you nervous?

8   A.   Yes.

9   Q.   And you did say things that were untruthful when the

10  agents came to your house; is that accurate?

11  A.   Yes.

12  Q.   And you were asked about being told that you could be on

13  Team U.S.A. or against Team U.S.A.  Do you remember exactly

14  whether that was the quote?

15  A.   I remember hearing words very similar to that.

16  Q.   And you mentioned that you understood that the suggestion

17  was that you should be helpful to the government?

18  A.   Yes, and it was my choice as well.

19  Q.   That it was your choice?

20  A.   To be helpful.

21  Q.   And by "be helpful" do you mean -- well, let me ask this

22  question:  Mr. Alderson, you and I have spoken before, correct?

23  A.   Correct.

24  Q.   Have I ever put words into your mouth?

25  A.   No.

1    Q.   Have I ever told you to say anything untruthful?

2    A.   No.  You always said tell the truth.

3    Q.   And you have -- I also gave you a letter, correct?

4    A.   Correct.

5    Q.   And I'm going to -- I'm going to put it up on the screen,

6    or on the ELMO, please.

7              THE COURT:  Ms. Taylor, it's not in evidence.

8              MR. KING:  Your Honor.

9              MS. TAYLOR:  I apologize.

10             THE COURT:  You can't put --

11   BY MS. TAYLOR:

12   Q.   Let me review some of the terms of the letter and you can

13   say whether you understand those terms.

14             You received a letter from me, correct?

15   A.   Correct.

16   Q.   About a week ago?

17   A.   I overviewed it as my attorney received the letter.  But

18   yes, I overviewed it with him.

19   Q.   Okay.  And it's addressed to you, correct?

20   A.   Correct.

21   Q.   And it states that your status at this trial is as that of

22   a witness, correct?

23   A.   Correct.

24   Q.   And that you understand that if you should falsely

25   implicate or incriminate any person, that the agreement to not

1   use your testimony against you would be null and void, correct?

2   A.   Correct.

3   Q.   So is it your understanding that if you were to come in

4   here and you were to falsely say that somebody had committed a

5   crime, what would be the consequence?

6   A.   It would be perjury or making a fault statement.

7   Q.   So when you say that you were -- you understood that the

8   expectation was for you to be helpful to the government, nobody

9   has ever suggested what your testimony should be, correct?

10  A.   Correct.  Just as far as telling the truth.

11  Q.   And that's all I've ever asked of you?

12  A.   Correct.

13  Q.   Have the agents ever asked of you anything other than for

14  you to tell the truth?

15  A.   I've never spoken to them other than those interactions.

16  Q.   And in the interactions that you've had with the

17  government related to this case, have I and the agents been

18  respectful to you?

19  A.   Yes.

20  Q.   And Mr. Alderson, Mr. King had asked you some questions a

21  moment ago about whether it was your sincerely-held belief that

22  you had not violated the NFA unless you actually cut the auto

23  key card?

24  A.   At the time of my purchase, yes, I did.

25  Q.   Are you a legal expert?

1    A.   By no means.

2    Q.   Did you research the statute?

3    A.   I did not.

4    Q.   So you didn't know exactly what the statute said in terms

5    of where the line was?

6    A.   Correct.

7            MS. TAYLOR:  I have no further questions.

8            THE COURT:  Mr. Larosiere?

9            MR. LAROSIERE:  No, Your Honor.

10           THE COURT:  Mr. King?

11           MR. LAROSIERE:  Thank you, Your Honor.

12                        CROSS-EXAMINATION

13   BY MR. KING:

14   Q.   Mr. Alderson, I want to just briefly revisit some of the

15   things you discussed with Ms. Taylor if that's okay.

16           She read to you a little bit from a letter you

17   received?

18   A.   Yes.

19   Q.   And we can agree there was more to it than that?

20   A.   Yes.

21   Q.   And part of it was that you would provide full, complete,

22   truthful and honest knowledge and information and --

23           COURT REPORTER:  Your Honor .  .  .

24           THE COURT:  Mr. King, you're talking too fast.

25           MR. KING:  And I'm doing it again.  Ms. Healey, I

1  apologize.  Let me slow down.  I will do that much slower so
2  everybody can -- so the court reporter can get me.
3  BY MR. KING:
4  Q.   One of the things that it also said is that for you to
5  provide full, complete, truthful and honest knowledge,
6  information, and cooperation regarding any of the matters noted
7  herein.  And this agreement will become null and void and you
8  may be prosecuted for perjury or false statement?
9  A.   Correct.
10 Q.   And it's your understanding that that's if the government
11 agrees that you've provided full, complete, truthful and honest
12 knowledge, correct?  The government's the one who determines
13 whether you've done that or not?
14 A.   I believe so, yes.
15 Q.   And it also says that you could be charged for perjury or
16 giving a false statement, but it also says "and for any federal
17 criminal violation of which the United States has knowledge,"
18 correct?
19 A.   I guess I can't recall the exact line.
20        MR. KING:  Your Honor, may I approach the witness?
21        THE COURT:  You may.
22 BY MR. KING:
23 Q.   Mr. Alderson, if you could take a look at what I've
24 provided you and just give me a second when you've had a chance
25 to review that.  And I know it goes on to a second page, so if

 1    you could take a look at that.

 2            Mr. Alderson, have you had a chance to take a look at

 3    that?

 4    A.    Yes.

 5    Q.    Is that the letter --

 6            THE COURT:  Mr. King, will you retrieve the document.

 7            MR. KING:  Thank you, Your Honor.

 8    BY MR. KING:

 9    Q.    Mr. Alderson, is that the letter we've been discussing?

10    A.    Yes.

11    Q.    And you understand that to be an immunity letter for your

12    testimony here today?

13    A.    Yes.

14    Q.    And addresses -- and the quote that I provided to you

15    before, that not only could you be "prosecuted for perjury and

16    for giving a false statement, but also for any federal criminal

17    violation of which the United States has knowledge, and the

18    United States may use any information or evidence provided and

19    any leads derived therefrom for any lawful purposes, including

20    using such evidence against you," do I have that correct?

21    A.    Can you repeat that?

22    Q.    Yes, sir.  Let me -- and I'll slow down a little bit.

23            So we've discussed the perjury and false statement,

24    and I want to discuss some of the other charges.  And it says

25    that you could be prosecuted -- and I'm skipping ahead to where

1    it says "for any federal criminal violation of which the United

2    States has knowledge, and the United States may use information

3    or evidence provided and any of the leads derived therefrom for

4    any lawful purpose, including using such evidence against you."

5            Is that -- do I have that correct?

6    A.    I believe so.

7    Q.    And that letter's from the prosecutor you've been talking

8    to here in court today?

9    A.    Yes.

10   Q.    And do you have, as we discussed, a lot on the line?

11   A.    Yes.

12   Q.    And would it be fair to say that you've decided to join

13   Team U.S.A.?

14   A.    Um, I was -- I -- I -- I guess I don't really understand

15   exactly that.  I decided to come here today and tell the truth.

16   Q.    And you're not worried about any of those felony

17   prosecutions we discussed?

18   A.    I guess it's -- I have an attorney to figure that all out

19   and navigate the situation.  Safe to say you're always going to

20   be, but I would hope that with the full truthful statements

21   that I wouldn't be.

22            MR. KING:  Nothing further, Your Honor.  Thank you.

23            THE COURT:  You may step down, sir.

24            Is this witness under subpoena by the defense?

25            MR. KING:  No, Your Honor.

1          THE COURT:  All right.  Then you're released, sir.

2          Next witness.

3          MS. TAYLOR:  The United States calls Phillip Wilson.

4          THE COURT:  I apologize, Ms. Taylor, I did not hear

5     you.

6          MS. TAYLOR:  Phillip Wilson.

7       (Witness exits the courtroom.)

8       (Witness enters the courtroom.)

9          COURTROOM DEPUTY:  All right, sir.  If you could

10    please raise your right hand.  Do you solemnly swear that the

11    testimony you're about to give before this Court will be the

12    truth, the whole truth, and nothing but the truth, so help you

13    God?

14          THE WITNESS:  I do.

15          COURTROOM DEPUTY:  You may have a seat.  If you could

16    please state your name for the record and spell your first and

17    last name.

18          THE WITNESS:  Phillip Wilson.  P-h-i-l-l-i-p,

19    W-i-l-s-o-n.

20          THE COURT:  Mr. Wilson, can I ask you to pull your

21    chair as close to that microphone as you can, and try to keep

22    your voice up, okay?

23          Go ahead, Ms. Taylor.

24          MS. TAYLOR:  Yes, Your Honor.

25          **PHILLIP WILSON, GOVERNMENT WITNESS, SWORN,**

                          DIRECT EXAMINATION

BY MS. TAYLOR:

Q.    Mr. Wilson, could you please let the jurors know where it
is that you live, just city and state.

A.    Stuart, Florida.

Q.    And back in late 2020 and early 2021, where were you
living?

A.    St. Augustine, Florida.

Q.    And what do you do for a living?

A.    I'm a contractor.

Q.    Do you own any firearms?

A.    I do.

Q.    How many firearms do you own, approximately?

A.    Eight.

Q.    And are any of those AR-15-style firearms?

A.    Yes, they are.

Q.    Is collecting firearms a hobby of yours?

A.    Yes.

Q.    Would you consider yourself an enthusiast?

A.    Yes.

Q.    Are you familiar with an item called the auto key card?

A.    Yes.

Q.    How are you familiar with the auto key card?

A.    I had purchased one online.

Q.    And where did you find out about the auto key card?

1   A.    On YouTube.

2   Q.    And do you recall anything about the particular video that

3   you watched?

4   A.    I remember the name of it and . . .

5   Q.    What was the name?

6   A.    It was something like "Items the ATF Wished Didn't Exist,"

7   something like that.

8   Q.    Do you recall whether it was a particular channel that had

9   published that video?

10  A.    It was.

11  Q.    And what was the name of that channel?

12  A.    I don't remember it exactly.  CRS Firearms, something like

13  that.

14  Q.    And do you recall anything about -- is there a man that's

15  in the video?

16  A.    Yes.

17  Q.    Do you recall anything about him in terms of like physical

18  characteristics, his voice, anything like that?

19  A.    He mostly wore a baseball hat backwards and he had some

20  tribal tattoos on one arm.

21  Q.    And do you recognize in the courtroom today the man who

22  was in the video that you watched?

23  A.    I do.

24  Q.    And could you describe who he is -- what he's wearing,

25  where he's sitting?

1    A.    The gentleman in the pink shirt with the tie and the

2    shaved head.

3    Q.    And is he sitting -- from your --

4    A.    He's sitting in the corner over there behind the table.

5              MS. TAYLOR:  Your Honor, I'd ask the record to

6    reflect that Mr. Wilson has identified Matthew Hoover.

7              MR. LAROSIERE:  Without objection, Your Honor.

8              THE COURT:  The record will so reflect.

9    BY MS. TAYLOR:

10   Q.    And Mr. Wilson, I'm going to pull up Exhibit 2, which is

11   already in evidence.  Do you recall -- the video that you

12   watched that caused you to learn about the auto key card, did

13   you watch the entire video or only part of it?

14   A.    I skimmed through it.  So I didn't watch the whole thing.

15             MS. TAYLOR:  Ms. Ganoe, if you could pull up Exhibit

16   2.

17        (Video played.)

18             MS. TAYLOR:  Pause it.

19        (Video stopped.)

20   BY MS. TAYLOR:

21   Q.    We've paused it at 53 seconds.  Mr. Wilson, do you

22   recognize that video?

23   A.    Yes, I do.

24   Q.    And is that the video that you were describing a moment

25   ago?

1    A.    Yes.

2    Q.    And so you learned about the auto key card through this

3    video, which is Government's Exhibit 2, correct?

4    A.    Yes.

5    Q.    What did you understand the auto key card to be?

6    A.    A metal card that had drawings on it of a lightning link

7    or --

8    Q.    Did you know -- sorry.

9    A.    -- a machine gun part that could make a machine gun -- an

10   AR fire repeatedly with one trigger pull.

11   Q.    And what caused you to come to that understanding of what

12   the auto key card was?

13   A.    I think it basically told me that in the video when I

14   watched it.

15   Q.    And did you know prior to watching this video what a

16   lightning link was?

17   A.    I knew there were devices like that.  I didn't know the

18   name "lightning link."

19   Q.    Would you have been able to recognize the designs on that

20   card as being the etchings for a lightning link?

21   A.    No, absolutely not.

22   Q.    But you were aware in general that devices existed that

23   could convert an AR-15 into a machine gun?

24   A.    Yes.

25   Q.    Mr. Wilson, did you -- after watching this video, did you

1   purchase an auto key card?

2   A.   I did.

3   Q.   Was there any other video that you watched that told you

4   anything about the auto key card prior to your purchase?

5   A.   No.

6   Q.   Was it this video published by CRS Firearms that led you

7   to purchase the auto key card?

8   A.   Yes.

9   Q.   And Mr. Wilson, did you receive an auto key card in the

10  mail?

11  A.   Yes.

12  Q.   And did you ultimately -- what did you end up doing with

13  the auto key card?

14  A.   I put it in the drawer of my desk.

15  Q.   And what were you intending to do with it at the time that

16  you purchased it?

17  A.   I thought about it a little bit, and I thought about

18  giving it to my brother as a Christmas gift.

19  Q.   And did you ever intend to cut it out?

20  A.   No.

21  Q.   Did you -- what did you end up doing with the auto key

22  card that you received?

23  A.   Nothing, until I surrendered it to the ATF.

24  Q.   At some point did agents from the ATF come speak with you?

25  A.   Yes, they did.

1  Q.    And do you recall whether you had a conversation with the
2  agents at the time that they first came and spoke with you?
3  A.    Yes.
4  Q.    And did you -- were the agents respectful to you when they
5  came and spoke with you?
6  A.    Yes.
7  Q.    And you and I have had some conversations preparing you
8  for trial today, correct?
9  A.    Yes.
10  Q.    Have I been respectful to you when I've spoken with you?
11  A.    Yes.
12          MS. TAYLOR:  Your Honor, if I could have just a
13  moment.
14          THE COURT:  You may.
15          MS. TAYLOR:  I have no further questions, Your Honor.
16          THE COURT:  Mr. Larosiere.
17          MR. LAROSIERE:  Yes, Your Honor.
18          MS. TAYLOR:  Actually, Your Honor, if I could have
19  just a moment.
20          THE COURT:  Okay.
21          MS. TAYLOR:  I apologize.
22      (Government's counsel confer.)
23          MS. TAYLOR:  And I am officially done now.  Thank
24  you.
25          THE COURT:  Mr. Larosiere, go right ahead, sir.

1                          CROSS-EXAMINATION

2    BY MR. LAROSIERE:

3    Q.   Mr. Wilson, thank you for your time.

4         You talked about just a moment ago that you had met

5    with attorneys for the government, right?

6    A.   (Nods head.)

7    Q.   Have you ever met me?

8    A.   No.

9    Q.   Do you have any idea what I'm about to ask you?

10   A.   No.

11   Q.   So at the time that agents from the ATF came to speak to

12   you about the auto key card, did they ask whether you had cut

13   it?

14   A.   I don't remember.

15   Q.   That's fine.  When you purchased the auto key card, is it

16   fair to say you believed what you were doing was legal?

17   A.   Yes.

18   Q.   So you've got a handful of firearms, right?  You identify

19   as a firearms enthusiast.  Are you familiar with the National

20   Firearms Act?

21   A.   Yes, somewhat.

22   Q.   Okay.  What types of firearms are regulated by the

23   National Firearms Act?

24   A.   The ones I know of are fully automatic weapons, silencers.

25   That's what I know about.

1    Q.    Okay.  No, that's fair.

2          Have you ever considered buying any NFA-regulated

3    firearms?

4    A.    Yes.

5    Q.    You have.  What were you considering buying?

6    A.    I purchased a silencer.

7    Q.    Okay.

8    A.    Or a suppressor, sorry.

9    Q.    Okay.  What type of suppressor?

10   A.    It's for an AR, 300 Blackout AR.

11   Q.    So given your -- it's fair to say you're a little

12   experienced with dealing with NFA firearms, right?

13   A.    (Nods head.)

14   Q.    Have you ever heard of the concept of indexing?

15   A.    No.

16          MR. LAROSIERE:  Thank you so much.  No further

17   questions.

18          THE COURT:  Mr. King.

19                        CROSS-EXAMINATION

20   MR. KING:

21   Q.    Good morning, Mr. Wilson.

22   A.    Good morning.

23   Q.    One of the things -- I know you're up here answering

24   questions.  And I know with Mr. Larosiere there's a couple

25   times you nodded your head.  And I think everybody in the room

1   understood you to be meaning yes.

2   A.   Okay.

3   Q.   But we have a court reporter right here, and she gets mad

4   at me for talking too fast, but she also gets a little upset

5   when people don't say answers out loud.  So I understood --

6   when you're nodding at me, I completely understand what you're

7   saying, but if you could just answer verbally, "yes," "no," or

8   whatever the answer that is appropriate to the question I ask,

9   okay?

10  A.   Absolutely.

11  Q.   And Mr. Wilson, you're here under a -- you got an immunity

12  letter as well?

13  A.   Yes.

14  Q.   Okay.  Yes.  No, that's fine.

15            And you've told the truth?

16  A.   Yes.

17  Q.   The -- and it's your understanding that pictures of

18  lightning links and all of these devices, those are readily

19  available online --

20  A.   Yes.

21  Q.   -- images, things like that?

22  A.   Yes.

23  Q.   And that's not something that's difficult to come across

24  or illegal, to your knowledge?

25  A.   No.

1    Q.    And when you -- walk me through.  I know you said you had

2    numerous firearms.  You have some AR-15-style firearms.  What

3    else do you what?

4    A.    I have handguns, pistols, revolvers, shotguns.

5    Q.    And when you purchased the auto key card, it was your

6    understanding that it would not even function in the type of

7    AR-15 that you had based upon the video that you saw; is that

8    correct?

9    A.    Yes.

10   Q.    And I asked that in a little convoluted way.

11         So you watched a video with Mr. Hoover in it we've

12   discussed, correct?

13   A.    Yes.

14   Q.    And you were aware as a result of that that the auto key

15   card, if it were to be cut out and machined as discussed, would

16   not work on a lot of AR-15s at all.  Is that your

17   understanding?

18   A.    That is my understanding.  But I can't tell you a hundred

19   percent whether I knew that before or after.  I did more

20   research after the fact, so I don't remember if I knew that

21   before or after.

22   Q.    But if it's in that video, you would have seen that?

23   A.    Yes.

24   Q.    And do you have an AR-15 with an SP1 bolt carrier?  Or did

25   you at the time, is probably a better question.

1   A.   Could you tell me what that is, an SP1 bolt carrier?

2   Q.   I honestly couldn't.  But if -- do you know for a fact

3   that your -- any of your AR-15s have an SP1 bolt carrier, or do

4   you not know?

5   A.   I don't know.

6   Q.   And you said that it was never your intention to cut out

7   or do anything to the auto key card?

8   A.   No.

9   Q.   But you still purchased it?

10  A.   Yes.

11  Q.   You thought it was interesting?

12  A.   Yes.

13  Q.   And you purchased it for yourself at the time --

14  A.   Yes.

15  Q.   -- though you did consider at some point giving it as a

16  gift.  But when you first purchased it, it was for you?

17  A.   Exactly, yes.

18  Q.   And you had no intention of manufacturing --

19       MS. TAYLOR:  Objection, Your Honor.  This is just

20  repeating the witness's testimony.

21       THE COURT:  Next question, Mr. King.

22  BY MR. KING:

23  Q.   And do you have the metal-working skills if you chose to

24  do so to even do that?

25  A.   I'm not sure.

1    Q.    Is that something you would be comfortable even

2    attempting?

3    A.    No.

4    Q.    And it was your understanding that it was a picture of a

5    part and not a machine gun device?

6    A.    Yes.

7              MR. KING:  Your Honor, I have no further questions.

8              Thank you, sir.

9              MS. TAYLOR:  Ms. Taylor.

10                        REDIRECT EXAMINATION

11   BY MS. TAYLOR:

12   Q.    Mr. Wilson, you testified that at the time you purchased

13   the auto key card you believed that it would be legal to own?

14   A.    Yes.

15   Q.    And that was based upon what?

16   A.    Logic and reason.

17   Q.    Did you research what the federal law -- what the statute

18   says about how it defines a machine gun conversion device?

19   A.    No, I didn't.

20   Q.    Was it also based on things that Matt Hoover said in the

21   video that you watched?

22   A.    Yes.

23   Q.    But you didn't do any further research?  You're not --

24   A.    No.

25   Q.    -- a legal expert?

1  A.    No.

2  Q.    And Mr. Wilson, you also never registered the auto key

3  card in the National Firearms Registration and Transfer Record;

4  is that accurate?

5  A.    I did not.

6  Q.    And you stated that you understood at the time that you --

7  well, you didn't believe that it would function with the

8  particular AR-15s that you had?

9  A.    I said that, yes.

10 Q.    And what was the basis for that belief?

11 A.    Again, I'm not sure, if I -- the sequence of, you know,

12 finding out the information, but as I understood it, there were

13 only certain carrier groups or receivers that that type of

14 lightning link would actually work in.  And to my

15 understanding, they were weapons that were made in the '80s.

16 And I don't have any, you know, old firearms like that.

17 Q.    But where did you get that information?

18 A.    Mostly off the internet and may -- off the internet.

19 Q.    Was it also information that Mr. Hoover put in his video,

20 or do you recall?

21 A.    I don't recall.

22 Q.    And Mr. Wilson, you stated -- well, you were asked the

23 question of whether you understood it was a picture of a part

24 and not a device.  Do you recall that?

25 A.    Yes.

1    Q.    And it's not a picture, it's a metal card, correct?

2            MR. KING:  Objection, Your Honor.  Counsel

3    testifying.

4            THE COURT:  Hold --

5            MS. TAYLOR:  I'll rephrase, Your Honor.

6            THE COURT:  Yeah, rephrase.

7    BY MS. TAYLOR:

8    Q.    What you received in the mail was a metal card?

9    A.    Correct.

10   Q.    It was not a photograph, correct?

11   A.    No.

12   Q.    And in the metal card did it have an engraving of a shape?

13   A.    Yes.

14   Q.    And was it your understanding that if you cut along the

15   line of that engraving that it would be a machine gun

16   conversion device?

17   A.    Yes.

18   Q.    Are you aware of whether different kinds of bolt carriers

19   can be purchased in gun stores?

20   A.    Yes.

21   Q.    And can they?

22   A.    Yes.

23   Q.    So if you didn't have the right bolt carrier in your

24   firearm, did you have an understanding that that was a part

25   that you could obtain?

1    A.    I'm not sure if at the time I understood that.

2    Q.    Okay.  And just one other question.  Did I ever tell you

3    or did anyone from the government ever tell you that you could

4    not speak with the defense attorneys if you wished to do so?

5    A.    No.

6               MS. TAYLOR:  No further questions.

7               MR. LAROSIERE:  Nothing further, Your Honor.

8               THE COURT:  Go ahead, Mr. King.

9               MR. KING:  Thank you, Your Honor.  I'll be brief.

10                        RECROSS-EXAMINATION

11   BY MR. KING:

12   Q.    Mr. Wilson, the auto key card that you gave back to the --

13   that you gave to the government, that was -- you'd had it for

14   months by the time that happened?

15   A.    Yes.

16   Q.    And when you returned it, it was completely uncut and

17   unaltered?

18   A.    Correct.

19   Q.    And you made no efforts to cut it or alter it or do

20   anything with it?

21   A.    Correct.

22              MR. KING:  Your Honor, I have no further questions.

23              Thank you, sir.

24              THE COURT:  All right, sir.  You may step down.

25              And Mr. Wilson is released?

1          MR. KING:  Yes, Your Honor.

2          THE COURT:  All right.  You're free to go, sir.

3      (Witness exits the courtroom)

4          MR. MESROBIAN:  The United States calls Richard

5  Roberts, Your Honor.

6      (Witness enters the courtroom.)

7          THE COURT:  Mr. Roberts.

8          THE WITNESS:  Oh, I'm sorry.

9          THE COURT:  You're fine.  I'm going to ask you to

10  come up to the witness stand.  And I'll ask you to remain

11  standing for just a moment to be sworn and then you can take

12  your seats.

13          THE WITNESS:  Okay.  I can't raise my right hand

14  though (indicating).

15          THE COURT:  Okay.  Fair enough.  That's all we'll ask

16  you to do.

17          COURTROOM DEPUTY:  Do you solemnly swear that the

18  testimony you're about to give before this Court will be the

19  truth, the whole truth, and nothing but the truth, so help you

20  God?

21          THE WITNESS:  Yeah, I do.

22          COURTROOM DEPUTY:  All right.  You may have a seat.

23          THE COURT:  That doesn't look like any fun.

24          THE WITNESS:  No.  I had a new shoulder put in and

25  bones in my hands.  It's okay.

1          THE COURT:  All right.

2          COURTROOM DEPUTY:  If you can please state your name

3    for the record and spell your last name.

4          THE WITNESS:  Richard Jerome Roberts, R-o-b-e-r-t-s.

5          THE COURT:  Go ahead, Mr. Mesrobian.

6          **RICHARD ROBERTS, GOVERNMENT WITNESS, SWORN,**

7                        DIRECT EXAMINATION

8    BY MR. MESROBIAN:

9    Q.   Good morning, Mr. Roberts.

10   A.   Hi.

11   Q.   Could you tell the jury the city and state where you live.

12   A.   Quentin Township, Michigan.

13   Q.   And what do you do for a living?

14   A.   I'm into plastics.

15   Q.   And do you own your own company?

16   A.   Yes, I do.

17   Q.   And what type of work does your company do --

18   A.   Actually, the wife does --

19   Q.   -- in plastics?

20   A.   -- but we're in the plastics.

21   Q.   So Mr. Roberts, are you required to be here today pursuant

22   to a subpoena?

23   A.   Yes, sir.

24   Q.   And prior to your testimony today, did the government

25   provide you a letter setting forth terms of immunity?

1    A.    Yes, sir.

2    Q.    Did you -- well, you understand that you just took an oath

3    to tell the truth today?

4    A.    Yes.

5    Q.    Is that your intention to do so?

6    A.    Oh, of course.

7    Q.    Mr. Roberts, do you own any firearms?

8    A.    Yes.

9    Q.    Is hunting or shooting firearms a hobby of yours?

10   A.    Yes, it is.

11   Q.    And what type of activities do you generally engage in?

12   A.    Hunting 90 percent of the time, with grandkids and my

13   kids.

14   Q.    Are you familiar with an item called the auto key card?

15   A.    Yes.

16   Q.    How did you first hear about the auto key card?

17   A.    On a YouTube.

18   Q.    Do you recall the name of the video that you watched?

19   A.    No.  It's with a gentleman that's got a bunch of tattoos.

20   I don't know his name.

21   Q.    Had you watched videos made by this particular person

22   before?

23   A.    Before I --

24   Q.    Before you watched the one where you learned about the

25   auto key card.

1  A.   I don't think so.

2  Q.   How did it -- how did you come to watch that video?

3  A.   It was just on there.  It's, you know, like shooting.  I'm

4  always looking, because I reload, so I'm on there just to

5  improve, to learn more about reloading.  And that's where I,

6  you know, found it.

7  Q.   Do you recall the title of that video?

8  A.   No, sir, I don't.

9  Q.   During that video, do you recall the individual who made

10 the video suggesting what someone could do with the auto key

11 card?

12 A.   Yeah, it turns your gun into automatic.

13 Q.   And do you recall him using any particular terms with

14 respect to converting the AR-15 into a fully automatic gun?

15 A.   No, sir.

16 Q.   Do you recall the term "lightning link" being used?

17 A.   Yeah, but I couldn't -- I thought that was, like,

18 different than the auto key card.

19 Q.   Do you recall if he provided instructions in that video on

20 how to use the auto key card to convert your AR-15 into a

21 machine gun?

22 A.   Yeah, you cut it out and install it.

23 Q.   At the time you watched this video, did you own an

24 AR-15-type rifle?

25 A.   Yes, sir.

1    Q.    How many?

2    A.    Four.

3    Q.    And so after you watched this video, did you purchase an

4    auto key card?

5    A.    Yes.

6    Q.    Why did you buy it?

7    A.    Just to horse around.

8    Q.    And what --

9    A.    You know, just thought it would be neat just to --

10   Q.    And when you say "horse around," what do you mean?

11   A.    Shooting, you know.  In shooting, just --

12   Q.    Did you intend to use the auto key card to convert your --

13   an AR-15 to be fully automatic?

14   A.    Yes.

15   Q.    And horse around, as you said?

16   A.    And horse around, yes.

17   Q.    How did you make that purchase?

18   A.    I don't know.  I bought it off another gentleman's site,

19   whoever sells it.

20   Q.    Do you recall there being different types or models of

21   auto key cards to choose from?

22   A.    Yes.  I think there was like two or three different ones.

23   Q.    And do you recall which model you purchased?

24   A.    A can opener or something like that it's called.

25   Q.    Do you recall how many lightning links or conversion

1   devices were on the card that you bought?

2   A.   I think three.

3   Q.   And you understood that -- at the time that there were

4   three of these devices engraved into this card?

5   A.   Yes, sir.

6   Q.   So did you make that purchase on or about January 13th,

7   2021?

8   A.   I don't know.  I'd have to look.

9   Q.   Ultimately, did you receive the auto key card that you

10  purchased?

11  A.   Yes, sir.

12          MR. MESROBIAN:  And Your Honor, I'd like to publish

13  at this point what is already in evidence as Government's

14  Exhibit 67AAA.

15          THE COURT:  Go ahead.

16          MR. MESROBIAN:  And if we could go down to page 2.

17          THE WITNESS:  Oh, boy.

18          MR. MESROBIAN:  And we'll focus on . . .

19          THE WITNESS:  Oh, that helps.

20  BY MR. MESROBIAN:

21  Q.   So on page 2 --

22  A.   I'm sorry.

23  Q.   -- there's what appears to be an Order Summary; is that

24  right?

