# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

vs.                                             Case No.  3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

_____

# O R D E R

**THIS CAUSE** is before the Court on Defendant Kristopher Justinboyer Ervin's Post-Verdict Motion for Judgment of Acquittal (Doc. 273; Ervin's Motion), filed May 19, 2023, and Defendant Matthew Raymond Hoover's Motion for Judgment of Acquittal (Doc. 274; Hoover's Motion), filed May 19, 2023. Following a nine-day jury trial, on April 21, 2023, the jury returned a verdict finding Ervin guilty as to all twelve counts of the Fourth Superseding Indictment (Doc. 204; Indictment) and a verdict finding Hoover guilty of five of the eight counts charged against him. See Verdict (Doc. 263; Ervin Verdict); Verdict (Doc. 264; Hoover Verdict). Specifically, the jury found Ervin guilty of conspiring to transfer unregistered machinegun conversion devices in violation of 18 U.S.C. § 371 (Count One); transferring unregistered machinegun conversion devices in violation of the National Firearms Act (NFA), 26 U.S.C. §§ 5861(e) and 5871 and 18 U.S.C. § 2 (Counts Two–Eight); structuring currency

transactions in violation of 31 U.S.C. § 5324(a)(3) and (d)(1) (Count Nine); and possessing unregistered machinegun conversion devices in violation of the NFA, 26 U.S.C. §§ 5861(d) and 5871 (Counts Ten–Twelve).  Ervin Verdict at 1–5; see also Indictment at 1–16.  As to Hoover, the jury returned guilty verdicts on the charges of conspiring to transfer unregistered machinegun conversion devices (Count One) and four counts of transferring unregistered machinegun conversion devices (Counts Two, Three, Five, and Seven).  Hoover Verdict at 1–3; see also Indictment at 1–14.  But the jury found Hoover not guilty of three counts of transferring unregistered machinegun conversion devices (Counts Four, Six, and Eight).  Hoover Verdict at 2–4.

In their motions, Defendants request that the Court enter judgments of acquittal as to all counts pursuant to Rule 29 of the Federal Rules of Criminal Procedure (Rule(s)) because "the evidence presented by the prosecution is insufficient to support a conviction."  Hoover's Motion at 1; see Ervin's Motion at 1–2.  The Government filed responses to both motions on June 16, 2023.  See Government's Response in Opposition to Defendants' Motion for Judgment of Acquittal (Doc. 289); Government's Response in Opposition to Defendant Ervin's Post-Verdict Motion for Judgment of Acquittal (Doc. 290).  Accordingly, this matter is ripe for review.

## I.    Legal Standard

Rule 29 provides the Court with authority, where appropriate, to enter a judgment of acquittal following a guilty verdict.  See Rule 29(c)(2).  A motion for judgment of acquittal under Rule 29 "is a direct challenge to the sufficiency of the evidence presented against the defendant."  United States v. Aibejeris, 28 F.3d 97, 98 (11th Cir. 1994); see also United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999) ("In considering a motion for the entry of judgment of acquittal under [Rule 29(c)], a district court should apply the same standard used in reviewing the sufficiency of the evidence to sustain a conviction.").  In ruling on such a motion, "a district court must 'determine whether, viewing all the evidence in the light most favorable to the jury's verdict, a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt.'"  United States v. Grigsby, 111 F.3d 806, 833 (11th Cir. 1997) (quoting United States v. O'Keefe, 825 F.2d 314, 319 (11th Cir. 1987)).

## II.    Discussion

Having carefully reviewed the record, the applicable law, and the parties' arguments, the Court finds that Ervin's Motion and Hoover's Motion are both due to be denied.

### A.    Firearms Charges (Counts One–Eight and Ten–Twelve)

The conspiracy charge in Count One and the firearms charges in Counts Two through Eight and Ten through Twelve arise from Ervin's "Auto Key Card"

