UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

    v.                                        CASE NO. 3:21-cr-22(S4)-MMH-MCR

KRISTOPHER JUSTINBOYER ERVIN
MATTHEW RAYMOND HOOVER

## UNITED STATES' SENTENCING MEMORANDUM

At the center of this case is a conspiracy between two men – defendants Ervin and Hoover – to willfully and flagrantly violate the United States' firearms laws by producing and selling machinegun conversion devices at mass scale. As proven at trial, the conspiracy involved at least 6600 of these devices, which were thinly-veiled as "conversation piece[s]" or "art." Had the ATF and other agencies investigating this case not intervened, the quantity likely would have been even more. These devices have been outlawed for civilian use for decades – and the reasons why are obvious. Converting an ordinarily semi-automatic AR-15 to a fully automatic machinegun increases its potential for the rapid taking of human life. Anyone who doubts this need only look to the 2017 Las Vegas shooting. In that incident, the shooter used a bump stock – a different type of device used to cause a rifle to rapidly fire – to indiscriminately shoot into a crowd gathered for a concert, killing 60 people and wounding at least 413.[1]

---

[1]    *See* Ken Ritter, "Las Vegas marks 3rd year since deadliest US mass shooting," October 1, 2020 (noting that 413 people were injured by bullet and shrapnel wounds, and in

The Sentencing Guidelines are designed to account for the danger that machineguns pose when unlawfully possessed, manufactured, or transferred – they do so by providing for an increased base offense level of 18 based on this factor alone.  *See* USSG § 2K2.1(a)(5).  The Guidelines also provide in the commentary for an upward departure where the offense involved multiple machineguns.  *See* USSG § 2K2.1 comment. n.11(B).  The Guidelines further reflect the increased culpability of a defendant where multiple firearms are involved – by providing for increases where at least 3 firearms are involved, topping out at "200 or more." USSG § 2K2.1(b)(1).  The commentary further provides for a potential upward departure where "the number of firearms substantially exceeded 200" – as it does in this case.  USSG § 2K2.1 comment. n.11(A).  Additionally, trafficking in firearms, as the defendants did here, is a further aggravating characteristic under the Guidelines.  USSG § 2K2.1(b)(5).

However, in this case, the Guidelines as scored fail to reflect nearly all of these factors, as a result of what appears to be an unintended consequence of a definition in the commentary.  Specifically, the United States objects to paragraph 52 of defendant Hoover's Pre-Sentence Report ("PSR") (Doc. 294) and paragraph 53 of

---

total 850 people were injured, including in fleeing from the concert), *available at* https://apnews.com/article/virus-outbreak-las-vegas-las-vegas-mass-shooting-nevada-shootings-ea1ab5537d62f9e3e52bb4f770910452; *see also* Lauren Edmonds et. Al, "Death toll of the 2017 Las Vegas massacre rises from 58 to 60," October 1, 2020 (death toll totaled 60 after two additional victims succumbed to their injuries in the years after the shooting), *available at* https://www.dailymail.co.uk/news/article-8795493/Death-toll-2017-Las-Vegas-massacre-rises-58-60.html.

defendant Ervin's PSR (Doc. 295). In those paragraphs and throughout the PSRs, the Probation Office fails to apply the applicable Specific Offense Characteristics ("SOCs") in USSG § 2K2.1, specifically, § 2K2.1(b)(1)(E) for the offense involving in excess of 200 firearms and § 2K2.1(b)(5) for the defendants being engaged in the trafficking of firearms. Failing to apply the SOCs contradicts the plain language of the Guidelines as well as binding case law, and results in a massive undercalculation of the defendants' respective Guidelines ranges. After each of the applicable SOCs and departures are taken into consideration, the offense level should be 38 for each defendant.

There is little to say in the way of mitigation in this case. Neither defendant has in any way accepted responsibility for the offense or expressed any remorse for his actions. As the United States will further elaborate at the sentencing hearing, both defendants undertook their criminal endeavor with the specific purpose of undermining the laws of this country. Sentences for both defendants within the properly calculated guidelines range are necessary to achieve the statutory purposes of sentencing under § 3553(a).

