UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CASE №: 3:21-cr22(S2)-MMH-MCR

UNITED STATES OF AMERICA,

v.

MATTHEW RAYMOND HOOVER.

_______________________________________________/

**DEFENDANT MATTHEW RAYMOND HOOVER'S SENTENCING MEMORANDUM**

While Defendant respectfully disagrees with the conclusions of the jury and this honorable court, he recognizes that he stands convicted of several serious offenses. What's concerning, though, is the government's attempt to depart from the guidelines to convert an already potentially multi-year sentence to a multi-decade sentence for a man who stands convicted of *talking about laser etchings on a homogenous piece of steel*.

This is not to detract from the fact that the jury found that such homogenous pieces of steel were "a combination of parts," Defendant understands this is not the time to raise that issue again, but it does shine light on just how incredibly far Defendant's conduct is from the "heartland" of cases contemplated by the applicable guidelines.

Perhaps unintentionally highlighting the extreme disparity between the convictions here at issue and the gun crime heartland, the government points to the horrific slaying of 60 human beings in the 2017 Las Vegas massacre. Defendant feels at least two counterpoints are necessary to address the inappropriateness of this allusion drawn by the state: One, that "[t]here are no identifiable victims in these offenses", Doc. 314, ¶ 46; and two, the 2017 massacre did not involve a machinegun, although that didn't stop the government from familiarly insisting otherwise. *See Cargill v. Garland*, 57 F. 4th 447 (5th Cir. 2023) (Holding that the rule of lenity precluded the enforcement of an administrative rule manufacturing a new category of machineguns, and that legislation was the only way to ban bump stocks).

## I. § 2K2.1 Does Not Support Greater than A Base Level of 12

The government spills no shortage of ink on suggesting that Defendant's conduct should be subject to an enhancement for both trafficking and in the number of firearms. This error is most easily explained by a failure to grasp that §5845(a) "firearms" include things that both are and are not firearms both in common parlance and the § 921(a)(3) context, which is much closer to the common use of the term. Following the logic of other cases, and of the PSR, § 2K2.1(a)(5) does not apply, making the base level 12 under § 2K2.1(a)(7), and potentially 6 given no dangerous use of firearms occurred, reducing the level to 6. U.S.S.C. § 2K2.1(b)(2).

The government cites *Unites States v. Hixon* to support both its argument for a 10-point enhancement, and for an upwards deviation. 624 F.Supp.3d 930 (N.D. Illinois, W. Div, 2022). This is because it is the only published case counsel are aware of even purporting to address § 2K2.1 in the context of a machinegun conversion device. *Hixon* dealt with a repeat felonious offender's sale and distribution of "Glock switches," which are designed solely and exclusively to convert a Glock-style handgun into a machine pistol, while the defendant was on parole. *Even there*, where the district court felt the defendant had "a propensity for criminal conduct, often very serious criminal conduct[,]" *id.* at 941, it still refused to contort § 2K2.1 the way the government there requested, as it does here. The *Hixon* defendant base level was 20 under § 2K2.1 because it involved a prohibited possessor with a firearm capable of accepting a large capacity magazine, *not* because of § 2K2.1(a)(5). That isn't the case here.

There is a much simpler, cleaner analysis here: the word "firearm" on its own is plainly ambiguous, hence why the guidelines provide a specific definition. Federal law has multiple divergent definitions of a firearm. It does not stand to reason that we abandon this reality in the context of § 2K2.1 to avoid looking at the comments which clearly solve the ambiguity. The firearms targeted by § 2K2.1—§ 921(a)(3) firearms—are instruments that have a capacity to project force. The operative part of the guidelines firearm definition

is "any **weapon** [] which will or is designed to [] expel a projectile by the action of an explosive". In serving as an enhancement under the guidelines, § 2K2.1(a)(5) points to a "firearm that is described in 26 U.S.C. § 5845(a)". The government would have this court delete the comment defining firearm and re-write § 2K2.1(a)(5) to "'firearm' as defined in 26 U.S.C. § 5845(a)". Doing such would render § 2K2.1(b)(3) mere surplusage, as the guidelines refer to specific § 5845(a) "firearms" in later sections—all of which are § 921(a)(3) firearms—and to ignore this would violate the canon of *expressio unius est exclusio alterius*. The guidelines drafters knew how to reference federal law—it very clearly does so in the comments, in a way which resolves this issue in a clean and logical manner. § 2K2.1(a)(5) applies where the offense involved a § 921(a)(3) firearm that fits the §5845(a) definition of firearm—that being various concealable firearms, actual machineguns (which fire projectiles through the action of an explosive), silencers, and destructive devices. Not things that *potentially could become* or *potentially could be installed* into a § 921(a)(3) firearm.