25  A.   Oh, "bottle opener" it says.  Sorry.

1    Q.    So underneath Order Summary it says "Auto Key Card 3 in 1

2    with Bottle Opener, $99"; is that right?

3    A.    Yes, sir.

4    Q.    And do you recall that to be the item that you purchased?

5    A.    Yes, sir.

6              MR. MESROBIAN:  If we could zoom out, Ms. Ganoe.

7    Actually . . .

8    BY MR. MESROBIAN:

9    Q.    And there, right beneath Order Summary, it says Order 2637

10   placed on January 13th, 2021.  Does that sound like

11   approximately the date that you ordered the auto key card?

12   A.    Yeah, if that's mine, that's -- that's it.

13             MR. MESROBIAN:  If we could go to page 1, please.

14   BY MR. MESROBIAN:

15   Q.    The heading of that email is an -- it's from

16   autokeycards.com and it's addressed to Rick Roberts on

17   January 13th, 2021; is that right?

18   A.    Yes, sir.

19             MR. MESROBIAN:  If we can go to the email above that.

20   BY MR. MESROBIAN:

21   Q.    And on February 8th, 2021, there's an email above that

22   where Rick Roberts wrote, "Hi.  Can you tell me when this was

23   delivered?  Rick."

24             Did I read that right?

25   A.    Yes, but I -- I use the name "Rick."

1    Q.    And so do you recall sending this email inquiring about

2    your delivery?

3    A.    I believe so, yeah.

4            MR. MESROBIAN:   Ms. Ganoe, could you go up to the

5    next email.

6    BY MR. MESROBIAN:

7    Q.    And also on February 8th, 2021,

8    customerservice@autokeycard replied to you, "Hi, Rick.   Thank

9    you for your purchase and for contacting us.   We are sorry to

10   hear you have not received your order yet.   I checked the

11   tracking for your order and USPS shows it as still in transit.

12   It seems your order is lost.   We will send you a replacement

13   order asap.   Thank you for your patience while we make this

14   right.   Sincerely, Autokeycard.com."

15           Did I read that correctly?

16   A.    Yeah, yes.

17   Q.    Did you ultimately receive --

18   A.    Yeah.

19   Q.    -- the auto key card?

20   A.    Yes, sir.

21   Q.    And I'll just ask that you wait until I finish the

22   question --

23   A.    Oh, I'm sorry.

24   Q.    -- just so the court reporter doesn't have any -- that's

25   fine.

1           You did receive an auto key card ultimately?
2    A.   Yes.
3           MR. MESROBIAN:  Ms. Ganoe, can we go to the top
4    email.
5    BY MR. MESROBIAN:
6    Q.   So this is an email reply from Rick Roberts, which is you;
7    is that right?
8    A.   Yes, sir.
9    Q.   To Customer Service on February 19th, 2021, at 1:35 p.m.,
10   correct?
11   A.   Yes.
12   Q.   And you wrote, "Hi.  I cut the part out of your, quote,
13   can opener, unquote, but it will not allow me to run automatic.
14   I own a tooling shop, so I cut it right to your line.  It will
15   allow me to shot [verbatim] one shell and it will load the next
16   but not fire unless I release the trigger.  I'm using a S&W
17   AR-15 Sport Two.  I tried it in two different AR-15s.  Am I
18   doing something wrong?"  And it's signed "Rick."
19           Do you recall sending that email?
20   A.   Yes.
21   Q.   What happened prior to your sending this email?
22   A.   Well, my brother lives up in the Thumb area and I was at
23   his place.  And guys were shooting automatic rifles down a
24   desolate road.  And I -- when I left, I thought, wow, that's
25   strange.  So I pulled in, talked to those guys about what they

1    were doing.  And they had what looked like the same thing and

2    he said it wouldn't --

3    Q.    When you say it "looked like the same thing," what did it

4    look like?

5    A.    That design, that cutout on that metal.

6    Q.    The lightning link on the auto key card?

7    A.    Yes.

8          So he said it wouldn't work in their guns and I could

9    have it.

10         So I took it back.  And even though I didn't cut his

11   out, I cut that out to match the line in that piece that I

12   bought from him, and it still wouldn't work.

13   Q.    So you wrote in the first sentence here, "I cut the part

14   out of your can opener but it will not allow me to run

15   automatic."

16         Are you talking about the lightning link inside the

17   auto key card?

18   A.    Yeah, that's where I got -- I messed up and said "can

19   opener."  Bottle opener or something.

20   Q.    And then you stated, "I own a tooling shop so I cut it

21   right to your line."

22         Did you cut it or did someone else cut it?

23   A.    No, it was already cut.  But then I thought, well, gee,

24   maybe it's just not right.  So I filed it to match the one

25   that's on that 3 in 1 or whatever you call it so that it

1  matched the lines.

2  Q.   And you then state a little bit later, "I'm using a S&W

3  AR-15 Sport Two."

4            What is that?

5  A.   That's the AR-15.  A gun.

6  Q.   Did you attempt to install the lightning link into the S&W

7  AR-15 Sport Two?

8  A.   Yes, sir.

9  Q.   And did it work or did it not?

10  A.   No.

11  Q.   How familiar were you or are you now with the internal

12  parts of an AR-15?

13  A.   I'm not.

14  Q.   Do you know what an SP1 bolt carrier is?

15  A.   Not at all.

16  Q.   Do you know what a high shelf versus a low shelf is?

17  A.   No, not at all.

18  Q.   And to be clear, Mr. Roberts, did you ever cut a lightning

19  link out of the auto key card that you purchased?

20  A.   No.

21  Q.   What did you do with your auto key card?

22  A.   Well, when I didn't get any response back for help, I then

23  went back on the YouTube to see if I was doing something wrong,

24  and that's when I learned that they were illegal.

25  Q.   When you say you went to learn if you were doing something

1   wrong, what do you mean?

2   A.   Well, I didn't know -- like maybe you had to bend it or

3   round off a corner, sharpen an edge or something.

4   Q.   So you were looking for additional instructions --

5   A.   Sure, yeah.

6   Q.   -- on how to convert your AR-15?

7   A.   Yes.

8   Q.   So after you found out that the auto key card was

9   purportedly illegal, what did you do?

10  A.   Well, before that I had sent a couple emails saying,

11  "Could you help me," or like -- whatever, "Can you help me?"

12          When I got nothing, I went on YouTube.  That's when I

13  found out they were illegal.  That's when I sent him another

14  email that says, "Don't call me back," or email me, something

15  like that, "I found out they're illegal."  And I literally cut

16  it up --

17          JUROR:  (Sneezes.)

18          THE WITNESS:  God bless you.

19          JUROR:  Thank you.

20  A.   -- I literally cut it up and threw it out the window into

21  a county ditch in little pieces.

22  Q.   Subsequently ATF agents came to your house, correct?

23  A.   Yes.

24  Q.   And did they interview you about the auto key card that

25  you had purchased?

1    A.    Yes.

2    Q.    Did they take anything of yours when they left your house?

3    A.    Yes.

4    Q.    What was that?

5    A.    My gun.

6    Q.    Is that the AR-15 you attempted to convert?

7    A.    Yes, sir.

8            MR. MESROBIAN:  May I have one moment, Your Honor?

9            THE COURT:  You may.

10   BY MR. MESROBIAN:

11   Q.    Mr. Roberts, are you familiar with the process of how to

12   register a firearm under the National Firearms Act?

13   A.    No.  Normally if I buy like a shotgun, you know, I buy it

14   from a dealer who's, you know, been there forever by me.  And

15   then we have to fill out the paperwork, he does background

16   checks.

17           And then the AR-15s I bought on a site -- I forget

18   the name of the site, but then it's got to go to an FFL, I

19   think they call them.

20   Q.    So I'm speaking specifically about an NFA firearm; as an

21   example, a silencer or a machine gun or a machine gun

22   conversion device.

23   A.    No, sir, I have no idea.

24   Q.    Have you ever owned one of those types of things?

25   A.    No, sir.

1   Q.   Did you register the auto key card with the ATF pursuant
2   to the NFA?
3   A.   Oh, no.  I didn't know you had to.
4            MR. MESROBIAN:  Okay.  No further questions, Your
5   Honor.
6            THE COURT:  Mr. Larosiere.
7                         CROSS-EXAMINATION
8   BY MR. LAROSIERE:
9   Q.   Good morning, Mr. Roberts.  So is it accurate that you
10  work in tool and die?
11  A.   Yes.  I've been in the injection mold building for
12  50 years.
13  Q.   That's a pretty high precision industry, injection
14  molding, right?
15  A.   Yes, it is.
16  Q.   So when you looked at the auto key card, the single piece
17  of steel, that line on there is pretty wide, right?  Maybe
18  40-thou?
19  A.   Yes.
20  Q.   That's thousandths of an inch?
21  A.   Yeah.
22            Your hair's about three-thousandths of an inch.
23  Q.   Right.  So it's like a -- in terms of thickness, that
24  would be like about an eighth inch, so like a Sharpie line,
25  something like that?

1  A.    No.  40-thousandths is less than a 16th of an inch.  16th
2  of an inch is .062.
3  Q.    So just in terms of like a common thing, would you say
4  it's like a Sharpie line?
5  A.    Yeah.  A light one, yeah.
6  Q.    So when you said you did it exactly to the line, did you
7  mean the outer edge of the line, the inner edge of the line,
8  the dead center?
9  A.    Well, I took what was there first and brought it to the
10 outside.  Some of them they had already cut past that, but I
11 took it to the outside.  That didn't work.  So then I tried to
12 the inside to get rid of the laser line -- I think it's
13 lasered -- and it still didn't work.
14 Q.    So it's fair to say you didn't know which dimension would
15 have been the right one, right, whether it be outside, inside,
16 or center?
17 A.    No, sir.
18 Q.    And when ATF agents came to talk to you, is it fair to say
19 they focused pretty heavily on whether you had cut out the
20 device?
21 A.    I don't know.  They had a lot of questions and I tried
22 answering everything.
23 Q.    But they did ask you if you had cut it out?
24 A.    Yes, sir.
25 Q.    And just, again, trying on the outside of the line or on

1   the inside of the line, you didn't successfully get it to fire?

2   A.   No, sir.

3        MR. LAROSIERE:  Nothing further.  Thank you so much.

4        THE COURT:  Mr. King.

5                    CROSS-EXAMINATION

6   BY MR. KING:

7   Q.   Mr. Roberts, good morning.

8   A.   Good morning, sir.

9   Q.   My understanding is you're here with an immunity letter.

10  So the government has given you immunity, whereas if you

11  testify to what they believe to be truthful, you will not get

12  prosecuted for any crimes that you've committed that you're

13  testifying about here.  Is that your understanding?

14  A.   That's my understanding, yes.

15  Q.   And my understanding is you tried to create a machine gun

16  yourself?

17  A.   Yes.

18  Q.   And you know that's illegal?

19  A.   No.  At that time I didn't know that turning that gun into

20  automatic was illegal.

21  Q.   I want to talk to you because I want to clarify, because I

22  wasn't quite sure.  There were some gentlemen that you said

23  were out in the woods or by a lake?  Do you know what I'm

24  talking about?

25  A.   Yes, sir.

1   Q.   And there were, what, three, four gentlemen?

2   A.   Something -- I don't know.  There was more than two or

3   three out there, so . . .

4   Q.   And they were shooting weapons --

5   A.   Yes.

6   Q.   -- when you came across them, correct?  Do I have that

7   correct?

8   A.   Yeah.  It's like DNR says that you can hunt or fish out of

9   there, and that's where they were at.  I don't know what they

10  call that.

11  Q.   Okay.  But there was a handful of gentlemen?

12  A.   (Nods head.)

13  Q.   And they were firing weapons, correct?

14  A.   Yes.

15  Q.   And those were automatic weapons from what you could tell?

16  A.   Some of them were, yeah.  They were actually shooting beer

17  bottles, which I thought was kind of stupid, but . . .

18  Q.   All right.  So you're watching them and they are using

19  automatic weapons?

20  A.   (Nods head.)

21  Q.   Is that correct?  I see you nodding your head.  I know you

22  mean yes, but we have a court reporter.

23  A.   Yes, yes.  Some of them were, yes.

24  Q.   Okay.  And one or more of them, without getting into what

25  they said, discussed the auto key card device?

1   A.   Well, when they were shooting they told me they modified

2   it.  Because I stopped in just to talk to them because they're

3   by my brother's.  And that's when they told me that they were

4   using that.  I said, "Hey, I just bought one of them."  And he

5   said, "Well, here, you can take these.  They don't work in our

6   guns."

7   Q.   So they had something that was already cut out, correct?

8   A.   Yes.

9   Q.   And it didn't -- and from your understanding of that

10  situation, they said, "This does not work.  This does not

11  function"?

12  A.   Yes.

13  Q.   And you took it to see if you could get it to function?

14  A.   Yes.

15  Q.   And you tried several different ways?

16              JUROR:  (Sneezes.)

17              THE WITNESS:  Bless you.

18  A.   Yes.

19  Q.   And you were also unsuccessful?

20  A.   Yes, sir.

21  Q.   And you sent an email to Auto Key Card.

22              MR. KING:  And Ms. Ganoe, can we pull up 67AAA.

23  BY MR. KING:

24  Q.   And before we get into this, the -- you said you --

25  before -- you had your conversation with the agents and you

1    told them you tried to make a machine gun essentially; is that

2    fair?

3    A.    Yes.

4    Q.    And you told them that before you had the immunity that

5    you now have, correct?

6    A.    Yeah.   They asked questions, I answered them.

7    Q.    Okay.   I just want to make sure I understand the order of

8    operations.

9    A.    Sure.

10   Q.    So you tell government agents, "Yeah, I tried to make a

11   machine gun," and then you get the immunity later, correct?

12   A.    Yes.

13   Q.    Okay.   In terms of the email, you fired off --

14           MR. KING:   Ms. Ganoe, if we could go to the bottom

15   half of the page.   Perfect.

16   BY MR. KING:

17   Q.    You remember this, going over this with Mr. Mesrobian?

18   A.    Yes, sir.

19   Q.    So you fired off an email at 4:39 asking about a delivery,

20   and you got a response not that minute, but pretty immediately?

21           Correct?

22   A.    Yeah, like three hours later or something.

23   Q.    Okay.   And when you --

24           MR. KING:   Thank you, Ms. Ganoe.   If we can get that

25   top email.

1    BY MR. KING:

2    Q.    And Mr. Roberts, so you also sent a follow-up email about

3    trying to make a machine gun, and you received no response at

4    all?

5    A.    No response.

6    Q.    And you know that email works because you emailed them and

7    they emailed you right back before, correct?

8    A.    Yes.

9    Q.    And you got no help or assistance in trying to manufacture

10   an illegal machine gun, correct?

11   A.    No, I didn't get a response.  I was asking, "Am I doing

12   something wrong," or, "Can you help me," and I didn't get a

13   response.

14   Q.    And you said that you saw a video that said it was

15   illegal.  Is that the CRS Firearms video where you were told

16   that Mr. Ervin had been arrested?

17   A.    At that time I didn't know.  All I know is when I looked,

18   it was -- somebody had said those things are illegal.  And then

19   I'm like, oh, no.  And then I went to another one to look and

20   the second one said they're illegal.  And I was in the garage

21   cutting it up.

22   Q.    So that was based on something else you had seen on the

23   internet?

24   A.    Yes.

25   Q.    And at the time you purchased this, even though you -- so

1   how many firearms do you own exactly?

2   A.   I don't know.  Honestly, I don't know.  I get them for the

3   kids and grandkids.

4   Q.   Sure.  A ball park, are we talking 3 or 4, 15 to 20, 200?

5   I mean --

6   A.   Oh, no, no.  You're in that, you know, 12, 16 range with

7   all the grandkids and everything, yes.

8   Q.   Okay.  At the time you purchased the auto key card, you

9   said you did not believe it was unlawful or illegal in any sort

10  of way?

11  A.   Oh, no.  I wouldn't have bought it if I knew it was.

12  Q.   And the only thing that makes you -- leads you to believe

13  that is either conversations with ATF or a video on the

14  internet?

15  A.   I mean, I -- yeah, I found out it was illegal on the

16  internet.  And then when they came to my house, naturally then

17  I knew it was because they were knocking on the door.

18              MR. KING:  Your Honor, if I could have a moment.

19              THE COURT:  You may.

20              MR. KING:  Your Honor, I have no further questions

21  for Mr. Roberts.

22              Thank you, sir.

23              THE WITNESS:  You're welcome.

24              THE COURT:  Mr. Mesrobian.

25              MR. MESROBIAN:  Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. MESROBIAN:

Q.   So Mr. Roberts, you were asked some questions about when you attempted to convert the S&W AR-15 into a machine gun.  Do you recall that?  Just now.

A.   Yes.

Q.   You don't know why it didn't function -- or why the lightning link didn't function in your AR-15, do you?

A.   No, not at all.

Q.   It could have been something related to your bolt carrier group; it could have been related to something else?

A.   Okay.  Whatever the bolt carrier is, if that's the thing that goes in, then could be.

Q.   Because I believe, as you've testified previously, you're not particularly familiar with the inner parts of the AR-15?

A.   No.  I'm -- I know shotguns.

Q.   Nevertheless, you know, as you testified before, it was your intent when you purchased the auto key card to convert and have fun --

A.   Yes, sir.

Q.   -- with the fully automatic fire?

A.   Yes, sir.

         MR. MESROBIAN:  No further questions, Your Honor.

         THE COURT:  Anything further?

         MR. KING:  No, Your Honor.

```
 1              MR. LAROSIERE:  No, Your Honor.
 2              THE COURT:  All right, sir.  You may step down.
 3              THE WITNESS:  Do I need to stay here?
 4              MR. KING:  No, Your Honor.
 5              THE COURT:  No, sir.  You're released.  You can go
 6    home.
 7              THE WITNESS:  So I can go home?
 8              THE COURT:  Yes, sir.
 9              THE WITNESS:  Thank God.  So I can get some sleep.
10              THE COURT:  Although I suspect our weather is
11    prettier, though.
12              THE WITNESS:  Oh, yes.  Have a nice day.
13              THE COURT:  Next witness.
14              MR. MESROBIAN:  Your Honor, the United States calls
15    Randy Willis.
16         (Witness exits the courtroom.)
17         (Witness enters the courtroom.)
18              THE COURT:  Sir, if you'll come right up here and
19    remain standing.
20              COURTROOM DEPUTY:  Please raise your right hand.  Do
21    you solemnly swear that the testimony you're about to give
22    before this Court will be the truth, the whole truth, and
23    nothing but the truth, so help you God?
24              THE WITNESS:  I do.
25              COURTROOM DEPUTY:  You may have a seat.  And if you
```

1   could please state your name for the record and spell your last

2   name.

3            THE WITNESS:  Randy Lee Willis, W-i-l-l-i-s.

4            THE COURT:  Mr. Willis, I'm going to ask you to pull

5   your chair as close as you can to that microphone.  And I'll

6   ask you to try to keep your voice up, okay?

7            All right, go ahead, Ms. Taylor -- Mr. Mesrobian,

8   sorry.

9            MR. MESROBIAN:  No problem, Your Honor.

10           **RANDY LEE WILLIS**, **GOVERNMENT WITNESS**, **SWORN**,

11                    DIRECT EXAMINATION

12  BY MR. MESROBIAN:

13  Q.   Mr. Willis, could you tell the jury the city and state

14  where you live?

15  A.   Flat Rock, Michigan.

16  Q.   And what do you do for a living, sir?

17  A.   I work for the county.  Public service works.  I drive,

18  fix roads.

19  Q.   So Mr. Willis, are you required to be here to testify

20  pursuant to a subpoena today?

21  A.   Yes, sir.

22  Q.   And prior to trial, did the United States provide you with

23  a letter setting forth certain terms of immunity?

24  A.   No.

25  Q.   Do you understand that you took an oath to tell the truth

1  today?

2  A.    Yes.

3  Q.    Is that your intention today?

4  A.    Yes, sir.

5  Q.    So Mr. Willis, do you own any firearms?

6  A.    I do.

7  Q.    Is shooting or hunting an interest of yours?

8  A.    Both.

9  Q.    Are you familiar with an item called the auto key card?

10  A.    I am.

11  Q.    How did you first hear about the auto key card?

12  A.    From a YouTube video.

13  Q.    Do you recall the name of that video?

14  A.    I do not recall the exact video.  My attorney provided

15  some videos that -- that I had seen.

16  Q.    And what channel were those videos from?

17  A.    I don't --

18  Q.    I'll ask another question.

19        Are you familiar with the YouTube channel CRS

20  Firearms?

21  A.    Right, correct, yes.

22  Q.    Have you seen videos on that channel before?

23  A.    Yes, sir.

24  Q.    Is that the channel from whom you learned about the auto

25  key card?

1   A.   Yes.

2          MR. MESROBIAN:  Ms. Ganoe, could we publish

3   Government Exhibit 2, beginning at approximately 42 --

4   45 seconds in.  45 seconds in.

5        (Video played.)

6        (Video stopped.)

7   BY MR. MESROBIAN:

8   Q.   Mr. Willis, does that video look familiar to you?

9   A.   Correct, yes.

10  Q.   Is that the video that you saw where you learned about the

11  auto key card?

12  A.   That is.

13  Q.   How long after you saw this video did you purchase an auto

14  key card?

15  A.   I don't know exact date.  I would say within a month.

16  Q.   Did you watch this entire video at the time you saw it?

17  A.   I don't -- I don't believe I watched the whole . . .

18  Q.   Well, do you recall in the video a discussion of what an

19  auto key card could do to an AR-15?

20  A.   I did not.  Previously I've heard of it.

21  Q.   When you say "previously I've heard of it," what do you

22  mean?

23  A.   Some older gentleman I work with had mentioned it

24  previously.

25  Q.   "Had mentioned it" referring --

1   A.   A lightning link.

2   Q.   And so you understood that the auto key card contained a

3   lightning link?

4   A.   A picture of, yes.

5   Q.   And did you have an understanding of what a lightning link

6   could do to an AR-15?

7   A.   Yes, sir.

8   Q.   And what's that?

9   A.   It could potentially make it a full -- full auto.

10  Q.   At the time you watched this video, did you own an AR-15?

11  A.   I'll say yes, but I'm not positive if at that time I did.

12  Q.   And then you did purchase an auto key card, correct?

13  A.   Yes.

14  Q.   How did you make that purchase?

15  A.   Through a card.

16  Q.   But did you go online?  Did you send in something by mail?

17  How did you make the purchase?

18  A.   Online.

19        MR. MESROBIAN:  Ms. Ganoe, could we now publish

20  what's already in evidence as Government Exhibit 89F.

21  BY MR. MESROBIAN:

22  Q.   So here, Mr. Willis, I'm showing you what's in evidence as

23  Government Exhibit 89F.  And does this appear to be an order

24  confirmation from autokeycards.com?

25  A.   Yes, sir.

1  Q.   And it says here Order Number 2694 placed January 17th,

2  2021; is that right?

3  A.   Correct.

4  Q.   And then down there it says billed to Randy Willis in Flat

5  Rock, Michigan; is that right?

6  A.   Yes, sir.

7  Q.   And that's the same shipping address, but your street

8  address has been redacted; is that right?

9  A.   Yes.

10 Q.   Is that you?

11 A.   Yes, it is.

12 Q.   And does that sound like approximately the day and time

13 that you ordered this item?

14 A.   Yes, sir.

15        MR. MESROBIAN:  If we could go further down,

16 Ms. Ganoe.

17 BY MR. MESROBIAN:

18 Q.   And here's the Order Summary section.  It specified the

19 item that you purchased was Auto Key Card 2 in 1 Pen Holder

20 Edition; is that right?

21 A.   Yes, sir.

22 Q.   And the price you paid for it was $109?

23 A.   Correct.

24 Q.   Was there a particular reason that you chose the Auto Key

25 Card 2 in 1 Pen Holder Edition?

1   A.   No specific.

2   Q.   Did you understand what "2 in 1" meant in terms of what

3   was on --

4   A.   Yes.

5   Q.   -- the auto key card?

6   A.   Yes.

7   Q.   And what was that?

8   A.   Two, 2 in 1.

9   Q.   Well, two --

10   A.   Two --

11   Q.   -- lightning links?

12   A.   Yes, sir.

13   Q.   Did you receive the 2 in 1 auto key card you ordered?

14   A.   I did.

15   Q.   And what did you intend to do with it after you received

16   it?

17   A.   Nothing.  Just something to -- like a novelty

18   conversation.

19   Q.   And where is your auto key card now?

20   A.   In possession of Mr. Hooker.

21   Q.   You surrendered it to the ATF?

22   A.   Correct.

23   Q.   And I just want to go back to something that we were

24   talking about at the beginning of your testimony.  Prior to

25   meeting with us -- prior to trial you met with the United

1    States to discuss your testimony; is that right?

2    A.    Correct.

3    Q.    During that meeting do you recall reviewing a document in

4    which you were advised that your testimony would not be used

5    against you in some sort of future prosecution if you testified

6    truthfully?

7    A.    I don't -- I don't recall the deal.  I had an attorney,

8    so . . .

9    Q.    And I understand that, sir, but just to be clear, you

10   understand you took an oath to tell the truth, correct?

11   A.    Correct.

12   Q.    And have you told the truth today?

13   A.    Yes, sir.

14         MR. MESROBIAN:  No further questions, Your Honor.

15         THE COURT:  Mr. Larosiere?

16         MR. LAROSIERE:  Yes, Your Honor.

17         May it please the Court.

18         THE COURT:  Go ahead.

19                        CROSS-EXAMINATION

20   BY MR. LAROSIERE:

21   Q.    Mr. Willis, so you met with agents from the ATF around

22   June 1st, '21, right?

23   A.    Correct.

24   Q.    Are any of the people -- the agents of the ATF that you

25   met that day here in this courtroom?

1   A.   One.

2   Q.   Is he the gentleman with the very full beard here in the

3   center of the prosecution table?

4   A.   Correct.

5   Q.   Okay.  And when they approached you, the gentlemen from

6   the ATF, asking about the auto key card, is it true that you

7   immediately responded with, "The novelty?"

8   A.   I don't believe that was my immediate response.  Initially

9   I was not completely honest.  After speaking with my attorney

10  we were able to get -- get the item and make sure it got turned

11  in.

12  Q.   No, I understand that.  But is it true that when you

13  purchased the auto key card, you did not believe it was

14  unlawful?

15  A.   Correct.

16  Q.   You believed it was a drawing, right?  Just a novelty,

17  right?

18  A.   Correct.

19  Q.   And you told the government that you bought it as a gift

20  for Goose, right?

21  A.   Right.

22  Q.   And like you talked about, that wasn't exactly the truth,

23  right?

24  A.   Right.

25  Q.   But you worked that out with the government, presumably?

1    A.    Right.

2              MR. MESROBIAN:  Objection, Your Honor.

3              THE COURT:  I'm going to sustain the objection and

4    just ask you to rephrase.

5              But, sir, can I ask you to keep your voice up a

6    little bit?

7              Okay.  Rephrase your question, please, Mr. Larosiere.

8    BY MR. LAROSIERE:

9    Q.    But that's not what we're dealing with right now --

10   A.    Right.

11   Q.    -- those previous statements?

12             THE COURT:  Mr. Larosiere, I don't know what you

13   mean.

14             MR. LAROSIERE:  I'll move on.  That's fine.

15             THE COURT:  Okay.

16   BY MR. LAROSIERE:

17   Q.    Do you recall at one point during your initial discussion

18   with Agent Slosson stating, "Do I understand that drawings are

19   now machine guns?"

20   A.    Is that a question?  Are you saying did that come up?  Was

21   that said to me?  Did I say --

22   Q.    Let me try --

23   A.    I'm not . . .

24   Q.    So after being told that the ATF was of the opinion that

25   the auto key card, which you purchased as a novelty gift, was a

1    machine gun --

2         MR. MESROBIAN:  Objection, Your Honor.  May we

3    approach?

4         THE COURT:  You may.

5       (Proceedings at sidebar:)

6         THE COURT:  Go ahead.

7         MR. MESROBIAN:  I was just waiting for Mr. King.

8         THE COURT:  Oh, sorry.

9         MR. MESROBIAN:  Your Honor, I object at this point on

10   the same grounds that Ms. Taylor objected, because this is not

11   anything about any sort of, you know, purported interest in why

12   this witness might want to help the United States.  This is now

13   attempting to introduce statements that he made during his

14   interview which have nothing to do with anything along those

15   lines and are not being offered for the effect on the listener.

16   It's witness's prior statements.

17        MR. LAROSIERE:  This is -- sorry.

18        THE COURT:  Go ahead.

19        MR. LAROSIERE:  This is the witness's own statement

20   reflecting his state of mind when he purchased the auto key

21   card, before he spoke to the government, which I think is

22   really relevant.

23        So would you like me to articulate my theory of

24   relevance?

25        THE COURT:  Well, you're offering his out-of-court

1    statement to prove what?

2          MR. LAROSIERE:  His state of mind at two different

3    points.  One, at the point where he purchased the auto key

4    card.  And then two is here when he's testifying.

5          He believed that it was legal when he purchased it,

6    and that -- and then here he's been told repeatedly that he is

7    not -- he is aware that he's in great jeopardy, not for the

8    same reasons as last time, right.  There was a flip.  And that

9    flip is what would cause his testimony to change, or his

10   motivations to change.

11         THE COURT:  Mr. Mesrobian.

12         MR. MESROBIAN:  Your Honor, I don't think that's an

13   accurate characterization of his testimony.  If this were a

14   prior inconsistent statement that would be one thing, but he

15   has already testified that he viewed this item as a novelty, he

16   was aware there were lightning links drawn or engraved on it,

17   whatever you would like to say.  But there is no basis to

18   introduce what he said or purported quotes of what he said.