business.  See generally Indictment.  The evidence at trial showed that Ervin's Auto Key Cards are stainless steel cards into which the designs of "lightning links," a type of machinegun conversion device, were etched.  See Jury Trial (Volume 1 of 9) (Doc. 277; Tr. Vol. 1) at 244–45; Gov't Ex. 64 (Doc. 259-171).  Hoover partnered with Ervin to create several videos advertising the sale of the Auto Key Cards.  See, e.g., Gov't Ex. 2 (Doc. 259-3; Gov't Ex. 2); Gov't Ex. 2A (Doc. 259-4; Gov't Ex. 2A) at 3; Gov't Ex. 3 (Doc. 259-5); Gov't Ex. 3A (Doc. 259-6) at 2–3.  In its closing argument, the Government urged the jury to find that the Auto Key Card is "a combination of parts designed and intended for use in converting an AR-15 [rifle] into a machine gun."  Jury Trial (Volume 8 of 9) (Doc. 284; Tr. Vol. 8) at 35.  The Government contended that the Auto Key Card is "an NFA item disguised as something innocuous."  Id. at 36.  In contrast, Ervin and Hoover argued that the Auto Key Card is merely artwork and a novelty, not a machinegun conversion device.  See id. at 73 ("It's not a machine gun.  It's lines on a piece of steel."); id. at 155 (asserting that the Auto Key Card is a "conversation piece").  Apparently rejecting Defendants' theory of the case, the jury found Ervin guilty of each of the machinegun conversion device charges and Hoover guilty of Counts One, Two, Three, Five, and Seven.  See Ervin Verdict at 1–5; Hoover Verdict at 1–3.

In Hoover's Motion, Hoover presents several arguments as to why the Court should acquit him of the firearms-related charges.  See Hoover's Motion

at 5–23.  Ervin adopts Hoover's arguments to the extent that they are applicable

to Ervin's convictions.  <u>See</u> Ervin's Motion at 2.  Ervin also raises a challenge

specific to his conviction for Count Six.  <u>See id.</u> at 2–3.  The Court will address

each argument in turn.

### 1. Sufficiency of the Evidence

Ervin and Hoover argue that there was insufficient evidence to support

each element of the firearms-related offenses.  <u>See</u> Hoover's Motion at 1; Ervin's

Motion at 2–3.   To find  a Defendant guilty of a conspiracy to transfer

unregistered machinegun conversion devices as charged in Count One, the jury

had to find that the Government proved all of the following facts beyond a

reasonable doubt:

> (1) two or more persons in some way agreed to try to accomplish a
> shared and unlawful plan;
>
> (2) the Defendant knew the unlawful purpose of the plan and
> willfully joined in it;
>
> (3) during the conspiracy, one of the conspirators knowingly
> engaged in at least one overt act as described in the indictment;
> and
>
> (4) the overt act was committed at or about the time alleged and
> with the purpose of carrying out or accomplishing some object of
> the conspiracy.

Court's Final Jury Instructions (Doc. 254; Jury Instructions) at 16.  To find

Ervin and Hoover guilty of the substantive counts of transferring unregistered

machinegun conversion devices, the jury had to find the following facts to be true beyond a reasonable doubt:

> (1) the Defendant knowingly transferred, or aided and abetted the transfer of, a firearm, specifically, a combination of parts designed and intended for use in converting a weapon to shoot automatically more than one shot, without manual reloading, by a single function of the trigger;

> (2) the firearm was not registered in the National Firearms Registration and Transfer Record; and

> (3) the Defendant knew of the specific characteristics or features of the firearm that made it subject to registration under the National Firearms Registration and Transfer Record.

Id. at 18–19. The jury had to find nearly identical elements to convict Ervin of possessing unregistered machinegun conversion devices as charged in Counts Ten through Twelve. See id. at 25–26.

### a. Evidence that the Auto Key Card Is a "Combination of Parts Designed and Intended" for Use in Converting a Weapon into a Machinegun

Hoover argues that no evidence at trial proved that Ervin and Hoover transferred a "combination of parts." Hoover's Motion at 5–6. According to Hoover, the Government's evidence demonstrated that "each Auto Key Card was a singular, homogenous piece of stainless steel into which a design was lightly etched." Id. at 6. Hoover also maintains that no evidence showed that the alleged parts would be functional if cut along the lines of the drawing. Id. at 8. In support of this argument, Hoover contends that the Government's

expert witness, Firearms Enforcement Officer Cody Toy, had to materially alter the Auto Key Card to create parts that caused a malfunction leading to multiple rounds being fired.  Id. at 7–8.

The Court finds that the Government presented sufficient evidence from which a reasonable jury could conclude that Ervin and Hoover transferred, and Ervin possessed, a combination of parts designed and intended for use in converting a weapon into a machinegun.  First, the evidence at trial showed that the etchings on the Auto Key Card demarcate metal pieces that are the correct shape and size to be the parts of a machinegun conversion device.  Special Agent Jesse Hooker testified that the etchings on the Auto Key Card are recognizable as the two parts of a lightning link, a machinegun conversion device consisting of a longer piece with a slot and a smaller piece that fits in the slot.  Tr. Vol. 1, at 244–45.  Toy explained that the longer piece is called the "body," and the smaller piece is the "paddle" or "connector."  Jury Trial (Volume 7 of 9) (Doc. 283; Tr. Vol. 7) at 144.