I.   **The SOCs in § 2K2.1 Apply.**

The governing Sentencing Guideline, USSG § 2K2.1(a)(5), provides for a base offense level of 18 "if the offense involved a firearm described in 26 U.S.C. § 5845(a)." *See* Hoover PSR ¶ 51, Ervin PSR ¶ 52. Section 5845(a), in turn, defines a "firearm" to include a "machinegun" (among other things), and it defines "machinegun" to include conversion devices consisting of a combination of parts

designed and intended for use in converting a weapon into a machinegun, such as the auto sears at issue here. *See* 26 U.S.C. § 5845(b) ("any . . . combination of parts designed and intended, for use in converting a weapon into a machinegun"). Therefore, an offense involving an auto sear has a base offense level of 18. The government concurs that the base offense level has been correctly scored.

The Guideline's SOCs increase the base offense level based on the number of firearms that "the offense involved." USSG § 2K2.1(b).[2] Ervin and Hoover's offenses involved trafficking in approximately 6,600 firearms – the auto sears that are "described in 26 U.S.C. § 5845(a)" and that govern the base offense level. Therefore, the Guideline calls for their offense level of 18 to be increased by 10 levels because the offense involved 200 or more auto sears pursuant to USSG § 2K2.1(b)(1)(E), and another 4 levels because the offense involved the trafficking of firearms pursuant to USSG § 2K2.2(b)(5). The total offense level for the firearm-related counts for both defendants should thus be **32** before any departures.

The commentary to the Guideline, though, says, "[f]or purposes of this guideline," that "'[f]irearm' has the meaning given that term in 18 U.S.C. § 921(a)(3)." USSG § 2K2.1 (comment. (n.1)). Section 921(a)(3), in turn, provides that a firearm is "(A) any weapon … which will or is designed to or may readily be

---

[2] The Guideline includes several other available adjustments, based on the characteristics of the firearm(s) (whether a destructive device, stolen, or bearing an obliterated serial number) and how the firearm was to be used (for sporting purposes, in connection with another felony offense, to traffick firearms or transport them out of the country, or to conceal a substantive firearm offense). USSG § 5K2.1(B)(2)–(7).

converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device." While the definition in section 921(a)(3) does not include auto sears, auto sears should nonetheless be considered for the SOCs under USSG § 2K2.1 under two separate theories: <u>first</u>, the language of the Guideline itself clearly defines firearms as including those described in 26 U.S.C. § 5845(a), which this Court should use to determine that the specific offense characteristics apply; and <u>second</u>, the Guideline is unambiguous in this respect and thus resort to the commentary is unnecessary in any event (*see, e.g., United States v. Dupree*, 57 F.4th 1269, 1279 (11th Cir. 2023) (en banc)).[3]

    A.   <u>The Guideline definition of firearm clearly includes machinegun conversion devices.</u>

The commentary's general definition of "firearm" does not apply to offenses like Ervin and Hoover's, which are based on the Guideline's more-specific application to "firearm[s] described in 26 U.S.C. § 5845(a)." A "specific statutory provision trumps a general one." *Nguyen v. United States*, 556 F.3d 1244, 1253 (11th Cir. 2009); *see also ConArt, Inc. v. Hellmuth, Obata + Kassabaum, Inc.,* 504 F.3d 1208, 1210 (11th Cir. 2007) ("[W]hen presented with a potential overlap between the broadly sweeping terms of a statute of general application that appear to apply to an

---

[3] The United States notes its continuing disagreement with *Dupree* and cases like it; we rely on *Dupree* here only insofar as it is binding and thus controls the proper calculation of the guidelines range.

5

entire class, and the narrow but specific terms of a statute that apply to only a subgroup of that class, we avoid conflict between the two by reading the specific [in this instance, the guideline's reference to 26 U.S.C. § 5845(a)] as an exception to the general [the commentary's reference to section 921(a)(3)].").

Moreover, the Guideline uses the same terminology in describing the base offense level determination (*e.g.*, when "the offense involved" a firearm described in 26 U.S.C. § 5845(a), *see* § 2K2.1(a)(5)) that it uses for the SOCs (when "the offense involved" three or more firearms, *see* § 2K2.1(b)(1)).  This commonality, too, indicates that the court is not to switch to an entirely new definition of what the offense involved at the second part of the offense level calculation involving the SOCs.  Rather, the Guideline's initial reference to a "firearm described in 26 U.S.C. § 5845(a)" is a term of art that guides the offense level determination.  It is not affected by the entirely different, unadorned definition of "firearm" in the commentary, which will govern defendants whose offenses do not involve either of the specific types of firearms spelled out in the guideline itself.[4]  It thus made sense, for example, for the Court in *United States v. Dodson*, 519 F. App'x 344 (6th Cir. 2013), to look to the definition of a firearm in section 5845(b), not in section 921(a)(3), in deciding whether the defendant's "halved grease gun" was a "firearm" subject to enhancement under USSG § 2K2.1(b)(4) (addressing firearms with altered or obliterated serial numbers).  The Court upheld the enhancement because the

---

[4]  Those are a "semiautomatic firearm that is capable of accepting a large capacity magazine" and a "firearm that is described in 26 U.S.C. § 5845(a)."

firearm was a "readily restorable" machinegun "under the terms of 26 U.S.C. § 5845(b)." 519 F. App'x at 352.