The reason § 2K2.1 does not apply here is as simple as it is logical, "the relevant guideline clearly intended to punish innocent possession and use of a firearm less severely, and *improper use* more severely." *U.S. v. Jones*, 158 F.3d 493, 501 (10th Cir. 1998) (emphasis added). The relevant part of the guideline refers to firearms as we would understand them in common parlance—the §

921(a)(3) firearms—because of their acute capacity to project force, and cause harm if used improperly. This is obvious from the guidelines, the comments, and numerous citing decisions. *See* U.S.S.G. § 2K2.1 (referring to violence four times in the first subsection).

The convicted conduct here at issue is far from the heartland of machinegun cases, and far from §921(a)(3) firearms. For that reason, a base level of 6 is as high as the guidelines contemplate.

## II. Instant Circumstances Warrant a Downward Departure

As Congress recognized in the Sentencing Reform Act, "it is difficult to prescribe a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision." Hence, flexibility to permit "individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices." 28 U.S.C. § 991(b)(1)(B).

In accordance with §5K2.0, a court may depart from the applicable guideline range if it finds a mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration . . . in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." This departure provision reflects the fact that the guidelines are designed to account for offenses that fall in the "heartland" of the offense type, but that conduct or circumstances

may make an individual offense fall outside of that "heartland." USSG Ch.1, Pt.A(1)(4)(b).

As previously alluded, the underlying conduct at issue couldn't be further from the "heartland" of machinegun cases and gun crime. "[T]he purpose of Firearms Act, of which § 5861 is a part, is to go after crime weapons," not tchotchkes or cards into which were allegedly etched a design. See *U.S. v. Vest*, 448 F. Supp. 2d 1002, 1014 (S.D. Ill. 2006). As this Court wrote in its Order Denying Defendant's Motion for Judgment of Acquittal "[w]hether Defendants transferred a "combination of parts" may not have been obvious in this particular case." Doc. 310. This case is also far from *Hixon*, where the defendant was openly selling machinegun conversion devices, while on parole for a separate felony. Defendant knows that this is not the stage to re-litigate whether or not the Auto Key Card was a machinegun, but it serves §5K2.0's purpose to point out that firearms law is in an incredible state of flux, and a reasonable person *could be* confused as to whether the underlying items were regulated at all.[1]

While "not ordinarily relevant," the Commentary to §5H1.6 suggests that a departure for family ties and responsibilities is warranted in special

[1] Defendant feels it necessary to highlight **regulated**, as machineguns are not, and never have been **prohibited**, as the government contends without citation.

circumstances like those here at bar, where Defendant's daughter is suffering acute episodes in addition to the loss of the familial figurehead, this, taken into account with the relative seriousness of the offense conduct and the innocence of the affected family, may justify a downward departure to avoid "a substantial, direct, and specific loss" of essential caretaking and financial support to the defendant's family.

Additionally, Defendant Hoover was not shy about his involvement with Auto Key Cards and his sponsorship relationship with his co-defendant. Much of trial time was spent reviewing Defendant's public statements, and he was open with law enforcement about his involvement with co-defendant. Of course, this is because Defendant did not believe he was in violation of the law, but his conduct in being open and cooperative certainly falls within the spirit of §5K2.16, which further justifies a downward deviation.

Most importantly, Hoover is far from the parolee repeat offender in *Hixson*. He has no significant criminal history whatsoever, and if his conduct can be described as anything within the guidelines, it would certainly be "aberrant behavior" under §5K2.20. The §5K2.20 factors are met because 1) Defendant did not significantly plan or obfuscate anything, largely because he did not believe he was violating the law, 2) only accepted the sponsorship for a limited time, and 3) the conduct "represents a marked deviation by the defendant from an otherwise law-abiding life."