19         They can ask the question about straight up what he

20   believed it to be at the time, but you can't -- I do object to

21   reading in a purported transcript of his interview.  That's not

22   inconsistent -- or it would -- there's no basis for that.

23         MR. LAROSIERE:  I do believe that the door may have

24   been opened slightly by Mr. Mesrobian, who, after getting

25   answers it seems to me he did not like, kept rephrasing.  After

1  he was told it was a drawing, he finally landed on

2  "contains" --

3          THE COURT:  Lower your voice, Mr. Larosiere.

4          MR. LAROSIERE:  I'm so sorry.

5          -- finally landed on "contains a lightning link," and

6  I feel like that's somewhat misleading.  He said two or three

7  different times, "It's a drawing, it's a drawing."  And then

8  Mr. Mesrobian finally said, "Contains a lightning link,"

9  suggesting -- does that make sense?

10         THE COURT:  Not really, but the point is that the

11 specific statement that you're trying to bring into evidence --

12 you're trying to use his out-of-court statement to prove his

13 state of mind, is what you've said.  But you're proving his

14 state of mind at the time that he spoke to the agents as

15 opposed to when he purchased the lightning link, which is

16 what's relevant.

17         So I think you can rephrase.  You may end up at the

18 same place, but I don't think you should be purporting to read

19 from his interview.

20         MR. LAROSIERE:  Okay.  And I think he did already

21 specifically say his state of mind when he purchased, I

22 believe, so I can just move on.

23         MR. MESROBIAN:  Your Honor, just -- should we be

24 prepared to take lunch after this witness is concluded or --

25         THE COURT:  It may be before the witness is

 1   concluded.  We'll probably stop around 12:30.

 2           MR. MESROBIAN:  Just for advising witnesses so that

 3   they can go get lunch.

 4           MR. LAROSIERE:  And I don't have much more.

 5           THE COURT:  Okay.  Well, we'll stop after this --

 6   we'll either interrupt this witness or we'll stop after this

 7   witness but we won't have another witness before lunch.

 8           MR. MESROBIAN:  Thank you, Your Honor.

 9           MR. LAROSIERE:  Thank you, Your Honor.

10       (Proceedings in open court:)

11           THE COURT:  Go ahead, sir.

12   BY MR. LAROSIERE:

13   Q.   I forgot exactly where we left off, but to put a cap on

14   it, you indicated that when you purchased the auto key card,

15   you didn't think there was anything legally wrong with it?

16   A.   Correct.

17   Q.   Okay.  Thank you.

18           Were you nervous during your interview with the ATF?

19   A.   I was, as I assume most people would be.

20   Q.   So they told you that there would be two ways you could

21   get into trouble, right?

22   A.   I don't know if I recall that exactly being said.

23   Q.   Do you recall hearing, "There's two ways the people who

24   bought the auto key card are going to get into trouble"?

25           MR. MESROBIAN:  Your Honor, I object.  He already

1    said he didn't recall.

2            THE COURT:  Sustained.

3            MR. LAROSIERE:  Oh, okay.

4    BY MR. LAROSIERE:

5    Q.   Do you recall hearing that one could get into trouble if

6    they cut this out and put it in a gun?

7    A.   I do.

8    Q.   Do you recall hearing that one could get into trouble if

9    they make up a story about not having it?

10   A.   Yes.

11   Q.   And when you spoke to agents with the ATF the second time,

12   you talked about some videos you had watched?

13   A.   I did not.  My lawyer spoke --

14   Q.   So that was --

15   A.   -- spoke with them.  I was --

16   Q.   That was all through your lawyer?

17   A.   (Nods head.)

18   Q.   Okay.

19           MR. LAROSIERE:  Nothing further.  Thank you so much.

20           THE COURT:  Go ahead, Mr. King.

21                        CROSS-EXAMINATION

22   BY MR. KING:

23   Q.   Good afternoon, Mr. Willis.  One of the things -- I know

24   you're a little soft spoken, but we do have a court reporter.

25   So if there's a yes or no -- I see you nodding your head.  If

1    you'd just answer out loud, if that's okay.  And if there's

2    something I ask --

3    A.    Yes.

4    Q.    That's much better.

5          And if there's something I'm asking you that you

6    don't understand or I can clarify, please let me know and I

7    will do so, okay?

8    A.    Yes, sir.

9    Q.    When you purchased this, was it your understanding that if

10   it was able to -- if a card was able to be punched out, if you

11   could push out a lightning link, that that would be illegal?

12   A.    Yes.

13   Q.    And you shared that with this agent?

14   A.    I don't recall.

15   Q.    And to be clear -- we've discussed it a little bit -- you

16   talked to several people about this with the government, one of

17   them being Agent Slosson.  Do you recognize him here in court

18   today?

19   A.    Yeah.  I apologize, I got the name off earlier.

20   Q.    Could you please point to him and identify him with a

21   physical description?

22   A.    Agent Slosson, full beard, in the middle.

23          MR. KING:  Your Honor, could the record reflect the

24   witness identified Agent Slosson?

25          MR. MESROBIAN:  Sure.  No objection, Your Honor.

1          THE COURT:  The record will so reflect.

2     BY MR. KING:

3     Q.    And the two statements that you discussed with

4     Mr. Larosiere about the two ways people could get in trouble,

5     either cutting out the auto key card or lying to them about it,

6     was that a conversation with Agent Slosson?

7     A.    I wouldn't say that's exactly how it went, but something

8     along those lines, yes.

9     Q.    Well, I certainly don't want to put any words in your

10    mouth.  How would you say it went?  I want to make sure we're

11    clear.

12    A.    They said if you have it, it's best to turn it over.  And

13    like I said, I was scared, nervous.

14    Q.    And you did turn something over to them?

15    A.    Right.  Not initially.

16          Yes, after I spoke with my attorney.

17    Q.    And I'm going to get back to that in a little bit, but

18    when you turned it over, had you attempted to manufacture a

19    machine gun or cut anything out?

20    A.    No, sir.

21    Q.    And what you turned over was the complete card?

22    A.    Yes, sir.

23    Q.    And it had been your purpose to buy that and share it with

24    a friend, correct?

25    A.    Buy it as a gift for a friend, yes.

1   Q.    What do you do for a living?

2   A.    Public works.

3   Q.    Do you have a CDL?

4   A.    Yes, sir.

5   Q.    And do you remember being told that that would be

6   jeopardized if you were to receive a felony conviction?

7   A.    I do not recall that being said.

8   Q.    And you said before that when you spoke with ATF you

9   weren't honest with them originally?

10  A.    That is correct.

11  Q.    But you did clear that up?

12  A.    Yes.

13  Q.    And you're telling the truth here today?

14  A.    Yes, sir.

15          MR. KING:  Your Honor, I have no further questions.

16          THE COURT:  Mr. Mesrobian.

17          MR. MESROBIAN:  Thank you, Your Honor.

18                       REDIRECT EXAMINATION

19  BY MR. MESROBIAN:

20  Q.    Mr. Willis, you were asked some questions about your

21  previous interactions with law enforcement.  Do you recall

22  that?  Just now.

23  A.    Yes.

24  Q.    At any point during those interactions did Special Agent

25  Slosson or other members of ATF yell at you or intimidate you

1    in some way?

2    A.    No.

3    Q.    And what is your understanding of what you're here today

4    to tell the jury?

5    A.    To tell them the truth how I heard about the key card and

6    how I obtained it.

7                MR. MESROBIAN:  No further questions, Your Honor.

8                MR. KING:  And nothing further.  And he's not under

9    subpoena from us.

10               MR. LAROSIERE:  Nothing further, Your Honor.

11               THE COURT:  Sir, you may step down and you're free to

12   go.

13               Ladies and gentlemen, it is time for lunch.  So it's

14   12:25.  We'll take an hour and ten minutes.  I'll ask you to be

15   back in the jury room prepared to continue with the evidence at

16   1:35.

17               Please remember to continue to follow all of the

18   instructions that I've been giving you throughout the case, and

19   we'll see you back in a little while.

20        (Witness exits the courtroom.)

21               COURT SECURITY OFFICER:  All rise for the jury.

22        (Jury exits, 12:26 p.m.)

23               COURT SECURITY OFFICER:  Please be seated.

24               THE COURT:  Ms. Taylor, we seem to be moving through

25   these witnesses pretty quickly.  Are we going to have -- are we

1   going to -- when we finish the purchaser witnesses, where are
2   we going?
3              MS. TAYLOR:  Yes.  So we have three more purchaser
4   witnesses to call after lunch and then I believe that
5   Mr. Lintner is on his way to the courthouse as well, so we
6   would anticipate moving to him after the purchaser witnesses.
7              THE COURT:  Okay.  All right.  Then I'll see you-all
8   back in an hour and ten minutes.
9              COURT SECURITY OFFICER:  All rise.
10       (Lunch recess, 12:27 p.m. to 1:42 p.m.)
11       (All parties present.  Jury not present.)
12             COURT SECURITY OFFICER:  All rise.  This Honorable
13  Court is back in session.
14             Please be seated.
15             THE COURT:  Let's get the jury, please.  And who's
16  the next witness?
17             MS. TAYLOR:  The next witness would be Steven Duty.
18             MR. KING:  And Your Honor, if we could, just for the
19  Court's planning purposes, I know we've got some scheduling
20  things --
21             THE COURT:  Can you speak into a microphone, please.
22             MR. KING:  By the end of it I will figure this out.
23             I know we have some scheduling things to discuss with
24  the Court at the next break.  I've been talking with
25  Ms. Taylor, and that might be an appropriate time, if that's

1    acceptable to the Court.

2            THE COURT:  At the next break?

3            MR. KING:  Yes, Your Honor.

4            THE COURT:  Okay.

5            COURT SECURITY OFFICER:  All rise for the jury.

6        (Jury enters, 1:43 p.m.)

7            COURT SECURITY OFFICER:  Please be seated.

8            THE COURT:  Ms. Taylor, call your next witness.

9            MS. TAYLOR:  The United States calls Steven Duty.

10       (Witness enters the courtroom.)

11           THE COURT:  Mr. Duty, if you'll come all the way up

12   here.  And I'll ask you to remain standing until you're sworn.

13           COURTROOM DEPUTY:  Please raise your right hand.  Do

14   you solemnly swear that the testimony you're about to give

15   before this Court will be the truth, the whole truth, and

16   nothing but the truth, so help you God?

17           THE WITNESS:  I do.

18           COURTROOM DEPUTY:  You may have a seat.  And if you

19   could please state your name for the record and spell your

20   first and last names.

21           THE WITNESS:  Steven Duty.  S-t-e-v-e-n, D-u-t-y.

22           THE COURT:  Go ahead, Ms. Taylor.

23           MS. TAYLOR:  Yes, Your Honor.

24           **STEVEN DUTY, GOVERNMENT WITNESS, SWORN,**

25                    DIRECT EXAMINATION

1    BY MS. TAYLOR:

2    Q.    Mr. Duty, could you please tell the jurors the city and

3    state that you live in?

4    A.    Alton, Illinois.

5    Q.    And back in late 2020/early 2021 were you living in a

6    different location?

7    A.    Yes.  I lived in Glen Carbon, Illinois.  We moved about

8    three, four weeks ago to Alton.

9    Q.    And what do you do for a living?

10   A.    I'm in pharmaceutical, manufacturing medication.

11   Q.    And do you own any firearms?

12   A.    Yes.

13   Q.    Approximately how many firearms do you own?

14   A.    14.

15   Q.    And are any of those AR-15-type firearms?

16   A.    Two models are.

17   Q.    And could you give the jurors a little bit of information

18   about what the two AR-15-type firearms are that you own?

19   A.    I have a 2000- either '09 to 2011, approximately those

20   years, Smith & Wesson AR-15, an MP model.  I also have a -- I

21   believe I -- it's a 2021 model AR-15, a Ruger pistol.

22   Q.    And Mr. Duty, would it be fair to say that firearms are an

23   interest or a hobby of yours?

24   A.    Yes.

25   Q.    Are you familiar with an item called the auto key card?

1    A.    Yes, ma'am.

2    Q.    How are you familiar with the auto key card?

3    A.    I learned about the auto key card through Mr. Matt

4    Hoover's YouTube channel.

5    Q.    And do you know the name of that YouTube channel?

6    A.    CRS Firearms.

7    Q.    Was CRS Firearms a YouTube channel that you watched

8    regularly?

9    A.    Yes.

10   Q.    And do you recall whether it was a particular video of

11   Mr. Hoover's that you watched on the CRS Firearms YouTube

12   channel that introduced you to the auto key card?

13   A.    He talked about my role model, Jean-Claude Van Damme, in

14   one of them that, you know, got my attention.  And that was --

15   I don't know the name of the video itself, but that's the one

16   that really caught my attention.

17   Q.    And Mr. Duty, if you were to -- if you were to see a

18   portion of that video, would you be able to recognize whether

19   it was the one that you watched or not?

20   A.    Yes.

21          MS. TAYLOR:  Your Honor, could I have just a moment?

22          THE COURT:  Yes.

23   BY MS. TAYLOR:

24   Q.    Do you recall the name of the video, Mr. Duty?

25   A.    No.  Not at this time.  I'm . . .

1   Q.   Drawing a blank?

2   A.   Yes.

3        MS. TAYLOR:  Ms. Ganoe, could we have the first

4   exhibit.

5        (Video played.)

6        MS. TAYLOR:  And we've played ten seconds of the

7   video.  And we'll pause it here.

8        (Video stopped.)

9   BY MS. TAYLOR:

10  Q.   Do you know whether this is the video?

11  A.   That has been -- he's made several videos, so I'm -- I

12  don't think this is the right one, though.

13  Q.   Okay.  Let's look at Exhibit 2, please, and play that.

14       (Video played.)

15       MS. TAYLOR:  If we can stop, Ms. Ganoe.

16       (Video stopped.)

17  BY MS. TAYLOR:

18  Q.   We've paused the video at 3 minutes and 10 seconds in; is

19  that correct?

20  A.   Yes.

21  Q.   Is this the video that you watched?

22  A.   Yes.

23  Q.   And Mr. Hoover at this -- is that Mr. Hoover in the video?

24  A.   Yes.

25  Q.   And he's got something in his hand, correct?

1    A.    Yes.

2    Q.    Do you recognize what that is?

3    A.    Yes.

4    Q.    What is it?

5    A.    It is the auto key card.

6    Q.    And at this point in the video he had just referred to

7    that as a lightning link, correct?

8    A.    Yes.

9    Q.    Now, did you -- and then he's got some -- a screenshot on

10   the left of the screen in his video, correct?

11   A.    Yes.

12   Q.    And do you recognize what's in that screenshot?

13         And you're putting on your glasses, correct?

14   A.    Number 1, lightning link; 2, swift link; 3 --

15   Q.    Oh, and Mr. Duty, so I think you're reading what's on the

16   whiteboard, correct?

17   A.    Yes.

18   Q.    So I'm talking about what's to the left of the whiteboard.

19   A.    Oh, sorry.

20   Q.    What's in that area?

21   A.    That is the auto key card.

22   Q.    And is it a website, or are you able to say?

23   A.    Yes.

24   Q.    Okay.  Now, did you -- after watching this video, did you

25   decide to purchase an auto key card?

1   A.   I'm not exactly sure when I did purchase -- I know I

2   purchased the auto key card in December of 2020.

3   Q.   Did you watch any other videos made by anyone besides

4   Mr. Hoover that factored in to your decision of whether to

5   purchase an auto key card?

6   A.   No.

7   Q.   At some point after watching this video you did purchase

8   an auto key card?

9   A.   Yes.

10        MS. TAYLOR:  Ms. Ganoe, could we have Exhibit 89D,

11  please.

12  BY MS. TAYLOR:

13  Q.   Do you recall whether you made the purchase online or

14  through a mail-in order or some other way?

15  A.   I did order it through online.

16  Q.   Okay.  And is this -- this is a document that's already in

17  evidence.  It says, "Autokeycards.com:  A new order has

18  arrived," correct?

19  A.   Yes.

20  Q.   And then it has names -- it has a date, correct?  What's

21  the date?

22  A.   December 16th, 2020.

23  Q.   And it says billed to Steve Duty in Glen Carbon, Illinois?

24  A.   Correct.

25  Q.   And shipping to Steve Duty in Glen Carbon, Illinois?

1    A.    Yes.

2    Q.    And who is that?

3    A.    I'm sorry?

4    Q.    Is that you?

5    A.    Oh, yes.

6    Q.    And at some point did you receive an auto key card in the

7    mail?

8    A.    Yes.

9          MS. TAYLOR:  Ms. Ganoe, if we could have the next

10   section down.

11   BY MS. TAYLOR:

12   Q.    This reflects the particular item that you ordered under

13   Order Summary, correct?

14   A.    Yes.

15   Q.    It was one Auto Key Card 2 in 1?

16   A.    Correct.

17   Q.    And what did you understand "2 in 1" to refer to?

18   A.    The auto key card was a single piece of metal that had

19   four single individual pieces that were like etched in a

20   diagram form.

21   Q.    So it had four etchings on the single piece of metal?

22   A.    Correct.

23   Q.    And so when it says "2 in 1," why -- what did you

24   understand "2 in 1" to mean?

25   A.    That it's two lightning links.

1    Q.    And did you have an understanding prior to watching
2    Mr. Hoover's video about what a lightning link was?  Was that
3    something you had heard of before?
4    A.    No.
5    Q.    Were you aware more generally of machine gun conversion
6    devices?
7    A.    No.
8    Q.    Had you -- did you know that such a thing existed?
9    A.    No.
10   Q.    So Mr. Hoover's video, was that the first time that you
11   became aware that there could be a device that would convert a
12   firearm into a machine gun?
13   A.    Correct.
14   Q.    And Mr. Hoover talks about a number of other items in that
15   video that you watched, correct?
16   A.    Yes.
17   Q.    Is one of those a solvent trap?
18   A.    Yes.
19   Q.    Did you purchase any solvent traps?
20   A.    Yes.
21   Q.    How many solvent traps did you purchase?
22   A.    Approximately five or six.
23   Q.    When you purchased the auto key card, what was the
24   reason -- what was your motivation for purchasing it?
25   A.    The COVID 19 pandemic had happened and I was wanting

1    knowledge how to use a, you know, full auto in case we were

2    invaded by, you know, a foreign ad- -- you know, country, or --

3    I was -- during this time I was, you know, terrified of

4    thinking that the world was, you know -- it was going to be a

5    crazy -- something we never experienced, or I had never

6    experienced before.

7    Q.   And so were you buying the auto key card to have for

8    protection?

9    A.   Correct.

10   Q.   And how did you envision the auto key card could be used

11   for protection?

12   A.   I -- when I received the product I had absolutely no clue,

13   you know, on how to make it work, so --

14   Q.   But I guess what I'm asking is more your motivation for

15   purchasing it.  In your mind, what did you anticipate using it

16   for?

17   A.   Oh.  For home protection.

18   Q.   Would that require that you cut a lightning link out of

19   the auto key card?

20   A.   Yes.  You'd have to.

21   Q.   And in other words, you weren't planning to like -- like

22   throw the auto key card at somebody if they tried to come in

23   your house, right?

24   A.   Correct.

25   Q.   Okay.  You were planning to use it to convert an AR-15

1    into a machine gun; is that correct?

2    A.    Correct.

3    Q.    And Mr. Duty, initially where did you store the auto key

4    card after you received it?

5    A.    I had placed it in a drawer for a little bit.  I had

6    placed it in different locations.  So it -- I mean, I had it in

7    a -- I had it in my garage; I had it in a drawer; had it in --

8    yeah, I mean --

9    Q.    I think when we talked -- we've spoken previously,

10   correct?

11   A.    Yes.

12   Q.    At one point -- you told me that at one point you were

13   storing it underneath your deck as well?

14         MR. KING:  Objection, that's improper.

15   Q.    Were you also --

16         THE COURT:  Hold on.

17         Please rephrase.

18   BY MS. TAYLOR:

19   Q.    At one point did you store it underneath your deck?

20   A.    Yes.

21   Q.    And did you -- so you intended to cut it out, correct?

22   A.    Yes.

23   Q.    And did you ever make an attempt to do that?

24   A.    Yes.

25   Q.    Prior to attempting to cut it out did you do research to

1  try and find instructions for how to do that?

2  A.   I did send the website an email asking, you know, how

3  to -- what tool was needed to be used and got no response.

4            MS. TAYLOR:  Ms. Ganoe, could we have Exhibit 67KK on

5  the screen, please.

6  BY MS. TAYLOR:

7  Q.   And Mr. Duty, this is an email that's labeled as from

8  Steve Duty to customerservice@autokeycards.com on January 16th

9  of 2021; is that accurate?

10 A.   Yes.

11 Q.   And what's the subject?

12 A.   "How do you cut out a card?"

13 Q.   Looking at this email, do you recognize it?

14 A.   Yes.

15 Q.   How do you recognize it?

16 A.   It's the email that I had sent.

17 Q.   And in the body of the email did you write, "That's all I

18 was needing, the above title?  What tool is used or is there a

19 video?  Thanks.  Steve"?

20 A.   Correct, yes.

21 Q.   But you did not get a response back from this?

22 A.   Correct.

23 Q.   Did you do any other research to try and find information

24 about how to cut it out?

25 A.   I don't recall at this time.

1   Q.    And Mr. Duty, you received no response to your email

2   inquiry that we're looking at right now, correct?

3   A.    Correct.

4   Q.    So nobody wrote you back and said, "Don't cut it out"?

5   A.    There was no response at all.

6   Q.    They didn't -- nobody responded to say that would be

7   illegal?

8   A.    I had no response --

9   Q.    Okay.

10  A.    -- given at all.

11  Q.    At some point did you make an attempt to cut out the

12  lightning link from an auto key card?

13  A.    Yes.

14  Q.    And how did you go about doing that?

15  A.    I took a drill and drilled a hole in a section of it and

16  then took a screw and screwed it down on a piece of wood.  And

17  then I have a DeWalt Sawzall that I tried to use, but that

18  didn't work because it just kept spinning around in the -- on

19  the, you know, piece of wood.

20         So I was getting nowhere with that, so then I had a

21  vise and put it in the vise instead.

22  Q.    A Sawzall, can you describe what kind of saw that is?

23  A.    I said Sawzall, but it was like a Rotozip.  I have a

24  Sawzall also, but it's a Rotozip.  It's a DeWalt with a wheel,

25  like a grinder.

1    Q.    And approximately how big is that wheel on the Rotozip?

2    A.    (Indicating.)

3    Q.    You're -- I'm going to guess three to four inches; does

4    that seem fair?

5    A.    Yeah.

6    Q.    Okay.  You're gesturing a circle?

7    A.    Yeah.  It's about three to four inches.

8    Q.    Okay.  And were you successful in cutting it out?

9    A.    No.

10   Q.    What did you -- what -- after you put it in the vise and

11   you were attempting to cut it out with the Rotozip, what

12   happened?

13   A.    Sparks started flying everywhere.  I got probably about an

14   inch and a half to two inch -- about an inch and a half to two

15   inch, you know, on the -- on the cut, and then that's when I

16   stopped.

17   Q.    Did you -- what did you do with the auto key card after

18   you stopped trying to cut it on that occasion?

19   A.    At that point I was tired because, you know, I work

20   midnights and I was playing with it during the -- after I got

21   off work.  So I just put it back on the garage shelf.

22   Q.    Did you at that point intend on making an additional --

23   doing additional research or making an additional attempt later

24   on to cut it out?

25   A.    Yeah.  I asked a neighbor next door if he had any ideas

1    how.  And he didn't have any ideas either, so --

2    Q.    You didn't throw it away at that point, correct?

3    A.    Correct.

4    Q.    Now, at some point did -- well, let's talk for a minute

5    about a solvent trap.  What did you say that was?  Can you

6    describe what a solvent trap is?

7    A.    A solvent trap is sold under the -- it's sold under the, I

8    guess, method of using it to clean out a gun.

9    Q.    Was that what you understood it was really for?

10   A.    It's -- if you -- you can, from what I believe, convert

11   them into a silencer if you have the right connections and the

12   right pieces.  You also have to drill out -- it comes with a

13   bunch of baffles that -- I never drilled out a single baffle.

14   So that is, I guess, the best way I can describe what a solvent

15   trap is.

16   Q.    When you purchased the solvent trap, was it with the

17   intention to use it in connection with cleaning a firearm or in

18   connection with trying to convert it to a silencer?

19   A.    Using it on a -- well, both.  Using it as a silencer.

20   Q.    Have you used a solvent trap in connection with cleaning a

21   firearm?

22   A.    No.

23   Q.    Now, at some point did ATF agents come to your residence

24   and ask you about the auto key card?

25   A.    Yes.

1   Q.   Do you recall what agents those were?

2        Well, let me ask a different question.  Do you

3   recognize any of the agents in the courtroom who spoke with

4   you?

5   A.   Where are they at?

6   Q.   Well, I'm asking you, do you recognize anyone in the

7   courtroom as being the agent that spoke with you?

8   A.   No.

9   Q.   Okay.  Did they -- did they ask you about the auto key

10  card?

11  A.   Yes.

12  Q.   And did you -- were you truthful with them about whether

13  you had purchased an auto key card?

14  A.   Yes.  I had told them that I had purchased.

15  Q.   And did you still have the auto key card at that point?

16  A.   Yes.

17  Q.   Were you truthful with the agents about whether you still

18  possessed the auto key card?

19  A.   No.

20  Q.   What did you tell the agents?

21  A.   I was terrified that I was going to get my door kicked in

22  and the dog shot.  And I'm sorry if that -- but I've heard, you

23  know, that on several, you know, videos and on YouTube, so --

24  some of them coming from Mr. Hoover's channel.  And that's why

25  I told them that.

1  Q.   So, sorry, the door kicked in and dog shot was something
2  that you had heard Mr. Hoover say on his videos?
3  A.   Yes.
4  Q.   And you were scared of that?
5  A.   Yes.
6  Q.   The ATF agents who actually came to your house, did they
7  kick in your door?
8  A.   No.
9  Q.   Did they shoot your dog?
10 A.   No.
11 Q.   Were they -- did they knock on your door?
12 A.   My son was the one who answered and I was sound asleep.
13 He said that they were banging on the door for some time.  But
14 I work nights, so I was asleep when they were knocking on the
15 door and he came up and got me.
16 Q.   In the conversations that you have had with the ATF agents
17 as well as conversations with me or Mr. Mesrobian, have you
18 been treated with respect?
19 A.   Yes.
20 Q.   After the agent came to your residence related to the auto
21 key card, what did you -- did you do anything with the auto key
22 card at that point?
23 A.   I'm sorry, run that by me again.
24 Q.   So going back to the day that the agents came to your
25 door -- and you said you were untruthful with them about the

1  fact that you still had it, correct?

2  A.   Yes.

3  Q.   Did you do anything with it after that?

4  A.   After the agents had left I went back to sleep, got up at,

5  you know, my normal time to go to work, it was around 8 p.m.,

6  and then realized that the -- when they were at the house and

7  asked me the questions, I -- at the time I was drawing a blank

8  where I did keep it.  So then I did go downstairs, remembered

9  where I had kept it in a lockbox in a safe, and retrieved the

10 card and put it outside underneath the deck before I went to

11 work.

12 Q.   At some point did you do something else with the card?

13 A.   Not that I recall.

14 Q.   Do you recall whether you destroyed the card?

15 A.   I did destroy the card after I completed my shift at work.

16 Q.   And did you do anything with the solvent traps that you

17 had purchased?

18 A.   Yes.  Those were destroyed the same time also.

19 Q.   Was that within a day or two of the agents coming to your

20 house?

21 A.   Yes.  Because the trash day was like a, you know, day or

22 two later from when they came to my house.

23 Q.   And later on you -- did you -- well, so you've come in to

24 the courtroom today and you've sworn an oath to tell the truth,

25 correct?

1   A.   Yes.

2   Q.   And you've admitted that initially you were not truthful

3   with the ATF agents who came to your house, correct?

4   A.   Yes.

5   Q.   Later on did you inform the ATF agents that you had

6   destroyed the auto key card?  Not those agents.  I'm saying

7   later on at some point before today did you inform ATF agents

8   that you had destroyed the auto key card?

9   A.   I don't recall.  I -- yeah, I -- I don't recall.

10  Q.   Okay.  Mr. Duty, are you familiar with the process of

11  registering a firearm in the National Firearms Registration and

12  Transfer Record?

13  A.   Very little.

14  Q.   Do you have any firearms registered in the National

15  Firearms Registration and Transfer Record?

16  A.   No.

17  Q.   Currently do you own any firearms that would be governed

18  by the National Firearms Act?  And I'm talking about machine

19  guns, machine gun conversion devices, silencers, destructive

20  devices, short-barreled rifles, short-barreled shotguns.  There

21  might be a couple more.

22        Do you own any of those things?

23  A.   I own an AR-15 pistol that is in debate, I guess, right

24  now with the pistol grip.  I mean, but as far as -- I have

25  never owned or fired a fully automatic rifle or gun my entire

1   life.

2   Q.    So the AR pistol that you have, is there -- are there

3   ongoing developments related to whether that needs to be

4   registered?

5   A.    I believe so.  They talked about there's like three

6   methods you can do with this, because it's a new law regarding

7   the pistol brace.  So you can -- I believe you can register it,

8   take it off, or -- and I don't know what the -- I forgot the

9   third method.

10  Q.    Mr. Duty, at some point did you -- did you still have the

11  packaging materials for the auto key card that you had

12  purchased?