Next, the Government introduced evidence that the pieces identified by the etchings on the Auto Key Card are the correct material to function as machinegun conversion devices.  Hooker testified that lightning links had to be made of metal to work in a rifle.  Tr. Vol. 1, at 245.  Indeed, Ervin advertised the Auto Key Card as "High strength stainless steel.  Durable" and "Full Auto

laser engraved to scale graphic design." Jury Trial (Volume 2 of 9) (Doc. 278; Tr. Vol. 2) at 119–120, 124 (emphasis added).

In addition, the jury heard evidence suggesting that the metal pieces demarcated by the etchings were meant to be removed from the surrounding metal. Two employees at the company that Ervin contracted to manufacture the Auto Key Cards thought that the etchings identified pieces of a tool to be cut out of the card because Ervin said the card was a tool. Transcript of Jury Trial (Volume 4 of 9) (Doc. 280; Tr. Vol. 4) at 27, 111–12. One employee testified that Ervin was concerned about the narrow spacing between two etchings on some of the Auto Key Cards. Id. at 85–87. The jury could reasonably infer that the spacing between the etchings mattered because a customer needed to be able to cut out both parts without damaging them. Moreover, Carolanne Wolfe testified that Ervin decided to include "1 in 1," "2 in 1," or "3 in 1" in the name of each Auto Key Card, even though those names did not describe the number of etchings on each card. Id. at 195. For example, the "3 in 1" Auto Key Card actually contained six separate etchings. Tr. Vol. 2, at 34. A reasonable jury could conclude that Ervin called the cards "3 in 1" because each card contained the parts for three lightning links.

Notably, the jury heard Hoover say that the Auto Key Cards contain firearm parts that can be removed from the surrounding metal. In his first video about the Auto Key Card, Hoover pointed to the different etchings on the

card and noted that a person could cut out "this piece right here" and fit the piece in the "slot right here."  Gov't Ex. 1 (Doc. 259-1; Gov't Ex. 1); Gov't Ex. 1A (Doc. 259-2; Gov't Ex. 1A) at 7–8.  Hoover explained how these pieces can interact with the other parts of an AR-15 rifle to produce automatic fire.  Gov't Ex. 1; Gov't Ex. 1A, at 7–8.  In another video, Hoover said that the Auto Key Card "was a great [Special Occupational Taxpayer] resource where <u>you could get machine gun parts</u>."  Gov't Ex. 14 (Doc. 259-25; Gov't Ex. 14); Gov't Ex. 14A (Doc. 259-26; Gov't Ex. 14A) at 2–3 (emphasis added).

Finally, the Government presented evidence from which the jury could reasonably conclude that the parts identified by the etchings in the Auto Key Card are reasonably accessible to an end user and actually function as a machinegun conversion device.  Using a commonly available Dremel tool and a hand file, Toy was able to cut out the parts of the lightning link from the first Auto Key Card that he received.  Tr. Vol. 7, at 148–50.  The whole process took him approximately 37 minutes.  See id. at 150.  Toy cut to the line on the Auto Key Card except that he removed "some of the material" off the paddle because it was "a little bit too tall."  Id. at 151–53.  Toy explained that "hand fitting" a part is not uncommon because firearms from different manufacturers have different tolerances.  Id. at 151–52.  Counsel for the Government placed the cut-out piece over the uncut etching on an Auto Key Card.  See id. at 153.  Toy agreed that it appeared to be a millimeter or less of a difference between the

dimensions of the piece he cut out and the etching on the card.  Id.  The jury could see for itself whether the pieces that Toy cut out conformed to the etchings on the Auto Key Card.  See id.; Gov't Ex. 20A (Doc. 259-40); Gov't Ex. 25A (Doc. 259-46); Tr. Vol. 1, at 256–57, 272–73.  Once Toy installed the pieces from that Auto Key Card, a formerly semiautomatic rifle fired more than one shot with a single function of the trigger.  Tr. Vol. 7, at 155–156.  Toy conducted an additional test fire in Jacksonville, Florida.  Id. at 167–168.  At that test, with the parts from this Auto Key Card installed, the weapon fired automatically with both a machine gun bolt carrier and with an SP1 bolt carrier.  Id. at 168.

With the second Auto Key Card that Toy received, he used a Dremel tool and a drill press.  Id. at 159–61.  It took him 53 minutes to successfully cut out the parts of a lightning link from that card.  Id. at 162.  Once Toy installed these parts into his rifle, the rifle fired automatically.  Id. at 163.  Based on Toy's testimony, a reasonable jury could find that, while Toy had to "materially alter" the Auto Key Card to access the parts of a lightning link, he did not have to materially alter the parts themselves.  Toy merely had to remove the parts from the surrounding metal in order to use them to convert a semiautomatic rifle into a machinegun.