Additionally, the history of the Guideline indicates that the Guideline's more specific definition is intended to control in this context. Until 2004, the commentary did not just refer to the statutes for its definitions of "firearm" and "ammunition," as it does now. Rather, the commentary spelled out the statutory terms, and—important here—it also did that with respect to "firearm described in 26 U.S.C. § 5845(a)." *See, e.g.,* United States Sentencing Guidelines Manual, § 2K2.1, comment. (n.3) (Nov. 2001). That definition in the commentary specified section 5845(a)'s five types of firearms (including machineguns) and said, "For a more detailed definition, refer to 26 U.S.C. § 5845." But when the Commission amended the Guideline and commentary to adopt the statutory definition of "destructive devices," it struck the definitions "[f]or consistency," and substituted "similar statutory definitions … for the definitions of 'ammunition' and 'firearm.'" Amendment 669, Reason for Amendment. The new definitions, as mentioned above, simply refer to the statutory definitions, rather than replicating them. *See, e.g.,* USSG § 2K2.2, comment. (n.1) ("'Firearm' has the meaning given that term in 18 U.S.C. § 921(a)(3)."). The commentary's definition for "firearm described in 26 U.S.C. § 5845(a)," though, was <u>not</u> replaced, presumably because the description in the Guideline is itself consistent with the other, new definitions. It would not have made sense for the commentary to say: "'Firearm described in 26 U.S.C. § 5845(a)' has the meaning given that term in 26 U.S.C. § 5845(a)." What does make sense is

7

that the Commission recognized that the Guideline definition is itself clear and sufficient. And nothing in the Commission's amendment suggests that the Commission intended to alter or diminish the meaning of the Guideline's references to section 5845(a), let alone to allow the commentary's "firearm" definition to take precedence over what is obvious from the text of the Guideline.

In sum, the Guideline's language—including the SOCs—clearly applies to firearms described in section 5845(a), including auto sears. Therefore, resort to the commentary to upend the Guideline's unambiguous reach would be wrong.

We recognize that one district court, in *United States v. Hixson*, 624 F. Supp. 3d 930 (N.D. Ill. 2022), has seemingly ruled otherwise. That court said that "[t]he Guidelines do *not* include machine guns—including devices that convert semiautomatic weapons into fully automatic weapons—in the definition of 'firearms.' *Compare* 18 U.S.C. § 921(a)(23) (definition of machinegun) *with* § 2K2.1 Application Note 1 (defining firearm to mean the definition in 18 U.S.C. § 921(a)(3))." 624 F. Supp. 3d at 933, *appeal dismissed*, No. 22-2544, 2022 WL 18863675 (7th Cir. Dec. 1, 2022). But that conclusion is incorrect. The Guideline does include machineguns because the guideline expressly reaches cases where the "offense involved a firearm described in 26 U.S.C. § 5845(a)," and that statute explicitly includes machineguns, including conversion devices. *See* 26 U.S.C. § 5845(a)(6) & (b). But by starting with the premise that the Guideline excludes machineguns, the *Hixson* court never addressed the relevant Guideline language, let alone attempted to reconcile it with the commentary language on which the court

8

relied. That guideline language, as discussed above, reaches specific types of firearms, including – pertinent here – a "firearm described in 26 U.S.C. § 5845(a)."[5]

### B. *Dupree* requires application of the SOCs.

Further, Section 2K2.1 itself unambiguously applies to "firearm[s] that [are] described in 26 U.S.C. § 5845(a)," and resort to the commentary is thus inappropriate under this Circuit's binding precedent. In *Dupree*, the *en banc* Eleventh Circuit held that the Sentencing Commission's commentary to a guideline can only bind a district court if it interprets a "genuinely ambiguous" Guidelines provision. 57 F.4th at 1274-75. The Guideline here is not ambiguous at all; indeed, it directly states that it applies to firearms defined in 26 U.S.C. § 5845(a), which include the machinegun conversion devices at issue here. Under *Dupree*, then, resort to the commentary here is inappropriate, as the commentary cannot overrule the Guideline's direct and explicit reference that this Court should consider auto sears as firearms.