## III. Application of 18 U.S.C. § 3553(a) to the Record Before the Court Demonstrates that there Should be a Downward Departure from the Guidelines

As this Court is aware, there are several factors to be considered when imposing a sentence on a defendant. *See, e.g., United States v. Ortiz-Pérez*, 30 F.4th 107, 112 (1st Cir. 2022) ("It is the sentencing court's prerogative—indeed, its duty—to 'draw upon [its] familiarity with a case, weigh the factors enumerated in [section] 3553(a), and custom-tailor an appropriate sentence.'"(alterations in original) (quoting *United States v. Flores-Machciote*, 706 F.3d 16, 20 (1st Cir. 2013))). When the Court weighs all the factors and reviews the character and history of the man and the crime to tailor the appropriate sentence, it will see that Defendant should be released based on credit for the time served. His offense was making YouTube videos to advertise a tchotchke.

### *1) The Nature And Circumstances of The Offense And The History And Characteristics Of The Defendant*

The Nature and Circumstances Defendant's YouTube Advertisements, at worst constituted a fringe, edge-case violation of the National Firearms Act. Given the nature and circumstances of Defendant's offense, *i.e.*, making and publishing YouTube videos that advertised the Auto Key Card, this factor supports mitigation of his sentence."[T]he purpose of Firearms Act, of which § 5861 is a part, is to go after crime weapons," not tchotchkes or cards into which

purported auto sears were etched. *See U.S. v. Vest*, 448 F. Supp. 2d 1002, 1014 (S.D. Ill. 2006). As this Court wrote in its Order Denying Defendant's Motion for Judgment of Acquittal (ECF 310) "[w]hether Defendants transferred a "combination of parts" may not have been obvious in this particular case." As trial, there was no evidence, testimony, or argument of counsel that the Auto Key Cards were "crime weapons," *i.e.*, used in the commission of any colloquial crime (like murder, robbery, or assault) as opposed to being conversation pieces that were then not registered on the National Firearms Registration and Transfer Record. At most, Defendant's crime was advertising an item that the jury found technically violated the NFA. "It does not appear that this statute was designed to criminalize [YouTubers] even if they may be guilty of mere technical violations." *Vest*, 448 F. Supp. 2d at 1011. This is far and away from the run-of-the-mill federal gun crime that involves violence, drugs, or human trafficking. (*Contra* ECF 313 P. 1 at n.1) (the Government describing the Las Vegas Massacre where 60 people were violently murdered). His sentence should be accordingly reduced to reflect the fringe, edge case nature of his technical violation of our federal code.

Defendant and his persona on his YouTube Channel CRS Firearms are separate and distinct. One reflects his everyday demeanor and respect for the law while the other pays the bills by way of selling advertising space on his channel and producing entertaining videos. The substance of Defendant's

conduct before his arrest, while awaiting trial, and during trial reflects that a downward variance is warranted. *See United States v. Huckins*, 529 F.3d 1312, 1319 (10th Cir. 2008) (affirming downward variance based on defendant's lack of significant criminal history, depression at the time of the offense, lack of repeat offending post-arrest, significant self-improvement while waiting to be prosecuted, and because the defendant was 20 years old when he committed the crime).

First, Defendant's previous criminal history constituted one instance of possession of marijuana back in 2006 (when he was merely 22 years old). ECF 314 at P. 14. He has depression, suffers from panic attacks, and was otherwise experiencing hardship from being a working man in rural Wisconsin struggling to make a living in the midst of an unprecedented global pandemic. *Id.* at P. 16 – 17 ("Before being a content creator on YouTube, the defendant worked as a truck driver (2012 through 2021) for Mike's Trucking, his father's business. He left the trucking industry to become a content creator. He earned .36 cents per mile."). Furthermore, he did not violate the conditions of his pre-trial release, and otherwise did not offend again after he was arrested.

Moreover, the PSI demonstrates that Defendant's current incarceration is negatively impacting his family, *i.e.*, resulting in his daughter—who has autism—to have "frustrated outbursts" since her father was remanded into custody. *See* ECF 314 at P. 15; *United States v. Lehmann*, 513 F.3d 805, 806,

809 (8th Cir. 2008) (affirming downward variance where the court found that a prison sentence would negatively affect the defendant's disabled young son).