13  A.    Yes.

14  Q.    Did you surrender those to an ATF agent?

15  A.    No.

16  Q.    The packaging materials?

17  A.    The packaging material I surrendered to you.

18  Q.    To me?

19  A.    Yes.

20  Q.    Okay.  So you gave it to the government?

21  A.    Yes.

22          MS. TAYLOR:  Okay.  I have no further questions, Your

23  Honor.

24          THE COURT:  Mr. Larosiere.

25          MR. LAROSIERE:  Yes, Your Honor.

1                      CROSS-EXAMINATION

2    BY MR. LAROSIERE:

3    Q.    Mr. Duty --

4    A.    Hello.

5    Q.    -- when you spoke with agents from the ATF about the auto

6    key card, did they ask whether or not you had cut it?

7    A.    I don't recall.

8    Q.    Okay.  When you bought the auto key card, you thought it

9    was legal in its original state, right?

10   A.    Yes.

11   Q.    But you thought that if you cut it, it would no longer be

12   legal, right?

13           Sorry, I'll try that again.

14           Did you think that it would be legal to cut it out?

15   A.    I am not for sure.  I thought that if you had put it in

16   your gun that it would be now considered illegal, if you

17   actually put it in the gun to fire.

18   Q.    Okay.  No, that's fine.  And not being sure is fine.

19           But in your mind, when you bought it you were pretty

20   confident that the card itself was legal to own, right?

21   A.    Yes.

22   Q.    Okay.  So you mentioned something about the pistol brace.

23   So you -- you have a -- an AR pistol, right?

24   A.    Yeah.  It's a Ruger AR-15 pistol.

25   Q.    With the brace thing on the back, right?

1   A.   Yes.

2   Q.   And so the brace is -- that's kind of an orthotic device

3   that wraps around the forearm or --

4        MS. TAYLOR:  Objection, testifying.

5        THE COURT:  Sustained.

6   BY MR. LAROSIERE:

7   Q.   What is the pistol brace?

8   A.   The pistol brace is a piece of Velcro that is attached to

9   the plastic that comes -- kind of like a -- that you can put

10  around your forearm, take the strap, the Velcro strap, and

11  then -- there you go (indicating).  Right.

12  Q.   So it's a type of device designed to wrap around the

13  forearm?

14  A.   Correct.

15  Q.   To help you stabilize this large pistol, right?

16  A.   Correct.

17  Q.   And so where did -- when you -- when you bought that, you

18  understood it was good to go as a normal pistol.  You didn't

19  need to register it, right?

20  A.   Correct.

21  Q.   Is it your understanding that ATF has changed its mind --

22       MS. TAYLOR:  Objection, relevance.

23       THE COURT:  Sustained.

24       MR. LAROSIERE:  Okay.  No further questions.

25       THE COURT:  Mr. King.

1          MR. KING:  May it please the Court.

2          THE COURT:  Go ahead.

3                    CROSS-EXAMINATION

4    BY MR. KING:

5    Q.    Good afternoon, Mr. Duty.

6    A.    Hello.

7    Q.    I want to talk to you a little bit about your intentions.

8    When you first purchased the auto key card -- and I want to

9    make sure I have this right, so if I'm not saying this correct,

10   please correct me -- you had concerns that the United States

11   may be invaded or subject to a foreign adversary?

12   A.    Yes.

13   Q.    And that was -- and you wanted to be prepared if that

14   happened?

15          MS. TAYLOR:  Objection to the repetition of the

16   testimony, Your Honor.

17          THE COURT:  Overruled.  Go ahead.

18   Q.    And Mr. Duty, you wanted to be prepared if that happened

19   to protect your family and community?

20   A.    Yes.

21   Q.    And you thought in your mind that that was a real danger

22   that you needed to prepare for for down the road?

23   A.    Yes.

24   Q.    You mentioned that you sent out an email asking for

25   instructions and never received a response?

1   A.   Correct.

2   Q.   You also mentioned that you tried to cut the device?  The

3   auto key card, you tried to cut it up?  Tried to cut things out

4   of it?

5   A.   Help me out here.  What --

6   Q.   Sure.  You said you put it on the DeWalt and you put in

7   the block of wood and that didn't work at all?

8   A.   Correct.

9   Q.   And you tried again with the rest of it and were

10  unsuccessful?

11  A.   I had placed the piece of metal -- I had drilled a hole in

12  it, you know, on a piece of wood, put a screw on that, and then

13  tried to cut it -- talking about the key card -- with a DeWalt,

14  we'll call it a Rotozip, and it just kept spinning around.  So

15  I was unsuccessful.  Then I put it in the vise.

16  Q.   And what happened when you put it in the vise?

17  A.   I got about a inch to an inch and a half cut and stopped.

18  Q.   And so when we're talking about when ATF came to your

19  home, this is after you've already cut into this auto key card?

20  A.   Correct.

21  Q.   At the time you mentioned you had also tried to

22  manufacture several silencers?

23  A.   No.

24  Q.   When did you try to do that?

25  A.   I purchased the solvent traps.  I never manufactured a

1    silencer or drilled a hole in the baffle, ever.

2    Q.    And Mr. Duty, let me ask it this way.  At that point, when

3    the ATF agents first came, were you under the impression that

4    you had done anything illegal or unlawful?

5    A.    I was woke up from a deep sleep, so I had to wait until,

6    you know, they explained to me what they were there for and

7    stuff.

8    Q.    And did you think after talking to them that you had done

9    something illegal?

10   A.    Possibly.

11   Q.    So you lied to them?

12   A.    Yes.

13   Q.    And prior to coming to court today, have we met?

14   A.    No.

15   Q.    Have we discussed what questions I'm going to ask you?

16   A.    I've never seen you in my life.

17   Q.    All right.  But you have discussed what questions you were

18   going to be asked with the government?

19   A.    Some.

20   Q.    And you went over all of that and what that would look

21   like?

22   A.    We had a proffer session, so . . .

23   Q.    And my understanding is you're here under a letter of

24   immunity?

25   A.    Correct.

1    Q.    And at this point nobody's threatened to proffer -- I'm

2    sorry, nobody's threatened to prosecute you for lying to those

3    federal agents back when you first met with them.  Is that --

4    do I have that accurately?

5    A.    Correct.

6    Q.    And part of the hope here is if -- you know, if you

7    testify what the government deems truthfully, that you won't be

8    prosecuted for that lie or for anything else that you may have

9    done?

10   A.    Yeah.  I guess.

11   Q.    And I'm sorry, sir, I didn't mean to interrupt you.

12   A.    Go ahead.

13   Q.    I'm sorry, go ahead.

14   A.    I was saying yeah, I guess.

15   Q.    And it's your understanding that separate and apart from

16   anything else, lying to a federal agent in the course of their

17   investigation is a serious felony that's punishable by up to --

18   you know, prison time?

19   A.    Well, the only reason that I did, because I was, you know,

20   woke up from a deep sleep and thinking that they were going to

21   kick my door in and shoot my dogs, so that's what happened.

22   Q.    Well, and Mr. Duty, I want to make sure my question is

23   clear.  You do know that that type of conduct, that is, lying

24   to a federal agent, in and of itself, putting everything else

25   aside, is a separate serious felony?

1    A.   No, I didn't know.

2    Q.   Did the agents ever explain that to you?

3    A.   I don't recall.

4    Q.   And my understanding is after those agents left, you

5    disposed of not only the auto key card that you attempted to

6    cut, but also the solvent traps?

7    A.   Yes.

8    Q.   And that was because you figured you had done something

9    illegal?

10   A.   The solvent traps, I didn't drill a hole in any of them.

11   So as far as I know, they were just still perfectly legal.  And

12   then the auto key card, of course, was destroyed.

13   Q.   Well, why -- if you thought it was perfectly legal, why

14   did you get rid of the solvent traps right after the ATF agents

15   came to your house?

16   A.   Just because.

17   Q.   Because of what, Mr. Duty?

18   A.   It was possibly the, you know -- it's kind of like the

19   same deal as the taking off the pistol brace, you know.

20   It's -- it's legal at one point when you buy it, and then it

21   becomes illegal, so what do you do?

22            MR. KING:  Your Honor, I have no further questions.

23            THE COURT:  Ms. Taylor.

24            MS. TAYLOR:  Yes, Your Honor.

25                         REDIRECT EXAMINATION

1  BY MS. TAYLOR:

2  Q.   Mr. Duty, you were asked some questions about whether you

3  believed the auto key card in its original state -- that is,

4  how you received it in the mail -- whether you believed it was

5  legal or illegal in that form.  Do you remember that?

6  A.   At the time, yeah, when I had purchased or received it, I

7  believed it was, you know, perfectly legal at that time.

8  Q.   What was that based on?

9  A.   Based on Mr. Hoover's, you know, selling it on his

10  channel.  And --

11  Q.   Did you --

12  A.   -- I think he was like a licensed SOT or -- he could sell

13  firearms legally, so that's when I thought that this item was

14  perfectly legal to purchase at that time when I bought it.

15  Q.   And Mr. Duty, you bought it with the intention that you

16  would cut the lightning links out of it, correct?

17  A.   Yes.

18  Q.   And did you understand from Mr. Hoover's video that that

19  would be illegal?

20  A.   I'm sorry, can you . . .

21  Q.   Did you understand that once -- that if you did cut it

22  out, that that would be illegal?

23  A.   Yes.

24  Q.   Did you understand Mr. Hoover to be encouraging his

25  viewers to cut out the pieces from the auto key card?

1    A.    Yes.

2    Q.    Now, you were also asked some questions about the

3    preparation that you did for your testimony here today,

4    correct?

5    A.    Yes.

6    Q.    You and I have spoken in the past; is that correct?

7    A.    Yes.

8    Q.    And when we prepared for your testimony, did you have some

9    expectation of the way in which I expected you to testify?

10   A.    Just truthful, which, of course, has happened, so . . .

11   Q.    And did I -- did I ever or anyone else from the government

12   ever tell you that you weren't allowed to talk to any of the

13   attorneys for the defendants if that's what you wanted to do?

14   A.    Can you run that --

15   Q.    Let me ask a different way.  Did I ever tell you, for

16   example, that you couldn't talk to Mr. King if that's what you

17   wanted to do?

18   A.    You never told me that I could not talk to Mr. King.

19   Q.    Okay.  Has anyone -- excuse me.  Have I or any other

20   federal prosecutor or federal agent threatened to prosecute you

21   for lying?

22   A.    No.

23   Q.    And have I been clear with you from the beginning that the

24   government views you as a witness in this case?

25   A.    Yes.

1           MS. TAYLOR:  I have no further questions, Your Honor.

2           THE COURT:  Mr. Larosiere?

3           MR. LAROSIERE:  Nothing further, Your Honor.

4           THE COURT:  Mr. King?

5           MR. KING:  Nothing further, Your Honor.

6           THE COURT:  All right, sir.  You may step down.

7           THE WITNESS:  Thank you.

8           THE COURT:  Go ahead, Mr. Mesrobian.

9           MR. MESROBIAN:  Your Honor, the United States calls

10   Joel Moya.

11       (Witness exits the courtroom.)

12       (Witness enters the courtroom)

13          THE COURT:  Sir, I'll ask you to come right up here.

14   And if you'll remain standing for just a moment.

15          COURTROOM DEPUTY:  Please raise your right hand for

16   me.  Do you solemnly swear that the testimony you're about to

17   give before this Court will be the truth, the whole truth, and

18   nothing but the truth, so help you God?

19          THE WITNESS:  I do.

20          COURTROOM DEPUTY:  You may have a seat.  And if you

21   could please state your name for the record and spell your last

22   name.

23          THE WITNESS:  My name is Joel Moya.  Last name is

24   spelled M-o-y-a.

25          THE COURT:  Go ahead.

1          **JOEL MOYA, GOVERNMENT WITNESS, SWORN,**

2                          DIRECT EXAMINATION

3    BY MR. MESROBIAN:

4    Q.   Good afternoon, sir.

5    A.   Good afternoon.

6    Q.   Could you -- and you may need to lean forward a little bit

7    closer to the microphone.  But could you please tell the jury

8    the city and state where you currently live.

9    A.   I currently live in Ocala, Florida.

10   Q.   And have you lived in the Jacksonville area previously?

11   A.   I have.  Orange Park to be exact.

12   Q.   And what do you do for a living?

13   A.   I'm a pharmacist.

14   Q.   Mr. Moya, are you required to be here today to testify

15   pursuant to subpoena?

16   A.   I am.

17   Q.   And prior to testifying, did the government provide you

18   with a letter setting forth certain terms of immunity?

19   A.   That is correct.

20   Q.   You understand that you just took an oath to tell the

21   truth?

22   A.   I do.

23   Q.   And is that your -- is that your intention today?

24   A.   Yes, sir.

25   Q.   So, sir, I'd like to ask first, do you own any firearms?

1  A.   I do.

2  Q.   Approximately how many?

3  A.   About 40.

4  Q.   Is shooting and collecting firearms a hobby of yours?

5  A.   It is.

6  Q.   How did you first get into it?

7  A.   Honestly, as a kid playing video games.  And then I

8  figured out that you can own guns in this country, and so I was

9  like, yeah, I'm going to buy one.

10  Q.   So, sir, are you familiar with the term "NFA firearm"?

11  A.   I am.

12  Q.   And what does that mean to you?

13  A.   National Firearms Act, I think it's 1934, I want to say.

14  Q.   Do you own -- do you know what types of firearms

15  constitute NFA firearms?

16  A.   Suppressors, explosives, AOWs, short-barreled rifles,

17  yeah.

18  Q.   And also machine guns?

19  A.   Oh, yeah, machine guns too, sorry.

20  Q.   Do you own any NFA firearms?

21  A.   I do not.

22  Q.   Sir, are you familiar with the item called the auto key

23  card?

24  A.   I am.

25  Q.   How did you first hear about the auto key card?

1    A.    I want to say it was a recommended YouTube video from

2    CRS's YouTube channel.

3    Q.    And had you watched videos made by CRS Firearms before?

4    A.    I have not.

5    Q.    Do you recall approximately when you saw this video?

6    A.    It was in the beginning of November.  I don't remember the

7    exact date.

8    Q.    And do you -- what do you recall being said in this video

9    about the auto key card?

10   A.    Well, it was -- it was basically -- I think the title was

11   "Things the ATF Wished Didn't Exist."  And basically it was

12   saying that it was a lightning link on a piece of metal.  And

13   then I think he went over like, "You need an SP1 bolt."  And

14   that's about as much as I can recall.

15   Q.    At the time you saw this video, did you know what a

16   lightning link was?

17   A.    I did.

18   Q.    And how did you first learn about what a lightning link

19   was?

20   A.    I mean, naturally when you get into guns you start -- you

21   start going down that rabbit hole and you start asking why are

22   things illegal, you know, I didn't do anything.  So then you

23   start doing your research, and that's how I found out.

24   Q.    Were you aware of what a lightning link could do to an

25   AR-15?

1    A.    Yes.

2    Q.    And what's that?

3    A.    If you drop it in and you have the right parts, it turns

4    it automatic.

5    Q.    And do you recall the CRS Firearms video talking about how

6    to order the auto key card?

7    A.    Yes.

8    Q.    And what do you recall being said about that?

9    A.    You can obviously -- you can either order it with your

10   credit card or you can, you know, use like a money order and

11   send it to somebody you don't like.

12   Q.    So did you watch videos made on that CRS Firearms channel

13   after you saw this video where you learned about the auto key

14   card?

15   A.    I did.

16   Q.    Did you follow anything related to the auto key card on

17   social media?

18   A.    After seeing the video, I did.

19   Q.    And what did you -- what did you do on social media?

20   A.    Well, I checked out the forums.  I checked out -- I think

21   there was an Instagram page.

22   Q.    Do you recall seeing any advertisements for the auto key

23   card on social media?

24   A.    I don't believe so.  Besides the obvious YouTube video,

25   but . . .

1    Q.    And when you refer to "the YouTube video," do you mean the

2    CRS Firearms video?

3    A.    Correct.

4    Q.    Do you recall ever seeing a video involving a fish?

5    A.    Yes.

6                MR. MESROBIAN:  Your Honor, may we publish Government

7    Exhibit 49A?

8                THE COURT:  You may.

9         (Video played.)

10        (Video stopped.)

11   BY MR. MESROBIAN:

12   Q.    So, sir, do you recall having seen what's in evidence as

13   Government Exhibit 49A before?

14   A.    Yes.

15   Q.    And did you understand that to be an advertisement for the

16   auto key card?

17   A.    Well, it is, but I don't know who made the video.  But

18   yeah.

19   Q.    So did you end up purchasing an auto key card?

20   A.    I did.

21   Q.    And at the time you purchased it, did you own an AR-15?

22   A.    I did.

23   Q.    More than one or just one?

24   A.    More than one.

25   Q.    How soon after you saw the CRS Firearms video did you

1   purchase an auto key card?

2   A.   I -- I think the video was in the beginning of November.

3   I think I purchased mine I want to say around like

4   November 23rd.  So it was about two or three weeks.  I was

5   waiting for the bottle opener version to be back in stock.

6   Q.   And, sir, why did you buy the auto key card?

7   A.   I mean, I bought it for -- more from a historical

8   collector standpoint.  But I bought it as a novelty piece,

9   honestly, like a conversation starter, something like that, and

10  obviously to open up my beers with, but yeah.

11  Q.   Did you intend at some point in the future to cut it out?

12  A.   I -- that was not my intention, although people's

13  intentions can change.  But that was not my intention.

14  Q.   You were aware, however, that you could potentially cut a

15  lightning link out of it?

16  A.   Correct.

17  Q.   And to be clear, you had researched lightning links and

18  machine gun conversion devices before?

19  A.   In the past, yes.

20  Q.   Would you have bought the auto key card if it was printed

21  on paper?

22  A.   No.

23  Q.   So, sir, how did you make the -- your purchase?

24  A.   I mean, I used my debit card and I shipped it to my

25  address at the time.

1          MR. MESROBIAN:  And Ms. Ganoe, could we publish

2    what's in evidence as Government Exhibit 89B, as in bravo.

3    BY MR. MESROBIAN:

4    Q.    So I've published in front of you on that screen

5    Government Exhibit 89B.  And this is an email regarding an

6    order on autokeycards.com; is that right?

7    A.    Correct.

8    Q.    And it says towards the middle of the page, "Order Number

9    1865.  Placed on November 30th, 2020"; is that right?

10   A.    Yes.

11   Q.    And below that it has "Billed To" and "Shipping To" both

12   as to Joel Moya in Orange Park Florida; is that right?

13   A.    That's correct.

14   Q.    And is that you?

15   A.    That is me.

16   Q.    And on November -- does November 30th, 2020, sound like

17   the date when you would have ordered the auto key card?

18   A.    It sounds about right, yeah.

19          MR. MESROBIAN:  If we could go a little further down.

20   BY MR. MESROBIAN:

21   Q.    And looking at the Order Summary section here, it says you

22   ordered four Auto Key Card 3 in 1 with Pen Holder Edition.  Is

23   that right?

24   A.    Yes.

25   Q.    And each of those, regular price, was $169 apiece at that

1    time?

2    A.    Yes.

3    Q.    And the total before discount was $676?

4    A.    Correct.

5    Q.    And after discount and tax you paid a total of $614.82?

6    A.    Yes.

7    Q.    So, sir, do you recall there being different models of

8    auto key cards to choose from on the website?

9    A.    I want to say there was a -- it was an individual one, all

10   solid, and then I think eventually the pen holder one came out,

11   and then there was the 3 in 1, which was all solid, and then

12   the bottle opener, which is the one I purchased.

13   Q.    So you ordered the 3 in 1 Pen Holder Edition?

14   A.    Correct.

15   Q.    And the Pen Holder Edition is the one with sort of a

16   D-shaped cutout within one part of the lightning link; is that

17   correct?

18   A.    Yeah, where the pen would go in.

19   Q.    And you bought four of these; is that right?

20   A.    I did.

21   Q.    And did you understand what "3 in 1" meant in the title of

22   the item?

23   A.    Yeah, that there's three different cutout -- potential

24   cutout pieces in there.

25   Q.    Three different lightning links within that?

1    A.    Yes.

2    Q.    Mr. Moya, what did you do with these items after you --

3    or, sorry, withdrawn.

4          Did you receive the four auto key cards you ordered?

5    A.    I did.

6    Q.    And what did you do with them after you received them?

7    A.    I -- I -- I -- I was like, oh, they came in the mail.  And

8    then I just stored them away, didn't touch them, didn't even

9    get to use them to open up a beer or anything.

10   Q.    So you never actually opened a bottle with them; is that

11   right?

12   A.    No.

13   Q.    Did you understand that -- withdrawn.

14   A.    I'm sorry, could you repeat that?

15   Q.    I withdrew the question.

16   A.    Oh.

17   Q.    I want to return to the topic of what you intended to do

18   with these.  Why did you buy 12 total lightning links on these

19   auto key cards?

20   A.    Well, I mean, again, from an historical standpoint, I

21   wanted them.  But also, I mean, this was during COVID 19.  I

22   mean, society's pretty fragile -- very fragile, as a matter of

23   fact.  I mean, if things were to go lawlessness, it's better to

24   be prepared than not prepared.

25   Q.    So, sir, at the time you purchased the auto key cards, did

1  you anticipate that there could be a circumstance where you

2  would cut these out and use them?

3  A.   Yeah.  Potentially, yes.

4  Q.   And sir, after you received the auto key cards did you

5  continue watching videos from CRS Firearms?

6  A.   I did.

7  Q.   And did any of those videos discuss this case?

8  A.   I -- it did.  It was a video where he was talking about I

9  think the ATF started visiting people, and that's when I

10  started to get worried.

11  Q.   Did Mr. Hoover, to your recollection, provide any advice

12  in those videos about what to do if the ATF came to your door?

13  A.   Yeah.  He said don't talk to law enforcement.

14         MR. MESROBIAN:  May I have one moment, Your Honor?

15         THE COURT:  You may.

16         MR. MESROBIAN:  No further questions, Your Honor.

17         THE COURT:  Mr. Larosiere.

18         MR. LAROSIERE:  One moment, Your Honor.

19         May it please the Court.

20         THE COURT:  Go ahead.

21                    CROSS-EXAMINATION

22  BY MR. LAROSIERE:

23  Q.   So Mr. Moya, you said to Mr. Mesrobian that you were

24  somewhat familiar with NFA firearms?

25  A.   Yes, sir.

1    Q.   But you don't own any NFA firearms, right?

2    A.   No, sir.

3    Q.   That said, you've gone down this rabbit hole, so you've

4    kind of learned a decent amount about them, right?

5    A.   Yes, sir.

6    Q.   So given what you've learned about the NFA and ATF, in

7    your personal opinion --

8               MR. MESROBIAN:  Objection, Your Honor, relevance.

9               MR. LAROSIERE:  I haven't made a question.

10              THE COURT:  Well, let me hear the question.

11              MR. LAROSIERE:  Should we sidebar, Your Honor?

12              THE COURT:  Go ahead.

13          (Proceedings at sidebar:)

14              THE COURT:  What's the question?

15              MR. LAROSIERE:  The question would be, "Is it your

16   opinion that ATF's opinions are consistent?"  And this has

17   been -- I feel this has been -- the door has been opened to

18   this multiple times because they've talked about solvent traps

19   constantly, whereas there were multiple ATF approvals on

20   solvent traps and then their minds have been changed.  They've

21   talked about the pistol brace repeatedly, suggesting that

22   they're regulated SBRs, whereas for 20 years they were not,

23   including lightning links.  For a long period of time ATF

24   consistently held the position that certain ones were not

25   machine guns, so --

1          THE COURT:  No, I was just trying to get you to lower
2     your voice.  You tend to yell.
3          MR. LAROSIERE:  I'm so sorry, Your Honor.
4          THE COURT:  It's okay.  It's okay.
5          Mr. Mesrobian.
6          MR. MESROBIAN:  Your Honor, the witness's opinion
7     about the consistency or lack thereof of ATF's regulatory
8     issuances is not relevant to this case.
9          THE COURT:  I agree.  Mr. Larosiere, it doesn't --
10    whether -- his opinion about whether ATF has taken consistent
11    or inconsistent positions doesn't go to prove or disprove any
12    fact that the jury has to determine in this case, so I'm not
13    going to allow that question.
14         MR. LAROSIERE:  Okay.  Thank you, Your Honor.
15       (Proceedings in open court:)
16    BY MR. LAROSIERE:
17    Q.   So you were saying you were pretty familiar with the NFA
18    world.  I think you listed off different types of firearms that
19    were regulated by the NFA?
20    A.   Correct.
21    Q.   Have you ever heard of the concept of indexing?
22         MR. MESROBIAN:  Objection, Your Honor.  Relevance.
23         THE COURT:  I'll allow the question.  But in a
24    vacuum, Mr. Mesrobian, I can't determine that.
25         Go ahead.

1    A.    Indexing?  No.

2            MR. LAROSIERE:  Okay.  That's all I have for you.

3    Thank you so much.

4            THE COURT:  Mr. King.

5            MR. KING:  May it please the Court.

6            THE COURT:  Go ahead.

7                        CROSS-EXAMINATION

8    BY MR. KING:

9    Q.    Good afternoon, sir.  And I want to make sure that I'm

10   addressing you properly.  Is it "Dr. Moya" or is it "Mr. Moya"?

11   A.    If I'm not in the hospital, "Mr. Moya" is okay.

12   Q.    Okay.  But otherwise, when you're working, you do go by

13   "Dr. Moya"?

14   A.    Well, I'm currently in the retail setting, so I -- I just

15   feel like it takes away from medical doctors.

16   Q.    Okay.  And you have advanced degrees?

17   A.    Correct.

18   Q.    And not to put you on the spot, do you consider yourself

19   an intelligent individual?

20   A.    Yes, sir.

21   Q.    And you've done a lot of research into firearms and NFA

22   items; is that a fair statement?

23   A.    Yes, sir.

24   Q.    And there was a couple of things I wanted to discuss with

25   you in terms of your understanding, is you purchased four

1   items, the bottle opener items?

2   A.   That is correct.

3   Q.   And ultimately you, at the request of the government, gave

4   those to the government?

5   A.   Yes.

6   Q.   And those, at that point, had not been cut out or

7   mutilated or altered in any sort of way?

8   A.   No, sir.  I had them just stored away.

9   Q.   And it was your understanding based on your own research

10  that if you did not cut anything out or otherwise materially

11  alter what you -- the auto key cards you received, that they

12  were not violative of the NFA?

13  A.   Yeah.  I was on the fence about purchasing it, but I kind

14  of considered it more like an 80 percent receiver, where you

15  still had to do the work in order for it to be considered a

16  firearm, or in this case a lightning link.

17  Q.   And to be clear, from your understanding, the piece of

18  metal itself doesn't do anything until you cut it up, put it

19  together, and do those sorts of things?

20  A.   Right, correct, with all the right pieces, and then it

21  comes together like a puzzle.

22  Q.   And it's not just the pieces that are on the auto key

23  card.  There's other pieces of that puzzle to go to as well?

24  A.   That is correct, several.

25  Q.   And there's several other things that you would need if

1    you wanted to break the law and try to do that?

2    A.   Yes, sir.

3    Q.   But you did not want to do that?

4    A.   No, sir.

5    Q.   We talked a little bit on direct, if you'll recall, you

6    were asked if you saw a video about not talking to law

7    enforcement?

8    A.   Yes.

9    Q.   But you talked to law enforcement?

10   A.   After getting a lawyer.

11   Q.   Okay.  But you did talk to them and answer their

12   questions?

13   A.   Yes, sir.

14   Q.   There's another comment that you made, and I want to make

15   sure that I understood what you were saying.  You made the --

16   and if I'm misquoting you, please correct me.

17         You said, "If things were to go lawlessness."  Do you

18   remember saying that?

19   A.   I did.

20   Q.   What are we talking about?

21   A.   Chaos.  I mean, we had these riots, we had COVID.  We live

22   in a very fragile society.  It's actually frightening.

23   Q.   And again, I don't want to put words in your mouth, so if

24   you don't agree with what I'm going to say, please either

25   reject it or correct it as you see fit; is that fair?

1   A.    Yes, sir.

2   Q.    So my understanding is you -- one of the reasons, and it

3   may be lower on your scale, and I'll ask you about that when

4   we're done, but if, essentially, the laws of the United States

5   broke down and civil society broke down, you had a safety or

6   backup that you thought you could potentially put together?

7   A.    Correct, but it wouldn't have been my first option.

8   That's -- it's not a -- it's an obsolete design.

9   Q.    What do you mean by that?

10  A.    It's -- it was made for the SP1 AR-15, which I want to say

11  was like in the '70s, the '80s.  I mean, you don't have an

12  option to go semi-auto.

13          Most shooting is done in semi-auto unless there's

14  like close-quarter combat or like suppressor fire.

15  Q.    Did you view this as a useful piece of technology, or how

16  did you view this?

17  A.    I mean, it's nice to have, but that's not the route I

18  would have taken if I wanted to break the law.

19  Q.    And in terms of where you saw -- if I put, you know,

20  conversation piece, bottle opener, collapse of Western

21  Civilization, where would you -- where you would rank kind of

22  the collapse of Western Civilization on there?

23  A.    I'm sorry, could you repeat the question?

24  Q.    In terms of your concerns or the reasons for your

25  purchase.

1  A.   Well, that -- I consider myself a prepper, so the collapse

2  of civilization is pretty up there.  It's high on the list.  If

3  society was to collapse, I mean, it would be bad.  Most people

4  don't even know how to get clean water.

5  Q.   And this is something that is concerning to you and other

6  people?

7  A.   Oh, yes, absolutely.

8  Q.   And something that you prepare for?

9  A.   Correct.

10  Q.   And it was not your intention to use this to violate the

11  law, but to be prepared for when laws might not exist; is

12  that --

13  A.   Yes, sir, because at that point, what does it matter?

14       MR. KING:  Your Honor, I have no further questions.

15       THE COURT:  Go ahead, Mr. Mesrobian.

16       MR. MESROBIAN:  Thank you, Your Honor.

17                     REDIRECT EXAMINATION

18  BY MR. MESROBIAN:

19  Q.   So, sir, just now with Mr. King you were talking about the

20  technology of the lightning link and that it was an older

21  technology, correct?