Given all of this evidence, the jury could reasonably conclude that Ervin and Hoover transferred and possessed a combination of parts designed and intended for use in converting a weapon into a machinegun.

**b. Evidence that Defendants Knew the Specific Characteristics of the Firearm that Made It Subject to Registration**

Hoover argues that the Government did not prove that he had the <u>mens rea</u> required to be convicted of transferring unregistered machineguns.  <u>See</u> Hoover's Motion at 10 (citing <u>Staples v. United States</u>, 511 U.S. 600 (1994)).  In <u>Staples</u>, the Supreme Court expressed concern that a gun "may give no externally visible indication that it is fully automatic," leaving the gun's possessor with "absolute ignorance of the gun's firing capabilities."  511 U.S. at 615.  The Court concluded that Congress did not intend "to subject such law-abiding, well-intentioned citizens" to a lengthy prison sentence if "what they genuinely and reasonably believed was a conventional semi-automatic [weapon] turns out to have worn down into or been secretly modified to be a fully automatic weapon.'"  <u>Id.</u> (alteration in original) (quoting <u>United States v. Anderson</u>, 885 F.2d 1248, 1254 (5th Cir. 1989) (en banc)).  Thus, the Court concluded that, to obtain a conviction, the Government must prove that a defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition of a machinegun."  <u>Id.</u> at 602, 619.[1]

_____

[1] The Court did not hold that the Government must prove that the defendant knew his possession was <u>unlawful</u>.  In her concurrence, Justice Ginsburg noted that "[t]he <u>mens rea</u> presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, 'deeply rooted in the American legal system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.'"  <u>Id.</u> at 622 n.3 (Ginsburg, J., concurring) (quoting <u>Cheek v. United States</u>, 498 U.S. 192, 199 (1991)).

Here, the jury could reasonably conclude that Ervin and Hoover knew of the characteristics or features that brought the Auto Key Card within the statutory definition of a machinegun.  Jonathan Monger testified that Ervin told him that the Auto Key Card is a "gray market item" that resembles the lightning link.  Tr. Vol. 4, at 266–67.  According to Monger, Ervin told him that, if the pieces of the Auto Key Card "were cut out correctly and formed in a certain way, it could make a certain model AR-15 fully auto."  Id. at 267–68.  In addition, in an advertisement video, Ervin interspersed videos and sounds suggesting automatic fire with images of the Auto Key Card.  Gov't Ex. 49A (Doc. 259-121).  Moreover, when a customer asked Ervin about the "proper use of the card," Ervin provided directions on how to find instructions for using the Auto Key Card as a machinegun conversion device.  Gov't Ex. 67E (Doc. 259-179; Gov't Ex. 67E); Tr. Vol. 2, at 115–16.  Ervin also told the customer,

> The auto key card is a conversation piece as sold and as with many legal products, illegal use can occur.  Think of brass knuckles sold as paperweights.  Please be smart and careful you don't get into trouble.  It is intended to stay in the sold as form.  Individuals may make the choice to use it in a different way under certain dire circumstances in the future.  Please share our product with others and friends that may need it someday.

Gov't Ex. 67E.  From this evidence, the jury could reasonably conclude that Ervin knew of the characteristics or features of the Auto Key Card that brought it within the scope of the NFA.

Similarly, the Government presented evidence from which a reasonable jury could find that Hoover knew that the Auto Key Card is a combination of parts designed and intended for use in converting a weapon to shoot automatically.  In one of his videos, Hoover instructed viewers how to get a functioning lightning link out of an Auto Key Card.  See Gov't Ex. 1; Gov't Ex. 1A, at 7–8.  Hoover explained that the Auto Key Card is "awesome" because it is "stupid cheap. You could drop it in your rifle – or, you know, if you're actually gonna do this legally, this is just the bottle opener."  Gov't Ex. 1; Gov't Ex. 1A, at 8–9.  And Hoover called the Auto Key Card a great resource "where you could get machine gun parts."  Gov't Ex. 14; Gov't Ex. 14A, at 2–3.  This evidence sufficiently supports the jury's finding that Hoover knew of the characteristics or features of the Auto Key Card that brought it within the scope of the NFA.