The applicability of either approach above is bolstered by the fact that applying the commentary definition to exclude machinegun conversion kits would lead to absurd results. Employing the section 921(a)(3) definition—rather than the definition governing the offense of conviction—would mean that someone who illegally possesses one auto sear would have the same base offense level as someone

---

[5] The *Hixson* court also says that the guideline has "three references to the statutory definition of a machinegun," 624 F. Supp. 3d at 936, but that is also incorrect. The guideline refers to the statutory definition of <u>firearm</u> in 26 U.S.C. § 5845(a), not to the statutory definition of machinegun, which is in § 5845(b).

9

who sells 1,000 of them, or 100,000 of them. There is no logic to that interpretation, and especially so given that the Commission has clearly embraced the significance of firearm quantity within the Guideline itself. Moreover, it is clear that the Commission did not purposefully limit that SOC only to more traditional categories of firearms (e.g., a weapon that can expel a projectile by the action of an explosive) because firearms silencers *are* explicitly included in section 921(a)(3). There is no rational argument for increasing a defendant's Guidelines for possessing 200 silencers but not doing so for the possession of 200 machinegun conversion devices.

## II. The SOC for Trafficking in Firearms Applies.

The evidence at trial proved beyond a reasonable doubt that the defendants conspired to transfer thousands of unregistered machinegun conversion devices to their paying customers. Therefore, the SOC in USSG § 2K2.1(b)(5) is applicable under the unambiguous definition of "trafficking in firearms." *See Dupree*, 57 F.4th at 1274-75. "Trafficking" is commonly defined as "the act of buying or selling usually illegal goods." *Trafficking Definition*, Merriam-Webster.com, https://www.merriam-webster.com/legal/trafficking (last visited August 30, 2023). To claim that the defendants' conduct did not constitute trafficking, by its plain language, would defy logic. For Ervin's part, his Auto Key Cards business was his sole source of income. The jury convicted Ervin and Hoover of conspiring over a period of many months to transfer unlawful machinegun conversion devices, and the evidence at trial showed that Ervin filled approximately 1900 orders for the devices

10

during that period. In other words, this was an ongoing, high-volume, illicit operation.

Nevertheless, even under the definition of "trafficking" in the application notes to the guidelines, the defendants' conduct necessitates application of the SOC. As set forth in the pre-*Dupree* case *United States v. Asante*, 782 F.3d 639, 643 (11th Cir. 2015), USSG § 2K2.1(b)(5) applies under the standard set forth in Application Note 13 when "the defendant 1) transported or transferred, or received with the intent to transport, two or more firearms to someone else; 2) knowing that the defendant's conduct would result in another's unlawful possession, use or disposal of those firearms." *See also United States v. Harris*, 719 F. App'x 946, 950 (11th Cir. 2018) (commentary to § 2K2.1(b)(5) requires a showing by the preponderance of the evidence that "defendant knew or had reason to believe that the transfer of firearms was to an individual who 'intended to use or dispose of the firearm unlawfully.'" (quoting § 2K2.1(b)(5) comment n.13(A)(ii)(II))); *United States v. James*, 752 F. App'x 805, 808 (11th Cir. 2018) (second element of trafficking enhancement requires proof "that the defendant had reason to know that he was transferring the firearms to . . . [an] individual [who] intended to use or dispose of the firearms unlawfully" (citing *Asante*, 782 F.3d at 643-44 )); *United States v. Grinnage*, 309 F. App'x 334, 336, (11th Cir. 2009) (firearms trafficking enhancement "requires that a defendant (1) transfer two or more firearms to an individual . . . (2) with knowledge or reason to believe that the individual 'intended to use or dispose of the firearms unlawfully'" (quoting USSG § 2K2.1 commentary)). The court may consider all of the surrounding

11

circumstances known to the defendant in determining whether the defendant was engaged in firearms trafficking. *United States v. Morrobel*, 754 F. App'x 867, 870 (11th Cir. 2018) (citing *Asante*, 782 F.3d at 644); *James*, 752 F. App'x at 808-09 (court considers "not what actually happened to the firearms, but instead to the circumstances known to the defendant" in determining trafficking enhancement (citing *Asante*, 782 F.3d at 644)).

Here, the defendants clearly transferred two or more firearms, satisfying the first prong of the application notes test.