2) *the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;*

As the Court hinted, this is an edge case given that "[w]hether Defendants transferred a "combination of parts" may not have been obvious in this particular case[,]" the sentence needs to reflect that it took an empaneled "jury [to find] that Defendants went too far and, rather than transferring mere art they were, in fact, transferring a combination of machinegun parts." (ECF 310 P. 21 – 22). The novel nature of the Government's prosecution of Defendant resulted in a jury finding that Defendant technically violated the National Firearms Act by way of advertising the Auto Key Card on YouTube. Given this, the Court should look to the proportionality principle when imposing a sentence, *i.e.*, the punishment should fit the crime. *See e.g.* J Feinbe*rg, Doing and Deserving: Essays in the Theory of Responsibility* (Princeton, NJ: Princeton University Press 1974) ("'[T]he degree of disapproval expressed by the punishment should "fit" the crime . . . in the . . . sense that the more serious crimes should receive stronger disapproval than the less serious ones.'").

With the proportionality principle in mind, given the character of Defendant's violation, the seriousness of the offense factor supports a downward variance of his sentence. Further, such a result would promote

respect for the law. Given the sizable media attention to this case, and the Government's unprecedented attempts to squelch speech and censor third parties who were covering these proceedings and criticizing the United States Attorney's Office, (ECF 296) the Court would send a message that while we live in a nation that follows the rule of law, given 18 U.S.C. § 3553(a) and Eighth Amendment, we do not "throw the book" at defendants in fringe cases where reasonable minds can, and manifestly do, differ.

3) *to afford adequate deterrence to criminal conduct; to protect the public; and to provide the defendant with cost effective treatment*

The deterrence factor also supports mitigation of Defendant's sentence and a downward variance. This case presents a rather unique fact pattern. Defendant advertised the Auto Key Card, which is a singular piece of stainless steel with a drawing of an auto sear on it. An empaneled jury found it was a combination of parts designed and intended to convert a weapon to fire automatically, and therefore, the advertisements constituted a NFA violation because the Auto Key Cards were not registered in the NFRTR. As a result of the jury determination, the message to not sell items like it has been heard loud and clear, and has been echoed by the media. Defendant will not attempt to promote or sell the Auto Key Card, or other items like it after these proceedings (whether he is released from confinement in days or years). And

the public is generally now on notice that the Auto Key Card, and similar items, can land them in deep trouble.

Defendant respectfully submits that similar logic applies to the "protect the public" factor. It should be noted that Defendant has not been accused of injuring any person by way of violence or fraud. There are no colloquial victims that suffered a concrete particularized injury as opposed to a general technical violation of the statute by way of his advertisements of the Auto Key Card. *See Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1242 (11th Cir. 2022) ("A 'bare statutory violation' is not enough, no matter how beneficial we may think the statute to be.") *citing TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207, 210 L. Ed. 2d 568 (2021) ("[W]e cannot treat an injury as 'concrete' for Article III purposes based only on Congress's say-so."). Defendant was not a danger and is not a violent or dangerous person. Thus, this factor falls squarely in his favor. And as to cost effective treatment for Defendant, he respectfully submits that the tax payer's dollars could better be served by not having him remanded into federal custody.

4) *the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines*

According to the guidelines, with a properly calculated offense level of 6 or 12, there is a wide range of options for this honorable court to select from, including parole, probation, supervised release, and the time he has already

served. *See*, *e.g.*, *United States v. Ruff*, 535 F.3d 999, 1001, 1003 (9th Cir. 2008) (affirming variance to one day of imprisonment plus three years' supervised release with a condition of twelve months and one day served at a corrections center that would permit the defendant to participate in work release, receive counseling, and make visits to his young son).

5) *any pertinent policy statement issued by the Sentencing Commission*

"Although the [g]uidelines range is one of seven factors listed in § 3553(a), it is far more than that. A defendant's [g]uidelines range is 'the starting point and initial benchmark' of sentencing, and 'a district court should begin all sentencing proceedings by correctly calculating the applicable [g]uidelines range." *United States v. Burris*, 29 F.4th 1232, 1237 (10th Cir. 2022). "As a matter of administration and to secure nationwide consistency, the [g]uidelines should be the starting point and the initial benchmark" but courts must "consider all of the § 3553(a) factors" and "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49 – 50 (2007)