22  A.   Yes, sir.

23  Q.   And you stated that it was nice to have?

24  A.   Yes, sir.

25  Q.   And when you say "nice to have," do you mean in terms of

1  its potential to be used as a machine gun conversion device?

2  A.    Yes, sir, having options.

3  Q.    And Mr. King also asked you about other parts that might

4  be required so that you could convert an AR-15 to full auto

5  with the lightning link; is that right?

6  A.    Correct.

7  Q.    What other parts are there other than a properly

8  configured AR-15?

9  A.    When you word it like that, none other.  But if you want

10 me to go into details, I can.

11 Q.    Well, you mentioned SP1 bolt carrier.  Is that -- to your

12 understanding, is that the type of bolt carrier you would need

13 to use with a lightning link?

14 A.    Correct, that is the type of bolt carrier you'll need, but

15 you do need other parts as well.

16 Q.    Such as?

17 A.    So there's different lower receivers for an AR-15.  Not

18 all of them are the same.  I want to say there's a low, there's

19 a mid, there's a high shelf.  And there's also -- Colt made

20 their proprietary lower, which is where the SP1 comes from

21 where you drop it in.  They have like a metal piece where you

22 can't drop in any automatic parts into the actual lower

23 receiver.  And you also need a single-stage trigger.  It can

24 cannot be a double-stage trigger.

25 Q.    So to be clear, those parts are available; is that

1  correct?

2  A.    Yes.  The SP1 bolt carrier is the harder part to find.

3  They do pop up on Gun Broker every now and then.  I think that

4  they go for like $300 or something like that.

5  Q.    Do you recall in any of the CRS Firearms videos you viewed

6  whether the availability of SP1 bolt carriers was discussed?

7  A.    It was.  And I think at the time there was a company that

8  was still making them, but I don't think they make them

9  anymore.  But they were.

10  Q.    But at the time you purchased the auto key card, these

11  were available?

12  A.    Yes, sir.

13        MR. MESROBIAN:  And Your Honor, may we publish

14  Government Exhibit 1 beginning at 11:55?

15        THE COURT:  Go ahead.

16     (Video played.)

17     (Video stopped.)

18  BY MR. MESROBIAN:

19  Q.    So Mr. Moya, was that the discussion of the SP1 bolt

20  carrier that we were just talking about?

21  A.    Yes.

22  Q.    And, I mean, does that conform with your recollection of

23  the market at the time, that these were available?

24  A.    Yeah, yeah, they have -- I believe, yeah, they were

25  available at the time, yes.

1      MR. MESROBIAN:  No further questions, Your Honor.

2      THE COURT:  Go ahead, Mr. King.

3      MR. KING:  Thank you.  May it please the Court.

4                    RECROSS-EXAMINATION

5  BY MR. KING:

6  Q.   Dr. Moya, I want to make sure that I'm understanding.  So

7  if I were to purchase -- go to a local gun shop and buy any new

8  AR-15, would what you would be able to cut out of an auto key

9  card function?

10 A.   It depends on everything --

11     MR. MESROBIAN:  Objection as to foundation.

12     THE COURT:  Go ahead with your next question.

13 BY MR. KING:

14 Q.   On a standard off-the-shelf AR-15, would this work or

15 would it need additional other parts to make it work?

16 A.   It would need additional other parts to make it work.

17 Q.   And in and of itself, an off-the-shelf AR-15, none of this

18 will work unless it's a 40-year-old firearm?

19 A.   Correct, because it needs the SP1 bolt carrier.

20     MR. KING:  Nothing further, Your Honor.

21     THE COURT:  Ms. Wiles.

22     (The judge and the courtroom deputy confer.)

23     THE COURT:  Anything else from this witness?

24     MR. MESROBIAN:  No.

25     THE COURT:  You may step down, sir.

1           Next witness.

2           MR. MESROBIAN:  Your Honor, the United States calls

3    Darek Stennes.

4       (Witness exits the courtroom.)

5       (Witness enters the courtroom.)

6           THE COURT:  Sir, I'll ask you to come right up here.

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  And remain standing for just a moment to

9    be sworn.

10          COURTROOM DEPUTY:  If you could please raise your

11   right hand.  Do you solemnly swear that the testimony you're

12   about to give before this Court will be the truth, the whole

13   truth, and nothing but the truth, so help you God?

14          THE WITNESS:  I do.

15          COURTROOM DEPUTY:  You may have a seat.  And if you

16   can please state your name for the record and spell your first

17   and last name.

18          THE WITNESS:  Darek Stennes.  Darek, D-a-r-e-k, last

19   name Stennes, S-t-e-n-n-e-s.

20          THE COURT:  Go ahead.

21          **DAREK STENNES, GOVERNMENT WITNESS, SWORN,**

22                        DIRECT EXAMINATION

23   BY MR. MESROBIAN:

24   Q.   Good afternoon, sir.  Could you tell the jury the city and

25   state where you live.

1   A.   Jacksonville, Florida.

2   Q.   And what do you do for a living?

3   A.   I'm executive chef for the River Club.

4   Q.   So sir, are you required to be here today to testify

5   pursuant to a subpoena?

6   A.   Yes, sir, I am.

7   Q.   And did the government provide you with a letter

8   explaining certain terms of immunity to you?

9   A.   Yes, sir.

10  Q.   You understand you just took an oath to tell the truth,

11  right?

12  A.   I do.

13  Q.   And is that your intention today?

14  A.   Yes, sir.

15  Q.   So Mr. Stennes, do you own any firearms?

16  A.   I do, approximately 20, 22.

17  Q.   Is hunting or shooting firearms a hobby of yours?

18  A.   It is.

19  Q.   How did you first get into it?

20  A.   Through my father.

21  Q.   And are you familiar with the term "NFA firearm"?

22  A.   Yes, sir, I am.

23  Q.   Do you own any NFA firearms?

24  A.   I do.  Currently I have six.

25  Q.   And are those registered with the ATF?

1  A.    Yes, sir.

2  Q.    And did you do that in your own name or did you create a

3  trust?

4  A.    A trust.

5  Q.    Do you own any machine guns?

6  A.    No, sir.

7  Q.    And do you have any registered in your name or in the

8  trust's name with the ATF?

9  A.    No, sir.

10  Q.    Have you ever?

11  A.    No, sir.

12  Q.    So Mr. Stennes, are you familiar with an item called the

13  auto key card?

14  A.    I am.

15  Q.    How did you first hear about the auto key card?

16  A.    It popped up on YouTube.

17  Q.    Had you -- do you recall the name of that video?

18  A.    I believe it was "Five things the ATF Doesn't Want You to

19  Know About," or something along those lines.

20  Q.    And do you recall the name of the channel that published

21  that video?

22  A.    It was CRS.

23  Q.    Had you watched videos made by the CRS Firearms channel

24  before?

25  A.    I don't believe so, but I'm not a hundred percent certain.

1   Q.   Do you recall when you saw this video?

2   A.   It was, I would say, beginning of November of '20, 2020.

3   Q.   And what do you recall Mr. Hoover -- or, excuse me, CRS

4   Firearms saying about the auto key card in that video?

5   A.   Basically it was a schematic or drawing of a key card, or

6   a lightning link, rather.  And then some other items, a coat

7   hanger and some other things he described.

8   Q.   And to be clear, there was an individual speaking in that

9   video?

10  A.   Correct.

11  Q.   And do you recall that person suggesting what someone

12  could do with an auto key card and an AR-15?

13  A.   Yeah, certainly.  You could cut it out, if you're so

14  inclined.

15  Q.   And what would you do after you cut it out?

16  A.   You'd place it in the AR-15, and with a certain bolt you

17  could potentially have automatic fire.

18  Q.   Do you recall if during the video the individual provided

19  instructions on how to install the auto key card?

20  A.   I think he showed like a -- the center part sliding over a

21  trigger or something, but not -- maybe not explicit

22  instructions, but it's kind of self-explanatory, I think.

23  Q.   Do you recall -- withdrawn.

24       When you say "self-explanatory," do you mean that you

25  thought it would be relatively simple?

1   A.   You could, yeah.  I mean, knowing -- I do have some
2   knowledge of firearms and their functions, and yeah, it could
3   easily be done with some time.
4   Q.   Did you watch videos made by CRS Firearms after you
5   learned about the auto key card?
6   A.   I have.
7   Q.   And did you follow the Auto Key Card account or anything
8   related to auto key cards on social media?
9   A.   I believe I watched a video on Instagram for auto key
10  cards of a tuna.
11  Q.   Did you say a tuna?
12  A.   Well, yeah, a fire-spitting tuna mimicking a machine gun.
13          MR. MESROBIAN:  Your Honor, may we publish Government
14  Exhibit 49A?
15          THE COURT:  You may.
16  (Video played.)
17  (Video stopped.)
18  A.   That's the video.
19  Q.   I'm sorry, what?
20  A.   That's it, yes, sir.
21  Q.   You saw that video on social media?
22  A.   I did.
23  Q.   And did you understand that to be an advertisement for the
24  auto key card?
25  A.   I did.

1    Q.    Did you see that -- or did you end up purchasing an auto
2    key card?
3    A.    I did.   Two.
4    Q.    Did you purchase them before or after you saw that video
5    involving the fish?
6    A.    I believe before, but I'm not certain.
7    Q.    But you purchased them after you saw the CRS Firearms
8    video?
9    A.    Yes, sir.
10   Q.    At the time you purchased the auto key cards, did you own
11   an AR-15-type rifle?
12   A.    Yes, sir, two.
13   Q.    Did you say two?
14   A.    Uh-hmm.
15   Q.    And how long after watching the CRS Firearms video did you
16   purchase the auto key cards?
17   A.    Say within three or four days probably.   Fairly soon
18   afterwards.
19   Q.    And how did you make that purchase?
20   A.    On a credit card in my name.
21   Q.    And did you do it via the website?
22   A.    Yes, sir.
23          MR. MESROBIAN:  And Your Honor, may we publish
24   Government Exhibit 670?
25          THE COURT:  Go ahead.

```
 1  BY MR. MESROBIAN:
 2  Q.   So Mr. Stennes, published Government Exhibit 670, is that
 3  an email regarding an order with autokeycard.com?
 4  A.   Yes, sir.
 5  Q.   And at the top -- or, rather, underneath the -- or right
 6  above the --
 7  A.   I see it.
 8  Q.   -- green box that says --
 9           MR. MESROBIAN:  If we can go back out, Ms. Ganoe.
10  BY MR. MESROBIAN:
11  Q.   The green box that says "View Order," it says "Darek
12  Stennes placed Order 1298 on November 14th"?
13  A.   Yes, sir, that's me.
14  Q.   And below that, under -- for Order Summary it states,
15  "Auto Key Card Stainless Steel Business Card 1 in 1," correct?
16  A.   Correct.
17  Q.   And the price at that point for that was $40?
18  A.   Yes, sir.
19  Q.   And the shipping address below is an address in
20  Jacksonville, Florida, to Darek Stennes; is that correct?
21  A.   Yes, sir, correct.
22  Q.   And that's you?
23  A.   That's me.
24  Q.   This was just for one auto key card; is that right?
25  A.   Right.
```

1           MR. MESROBIAN:  May we publish Government

2    Exhibit 67P, as in Peter?

3           THE COURT:  Go ahead.

4    BY MR. MESROBIAN:

5    Q.    And Mr. Stennes, this is another email regarding an order,

6    right?

7    A.    Correct.

8    Q.    And this happened on the same day, November 14th, 2020?

9    A.    Yes, sir.

10   Q.    And this order is for an Auto Key Card 1 in 1 Pen Holder

11   Edition for $65; is that right?

12   A.    Correct.

13   Q.    And the shipping address is, again, Darek Stennes at a

14   particular address --

15   A.    Same, yes, sir.

16   Q.    -- in Jacksonville, Florida?  And that is also you?

17   A.    Yes, sir.

18   Q.    So these are two different auto key cards that you

19   purchased, one 1 in 1 without a pen holder and one 1 in 1 with

20   a pen holder?

21   A.    Correct.

22   Q.    Why did you make these two orders?

23   A.    Originally I wanted just the pen holder.  I hit the wrong

24   one on the website, so I almost immediately ordered the pen

25   holder one.

1    Q.   So why did you make this purchase on or about

2    November 14th, 2020?

3    A.   I mean, actually, I knew what it was a depiction of -- a

4    lightning link -- and I actually got it as a pen holder.  I

5    wanted to use it to people -- you could tell people what it was

6    and, if you were so inclined, what you could do with it.  But I

7    actually got it as a pen holder to put on my desk.

8    Q.   Did you initially receive the auto key cards you ordered?

9    A.   No, I did not.  They were lost in the mail.  It's a newer

10   subdivision with a central mailbox, and I've lost quite a few

11   packages.  But those were lost.

12        MR. MESROBIAN:  And Your Honor, may we publish

13   Government Exhibit 67S?

14        THE COURT:  Go ahead.

15        MR. MESROBIAN:  If we could go to the last page,

16   Ms. Ganoe.

17   BY MR. MESROBIAN:

18   Q.   So in front of you is Government Exhibit 67S.  And at the

19   bottom -- this is an email chain between you and someone at

20   autokeycard.com?

21   A.   Yes, sir.

22   Q.   And at the bottom here there's an email from you on

23   November 18th, 2020, at 6:03 p.m.; is that right?

24   A.   Yes, sir.

25   Q.   And it states, "USPS states delivered, dot dot dot, not to

1    me.  Check all neighbors.  Nowhere to be found.  Please advise.

2    Thanks, Darek"?

3    A.    Correct.

4    Q.    There are a couple typos in there, but did I interpret

5    that correctly?

6    A.    Yes, sir.

7    Q.    So does this reflect that you didn't initially get the

8    package that --

9    A.    Yes, sir.

10   Q.    -- was intended for you?

11          So above that there's a response from

12   autokeycard.com.

13          MR. MESROBIAN:  If you could go up just slightly,

14   Ms. Ganoe.

15   BY MR. MESROBIAN:

16   Q.    November 18th at 6:12 p.m.  Did you receive this email?

17   A.    Yes, sir.

18   Q.    And it reads, "Dear Darek Stennes, I was able to find your

19   orders in the system.  There are two of them.  Did you receive

20   one and not the other or neither?  They both show delivered,"

21   and it continues on.  Is that right?

22   A.    Yes, sir.

23   Q.    And so did you engage with a -- with someone at

24   autokeycard.com about your lost order?

25   A.    Yes, sir.

1    MR. MESROBIAN:  Go up to the next page, Ms. Ganoe.

2    BY MR. MESROBIAN:

3    Q.    So on November 18th at the bottom of the -- this page you

4    replied and talked about the subdivision that you lived in; is

5    that right?

6    A.    Yes, sir.

7    Q.    And someone at autokeycard.com replied to your email and

8    said, "Okay, I will call you to discuss.  Our number is

9    (904) 413-1776"; is that right?

10   A.    Yes, sir.

11   Q.    Did you speak to someone on the phone?

12   A.    I did.  I saw the local number, so I called.

13   Q.    Did -- who did you speak to?

14   A.    I'm not certain the name, but whoever answered; whoever

15   was in charge at Auto Key Card.

16   Q.    Was it a man?

17   A.    Yes, sir.

18   Q.    And what was the conversation like?

19   A.    Just basically it was lost, don't worry about it.  You can

20   just send a replacement or send a refund, either way is fine.

21   He said he would resend it.

22   Q.    Did you ultimately receive any auto key cards?

23   A.    Yes, sir, I did.

24   Q.    How many did you receive?

25   A.    There was four total:  the two that I originally ordered,

1  an additional bottle opener one, and a single card.  I think it

2  had two on it.  I don't recall.  But four total.  Four total

3  cards.

4          MR. MESROBIAN:  Ms. Ganoe, if we could go up to the

5  next page above this one.

6  BY MR. MESROBIAN:

7  Q.   So on November 21st, 2020, someone at autokeycard.com

8  wrote an email.  Do you recall receiving this email?

9  A.   I do.

10  Q.   And it read, "I sent a replacement order to you via UPS.

11  They said it will be there on Thursday.  The tracking number,

12  is" -- and there's a tracking number there.  "I also included a

13  free bonus for you.  Hometown heros have to stick together.

14  Thank you for your support"; is that right?

15  A.   Yes, sir.

16  Q.   And does that reflect the discussion that you had about

17  getting a replacement order?

18  A.   Yes, sir.

19  Q.   And then the bonuses you received?

20  A.   Uh-hmm.

21          THE COURT:  Was that yes?

22          THE WITNESS:  Yes.  Yes, it was, sorry.

23          MR. MESROBIAN:  Thank you, Your Honor.

24  BY MR. MESROBIAN:

25  Q.   So, Mr. Stennes, when you received these auto key cards,

1   what was your reaction?

2   A.   I guess I was a little nervous and shocked.  To be honest,

3   I thought from the get-go that it was almost a sting operation.

4   I mean, I felt uneasy about it.  I knew what it was a picture

5   of.  I knew what someone with intent could do with it.  I did

6   not have that intent.  But upon seeing the precision of how the

7   center portion was cut out, I did not feel good about it.  And

8   within a day or two I destroyed them.

9   Q.   And when you say the precision of the center portion, are

10  you referring to what was called on the website "the Pen

11  Holder"?

12  A.   Correct, yes, sir.

13  Q.   And you understood that to -- when you saw it to be what?

14  A.   Well, the part that went over the trigger, I -- obviously

15  it could hold a pen.  And the precision, the way it was cut, I

16  did not feel comfortable with it at all.  So I disposed of

17  it -- or destroyed it, rather, and kept it in my safe for

18  something that obviously ended up happening further down the

19  road, so . . .

20  Q.   When you say obviously something, do you mean ATF --

21  A.   Yeah, this, yeah.

22  Q.   Did ATF come to speak with you?

23  A.   Actually, no, they did not.  I -- they went to speak to a

24  friend of mine.  We both contacted a lawyer.  This is within a

25  day or two when the story hit on YouTube and everywhere.

1            And my lawyer obviously contacted the ATF and said,

2    "I've got another gentleman who's got some more information

3    that may or may not pertain to the trial," so -- or

4    investigation, rather, so . . .

5    Q.   And at the time you contacted a lawyer and the lawyer

6    reached out to law enforcement, you still had the cut-up pieces

7    of --

8    A.   Yes, yes, sir.

9    Q.   And did you surrender those to ATF?

10   A.   I did.

11            MR. MESROBIAN:  Your Honor, may I approach with

12   Government Exhibit 108?

13            THE COURT:  You may.

14   BY MR. MESROBIAN:

15   Q.   I see you are already cutting open 108.

16   A.   Oh, I'm sorry.

17   Q.   That's fine.

18   A.   I figured --

19   Q.   I reached back to the microphone.

20            But would you mind opening up Government Exhibit 108.

21   A.   Yes, sir.

22   Q.   And just be careful when you're handling those.

23   A.   Trust me, I have many cuts.

24   Q.   Do you recognize that?

25   A.   I do, sir.

1    Q.   And what is it?

2    A.   It's the remnants of the key cards.

3    Q.   And that's what you surrendered to ATF?

4    A.   Yes, sir.

5    Q.   And do you -- how did you cut these up?

6    A.   With a -- not very carefully, but with a quarter-inch

7    angle grinder and a cut-off blade.

8              MR. MESROBIAN:  Your Honor, I move to admit

9    Government Exhibit 108.

10             MR. KING:  Without objection, Your Honor.

11             MR. LAROSIERE:  Without objection, Your Honor.

12             THE COURT:  108 is admitted.

13         (Government's Exhibit 108 admitted in evidence.)

14             MR. MESROBIAN:  May I have one moment, Your Honor?

15             THE COURT:  You may.

16             MR. MESROBIAN:  No further questions, Your Honor.

17             THE COURT:  Mr. Larosiere.

18             MR. LAROSIERE:  Yes, Your Honor.

19                        CROSS-EXAMINATION

20   BY MR. LAROSIERE:

21   Q.   So you -- you indicated you saw that Instagram, or

22   whatever it was, video, right?

23   A.   Yes, sir.

24   Q.   What was your intent when you bought it?  You said

25   literally to hold a pen, right?

1    A.    Yes, sir.

2    Q.    And you mentioned about -- you mentioned about an area

3    that goes over the trigger?

4    A.    The center portion of it, rather.

5    Q.    Does that go over the trigger?

6    A.    Potentially, yeah.

7    Q.    So you're not sure?

8    A.    Well, I mean, I never cut it out so I don't know.  But

9    dimensionally it looked to be about the right size.  I do have

10   some knowledge of how they function -- lightning links -- and

11   it looked to be about the right location for it.

12   Q.    Okay.  I was just a little confused when you said "goes

13   over the trigger" --

14   A.    Yeah.

15   Q.    -- but thank you for clearing that up.

16            MR. LAROSIERE:  Nothing further.

17            THE COURT:  Mr. King.

18            MR. KING:  May it please the Court.

19            THE COURT:  Go ahead.

20                        CROSS-EXAMINATION

21   BY MR. KING:

22   Q.    Good afternoon, sir.

23   A.    Good afternoon.

24   Q.    Who is George Epperson to you?

25   A.    He's a friend of mine.

1    Q.    How do you know him?

2    A.    I met him through his uncle probably eight or nine years

3    ago.

4    Q.    And are y'all friends, acquaintances?

5    A.    I'd say acquaintances.  He lives in Yulee, so kind of far

6    away, but we -- I race cars in my spare time and he helps with

7    the mechanic aspects of it.

8    Q.    Did y'all used to own a race car together?

9    A.    We did.

10   Q.    And you weren't contacted by law enforcement but he was?

11   A.    Correct.

12   Q.    And were you concerned your friend was in trouble?

13   A.    Well, I had told him to cut it up when I did back in

14   November.  He said he did.  He, in fact, sent me pictures of it

15   at some point.  But he's a little -- well, he gets kind of

16   nervous, so yeah, I was kind of concerned for him because he

17   was having seizures and -- you know, more as a friend and

18   medically.

19   Q.    And you guys both hired the same attorney to help you out

20   with this problem?

21   A.    Yes, sir.

22   Q.    And my understanding is you would have received this back

23   in November?

24   A.    Correct.

25   Q.    And law enforcement comes months later?

1   A.    Uh-hmm.

2   Q.    I'm sorry, I know you mean yes, sir.

3   A.    I'm sorry.  Yes, sir, yes, sir.  I'm sorry.

4   Q.    That's not a problem.

5          And so what I'm trying to understand, and please help

6   me out here, is if you got it and didn't like it, you cut it

7   up --

8   A.    Yes, sir.

9   Q.    -- why did you save the pieces for four, five, six months?

10  A.    Just in case.  Same reason I kept the emails; just, I

11  didn't feel comfortable with it.  And sometimes things happen

12  that are not wise.  More than buyer's remorse, I would say.

13  And I wanted to keep it just so I could prove that if something

14  did come up, I, in fact, destroyed it.

15  Q.    So you just kept the pieces for that reason?

16  A.    Yes, sir.

17  Q.    And when you purchased it you said there was two things.

18  One, to hold a pen?

19  A.    Uh-hmm.

20  Q.    I'm sorry, is that a yes?

21  A.    I forgot.  Yes.

22  Q.    You are not the first person to do that; won't be the

23  last.  It's not a problem.

24          What was the second reason that you said when you

25  were talking to the attorney for the government?

1  A.   Well, I mean, somebody could buy one and cut it out and
2  make it work, I would assume.  I did not.  I bought it
3  literally for a pen holder.  But yeah, it could.  The
4  schematics were there, for lack of a better word.
5  Q.   Okay.  Let me ask you this.  Not why somebody else would
6  buy it, but you said there was a second reason you bought it,
7  and that was because you thought it was interesting to talk
8  about with people?
9  A.   Sure, yeah.  I mean, as a pen holder I could say what it
10  was or what it could be.
11  Q.   And we could agree that 40 or $50 is a lot for a pen
12  holder --
13  A.   Yes.
14  Q.   -- without some other aspect?
15  A.   Yes, sir.
16  Q.   And so the reason for your purchase, you never had any
17  intent to cut any pieces out and create a machine gun or
18  otherwise break the law; is that fair?
19  A.   No, sir.
20  Q.   But you did buy it not only just to hold a pen, but really
21  so that you could have something to show people and talk about
22  and explain to them what it was and what it meant?
23  A.   Yes, sir.
24  Q.   And that's part of your hobby as a gun owner?
25  A.   Yes, sir.

1   Q.   And you thought that it independently had value to show

2   people to discuss, independent of anything else?

3   A.   I did.  I mean yeah, granted, it's a very expensive pen

4   holder, but yeah.

5   Q.   And so just as a pen holder, it's probably not a very good

6   value, but it's something to show and talk about with people?

7   A.   Sure.

8         MR. KING:  Your Honor, I have no further questions of

9   this witness.

10        THE COURT:  Anything else?

11        MR. MESROBIAN:  Yes.  Very briefly, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. MESROBIAN:

14  Q.   Mr. Stennes, did you ever use the auto key card to hold

15  your pen?

16  A.   Yes, sir, I did.

17  Q.   How long did you use it to hold your pen?

18  A.   Not very long.

19  Q.   And why did you stop doing that?

20  A.   Well, you know, the longer I looked at it and thought

21  about it, the more uneasy I felt with it.

22  Q.   And when you bought the auto key card, did you believe

23  that it could be cut out and used as a machine gun conversion

24  device?

25  A.   It could have been, yes, sir.

1           MR. MESROBIAN:  No further questions, Your Honor.

2           THE COURT:  Anything else?

3           MR. KING:  No, Your Honor.  He can be excused.

4           MR. LAROSIERE:  No, Your Honor.

5           THE COURT:  You may step down.  And you're released.

6       (Witness exits the courtroom.)

7           THE COURT:  All right.  Ladies and gentlemen, I think

8   it's a good time for our afternoon break, just because we are

9   running a little early.  It's about 3:20.  I'll ask you to be

10  back at 3:35 and we will continue with the evidence at that

11  time.

12          Please remember to continue following all of the

13  instructions that I've given you throughout the trial.

14          COURT SECURITY OFFICER:  All rise for the jury.

15      (Jury exits, 3:17 p.m.)

16          COURT SECURITY OFFICER:  Please be seated.

17          THE COURT:  Mr. King, you wanted to address the

18  schedule.

19          MR. KING:  Yes, Your Honor.  And I'll defer to the

20  government.  I know we are -- from what the government tells

21  me, I know we're approaching towards the end of their case in

22  chief.  There was a -- I'm not near the microphone again.

23  Apparently I don't learn.

24          The -- I know that -- and this kind of dovetails into

25  a second issue I'm having that I think I might want to address

1    first, is since right before the trial Mr. Ervin has been in

2    solitary confinement and unable to call my office.  And it's

3    been very difficult to meet with him.

4         Since I brought that up to the government, we do have

5    a meeting scheduled tomorrow so that I can discuss his

6    intentions to testify or not to testify and what that would

7    look like again.

8         But if there's any way the Court could either address

9    with the marshals -- I'm not sure -- I know it's nothing

10   intentionally the government's doing, but communication since

11   about a couple days before the trial has been virtually

12   impossible.  And if there's any instructions the Court could

13   provide the marshals to provide the Baker County Jail, if

14   there's something I can do, that is -- I'm not sure exactly how

15   to handle that, but it has become quite problematic.

16        THE COURT:  All right.  I'll look into it.

17        MR. KING:  I appreciate that, Your Honor.

18        The other issue is I don't know how long of a case

19   the defense is going to have because we still need to have that

20   conversation in depth and haven't had it yet.

21        If the government does plan on resting Wednesday, we

22   have maybe -- depending on whether defendants testify and how

23   long that takes, conceivably, if they choose not to testify

24   and, you know, we have our rebuttal witness, but I wouldn't

25   anticipate that taking very long at all if it does happen, we

1    may be to the point where both parties are --

2             THE COURT:  I'm sorry, a rebuttal witness?

3             MR. KING:  Yes, Your Honor.  We had -- Mr. Daniel

4    O'Kelly, who we discussed at -- he was the individual we had

5    listed under Rule 16, to remind the Court.

6             THE COURT:  Right.  That would just be your -- if you

7    called him, that wouldn't be a rebuttal -- well, you would just

8    be calling him in your case in chief.

9             MR. KING:  Correct, Your Honor.

10            THE COURT:  Okay.  Go ahead.

11            MR. KING:  But I would anticipate even with his

12   testimony, that would be very brief.  Conceivably we could be

13   done, depending on testimony, with everything on Wednesday

14   based on what the government tells me of their schedule left.

15            And so, you know, we thought it incumbent to discuss

16   when we would discuss jury instructions, if the Court planned

17   on -- if we did finish up testimony Wednesday, would we be

18   jumping into closings Wednesday or would we have time to make

19   sure we prepared based on the jury instructions.  And I'm not

20   sure when we wanted to address jury instructions as it relates

21   to both of those things, and then closing argument.

22            THE COURT:  All right.  I think I need to hear from

23   Ms. Taylor as to what you expect in terms of how much longer

24   the government's case is going to take.

25            MS. TAYLOR:  Yes, Your Honor.

1          Essentially we have three more witnesses.  That's

2     Mr. Lintner, Mr. Toy, who are the expert witnesses, and Special

3     Agent Slosson.  I don't think Special Agent Slosson's testimony

4     will take terribly long.  I certainly think -- my expectation

5     is, especially if we get through the bulk of Mr. Lintner's

6     testimony today, that we likely would be finished around the

7     end of Wednesday morning with our case in chief.

8          And so I do share the concern -- I'm working on my

9     closing and preparing slides, and I want to make sure that I

10    correctly am representing in my slides what the jury

11    instructions are going to be, especially with regard to the

12    sort of special modification that the defense has requested in

13    the -- in the substantive instruction related to the

14    conspiracy -- I can't remember if it's in the conspiracy or the

15    substantive transfer counts.  But I wanted to get some clarity

16    on that and any other items in the jury instructions that are

17    in dispute so that I can be sure that my closing is accurate,

18    if possible.