The jury also could reasonably conclude that Ervin and Hoover knew that parts could fall within the definition of "machinegun" even when the parts could not immediately be used.  Ervin told Wolfe that a lightning link that she found online was a "no-no" because it was "like 95 percent."  Tr. Vol. 4, at 227–29.  Similarly, Hoover stated that the "old Lightning Links" caused problems because there were "just a couple of small pieces of metal holding them in the original piece.  All's you had to do was take your finger, pop it out.  Boom.  You have a machine gun."  Gov't Ex. 2; Gov't Ex. 2A, at 3.  Hoover described another conversion device called the "swift link" and mentioned how they were

"disguised as a little stick-on coat rack. You just snapped off the back of it." Gov't Ex. 1; Gov't Ex. 1A, at 6.  In the video "This Makes an Illegal Machine Gun," Hoover argued that the "portable wall hanger" is not a machinegun conversion device because "modification needs to happen."  Gov't Ex. 7 (Doc. 259-13; Gov't Ex. 7); Gov't Ex. 7A (Doc. 259-14; Gov't Ex. 7A) at 3.  He then admitted that the ATF "considered it" a machinegun conversion device "for whatever reason."  Gov't Ex. 7; Gov't Ex. 7A, at 3.  Finally, Hoover discussed drilling a third hole in a receiver and noted how "dimpling," or merely marking in the metal where the third hole would go, would mean that the ATF classified the receiver as a machinegun.  Gov't Ex. 1; Gov't Ex. 1A, at 7.  Based on this evidence, the jury could reasonably find that Ervin and Hoover knew that they were transferring and possessing a combination of parts designed and intended for use in converting a weapon into a machinegun, notwithstanding the extra material surrounding the parts in the Auto Key Card.

### c. Evidence that Ervin Transferred Machinegun Conversion Devices to J.A.

With regard to Count Six of the Indictment, the jury found Ervin guilty of transferring unregistered machinegun conversion devices to a person with the initials "J.A."  See Ervin Verdict at 3.  Ervin argues that no evidence showed that an individual with the initials J.A. existed or ordered and received an Auto Key Card.  Ervin's Motion at 3.  However, the Court finds that the jury heard

sufficient evidence to conclude that Ervin transferred an Auto Key Card 2 in 1 Pen Holder Edition (containing two conversion devices) to a real individual named James Acs.  See Gov't Ex. 89E (Doc. 259-256); Jury Trial (Volume 3 of 9) (Doc. 279; Tr. Vol. 3) at 40; Tr. Vol. 2, at 164–65; Gov't Ex. 110 (Doc. 259-336). Therefore, Ervin's Motion is due to be denied as to Count Six.

### d. Evidence that Defendants Knew of the Conspiracy's Unlawful Purpose

As to Count One, Hoover argues that there was no evidence that he knew the unlawful purpose of the conspiracy.  See Hoover's Motion at 10–11.  Hoover's argument is unavailing because the Government presented sufficient evidence of each Defendant's knowledge and intent.  As discussed above, a reasonable jury could conclude that Ervin and Hoover knew that they were transferring parts subject to the NFA.  In addition, the evidence showed that Ervin set up, and Hoover advertised, discrete mail-in ordering for the Auto Key Card because they knew that customers would worry about their names being connected with the product.  Gov't Ex. 1; Gov't Ex. 1A, at 5; Gov't Ex. 2; Gov't Ex. 2A, at 3.  The evidence also revealed that Ervin explicitly discussed the possibility of prosecution and professed his belief that law enforcement could not prove his intent unless they got into his head.  Tr. Vol. 4, at 221.  Moreover, in a video, Hoover says that he told Ervin that "it's kind of an edgy product."   Gov't Ex. 14; Gov't Ex. 14A, at 1.  According to Hoover, the gist of what Ervin said in reply

is, "Look, if a drawing on a piece of metal that I have scribed in there is gonna be illegal, that's my line in the sand.  That's where I want to fight."  Gov't Ex. 14; Gov't Ex. 14A, at 1–2.  Hoover responded, "I got your back, man." Gov't Ex. 14; Gov't Ex. 14A, at 2.  In another video, Hoover said that it would be ridiculous for an ATF agent to argue in a courtroom that the Auto Key Card is a machinegun, but he acknowledged that "they probably will do that at some point in time. . . . But these are so incredibly affordable, it doesn't really matter." Gov't Ex. 1; Gov't Ex. 1A, at 4–5 (emphasis added).  In the video "The Parts the ATF Wishes Never Existed," Hoover discusses several products, including the Auto Key Card, and refers to them as "these parts that are currently legal – well, kind of legal."  Gov't Ex. 2; Gov't Ex. 2A, at 2 (emphasis added).  After speaking about cutting out the parts contained in the Auto Key Card, Hoover told his viewers, "Definitely don't go on the internet and upload videos with you using this."  Gov't Ex. 2; Gov't Ex. 2A, at 3.  Based on this evidence, the jury could reasonably conclude that each Defendant knew the unlawful purpose of their plan and willfully joined it.