The evidence introduced at trial proved that the defendants specifically marketed the auto sears to, *inter alia*, individuals who were prohibited from possessing firearms. For example, in defendant Hoover's November 4, 2020, video entitled "Is This an ATF Trap and How Does It Work" (Trial Ex. 1) – his first video advertising the Auto Key Card – he described the "options" for individuals to "experience full auto." One such option was the "zero fuck [sic] given" category, which Hoover described as follows:

> This would apply to a prohibited person because a prohibited person – when they say you can't have gun rights anymore, that doesn't mean you can't have guns. What that means is your chains have been broken. You can do whatever the hell you want with a gun. You can drill your third hole. Do whatever you want 'cause it doesn't matter. If you get caught with the gun anyway, you're already screwed. So why not do whatever you want with it. You make a machine gun.

Hoover followed this description with an advertisement for the Auto Key Card, which he recommended the purchaser have sent not to their own home address, but

12

rather that of an "anti-gun relative[]." Additionally, Hoover not only provided instructions for using it to convert an AR-15 into a machinegun but also encouraged his viewers to do so. Hoover also encouraged his viewers to buy multiple Auto Key Cards to share and redistribute to others, stating that he himself had "bought a pile of them for stocking stuffers." The evidence at trial further showed that Ervin watched this video and was well aware of how Hoover was marketing the Auto Key Card, and the video resulted in substantially increased attention and sales. *See, e.g.*, Trial Ex. 60 at p. 10-11. Ervin and Hoover, of course, continued to conspire to advertise and transfer Auto Key Cards in the ensuing months. It is also undisputed that Ervin and Hoover did not conduct background checks on the individuals who purchased the auto sears. According to data presented at trial, Ervin completed approximately 1900 sales transactions of Auto Key Cards in the course of the conspiracy. For his part, Ervin advised at least two customers that "illegal use can occur" with the Auto Key Card, and that "[i]ndividuals may make the choice to use it in a different way under certain dire circumstances in the future." Trial Ex. 67e, 67f.

Given the express marketing of Auto Key Cards to prohibited persons by Hoover, that they were sold with the express purpose that they be used to make an illegal machinegun, the large number of transactions fulfilled by Mr. Ervin, and all of the other circumstances in this case, the defendants "knew or had reason to believe that [they] transferred firearms to someone who intended to use them" for criminal purposes. *Morrobel*, 754 F. App'x at 870 (finding no clear error where district court applied trafficking enhancement based upon evidence that defendant "sold several

13

firearms with silencers or large capacity magazines, one of which was stolen and one of which had a defaced serial number," and engaged in multiple transactions with the same buyer, and therefore had reason to believe that the purchaser intended to use the firearms for criminal purposes).

Additionally, Ervin mailed packages containing Auto Key Cards to Hoover so that Hoover could use them for giveaways. Thus Ervin also meets the second prong because he transferred the firearms to Hoover knowing that Hoover intended to dispose of them unlawfully as part of a "giveaway" by transferring them – unregistered – to winners of the "giveaway." Hoover repeatedly urged his viewers to use "discrete ordering" and to have the cards mailed to a third party to avoid detection by law enforcement. At trial, two witnesses – Osso and Alderson – testified that they had engaged in Hoover's "discrete ordering" process wherein Alderson paid Osso a nominal amount to place a mail order for a 3-in-1 Auto Key Card (containing etchings for 3 auto sears) on Alderson's behalf. Osso received the Auto Key Card in the mail and then disposed of the Auto Key Card to Alderson, knowing that Alderson intended to cut it out to convert his AR-15 into a machinegun. Ervin, for his part, encouraged this ordering process by providing a mail in order form on his website and plainly was aware that Hoover was advocating this ordering process.

Therefore, under the applicable preponderance of the evidence standard, *see United States v. Askew*, 193 F.3d 1181, 1183 (11th Cir. 1999) ("The Government bears the burden of establishing by a preponderance of the evidence the facts necessary to

14

support a sentencing enhancement."), the United States has more than adequately established that the defendants transferred more than two or more firearms, and that they had reason to believe that their conduct would result in possession of the firearms by prohibited persons, as well as the transfer of a firearm to an individual who intended to use or dispose of the firearm unlawfully. The SOC in § 2K2.1(b)(5) therefore would necessarily apply under either the pre- or post-*Dupree* interpretation of "trafficking."