In accordance with §5K2.0, a court may depart from the applicable guideline range if it finds an aggravating or mitigating circumstance "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." This departure provision reflects the fact that

the guidelines are designed to account for offenses that fall in the "heartland" of the offense type, but that conduct or circumstances may make an individual offense fall outside of that "heartland." USSG Ch.1, Pt.A(1)(4)(b). "[T]he purpose of Firearms Act, of which § 5861 is a part, is to go after crime weapons," not tchotchkes or cards into which were allegedly etched a design. *See U.S. v. Vest*, 448 F. Supp. 2d 1002, 1014 (S.D. Ill. 2006). As this Court wrote in its Order Denying Defendant's Motion for Judgment of Acquittal (ECF 310) "[w]hether Defendants transferred a "combination of parts" may not have been obvious in this particular case." Because this case involves a YouTuber who advertised an item that was not obviously a NFA item (and therefore technically needed to be registered), this case is *far* outside of the heartland of a typical case.

Furthermore, §5K2.20 which is the Aberrant Behavior Policy Statement applies. The court may depart downward under this policy statement if the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life. Apart from a very minor instance involving marijuana in 2006. is the first time that Defendant has been on the wrong side of the law. As it played out at trial, the Auto Key Card affair was not cold-blooded or otherwise significantly planned out. Moreover, it did not last a

number of years—it was limited in scope and duration. And finally, it certainly is a marked deviation from Defendant's law-abiding life insofar that he scored a zero for his criminal history score. This is the first time he has been in trouble of this nature. For those reasons, the Court should apply this factor in supporting a downward departure from his guidelines sentence.

Indeed, the downward departure for the voluntary disclosure of the offense also applies to this case. (§5K2.16). Defendant told his local ATF Agent Miguel A. Ruiz about the Auto Key Card before he started advertising them. And he quite literally published everything pertaining to the Auto Key Card on the Internet for everyone (the Government included) to see. While Defendant respectfully disagrees with the jury's ultimate conclusion that his actions constituted a crime, he has taken responsibility for his actions, *i.e.*, advertising the Auto Key Card. The Court should apply this downward departure factor in support of mitigation of his sentence.

*6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct*

This is a novel case with unique facts. Defendant is unaware of defendants with similar records who have been found guilty of violating the NFA by way of advertising a product like the Auto Key Card. Respectfully, because of all of the arguments *supra* regarding how this is most likely the first type of prosecution of this nature, *i.e.*, the Government brought criminal

charges against a defendant YouTuber for advertising an item that was not on the National Firearms Registry, this factor tends to support a downward variance of Defendant's sentence to distinguish his violation from crimes that are in the heartland of NFA violations—like use of crime weapons to facilitate colloquial criminal activity. *See U.S. v. Vest*, 448 F. Supp. 2d 1002, 1014 (S.D. Ill. 2006) ("[T]he purpose of Firearms Act, of which § 5861 is a part, is to go after crime weapons," not tchotchkes or cards into which purported auto sears were etched.)

*7) the need to provide restitution to any victims of the offense.*

At the bottom, there are no victims in this case—let alone any that have suffered any concrete particularized injury such that they are entitled to restitution from Defendant. *See Hunstein v. Preferred Collection & Mgmt. Servs.*, Inc., 48 F.4th 1236, 1242 (11th Cir. 2022) ("The reason it matters whether Hunstein has alleged a concrete harm, rather than simply a statutory violation, is that federal courts have limited jurisdiction. Under the Constitution, we only have power to resolve "Cases" and "Controversies." U.S. Const. art. III, § 2.") *citing TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200, 210 L. Ed. 2d 568 (2021) ("To have Article III standing to sue in federal court, plaintiffs must demonstrate, among other things, that they suffered a concrete harm. No concrete harm, no standing."). This factor supports a downward variance in Defendant's sentencing.

## CONCLUSION

For all of the reasons heretofore stated, Defendant believes that the time he has already served in the county detention center satisfies §3553(a). Beyond that, any further sentence need not be beyond supervised release.

DATED: September 1, 2023

*/s/Zachary Z. Zermay*______
Zachary Z. Zermay, Esq.
1762 Windward Way
Sanibel, FL 33957
Email: zach@zermaylaw.com
Telephone: 239-699-3107
*Lead Counsel for Defendant*

*/s/Matthew Larosiere*______
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 1, 2023 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/Zachary Z. Zermay*______
Zachary Z. Zermay, Esq.