19          THE COURT:  Okay.  Well, you-all are running a little

20    ahead of schedule, as you know, which complicates things for

21    me.

22          I would say we do it tomorrow, but we can't do it

23    tomorrow, so -- unless Mr. Mesrobian just handles the -- the

24    charge conference.

25          MS. TAYLOR:  If we have it like late tomorrow I

 1   could -- or early.  I could be here either of those.  My

 2   treatment I think is supposed to start at like 10:30.  So if we

 3   started at 8:30 tomorrow I think we could probably get it done.

 4            THE COURT:  Unfortunately, that doesn't give me a

 5   chance to --

 6            MS. TAYLOR:  Or alternatively, perhaps 3:30 or 4

 7   tomorrow.

 8            MR. KING:  And just before we get too far on that,

 9   the only time the Baker County Jail has said I can visit

10   Mr. Ervin is tomorrow afternoon, and I need to do that.

11            THE COURT:  Well, if we're having the charge

12   conference he'll be here, so you could visit with him here.

13            MR. KING:  And that saves me a trip to Baker County,

14   which I will never object to, so that could work quite well.

15            THE COURT:  Let me speak with Ms. Wiles.

16        (The judge and the courtroom deputy confer.)

17            THE COURT:  Here's the problem, and that is that the

18   case was -- you-all originally said three weeks.  Ms. Taylor

19   did say that it was going to be shorter than that, but we don't

20   yet have a final draft -- my final draft instructions ready.

21   And while I may be able to have them by late tomorrow

22   afternoon, I'm not sufficiently sure of that.

23            So I think the better thing for us to do would be to

24   have the charge conference Wednesday morning and just tell the

25   jury to come in at like 10:15, planning to start with them at

1    10:30.  And that way we could do the charge conference in the

2    morning and then continue with the evidence after that.

3            Any reason why we can't proceed in that manner,

4    Ms. Taylor?

5            MS. TAYLOR:  No, Your Honor.  I think just as long as

6    I have a sufficient lunch break to make any changes to my

7    slides, then that should be fine.

8            THE COURT:  Okay.

9            Mr. King?

10           MR. KING:  And Your Honor, just for scheduling

11   purpose, would it be the Court's intention that if we finish

12   the evidence on Wednesday, we would proceed into closings, or

13   that we would come back Thursday for closings?

14           THE COURT:  I think that will depend on the time of

15   day.

16           MR. KING:  Yes, Your Honor.

17           THE COURT:  I don't know, Mr. Larosiere or

18   Mr. Zermay, which one of you wants to address this.

19           MR. LAROSIERE:  I don't think we have anything to

20   add.

21           THE COURT:  Okay.  May I see the marshal a moment.

22       (The judge confers with the marshal.)

23           THE COURT:  Mr. King, would it be better -- and I'll

24   let you confer with Mr. Ervin about this, but would it be

25   better for you to go to Baker tomorrow or for me to have the

1   marshals bring Mr. Ervin to the courthouse tomorrow?  Keeping

2   in mind, if he's brought over to the courthouse, he'll be

3   brought over in the morning and will stay until the end of the

4   day, until everybody goes back.  So it's not like it would just

5   be for the hour or two or whatever y'all would to talk.

6           Do you want to talk to him?

7           MR. KING:  If I could briefly, Your Honor.

8           THE COURT:  Of course.

9       (Mr. King confers with Defendant Ervin.)

10          MR. KING:  Your Honor, if we could have him brought

11  here --

12          THE COURT:  Microphone.

13          MR. KING:  I apparently won't learn.

14          Your Honor, if we could have him brought here, it

15  would be significantly more convenient for me, and Mr. Ervin

16  said he has no problem with that.

17          THE COURT:  Okay.  So Ms. Wiles, I'll ask you to

18  request that of the marshals.

19          And then in the meantime, I will -- I've asked the

20  marshal to look into the solitary.  He did confirm that that's

21  not at the marshal's request, but I don't know if Baker County

22  has some sort of rule, but we'll look into that.

23          MR. KING:  Yes, Your Honor.  And I think I was

24  hopefully clear with the Court and the government, I don't

25  think anybody in this room has had any reason to cause that,

1    it's just something that happened.

2            THE COURT:  I know that at least during COVID

3    whenever somebody was getting ready to be in trial or in trial,

4    they kept them segregated out of concern that they would catch

5    COVID and bring it back to the entire population.  And that may

6    be ongoing, I don't know.  But I know that that certainly was

7    the case previously.

8            All right.  So what we're -- when we conclude today

9    I'll tell the jury that they're going to -- that they're not

10   going to come back until 10:15 or 10:30 on Wednesday.  But I

11   think it would be wise for me, because we're now taking a full

12   day off and a little bit of a morning, to just tell them the

13   case has proceeded more quickly than usual and so this won't

14   result in it running over what we estimated.

15           Would you agree with that, Ms. Taylor?

16           MS. TAYLOR:  Yes, Your Honor.

17           THE COURT:  Mr. King?

18           MR. KING:  Yes, Your Honor.

19           THE COURT:  And counsel for Hoover?

20           MR. LAROSIERE:  Yes, Your Honor.

21           THE COURT:  Okay.  All right.  So let me -- you-all

22   didn't get a comfort break.  So it's 3:30.  I'll give you ten

23   minutes.

24           And if the court security officer can just let the

25   jury know that we'll be with them at a little after 3:40.

1          COURT SECURITY OFFICER:  All rise.

2      (Recess, 3:31 p.m. to 3:44 p.m.)

3      (All parties present.  Jury not present.)

4          COURT SECURITY OFFICER:  All rise.  This Honorable

5  Court is back in session.

6          THE COURT:  You can be seated.  But I want to see

7  counsel at sidebar.

8      (Proceedings at sidebar:)

9          THE COURT:  So Mr. King, it turns out that Mr. Ervin

10  is in confinement because he's in disciplinary confinement

11  because he violated the jail rules both by possessing items

12  that he wasn't supposed to possess and by damaging property.

13  So there is nothing I can do about his segregation.

14          MR. KING:  Understood.

15          THE COURT:  I will have him brought over tomorrow.

16          MR. KING:  Yes, Your Honor.

17          Your Honor, there was one other thing.  I know I

18  asked the Court to revisit the ruling into the specific number

19  of years based upon the government playing a portion of the

20  video in Exhibit 5.

21          THE COURT:  I expected that you would have brought

22  that up when you had the witnesses.

23          MR. KING:  Well, and I did not need -- I did not feel

24  the need to revisit it, so I will withdraw that request just on

25  the record, because I think that -- I don't expect any more of

1  those witnesses and I don't feel the need to get into it with

2  any other witnesses.

3          THE COURT:  Yeah, I mean, I anticipated that if it

4  was something you wanted to address you would have brought it

5  up with those witnesses.  And when you didn't, I --

6          MR. KING:  That was my intention.  I just wanted to

7  make sure that I was making a good record, Your Honor.  Thank

8  you, Your Honor.

9          THE COURT:  Okay.

10      (Proceedings in open court:)

11          THE COURT:  Who's the next witness?

12          MR. MESROBIAN:  We're calling Ernest Lintner, Your

13  Honor.

14          THE COURT:  Okay.  Before we hear from Mr. Lintner,

15  Mr. -- hold on.  Mr. Zermay had requested a -- an instruction

16  be given with regard to Mr. Lintner's testimony.  And when was

17  it that you wanted that instruction?

18          Hello?

19          MR. ZERMAY:  Ahead of his testimony.

20          THE COURT:  So there's a rather lengthy instruction

21  that Mr. Hoover proposed.

22          Here's what I would suggest, "This witness is likely

23  to testify as to the meaning of certain terms, laws, and

24  regulations pertaining to firearms.  In addition, this witness

25  may refer to items as 'firearms' or 'machine gun conversion

1   devices.'  As with any other evidence, you may give this

2   testimony as much or as little weight as you believe it

3   deserves.  Remember that you must follow my instructions on the

4   law, and you will decide for yourselves based on the evidence

5   and those instructions" -- "based on the evidence in this case

6   and those instructions whether the auto key card is subject to

7   firearm laws and regulations."

8           I'll read that again.  "This witness is likely to

9   testify as to the meaning of certain terms, laws, and

10  regulations pertaining to firearms.  In addition, the witness

11  may refer to items as 'firearms' or 'machine gun conversion

12  devices.'  As with any other evidence, you may give this

13  testimony as much or as little weight and credit as you believe

14  it deserves.  Remember, you must follow my instructions on the

15  law and decide for yourselves based on the evidence in this

16  case and my instructions whether the auto key card is subject

17  to firearm laws and regulations."

18          Does that suffice, Mr. Zermay?

19          MR. ZERMAY:  Yes, Your Honor.

20          THE COURT:  Mr. King?

21          MR. KING:  Yes, Your Honor.  And I know we had

22  included a version of that in our proposed jury instructions.

23  I guess we can address that Wednesday.

24          THE COURT:  Is it Mr. Mesrobian for this witness?

25          MR. MESROBIAN:  Yes, Your Honor.  And that's fine,

1    what the Court just read.

2           THE COURT:  So should I just do it at the beginning

3    of his testimony?

4           MR. MESROBIAN:  That's fine with the United States,

5    Your Honor.

6           THE COURT:  Okay.  Let me just read through it

7    because I changed a couple of the words.  Let me . . .

8           Okay.  Mr. Lintner, you may come and take your seat.

9           And let's have the jury, please.

10          Actually, Mr. Lintner, if you'll just remain standing

11   right up here.

12          MR. ZERMAY:  Your Honor, just to be clear,

13   Mr. Larosiere is going to be cross-examining this witness.

14          THE COURT:  Oh, okay.

15          COURT SECURITY OFFICER:  All rise for the jury.

16      (Jury enters, 3:51 p.m.)

17          COURT SECURITY OFFICER:  Please be seated.

18          THE COURT:  If you'll remain standing.

19          Madam Deputy.

20          Oh, I'm sorry, Mr. Mesrobian.  Will you call the

21   witness.

22          MR. MESROBIAN:  Yes, Your Honor.  The United States

23   calls Ernest Lintner.

24          THE COURT:  All right.  Madam Deputy, will you swear

25   the witness.

1          COURTROOM DEPUTY:  Please raise your right hand.  Do

2    you solemnly swear that the testimony you're about to give

3    before this Court will be the truth, the whole truth, and

4    nothing but the truth, so help you God?

5          THE WITNESS:  I do.

6          COURTROOM DEPUTY:  You may have a seat.  And if you

7    could please state your name for the record and spell your last

8    name.

9          THE WITNESS:  Ernest Lintner, L-i-n-t-n-e-r.

10         THE COURT:  Sir, could I get you to get a little

11   closer to that microphone.

12         THE WITNESS:  Yes, ma'am.  Ernest Lintner,

13   L-i-n-t-n-e-r.

14         THE COURT:  Ladies and gentlemen, before we

15   testify -- or before we hear from this witness, I instruct you

16   that the witness is likely to testify as to the meaning of

17   certain terms, laws, and regulations pertaining to firearms.

18   In addition, the witness may refer to items as "firearms" or

19   "machine gun conversion devices."  As with any other evidence,

20   you may give this testimony as much or as little weight and

21   credit as you believe it deserves.  Remember, you must follow

22   my instructions on the law and decide for yourselves based on

23   the evidence in this case and my instructions whether the auto

24   key card is subject to firearms laws and regulations.

25         You may proceed, Mr. Mesrobian.

1          MR. MESROBIAN:  Thank you, Your Honor.

2          **ERNEST LINTNER, GOVERNMENT WITNESS, SWORN,**

3                     DIRECT EXAMINATION

4    BY MR. MESROBIAN:

5    Q.   Good afternoon, sir.

6    A.   Good afternoon.

7    Q.   Where are you employed?

8    A.   The Bureau of Alcohol, Tobacco, Firearms, and Explosives.

9    Q.   And how long have you been with ATF?

10   A.   A little over 17 years.

11   Q.   What is your current position?

12   A.   My current position is a Branch Chief of our Advanced

13   Training Branch.  We're located in Brunswick, Georgia, at the

14   Federal Law Enforcement Training Center.

15   Q.   And what are your responsibilities and duties in that

16   role?

17   A.   I oversee the implementation of and delivery of training

18   programs to our employees.

19   Q.   Prior to being Branch Chief in Advanced Training, what was

20   your position with ATF?

21   A.   I was an Area Supervisor, which is a first-line supervisor

22   for the regulatory inspection personnel in our field offices.

23   Q.   And what was your role and responsibilities in that

24   position?

25   A.   I would supervise a group of usually seven to eight

1    regulatory inspection personnel known as Industry Operations

2    Investigators.

3    Q.    And what do Industry Operations Investigators do?

4    A.    They review records that are required to be maintained by

5    Federal Firearms Licensees.

6    Q.    And is that also known as an FFL?

7    A.    Yes.

8    Q.    And do those Industry Operations also handle compliance

9    with the SOT, or Special Occupation -- what is an SOT?

10   A.    The Special Occupational Tax.

11   Q.    And do they handle compliance with those laws as well?

12   A.    Yes, they do.

13   Q.    And how long were you Area Supervisor for Industry

14   Operations?

15   A.    Approximately a year and a half in Orlando.

16   Q.    And what did you do with ATF prior to that?

17   A.    I was the ATF representative or liaison to FBI NICCS,

18   where the FBI conducts background checks on firearms

19   purchasers.

20   Q.    And what is NICCS?

21   A.    National Instant Criminal Check System.

22   Q.    And how long were you the liaison for FBI NICCS?

23   A.    Seven years.

24   Q.    Prior to that did you serve in another capacity at ATF?

25   A.    Yes.  I was an Area Supervisor in Harrisburg,

1    Pennsylvania.

2    Q.    And when you were an Area Supervisor, was that similar to

3    your role that you discussed a moment ago before your current

4    position?

5    A.    Yes, it was.

6    Q.    And how long were you in that role then?

7    A.    Approximately three and a half years.

8    Q.    Before you were Area Supervisor in Harrisburg, where were

9    you employed?

10   A.    I worked at the National Firearms Act Branch in

11   Martinsburg, West Virginia.

12   Q.    And what did you do there?

13   A.    My job title was Specialist.  We would work on various

14   aspects of the National Firearms Act.  We would respond to

15   correspondence, occasionally process registrations.  Basically,

16   you know, act as a consultant to other people in the agency and

17   the industry.

18   Q.    And to be clear, when you were in that role, or at any

19   point during your time with ATF, have you been charged with

20   making determinations about what is or what is not an NFA

21   firearm?

22   A.    No, I have not.

23   Q.    And prior to your serving as a specialist with the NFA

24   Branch, where were you working?

25   A.    I was an Industry Operations Investigator in Oxford,

1   Mississippi.

2   Q.   And was that your first role with ATF?

3   A.   Yes.

4   Q.   And do you have previous training as a law enforcement as

5   well?

6   A.   I do.  I was a municipal and state law enforcement officer

7   in Illinois prior to employment with ATF.

8   Q.   And outside of your law enforcement experience, do you

9   have personal experience with firearms?

10  A.   I do.

11  Q.   And could you describe for the jury what that is?

12  A.   I grew up with them.  It's been a hobby for a long time.

13  And when I was in the Air Force I served as an armorer at RAF

14  Greenham Common, England.

15  Q.   So Mr. Lintner, during your career with ATF in your

16  various roles, have you become familiar with regulations

17  regarding machine guns and machine gun conversion devices?

18  A.   Yes.

19  Q.   And you've spent a number of years, it sounds like, either

20  as a Specialist with the NFA Branch or a supervisor/inspector

21  relating to FFLs and payment of the SOT tax?

22  A.   Yes.

23  Q.   So a couple terms you referenced.  The first was Federal

24  Firearms Licensee.  What is that?

25  A.   A Federal Firearms Licensee is a person or business entity

1    that holds a license to engage in the business of importing,

2    manufacturing, or dealing in firearms.

3    Q.    And the other term was "SOT."  What is an SOT?

4    A.    The Special Occupational Tax.  That tax is imposed by the

5    National Firearms Act and allows the payor to engage in the

6    business of importing, manufacturing, or dealing in firearms

7    that are covered by the National Firearms Act.

8    Q.    And are there different types of SOTs?

9    A.    Yes.

10   Q.    And the three categories you just described, are those the

11   different types?

12   A.    Yes, they are.

13   Q.    And what were those again?

14   A.    Importer, manufacturer, and dealer.

15   Q.    In your career with ATF, have you had regular contact with

16   FFLs and SOTs regarding the transfer and registration of

17   firearms?

18   A.    Yes.

19   Q.    Mr. Lintner, the term "firearm" can have a different

20   definition depending on the context.  Is that fair to say?

21   A.    Yes.

22   Q.    Are you familiar with the Gun Control Act of 1968?

23   A.    Yes.

24   Q.    And what is a firearm covered by the GCA, the Gun Control

25   Act?

1    A.    It is a weapon that is designed to expel a projectile by

2    means of explosive, or the frame or receiver of that weapon.

3    Q.    And that is a broad definition that includes semiautomatic

4    pistols and rifles, revolvers, and other items, correct?

5    A.    Correct.

6    Q.    Are you also familiar with the National Firearms Act of

7    1934, or the NFA?

8    A.    Yes.

9    Q.    And what categories of firearms are regulated by the NFA?

10   A.    Short-barreled rifles, short-barreled shotguns, machine

11   guns, destructive devices, silencers, and any other weapon.

12   Q.    And "any other weapon," do you -- what is that?

13   A.    There's no set type of firearm for it.  It can be a

14   combination rifle-shotgun with barrels between 12 and

15   18 inches.  It could be a smoothbore shot pistol.  It could be

16   a firearm that's disguised to look like something else; an ink

17   pen or flashlight, as a couple of examples.

18   Q.    And we'll talk more about this in a moment, but does the

19   category of machine gun also include machine gun conversion

20   devices?

21   A.    It does.

22   Q.    So with respect to these categories of firearms, what are

23   the particular regulatory requirements for these -- for these

24   categories?

25   A.    I'm sorry, could you repeat that?

1    Q.    Sure.   In order to possess or transfer one of -- one of

2    the NFA firearms you just set out, what are the regulatory

3    requirements in terms of registration, taxes, and so forth?

4    A.    The person who currently holds the firearm and has it

5    registered to them has to make application to the ATF and

6    obtain permission prior to disposing of the firearm.

7    Q.    And when you say "disposing of the firearm," do you mean

8    sell it or transfer it?

9    A.    Yes, to transfer it, to give it possession to another.

10   Q.    And with respect to the firearm itself, when it's

11   manufactured, if it's -- what happens in terms of registering

12   it with ATF?

13   A.    If a manufacturer builds a firearm, that activity is

14   reported on an ATF Form 2.   That is its entry into the

15   registry.

16         If an individual builds a firearm, they would utilize

17   a Form 1 and obtain permission prior to building.

18   Q.    And specifically, when a new NFA firearm is born, is it

19   assigned a serial number?

20   A.    Yes.

21   Q.    And is that particular to that individual firearm?

22   A.    Yes.

23   Q.    And where is that particular serial number recorded?

24   A.    It's on the frame or receiver, if such a thing exists on

25   that firearm.

1    Q.    And does the ATF or the federal government keep track of

2    those serial numbers as well?

3    A.    Yes.

4    Q.    And where are they recorded?

5    A.    A database commonly referred to as NFRTR.  It's National

6    the Firearms Registration and Transfer Record.

7    Q.    So can a civilian own or possess an NFA firearm?

8    A.    Yes.

9    Q.    And what are the requirements for a civilian to purchase

10   an NFA firearm?

11   A.    The transferor submits an application.  It will identify

12   the person who wishes to take possession of it.  Transfer tax

13   is normally due.  Transfer to a government agency would be

14   exempt from that tax, but normally it's $200, or for an "any

15   other weapon" it's $5.

16   Q.    And is there a background check requirement or anything

17   like that for the person purchasing the NFA firearm?

18   A.    Yes, background check is conducted, and also review of

19   state laws where the proposed recipient resides.

20   Q.    So Mr. Lintner, I'd like to focus on one of these

21   categories of NFA firearms, the machine gun and machine gun

22   conversion device.  Are there additional restrictions or

23   regulations placed on that category?

24   A.    On machine guns, yes.  Beginning May 19th, 1986, Congress

25   passed a statute, 18 U.S.C. 922(o), which restricts possession

1    of firearms.  A machine gun built on or after that date would

2    be restricted to a government entity or to someone who is

3    engaged in the business of importing, dealing, or manufacturing

4    NFA firearms.

5    Q.    And is that the SOT, that latter category you were

6    discussing?

7    A.    Yes.

8    Q.    So to be clear, if a machine gun or machine gun conversion

9    device was manufactured and registered prior to that day in May

10   of '86, can it be possessed by a civilian?

11   A.    Yes.

12   Q.    If it's manufactured after that date, is it restricted

13   from civilian use?

14   A.    Yes.

15   Q.    Have machine guns been manufactured since this law was

16   passed in 1986?

17   A.    Yes.

18   Q.    And who can possess those?

19   A.    There would be government agencies, could be the military.

20   It can also be federal, state, local law enforcement agencies,

21   or also those engaged in the business who pay an occupational

22   tax.

23   Q.    So within the Special Occupational Tax, the SOT, is there

24   something known as a Class 2 or Type 2 SOT?

25   A.    Yes.

1   Q.   And is that the manufacturer?

2   A.   Yes.

3   Q.   And can a Class 2 SOT manufacture a machine gun?

4   A.   Yes.

5   Q.   For what purpose?

6   A.   Anticipated sales to authorized recipients.

7   Q.   Can they do so for any purpose, or for that specific

8   purpose?

9   A.   That's supposed to be the purpose that they're building

10  them for.

11  Q.   And if an SOT manufactures a machine gun for that purpose,

12  what do they have to do with respect to the ATF and the

13  registry?

14  A.   They would submit the ATF Form 2 to report the manufacture

15  of any given firearm.

16  Q.   Could an SOT outsource the manufacturing of a machine gun

17  to someone else who is not an SOT?

18  A.   No.

19  Q.   Mr. Lintner, we were just discussing machine guns, but

20  what all is encompassed under the definition of "machine gun"

21  in the NFA?

22  A.   Machine gun would be what you would maybe normally think

23  of as a complete functioning firearm.  It also includes the

24  frame or receiver of a machine gun, or a part or a combination

25  of parts that are designed to convert a weapon into a machine

1   gun.

2   Q.   So are you familiar with the term --

3           MR. KING:  Your Honor, I apologize.  Can we approach?

4           THE COURT:  You may.

5       (Proceedings at sidebar:)

6           THE COURT:  Yes.

7           MR. KING:  Your Honor, I'm going to object to the

8   definition that's been provided, particularly in the context of

9   how it's been charged.  He has I think improperly lumped "part"

10  and "combination of parts" into one definition without the

11  complete definition, which is "a part solely and intended."

12  And I think it's inappropriate for him to be providing half

13  definitions, particularly when that's going to, I imagine, be a

14  big issue when we get to our jury instructions as well as the

15  motions in limine that we have.

16          THE COURT:  Go ahead, Mr. Mesrobian.

17          MR. MESROBIAN:  Your Honor, my next question was to

18  ask about the specific language as alleged in the indictment,

19  the "combination of parts" language, and clarify that.  I think

20  if they would like to cross-examine about, "Can it also be a

21  part, you know, exclusively" -- or whatever the terminology is

22  in the rest of the statute, that's fine.  But I am planning on

23  clarifying about "combination of parts."  But I don't think he

24  inaccurately described the various ways -- the various

25  definitions underneath "machine gun" in the NFA.

1        THE COURT:  I'm going to overrule the object- --  I'm

2   assuming that Mr. Hoover joins in the objection?

3        MR. LAROSIERE:  Yes, Your Honor.

4        THE COURT:  Okay.  I'm going to overrule the

5   objection.  And just for -- I mean, you can go ahead and you

6   can cross-examine him on that, Mr. King.  I will tell you that

7   as currently drafted, I'm not intending to instruct the jury on

8   the "solely and exclusively" language for the reason that I

9   said in my previous written order.

10       MR. KING:  Yes, Your Honor.

11       THE COURT:  But I'll hear from you again about that

12   at the charge conference.  But just so you're aware, my current

13   thought is that they're not going to be instructed on that.

14   But you can do with that as you wish.

15       MR. KING:  And Your Honor, Mr. Mesrobian may cure it

16   with his current examination.  I maybe have jumped the gun a

17   little bit.  But my concern is a singular part has additional

18   requirements than a combination of parts, and I want to make

19   sure that we're not misleading the jury in any way, if that

20   makes sense.

21       THE COURT:  All right.  Well, if there's confusion,

22   then you guys can clear it up.

23       MR. KING:  Yes, Your Honor.

24       THE COURT:  All right.

25       MR. KING:  Thank you.

1        MR. MESROBIAN:  Thank you, Your Honor.

2     (Proceedings in open court:)

3        THE COURT:  Go ahead.

4  BY MR. MESROBIAN:

5  Q.   So, Mr. Lintner, are you familiar with the terminology "a

6  combination of parts designed and intended for use in

7  converting a weapon into a machine gun"?

8  A.   Yes.

9  Q.   And is that part of the definition of "machine gun" in

10 Title 26?

11 A.   Yes.

12 Q.   Did Congress pass that language?

13 A.   Yes.

14 Q.   That's not something that the ATF invented itself,

15 correct?

16 A.   Correct.

17 Q.   Mr. Lintner, are you familiar with something called a

18 lightning link?

19 A.   Yes.

20 Q.   To your knowledge, is that a type of machine gun

21 conversion device as previously determined by someone else at

22 ATF?

23 A.   Yes.

24 Q.   Were lightning links being manufactured prior to the 1986

25 law that we were discussing?

```
 1   A.    Yes.

 2   Q.    Who was manufacturing them?

 3   A.    One company that I'm familiar with is known as S.W.D.

 4   Q.    And did S.W.D. call it a lightning link or did they call

 5   it something else?

 6   A.    I believe they referred to it as an auto connector.

 7   Q.    And did you review ATF records from the registry for

 8   registered lightning link machine gun conversion devices?

 9   A.    Yes.

10          MR. MESROBIAN:  And Your Honor, may I approach with

11   what's marked for identification as Government Exhibits 116A,

12   B, C, and D?

13          THE COURT:  You may.

14   BY MR. MESROBIAN:

15   Q.    Please take a look through those exhibits and let me know

16   when you're ready.

17   A.    Go ahead, sir.

18   Q.    Do you recognize those documents, Government Exhibits

19   116A, B, C, and D?

20   A.    I do.

21   Q.    And what are they?

22   A.    They're ATF Forms 2.

23   Q.    And what is the Form 2 again?

24   A.    It is a Notice of Firearms Manufactured or Imported.

25   Q.    And is that the type of document that would be filed when
```

1   a manufacturer first creates an NFA firearm?

2   A.   Yes.

3   Q.   And what specific types of items do these Forms 2, or

4   these exhibits, relate to?

5   A.   They're all drop-in auto connector, model M15 AC.

6   Q.   And did you procure these records yourself from the ATF?

7   A.   No.

8   Q.   Did you have someone procure them for you?

9        Well, are you familiar with these documents?

10  A.   Oh, yes, yes.

11  Q.   And do these appear to be records from the NFA -- the

12  NFRTR?

13  A.   Yes.

14       MR. MESROBIAN:  Your Honor, move to admit Government

15  Exhibits 116A, B, C, and D.

16       MR. KING:  Without objection, Your Honor.

17       MR. LAROSIERE:  Without objection, Your Honor.

18       THE COURT:  116A, B, C, and D are admitted and you

19  may publish as you wish.

20     (Government's Exhibits 116A-16D admitted in evidence.)

21       MR. MESROBIAN:  And Ms. Ganoe, could we please just

22  publish 116A.

23  BY MR. MESROBIAN:

24  Q.   So could you just briefly walk the jury through what this

25  document reflects in 116A.

```
 1   A.   We have the name and title of the person authorized to
 2   sign for the business.
 3   Q.   And the business on this form is S.W. Daniel, or S.W.D.,
 4   Inc.?  That's the company that you were referring to?
 5   A.   Yes.
 6   Q.   And what is the date of manufacture of this particular
 7   item?
 8   A.   January 2nd, 1984.
 9   Q.   And what is the description of this particular firearm?
10   A.   Type of firearm, drop-in auto connector.
11   Q.   And is that the S.W.D. auto connector or lightning link we
12   were talking about a moment ago?
13   A.   Yes.
14   Q.   And on the right it says, "Serial number and other marks
15   of identification."
16           What does that mean?
17   A.   That the serial number would be AC 001.
18   Q.   And is that particularized to that lightning link or auto
19   connector?
20   A.   Yes.
21           MR. MESROBIAN:  And Ms. Ganoe, if we could go to the
22   bottom right.  That's fine.  Thank you.
23   BY MR. MESROBIAN:
24   Q.   And so on the very bottom right of this -- of Government
25   Exhibit 116A there's a date that's January 2nd, 1984; is that
```

1  right?

2  A.   Yes.

3  Q.   And is that the date that this Form 2 was filed?

4  A.   Yes.

5         MR. MESROBIAN:  Ms. Ganoe, if we could publish

6  Government Exhibit 116C, please.

7  BY MR. MESROBIAN:

8  Q.   Is this a similar Form 2 from S.W.D. for other auto

9  connectors it manufactured?

10        And if it would help to refer to the paper documents

11 in front of you, you can do that as well.

12 A.   Okay.  Yes.

13 Q.   And on Government Exhibit 116C, there are several drop-in

14 auto connectors being included on this form?

15 A.   Yes.

16 Q.   And the serial numbers for those are AC534, AC535, and

17 AC536; is that right?

18 A.   Yes.

19 Q.   And in the bottom right of the document, what is the date

20 that this was filed?