In sum, the Court concludes that sufficient evidence supported each of the jury's guilty verdicts as to the conspiracy charge in Count One and the related firearms offenses in Counts Two through Eight and Ten through

Twelve.[2]  Therefore, Defendants' requests for judgments of acquittal are due to be denied.

### 2. Vagueness

Hoover argues that "[a]s applied against Mr. Hoover, 26 U.S.C. §§ 5861(e) and 5871, and 18 U.S.C § 2 are unconstitutionally vague under the Fifth Amendment."  Hoover's Motion at 21; see also id. at 13–15 (citing several cases that applied the vagueness doctrine).  He asserts, "In no event would a reasonably intelligent person foresee that the conduct charged in this case—talking about a card with a drawing on it—would be deemed criminal, much less that a homogenous piece of steel with a drawing on it would be deemed a combination of parts."  Id. at 21.

Challenging a statute for vagueness is an assertion that "criminal responsibility should not attach [because] one could not reasonably understand that his contemplated conduct is proscribed."  United States v. Nat'l Dairy Prods. Corp., 372 U.S. 29, 32–33 (1963).  A statute must "define the criminal

---

[2]  Defendants raise several additional arguments based on evidence that they contend shows their innocence.  See Hoover's Motion at 6 (Ervin's instructions to Orange Park Machine & Fab.); id. (testimony that drawings and templates are not machineguns); id. at 8 (witness who failed to convert his rifle to fire automatically); id. at 10 (Hoover's statements about the legality of the Auto Key Card); id. at 21 (no evidence showing that a purchaser of the Auto Key Card successfully converted a weapon to shoot automatically).  However, to succeed on a motion for judgment of acquittal, "[t]he defendant must do more than 'put forth a reasonable hypothesis of innocence, because the issue is not whether a jury reasonably could have acquitted but whether it reasonably could have found guilt beyond a reasonable doubt.'"  United States v. Toll, 804 F.3d 1344, 1354 (11th Cir. 2015) (quoting United States v. Thompson, 473 F.3d 1137, 1142 (11th Cir. 2006)).

offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." United States v. Awan, 966 F.2d 1415, 1424 (11th Cir. 1992) (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983)). If a vagueness challenge to a statute does not involve the First Amendment, then the analysis must be applied to the facts of the case.[3] United States v. Duran, 596 F.3d 1283, 1290 (11th Cir. 2010). Notably, the Supreme Court has instructed that there is a "strong presumption supporting the constitutionality of legislation." Nat'l Dairy Prods. Corp., 372 U.S. at 32. The Eleventh Circuit has instructed that "[i]n analyzing a vagueness claim, the first step in determining whether a statute provides fair warning is to begin with the language of the statute itself. Where the language alone sets forth plainly perceived boundaries, no further inquiry is necessary." Duran, 596 F.3d at 1291 (citation omitted).

Here, the language of the relevant statutory provisions sets forth plainly perceived boundaries. The NFA prohibits possessing or transferring unregistered machineguns. See 26 U.S.C. § 5861(d)–(e). The statute defines the term "machinegun" as follows:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function

---

[3]   Defendants do not argue that their vagueness challenge involves the First Amendment, and they specifically state that they are challenging the statutes "as applied." Hoover's Motion at 21.

- 18 -

> of the trigger.  The term shall also include . . . any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun . . . .

26 U.S.C. § 5845(b).  This language is clear and definite.  In the context of a prosecution for possessing and transferring machinegun conversion devices, the former Fifth Circuit rejected a defendant's argument that the statute is unconstitutionally vague.  See United States v. Campbell, 427 F.2d 892, 893 (5th Cir. 1970) (per curiam).[4]  Notably, Hoover does not identify which portion of this definition is supposedly vague.  He does not explain how the statute fails to define the crime "with sufficient definiteness that ordinary people can understand what conduct is prohibited."  Awan, 966 F.2d at 1424.  Nor does he explain how the statute encourages "arbitrary and discriminatory enforcement."  Id.

Instead, Hoover emphasizes that the NFA does not give notice that drawings and tchotchkes are illegal.  For example, Hoover asserts, "[i]t should not be controversial to state that a statute proscribing a 'combination of parts' gives no notice that a drawing, or even a drawing that could become a

---

[4]   In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.  However, because vagueness challenges are "as applied" and the court in Campbell faced somewhat different facts, the holding in Campbell likely is not controlling in this case.  It is nevertheless persuasive authority that the statutory language generally is sufficiently clear to put a person of reasonable intelligence on notice as to what is forbidden.