### III.  Upward Departures are warranted under Sections 2K2.1 and 5K2.0.

If the Court decides that the commentary definition of "firearm" controls and that the number-of-firearms and trafficking enhancements do not apply, it should depart and/or vary upward to account for the large number of auto sears manufactured, marketed, and sold by Ervin and Hoover. *See Hixson*, 624 F. Supp. 3d at 941–42 (varying upward because the guidelines range calculated without the SOCs "woefully underrepresents the seriousness of the offenses [because] the range completely ignores the Glock switches, which Congress has defined as machineguns"). The Probation Office notes this clear and obvious grounds for an upward departure and/or variance in Hoover's PSR at paragraphs 107-09 and Ervin's PSR at 118-20, but only to the extent of the upper limit of the chart in 2K2.1(b)(1) – that is, 10 levels for "200 or more" firearms.

For the sake of clarity:  if this Court rules that the SOCs do not apply to these defendants' conduct, the government requests an upward departure under § 5K2.0(a)(1)(A) because "there exists an aggravating circumstance . . . of a kind, or

15

to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines" that must be corrected to fulfill the statutory purposes of sentencing. *See also* USSG § 5K2.0(a)(3) (departure may be warranted where a circumstance taken into account by the Guidelines is present to a degree that is substantially in excess of what is ordinarily involved in the offense).

In this case, departing upward by 10 levels for the number of firearms involved is insufficient, and the guidelines support this conclusion. Section 2K2.1's commentary provides that an upward departure may be warranted where "the number of firearms substantially exceeded 200." USSG § 2K2.1 n.11(A). 6600 firearms are, obviously, substantially more than 200. In reviewing the SOC's "Number of Firearms" table in § 2K2.1(b)(1), the number of firearms approximately double or triple for each additional two points added. Extrapolating this chart out, 200-599 firearms might merit a 10-level increase; 600-1799 firearms might merit a 12-level increase; 1800-5399 firearms might merit a 14-level increase; and 5400-16,199 firearms might merit a 16-level increase – that is the category into which this case falls. As further aggravation, all 6600 firearms involved in this case were NFA weapons – a separate ground for an upward departure, according to the commentary. USSG § 2K2.1 n.11(B). Therefore, an offense level of 38 – taking into account the BOL of 18; a 10-level increase under the SOC for the quantity of firearms; a 4-level increase under the SOC for trafficking in firearms; and a 6-level upward departure to account for the extremely large quantity of firearms involved, and that every one of them was an NFA weapon – represents the appropriate offense level in this case.

16

Similarly, if the Court rules that the SOCs do apply to these defendants' conduct, the United States requests the 6-level upward departure to account for the large number of NFA firearms, resulting in the same offense level of 38.

Finally, if the Court rules that the SOCs do not apply <u>and</u> does not upwardly depart, and adopts the range calculated by Probation in the initial PSRs, the United States requests that the Court upwardly vary in order to impose a sentence that is sufficient, but not greater than necessary, to serve the goals of sentencing in 18 U.S.C. § 3553(a).  An upward variance in this scenario would be necessary to reflect the seriousness of the offense, provide a just punishment, protect the public from further crimes of these defendants, and provide specific and general deterrence.  For all of the reasons discussed herein, the United States submits that an upward variance to a sentence within the range recommended by an offense level of 38 would be sufficient, but not greater than necessary, to achieve the statutory purposes of sentencing.  The United States will further address the § 3553(a) factors at the sentencing hearing.

## **CONCLUSION**

This case involves exceptionally dangerous conduct, of especially large scope, by defendants who believe their actions in flouting the laws of this country were

justified and even heroic.   A substantial sentence is necessary and appropriate to achieve the statutory purposes of sentencing.

          Respectfully submitted,

          ROGER B. HANDBERG
          United States Attorney


By:   *s/ Laura Cofer Taylor*
      LAURA COFER TAYLOR
      Assistant United States Attorney
      USAO No. 170
      300 North Hogan Street, Suite 700
      Jacksonville, Florida   32202-4270
      Telephone:  (904) 301-6300
      Facsimile:   (904) 301-6310
      E-mail:  laura.c.taylor@usdoj.gov


      *s/ David B. Mesrobian*
      DAVID B. MESROBIAN
      Assistant United States Attorney
      USAO No. 188
      300 North Hogan Street, Suite 700
      Jacksonville, Florida   32202-4270
      Telephone:  (904) 301-6300
      Facsimile:   (904) 301-6310
      E-mail:  david.mesrobian@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2023, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Alex King, Esq.
Zachary Z. Zermay, Esq.
Matthew Larosiere, Esq.

/s/ *Laura Cofer Taylor*
LAURA COFER TAYLOR
Assistant United States Attorney