21 A.   April 21, 1986.

22 Q.   So in total, approximately how many lightning links or

23 auto connectors were registered with the ATF pursuant to the

24 NFA?

25 A.   Assuming the serial numbers are all sequential and there

1  were no gaps, it would appear that there's 536, at least.

2  Q.    And is it possible that there was an addition- -- there

3  was another brand name or another serial number under which

4  lightning links were registered with the NFA?

5  A.    That would be possible, yes.

6  Q.    So these registered devices manufactured prior to 1986, or

7  that date in 1986, are they transferable to and between

8  civilians?

9  A.    Yes.

10  Q.    But would lightning links manufactured after May 19th,

11  1986, be limited to the government agencies and SOTs that you

12  were talking about before?

13  A.    Yes.

14  Q.    After the ban in 1986, based on your training and

15  experience, what happened to the prices of machine guns and

16  machine gun conversion devices lawfully transferable among

17  civilians?

18  A.    The ones that are transferable to the general public, the

19  price went up substantially.

20         MR. MESROBIAN:   Your Honor, may I approach with

21  Government Exhibit 61?

22         THE COURT:   You may.

23  BY MR. MESROBIAN:

24  Q.    And I'll give you a moment, and just let me know when

25  you're ready after you've reviewed Exhibit 61.

1   A.   Go ahead, sir.

2   Q.   Do you recognize those documents?

3   A.   Yes.

4   Q.   Did you review them prior to court?

5   A.   Yes.

6   Q.   And are these business records obtained from Rock Island

7   Auctions?

8   A.   Yes.

9   Q.   Are you familiar with Rock Island Auctions?

10  A.   I am.

11  Q.   What is it?

12  A.   It's an auction house.  They auction a substantial number

13  of firearms, many of which are collectible or historical, what

14  you would call high-end, expensive firearms.

15  Q.   And does Government Exhibit 61 contain documents related

16  to a particular lightning link?

17          MR. LAROSIERE:  Your Honor, we object to -- can we

18  sidebar?

19          THE COURT:  You may.

20      (Proceedings at sidebar:)

21          MR. LAROSIERE:  I still can't quite comprehend the

22  theory of relevance here as to Rock Island Company selling the

23  lightning link for a certain price.

24          And also -- I mean, I guess it is business records,

25  so mainly relevance is my objection.

1          THE COURT:  Okay.  That -- that objection is

2    overruled for the reasons that we discussed in the written

3    order.

4          MR. KING:  And Your Honor, do we need to object again

5    when the government moves that in evidence, or is this

6    sufficient?

7          THE COURT:  No.  Mr. King, are you -- not Mr. King.

8          Mr. Mesrobian -- that's what I keep closing my eyes

9    for, is to remember who I'm talking to -- is it your intention

10   to move the exhibit into evidence, Exhibit 61.

11         MR. MESROBIAN:  Yes, Your Honor.

12         THE COURT:  And it does have an 803(6) and a 902(11)

13   certification.  So the only objection is relevance?

14         MR. LAROSIERE:  Unless you've thought of something

15   else.

16         MR. KING:  Your Honor, our objection is based on our

17   motion in limine.  We don't have any issue with the business

18   records certification or the authenticity.  It's to the

19   admissibility as addressed in that motion in limine.  And I

20   understand the Court's ruling, I just wanted to make sure I

21   properly object to that.

22         THE COURT:  And is that your position as well,

23   Mr. Larosiere?

24         MR. LAROSIERE:  Yes, Your Honor.

25         THE COURT:  All right.  So as stated in the motion in

1  limine, the objection to its introduction on that basis is

2  overruled.

3          So I'll -- if you'll just move it into evidence in

4  front of the jury, I'll just admit it without asking for a

5  response.

6          MR. KING:  Thank you, Your Honor.

7          MR. LAROSIERE:  Thank you, Your Honor.

8      (Proceedings in open court:)

9          MR. MESROBIAN:  Your Honor, move for admission of

10  Government Exhibit 61.

11          THE COURT:  61 is admitted.

12      (Government's Exhibit 61 admitted in evidence.)

13          MR. MESROBIAN:  And may we publish, Your Honor?

14          THE COURT:  You may.

15          MR. MESROBIAN:  Please start with page 3, Ms. Ganoe.

16  And on the top half, please.

17          And Your Honor, may we dim the lights in case that

18  might help?

19          THE COURT:  Sure.

20          Ms. Wiles.

21  BY MR. MESROBIAN:

22  Q.   So Mr. Lintner, these documents from Rock Island Auction,

23  do they relate to an auction that closed on or about May 14th,

24  2021?

25  A.   Yes.

1    Q.    And what's listed here is "S.W.D., Inc. Class III/NFA,

2    quote, lightning link, unquote, auto connector for AR-15

3    platform rifles."  Is that right?

4    A.    Yes.

5    Q.    And what was the, as they refer to it, "price realized"

6    for this particular auction?

7    A.    $18,400.

8          MR. MESROBIAN:  And if we could go down to the bottom

9    half, Ms. Ganoe.

10   BY MR. MESROBIAN:

11   Q.    Underneath -- in the bottom half of page 3 of Government

12   Exhibit 61, is there a description of this particular item?

13   A.    Yes.

14   Q.    And could you read that particular description?  You don't

15   need to read the letter -- the long string of letters that are

16   there, but could you read the description, please.

17   A.    "One of approximately 900 manufactured and registered with

18   the BATFE in the early 1980s, these S.W.D., Inc. auto

19   connectors were, and still are, one of the most cost-effective

20   ways to make an AR-15 platform rifle fully automatic.  This

21   example is marked 'S.W.D.'" --

22   Q.    And so forth?

23   A.    Yes, and so forth.

24          -- "followed by the hand marked serial number AC 170,

25   with an extra bolt contact arm and other small parts."

1  Q.   And underneath that there's something called the "Rating
2  Definition" --
3  A.   Yes.
4  Q.   -- is that right?
5  A.   Yes.
6  Q.   And that states, in part, "Very fine, retains most of the
7  original matte gray finish.  While the component is of a
8  'drop-in' nature" -- "drop-in" in quotes -- quality of function
9  is not guaranteed, adjustments may be necessary."
10          Is that right?
11  A.   Yes.
12  Q.   And then it notes that this weapon is a National Firearms
13  Act fully transferable Class III which is registered with the
14  Bureau of Alcohol, Tobacco, Firearms, and Explosives under the
15  provisions of Title 18 and Title 27 of the CFR; is that right?
16  A.   Yes.
17  Q.   To be clear, are you familiar with this particular
18  lightning link in any way?
19  A.   No.
20  Q.   Have you ever actually seen a lightning link up close to
21  your recollection?
22  A.   Yes.
23  Q.   On how many occasions?
24  A.   Very few.  Once or twice.  And I think it was one that we
25  use in our training scenarios at the academy.

1    MR. MESROBIAN:  And Ms. Ganoe, could we go to page 2,
2  please.  And could we focus on the upper left image -- or upper
3  part of the image.  Yeah.
4  BY MR. MESROBIAN:
5  Q.   So Mr. Lintner, this is an image of this particular item
6  up for auction; is that right?
7  A.   Yes.
8  Q.   According to these records?
9  A.   Yes.
10 Q.   What does the "AC 170" inscribed on this item refer to?
11 A.   The serial number.
12 Q.   And that's the particularized serial number assigned to
13 this particular lightning link?
14 A.   Yes.
15 Q.   And again, this lightning link was transferable to a
16 civilian, assuming they followed the particular requirements
17 that you discussed earlier, correct?
18 A.   Yes.
19 Q.   The price was -- that this auction ended at was $18,400?
20 A.   Yes.
21 Q.   Does that reflect that rise in prices for machine guns and
22 machine gun conversion devices that you discussed before?
23 A.   Yes.
24    MR. MESROBIAN:  You can take that down, Ms. Ganoe.
25 BY MR. MESROBIAN:

1    Q.    So to be clear, Mr. Lintner, are you an expert

2    specifically on machine guns or lightning links?

3    A.    No.

4    Q.    Are you familiar with the Firearms and Ammunition

5    Technology Division at ATF?

6    A.    Yes.

7    Q.    And what is -- and that's known as FATD?

8    A.    Yes.

9    Q.    What is FATD's role?

10   A.    They work with the industry and also our employees in the

11   field offices.  They will make determinations and

12   classifications upon request.

13   Q.    And based on your experience, why do people request --

14            MR. KING:  Your Honor, can we approach?

15            THE COURT:  You may.

16        (Proceedings at sidebar:)

17            MR. KING:  Your Honor, I'd object to bolstering.

18   This witness is using his expertise to endorse the next

19   government expert witness and talking about his role and those

20   sorts of things.  So we believe it's bolstering and

21   inappropriate for this witness to comment on another witness's

22   qualification or area of expertise.

23            THE COURT:  Is that where you were going, Mr. --

24            MR. MESROBIAN:  No, Your Honor.  Frankly, I was

25   trying to forestall any attempt to try and get this witness to

1   opine about what is and what is not a machine gun conversion

2   device and explain that that's something else -- some other

3   individual or group's role at ATF.  And I don't think I was

4   asking him to extol the virtues of that division, I was just

5   asking for context.

6           MR. KING:  Your Honor, I withdraw my objection.  I

7   think I misread where we were at with that, so I apologize.

8           THE COURT:  And maybe -- and you're not the first one

9   to do this.  Maybe you guys need to let the question get asked

10  so that we know what it is before you object.

11          MR. KING:  Yes, Your Honor.

12          THE COURT:  Okay.

13      (Proceedings in open court:)

14          THE COURT:  Go ahead, Mr. Mesrobian.

15  BY MR. MESROBIAN:

16  Q.   We were talking about FATD.  Are they the group at ATF

17  that interacts with the industry about particular -- about

18  making classifications of particular items?

19  A.   Yes.

20  Q.   And can a manufacturer submit an item for classification

21  by FATD?

22  A.   Yes.

23  Q.   Does an ATF agent in the field normally make those types

24  of classification decisions?

25  A.   In my experience, no.  They would also rely on the FATD.

1    Q.    Have you ever made those types of determinations?

2    A.    I have not.

3              MR. MESROBIAN:  May I have one moment, Your Honor?

4              THE COURT:  You may.

5              MR. MESROBIAN:  No further questions, Your Honor.

6              THE COURT:  Mr. Larosiere?

7              MR. LAROSIERE:  Yes, Your Honor, just one moment.

8              THE COURT:  Take your time.

9              MR. LAROSIERE:  May it please the Court.

10             THE COURT:  Go ahead.

11                          CROSS-EXAMINATION

12   BY MR. LAROSIERE:

13   Q.    So Mr. Lintner, we've talked about a lot of different

14   acronyms here, right?  We have the GCA, the NFA, the FATD.  I'd

15   kind of like to talk with you and nail some of these down, if

16   you don't mind.

17   A.    Yes, sir.

18   Q.    So you talked about the NFA, right, and the types of

19   weapons that that regulates?

20   A.    Yes.

21   Q.    And that would be machine guns, short-barreled rifles,

22   short-barreled shotguns, any other weapons, destructive

23   devices, and silencers?

24   A.    Yes, sir.

25   Q.    Okay.  And you had mentioned an "any other weapon"

1    earlier.  And that's -- you said something about combination

2    rifles and smoothbore pistols?

3    A.    Yes.

4    Q.    Is the focus of that concealability?

5    A.    Yes.  That term, "concealed on the person," is part of the

6    definition.

7    Q.    So all of these weapons, for an ordinary person to own

8    them, have to be registered in the NFRTR, correct?

9    A.    Yes.

10   Q.    And it's those classes of weapons that we just talked

11   about exclusively that is on the NFRTR?

12   A.    Yes.  That's the way it's supposed to be, yes.

13   Q.    Right.  So registering, for example, an M1 Garand with a

14   30-inch barrel, semiautomatic, no issue, as a short-barreled

15   rifle would be improper?

16   A.    Correct.  We would consider it an erroneous application

17   and hopefully return it.

18   Q.    And refund the tax payment?

19   A.    Yes.

20   Q.    So part of the reason for that NFRTR, as you discussed, is

21   to kind of have a record of all these firearms by serial

22   number, right?

23   A.    Yes.

24   Q.    So then one couldn't, for example, use the NFRTR to

25   register a patent or a trademark for their product, right?

1  A.   Correct.

2  Q.   And it's safe to say one wouldn't, generally speaking,

3  register a design or a drawing of any type with the ATF, right?

4          MR. MESROBIAN:  Objection, Your Honor.  Speculation.

5          THE COURT:  I'm going to sustain the objection -- I'm

6  sorry, I'm going to overrule the objection.  You can ask the

7  question.

8          Sorry.  Confused myself.

9  BY MR. MESROBIAN:

10  Q.   It's safe to say that one would not, generally speaking,

11  be able to register a drawing or a design with the ATF on the

12  NFRTR, right?

13  A.   Correct.

14  Q.   And, in fact, specific to America, and specifically

15  between Americans, isn't it totally legal to share information

16  when it comes to firearms?

17          MR. MESROBIAN:  Objection, Your Honor.  Relevance.

18          THE COURT:  Overruled.

19  BY MR. LAROSIERE:

20  Q.   Would you like me to ask again?

21  A.   Please do, sir.

22  Q.   Specifying in America, and between Americans, it's totally

23  legal to share technical information when it comes to firearms,

24  right?

25  A.   As far as I'm aware, and generally speaking.  We could get

1    into things that are outside the scope of my purview, defense

2    contractors, classified information, things like that, but --

3    Q.    Right.

4    A.    -- yeah, to just share information, yes, it's fine.

5    Q.    And so your concern there is like ITAR, wild stuff,

6    international.

7          So no, specifically understanding between Americans,

8    ordinary people in America, you can share blueprints, correct?

9    A.    Yes.

10   Q.    Drawings, correct?

11   A.    To the best of my knowledge, yes.

12   Q.    Stencils?

13   A.    Yes.

14   Q.    G code files for a CNC machine?

15   A.    If I knew what that was.

16   Q.    Sorry.

17          THE COURT:  Next question.

18          MR. LAROSIERE:  Right.

19   BY MR. LAROSIERE:

20   Q.    Is it fair to say that information on how to manufacture

21   firearms is not secret, and sharing it in America between

22   Americans is not illegal in any way?

23          MR. MESROBIAN:  Objection, Your Honor.  Compound and

24   confusing.

25          THE COURT:  I'll sustain the objection.

1           You'll need to rephrase that.

2           MR. LAROSIERE:  I'm so sorry.

3    BY MR. LAROSIERE:

4    Q.   Again, prefacing, in America, between Americans, is it

5    fair to say that information regarding how to make firearms,

6    including machine guns, is not a big secret?  Is that fair to

7    say?

8    A.   I believe so, yes.

9    Q.   Is it fair to say that exchange of that information,

10   again, between Americans, is not illegal in any way?

11   A.   I may be overthinking this, but I always -- I revert back

12   to is there something proprietary, is it -- generally speaking,

13   yes, not -- it's not a problem.

14   Q.   So, for example, a drawing of a lightning link, would that

15   be, in your experience, legal to share?

16   A.   Yes.

17   Q.   So we've also talked -- we touched on the laws as they

18   relate to machine guns.  And you said that started with NFA of

19   1934, right?

20   A.   Yes.

21   Q.   Was that amended by the GCA of '68?

22   A.   It was.

23   Q.   And then you had mentioned 922(o).  That was about, what,

24   '80- --

25   A.   '86.

1  Q.   '86.  So aside from that -- I'll withdraw that question.

2          Has the definition of a machine gun under the law

3  changed?

4  A.   Could you be more specific, sir?  Are you talking from the

5  inception?

6  Q.   Since 1968.

7  A.   I'm not certain, but I don't believe it has since 1968.

8  Q.   And you talked about a couple different types of machine

9  guns.  Would you agree that the definition of a machine gun is

10 a multi-part one?

11 A.   Yes.

12 Q.   And are these different parts of the machine gun

13 definition -- they apply to different situations, right?  Like

14 one for a whole gun, one for a drop-in piece, and another for

15 something else?

16 A.   Yes.

17 Q.   So would you agree the core function of the machine gun

18 definition to be a weapon which shoots, is designed to shoot,

19 or can readily be restored to shoot automatically more than one

20 shot, without manual reloading, by a single function of the

21 trigger?

22 A.   That would be one, yes.

23 Q.   And all the others relate back to that, right?

24 A.   Could you rephrase that?  Or repeat.

25 Q.   The further definitions relate back to that main

1   definition, correct?

2   A.   In some way, yes.

3   Q.   Okay.  So would you agree the term would include the frame

4   or receiver of any such weapon?

5   A.   Yes.

6   Q.   And that's one definition?

7   A.   Yes.

8   Q.   Okay.  Would you agree the term would include any part

9   designed and intended solely and exclusively for use in

10  converting a weapon into a machine gun?  Going back to the

11  front.

12  A.   Yes.

13  Q.   So that's another individual one, the part?

14  A.   Yes.

15  Q.   And so in that "part" definition, that part must be

16  designed and intended solely and exclusively for that machine

17  gun purpose, right?

18          MR. MESROBIAN:  Objection, Your Honor.

19          THE COURT:  You can address that on redirect.

20          Go ahead.

21  BY MR. LAROSIERE:

22  Q.   Would you agree?

23  A.   Yes.

24  Q.   And then we've got "a combination of parts."  Does that

25  sound right?

1   A.    Yes.

2   Q.    "Parts" plural?

3   A.    Yes.

4   Q.    So more than one?

5   A.    Yes.

6   Q.    Designed and intended for use in converting a weapon to

7   machine gun?

8   A.    Yes.

9   Q.    What would be an example of the single "part" definition?

10  A.    It could take a lot of different forms.  However, if you

11  had -- like, for example -- I've never seen this done -- I've

12  heard from people in the industry that you can utilize a

13  paperclip to make an effective conversion device.  Never

14  witnessed it, but if that truly is done, then the paperclip

15  would become the conversion device.

16  Q.    What about a shoelace?  Have you heard about a shoelace

17  being considered a machine gun?

18  A.    I have.

19  Q.    So those are the only parts I think are really worth

20  bearing on right now.

21        Do you agree that Congress has not modified this law

22  in any way -- in any material way since 1968?

23  A.    I believe so, yes.

24  Q.    So ATF -- does ATF serve a regulatory function as well as

25  law enforcement function?

1    A.    Yes.

2    Q.    And have you worked on both sides of that?

3    A.    I have not had any criminal enforcement experience, if

4    that's what you were intending.

5    Q.    Have you worked with individuals within ATF on the

6    criminal enforcement side?

7    A.    Yes.

8    Q.    Okay.  So on the regulatory side, would it be fair to say

9    that ATF works with members of the industry --

10   A.    Yes.

11   Q.    -- to try to kind of keep them within the lines, make sure

12   that nothing is crossed, advise them?

13   A.    Yes.

14   Q.    Are you aware of -- well, anywhere within ATF, for

15   example, sending cease-and-desist letters to members of

16   industry?

17   A.    The only experience I've had with something like that

18   would be many years ago when I was out in the field office.  If

19   a business had somehow rendered their license invalid -- maybe

20   they had obtained a license as a sole proprietor, then they

21   began operation as an LLC or a corporation -- did not obtain a

22   new license.  But that's the limit of my experience with

23   cease-and-desist.

24   Q.    Okay.  So before we move on from the machine gun question,

25   I'd just like to ask you if you have heard within ATF about the

1    concept of indexing.

2    A.    Not a familiar term to me.

3    Q.    Are you aware within ATF of a mechanism to say that an

4    incomplete part is a part?

5                MR. MESROBIAN:  Objection, Your Honor.  Confusing.

6                THE COURT:  I don't understand the question.  Please

7    rephrase.

8    BY MR. LAROSIERE:

9    Q.    For example, in some firearms, would you agree the

10   position and placement of holes is critical?

11               MR. MESROBIAN:  Objection, Your Honor.  May we

12   approach?

13               THE COURT:  Yes.

14      (Proceedings at sidebar:)

15               MR. MESROBIAN:  Your Honor, this is exactly what I --

16   what I was trying to forestall with my questions.  And I don't

17   know why we're headed this way with this witness, but I have to

18   object at this point.

19               MR. LAROSIERE:  I'm not asking him about

20   classifications.

21               THE COURT:  Then what's the point of the question?

22               MR. LAROSIERE:  If he -- he has been at NFA Branch

23   for a long time.  And the next witness, we already are well

24   aware, is going to rest his entire head on indexing.  And this

25   is something that is not published anywhere.  I want and am

1    trying to elicit whether anyone is aware of this.

2           And him, being an expert that has worked with NFA for

3    a long time --

4           MR. KING:  Quieter.

5           MR. LAROSIERE:  I'm so sorry.

6           THE COURT:  What is the testimony about indexing?  I

7    mean, you guys keep talking about it.  I don't know what you're

8    talking about.

9           MR. MESROBIAN:  And Your Honor, I don't think

10   Specialist Toy is going to talk about indexing at all.  So I've

11   been happy to allow these cross-examining questions and --

12   where all these witnesses have no idea what the answer is, but

13   at this point I just don't -- I don't know what we're doing on

14   this.

15          THE COURT:  Well, I guess I don't -- I don't

16   understand -- you're asking him about the effect of the placing

17   of a hole.  I don't know what that has to do with indexing.

18          MR. LAROSIERE:  The primary-use case for indexing in

19   ATF has been a dimple.  That's -- the government has repeatedly

20   and incessantly brought up solvent traps, and those have only

21   been considered suppressors when the holes were dimpled; AKA,

22   indexed.

23          I'm wanting to get this out somewhere before --

24   because the simple fact is it's our position that this is

25   nowhere in the law, nowhere in the regulations, and this is

1  something ATF has just made up entirely.  And it seems that the

2  only witness that will be able to say anything about it would

3  be Toy.  And I think that's important to get out.

4       THE COURT:  All right.  I'm going to let the jury go

5  so we can talk about this.

6       (Proceedings in open court:)

7       THE COURT:  All right.  Ladies and gentlemen, we're

8  going to go ahead and stop now and let you go home.  And

9  remember, you've got tomorrow off.  I'm also going to have you

10  come in a little late on Wednesday; have you come in at 10:30

11  so that we can start by 10:45.

12       Just so you know, the evidence has progressed more

13  quickly than we expected, so taking this time off will not in

14  any way delay the case.  It just allows us to take care of

15  stuff that you would ordinarily be cooling your heels in the

16  jury room.  To be respectful of your time, we'll just give you

17  extra time off.  We'll take care of that so that when we get

18  you back here we can have you in the courtroom rather than

19  waiting on us.

20       So because we're taking -- oh, the other thing, I

21  know there's a doctor's appointment that we need to accommodate

22  on Wednesday.  So we'll start up at 10:45 on Wednesday.  We'll

23  go an hour and a half and stop at 12:15 to accommodate that

24  doctor's appointment, and then we'll continue with the evidence

25  that afternoon.  I'm not asking who it was.

1          Now I got sidetracked.  Okay.  So let me see the

2    court security officer a moment.

3       (The judge, the court security officer, and the courtroom

4    deputy confer.)

5          THE COURT:  Never mind.  Now I understand.  I

6    hadn't -- I didn't -- so apparently the juror that had the

7    doctor's appointment that needed to be accommodated is the

8    juror that fell ill.  So we don't have to worry about that.  So

9    we'll just do a normal schedule.  Thank you.  I didn't quite

10   understand what you were telling me, but okay.

11         So with that, be here at 10:30 on Wednesday morning

12   with the idea that we'll actually probably get started as soon

13   as you're all here on Wednesday morning.

14         Please remember that over this recess, which is a

15   lengthier recess than normal, you must not discuss the case

16   with one another, your family, or your friends.

17         Please don't allow anybody to talk to you about the

18   case or in your presence about the case.  And if anybody should

19   do so, please notify the court security officer immediately.

20         Please don't go out and do any research in any way

21   relating to the case, the people, the terms that you've heard,

22   or the items that you've heard about.

23         All of the information that you use to decide the

24   case must come from here in this courtroom.  And if you go out

25   and do any independent investigation to learn about something,

1    that will result in a mistrial, which means that all of the

2    efforts that have been expended in the case thus far would be

3    wasted.  So please, please do not do that.

4            Remember that you must not form or express any

5    opinions about anything in any way related to the case because

6    you haven't heard all the evidence, my instructions, or the

7    arguments of the attorneys.

8            And please do not read, watch, or listen to any media

9    reports or any reports on the internet about the case.

10           With those instructions, have a wonderful afternoon

11   and we will see you on Wednesday.

12           COURT SECURITY OFFICER:  All rise for the jury.

13       (Jury exits, 4:48 p.m.)

14           COURT SECURITY OFFICER:  Please be seated.

15           THE COURT:  Sir, I'm going to let you step down, but

16   I'll ask you to stand right outside the courtroom.

17           COURTROOM DEPUTY:  Sir, sir.

18           THE COURT:  Nope.

19           COURTROOM DEPUTY:  Thank you.

20       (Witness exits the courtroom.)

21           THE COURT:  Thank you.

22           So your question, Mr. Larosiere, was, "In some

23   firearms, would you agree that the position and placement of

24   holes is critical?"

25           And I'm not sure that I understand what you're

1    getting at with this witness with that question.  So explain to

2    me why you think that's an appropriate question of this

3    witness.

4         MR. LAROSIERE:  Your Honor, may I have a moment?

5         THE COURT:  Yes.

6       (Defense counsel confer.)

7         THE COURT:  Go ahead.

8         MR. LAROSIERE:  The core of this case comes down to

9    whether or not the auto key card is a machine gun.

10        THE COURT:  I need you at microphone.  Why don't you

11   go -- you're a little too tall, so it's not reaching you.

12        MR. LAROSIERE:  Sorry.  I've been trying to quit.

13        The very core of this case is whether or not the auto

14   key card is a machine gun.  Now, the Gun Control Act amended

15   the NFA slightly, and that has not changed since 1968.  But the

16   simple fact is that ATF has been creating -- in many

17   unpromulgated, unpublished, internal changes of opinion -- new

18   things.

19        So this case is about a line drawn with a laser.  In

20   the past, the concern where indexing originated from was a

21   pockmark where an auto sear hole might have been, or pockmarks

22   where simple holes on an ordinary pedestrian firearm receiver

23   might have been, or pockmarks on a solvent trap that the

24   government is -- so desperately wants to keep harping on.  It

25   all relates to the ATF's unpromulgated, unpublished,

1   wholly-internal conception of indexing, the only reference to

2   which is in the Firearms Technology Officer's Report of

3   Investigation, which would be incredibly prejudicial not to

4   show, that virtually no one else, even within the ATF, is aware

5   of this concept.  So the --

6            THE COURT:  Of what concept?

7            MR. LAROSIERE:  Indexing.

8            THE COURT:  Of course, Mr. Mesrobian said there's not

9   going to be any testimony about indexing.  So I --

10           MR. LAROSIERE:  He may not use the word, but it is

11   the concept.  I mean, if Mr. Mesrobian is willing to cede that

12   he wouldn't suggest anywhere that a -- a dot is not a hole and

13   a line is not a cut, well, then that's fine.  But I don't think

14   he's willing to make that concession.

15           THE COURT:  What does "a line is not a cut" have to

16   do with indexing?

17           MR. LAROSIERE:  It goes back to the cases cited in

18   our motion to dismiss.  The lines on a piece of paper, that was

19   to do with an AK flat where there were little creases on it.

20           THE COURT:  Okay.

21           MR. LAROSIERE:  And you distinguished --

22           THE COURT:  I'm aware that I denied it.

23           MR. LAROSIERE:  Yeah, yeah.  That was indexing.  ATF

24   in that case referred to it as a concept of indexing.

25           THE COURT:  Okay.  Here's the difficulty that I see

1  with your argument.  And what you seem to be wanting to argue

2  to the jury is that the ATF is improperly categorizing this as

3  a firearm.  But the jury has to decide whether the auto key

4  card falls within the statutory definition of a firearm.  The

5  fact that the ATF's view of an item has evolved over time,

6  that's not relevant to that determination.

7         MR. LAROSIERE:  I think as --

8         THE COURT:  What you seem to be trying to do is a

9  jury nullification argument.

10        MR. LAROSIERE:  No, Your Honor.  And I think now I

11 see the disconnect.

12        What the government is attempting to do is completely

13 delete an element of the charged offense, which is that it's

14 parts.  And that is what -- really their -- it has been

15 telegraphed.

16        THE COURT:  I don't see that, but -- Mr. King, take

17 your seat.  I'm talking to Mr. Larosiere.

18        And Mr. Mesrobian, you take your seat as well.

19        Even if you believe that they are trying to delete --

20 to take a singular part and put it in the definition of the

21 multiple parts so that it no longer has to be "designed and

22 intended exclusively for," what does that have to do with

23 asking this witness about the dimpling or the placement of

24 holes?

25        MR. LAROSIERE:  The question is -- it goes to whether

1  or not the conception -- which I trust the government will make

2  their case on with FEO Toy -- of indexing in whatever way they

3  refer to it on that day is a legitimate --

4          THE COURT:  See, you're going back to questioning --

5          MR. LAROSIERE:  Well, but the main issue is that the

6  statute has not changed.  This is -- there's a regulatory

7  process which, you know, Mr. Lintner will be testifying on it.

8  And all we want to get before the jury is that there are other

9  situations where the government has changed their mind and they

10  went through these processes, and that's fine.

11          And in this situation, no such thing was published.

12  There's nowhere to find this information on what is or is not

13  an indexed line, and let them draw from that what they will.

14          It's certainly not a nullification argument.  At no

15  point will we argue that he's met all of the elements and

16  should still thus be acquitted.  It's saying that the

17  government is attempting to delete an element, an essential

18  element.