combination of parts through transformative labor, [is] covered." Hoover's Motion at 14; see also id. at 18 ("Such tchotchkes are not regulated under the Gun Control Act or the [NFA]."); id. at 20–21 ("The statute does not refer to something that may one day become a part, nor does it refer to drawings or schematics for parts. It refers, quite simply, to something that is a combination of parts."). However, the Government has never suggested that the NFA applies to mere drawings or novelties. And, the Court did not instruct the jury that it could convict based on the transfer of a mere tchotchke, drawing, or drawing that could become a combination of parts. Rather, the Court instructed the jury that it could only find Defendants guilty if the Government proved beyond a reasonable doubt that Defendants had possessed and transferred a "combination of parts designed and intended" for use in converting a weapon into a machinegun. Jury Instructions at 18, 25. Thus, Hoover's arguments about drawings and trinkets are unavailing.

Hoover also lists hypotheticals and asks whether they are prohibited by the statute. See Hoover's Motion at 19 ("If the DXF File of the Drawing and instructions how to break the law, like the Anarchist Cookbook, are constitutionally protected speech, is the Drawing with oil-based paint on [a] piece of stainless steel, okay? What about military grade plastic with the etching—is that Kosher?"). While those hypotheticals may identify difficult or

close cases, they do not explain what is vague about the statutory language itself.  The Eleventh Circuit has instructed,

> [Void for vagueness] does not mean that the statute must define every factual situation that may arise.  The existence of "marginal cases in which it is difficult to determine the side of the line on which a particular fact situation falls is no sufficient reason to hold the language too ambiguous to define a criminal offense."  Moreover, ignorance of the fact that one's conduct is a violation of the law is no defense to criminal prosecution.

United States v. Nelson, 712 F.3d 498, 508 (11th Cir. 2013) (citations omitted) (quoting United States v. Biro, 143 F.3d 1421, 1430 (11th Cir. 1998)); see also Johnson v. United States, 576 U.S. 591, 601 (2015) ("[E]ven clear laws produce close cases . . . .").  The Supreme Court also has noted, "As a general matter, we do not doubt the constitutionality of laws that call for the application of a qualitative standard such as 'substantial risk' to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'"  Johnson, 576 U.S. at 603–04 (alteration in original) (quoting Nash v. United States, 229 U.S. 373, 377 (1913)).  Whether Defendants transferred a "combination of parts" may not have been obvious in this particular case.  But the law itself provides a meaningful standard.  Applying that standard to Defendants' real-world conduct, the jury found that Defendants went too far and, rather than transferring mere art, they were, in

fact, transferring a combination of machinegun parts.  Resolving that factual question was well-within the province of the jury.[5]

In addition, "[b]ecause 'objections to vagueness under the Due Process Clause rest on the lack of notice,' an as-applied vagueness challenge 'may be overcome in any specific case where reasonable persons would know that their conduct is at risk.'"  United States v. Edgar, 304 F.3d 1320, 1327 (11th Cir. 2002) (quoting Maynard v. Cartwright, 486 U.S. 356, 361 (1988)).  Here, the Court concludes that a reasonable person would know that selling an Auto Key Card would place him at risk.  In fact, as discussed above, the evidence showed that Ervin and Hoover knew their conduct was at risk.  See id. at 1328 (rejecting a vagueness challenge in light of the defendant's "knowledge and experience," which showed that he "[s]urely" knew his conduct was unlawful).  The Supreme Court has found that it is not "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."  Boyce Motor Lines v. United States, 342 U.S. 337, 340 (1952).  Ervin and Hoover acted deliberately to sell a product that they knew was

---

[5] For the same reasons, Defendants' argument fails to the extent they rely on the rule of lenity.  See Hoover's Motion at 16–18.  The rule of lenity applies "where there is a 'grievous ambiguity or uncertainty' in the statute."  United States v. Izurieta, 710 F.3d 1176, 1182 (11th Cir. 2013) (quoting Chapman v. United States, 500 U.S. 453, 456 (1991)).  Defendants do not identify any ambiguity in 26 U.S.C. §§ 5845, 5861, and 5871.  Defendants wrongly equate uncertainty about a factual question (whether the items Defendants transferred were mere drawings or a combination of parts) with doubt about a legal question (the meaning of the statute itself).

"edgy," Gov't Ex. 14; Gov't Ex. 14A, at 1, and a "gray-market item," Tr. Vol. 4, at 266–67.   Having knowingly taken that risk, Defendants may not now complain that the statute provided them insufficient notice.   For all of these reasons, Defendants' vagueness challenge is unavailing.