19          THE COURT:  All right.  Let me hear from

20  Mr. Mesrobian and then Mr. King, if you want to add argument.

21  But I think you should respond to Mr. Larosiere's argument

22  first.  Go ahead.

23          MR. MESROBIAN:  Your Honor, there was a lot there

24  just now.  I think I'll start with the fact that, as I think

25  has been pretty clear from the expert disclosure and the

1    Daubert hearing, what Officer Toy's testimony is going to be is
2    that he received the auto key card, he cut a lightning link out
3    of it, tested it, and it fired fully automatically.

4          I think we are distinctly not eliciting the opinion.
5    "Therefore, Officer Toy, do you believe in your expert opinion
6    that the auto key card is a machine gun conversion device?"

7          That's the whole -- I feel like that's what the
8    hearing was all about and why Mr. King withdrew Mr. O'Kelly as
9    an expert except in potential rebuttal.

10          So to the extent that ATF has engaged in rulemaking
11   or unspoken analyses of these other devices which are not
12   relevant to this case, that's not relevant.

13          And I don't see why we're going down this road when,
14   again, Officer Toy's testimony is going to be about the process
15   that he used to cut out a lightning link and then test it, not
16   expert opinion about what is something and what is not
17   something based on indexing or anything else.

18          So at this point I don't understand why these
19   questions are being asked.  I mean, let alone about dimpling
20   and other things, which are, again, not relevant to this case.

21          We've talked about -- you know, Mr. Hoover has talked
22   about these things in his videos.  And purchasers have talked
23   about, you know, the other items, the solvent trap, that I
24   don't think that we've been harping on the solvent trap but it
25   has obviously come up because certain individuals purchased

 1   solvent traps.  But I don't think that this case is quite as

 2   big as maybe Mr. Larosiere describes it.

 3          This case is about the auto key card and putting the

 4   evidence in front of the jury to let them decide whether or not

 5   it's a combination of parts designed and intended to convert a

 6   semiautomatic rifle into a machine gun.

 7          And beyond that, indexing and all this other stuff, I

 8   don't see why that is relevant.

 9          THE COURT:  And Mr. Larosiere, to the extent that

10   you're wanting to argue that there's a regulatory process that

11   can be followed and it wasn't followed in this case, I don't

12   think that is -- well, why is that relevant to any issue that

13   the jury has to find in order to determine guilt or innocence

14   in this case?

15          MR. LAROSIERE:  The main question there relates to

16   scienter.  The defendants are charged with knowing -- knowingly

17   engaging in this conduct.

18          THE COURT:  Knowingly engaging in the conduct of

19   conspiring to manufacture and transfer items that fall within

20   the definition of a machine gun.  But that definition is -- I'm

21   going to paraphrase, but a combination of parts designed and

22   intended to convert a weapon into a machine gun.

23          The scienter is the knowledge that the item -- or

24   that the combination of parts will allow multiple rounds to be

25   fired without moving the -- without using the trigger again.

1    That's what has -- that's the knowledge that has to be proven.

2          So I don't see how knowledge of ATF's rulemaking

3    processes is relevant to knowledge of what was being

4    manufactured and sold.

5          MR. LAROSIERE:  So it does go down to -- which this

6    court made a ruling on earlier -- whether or not the government

7    believes the item to actually be a machine gun.  In the past

8    the government -- the fact that when products were sold on the

9    market in open commerce, the government then engaged in a

10   public notice and comment and rulemaking procedure, and that

11   was the reaction, I think that's relevant.

12         Whereas in this situation there was no public notice,

13   no public comment, no cease-and-desist, unlike many other

14   situations in the past.  The implication there is that the

15   government may -- the suggested implication is that the

16   government might not truly believe it to be a machine gun

17   conversion device.

18         THE COURT:  I disagree that that's relevant to any

19   issue that the jury has to decide, Mr. Larosiere.  What the

20   jury has to decide is whether these gentlemen knowingly

21   manufactured an item that falls within the definition of a

22   machine gun under the statute.  And they don't -- the law

23   doesn't require that they necessarily knew that.

24         If they manufactured or conspired to manufacture and

25   sell a combination of parts that's designed and intended to

1   allow a firearm to be fully automatic, then I believe that

2   satisfies the statutory definition and I don't think that the

3   information that you're trying to elicit through this witness

4   is relevant.  So I'm not going to allow that line of testimony,

5   but -- well, I'm not inclined to.

6          But Mr. King, if you have additional arguments, I'll

7   consider them.  But this idea that the jury should hear that

8   there should have been a notice and rulemaking and that

9   defendants should have known about this, that's not proper for

10  the jury.

11         But go ahead.

12         MR. KING:  Your Honor, to clarify what I -- where I

13  think the relevance here is for some of this testimony, maybe

14  not all of it, but some of this testimony, is the scienter

15  requirement is not just to the firearm definition, which is the

16  more than one shot from pulling the trigger, but also to the

17  machine gun definition, which, as ATF is interpreting that

18  definition differently over time, does not give fair notice and

19  warning to criminal defendants as to what conduct is permitted,

20  not permitted.

21         For instance, you know, kind of recent, by analogy,

22  there's the bump stock.  There's been a lot of litigation about

23  bump stocks.  For nearly 20 years the ATF ruling was that bump

24  stocks were lawfully permitted, and then they did a rulemaking

25  process and changed their mind.  Nothing in the Gun -- and

1   determined them to be machine guns.  Nothing in the Gun Control

2   Act or the National Firearms Act changed in the 20-plus years

3   where they were lawful and then changed their mind recently.

4           And that type of lack of notice to criminal

5   defendants is central to our defense, which is the -- you know,

6   at times ATF has not considered drawings or dimples or marks --

7           THE COURT:  But this case isn't about drawings or

8   dimples or marks.

9           MR. KING:  Respectfully, I would disagree, Your

10  Honor.  In the past the ATF has said the parts have to be

11  complete and finalized or -- and they have changed their

12  definition.

13          And it's part of FEO -- Mr. Toy's anticipated

14  testimony based on his report that ATF has said that if it's

15  far enough along in the manufacturing process, they believe it

16  to be a firearm.  And what that looks like -- what "far enough

17  along" looks like has changed over time, failing to give

18  criminal defendants knowledge and clear warning as to what --

19  you know, what point they've crossed the line from, you know,

20  discussing it and showing people how things work or even

21  premarking for other people if they choose to break the law,

22  but at what point their conduct becomes unlawful.

23          One of the instances, I think Mr. Hoover talked in

24  his video, is ATF is now of the position that if there's a

25  dimple mark where -- and I know very little personally about

1  firearms, but my understanding is if you change where the

2  selector switch goes on certain AR-15s, it used to require a

3  hole being drilled.  And now they're saying if there's any sort

4  of mark or dimpling, they are considering that a firearm

5  because it demonstrates an intent to do so down the road.

6         But it all ties back to the scienter not of the

7  firearm, which is something where you pull the trigger and more

8  than one cartridge or bullet is expelled.  I'm never sure which

9  is the cartridge and which is the bullet.

10         But in terms of the definition -- the scienter for

11  the machine gun, which is at what point is this -- you know, if

12  it's a drawing on a piece of paper, is it a drawing on a piece

13  of plastic, is it a drawing on metal, is it an etching, or is

14  it a fully cut-out part -- where that line is.

15         And criminal -- ATF has changed their mind over time.

16  And that's what we anticipate this testimony will get out.

17         And where it's difficult for a criminal defendant to

18  knowingly follow the law is a lot of this is through un- --

19  non-public rulemaking and private letters that are not

20  available to the general public.  I expect there will be some

21  testimony of that from FEO Toy.

22         If you, for instance, go to the --

23         THE COURT:  You've said this twice now, that is, that

24  this will be testimony from Agent Toy.  And that goes back to

25  where we started originally, which is the -- which was that

1   this wasn't an appropriate question or line of testimony for

2   this witness.  And you're really just confirming that, because

3   he's not the one that makes the classification decisions.

4          To the extent any of this may or may not be relevant,

5   why on earth should this question be asked of this witness?

6   Based on his testimony, he didn't -- it's -- well, none of his

7   testimony relates to what you are now asking him,

8   Mr. Larosiere.

9          So Mr. King, assuming -- and I don't have Agent Toy's

10  report in front of me.  And some of this stuff is stuff that I

11  haven't -- it's been awhile since I looked back at it.  To the

12  extent that you have a question or that his report talks about

13  changes over time, why aren't these questions better suited to

14  him?  That's to you, Mr. King, because you're arguing that the

15  question should be asked, but your arguments relate to Agent

16  Toy.

17         MR. KING:  Your Honor, I think the bulk of the

18  questions would be more appropriate for Agent Toy.  But in

19  terms of the regulatory process and the rulemaking process that

20  ATF goes to, Agent Lintner is actually a much better witness

21  because that is what he has served as for his entire career on

22  the regulatory side for somebody who has worked with industry.

23         And, you know, there's a -- and part of it ties to --

24  I -- the government has, in a pleading with regard to one of my

25  motions in limine, addressed that they plan on getting into

1    that an individual can submit an item and ask for an opinion

2    letter from the ATF.  And I -- the ATF also has the ability,

3    but not the requirement, to issue their own letters when they

4    believe something is a firearm that they've reviewed themselves

5    or has been reported to them.  And those would go hand in hand.

6    And Agent -- or Mr. Lintner would be an expert on that

7    regulatory process and how it works in relation to these items

8    in particular, but these items in general as well, because he's

9    worked on that regulatory business side of this.

10           So I know the specific questions as to the criminal

11   determinations by the branch in Martinsburg, West Virginia, may

12   be beyond his scope, but certainly in terms of the regulatory

13   part and how that works with industry, I believe that's -- that

14   is fodder for cross-examination and would help explain the

15   scienter of these defendants as to the machine gun element and

16   their knowledge thereof.

17           I'm afraid I've lost you, Your Honor.

18           THE COURT:  Well, backing up to there's a process to

19   get opinions, my recollection is that the government argued

20   that would be relevant if the defendants took the position that

21   they had no way of knowing this was a machine gun or an

22   unlawful device.  And I think that in my order that's what I

23   said, was that it would be relevant in that context.

24           But I'll let Mr. Mesrobian respond.

25           MR. MESROBIAN:  Your Honor, I feel like the Daubert

1    hearing, or Daubert semi hearing, didn't happen, because I feel
2    like we covered a lot of this ground already.

3            First, with respect to notice and comment,
4    rulemaking, that has nothing to do with this case.  Nothing.
5    And the -- I believe Mr. Lintner already did testify that
6    members of the industry can submit items for classification to
7    FATD.  But that was, again, my attempt to try and forestall a
8    lot of these questions about, you know, what is -- what is or
9    is not a machine gun, can you look at this, are you familiar
10   with this.

11           And I don't know how any of this is relevant to
12   Mr. Lintner.

13           He testified about the classification -- the
14   potential to obtain a classification letter.  I don't think
15   he's ever functioned in any sort of notice and comment,
16   rulemaking capacity in terms of ATF policymaking.  He's been an
17   Area Supervisor for people that go out and do inspections for
18   FFLs and SOTs.  And he's answered questions about NFA firearms,
19   but I don't think that has anything to do with what they appear
20   to be trying to drive at in their proposed cross-examination.

21           Separately, Your Honor, again, they've both --
22   Mr. Larosiere and Mr. King have made references to that there's
23   going to be evidence and testimony about indexing and what's in
24   FEO Toy's report.  Mr. Toy's report is not evidence.  What's
25   going to be evidence is his testimony on the stand.  And we

1    went through the Daubert hearing to, again, address concerns by

2    the defense that the witness or -- him or anybody else was

3    going to arrive at some sort of expert opinion and state

4    clearly, "In my expert opinion, based on my training and

5    specialized experience, the auto key card is a machine gun."

6    And that's not the purpose of that testimony.

7         The purpose of that testimony is to talk about his

8    being an expert in testing these devices and what happened when

9    he tested it.  There is no ultimate opinion because, again,

10   that is the question for the jury in this case.  And I don't --

11   to the extent that they're going to try -- I think that will be

12   Ms. Taylor's witness, Mr. Toy, but I think we'll be objecting

13   heavily if we're getting into, "You said in your report your

14   ultimate conclusion was this and you said that it was based on

15   this process, and isn't that process undisclosed to the public

16   and it's based on indexing," or whatever.  That's just not

17   relevant.  And it's going to be beyond the scope of his

18   testimony.

19        And that's -- if there's anything else the Court

20   wants me to address.  I'm not sure if I covered everything.

21        THE COURT:  No, that's all right.  Let me look back

22   at one thing.

23      (Pause in proceedings.)

24        THE COURT:  I'm still having difficulty understanding

25   how the question that prompted this objection gets into the

1   evidence that you-all are arguing is relevant.

2          The question was, "For example, in some firearms,

3   would you agree the position and placement of holes is

4   critical?"

5          Let's say he says "yes" to that, then where do you go

6   from there?  What's your next question, Mr. Larosiere?

7          MR. LAROSIERE:  The next question would be to ask --

8   and I'm not a hundred percent sure how I would do it.  It would

9   be to elicit something to the effect of, "Are you aware of any

10  policies or positions within ATF where a hole that is not

11  actually drilled but simply marked is considered a hole for the

12  purposes of classifying a weapon?"

13         THE COURT:  And why is that relevant to the facts in

14  this case?

15         MR. LAROSIERE:  Because the line on the auto key

16  card -- the auto key card is a singular sheet of steel.

17         THE COURT:  Right.

18         MR. LAROSIERE:  I feel it's pretty obvious where it's

19  going.

20         THE COURT:  It's not.  The idea that this other

21  method of converting a firearm into a machine gun -- why --

22  you're shaking your head.

23         MR. LAROSIERE:  Oh, because, no, it would have

24  nothing to do with that method of conversion.

25         THE COURT:  Right.  So why are we talking about it?

1          MR. LAROSIERE:  It's a question of is it a hole or

2    not.  Just like here, is it a cut or not.  That's the whole

3    focus.

4          We had anticipated -- and now Mr. Mesrobian is saying

5    that they're not going to, you know, elicit that testimony.  It

6    was our whole position to kind of preempt and show that there

7    is no standard -- standard, accepted way to get around the

8    essential element that it's a combination of parts by simply

9    saying, "Oh, well, it's almost parts," right.

10         THE COURT:  All right.  I don't see -- if there's --

11   I'm not going to allow that question.  If there's another -- do

12   you have other questions for this witness, Mr. Larosiere?

13         MR. LAROSIERE:  Yes.

14         THE COURT:  And are they along the lines of the

15   classification of the firearm?

16         MR. LAROSIERE:  No, Your Honor.

17         THE COURT:  Okay.  So we'll continue with his

18   testimony.  What I may be inclined to do is -- you-all said he

19   traveled.  Where did he travel from?

20         MR. MESROBIAN:  Your Honor, he's working out of

21   Brunswick, Georgia, which is a distance away.  But he was aware

22   that we might need him today, so he came down and was here and

23   available to testify.  He was already going to be available on

24   Wednesday.  So if there's -- if there's some particular time

25   that the Court would like him back, I'm sure -- we can talk to

1    him, I'm sure.

2            THE COURT:  Well, but what I was going to say is that

3    what we can do, just in an abundance of caution, is -- because

4    I'm foreclosing that area of inquiry, I'll -- for now, I think

5    I'll ask the United States to keep him available until after

6    Agent Toy's testimony.  And if somehow the questions that they

7    wanted to ask become relevant, which I think is unlikely, but

8    just in case, that you would -- I would be inclined to allow

9    the defendants to call him.

10           MR. MESROBIAN:  Understood, Your Honor.

11           THE COURT:  All right.  So that way you have the

12   ability to make your argument after you hear what Agent Toy

13   actually testifies to.

14           MR. LAROSIERE:  Thank you so much, Your Honor.

15           THE COURT:  Okay.  So we're going to start tomorrow

16   with finishing Agent -- or Lintner.  How much longer do you

17   think you have with him, Mr. Larosiere?

18           MR. MESROBIAN:  Your Honor --

19           THE COURT:  I'm asking him how much longer he has

20   for --

21           MR. MESROBIAN:  And it's on Wednesday, Your Honor,

22   not tomorrow, I'm sorry.

23           THE COURT:  Yeah, yeah, when we get back together,

24   Wednesday.

25           MR. LAROSIERE:  Let me look at my outline.  Not

1  terribly much longer.  Off the top of my head, I'd say maximum
2  20 minutes.
3          THE COURT:  All right.
4          And Mr. King, how long do you think?
5          MR. KING:  Approximately about the same amount of
6  time.
7          THE COURT:  About 20 minutes?
8          MR. KING:  Closer to 15, but I understand attorneys
9  always underestimate how long they think things are going to
10  take.  So I think 20 minutes would get us there.
11          THE COURT:  Other than trials.  You-all always
12  overestimate how long the trial is going to be.
13          All right.  And then, Ms. Taylor, for Toy and Slosson
14  together -- I'm just trying to figure out how far into tomorrow
15  we're going to go -- to Wednesday.  In trial days it's
16  "tomorrow."
17          MS. TAYLOR:  Maybe two hours.
18          THE COURT:  For both?
19          MS. TAYLOR:  Yes.  That's what -- I think so.  As
20  Mr. Mesrobian discussed, and we've discussed at length, our
21  intended testimony from Mr. Toy is just, "I got it, I
22  recognized the design as one for a lightning link, I cut it, I
23  tested it," play the video.  It's pretty straightforward.
24          THE COURT:  All right.  So it is distinctly possible
25  that we'll close on Wednesday.  So, I mean, if there's not that

1    much evidence, then we'll close.  If it's too late in the day,

2    then I'll -- we'll kick it to Thursday morning.  But I want to

3    be respectful of the jury's time.

4          Ms. Taylor or Mr. Mesrobian, would you like to

5    respond to the request for the instruction regarding the wall

6    hanger that was filed?  It's document number 250.

7          MS. TAYLOR:  Your Honor, I think that the proposed

8    instruction is misleading.  I also think that Special Agent

9    Hooker testified that he was prosecuted.  He didn't testify

10   what the outcome of that prosecution was, and so there was

11   nothing that was false about Special Agent Hooker's testimony.

12         We previously agreed, I believe, to just allow the

13   Court to instruct the jury to disregard any testimony about the

14   prosecution of the individual associated with portable wall

15   hanger.

16         I would also advise the Court, Your Honor, that I

17   communicated with the prosecuting AUSA on that portable wall

18   hanger case this morning.  And as the Court might expect, the

19   resolution of that case was to one of the charges.  And the

20   charges related to the portable wall hanger were dismissed as

21   part of a plea agreement.

22         The AUSA told me, and it's reflected in the plea

23   agreement itself, that they reserved the right to argue at

24   sentencing that the portable wall hanger was a machine gun.  He

25   stated that they did advance those arguments at the sentencing

1   hearing and that the Court accepted that the portable wall

2   hanger was a machine -- that it fit the definition of a machine

3   gun in the statute and imposed an upward variance on that

4   basis.

5           So, I mean, that's obviously getting way into the

6   weeds to explain that to the jury.  I still think it's

7   sufficient to just instruct the jury to disregard the portion

8   of the testimony related to whether he was prosecuted or not.

9           THE COURT:  Mr. King, if I instruct the jury to

10  disregard the testimony about an individual being prosecuted

11  for the portable wall hanger, is that sufficient?

12          MR. KING:  It's not, Your Honor.  The primary

13  reason -- it's twofold.  One is, you know, I understand that's

14  the United States's position, but a jury has not adjudicated

15  whether or not that item or that conduct is illegal, and there

16  was a heavy implication by the government that that was.  Even

17  after I brought up the fact that those charges had been dropped

18  they asked another witness if Mr. Ervin had done that -- that's

19  Mr. Johnny Monger, Your Honor.  The government went back into

20  it with another witness after I brought this to everybody's

21  attention, with the heavy implication that Mr. Ervin knowingly

22  engaged in illegal conduct with an item that had been -- and

23  certainly implication after Agent Hooker's testimony -- had

24  been adjudicated by a court and/or a jury and determined it was

25  a machine gun.  And that's just simply not accurate.  And so

1    asking the jury to disregard the fact that he was prosecuted I

2    think is still misleading.

3           In terms of the --

4           THE COURT:  I'm going to stop you, Mr. King, because

5    the only thing that's misleading is the instruction that you're

6    asking me to give the jury.  The statement that he was

7    prosecuted for the portable wall hanger was not misleading.

8    It's a fact.  You provided me the indictment, and he was

9    charged with it.  That's him being prosecuted.

10          The specific charge regarding the portable wall

11   hanger was dismissed, but it was dismissed pursuant to a plea

12   agreement.  And it is not an accurate statement of the law to

13   suggest that he could not be held accountable for that conduct.

14          You're wanting the Court to instruct the jury that

15   Mr. Watson had all charges against him related to the portable

16   wall hanger device dismissed against him upon motion of the

17   United States, but without advising the jury that he pled

18   guilty to another offense that carried the same maximum penalty

19   and for which he could be held accountable for the relevant

20   conduct, which is the dismissed charges.  And that is

21   misleading to the jury.

22          And I'm a little surprised that the government is

23   still willing to support an instruction that the jury disregard

24   that he was prosecuted for the portable wall hanger device.  I

25   was inclined to say that originally because you told me it had

1   been dismissed and I thought all the charges had been

2   dismissed.  I didn't know that it was pursuant to a negotiated

3   plea agreement.

4           And the plea agreement -- you provided me the -- the

5   indictment and the dismissal.  The plea agreement specifically

6   includes discussion of the government intending to present to

7   the jury evidence regarding the portable wall hangers.  So it

8   just -- a jury would not understand that the -- that despite

9   the dismissal of those charges the defendant could still be

10  held accountable for that conduct.

11          And what you seem to be suggesting to the jury is --

12  or wanting to suggest to the jury is that there was a -- that

13  the United States determined that the device was not unlawful

14  and that's why they dismissed the charges against him.  And

15  that is misleading.  So I'm not inclined to give the

16  instruction that you are requesting because in order for it to

17  be accurate we would have to go down a rabbit hole of

18  explaining how Mr. Watson's case was resolved and why.  And

19  that's just irrelevant.

20          I am willing to -- I'm willing to give the

21  instruction that they should disregard the statement that the

22  individual was prosecuted for the portable wall hanger device

23  even though that is not an inaccurate statement.  They didn't

24  say he was convicted for it.  But I'm not willing to say that

25  he had all charges against him related to the portable wall

1   hanger device dismissed against him upon motion of the United

2   States because without more information, that instruction is

3   misleading and inaccurate.

4           So if you still want the instruction that they should

5   disregard it I will give you that, but I will not give this

6   instruction.

7           MR. KING:  Your Honor, may I ask to readdress the

8   Court on Wednesday after I've had an opportunity to speak to

9   Mr. Ervin about his feelings about that?

10          THE COURT:  About whether or not I give the

11  instruction that I said I was willing to give?

12          MR. KING:  Yes, Your Honor.

13          THE COURT:  Yes, you can readdress that.  To the

14  extent you want to readdress giving this instruction, my ruling

15  on that is firm.  This instruction is not an appropriate

16  instruction because it does not accurately reflect what

17  happened in that case.

18          MR. KING:  Yes, Your Honor.  I was referring to

19  speaking to Mr. Ervin about the Court's proposal.

20          THE COURT:  Sure.

21          Okay.  What else do we need to address?

22          Ms. Taylor?

23          MS. TAYLOR:  I don't think there's anything, Your

24  Honor.

25          THE COURT:  All right.

 1              Mr. King?

 2              MR. KING:  Nothing, Your Honor.  Thank you.

 3              THE COURT:  I don't know who I'm hearing from on

 4    behalf of Mr. Hoover.

 5              MR. LAROSIERE:  No, Your Honor.

 6              THE COURT:  All right.  So here's what we're going to

 7    do.  We're taking, as you know, tomorrow off.  We will

 8    reconvene at 8:45 on Wednesday morning.  At that time my

 9    anticipation is that I will have the jury instructions at

10    counsel table waiting for you.  I'll give you an opportunity to

11    review them and then I will join you and we will have the

12    charge conference.

13              As I did -- at sidebar I suggested that at least at

14    this time I'm unlikely to instruct the jury that the

15    "combination of parts" definition requires the item to be

16    designed and intended solely for conversion.  So I'm just

17    bringing that up so you're prepared to address it.

18              At the same time, for the government, at least as of

19    right now, I'm not sure I have seen evidence of an effort to

20    avoid knowledge of the offense conduct, or the illegality of

21    the conduct.  So if you're going to continue to request an

22    instruction on that basis, you'll have to be prepared to advise

23    me of the evidence that supports it.

24              MS. TAYLOR:  Yes, Your Honor.  Sorry.  I was just

25    acknowledging.

1          THE COURT:  Well, if you're going to take that out of

2     the equation, you can tell me now, because that's time I won't

3     spend on it.

4          MS. TAYLOR:  Well, Your Honor --

5          THE COURT:  But that's just the initial inclination

6     I've had in discussions with my law clerk on the matter.

7          MS. TAYLOR:  Yes, Your Honor.  I think we can address

8     it in more detail on Wednesday.  But I would say there is

9     evidence of avoidance of positive knowledge.  For example,

10    there's the text message that Mr. Ervin sent to Ms. Wolfe where

11    he says, essentially, "Whatever happens to it after it's out of

12    my hands, I can't be responsible for that.  I'm only

13    responsible for the thing that I make."

14          I'm sorry, I hit the microphone.

15          And then there are the many -- the many emails that

16    Mr. Ervin receives where people are asking if it works in a

17    certain firearm, where people are asking for instructions, and

18    he just ignores those emails.

19          It may be the case that the instruction needs

20    modification to really fit this situation, but I certainly do

21    think that the part where it talks about, you know, essentially

22    deliberately avoiding learning of something or deliberately

23    ignoring evidence of a fact is evidence of knowledge --

24          THE COURT:  Yeah --

25          MS. TAYLOR:  -- of the fact.

1          THE COURT:  -- so I think the -- the problem I see
2    with that, and we'll talk more about this, but his intent --
3    you have to prove his intent when he manufactures and transfers
4    this device.  He has to know at that time that it is, for
5    purposes of your charge in the indictment, a combination of
6    parts that is -- now I lost language.
7          MS. TAYLOR:  Designed and intended.
8          THE COURT:  Thank you.
9          -- designed and intended to convert the weapon into
10   one that can be fully automatic.
11         That's different than him saying to the Shopify
12   people, "No, no, no, no, no, I don't know what they do with it
13   afterwards."
14         What you have to prove is what he knows when he
15   designs and when he manufactured and transferred it.  The fact
16   that he avoids learning of what they actually do with it later,
17   I'm not -- I'm not sure that that is evidence of the conscious
18   avoidance for the offense charged.
19         So I would suggest that you-all might want to look at
20   the case law and -- so, for example, the cases -- you know, the
21   sort of normal way it comes up is with a drug mule.  Somebody
22   gives somebody a paper bag or a suitcase and says -- buys them
23   a ticket -- you know, a one-way ticket to go someplace and
24   tells them they will -- you know, under circumstances that it's
25   very suspicious of why you're going and don't open the suitcase

1   because they don't want to know what's in it.

2          This isn't an "I don't want to know what's in it when

3   I'm transporting it."  This isn't a Mr. Ervin didn't want to

4   know what he was manufacturing.  Maybe he didn't want to know

5   whether someone actually used it for that purpose later.  But

6   you have to prove that he knew what he was manufacturing and

7   transferring.

8          MS. TAYLOR:  Yes, Your Honor.  And understanding

9   that -- and yes, clearly the instruction was written -- and I

10  think the way it's written it actually talks about the --

11  basically the, you know, drugs in a bag that you don't open.

12         But this is a conspiracy that spans a number of

13  months in which Mr. Ervin -- you know, he starts making the

14  product, he sends some of them out, he gets some of these

15  emails, then he makes an order for another, you know, set of

16  auto key cards, and then he sends those out and keeps getting

17  more emails of people saying, "How do I use this?  How do I cut

18  it?  Does it work in my firearm?"  And he keeps making orders

19  of the product that he's manufacturing and sending them out.

20         So I think given the continuing nature of the

21  conduct, that it does become relevant, the feedback that he is

22  getting repeatedly from his customers about why they're

23  purchasing it.

24         But, Your Honor, again, I'm happy to address it in

25  more detail on Wednesday.

1      THE COURT:  I'll just address that last thing, just

2  so you know how I see it.  To me, that's affirmative knowledge.

3  He's reading those emails.  That's the evidence that you-all

4  have presented, is that it's his email account.

5      It would be different if the evidence was he's

6  getting emails from people that are saying, "Hey, I'm trying to

7  manufacture it," but he intentionally has somebody else read

8  those emails and "don't tell me what's in them."  That would be

9  avoidance.

10      The fact that he's receiving these emails, that's

11  evidence of actual knowledge, in my view.

12      But I've raised the issue and I'll let you-all look

13  at it.  But I just wanted -- I wanted both sides to be aware of

14  those, because they're inconsistent with some positions that

15  you-all hold pretty strongly.

16      All right.  Mr. McCroskey, can you think of anything

17  else I should address at this time?

18      LAW CLERK:  No, Your Honor.

19      THE COURT:  All right.  I will see you back on

20  Wednesday morning at 8:45.

21      MR. KING:  Thank you, Your Honor.

22      COURT SECURITY OFFICER:  All rise.

23    (Proceedings concluded at 5:36 p.m.)

24              -    -    -

25

1            CERTIFICATE OF OFFICIAL COURT REPORTER

2

3    UNITED STATES DISTRICT COURT)

4    MIDDLE DISTRICT OF FLORIDA )

5

6         I hereby certify that the foregoing transcript is a true

7    and correct computer-aided transcription of my stenotype notes

8    taken at the time and place indicated herein.

9

10        DATED this 7th day of June, 2023.

11

12                        /s/ Katharine M. Healey
                          _____
                          Katharine M. Healey, RMR, CRR, FPR-C
13                        Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25