### 3. Constructive Amendment of the Indictment

Hoover argues that the Government impermissibly shifted from prosecuting a "part" theory to prosecuting a "combination of parts" theory. Hoover's Motion at 11.  In support of this argument, Hoover cites United States v. Chandler for the proposition that it is error for the grand jury to indict on one theory of illegal conduct and the Government to prosecute the case on another, entirely different theory.   See 388 F.3d 796, 798 (11th Cir. 2004).   But no impermissible shift in the Government's theory occurred here.  In the operative Indictment, the Government charged that Defendants had transferred and possessed a "combination of parts designed and intended for use in converting a weapon into a machinegun." Indictment at 2, 10–16. At trial, the Government presented proof and argued that the Auto Key Card is a combination of parts. See Tr. Vol. 8, at 35.  And, consistent with the language of the Indictment, the Court instructed the jury on the "combination of parts" portion of the definition of a machinegun.  Jury Instructions at 18, 25.  Because the Government did not impermissibly shift its theory of the case, Defendants' argument is unavailing.

**B.     Structuring Currency Transactions (Count Nine)**

With regard to Count Nine of the Indictment, the jury found Ervin guilty of structuring, and attempting to structure, currency transactions for the purpose of evading currency transaction reporting requirements.  <u>See</u> Ervin Verdict at 4.  Ervin argues that "there is no record evidence that [he] was attempting to avoid the reporting requirement."[6]  Ervin's Motion at 5.

The Court finds that the record contains sufficient evidence from which the jury could reasonably conclude that Ervin acted with the purpose to evade the transaction-reporting requirements.  An employee of Ervin's bank Amy Sarkese testified that Ervin asked her what the threshold to trigger the reporting requirement was.  <u>See</u> Tr. Vol. 3, at 162 ("Well, how much can I take out so it's not reported?").  Sarkese stated that Ervin asked this question sometime before he started repeatedly withdrawing $9,000 in cash from his account.  <u>See</u> <u>id.</u> at 197.  On the day of the first structured transaction,

---

[6] Ervin also argues that the law requires the Government to prove that he knew of the "actual reporting requirement" and of his duty not to avoid triggering a transaction report. Ervin's Motion at 5 (citing <u>Ratzlaf v. United States</u>, 510 U.S. 135, 146–47 (1994)).  This argument misstates the law because Congress amended 31 U.S.C. § 5324 after the Supreme Court's decision in <u>Ratzlaf</u>.  <u>See</u> <u>United States v. Vazquez</u>, 53 F.3d 1216, 1218 n.2 (11th Cir. 1995).  "[T]he only mental state apparently required under the new penalty provision is a purpose to evade the filing requirement."  <u>Id.</u>; <u>see</u> <u>United States v. Hernandez</u>, 490 F. App'x 250, 253 (11th Cir. 2012) (per curiam).

In citing <u>Hernandez</u>, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

December 28, 2020, Ervin initially asked to withdraw all of the money in his account in cash.  See id. at 170–71.  According to Sarkese, she informed him that he could not withdraw all of the money in cash that day.  See id. at 171.  Sarkese instead offered to allow him to withdraw $10,000.  See id.  Although Ervin at first agreed to withdraw this amount, he changed his mind and asked to withdraw $9,000.  See id. at 171–73.  Based on this testimony, the jury could reasonably infer that Ervin heard "$10,000," became concerned about the reporting threshold, and requested a lower amount to avoid triggering the reporting requirement.  In addition, Sarkese testified that Ervin had the option of withdrawing all of his money in cash at once through a special order that could have been available by the end of the following week.  See id. at 171.  Instead of requesting a special order and waiting less than two weeks to receive all of his money, Ervin returned to a branch of his bank on seven separate days over the course of a week and a half and withdrew $9,000 in cash each time.  See Gov't Ex. 95C (Doc. 259-302) at 22–23, 26.  This course of conduct readily supports an inference that Ervin was acting with the intent to evade the reporting requirement.  See United States v. Vigil-Montanel, 753 F.2d 996, 999 (11th Cir. 1985) ("A defendant's intent can be inferred from his conduct and all the surrounding circumstances.").  Therefore, the Court will deny Ervin's Motion as to Count Nine.

## III.   Conclusion

Viewing all of the evidence in the light most favorable to the jury's verdict, the Court finds that a reasonable trier of fact could find that the evidence established guilt beyond a reasonable doubt as to each conviction.   And Defendants' legal challenges are unavailing.   Accordingly, it is

**ORDERED:**

Defendant   Kristopher   Justinboyer   Ervin's   Post-Verdict   Motion   for Judgment of Acquittal (Doc. 273) and Defendant Matthew Raymond Hoover's Motion for Judgment of Acquittal (Doc. 274) are **DENIED**.

**DONE AND ORDERED** in Jacksonville, Florida, on August 23, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

lc30
Copies to:

Counsel of Record